ORAL ARGUMENT REQUESTED

No. 19-3318

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

WESLEY IRA PURKEY,

*Petitioner-Appellant*,

*v.*

UNITED STATES OF AMERICA, et al.,

*Respondents-Appellees*.

On Appeal from the United States District Court
for the Southern District of Indiana, No. 19 Civ. 414
Before the Honorable Judge James P. Hanlon

## BRIEF FOR PETITIONER-APPELLANT

REBECCA E. WOODMAN
ATTORNEY AT LAW, L.C.
1263 W. 72nd Terrace
Kansas City, MO 64114
(785) 979-3672

MICHELLE M. LAW
ASSISTANT FEDERAL PUBLIC DEFENDER
WESTERN DISTRICT OF MISSOURI
901 St. Louis Street, Suite 801
Springfield, MO 65806
(417) 873-9022

ALAN E. SCHOENFELD
STEPHANIE SIMON
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

December 20, 2019

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 19-3318

Short Caption: Purkey v. Warden of USP Terre Haute

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervener or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐   **PLEASE CHECK HERE IS ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Wesley Ira Purkey

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Rebecca E. Woodman, Attorney at Law, L.C.

(3)   If the party, amicus or intervener is a corporation:

   i)      Identify all its parent corporations, if any; and
         N/A

   ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervener's stock:
         N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
   N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
   N/A

Attorney's Signature: /s/ Alan E. Schoenfeld                    Date: December 6, 2019

Attorney's Printed Name:  Alan E. Schoenfeld

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** ☑   **No** ☐

Address:  Wilmer Cutler Pickering Hale & Dorr LLP, 250 Greenwich Street, 7 World Trade Center, New York, NY 10007

Phone Number: (212) 937-7294                    Fax Number:  (212) 230-8888

E-Mail Address: alan.schoenfeld@wilmerhale.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 19-3318

Short Caption: Purkey v. Warden of USP Terre Haute

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervener or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IS ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Wesley Ira Purkey

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Rebecca E. Woodman, Attorney at Law, L.C.

(3)   If the party, amicus or intervener is a corporation:

   i)      Identify all its parent corporations, if any; and

     N/A

   ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervener's stock:

     N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Stephanie Simon     Date: December 6, 2019

Attorney's Printed Name: Stephanie Simon

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐   **No** ☑

Address: Wilmer Cutler Pickering Hale & Dorr LLP, 250 Greenwich Street, 7 World Trade Center, New York, NY 10007

Phone Number: (212) 937-7210     Fax Number: (212) 230-8888

E-Mail Address: stephanie.simon@wilmerhale.com

rev. 12/19 AK

Case: 19-3318    Document: 7    Filed: 12/18/2019    Pages: 1

**Save As**    **Clear Form**

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 19-3318

Short Caption: Purkey v. Warden of USP Terre Haute

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Wesley Ira Purkey

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Wilmer, Cutler, Pickering, Hale and Dorr LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and
N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: /s/Rebecca E. Woodman    Date: December 18, 2019

Attorney's Printed Name: Rebecca E. Woodman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [ ]    **No** [✔]

Address: Rebecca E. Woodman, Attorney at Law, L.C., 1263 W. 72nd Ter., Kansas City, Missouri 64114

Phone Number: (785) 979-3672    Fax Number:

E-Mail Address: rewlaw@outlook.com

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 19-3318

Short Caption: Purkey v. Warden of USP Terre Haute

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervener or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐  **PLEASE CHECK HERE IS ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Wesley Ira Purkey

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Wilmer, Cutler, Pickering, Hale and Dorr LLP

(3)    If the party, amicus or intervener is a corporation:

   i)      Identify all its parent corporations, if any; and
   N/A

   ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervener's stock:
   N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: /s/ Michelle M. Law          Date: December 18, 2019

Attorney's Printed Name:  Michelle M. Law

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address:  Michelle M. Law, Assistant Federal Public Defender, 901 East St. Louis Street, Suite 801, Springfield, Missouri 65806

Phone Number: (417) 873-9022          Fax Number: (417) 873-9038

E-Mail Address: Michelle_Law@fd.org

rev. 12/19 AK

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION ............................................................................................1

JURISDICTIONAL STATEMENT ..................................................................4

STATEMENT OF THE ISSUES......................................................................5

STATEMENT OF RELATED CASES AND PROCEEDINGS ...........................5

STATEMENT OF THE CASE..........................................................................6

      A.     Factual Background.............................................................6

      B.     Statutory Background.........................................................11

      C.     Procedural Background ......................................................12

SUMMARY OF ARGUMENT .........................................................................15

STANDARD OF REVIEW ..............................................................................18

ARGUMENT ..................................................................................................18

THE SAVINGS CLAUSE APPLIES TO MR. PURKEY'S PETITION ...................................18

      A.     The Principles Of *Martinez* And *Trevino* Require
            Application Of The Savings Clause To Federal Prisoners .................18

      B.     Ineffective Assistance Of § 2255 Counsel Deprived Mr.
            Purkey Of A Reasonable Opportunity To Test The
            Fundamental Legality Of His Conviction And Sentence....................24

CONCLUSION...............................................................................................30

CERTIFICATE OF COMPLIANCE

CIRCUIT RULE 30(d) CERTIFICATION

ADDENDUM

CERTIFICATE OF SERVICE

**TABLE OF AUTHORITIES**

**CASES**

Page(s)

*Atkins v. Virginia*, 536 U.S. 304 (2002).................................................................19

*Brown v. Brown*, 847 F.3d 502 (7th Cir. 2017) ................................................17, 24, 25

*Chazen v. Marske*, 938 F.3d 851 (7th Cir. 2019) .......................................................18

*Choice Hotels International, Inc. v. Grover*, 792 F.3d 753 (7th Cir. 2015).................21

*Coleman v. Thompson*, 501 U.S. 722 (1991)..................................................................2

*Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013) ........................................................24

*Fulks v. Krueger*, 2019 WL 4600210 (S.D. Ind. Sept. 20, 2019)...........................12

*Galbraith v. United States*, 313 F.3d 1001 (7th Cir. 2002) ......................................18

*Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001) ..........................................12, 19, 20

*Hunley v. Godinez*, 975 F.2d 316 (7th Cir. 1992).....................................................8, 25

*In re Davenport*, 147 F.3d 605 (7th Cir. 1998)..........................................12, 18, 20

*Light v. Caraway*, 761 F.3d 809 (7th Cir. 2014) ...................................................13, 18

*Lombardo v. United States*, 860 F.3d 547 (7th Cir. 2017) .........................14, 22, 23

*Martinez v. Ryan*, 566 U.S. 1 (2012) .............................................................*passim*

*Ramirez v. United States*, 799 F.3d 845 (7th Cir. 2015)..................................*passim*

*Sanders v. Norris*, 529 F.3d 787 (8th Cir. 2008) ...................................................8, 25

*Shepherd v. Krueger*, 911 F.3d 861 (7th Cir. 2018)..............................................11, 16

*Smith v. Phillips*, 455 U.S. 209 (1982) ........................................................................8

*Strickland v. Washington*, 466 U.S. 668 (1984) ....................................10, 17, 24, 25

*Trevino v. Thaler*, 569 U.S. 413 (2013)..............................................................2, 3, 21

*United States v. Frost*, 125 F.3d 346 (6th Cir. 1997) .................................................26

*United States v. Lee*, 2014 WL 1093197 (E.D. Ark. Mar. 18, 2014), ....................22

*United States v. Medina*, 430 F.3d 869 (7th Cir. 2005) ............................................25

*United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005) ...............................................9

*United States v. Sheppard*, 742 F. App'x 599 (3d Cir. 2018) ................................22

*Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) ...............................................*passim*

*Wiggins v. Smith*, 539 U.S. 510 (2003) ........................................................................9

*Williams v. Florida*, 465 U.S. 1109 (1984) ..............................................................28

*Wilson v. Mazzuca*, 570 F.3d 490 (2d Cir. 2009) .....................................................28

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ................................................9, 28

*Workman v. Superintendent Albion SCI*, 915 F.3d 928 (3d Cir. 2019) ..................24

## DOCKETED CASES

*In re Federal Bureau of Prisons' Execution Protocol Cases*, No.
19A615 (U.S.).....................................................................................................13

*In the Matter of the Federal Bureau of Prisons' Execution Protocol
Cases*, No. 19-5322 (D.C. Cir.) ..................................................................5, 13

*Roane v. Barr*, No. 19-mc-145 (D.D.C.) ...............................................................5, 13

*United States v. Purkey*, No. 01 Cr. 308 (W.D. Mo.) ............................................7, 9

## STATUTES AND RULES

18 U.S.C. § 1201 ............................................................................................................6

28 U.S.C.
§ 1291 ..................................................................................................................5
§ 1331 ..................................................................................................................5
§ 2241 ........................................................................................................*passim*
§ 2253 ..................................................................................................................4
§ 2254 ..............................................................................................3, 21, 22, 23
§ 2255 ........................................................................................................*passim*

Federal Rule of Civil Procedure 60 ...................................................................14, 22

Cir. R. 22 ......................................................................................................................4

## OTHER AUTHORITIES

United States Department of Justice, Press Release No. 19-807,
*Federal Government to Resume Capital Punishment After
Nearly Two Decade Lapse* (July 25, 2019),
https://www.justice.gov/opa/pr/federal-government-resume-
capital-punishment-after-nearly-two-decade-lapse ......................................12

Rose, David, *Death row: the lawyer who keeps losing*, The Guardian
(Nov. 24, 2016), https://www.theguardian.com/world/
2016/nov/24/death-row-the-lawyer-who-keeps-losing ....................................1

**INTRODUCTION**

Wesley Ira Purkey is incarcerated on federal death row at the United States Penitentiary at Terre Haute, following his conviction and sentence in the Western District of Missouri. Though entitled under the United States Constitution to the effective assistance of counsel, Mr. Purkey has been denied that right throughout his prosecution and postconviction proceedings. At his criminal trial, Mr. Purkey was represented by Frederick Duchardt, who is single-handedly responsible for more clients sentenced to death in the federal system than any other attorney. Rose, *Death row: the lawyer who keeps losing*, The Guardian (Nov. 24, 2016).

Mr. Duchardt failed to represent Mr. Purkey adequately during the guilt phase of his trial. In particular, Mr. Duchardt advised Mr. Purkey to concede, at a suppression hearing, that he had transported the victim across state lines, thereby establishing federal jurisdiction, and also failed to challenge a juror whose similarity to Mr. Purkey's alleged victim presented a substantial risk of bias. Mr. Duchardt was similarly deficient at the penalty phase, where he failed to investigate and present critical mitigating evidence concerning the horrific abuse Mr. Purkey had experienced as a child, as well as his history of mental illness.

In his initial motion under 28 U.S.C. § 2255, filed on October 16, 2007 in the Western District of Missouri, Mr. Purkey again received ineffective assistance. Like his trial counsel, Mr. Purkey's § 2255 counsel failed to investigate his case

properly; as a result, § 2255 counsel failed to bring the ineffective assistance of trial counsel claims Mr. Purkey presses now. In particular, counsel failed to raise claims in connection with the biased juror or the damaging concession and failed to investigate mitigating evidence that trial counsel did not adequately develop or present.

The Supreme Court's holdings in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), "significantly changed [the Supreme Court's] approach to claims of ineffective assistance of counsel at initial-review collateral proceedings." *Ramirez v. United States*, 799 F.3d 845, 848 (7th Cir. 2015). *Martinez* considered the Court's prior holding in *Coleman v. Thompson*, that "attorney error that led to the default of [a] claim[] in state court cannot constitute cause to excuse the default in federal habeas," 501 U.S. 722, 757 (1991). That case "left open … whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 8.

While *Martinez* did not hold that prisoners are constitutionally entitled to effective counsel in collateral proceedings, the Court found it necessary to "modify" *Coleman*'s holding "[t]o protect prisoners with a potentially legitimate claim of ineffective assistance of trial counsel," and "recogniz[ed] a narrow exception" that "[i]nadequate assistance of counsel at initial-review collateral

proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 9. Thus, in *Martinez*, the Court held that where a state prisoner must wait until collateral-review proceedings to bring ineffective assistance of trial counsel claims, a court may hear a procedurally-barred ineffective assistance claim pursuant to 28 U.S.C. § 2254 where "counsel in [collateral-review] proceedings was ineffective." *Id.* at 17.

In *Trevino*, the Supreme Court held that the rule announced in *Martinez* applies even where the applicable procedural framework "makes it highly unlikely in a typical case," even if not strictly impossible, "that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." 569 U.S. at 429.

Then, in *Ramirez*, this Court recognized that *Martinez* and *Trevino* (which directly addressed claims by state prisoners under § 2254) apply equally to motions brought by federal prisoners under § 2255. *See* 799 F.3d at 854. That is so, this Court explained, "[b]ecause the federal courts have no established procedure … to develop ineffective assistance claims for direct appeal," and thus "the situation of a federal petitioner is the same as the one the Court described in *Trevino*: as a practical matter, the first opportunity to present a claim of ineffective assistance of trial or direct appellate counsel is almost always on collateral review, in a motion under section 2255." *Id.* at 853.

*Martinez*, *Trevino*, and *Ramirez* compel the conclusion that a prisoner in Mr. Purkey's position can challenge his conviction under 28 U.S.C. § 2241. Where, as here, the prisoner received ineffective assistance of counsel in connection with a motion under § 2255, that statute is "inadequate or ineffective to test the legality" of the prisoner's conviction or sentence, and the savings clause at § 2255(e) is triggered to permit the prisoner to file a petition for a writ of habeas corpus under § 2241. Accordingly, the district court's refusal to hear Mr. Purkey's § 2241 petition was error. The Court should vacate the decision below and remand for further proceedings on the merits of Mr. Purkey's claims.

## JURISDICTIONAL STATEMENT

Mr. Purkey seeks review of the district court's November 20, 2019 order denying his petition for a writ of habeas corpus under 28 U.S.C. § 2241. Supp.App. 1-29.[1] Mr. Purkey timely filed a Notice of Appeal on November 22, 2019. Dist. Ct. ECF No. 78.[2] Because the appeal is from a § 2241 petition, there is no Certificate of Appealability ("COA") requirement, and none is attached hereto. *See* 28 U.S.C. § 2253(c)(1)(A)-(B) (requiring a COA for habeas proceedings challenging state court convictions and final orders in § 2255 proceedings); Cir. R.

---

[1]     All citations to "Supp.App." refer to Petitioner-Appellant's Supplemental Appendix, attached hereto.

[2]     Citations in the brief to the proceedings in *Purkey v. United States*, No. 19 Civ. 414 (S.D. Ind.) are cited as "Dist. Ct. ECF No." unless otherwise referenced.

22(h)(3) (requiring attachment of COA to a stay of execution or, in the alternative, an explanation for why the COA is not attached). The district court had jurisdiction over Mr. Purkey's petition under 28 U.S.C. §§ 1331 and 2241(a). This Court has jurisdiction to hear this appeal under 28 U.S.C. §§ 1291 and 2241(a).

## STATEMENT OF THE ISSUES

Whether under *Martinez*, *Trevino*, and *Ramirez*, an individual sentenced to death who received ineffective assistance of counsel in connection with his § 2255 petition—and for that reason did not have an adequate opportunity to raise claims regarding the ineffective assistance of trial counsel—may file a petition for a writ of habeas corpus under § 2241 raising for the first time Sixth Amendment claims that directly challenge the reliability of his conviction and sentence.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Mr. Purkey is a plaintiff in a lawsuit pending in the U.S. District Court for the District of Columbia, challenging the lethal injection protocol the federal government proposes to use in conducting his execution. *Roane v. Barr*, No. 19-mc-145 (D.D.C.). On November 20, 2019, the district court granted a preliminary injunction barring Mr. Purkey's execution (as well as the executions of three other federal inmates scheduled to be executed), *Id.*, ECF No. 51; an appeal from that injunction is currently pending before the D.C. Circuit Court of Appeals. *In the Matter of the Fed. Bureau of Prisons' Protocol Cases*, No. 19-5322 (D.C. Cir.).

- 5 -

**STATEMENT OF THE CASE**

**A.      Factual Background**

Mr. Purkey was charged in the U.S. District Court for the Western District of Missouri on one count of kidnapping a minor resulting in death, in violation of 18 U.S.C. § 1201.  Supp.App. 3.  The charge stemmed from the 1998 kidnapping, rape, and murder of Jennifer Long in Kansas City.  Supp.App. 2.  Mr. Purkey was represented by Mr. Duchardt, who was assisted at times by Laura O'Sullivan.  Supp.App. 4.  Among other failings, counsel did not investigate and present critical mitigation evidence, failed to challenge a presumptively biased juror for cause, and failed to move to exclude certain of Mr. Purkey's testimony given during a suppression hearing.

Before Mr. Purkey was indicted, he told investigators that he had transported Ms. Long across state lines from Kansas City, Missouri to Lansing, Kansas against her will.  App. 1547, 1552.[3]  He said this not because it was true, but because he hoped to be prosecuted in the federal system and was aware that this admission would confer federal jurisdiction over his case.[4]  *See* App. 1549-1550.  Mr. Purkey

---

[3]      All citations to "App." refer to the Appendix filed with Mr. Purkey's § 2241 petition in the district court.  Dist. Ct. ECF No. 23.

[4]      Mr. Purkey has consistently maintained that he did not transport Ms. Long against her will and believed her to be a prostitute who agreed to accompany him. App. 1552; Supp.App. 82.

did not understand at the time that federal prosecutors could seek the death penalty.

In advance of his trial, Mr. Purkey challenged the voluntariness of this pre-indictment statement—he argued that he made the statement because he understood that he could receive an offer of a life sentence from federal prosecutors. Motion to Suppress, *United States v. Purkey*, No. 01 Cr. 308 (W.D. Mo.), ECF No. 19. At a subsequent suppression hearing, Mr. Duchardt advised Mr. Purkey that he needed to adopt his prior statement that he had kidnapped Ms. Long, even though his defense at trial was to be that he had not transported Ms. Long against her will. App. 1552. Mr. Duchardt told Mr. Purkey that repeating his prior assertion that he had in fact kidnapped Ms. Long would corroborate the point that he had made this statement involuntarily in exchange for a lighter sentence. However, Mr. Purkey ultimately testified on cross-examination that his pre-indictment statement was, in fact, true. App. 1504. Counsel did nothing to cure this testimony and did not bother to seek to exclude it from the trial.

During jury selection for Mr. Purkey's trial, counsel failed to object to the selection of a juror whose striking similarities to the victim constituted a clear basis for a challenge for cause. App. 1170-1171. Juror 13 disclosed not only that she had been the victim of an attempted rape at the same age as the victim, but also that she even shared the victim's first name. App. 1742. Mr. Duchardt failed to strike this juror, even though bias may be presumed where a juror's experiences

are similar to the facts underlying the alleged offense.  *See, e.g.*, *Smith v. Phillips*, 455 U.S. 209, 221-224 (1982) (O'Connor, J., concurring); *Hunley v. Godinez*, 975 F.2d 316, 319 (7th Cir. 1992) ("[C]ourts have presumed bias in cases where the prospective juror has been the victim of a crime … similar to the one at issue in the trial."); *Sanders v. Norris*, 529 F.3d 787, 791-792 (8th Cir. 2008).  The case proceeded to trial with Juror 13 empaneled.  App. 1538.

At trial, Mr. Purkey testified that he did not kidnap Ms. Long.  Trial Tr. Vol. VII 934:11-935:8, 950:4-11.[5]  The prosecution used Mr. Purkey's testimony from the suppression hearing—that he had kidnapped Ms. Long—to impeach him.  App. 2455.  Ms. O'Sullivan made no attempt to allow Mr. Purkey to explain why he made this statement before his indictment and why he repeated it at the suppression hearing.  Mr. Purkey was convicted on November 5, 2003.  Supp.App. 3.

The case then proceeded to the penalty phase, during which Mr. Duchardt again failed to meet the minimum professional standards for counsel in a capital case.  Mr. Duchardt did not adequately develop the record of the unrelenting mental, physical, and sexual abuse by his parents, teachers, and clergy that Mr. Purkey endured throughout his childhood, his history of traumatic head injury, and his extensive history of substance abuse, despite the critical importance of such

---

[5]     All citations to "Trial Tr. Vol." refer to the transcripts from Mr. Purkey's criminal trial.  Dist. Ct. ECF Nos. 28-45.

mitigating evidence to the penalty phase of a capital trial. *See Woodson v. North Carolina*, 428 U.S. 280, 304 (1976); *Wiggins v. Smith*, 539 U.S. 510, 524-525 (2003). Counsel did not hire a dedicated mitigation expert despite asking the court for funding for one. App. 2115-2116, 2129. Instead, he hired a personal friend as a fact investigator and asked him to conduct the mitigation investigation, even though the friend lacked the specialized qualifications required of a mitigation expert for a capital case. App. 1182, 1188-1190, 1194, 1438. While counsel presented numerous witnesses during the penalty phase—including a Bureau of Prisons doctor, fellow inmates from Mr. Purkey's incarcerations in state prisons, family members, a psychologist, and a psychiatrist—the jurors did not hear critical evidence of Mr. Purkey's post-traumatic stress diagnosis and his extraordinary history of trauma. Trial Tr. Vol. XI 1406:22-1407:8, 1449:20-1450:5, 1468:19-1469:9; Trial Tr. Vol. XII 1577:13-25; Trial Tr. Vol. XIV 1738:3-17; Trial Tr. Vol. XV 1840:16-1841:2.

A jury voted to sentence Mr. Purkey to death, and on January 23, 2004, the court imposed that sentence. Judgment, *United States v. Purkey*, No. 01 Cr. 308 (W.D.Mo.), ECF No. 506. Mr. Purkey appealed his conviction—while still represented by Mr. Duchardt—and the Eighth Circuit affirmed. *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005).

In 2007, Mr. Purkey timely filed a motion in the U.S. District Court for the Western District of Missouri for relief pursuant to § 2255. App. 1546-1601. During his collateral attack, Mr. Purkey was represented by new counsel, Teresa Norris and Gary Brotherton ("§ 2255 counsel").[6] App. 1598-1599. They raised a limited set of ineffective-assistance claims based on an unreasonably narrow investigation. *See* App. 1551-1596. In particular, despite the importance of the evidence of Mr. Purkey's history of trauma and mental illness, they did not hire any new experts to examine him.

Without holding an evidentiary hearing, the district court concluded Mr. Purkey had not met his burden under either the deficient-performance or prejudice prongs of *Strickland v. Washington*, 466 U.S. 668 (1984). Supp.App. 69-79. In so holding, the district court relied heavily on a 117-page sworn affidavit from Mr. Duchardt that affirmatively advocated against Mr. Purkey's claims and offered numerous false claims regarding the investigation and trial. *See id.* The Eighth Circuit affirmed. Supp.App. 30-45.

---

[6]     Mr. Brotherton has since been suspended from the practice of law by the Missouri Supreme Court. App. 1544.

**B.     Statutory Background**

This case turns on when the "Savings Clause" of 28 U.S.C. § 2255 is triggered such that a federal prisoner may challenge his confinement under 28 U.S.C. § 2241, the federal habeas corpus statute.

As a general rule, a federal prisoner who wishes to attack his conviction or sentence must do so by motion brought pursuant to § 2255(a) in the federal district where he was sentenced.  *Shepherd v. Krueger*, 911 F.3d 861, 862 (7th Cir. 2018) ("Section 2255 is by far the primary route for federal prisoners to challenge the lawfulness of their convictions and sentences."), *cert. denied*, 139 S. Ct. 1582 (2019).  A "second or successive motion" is generally not permitted, unless the movant can point to either (1) "newly discovered evidence" that would undermine his conviction, or (2) a new, retroactive "rule of constitutional law … that was previously unavailable."  28 U.S.C. § 2255(h).

However, the Savings Clause, codified in § 2255(e), creates an exception to the bar on successive habeas applications where "it … appears that the remedy by motion [under § 2255] is inadequate or ineffective to test the legality of his detention."  Under those circumstances, a federal prisoner may file a petition for a writ of habeas corpus under § 2241 in the federal district where he is confined. *See, e.g.*, *Shepherd*, 911 F.3d at 862; *Webster v. Daniels*, 784 F.3d 1123, 1135-1139 (7th Cir. 2015).

Under this Circuit's precedents, the Savings Clause applies when there is "some kind of structural problem with section 2255," *Webster*, 784 F.3d at 1136, based on "something more than a lack of success with a § 2255 motion," *id.*, such that the prisoner "had no reasonable opportunity to obtain earlier judicial correction of a fundamental defect in his conviction or sentence," *In re Davenport*, 147 F.3d 605, 611 (7th Cir. 1998). This Court has held that the Savings Clause applies where a prisoner's claim is based on (i) a change in statutory law made retroactive by the Supreme Court, *Davenport*, 147 F.3d at 611; (ii) a decision of another tribunal, handed down after a prisoner exhausted his direct appeal and § 2255 motion, that "was literally impossible for him to … raise[]" during prior appeals, *Garza v. Lappin*, 253 F.3d 918, 923 (7th Cir. 2001); or (iii) "new evidence [that] would reveal that the Constitution categorically prohibits a certain penalty," *Webster*, 784 F.3d at 1139. This Court has never ruled that these are the only circumstances in which the Savings Clause might apply. *Fulks v. Krueger*, 2019 WL 4600210, at *14 (S.D. Ind. Sept. 20, 2019) ("The Seventh Circuit has never held that the Savings Clause is only met in the specific circumstances in which it has so found.").

## C.     Procedural Background

On July 25, 2019, the U.S. Department of Justice announced that it would resume executions after a 16-year hiatus. DOJ, Press Release No. 19-807, *Federal*

*Government to Resume Capital Punishment After Nearly Two Decade Lapse* (July

25, 2019). Mr. Purkey's execution date was set for December 13, 2019.[7] On

August 27, 2019, Mr. Purkey filed a petition for a writ of habeas corpus in the U.S.

District Court for the Southern District of Indiana pursuant to § 2241, asserting,

among other things, that he had received ineffective assistance of counsel during

his trial that formed the basis for his conviction and sentence, as counsel failed to

strike a biased juror, failed to present critical mitigation evidence, and improperly

advised him to provide inculpatory testimony during a suppression hearing.[8]

On November 20, 2019, the district court denied Mr. Purkey's application.

The court explained that this Court has recognized only three circumstances in

which the Savings Clause permits a petition under § 2241 as set forth in

---

[7]     Mr. Purkey's execution date has been stayed pursuant to a preliminary injunction entered by the U.S. District Court for the District of Columbia in a lawsuit challenging the legality of the Department of Justice's lethal injection protocol. *Roane v. Barr*, No. 19-mc-145, ECF No. 50. The D.C. Circuit denied the government's request for a stay of that injunction pending appeal, *In the Matter of the Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19-5322, ECF No. 1818236, as did the Supreme Court, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19A615, (Dec. 6, 2019). The injunction is on appeal to the D.C. Circuit.

[8]     The government argued below that Mr. Purkey's petition should have been filed in the district of conviction—the Western District of Missouri—and that his decision to file in the Southern District of Indiana was the product of calculated forum shopping. Dist. Ct. ECF No. 49 at 47-50. This is not at all the case. Mr. Purkey is proceeding under § 2241, which requires that petitions be brought "in the district of incarceration[.]" *Light v. Caraway*, 761 F.3d 809, 812 (7th Cir. 2014).

*Davenport*, *Garza*, and *Webster*.  Supp.App. 10-14.  It concluded that Mr. Purkey's petition did not fit into any of the circumstances recognized in those cases.  Supp.App. 15-16.

The district court next considered and rejected Mr. Purkey's argument that the Supreme Court's decisions in *Martinez* and *Trevino* require application of the Savings Clause if the prisoner received ineffective counsel in his § 2255 proceeding.  The district court concluded that, because neither *Martinez* nor *Trevino* "involve the Savings Clause," they "are not controlling."  Supp.App. 21-23.  The court found that that *Ramirez* confined its holding to "'federal prisoners who bring motions for postconviction relief *under section 2255*,'" and reasoned that *Ramirez* does not support application of *Martinez*'s holding to the Savings Clause because *Ramirez* dealt with a motion under Federal Rule of Civil Procedure 60(b) for relief from the judgment on an initial motion under § 2255.  Supp.App. 21 (quoting *Ramirez,* 799 F.3d at 852) (emphasis in district court opinion).  Relying on *Lombardo v. United States*, 860 F.3d 547, 559 (7th Cir. 2017), the district court explained that *Ramirez* has been construed narrowly by the Seventh Circuit.  Supp.App. 22.  The district court did not directly address the argument that, notwithstanding the different procedural posture, *Ramirez* militates in favor of extending *Martinez* and *Trevino* to the Savings Clause.

The district court further found that even if *Martinez* and *Trevino* applied to § 2241 petitions, they would not permit Mr. Purkey's petition to go forward. Supp.App. 23-25. The court reasoned that Mr. Purkey's petition did not raise the "'something more'" required for the Savings Clause to apply because his petition merely sought to "second-guess the selection of the claims that were asserted in the § 2255 action [or] pick new or 'better' claims[.]" Supp.App. 24. The court cited the history of § 2255 and its prohibition against "'repetitive filings'" and maintained that, because applying *Martinez* and *Trevino* would, in the court's view, affect more than "a very small category of cases," they must not apply to petitions under § 2241. Supp.App. 25-26 (citation omitted). On this basis, the court held that Mr. Purkey's petition was "barred by the Savings Clause." Supp.App. 27-28. It did not rule on the merits of Mr. Purkey's claims for relief.

## SUMMARY OF ARGUMENT

The district court erred in holding that the Savings Clause does not permit Mr. Purkey to proceed under § 2241.

*First*, it was error for the district court to hold that *Martinez* and *Trevino* have no application to this case. In *Ramirez*, this Court held that the principle articulated in *Martinez* and *Trevino* is equally applicable to federal prisoners who bring motions for postconviction relief under § 2255. *See* 799 F.3d at 853. This Court explained that "[b]ecause the federal courts have no established procedure

- 15 -

… to develop ineffective assistance claims for direct appeal, the situation of a federal petitioner is the same as the one the Court described in *Trevino*: as a practical matter, the first opportunity to present a claim of ineffective assistance of trial … is almost always on collateral review, in a motion under section 2255." *Id.* While *Ramirez* arose under Rule 60(b) and did not address the Savings Clause directly, its holding—that *Martinez* and *Trevino* apply to motions brought under § 2255—did not turn on the procedural posture of Ramirez's motion.

It necessarily follows that a federal prisoner who received ineffective assistance of counsel during his initial § 2255 proceeding, and who was thus denied a reasonable opportunity to present his claim that he received ineffective assistance of counsel at his original trial, must be permitted to file a petition for a writ of habeas corpus under § 2241. *See Webster*, 784 F.3d at 1136 (Section 2255 is inadequate where it deprives a prisoner of "'a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence.'"). By design, § 2241 steps into the shoes of § 2255 where § 2255 is "inadequate or ineffective" to test the legality of a prisoner's conviction or sentence. *See Shepherd*, 911 F.3d at 862. And because *Martinez* recognized that a prisoner must have effective postconviction counsel in order to vindicate the right to the effective assistance of *trial* counsel, it follows that § 2255 is "ineffective or

insufficient" to test the legality of the movant's conviction or sentence where § 2255 counsel were themselves ineffective.

*Second*, it was also error for the district court to hold that "[t]here is no structural problem with § 2255 when applied to the facts of Mr. Purkey's case." Supp.App. 23-24. Because § 2255 bars "second or successive" motions, except in limited circumstances not applicable here, it does not provide any mechanism for any court to review the ineffective assistance of trial counsel claims that Mr. Purkey's § 2255 counsel failed to raise. Because "counsel in [his § 2255] proceeding was ineffective," *Martinez*, 566 U.S. at 17, Mr. Purkey has not had "'a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence,'" *Webster*, 784 F.3d at 1136. Mr. Purkey's § 2255 counsel overlooked critical arguments about the constitutional ineffectiveness of his trial counsel, failed to investigate and present Mr. Purkey's extensive history of intense psychological trauma, and relied on false statements by Mr. Purkey's trial counsel. Mr. Purkey's § 2255 counsel did not meet an objective standard of reasonableness, resulting in actual prejudice to Mr. Purkey through the default of his substantial claims of ineffective assistance of trial counsel. *Strickland*, 466 U.S. at 688; *Brown v. Brown*, 847 F.3d 502, 513 (7th Cir. 2017). Section 2255 is, therefore, structurally inadequate to test the legality of Mr. Purkey's conviction and sentence.

**STANDARD OF REVIEW**

This Court reviews "the denial of [a] habeas petition *de novo*, and all of the district court's factual determinations for clear error." *Light v. Caraway*, 761 F.3d 809, 812 (7th Cir. 2014); *see also Galbraith v. United States*, 313 F.3d 1001, 1006 (7th Cir. 2002).

**ARGUMENT**

**THE SAVINGS CLAUSE APPLIES TO MR. PURKEY'S PETITION**

**A.     The Principles Of *Martinez* And *Trevino* Require Application Of The Savings Clause To Federal Prisoners**

This Court has already recognized the core principles that establish why *Martinez* and *Trevino* trigger application of the Savings Clause to permit a federal prisoner to file a petition under § 2241.[9]

In *In re Davenport*, this Court held that the Savings Clause applies when a federal prisoner "had no reasonable opportunity to obtain earlier judicial correction of a fundamental defect in his conviction or sentence[.]" 147 F.3d 605, 611 (7th Cir. 1998). There, the court found § 2255 inadequate to test the legality of a

---

[9]     The district court correctly applied Seventh Circuit law to decide the jurisdictional question of whether Mr. Purkey may proceed under § 2241. Supp.App. 9; *see also Chazen v. Marske*, 938 F.3d 851, 856 (7th Cir. 2019) (applying Seventh Circuit law to decide whether the Savings Clause permitted a prisoner to file a petition under § 2241).

- 18 -

conviction where the petitioner's claim turned on a retroactively applied change in statutory law after his initial § 2255 motion.

Several years later, in *Garza v. Lappin*, this Court held that the petitioner could proceed under § 2241 where the Inter-American Commission on Human Rights determined that Garza's sentence "violat[ed] international human rights norms to which the United States had committed itself" because the trial court admitted evidence regarding five uncharged murders Garza allegedly committed in Mexico. 253 F.3d 918, 920 (7th Cir. 2001). Because the Commission's decision was rendered after Garza exhausted all of his appeals, it was "literally impossible for [Garza] to have raised" this subsequent finding "in his direct appeals or in his first § 2255 motion," and because the decision did not present new evidence, it did not provide a basis for a second § 2255 motion. *Id.* at 923.

More recently, in *Webster v. Daniels*, this Court held that the Savings Clause permitted a § 2241 petition based on evidence that the Constitution prohibited the petitioner's sentence. 784 F.3d 1123, 1139 (7th Cir. 2015). There, the prisoner presented newly discovered evidence—that was available before trial but that had not been discovered—showing that he was intellectually disabled and thus unable to be executed under *Atkins v. Virginia*, 536 U.S. 304 (2002).

*Davenport*, *Garza*, and *Webster* collectively confirm that the Savings Clause must come into play where, "as a structural matter," claims asserting a

fundamental defect in a conviction or sentence "cannot be entertained by use of the 2255 motion." *Webster*, 784 F.3d at 1139; *accord Garza*, 253 F.3d at 923; *Davenport*, 147 F.3d at 611. Put differently, in each case, the prisoner could not possibly have raised in a direct appeal or initial § 2255 motion the impact of a new law, later judicial finding, or new evidence that arose *after* those avenues of appeal were exhausted.

Like in *Davenport*, *Garza*, and *Webster*, § 2255 is structurally inadequate to resolve Mr. Purkey's ineffective assistance of trial counsel claims. Because the federal system does not permit claims of ineffective assistance of counsel to be raised on direct appeal, and because of the deficient performance of Mr. Purkey's § 2255 counsel, it was "literally impossible," *Garza*, 253 F.3d at 923, for Mr. Purkey to have raised these ineffectiveness claims during those proceedings. Having been denied the adequate and effective resolution of those claims during his § 2255 proceedings, it follows that the Savings Clause applies, and that Mr. Purkey ought to be permitted to proceed under § 2241.

This follows unavoidably from the Supreme Court's decisions in *Martinez* and *Trevino*. *Martinez v. Ryan* held that where "claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there

was no counsel or counsel in that proceeding was ineffective." 566 U.S. 1, 17 (2012). The Court recognized that a prisoner unaided by an "adequate attorney" "will have … difficulties vindicating a substantial ineffective-assistance-of-trial-counsel claim" as these "require investigative work and an understanding of trial strategy." *Id.* at 11. In *Trevino v. Thaler*, the Court extended this reasoning to cases where the "state procedural framework … makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." 569 U.S. 413, 429 (2013).

In *Ramirez v. United States*, this Court recognized that "[t]he same principles apply in both the section 2254 and the section 2255 contexts" such that application of *Martinez* in one setting demands its application in the other. 799 F.3d 845, 854 (7th Cir. 2015); *cf. Choice Hotels Int'l, Inc. v. Grover*, 792 F.3d 753, 755 (7th Cir. 2015) (observing that Supreme Court decisions concerning abandonment by counsel should apply equally "to all collateral litigation under 28 U.S.C. § 2254 or § 2255"). The *Ramirez* Court correctly recognized that "neither *Martinez* nor *Trevino* suggested that, for these purposes, the difference between sections 2254 and 2255 was material," and held that, under the reasoning of *Trevino*, *Martinez* applied equally to federal prisoners. 799 F.3d at 854 ("[T]he situation of a federal petitioner is the same as the one that the Court described in *Trevino*: as a practical matter, the first opportunity to present a claim of ineffective

assistance of trial … is almost always on collateral review, in a motion under section 2255.").

The district court erred in holding that *Ramirez* ought to be confined to motions under Rule 60(b) to reopen an initial motion under § 2255. Nothing in *Ramirez* suggests that it must be so narrowly construed. More to the point, the *Ramirez* Court's conclusion that the "difference between sections 2254 and 2255" is not "material"—such that the holdings of *Martinez* and *Trevino* "apply to some or all federal prisoners who bring motions for postconviction relief under section 2255"—did not turn on the procedural posture of Ramirez's Rule 60(b) motion. *See Ramirez*, 799 F.3d at 852-854.[10]

The district court also incorrectly relied on *Lombardo v. United States*, 860 F.3d 547 (7th Cir. 2017), to find that "*Ramirez* has been construed narrowly by the

---

[10]    The Third Circuit's non-precedential opinion in *United States v. Sheppard*, 742 F. App'x 599 (3d Cir. 2018) (discussed at Supp.App.23), is not to the contrary. There, the Third Circuit held that a *Martinez* claim "may" be brought by a federal prisoner using a motion under Rule 60(b) and that, where such a motion may be brought, "[s]ection 2255 together with Rule 60(b) … is not inadequate or ineffective to test the legality" of a conviction or sentence. 742 F. App'x at 601-602. *Sheppard* did not decide whether *Martinez*'s holding may be applied outside the context of a Rule 60(b) motion, and thus does not address the question presented in this appeal. Nor did *Sheppard* grapple with the limitations of motions under Rule 60(b) or address the application of the Savings Clause where such a motion is unavailable. *United States v. Lee*, 2014 WL 1093197, at *5-6 & n.5 (E.D. Ark. Mar. 18, 2014) (declining to extend *Martinez* to a motion under Rule 60(b) where there was no procedural default below), *aff'd*, 792 F.3d 1021, 1024-1025 (8th Cir. 2015).

Seventh Circuit to the facts involving abandonment of counsel." Supp.App. 22. In fact, *Lombardo* acknowledged that *Ramirez* "embrac[ed] … the principles underlying [*Martinez* and *Trevino*]" and did not disturb its holding that those cases apply with equal force in the § 2254 and § 2255 contexts. 860 F.3d at 558-559. *Lombardo* simply declined to extend *Ramirez*'s reasoning to the equitable tolling context, which would require the panel in that case to "overturn our own precedent" on equitable tolling. *Id*. at 559.

Because *Martinez* and *Trevino* apply to federal prisoners seeking relief under § 2255, it follows that they permit a federal prisoner to file a petition under § 2241 where he can show that the ineffectiveness of his § 2255 counsel denied him a reasonable opportunity to challenge a fundamental defect in his sentence or conviction. *Martinez* and *Trevino*, as applied in the federal system, entitle federal prisoners to raise ineffective assistance of trial counsel claims that they did not raise during initial collateral-review proceedings because their counsel in those proceedings were ineffective. *See Ramirez*, 799 F.3d at 854. By definition, these claims cannot be vindicated on direct appeal or during an initial motion under § 2255, and they do not independently present a basis for a second, successive petition under § 2255(h). Herein lies the "structural problem" in § 2255: a prisoner who had a valid Sixth Amendment claim, but whose ineffective § 2255 counsel failed to present that claim, will never get judicial consideration of that claim

because he has already filed one motion under § 2255.  Section 2255 is thus "inadequate or ineffective to test the legality of [the prisoner's] detention," and the Savings Clause at § 2255(e) applies.

**B.    Ineffective Assistance Of § 2255 Counsel Deprived Mr. Purkey Of A Reasonable Opportunity To Test The Fundamental Legality Of His Conviction And Sentence**

Mr. Purkey's § 2241 petition demonstrates that the ineffective assistance of his § 2255 counsel prevented him from raising substantial claims of ineffective assistance of trial counsel during his first collateral proceeding.  *Martinez*, 566 U.S. at 9.

*Martinez* applies where initial-review collateral counsel was "ineffective under the standards of *Strickland v. Washington*.  *Martinez*, 566 U.S. at 14.  In such cases, this Circuit and others have required the petitioner to show (1) "deficient performance by counsel on collateral review as required under the first prong of the *Strickland* analysis," and (2) "[a]ctual resulting prejudice," which "can be established with a substantial claim of ineffective assistance of trial counsel that would otherwise have been deemed defaulted."  *Brown v. Brown*, 847 F.3d 502, 513 (7th Cir. 2017) (citing *Strickland*, 466 U.S. at 687; *Detrich v. Ryan*, 740 F.3d 1237, 1245-1246 (9th Cir. 2013) (en banc)); *see also Workman v. Superintendent Albion SCI*, 915 F.3d 928, 939 & n.34 (3d Cir. 2019) (noting approval and applying the "view shared by the Seventh and Ninth Circuits" citing

*Brown* and *Detrich*). A "substantial" underlying claim for ineffective assistance is one that "has some merit." *Martinez*, 566 U.S. at 14. Those elements are easily established here.

Mr. Purkey's § 2255 counsel committed three errors that "fell below an objective standard of reasonableness" and thus constitute deficient performance. *See Strickland*, 466 U.S. at 688. These errors resulted in the default of what would have otherwise been substantial claims of ineffective assistance by trial counsel. *See Brown*, 847 F.3d at 513.

*First*, § 2255 counsel failed to discover Juror 13's disclosure on a jury questionnaire that she herself had been the victim of an attempted rape at the same age as Jennifer Long. Because § 2255 counsel was entirely unaware of this issue, Mr. Purkey's § 2255 petition did not include a claim of ineffective assistance based on trial counsel's failure to adequately examine Juror 13 during voir dire or to challenge her empanelment on the basis of inherent bias. Courts have presumed bias in just such cases, where a juror or prospective juror "has been the victim of a crime or has experienced a situation similar to the one at issue in the trial." *Hunley v. Godinez,* 975 F.2d 316, 319 (7th Cir. 1992); *see also United States v. Medina*, 430 F.3d 869, 878 (7th Cir. 2005) (noting the rare circumstances that support a finding of implied bias "involve crimes very closely related to the ones at issue in the trials in which the jurors are sitting"); *Sanders v. Norris,* 529 F.3d 787, 793 (8th Cir. 2008)

(observing that "[s]ome courts have implied bias in circumstances that have the "'potential for substantial emotional involvement,'" but concluding "there is no evidence that [the juror] or those close to him had been victims of violent crime or had any other life experience that was similar to the facts of [defendant's] case") (quoting *United States v. Frost*, 125 F.3d 346, 379-380 (6th Cir. 1997)).  Mr. Purkey's ineffective assistance claim with respect to trial counsel on this issue is undoubtedly substantial, as it has at least "some merit."  *Martinez*, 566 U.S. at 14. There is also at least a "reasonable probability" that § 2255 counsel's failure to discover this source of implied bias affected the outcome of Mr. Purkey's first *habeas* petition.

*Second*, § 2255 counsel failed to raise an ineffective assistance claim based on trial counsel's actions (and inactions) related to Mr. Purkey's suppression hearing testimony.  As explained, at the suppression hearing, trial counsel advised Mr. Purkey to adopt his pre-indictment statement to investigators that he took Ms. Long across state lines against her will.  The aim of the suppression hearing was to show that this statement was given involuntarily in exchange for a lighter sentence in federal court.  Mr. Purkey's testimony adopting his untruthful pre-indictment statement enabled the prosecution to impeach Mr. Purkey's trial testimony with his suppression-hearing testimony.  Trial counsel then failed to move to exclude the testimony from the trial and failed to object when the Government improperly

argued the truth of the statement during closing argument, even though counsel knew that Mr. Purkey maintained that Ms. Long accompanied him willingly. Because § 2255 counsel did not raise this argument, it has never been considered by a court.

*Third*, § 2255 counsel failed to investigate and present during the guilt phase of the trial the wealth of non-cumulative mitigating evidence from Mr. Purkey's life-long history of trauma and physical, emotional, and sexual abuse. Section 2255 counsel ignored important leads, limiting their investigation to scant few witnesses and focusing exclusively on sexual abuse inflicted by Mr. Purkey's mother. This unreasonably narrow scope is likely due in part to the fact that § 2255 counsel failed only belatedly hired a mitigation specialist, who then had just two months to compile evidence before the deadline for Mr. Purkey's § 2255 petition. The district court rejected what little mitigating evidence was presented by § 2255 counsel on the basis that it was cumulative. However, the full weight of mitigating evidence (including a family history of, and genetic vulnerability to, PTSD, substance abuse, and addiction, as well as a vulnerability to violence in the context of posttraumatic stress and intoxication) has never been considered by a court.[11] Counsel's failure to investigate during collateral proceedings is of

---

[11] A detailed explanation of Mr. Purkey's trauma history is set forth in his petition under § 2241. Dist. Ct. ECF No. 23 at 13-82, 131-135.

particular concern because "[i]neffective-assistance claims often depend on evidence outside the trial record." *Martinez*, 566 U.S. at 13. A "lack of desire to uncover the truth" qualifies as deficient under *Strickland*, as does "'oversight, carelessness, ineptitude, or laziness.'" *Ramirez*, 799 F.3d at 855 (quoting *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009)). Once again, there is a reasonable probability that full investigation of mitigating evidence would have affected the outcome of Mr. Purkey's *habeas* claim.

In each of the three instances described above, § 2255 counsel undertook only minimal investigation into the underlying facts and prior proceedings, resulting in a default of substantial ineffective assistance claims. The resulting prejudice is all the more concerning in the current context. The "right to the effective assistance of counsel at trial is a bedrock principle in our justice system." *Martinez*, 566 U.S. at 12. Although it is important at any criminal trial, it is *vital* where a prisoner faces the death penalty, which is "qualitatively different from a sentence of imprisonment, however long" and thus there is a "corresponding difference in the need for reliability in the determination that death is the appropriate punishment." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). To that end, "federal constitutional standards … have been designed to ensure heightened sensitivity to fairness and accuracy where imposition of the death penalty is at issue." *Williams v. Florida*, 465 U.S. 1109, 1110-1111 (1984).

Mr. Purkey was denied constitutionally guaranteed protections when he received ineffective representation by trial counsel and subsequently by initial-review § 2255 counsel. The cumulative effect of this systematic failure of counsel to meet an objective standard of reasonableness is that Mr. Purkey's substantial claims have never yet been heard by a court and never will be if the district court's decision below is affirmed. *Martinez*, 566 U.S. at 17. In other words, Mr. Purkey has been denied "'a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence.'" *Webster*, 784 F.3d at 1136. Because § 2255 is structurally insufficient to support his substantial claims, Mr. Purkey must be allowed to raise them under § 2241 via the Savings Clause of § 2255(e).

**CONCLUSION**

For the foregoing reasons, the Court should vacate the judgment of the

district court and remand for further proceedings on the merits of Mr. Purkey's

petition.

Respectfully submitted.

/s/ Alan E. Schoenfeld

REBECCA E. WOODMAN
ATTORNEY AT LAW, L.C.
1263 W. 72nd Terrace
Kansas City, MO 64114
(785) 979-3672

MICHELLE M. LAW
ASSISTANT FEDERAL PUBLIC DEFENDER
WESTERN DISTRICT OF MISSOURI
901 St. Louis Street, Suite 801
Springfield, MO 65806
(417) 873-9022

ALAN E. SCHOENFELD
STEPHANIE SIMON
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

December 20, 2019

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 6,982 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Alan E. Schoenfeld
ALAN E. SCHOENFELD

December 20, 2019

# CIRCUIT RULE 30(d) CERTIFICATION

In accordance with Circuit Rule 30(d), the undersigned hereby certifies that all materials required by Circuit Rules 30(a) and (b) are included in Plaintiff-Appellant's Supplemental Appendix.

/s/ Alan E. Schoenfeld

ALAN E. SCHOENFELD

December 20, 2019

# ADDENDUM

# ADDENDUM
# TABLE OF CONTENTS

Page(s)

18 U.S.C. § 1201 .......................................................................Add. 1 – Add. 3

28 U.S.C. § 2241 .......................................................................Add. 4 – Add. 5

28 U.S.C. § 2254 .......................................................................Add. 6 – Add. 8

28 U.S.C. § 2255 .......................................................................Add. 9 – Add. 10

# RELEVANT STATUTORY PROVISIONS

## 18 U.S.C. § 1201

## § 1201. Kidnapping

**(a)** Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when—

> **(1)** the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary, or the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense;

> **(2)** any such act against the person is done within the special maritime and territorial jurisdiction of the United States;

> **(3)** any such act against the person is done within the special aircraft jurisdiction of the United States as defined in section 46501 of title 49;

> **(4)** the person is a foreign official, an internationally protected person, or an official guest as those terms are defined in section 1116(b) of this title; or

> **(5)** the person is among those officers and employees described in section 1114 of this title and any such act against the person is done while the person is engaged in, or on account of, the performance of official duties,

shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

**(b)** With respect to subsection (a)(1), above, the failure to release the victim within twenty-four hours after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away shall create a rebuttable presumption that such person has been transported in interstate or foreign commerce. Notwithstanding the preceding sentence, the fact that the presumption under this section has not yet taken effect does not preclude a Federal investigation of a possible violation of this section before the 24-hour period has ended.

**(c)** If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life.

**(d)** Whoever attempts to violate subsection (a) shall be punished by imprisonment for not more than twenty years.

**(e)** If the victim of an offense under subsection (a) is an internationally protected person outside the United States, the United States may exercise jurisdiction over the offense if (1) the victim is a representative, officer, employee, or agent of the United States, (2) an offender is a national of the United States, or (3) an offender is afterwards found in the United States. As used in this subsection, the United States includes all areas under the jurisdiction of the United States including any of the places within the provisions of sections 5 and 7 of this title and section 46501(2) of title 49. For purposes of this subsection, the term "national of the United States" has the meaning prescribed in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)).

**(f)** In the course of enforcement of subsection (a)(4) and any other sections prohibiting a conspiracy or attempt to violate subsection (a)(4), the Attorney General may request assistance from any Federal, State, or local agency, including the Army, Navy, and Air Force, any statute, rule, or regulation to the contrary notwithstanding.

**(g) Special Rule for Certain Offenses Involving Children.—**

   **(1) To whom applicable.**—If—

   **(A)** the victim of an offense under this section has not attained the age of eighteen years; and

   **(B)** the offender—

   **(i)** has attained such age; and

   **(ii)** is not—

   **(I)** a parent;

   **(II)** a grandparent;

   **(III)** a brother;

   **(IV)** a sister;

   **(V)** an aunt;

   **(VI)** an uncle; or

   **(VII)** an individual having legal custody of the victim;

   the sentence under this section for such offense shall include imprisonment for not less than 20 years.

   **[(2) Repealed.** Pub.L. 108-21, Title I, § 104(b), Apr. 30, 2003, 117 Stat. 653.]

**(h)** As used in this section, the term "parent" does not include a person whose parental rights with respect to the victim of an offense under this section have been terminated by a final court order.

## § 2241.  Power to grant writ

**(a)** Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions. The order of a circuit judge shall be entered in the records of the district court of the district wherein the restraint complained of is had.

**(b)** The Supreme Court, any justice thereof, and any circuit judge may decline to entertain an application for a writ of habeas corpus and may transfer the application for hearing and determination to the district court having jurisdiction to entertain it.

**(c)** The writ of habeas corpus shall not extend to a prisoner unless—

> **(1)** He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or

> **(2)** He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or

> **(3)** He is in custody in violation of the Constitution or laws or treaties of the United States; or

> **(4)** He, being a citizen of a foreign state and domiciled therein is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof, the validity and effect of which depend upon the law of nations; or

> **(5)** It is necessary to bring him into court to testify or for trial.

**(d)** Where an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him and each of such district courts shall have concurrent jurisdiction to entertain the application. The district court for the district wherein such an application is filed in the exercise of its discretion and in furtherance of justice may transfer the application to the other district court for hearing and determination.

**(e)(1)** No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by

the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

**(2)** Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

## 28 U.S.C. § 2254
## § 2254.  State custody; remedies in Federal courts

**(a)** The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

**(b)(1)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

> **(A)** the applicant has exhausted the remedies available in the courts of the State; or

> **(B)(i)** there is an absence of available State corrective process; or

> **(ii)** circumstances exist that render such process ineffective to protect the rights of the applicant.

**(2)** An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

**(3)** A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

**(c)** An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

**(d)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

**(e)(1)** In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant

shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

**(2)** If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

>**(A)** the claim relies on—

>>**(i)** a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

>>**(ii)** a factual predicate that could not have been previously discovered through the exercise of due diligence; and

>**(B)** the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

**(f)** If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such determination. If the applicant, because of indigency or other reason is unable to produce such part of the record, then the State shall produce such part of the record and the Federal court shall direct the State to do so by order directed to an appropriate State official. If the State cannot provide such pertinent part of the record, then the court shall determine under the existing facts and circumstances what weight shall be given to the State court's factual determination.

**(g)** A copy of the official records of the State court, duly certified by the clerk of such court to be a true and correct copy of a finding, judicial opinion, or other reliable written indicia showing such a factual determination by the State court shall be admissible in the Federal court proceeding.

**(h)** Except as provided in section 408 of the Controlled Substances Act, in all proceedings brought under this section, and any subsequent proceedings on review, the court may appoint counsel for an applicant who is or becomes financially unable to afford counsel, except as provided by a rule promulgated by the Supreme Court pursuant to statutory authority. Appointment of counsel under this section shall be governed by section 3006A of title 18.

**(i)** The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.

**§ 2255.  Federal custody; remedies on motion attacking sentence**

**(a)** A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

**(b)** Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.  If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

**(c)** A court may entertain and determine such motion without requiring the production of the prisoner at the hearing.

**(d)** An appeal may be taken to the court of appeals from the order entered on the motion as from a final judgment on application for a writ of habeas corpus.

**(e)** An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

**(f)** A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—

> **(1)** the date on which the judgment of conviction becomes final;

> **(2)** the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United

States is removed, if the movant was prevented from making a motion by such governmental action;

**(3)** the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

**(4)** the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

**(g)** Except as provided in section 408 of the Controlled Substances Act, in all proceedings brought under this section, and any subsequent proceedings on review, the court may appoint counsel, except as provided by a rule promulgated by the Supreme Court pursuant to statutory authority. Appointment of counsel under this section shall be governed by section 3006A of title 18.

**(h)** A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain—

**(1)** newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or

**(2)** a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of December, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Alan E. Schoenfeld

ALAN E. SCHOENFELD

# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

WESLEY IRA PURKEY,

*Petitioner-Appellant*,

v.

UNITED STATES OF AMERICA, et al.,

*Respondents-Appellees*.

On Appeal from the United States District Court
for the Southern District of Indiana, No. 19 Civ. 414
Before the Honorable Judge James P. Hanlon

## PETITIONER-APPELLANT'S SUPPLEMENTAL APPENDIX

REBECCA E. WOODMAN
ATTORNEY AT LAW, L.C.
1263 W. 72nd Terrace
Kansas City, MO 64114
(785) 979-3672

MICHELLE M. LAW
ASSISTANT FEDERAL PUBLIC DEFENDER
WESTERN DISTRICT OF MISSOURI
901 St. Louis Street, Suite 801
Springfield, MO 65806
(417) 873-9022

ALAN E. SCHOENFELD
STEPHANIE SIMON
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

December 20, 2019

## Supplemental Appendix Index

United States District Court for the Southern District of Indiana
Decision denying Petition for Writ of Habeas Corpus
(Nov. 20, 2019) ...................................................................SUPP. APP. 0001

United States Court of Appeals for the Eighth Circuit Decision
affirming District Court denial of Motion Under 28 U.S.C. § 2255
(Sept. 6, 2013)...................................................................SUPP. APP. 0030

United States District Court for the Western District of Missouri
Decision denying Motion for Certificate of Appealability
(Oct. 28, 2010) ..................................................................SUPP. APP. 0046

United States District Court for the Western District of Missouri
Decision denying Motion to Alter Judgment (Dec. 22, 2009) .......SUPP. APP. 0064

United States District Court for the Western District of Missouri
Decision denying Motion Under 28 U.S.C. § 2255, To Vacate, Set
Aside, or Correct Sentence by A Person in Federal Custody
(Sept. 29, 2009)..................................................................SUPP. APP. 0069

United States Court of Appeals for the Eighth Circuit Decision
denying Appeal for Reversal of the Death Sentence
(Nov. 7, 2005) ...................................................................SUPP. APP. 0080

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

WESLEY IRA PURKEY,                          )
                                            )
                    Petitioner,             )
                                            )
        v.                                  )        No. 2:19-cv-00414-JPH-DLP
                                            )
UNITED STATES OF AMERICA, et al.            )
                                            )
                    Respondents.            )

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

Wesley Purkey is a federal prisoner on death row at the United States Penitentiary in Terre Haute, Indiana.  He was sentenced to death 16 years ago in the United States District Court for the Western District of Missouri after a jury found him guilty of kidnapping and murdering Jennifer Long.  The conviction and sentence were affirmed on direct appeal.  Mr. Purkey sought postconviction relief under 28 U.S.C. § 2255 in the district court where he was convicted and sentenced.  That request was denied by the district court and affirmed on appeal.

Mr. Purkey cannot bring a successive § 2255 motion in the court of conviction, so he seeks relief from this Court in the form of a 28 U.S.C. § 2241 petition that raises eight claims.  These claims, however, cannot be raised and adjudicated under § 2241 because they do not fall within any of the limited circumstances the Seventh Circuit has recognized when a federal prisoner may challenge a conviction and sentence by way of § 2241.  Moreover, there is not a structural problem with § 2255 when applied to Mr. Purkey's case.  For these

1

reasons, Mr. Purkey's § 2241 action must be dismissed and his petition for a writ of habeas corpus denied.

## I.

A full recitation of the facts and procedural background is set forth in the two opinions issued by the United States Court of Appeals for the Eighth Circuit following Mr. Purkey's appeals.  *See United States v. Purkey*, 428 F.3d 738, 744-46 (8th Cir. 2005) ("*Purkey I*"); *United States v. Purkey*, 729 F.3d 860, 866-68 (8th Cir. 2013) ("*Purkey II*").

### A.    Factual Background

While the details of Mr. Purkey's crimes are not relevant to the ultimate resolution of his legal claims, a brief summary is appropriate for context.

Jennifer Long, a sixteen-year-old high school sophomore, disappeared in January 1998.  *Purkey I*, 428 F.3d at 745.  She was walking on a sidewalk in Missouri when Mr. Purkey picked her up in his truck and drove her to his house in Kansas.  *Purkey II*, 729 F.3d at 866-67.  Mr. Purkey raped her and, after she attempted to escape, "became enraged and repeatedly stabbed [her] in the chest, neck, and face with [a] boning knife, eventually breaking its blade inside her body."  *Id.*  Mr. Purkey dismembered her body with a chainsaw, burned her remains in his fireplace, and dumped them into a septic pond.  *Id.*

No one knew what happened to Jennifer Long until December 1998.  *Purkey I*, 428 F.3d at 745.  At that time, Mr. Purkey faced a life sentence for murdering eighty-year-old Mary Ruth Bales, whom Mr. Purkey bludgeoned to death with a hammer in her own home.  *Purkey II*, 729 F.3d at 867–68.  Mr.

2

Purkey confessed to law enforcement that he had kidnapped, raped, and murdered Jennifer Long earlier that year. *Id.* He also admitted taking "extraordinary measures to dispose of the body, including dismembering it with a chain saw and burning the remains[.]" *Purkey I*, 428 F.3d at 745. Law enforcement recovered remnants of crushed human bones where Mr. Purkey told them he had disposed of them, and in his former house where the murder took place. Mr. Purkey led law enforcement to where he left her remains. *Id*; *Purkey II*, 729 F.3d at 867; Dkt. 33-1 at 76–78.

### B.   Procedural Background

Mr. Purkey was indicted for the kidnapping and murder of Jennifer Long on October 10, 2001, in the United States District Court for the Western District of Missouri. *See United States v. Purkey*, No. 4:01-cr-00308-FJG (W.D. Mo. Oct. 10, 2001), Dkt. 1. On November 5, 2003, a jury found Mr. Purkey guilty. *Id.*, Dkt. 461.

The separate penalty phase of the proceedings lasted seven days. Mr. Purkey's counsel presented 27 mitigating factors, including evidence of brain abnormalities and abuse as a child. Dkt. 23-37 at 94-97. The mitigation evidence included the testimony of 18 witnesses over two days. Dkt. 38-1; Dkt. 39-1; Dkt. 40-1; Dkt. 41-1; Dkt. 42-1. Finding the existence of all six statutory aggravating factors, the jury recommended a sentence of death. *Purkey*, No. 4:01-cr-00308-FJG, Dkt. 487. The District Court sentenced Mr. Purkey to death on January 23, 2004. *Id.*, Dkt. 505.

3

Mr. Purkey appealed his conviction and sentence to the United States Court of Appeals for the Eighth Circuit.  He raised several challenges to the pretrial proceedings, jury selection, and the guilt and penalty phases.  *Purkey I*, 428 F.3d at 746–64.  One of those challenges—which is similar to claims before this Court—was that the District Court erred by accepting the mitigating factors portion of the verdict without requiring the jury to write out their specific findings.  *Id.* at 763.  The Eighth Circuit rejected Mr. Purkey's claims and affirmed his conviction and sentence.  *Id.* at 764.  Mr. Purkey's petition for writ of certiorari was denied by the United States Supreme Court on October 16, 2006.  *See Purkey v. United States*, 127 S. Ct. 433 (2006).

On November 25, 2006, Mr. Purkey initiated postconviction proceedings by filing a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 in the United States District Court for the Western District of Missouri.  *See Purkey v. United States*, 2009 WL 3160774 (W.D. Mo. Sept. 29, 2009).  The same District Judge who presided over Mr. Purkey's trial presided over his § 2255 motion.

Mr. Purkey made 17 allegations of ineffective assistance against his trial counsel—Frederick Duchardt, Jr. and Laura O'Sullivan.  *Id.* at *1-3.  Mr. Duchardt submitted a 117-page affidavit to "refute" Mr. Purkey's claims.  *Id.* at *2. The District Court substantially relied on Mr. Duchardt's affidavit in rejecting the ineffective assistance of counsel claims.  *Id.*  Mr. Purkey also alleged several due process violations.  *Id.* at *3-5.  The District Court rejected these claims as well and denied Mr. Purkey's § 2255 motion.  *Id.* at *6.  The District Court later

4

denied Mr. Purkey's Rule 59(e) motion to alter or amend the judgment, *see Purkey v. United States*, 2009 WL 5176598, *3 (W.D. Mo. Dec. 22, 2009), and his request for a certificate of appealability, *see Purkey v. United States*, 2010 WL 4386532, *10 (W.D. Mo. Oct. 28, 2010).

Mr. Purkey sought a certificate of appealability from the Eighth Circuit on several claims, *see* Dkt. 48-13, but the Eighth Circuit granted Mr. Purkey a certificate of appealability on only two of them, *see Purkey II*, 729 F.3d at 861; Dkt. 48-14.  First, the Eighth Circuit permitted Mr. Purkey to raise three issues regarding the ineffectiveness of his trial counsel during the penalty phase: "(1) his alleged failure to adequately prepare and present the testimony of three expert witnesses, (2) his alleged failure to adequately investigate and prepare two mitigating witnesses, which resulted in their testimony being more prejudicial than beneficial, and (3) his alleged failure to adequately investigate and present other mitigating evidence." *Purkey II*, 729 F.3d at 862.  These issues are similar to the second claim Mr. Purkey raises in this Court.  Second, the Eighth Circuit permitted Mr. Purkey to challenge whether the District Court abused its discretion by denying relief without an evidentiary hearing.  *Id.*

The Eighth Circuit rejected both of Mr. Purkey's claims.  It reasoned that it need not decide whether Mr. Purkey could establish deficient performance—and consequently did not consider Mr. Duchardt's affidavit—because Mr. Purkey could not establish prejudice given the "particularly gruesome" nature of the crime.  *Id.* at 862-68 & n.2.  As to whether the District Court should have held an evidentiary hearing, the Eighth Circuit reasoned that Mr. Purkey could not

5

establish prejudice even taking his evidence as true, so it was not an abuse of discretion to decline to hold an evidentiary hearing.  *Id.* at 869.

Mr. Purkey petitioned for panel rehearing, Dkt. 48-15, which the Eighth Circuit denied on December 17, 2013, Dkt. 48-16.  The Supreme Court denied Mr. Purkey's petition for writ of certiorari on October 14, 2014.  *See Purkey v. United States*, 135 S. Ct. 355 (2014).

On July 25, 2019, the Department of Justice set Mr. Purkey's execution date for December 13, 2019.  He filed the instant habeas petition under 28 U.S.C. § 2241 on August 27, 2019.  He filed an amended petition on September 12, 2019.  The petition was fully briefed on October 28, 2019.

## II.

Mr. Purkey raises eight claims in his § 2241 petition:

(1) trial counsel provided ineffective assistance by failing to challenge Juror 13;

(2) trial counsel provided ineffective assistance by failing to investigate, develop, and present compelling mitigation evidence;

(3) Mr. Duchardt perpetrated a fraud on the Court during the § 2255 proceedings by submitting an affidavit containing false and misleading statements to undermine Mr. Purkey's ineffective assistance of counsel claims;

(4) Mr. Purkey's death sentence violates the Eighth Amendment because there is a substantial possibility that the jury instructions led the jury to believe that they could not consider certain mitigating evidence;

6

(5) Mr. Purkey's death sentence violates the Sixth Amendment because the jury did not find beyond a reasonable doubt each fact necessary to impose a death sentence;

(6) imposition of the death penalty under the Federal Death Penalty Act violates the Eighth Amendment;

(7) imposition of the death penalty on individuals such as Mr. Purkey who suffer from a severe mental illness violates the Eighth Amendment; and

(8) trial counsel provided ineffective assistance by improperly advising Mr. Purkey before he testified at the pre-trial suppression hearing. *See* Dkt. 23.

The United States takes the position that the Court cannot reach the merits of these claims because Mr. Purkey cannot raise them in a § 2241 petition. Dkt. 49. That's true if Mr. Purkey cannot meet the requirements of 28 U.S.C. § 2255(e)—commonly referred to as the Savings Clause. *See Webster v. Daniels*, 784 F.3d 1123, 1135 (7th Cir. 2015) (en banc). Mr. Purkey argues that some of his claims meet these requirements. Dkt. 23; Dkt. 58.

### III.

The Court begins its analysis by examining the statutory framework governing federal prisoners' postconviction challenges. The Court next assesses whether Seventh Circuit precedent requires or allows Mr. Purkey's claims to proceed under the Savings Clause. The Court then turns to Mr. Purkey's arguments for recognizing a new category of claims that can be brought via § 2241.

7

**SUPP. APP. 0007**

### A. Statutory Framework for Federal Prisoners Seeking Postconviction Relief

The only way a federal prisoner may pursue postconviction relief in a separate civil action is under 28 U.S.C. §§ 2255 and 2241.

1. Section 2255

"As a general rule, a federal prisoner wishing to collaterally attack his conviction or sentence must do so under § 2255." *Chazen v. Marske*, 938 F.3d 851, 856 (7th Cir. 2019). Congress has placed limitations on a federal prisoner's ability to bring a § 2255 action. First, such action can only be brought in the court which imposed the sentence. 28 U.S.C. § 2255(a). Second, a federal prisoner is limited to bringing one § 2255 motion, unless the court of appeals for the district where the action is filed determines that a second or successive motion contains:

> (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or

> (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

28 U.S.C. § 2255(h).

2. The Savings Clause and Section 2241

Congress created within § 2255 a narrow exception to the "general rule" that requires a federal prisoner to bring a collateral attack under § 2255—the Savings Clause. Under the Savings Clause, a prisoner can seek a writ of habeas corpus through an action under § 2241 if the prisoner can show "that the remedy

8

SUPP. APP. 0008

by [§ 2255] motion is inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e). Unlike a § 2255 action, which must be brought in the district where the sentence was imposed, a § 2241 action must be brought in the district where the prisoner is in custody. *Webster*, 784 F.3d at 1124.

Consistent with the "general rule," the Savings Clause "steers almost all prisoner challenges to their convictions and sentences toward § 2255" and away from § 2241. *Shepherd*, 911 F.3d 861, 862 (7th Cir. 2018). Consequently, a federal prisoner may seek relief under § 2241 "[o]nly in rare circumstances where § 2255 is inadequate or ineffective to test the legality of the prisoner's detention . . . ." *Light v. Caraway*, 761 F.3d 809, 812 (7th Cir. 2014) (citations and quotations omitted). To determine whether Mr. Purkey's petition presents such a "rare circumstance," the Court looks to Seventh Circuit precedent.

**B.    Instances Where the Seventh Circuit has Found the Savings Clause to Apply**

Determining whether § 2255 is inadequate or ineffective is a "very knotty procedural issue" of "staggering" complexity. *Chazen*, 938 F.3d at 855-56. While it is "hard to identify exactly what [the Savings Clause] requires," *id.* at 863 (Barrett, J., concurring), several guiding principles have emerged from the cases.

Section 2255 is inadequate or ineffective as applied to a specific case only where there is "some kind of structural problem with section 2255." *Webster*, 784 F.3d at 1136. A structural problem requires "something more than a lack of success with a section 2255 motion." *Id.* It must "foreclose[] even one round of effective collateral review, unrelated to the petitioner's own mistakes." *Poe v.*

9

*LaRiva*, 834 F.3d 770, 773 (7th Cir. 2016) (citation and quotation omitted). Section 2255 is inadequate or ineffective where the court finds that the federal prisoner did not have "a reasonable opportunity [in a prior § 2255 proceeding] to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *Chazen*, 938 F.3d at 856 (alteration in original) (quoting *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998)).

Applying these principles, the Seventh Circuit has found a structural problem with § 2255 in three instances:

1.  When a claim is based on a new rule of *statutory* law made retroactive by the Supreme Court. *See Davenport*, 147 F.3d at 610.

2.  When a claim is based on a decision of an international tribunal that could not have been raised in an initial § 2255 motion. *See Garza v. Lappin*, 253 F.3d 918, 920 (7th Cir. 2001).

3.  When a claim is based on limited types of new evidence that "would reveal that the Constitution categorically prohibits a certain penalty." *Webster*, 784 F.3d at 1139.

*See id.* at 1135–36 (analyzing *Davenport*—which contains the Seventh Circuit's "most extensive treatment" of the Savings Clause—and *Garza* when setting out the Seventh Circuit's Savings Clause precedents); *see also Fulks v. Krueger*, 2019 WL 4600210, *3 (S.D. Ind. Sept. 20, 2019). The parties appear to agree that these three cases identify the structural problems with § 2255 recognized by the Seventh Circuit. *See* Dkt. 49 at 38–42; Dkt. 58 at 7–9.

10

1. *Davenport*

In *Davenport,* the Seventh Circuit found a structural problem in § 2255 because § 2255(h) does not permit federal prisoners to file a second or successive § 2255 motion raising claims based on new *statutory* law.  The petitioner sought the benefit of a Supreme Court decision changing the Seventh Circuit's interpretation of a statute that existed at the time of his first § 2255 motion. *Davenport,* 147 F.3d at 610.  Because the Supreme Court changed the governing law after the petitioner's § 2255 proceedings had concluded, he "could not [have] use[d] a first motion under [§ 2255] to obtain relief on a basis not yet established by law."  *Id.*  Nor could he have received authorization to file "a second or other successive motion [under § 2255(h)] . . . because the basis on which he [sought] relief [was] neither newly discovered evidence nor a new rule of *constitutional* law."  *Id.* (emphasis added); *see Poe,* 834 F.3d at 773 ("Where *Davenport* recognized a structural problem in § 2255(h) is in the fact that it did not permit a successive petition for new rules of *statutory* law made retroactive by the Supreme Court.").  This structural problem was fixed in *Davenport* "by effectively giving such prisoners the relief that they would have had if § 2255(h)(2) had included them."  *Chazen,* 938 F.3d at 864 (Barrett, J., concurring).

The Seventh Circuit has "developed a three-part test implementing *Davenport*'s holding."  *Beason v. Marske,* 926 F.3d 932, 935 (7th Cir. 2019).  The petitioner must establish that:

> (1) the claim relies on a statutory interpretation case, not a constitutional case and thus could not have been invoked by a successive § 2255 motion; (2) the petitioner could not have invoked

11

SUPP. APP. 0011

the decision in his first § 2255 motion and the decision applies retroactively; and (3) the error is grave enough to be deemed a miscarriage of justice.

*Id.*

2. *Garza*

In *Garza*, the Seventh Circuit again found a structural problem with § 2255 rooted in § 2255(h). After the conclusion of the petitioner's first § 2255, he received a decision from the Inter-American Commission on Human Rights finding that his rights were violated during the penalty phase of his criminal trial. *Garza*, 253 F.3d at 920. The petitioner wished to use this decision to challenge his death sentence. *Id.* Notably, the petitioner could not have petitioned the Inter-American Commission on Human Rights for relief until he had exhausted his "national remedies"—that is, until after he had filed a § 2255 motion. *Id.* Because it was "literally impossible" for the petitioner to have raised his claim in his § 2255 motion, there was a structural problem with § 2255 in that it did not "provide[] an adequate avenue for testing Garza's present challenge to the legality of his sentence." *Id.* at 922–23. Simply put, the petitioner could not have raised his claim in his initial § 2255, nor, as in *Davenport*, could he have received authorization to file a second or successive § 2255 motion under § 2255(h). *Id.* at 923.

3. *Webster*

In *Webster*, the Seventh Circuit held for the first and only time that the Savings Clause was met for a constitutional claim. The petitioner in *Webster* sought to challenge his death sentence as barred by *Atkins v. Virginia*, 536 U.S.

12

304 (2002), which held that the Eighth Amendment forbids the execution of a person with an intellectual disability. Although the petitioner had raised an *Atkins* claim in his § 2255 proceeding, he wished to present "newly discovered evidence" to support that claim in his § 2241 petition. *Webster*, 784 F.3d at 1125.

The Seventh Circuit found that "there is no categorical bar against resort to section 2241 in cases where new evidence would reveal that the Constitution categorically prohibits a certain penalty." *Id.* at 1139. The structural problem identified by the Seventh Circuit was based on at least two concerns. First, § 2255(h)(1) only allows a second or successive § 2255 motion if newly discovered evidence meets a certain threshold to demonstrate that the petitioner is not guilty of the *offense. Id.* at 1134–35, 1138. It does not allow for such motions if the petitioner presents newly discovered evidence that the petitioner is ineligible to receive his *sentence. Id.* Second, Congress could not have contemplated whether claims of categorical ineligibility for the death penalty should be permitted in second or successive § 2255 motions because the relevant cases— *Atkins* and *Roper v. Simmons*, 543 U.S. 551 (2005)[1]—had not been decided when § 2255 was enacted. *Webster*, 784 F.3d at 1138 ("[T]he fact that the Supreme Court had not yet decided *Atkins* and *Roper* at the time AEDPA was passed supports the conclusion that the narrow set of cases presenting issues of constitutional ineligibility for execution is another lacuna in the statute."); *id.* at

---

[1] In *Roper*, the Supreme Court held it violates the Eighth and Fourteenth Amendments to impose "the death penalty on offenders who were under the age of 18 when their crimes were committed." 543 U.S. at 578.

SUPP. APP. 0013

1139 ("In Webster's case, the problem is that the Supreme Court has now established that the Constitution itself forbids the execution of certain people: those who satisfy the criteria for intellectual disability that the Court has established, and those who were below the age of 18 when they committed the crime.").

*Webster* is the first and only time the Seventh Circuit permitted a constitutional claim to proceed through the Savings Clause.  Indeed, the court "took great care to assure that its holding was narrow in scope."  *Poe*, 834 F.3d at 774.  It limited its holding to the narrow legal and factual circumstances presented in the case, stating explicitly that the case "will have a limited effect on future habeas corpus proceedings."  *Webster*, 784 F.3d at 1140 n.9; *see Poe*, 834 F.3d at 774 ("[T]here is nothing in *Webster* to suggest that its holding applies outside the context of new evidence.").

To fall within *Webster*'s holding, the new evidence must meet three conditions:

> First, the evidence sought to be presented must have existed at the time of the original proceedings. . . . Second, the evidence must have been unavailable at the time of trial despite diligent efforts to obtain it. Third, and most importantly, the evidence must show that the petitioner is constitutionally ineligible for the penalty he received. Because the Supreme Court has declared only two types of persons (minors and the intellectually disabled) categorically ineligible for a particular type of punishment, our ruling is as a matter of law limited to that set of people—those who assert that they fell into one of these categories at the time of the offense. These three limitations are more than adequate to prevent the dissent's feared flood of section 2241 petitions[.]

*Webster*, 784 F.3d at 1140 n.9.  It's thus "a rare case" that qualifies.  *Id.* at 1140.

14

In sum, the Seventh Circuit has found a structural defect in § 2255 in three instances, each limited to a narrowly identified specific type of claim.

**C.   Mr. Purkey's Claims Do Not Fit within Any of the Instances Where the Seventh Circuit Has Found the Savings Clause to Apply**

Mr. Purkey's claims do not fall within the holdings of *Davenport*, *Garza*, or *Webster*.   Mr. Purkey's claims are all constitutional rather than statutory, so none of them meet *Davenport*'s first requirement. *See Poe*, 834 F.3d at 773 (explaining that *Davenport* "preclude[s] use of § 2241 for a constitutional case"). The structural defect in § 2255 identified in *Davenport*—that § 2255(h) does not permit successive § 2255 motions "for new rules of *statutory* law made retroactive by the Supreme Court," *id.*—therefore does not apply to any of his claims.

Mr. Purkey's claims do not fit within *Garza*'s narrow holding.   Unlike the petitioner's claims in *Garza*—which were based on the decision of an international tribunal and could not possibly have been raised in his initial § 2255 motion—Mr. Purkey's claims are common constitutional claims that can be raised in a § 2255 motion and thus do not implicate the structural concern identified in *Garza*.   Notably, the Seventh Circuit has recognized that *Garza* involved "'very unusual facts' . . . [and thus] its applicability beyond those facts is limited."   *Kramer v. Olson*, 347 F.3d 214, 218 n.1 (7th Cir. 2003) (quoting *Garza*, 253 F.3d at 921).

Last, Mr. Purkey's claims do not fall within *Webster*'s narrow holding. Among other limitations, *Webster* only applies to claims that an individual is

15

"categorically ineligible for the death penalty," such as claims under *Atkins* and *Roper*. *Webster*, 784 F.3d at 1138-40; *see id.* at 1140 n.9 ("Because the Supreme Court has declared only two types of persons (minors and the intellectually disabled) categorically ineligible for a particular type of punishment, our ruling is as a matter of law limited to that set of people—those who assert that they fell into one of these categories at the time of the offense.").[2] Only one of Mr. Purkey's claims meets this requirement—his claim that *Atkins* should be extended to preclude execution of those who are mentally ill. Dkt. 23 at 199. But Mr. Purkey does not present any argument that this claim meets the Savings Clause, let alone a specific argument that it meets the requirements of *Webster* by, for example, showing that the claim relies on newly discovered evidence that existed at the time of the original proceeding. *See* Dkt. 23; Dkt. 58. Accordingly, Mr.

---

[2] For the first time in his reply, Mr. Purkey presents a cursory argument for why the Savings Clause is met for Claim 4 (that the jury instructions led the jury to believe that they could not consider certain mitigating evidence) and Claim 6 (the death penalty violates the Eighth Amendment). *See* Dkt. 58 at 67-69. He argues that Claim 4 falls within *Webster* because he relies on new evidence—namely, juror affidavits that purportedly show that jurors misunderstood the jury instructions. *Id.* at 66-67. But, as explained, this claim does not meet *Webster*'s third limitation.

As to Claim 6, he argues that this claim relies on new law—the Supreme Court's decision in *Hurst v. Florida*, 136 S. Ct. 616 (2016)—and thus his claim falls within *Garza* and *Webster*. Dkt. 58 at 68-69. *Webster* is of no assistance for this claim, as it does not rely on new evidence. *Poe*, 834 F.3d at 774 ("[T]here is nothing in *Webster* to suggest that its holding applies outside the context of new evidence."). *Garza* is also of no assistance, as nothing in it suggests that simply relying on a new legal precedent can meet the Savings Clause. If it did, *Garza* would not be described by the Seventh Circuit as having only "limited" applicability beyond its "'very unusual facts.'" *Kramer*, 347 F.3d at 218 (quoting *Garza*, 253 F.3d at 921).

16

SUPP. APP. 0016

Purkey's claims cannot proceed through the Savings Clause via the structural defect in § 2255 identified in *Webster*.

Recognizing that his claims do not fall within the specific holdings of *Davenport*, *Garza*, or *Webster*, dkt. 58 at 7-8, Mr. Purkey argues that he can nonetheless meet the general Savings Clause test set forth in these cases. *Id.* at 7-9. In other words, Mr. Purkey asks this Court to extend the Seventh Circuit's Savings Clause precedents to new types of claims. The Court now turns to these arguments.

### D. The *Martinez–Trevino* Doctrine Does Not Apply to Mr. Purkey's Case

Mr. Purkey's only fully developed Savings Clause argument is for his ineffective assistance of trial counsel claims (Claims 1, 2, and 8).[3] *See* Dkt. 23 at 11-19; Dkt. 58 at 6-19. Mr. Purkey argues that his ineffective assistance claims meet the Savings Clause because he "has not had a meaningful opportunity to present" them to any Court. Dkt. 23 at 15.

There is no dispute that Mr. Purkey could not have raised these ineffective assistance claims on direct appeal and that he cannot raise them now in a second or successive § 2255 motion. Dkt. 23 at 12, 15; Dkt. 49 at 36. Mr. Purkey could not have raised his ineffective assistance claims on direct appeal because, except in rare circumstances, such claims "should be pursued in a collateral proceeding under 28 U.S.C. § 2255." *United States v. Moody*, 770 F.3d

---

[3] Mr. Purkey does not advance any argument for why the Savings Clause is met for Claims 5 and 7, and the cursory arguments for why his other claims meet the Savings Clause are addressed in Section III.C above.

577, 582 (7th Cir. 2014); *see United States v. Bryant*, 754 F.3d 443, 444 (7th Cir. 2014) ("A claim of ineffective assistance need not, and usually as a matter of prudence should not, be raised in a direct appeal, where evidence bearing on the claim cannot be presented and the claim is therefore likely to fail even if meritorious."). He cannot raise them now in a second or successive § 2255 motion because his claims do not meet the criteria in § 2255(h).

That leaves the failure to raise the claims in his initial § 2255 proceeding. Mr. Purkey maintains that he did not raise them because § 2255 counsel was ineffective.[4] Dkt. 23 at 13-18. Mr. Purkey argues that he may raise these claims now in this § 2241 action based on *Martinez v. Ryan,* 566 U.S. 1 (2012), *Trevino v. Thaler*, 569 U.S. 413 (2013), and *Ramirez v. United States*, 799 F.3d 845, 853 (7th Cir. 2015). Dkt. 23 at 16-17. The United States argues that neither the *Martinez–Trevino* doctrine nor *Ramirez* relate to the Savings Clause analysis, and that this Court should not extend the holdings of those cases to the entirely different legal question presented here. Dkt. 49 at 42-47.

1. The *Martinez–Trevino* Doctrine

The Court begins with the *Martinez–Trevino* doctrine. Both *Martinez* and *Trevino* involved state prisoners whose ineffective assistance of trial counsel claims were deemed procedurally defaulted by a federal court because the claims were not properly raised in state court.

---

[4] Because Mr. Purkey's claims must be rejected for other reasons, the Court does not address whether § 2255 counsel provided ineffective assistance by not adequately investigating and presenting Mr. Purkey's ineffective assistance of trial counsel claims.

**SUPP. APP. 0018**

In *Martinez*, appointed postconviction counsel failed to raise an ineffective assistance claim in an Arizona collateral proceeding. Martinez's postconviction relief case was dismissed. About a year and half later, Martinez obtained new counsel and filed new ineffective assistance of counsel claims in a second Arizona collateral proceeding. The petition was dismissed because Martinez had not raised these claims in his first collateral proceeding. After exhausting all postconviction procedures available under Arizona law, Martinez sought habeas relief in federal court.

The District Court denied relief on the basis that Martinez had procedurally defaulted his ineffective assistance claims by not properly raising them in state court. After the Ninth Circuit affirmed, the Supreme Court granted certiorari to answer the "precise question" of "whether ineffective assistance in an initial-review collateral proceeding on a claim of ineffective assistance at trial may provide cause for a procedural default in a federal habeas proceeding." *Martinez*, 566 U.S. at 9. The Supreme Court held that if state law requires state prisoners to raise ineffective assistance of trial counsel claims "in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel *or counsel in that proceeding was ineffective*." 566 U.S. at 17 (emphasis added).

In *Trevino*, the Court considered "whether, as a systematic matter, Texas affords meaningful review of a claim of ineffective assistance of trial counsel." *Trevino*, at 425. Concluding it did not, the Court extended the holding of

19

*Martinez* to jurisdictions like Texas where, although one can technically raise ineffective assistance of trial counsel claims on direct review, the "structure and design" of the system make that "virtually impossible."  569 U.S. at 416.

2.  The Extension of the *Martinez–Trevino* Doctrine in the Seventh Circuit

In *Ramirez*, the Seventh Circuit addressed, to a limited extent, whether the *Martinez–Trevino* doctrine applies in the context of a federal § 2255 proceeding. The petitioner was a federal prisoner who failed to timely appeal the denial of his § 2255 motion because § 2255 counsel abandoned him.  799 F.3d at 847. Consequently, he was not able to obtain appellate review of his § 2255 proceeding.  *Id.* at 849.  The petitioner then "moved under Federal Rule of Civil Procedure 60(b)(6) for relief from the judgment," arguing "that postconviction counsel was ineffective for causing him to miss the appeal deadline."  *Id.* at 848. The District Court denied the motion, believing that "there is no right to counsel on collateral review."  *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722 (1991)).

The Seventh Circuit resolved two issues.  It first found that the petitioner was not "trying to present a new reason why he should be relieved of either his conviction or sentence" but instead was "trying to reopen his existing section 2255 proceeding and overcome a procedural barrier to its adjudication."  *Id.* at 850.   Under these circumstances, the Seventh Circuit concluded that the petitioner's Rule 60(b)(6) motion was permitted and was "not a disguised second or successive motion under section 2255."  *Id.*

The Seventh Circuit next concluded that the *Martinez–Trevino* doctrine applies to federal prisoners "who bring motions for postconviction relief under

20

section 2255." *Ramirez*, 799 F.3d at 852.  Therefore, under Rule 60(b)(6), the petitioner could argue that § 2255 counsel's abandonment allowed him to file an otherwise untimely appeal.  *Id.* at 854 ("We see no reason to distinguish between actions at the state level that result in procedural default and the consequent loss of a chance for federal review [as happened in *Martinez* and *Trevino*], and actions at the federal level that similarly lead to a procedural default that forfeits appellate review.").

3. Mr. Purkey's Claims Cannot Proceed Under *Martinez, Trevino*, or *Ramirez*

Mr. Purkey argues that under *Ramirez*, he may now raise claims of ineffective assistance of trial counsel that were not raised in his § 2255 action due to ineffective assistance of § 2255 counsel.   Acknowledging that he cannot bring a second or successive § 2255 action, Mr. Purkey argues that he nonetheless has the right to judicial review of his § 2255 proceeding.  Dkt. 23 at 15-18.  More specifically, he argues that he must be able to present his claims in a § 2241 action and that *Ramirez* supports opening this avenue of review.

The Court disagrees.  *Martinez, Trevino,* and *Ramirez* do not involve the Savings Clause and thus are not controlling.  Moreover, nothing in *Ramirez* suggests that its holding regarding *Martinez–Trevino* applies outside of the § 2255 context. The Seventh Circuit framed the second legal question in *Ramirez* as whether *Martinez* and *Trevino* "apply to some or all federal prisoners who bring motions for postconviction relief *under section 2255*." 799 F.3d at 852 (emphasis added).  But this says nothing about whether *Martinez–Trevino* has any role in demonstrating whether the Savings Clause is met and thus whether § 2241 is

21

available.  Further, applying *Martinez–Trevino* to the narrow circumstances of a Rule 60(b) motion in a § 2255 proceeding does not create a rule that federal prisoners must have an alternative way to raise ineffective assistance of postconviction counsel when § 2255 is closed.  *Ramirez* does not address these questions at all.  And unlike the petitioner in *Ramirez,* Mr. Purkey had appellate review of his § 2255 case.  Applying it here would therefore require a substantial extension of *Ramirez,* and the Seventh Circuit has rejected other opportunities to do so.  *Cf. Lombardo,* 860 F.3d at 559 (holding that *Ramirez* should not be extended to the equitable tolling context).

Moreover, *Ramirez* has been construed narrowly by the Seventh Circuit to the facts involving abandonment of counsel.  *See Lombardo v. United States*, 860 F.3d 547, 559 (7th Cir. 2017) ("[N]otwithstanding its discussion of *Martinez* and *Trevino* and its embracing of the principles underlying those cases, *Ramirez*'s holding is best construed as resting on [counsel] abandonment."); *see also Adams v. United States*, 911 F.3d 397, 404 n.2 (7th Cir. 2018) (citing *Ramirez* for the proposition that "[a]bandonment by counsel" can qualify as a procedural defect that can be raised in a Rule 60(b) motion following the denial of § 2255 relief).

For these reasons, the Court rejects Mr. Purkey's argument that ineffective assistance of trial counsel claims that rely on *Martinez–Trevino* meet the Savings Clause.[5]  Mr. Purkey does not cite any federal court that has accepted this

---

[5] Mr. Purkey argues, in reply, that the *Martinez–Trevino* doctrine permits his fraud-on-the-Court claim (Claim 3) to proceed in this action.  Dkt. 58 at 57-58.

22

argument, and the federal courts that have considered this argument have rejected it. *See, e.g.*, *United States v. Sheppard*, 742 F. App'x 599 (3d Cir. 2018) (rejecting the petitioner's argument that *Ramirez* shows he meets the Savings Clause because he can raise the *Martinez–Trevino* issue in a Rule 60(b) motion in the underlying § 2255; "Section 2255 together with Rule 60(b) thus plainly is not inadequate or ineffective to test the legality of [the petitioner's] conviction and sentence such that he may resort to a § 2241 habeas corpus petition."); *Rojas v. Unknown Party*, 2017 WL 4286186, *6 (D. Ariz. May 16, 2017) ("*Martinez* and *Trevino* do not impact the [Savings Clause] analysis or otherwise apply to § 2241 petitions. Simply stated, *Martinez* and *Trevino* were based on the narrow ground of procedural default in the context of a § 2254 petition. The reasoning of these cases has never been extended or applied by any court to a § 2241 petition."); *see also Dinwiddie v. United States*, No. 2:18-cv-00149-JPH-MJD, Dkt. 25 (S.D. Ind. July 25, 2019); *Jackman v. Shartle*, 535 F. App'x 87, 89 n.5 (3d Cir. 2013).

The Court concludes that neither *Ramirez* nor any other precedent requires it to grant Mr. Purkey the relief he seeks.

### E.   There is No Structural Problem with § 2255 When Applied to Mr. Purkey's Case

To the extent that *Ramirez* may authorize, without requiring, the Court to extend *Ramirez*'s holding to the Savings Clause context, the Court declines to do so. There is no structural problem with § 2255 when applied to the facts of Mr.

---

For the same reasons it does not permit his ineffective assistance claims to proceed, the Court rejects this contention.

23

Purkey's case. While Mr. Purkey did not succeed with his § 2255 motion, a structural problem requires "something more than a lack of success with a section 2255 motion." *Webster*, 784 F.3d at 1136. It must "foreclose[] even one round of effective collateral review, unrelated to the petitioner's own mistakes." *Poe v. LaRiva*, 834 F.3d 770, 773 (7th Cir. 2016) (citation and quotation omitted). That's not the case here.

In his § 2255 action, Mr. Purkey made 17 allegations of ineffective assistance against his trial counsel. Those claims were heard and adjudicated by the District Court, and the denial of them was affirmed by the Eighth Circuit. The record demonstrates that Mr. Purkey had "'a *reasonable* opportunity [in a prior § 2255 proceeding] to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence.'" *Chazen*, 938 F.3d at 856 (quoting *Davenport*, 147 F.3d at 609) (emphasis added); *see Davenport*, 147 F.3d at 609 ("Nothing in 2255 made the remedy provided by that section inadequate to enable Davenport to test the legality of his imprisonment. He had an unobstructed procedural shot at getting his sentence vacated."). A reasonable opportunity does not include the opportunity to years later second-guess the selection of the claims that were asserted in the § 2255 action, pick new or "better" claims, and have those claims subject to judicial review in another judicial district. Applied to the facts of Mr. Purkey's case, § 2255 is not inadequate or ineffective.

Moreover, allowing Mr. Purkey's ineffective assistance claims to be brought in a § 2241 proceeding would be contrary to the statutory framework Congress

24

created for federal prisoners seeking postconviction relief. Congress amended § 2255 in 1996 as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Most relevant here, AEDPA limits federal prisoners to one § 2255 motion unless they receive authorization from the Court of Appeals to file a second or successive § 2255 motion. 28 U.S.C. § 2255(h). This limitation was designed to curtail the problem of "repetitive filings" from federal prisoners challenging their convictions. *Garza*, 253 F.3d at 922.

Congress chose to "steer[] almost all [federal] prisoner challenges to their convictions and sentences toward § 2255." *Shepherd*, 911 F.3d at 862. It did so by requiring § 2255 motions be filed in the district of conviction, *Light*, 761 F.3d at 812, and limiting federal prisoners' access to § 2241 by way of the Savings Clause. *See Davenport*, 147 F.3d at 609 ("The purpose behind the enactment of section 2255 was to change the venue of postconviction proceedings brought by federal prisoners from the district of incarceration to the district in which the prisoner had been sentenced." (citing *United States v. Hayman*, 342 U.S. 205, 212-19 (1952)).

Section 2255 "not only relieved the district courts where the major federal prisons were located from a heavy load of petitions for collateral relief; it also enhanced the efficiency of the system by assigning these cases to the judges who were familiar with the records." *Webster*, 784 F.3d at 1145.

The Savings Clause "must be applied in light of [§ 2255's] history." *Taylor v. Gilkey*, 314 F.3d 832 (7th Cir. 2002); *see Unthank v. Jett*, 549 F.3d 534, 535 (7th Cir. 2008) (same). It cannot be interpreted so expansively that it

25

SUPP. APP. 0025

undermines "the careful structure Congress has created." *Garza*, 253 F.3d at 921; *see Chazen*, 938 F.3d at 865 (Barrett, J., concurring) (expressing "skeptic[ism]" of an argument that, if accepted, "risks recreating some of the problems that § 2255 was designed to fix").

In the limited instances where the Seventh Circuit has found the Savings Clause met, the Court crafted narrow holdings so as to not "creat[e] too large an exception to the exclusivity of section 2255." *Webster*, 784 F.3d at 1140; *see id.* at 1140 n.9. Here, that's not possible. The petitioners in *Davenport*, *Garza*, and *Webster* each presented a very specific "problem" based on a unique set of facts presented. In each case the relief granted was symmetrical, and thus inherently limited to a very small category of cases involving scenarios that could not or were not foreseen by Congress. In *Davenport*, for example, the petitioner's "problem" was that § 2255(h) did not permit a successive petition for new rules of statutory law. To fix this problem, the Seventh Circuit crafted a narrow exception with three specific requirements limiting when and how a petitioner could pass through this exception. *See Beason*, 926 F.3d at 935; *Davenport*, 147 F.3d at 610-12.

Here, there is no very specific "problem" based on a unique set of facts that could be remedied through a narrowly drawn rule that would apply to a very small category of cases. Mr. Purkey's "problem" is that after availing himself of the postconviction relief process created by Congress, including appellate review, he did not get the outcome that he wanted on his claims of ineffective assistance

26

of counsel.  But there is no "something more," *Webster*, 784 F.3d at 1136, so there is no structural problem with § 2255.

Unlike the limited types of claims that the Seventh Circuit has held to meet the Savings Clause in *Davenport* (statutory claims based on a retroactive change in the law), *Garza* (claims based on new decisions from international tribunals), and *Webster* (*Atkins* or *Roper* claims based on newly discovered evidence that existed at the time of the original proceedings and could not be discovered through reasonable diligence), Mr. Purkey asks the Court to allow ineffective assistance of trial counsel claims to proceed through the Savings Clause on the basis that § 2255 counsel was ineffective.  But unlike the relatively narrow categories of claims allowed to proceed in *Davenport*, *Garza*, and *Webster*, ineffective assistance of trial claims are ubiquitous.  *See Burt v. Titlow*, 571 U.S. 12, 19 (2013) (emphasizing that ineffective assistance of counsel claims are "common" and have been "adjudicated in countless criminal cases for nearly 30 years").  To allow such a frequently litigated claim to be raised in a § 2241 petition would dismantle the very structure of § 2255.  "If error in the resolution of a collateral attack were enough to show that § 2255 is inadequate or ineffective, many of the amendments made in 1996 would be set at naught."  *Taylor*, 314 F.3d at 836.

## IV.

For the foregoing reasons, the claims Mr. Purkey presents in his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 are barred by the Savings Clause, 28 U.S.C. § 2255(e).  His ineffective assistance of trial counsel

27

SUPP. APP. 0027

claims (Claims 1, 2, and 8) are rejected for the reasons set forth in Sections III.D and III.E.  His remaining five claims fail to fall within any of the Seventh Circuit's Savings Clause precedents, and Mr. Purkey does not advance any basis for extending those precedents to these claims.  Accordingly, his petition is denied with prejudice.  *See Prevatte v. Merlak*, 865 F.3d 894, 901 (7th Cir. 2017) (explaining that dismissals pursuant to § 2255(e) are with prejudice).

Because the Court has resolved Mr. Purkey's claims, his motion to stay his execution pending resolution of his claims, dkt. [4], is **denied** as moot.  Final Judgment consistent with this Order shall issue.

**SO ORDERED.**

Date: 11/20/2019

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Brian Patrick Casey
U.S. ATTORNEY'S OFFICE
brian.casey@usdoj.gov

Michelle M. Law
FEDERAL DEFENDER -- WESTERN DISTRICT OF MISSOURI
michelle_law@fd.org

Kathleen D. Mahoney
UNITED STATES ATTORNEY'S OFFICE
kate.mahoney@usdoj.gov

Brian L. Reitz
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
brian.reitz@usdoj.gov

SUPP. APP. 0028

Jeffrey E. Valenti
UNITED STATES ATTORNEY'S OFFICE
jeff.valenti@usdoj.gov

Rebecca Ellen Woodman
REBECCA E. WOODMAN, ATTORNEY AT LAW, L.C.
rewlaw@outlook.com

**SUPP. APP. 0029**

# United States Court of Appeals
## For the Eighth Circuit

_____

No. 10-3462

_____

Wesley Ira Purkey

*Movant - Appellant*

v.

United States of America

*Respondent - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: September 20, 2012
Filed: September 6, 2013

_____

Before BYE, GRUENDER, and SHEPHERD, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Wesley Ira Purkey appeals the denial of his motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. We granted a certificate of appealability to review whether Purkey received effective assistance of counsel during the penalty

Appellate Case: 10-3462      Page: 1      Date Filed: 09/06/2013 Entry ID: 4072815

SUPP. APP. 0030

phase of the trial and whether the district court[1] abused its discretion by denying relief without conducting an evidentiary hearing. We conclude that Purkey's proffered evidence, taken as true, fails to establish that his trial counsel's allegedly deficient performance was prejudicial to Purkey. Therefore, we affirm.

I.

In November 2003, a federal jury convicted Purkey of the interstate kidnap, rape, and murder of sixteen-year-old Jennifer Long. During the penalty phase of the trial, the jury heard evidence on six statutory aggravating factors, four non-statutory aggravating factors, and twenty-seven mitigating factors. The jury found the existence of all six statutory aggravating factors and three of the four non-statutory aggravating factors. The verdict form also contained spaces to record the number of jurors who found the existence of each mitigating factor presented by Purkey. The jury left each of those spaces blank. The jury determined that Purkey should be sentenced to death. We affirmed Purkey's conviction and sentence on direct appeal. *See United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005), *cert. denied*, 549 U.S. 975 (2006).

Purkey then filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 and sought an evidentiary hearing. As relevant to this appeal, Purkey argued that his death sentence should be set aside because he did not receive effective assistance of counsel during the penalty phase of his trial, as required by the Sixth Amendment. With his motion, Purkey submitted a proffer of "new" mitigating evidence including affidavits from several family members, friends, and expert witnesses who testified at trial. Purkey claims that his trial counsel, Frederick Duchardt, failed to perform consistent with objective standards of reasonableness

---

[1]The Honorable Fernando J. Gaitan, Jr., Chief Judge, United States District Court for the Western District of Missouri.

-2-

SUPP. APP. 0031

because he failed to adequately investigate and prepare these witnesses. Additionally, Purkey submitted affidavits from several potential witnesses whom Duchardt never contacted during his mitigation investigation or whom Duchardt decided not to call as witnesses. Purkey argues that Duchardt's performance also fell below an objective standard of reasonableness because he failed to call these witnesses during the penalty phase. Before replying to Purkey's motion, the Government requested an order from the district court compelling Duchardt to provide an affidavit responding to Purkey's claims of ineffective assistance. Duchardt prepared a 117-page affidavit, which the Government filed with its response to Purkey's § 2255 motion. Duchardt's affidavit contested many of the facts alleged in the affidavits attached to Purkey's § 2255 motion and provided strategic reasons for not presenting some of the proffered evidence—all challenging Purkey's claim that Duchardt's performance fell below an objective standard of reasonableness.

The district court denied Purkey's § 2255 motion, determining that Duchardt's performance did not fall below an objective standard of reasonableness. The district court alternatively concluded that, even assuming Duchardt's representation did fall below an objective standard of reasonableness, Purkey's proffered evidence did not support a finding of prejudice as required for relief under *Strickland v. Washington*, 466 U.S. 668 (1984). The district court also denied Purkey's request for an evidentiary hearing, concluding that the proffered new evidence, taken as true, provided no basis for finding prejudice. *See Machibroda v. United States*, 368 U.S. 487, 496 (1962) (remanding for an evidentiary hearing because the petitioner would have been entitled to relief if the allegations in his § 2255 motion were true, even if the allegations were improbable).

After the district court denied Purkey's motion for a certificate of appealability ("COA"), Purkey requested a COA from this court. *See* 28 U.S.C. § 2253(c)(1)(B). We granted a COA on the issue of whether Duchardt's performance during the penalty phase constituted ineffective assistance of counsel under the Sixth

-3-

SUPP. APP. 0032

Amendment. The COA allows Purkey to challenge three aspects of Duchardt's performance in this proceeding: (1) his alleged failure to adequately prepare and present the testimony of three expert witnesses, (2) his alleged failure to adequately investigate and prepare two mitigating witnesses, which resulted in their testimony being more prejudicial than beneficial, and (3) his alleged failure to adequately investigate and present other mitigating evidence. We also granted a COA to determine whether the district court abused its discretion in denying Purkey's request for an evidentiary hearing.

## II.

"To establish ineffective assistance of counsel, [Purkey] must show that his counsel's performance was deficient, and that he suffered prejudice as a result." *Paul v. United States*, 534 F.3d 832, 836 (8th Cir. 2008) (citing *Strickland*, 466 U.S. at 687). Purkey must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Wong v. Belmontes*, 558 U.S. 15, 19 (2009) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Cullen v. Pinholster*, 563 U.S. ---, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 694). "That showing requires [Purkey] to establish 'a reasonable probability that a competent attorney, aware of [the available mitigating evidence], would have introduced it at sentencing,' and 'that had the jury been confronted with this . . . mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Wong* 558 U.S. at 19-20 (second and third alterations in original) (quoting *Wiggins v. Smith*, 539 U.S. 510, 535, 536 (2003)). There must be a "'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen*, 131 S. Ct. at 1403 (quoting *Harrington v. Richter*, 562 U.S. ---, 131 S. Ct. 770, 792 (2011)).

-4-

**SUPP. APP. 0033**

During the penalty phase, Duchardt presented a lengthy and detailed mitigation case on behalf of Purkey, with testimony from eighteen witnesses spanning more than two days. The witnesses included Purkey's brother, daughter, and aunt, as well as inmates and religious counselors with whom Purkey had developed relationships while in prison. Each family member testified that, as a child, Purkey suffered significant physical and emotional abuse at the hands of his parents. The evidence established that Purkey's father was an alcoholic who repeatedly assaulted both Purkey and his brother and who eventually committed suicide. His mother, also an alcoholic, humiliated Purkey for stuttering, once throwing a drink in his face while he was having trouble speaking. Purkey's brother, Gary Hamilton, was sexually abused by their mother beginning at age eleven or twelve. Hamilton testified that she forced him to have sex with her in the bathroom on numerous occasions, though he did not know whether their mother also abused Purkey in this manner because the two never discussed it.

A religious counselor testified that Purkey was eager to leave his past behind, which Purkey had demonstrated by renewing his Christian commitments and expressing remorse for his crimes. Duchardt also elicited evidence that Purkey filed a request with the Bureau of Prisons to have his Aryan Brotherhood tattoos removed and attempted to cover up the tattoos on his own using flesh-toned ink. Family, friends, and fellow inmates alike testified that Purkey was a good friend, and that, if he were granted a life sentence rather than death, it would enrich their lives and the lives of his fellow prisoners.

Duchardt also presented testimony from various prison officials and mental health experts. Perhaps the most important evidence Duchardt presented came from two of Purkey's expert witnesses, Dr. Stephen Peterson and Dr. Mark Cunningham, who both testified in detail about the sexual abuse that Purkey suffered as a child. Dr. Peterson testified that Purkey's mother, Velma, sexually assaulted Purkey between ages six and fourteen, teaching him to "sexually stimulate her anally and orally and

-5-

SUPP. APP. 0034

. . . washing him in way[s] that were sexualized." Purkey also witnessed his mother "being sexually involved with many of her paramours" after his father left the family household. When Purkey was about fourteen years old, his father began offering to pay for prostitutes for Purkey, "encourag[ing] him to be sexually active well beyond his years and emotional development." According to Dr. Peterson, these experiences rendered Purkey unable to engage normally with anyone in a sexual way and caused him to seek sexual gratification in a "scripted and controlled" manner.

In addition to interviewing Purkey, Dr. Peterson reviewed Purkey's medical and mental health records to corroborate Purkey's account of his past. He located a Kansas State Reception Diagnostic Center report from 1982 that described Purkey as "having a serious personality disorder centered on psychosexual problems of identification," a diagnosis consistent with reports of Purkey's childhood sexual abuse. Dr. Peterson also found within Purkey's records a statement from his aunt, which corroborated Purkey's claims of childhood abuse.

Dr. Cunningham gave similar testimony. He discussed in detail the sexual acts that Velma forced Purkey to perform on her. She had Purkey "rub[] lotion on her . . . stimulat[e] her with a hair brush, penetrat[e] her with a hair brush, [engage in] oral genital sexual exchanges, and ultimately hav[e] intercourse with her." Dr. Cunningham also confirmed that Purkey witnessed his mother having sex with other men in their home. He further testified that it was not unusual for a male to conceal childhood sexual abuse, noting that Purkey's records revealed symptoms of sexual abuse when he was as young as fifteen. Duchardt also called a third expert witness, clinical psychologist Dr. Bruce Leeson, who testified that Purkey had significant frontal lobe damage that affected his ability to control impulsive behavior. He also testified that Purkey had a below-average IQ of 90.

For more than two days, the jury listened to witnesses testify that Purkey is a positive influence in their lives and that society would be better off if he were to

-6-

SUPP. APP. 0035

receive a life sentence rather than a death sentence. The jury also heard, in significant detail, that Purkey's parents abused him sexually throughout his childhood, causing him to develop abnormal sexual tendencies. Yet in his § 2255 motion to vacate, Purkey argues that Duchardt failed to present evidence of his childhood sexual abuse and his positive character traits. He also argues that Duchardt's performance fell short when preparing several mitigation witnesses for their testimony.

In Purkey's proffer of new evidence submitted with his § 2255 motion, several witnesses who testified during the penalty phase complain that, although Duchardt contacted them during his mitigation investigation, his investigative techniques were ineffective for various reasons. Hamilton, for example, claims that he withheld material evidence from Duchardt during the mitigation investigation because Duchardt's son was present during their interview. Purkey claims the evidence Hamilton withheld was pertinent to his defense. In his affidavit, Hamilton recalled an incident in which the boys' father slammed Velma's arm in a door repeatedly until it broke, indicating that he would have told the jury about the incident if Duchardt's investigation had been more thorough. Purkey's daughter, Angie Genail, criticizes Duchardt's investigation because he first visited her home for an interview on the day of her wedding and because he failed to follow up when she asked to reschedule. Duchardt only contacted her shortly before trial, never discussing his plan for her testimony, and Genail felt unprepared to testify as a result. If better prepared, Genail claims she would have testified about the many poems, stories, and songs that Purkey has written for her. Marguerite Hotchkiss, Purkey's aunt, felt similarly unprepared and further claims that the circumstances of her testimony, which Duchardt conducted via teleconference, hampered her testimony. Had Duchardt adequately prepared her, Hotchkiss now avers that she would have testified that Purkey's childhood home was unkempt and constantly reeked of liquor and cigarettes from his parents' drinking and smoking and that Velma was a "party girl" with poor parenting skills.

-7-

SUPP. APP. 0036

The non-testifying individuals identified in Purkey's proffer of new evidence complain that Duchardt's investigation was defective because he either never contacted them or chose not to have them testify. Purkey's cousin and two of his childhood friends reiterate that Purkey grew up in an abusive home and claim that he is nevertheless a positive influence in their lives. A volunteer prison minister avers that Purkey never caused problems with other inmates and that his "family is still his number one concern." Two family friends, Floyd Bose and Floyd's daughter Dion Lieker, commended Purkey for his role in solving the murder of Floyd's son (Dion's brother) in prison. Bose and Lieker each went on to develop relationships with Purkey, both noting that Purkey was very sorry for his crimes. Lieker especially found Purkey to be compassionate but also unstable because his father "beat the daylights" out of him and because his mother forced him to have sex with her. Dr. Rex Newton, a prison psychologist who knew Purkey in 1987, believed, based on Purkey's behavior in prison, that he had been sexually abused as a child and noted that he would have testified and discussed corroborating evidence if Duchardt had asked him to testify.

Purkey also argues that Duchardt failed to adequately prepare and present the testimony of Dr. Peterson, Dr. Cunningham, and Dr. Leeson. He claims Duchardt should have allowed Dr. Peterson and Dr. Cunningham to testify about Purkey's sexual abuse in greater detail, that Dr. Peterson was not properly prepared to testify because he was aware of additional medical records that corroborated Purkey's claims of childhood abuse and failed to mention them during cross-examination, that Duchardt should have allowed Dr. Cunningham to use a PowerPoint presentation that he prepared to aid his testimony, and that Duchardt should have better prepared Dr. Leeson to withstand the Government's cross-examination.

Finally, Purkey argues that Duchardt failed to adequately prepare Mark Russell and Dr. William Grant, resulting in their testimony being more prejudicial than beneficial. Russell, a correctional counselor at the Bureau of Prisons, testified that

-8-

SUPP. APP. 0037

Purkey was housed in a special cell block while awaiting trial and spent at least twenty-three hours per day in his cell. Dr. Grant, a Bureau of Prisons psychiatrist, testified about the medications he prescribed to treat Purkey's anxiety while awaiting trial. Purkey claims Dr. Grant's testimony was ultimately prejudicial because he characterized Purkey's "anxiety" as "attitude, belligeren[ce], irritab[ility]" in response to a question on cross-examination. Purkey argues that Russell's testimony became prejudicial because he revealed on cross-examination that Purkey was housed in a special unit due to his history of behavioral problems.

All of Purkey's proffered evidence does nothing to establish prejudice as required by *Strickland* because it is entirely cumulative. *See Paul*, 534 F.3d at 843 (holding that the existence of additional but cumulative mitigating evidence "[was] insufficient to undermine confidence in the jury's verdict in the penalty phase"). During the penalty phase, Duchardt presented two days of testimony to support the argument that Purkey would provide a net benefit to society if he were to serve a life sentence. The new evidence about Purkey's positive influence on others adds nothing of substance. Duchardt also presented extensive, detailed evidence from multiple sources about the sexual abuse Purkey suffered as a child. Dr. Peterson testified that Purkey's behavior as early as 1982 suggested a history of childhood sexual abuse. Notably, the Kansas State Reception Diagnostic Center report that Dr. Peterson discussed is the same corroborating evidence that Purkey now argues Dr. Newton could have presented. Purkey's isolated examples of "prejudicial" testimony resulting from Duchardt's alleged failure to prepare mitigation witnesses comprised only a tiny portion of Purkey's case in mitigation. As the newly proffered evidence is entirely cumulative and the examples of "prejudicial" mitigation testimony are insignificant compared to the rest of the extensive case in mitigation, we conclude that Purkey suffered no prejudice, even assuming Duchardt's representation was

-9-

constitutionally defective.[2] *See Hanegan v. Miller*, 663 F.3d 349, 354-56 (8th Cir. 2011), *cert. denied*, 566 U.S. ---, 132 S. Ct. 2393 (2012) (assuming counsel's performance fell below an objective standard of reasonableness but denying habeas relief because petitioner failed to establish prejudice); *see also Cullen*, 131 S. Ct. at 1409 (finding no prejudice where "new" evidence largely duplicated the mitigation evidence presented at trial); *Wong*, 558 U.S. at 22-23 (concluding that additional evidence of the defendant's "humanizing" features would not have affected the sentencing jury's decision); *Bobby v. Van Hook*, 558 U.S. 4, 12 (2009) (finding no prejudice where "[n]either the Court of Appeals nor [the petitioner] has shown why the minor additional details the [fact finder] did not hear would have made any difference").

Even assuming for the purposes of argument that Purkey's filings did present new material evidence, we must assess prejudice by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence" to determine whether "the result of the proceeding would have been different." *Wiggins*, 539 U.S. at 534 (citation omitted). The underlying crime in this case is particularly gruesome, and the Government presented substantial incriminating evidence during the guilt phase, which created context for the aggravation case it later presented during the

---

[2]Purkey spends a considerable portion of his brief arguing that the district court improperly denied his motion to strike Duchardt's 117-page affidavit. Purkey also argues that the Duchardt affidavit made an evidentiary hearing necessary because the affidavit contradicts some aspects of his proffered new evidence and asserts strategic choices that are not credible. The Government moves to strike this portion of Purkey's brief, arguing that Purkey's request to strike the affidavit is outside the scope of the COA. Purkey counters that the question is intertwined with the issues identified in the COA. Because we conclude that Purkey fails to establish prejudice without reaching the only matter addressed in the affidavit—whether Duchardt's performance fell below an objective standard of reasonableness—we need not consider any of the contents of Duchardt's affidavit. As a result, we deny as moot the Government's motion to strike.

-10-

SUPP. APP. 0039

penalty phase. According to Purkey's confession to the FBI, which was largely confirmed by his own testimony during the guilt phase, Purkey drove to Kansas City, Missouri, from his home in Lansing, Kansas, on January 22, 1998, for a job interview with a plumbing company. After the interview, Purkey smoked half a rock of crack cocaine and began driving down the street when he passed sixteen-year-old Jennifer Long, who was walking on the sidewalk. He pulled over to ask Jennifer if she wanted to "party," then took her to a liquor store to buy her gin and orange juice. After buying her the gin, Purkey told Jennifer he needed to go back to his home in Kansas. She asked to be let out of his truck. Instead, Purkey reached into the glove box, grabbed a boning knife, and placed it under his thigh, making it clear that he would not let her go.

When they arrived at his home, Purkey took Jennifer into a room in his basement. Holding a knife, he ordered her to take her clothes off and lie down on the floor, where he raped her. After Purkey finished raping her, Jennifer told him that she had been a virgin. He then grew fearful, and as Jennifer tried to escape his house, he grabbed her leg and forced her to the ground. The two briefly struggled before Purkey became enraged and repeatedly stabbed Jennifer in the chest, neck, and face with the boning knife, eventually breaking its blade inside her body. When he confessed, he told FBI Agent Dirk Tarpley, "it's not like in the movies. They don't die right away. It took her a little time to die." Purkey then stuffed Jennifer's body into a toolbox, cleaned up the surrounding area, and spent several hours drinking at a bar before driving to Sears to purchase an electric chainsaw. Over the next few days, Purkey used the chainsaw to dismember Jennifer's body while it was lying inside the box. Several times, Purkey had to stop and clean the chainsaw to continue cutting the body because it had become clogged with her remains. At one point, he examined Jennifer's heart, observing two stab wounds. Once he finished dismembering Jennifer's body, he divided her body parts among several plastic bags and added in leaves and debris from his back yard. Purkey enlisted his stepchildren to help him clean the basement with bleach. He then purchased several cords of

-11-

Appellate Case: 10-3462   Page: 11   Date Filed: 09/06/2013 Entry ID: 4072815

SUPP. APP. 0040

wood and began to burn the bags in his fireplace one by one while his wife and stepchildren were away at work and school. To keep the fire hot, he added diesel fuel. Despite these efforts, Jennifer's bones did not burn completely. He crushed the remaining bone fragments with his hands. When he finished burning Jennifer's body, Purkey collected her remains from the fireplace with a wet-dry vacuum and refilled the garbage bags. He then dumped the remains into a septic pond in Clearwater, Kansas.

No one knew about Jennifer's murder until Purkey himself contacted a Kansas City, Kansas police officer while incarcerated in a Kansas state prison for the unrelated murder of 80-year-old Mary Ruth Bales. The jury heard the details of Bales's murder during the penalty phase. Nine months after raping and murdering Jennifer Long, Purkey was employed by a plumbing company. He met Bales when he responded to a service call at her home during the evening of October 26, 1998. Purkey told Bales that his employer charged a great deal for the particular job she needed, and he offered to return later to do the work under the table if she would pay him $70 up front. She paid, and Purkey left, using Bales's money to hire a prostitute and buy several rocks of crack cocaine the next morning. Purkey and the prostitute proceeded to a motel room for several hours, where they had sex and smoked the crack cocaine before driving together to Bales's house. Telling the prostitute that someone who lived in the home owed him money, Purkey went inside with a toolbox from his truck and bludgeoned Bales to death in her bedroom with a claw hammer. Investigators determined that Bales, who had suffered from polio and walked with a cane, died from blunt force trauma resulting from repeated strikes to her skull with the claw side of the hammer. Bales also suffered from defensive wounds on both hands.

After murdering Bales, Purkey stayed at Bales's house for several hours with the prostitute, injecting drugs, smoking crack cocaine, and eating food from Bales's kitchen. The next day, Purkey returned to the house with two gallons of gasoline,

-12-

intending to burn it down. He was arrested after a neighbor saw him in Bales's back yard and reported him to the police. Purkey pled guilty to murdering Bales and faced a life sentence in the Kansas penitentiary. In a misguided attempt to avoid serving a life sentence in state prison for murdering Bales, Purkey contacted authorities about the interstate abduction, rape, and murder of Jennifer Long, hoping to serve his life sentence in the relatively more comfortable surroundings of a federal penitentiary.

In addition to the details of Bales's murder and the other evidence related to the circumstances of Purkey's confession, the Government introduced evidence of Purkey's thirteen prior felony convictions, including: first-degree burglary in 1970; robbery and theft in 1976; aggravated escape from custody in 1978; and multiple counts of aggravated robbery, kidnaping, aggravated battery, and firearms violations in 1981. The jury also heard from several additional witnesses during the penalty phase. Gregg Carlberg testified that in 1980 Purkey and his friend kidnaped Carlberg, drove him into the woods, shot him in the head, and left him for dead. Gary Hatfield, a man who was incarcerated with Purkey in Oregon, testified that Purkey raped him at knife-point in a prison kitchen. A prison gang expert explained that Purkey's "Aryan Pride," swastika, and Ku Klux Klan tattoos indicated his involvement with the Aryan Brotherhood. And finally, Jennifer Long's family shared the impact of her death. Her father told the jury, "I can sit here for hours and tell you that he didn't murder her that day, he murdered me"; her mother lamented, "I lost my house. . . . I lost my job. I lost my car. I lost my husband. I lost my will. I lost a lot of great things, but most of all I lost her." After deliberating, the jury found nine aggravating factors beyond a reasonable doubt and determined that Purkey should be sentenced to death. *See Purkey*, 428 F.3d at 746.

In light of the heinous abduction, rape, and murder of sixteen-year-old Jennifer Long and the similarly heinous bludgeoning murder of eighty-year-old Mary Ruth Bales, both committed by someone who also had been convicted of first-degree burglary, aggravated robbery, theft, aggravated escape from custody, aggravated

-13-

battery, and who also kidnaped and tried to kill an innocent bystander and raped a man in prison, we conclude that it is not substantially likely that the jury would have returned a different sentence had Purkey's proffered evidence been presented to it. *See Cullen*, 131 S. Ct. at 1403 (requiring a habeas petitioner to show a "'substantial,' not just 'conceivable,' likelihood of a different result" to establish prejudice (quoting Harrington 131 S. Ct. at 792)). The aggravating evidence is too overwhelming and the "new" mitigating evidence too redundant for us to conclude that even "one juror would have struck a different balance." *See Wiggins*, 539 U.S. at 537; *see also Williams v. Roper*, 695 F.3d 825, 832-33 (8th Cir. 2012) (concluding that the state court reasonably determined that new evidence of the defendant's childhood sexual abuse did not establish prejudice where the state presented overwhelming aggravation evidence); *Paul*, 534 F.3d at 840-42 (affirming the denial of an inmate's § 2255 motion and holding that the inmate's newly proffered evidence was largely cumulative and thereby failed to establish the reasonable probability of a different sentence).[3]

Accordingly, we affirm the district court's denial of Purkey's motion to vacate, set aside, or correct his sentence.

---

[3]Purkey also asks us to reverse the district court because it relied on the arguably incomplete mitigating factors portion of the verdict form to conclude that Purkey failed to establish prejudice. *See Purkey v. United States*, 06-8001-CV-W-FJG, 2009 WL 3160774, at *5 (W.D. Mo. Sept. 29, 2009) ("[O]f the twenty-seven mitigating factors which were presented to the jury, no jurors voted for a single mitigating factor."). However, we review the issue of prejudice *de novo*, *Hamberg v. United States*, 675 F.3d 1170, 1172 (8th Cir. 2012), and we have not relied on the fact that the jury did not record any findings with respect to the mitigating factors in reaching our conclusion that Purkey fails to establish prejudice. On direct appeal, we held that the jury is not required to identify the mitigating factors it may find to exist and that the district court did not err when it accepted the arguably incomplete form. *See Purkey*, 428 F.3d at 763.

-14-

SUPP. APP. 0043

III.

Purkey also argues that the district court abused its discretion by denying his request for an evidentiary hearing. No evidentiary hearing is required where "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." 28 U.S.C. § 2255(b). We review the denial of a § 2255 evidentiary hearing for an abuse of discretion, but this standard is "somewhat misleading . . . because review of the determination that no hearing was required obligates us to look behind that discretionary decision to the court's rejection of the claim on its merits, which is a legal conclusion that we review de novo." *Noe v. United States*, 601 F.3d 784, 792 (8th Cir. 2010) (quoting *Saunders v. United States*, 236 F.3d 950, 952 (8th Cir. 2001)). Thus, when reviewing the denial of Purkey's motion for an evidentiary hearing, we must review the district court's conclusion that the evidence Purkey presented along with his § 2255 motion, taken as true, was insufficient to establish a violation of his Sixth Amendment right to effective assistance of counsel. As explained above, our *de novo* review of the record conclusively shows Purkey is unable to establish prejudice as required by *Strickland*. We therefore hold that the district court did not abuse its discretion by denying Purkey's request for an evidentiary hearing. *See Hill v. Lockhart*, 474 U.S. 52, 60 (1985) ("Because petitioner in this case failed to allege the kind of 'prejudice' necessary to satisfy the second half of the *Strickland v. Washington* test, the District Court did not err in declining to hold a hearing on petitioner's ineffective assistance of counsel claim.").

-15-

**SUPP. APP. 0044**

IV.

We affirm.[4]

_____

<hr>

[4]We also deny Purkey's belated motion to proceed *pro se*, filed after the case was fully briefed.

-16-

**SUPP. APP. 0045**

# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

WESLEY IRA PURKEY, )
)
Petitioner, )
)
v. ) No. 06-8001-CV-W-FJG
)
UNITED STATES OF AMERICA, )
)
Respondent. )

## ORDER

Currently pending before the Court is petitioner's Motion for a Certificate of Appealability (Doc. # 107).

## I. BACKGROUND

On September 29, 2009, the Court entered an Order denying Purkey's Petition for Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2255. On October 13, 2009, Purkey filed a Motion to Alter the Judgment. On December 22, 2009, the Court denied the Motion to Alter the Judgment. Purkey filed the instant Motion for a Certificate of Appealability ("COA") on March 24, 2010. Purkey is seeking a Certificate of Appealability on four issues: 1) Whether he was denied effective assistance of counsel due to his counsel's failure to adequately investigate and present the available mitigation evidence; 2) Whether an evidentiary hearing should have been conducted regarding Purkey's claims of ineffective assistance of counsel and whether this Court's findings are sufficient to provide for meaningful appellate review; 3) Whether counsel's affidavit exceeded the scope of Purkey's waiver of his attorney-client privilege and 4) Whether counsel was ineffective in not calling Dr. Peterson to rebut the Government's unfounded charge that Purkey fabricated his recantation of the kidnaping right before

**SUPP. APP. 0046**

trial rather than having done so earlier.

## II. STANDARD

Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue only if a movant has made a substantial showing of the denial of a constitutional right. See Miller-El v. Cockrell, 537 U.S. 322, 335-36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); Garrett v. United States, 211 F.3d 1075, 1076-77 (8th Cir.2000); Carter v. Hopkins, 151 F.3d 872, 873-74 (8th Cir.1998); Cox v. Norris, 133 F.3d 565, 569 (8th Cir.1997); Tiedeman [v. Benson],122 F.3d 518, 523 [(8th Cir. 1997)]. To make such a showing, the issues must be debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings. Cox, 133 F.3d at 569 (citing Flieger v. Delo, 16 F.3d 878, 882-83 (8th Cir.1994)); see also Miller-El, 537 U.S. at 335-36 (reiterating standard). Courts reject constitutional claims either on the merits or on procedural grounds. "'[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy [28 U.S.C.] § 2253(c) is straightforward: the [movant] must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" Miller-El, 537 U.S. at 338 (quoting Slack v. McDaniel, 529 U.S. 473, 484,120 S.Ct.1595, 146 L.Ed.2d 542 (2000)).

Masse v. United States, Nos. C08-0092-LRR,CR04-0072-LRR, 2010 WL 3724536, *3 (N.D.Iowa Sept. 16, 2010).

## III. DISCUSSION

### A. Failing to Adequately Investigate & Develop the Mitigation Case

Purkey claims that his former counsel, Mr. Fred Duchardt, was ineffective for failing to:

1. Obtain corroboration and substantive information from Purkey's brother, Gary Hamilton and Purkey's friend, Peggy Martenay Noe, regarding Purkey's father's violence and his mother and grandmother's sexual abuse of Purkey and his brother.

2. Obtain rebuttal evidence, countering the Government's argument of recent fabrication, establishing Purkey's prior report of sexual abuse to Dr. Newton in the Oregon Dept. Of Corrections.

3. Obtain rebuttal evidence from Dr. Newton countering the government's arguments that Purkey was racist and active in prison gangs.

2

**SUPP. APP. 0047**

4.  Obtain significant positive character evidence, including favorable testimony from two former law enforcement officers, Mr. Bose and Ms. Leiker.

Purkey also argues that Mr. Duchardt failed to adequately prepare defense witnesses for their testimony and this resulted in the expert witnesses being unable to provide any meaning or details to describe the generic label of "sexual abuse" and losing credibility during cross-examination because they were unfamiliar with portions of Purkey's background records and history.  Purkey argues that in ruling on the § 2255 motion, the Court simply made conclusory findings that Purkey "failed to overcome the presumption that Mr. Duchardt's actions were not sound trial strategy."  Purkey also argues that the Court make conclusory findings that counsel's "actions did not fall below an objective standard of reasonableness."  Purkey argues that in deciding whether a Certificate of Appealability should issue, the Court needs to only make a "general assessment of [the] merits"  and he has established the debatability of the underlying constitutional claim.

The Government argues that Mr. Duchardt presented eighteen witnesses in support of twenty-seven mitigating factors, and that the additional mitigating evidence which he argues Mr. Duchardt should have developed or introduced  would simply have been cumulative evidence.

Purkey argues that while Mr. Duchardt did conduct some investigation - he gathered records, retained mental health experts and interviewed family members and others who had known Purkey for several years, these efforts were only directed at the limited time frame surrounding the crimes.  For example, Purkey argues that Mr. Duchardt did not adequately interview Purkey's brother and he only interviewed his aunt and cousin by phone.  The only information obtained about Purkey's childhood was

**SUPP. APP. 0048**

from records.  Purkey argues that Mr. Duchardt failed to interview Peggy Noe, who was Purkey's common law wife and who knew Purkey when he was a young man.  He also did not interview Ms. Noe's daughter, two former law enforcement officers or Dr. Rex Newton, a prison psychologist who had treated Purkey for years before he committed the crime at issue.  If Mr. Duchardt had interviewed these witnesses, it would have confirmed that Purkey had complained to several people that he was sexually abused by his mother *before* he was facing capital murder charges.  Purkey argues that Mr. Duchardt failed to present corroborative evidence for the experts and to call unbiased lay witnesses who possesses enhanced credibility.  Purkey argues that he has made a threshold showing  that reasonable jurists could debate whether he is entitled to relief and thus he should be granted a Certificate of Appealability on this issue.

Purkey notes that this Court need only make a threshold inquiry rather than fully considering whether he has established that he is entitled to relief.  In the affidavit provided by Mr. Duchardt he recounts that he "located and obtained thousands of pages of records pertaining to Mr. Purkey and his family.  I thoroughly read all of the records and I had two professionals, psychiatrist, Dr. Stephen Peterson, M.D. and psychologist, Dr. Mark Cunningham, Ph.D., do the same.  Dr. Peterson and Dr. Cunningham produced comprehensive reports about their review.  Out of this preparatory work sprung a mitigation case consisting of eighteen lay and expert witnesses whose combined presentations cover over 500 hundred pages of transcript." (Duchardt Affidavit, Doc. 73, Ex. A, pp. 49-50).  Mr. Duchardt explains in his affidavit that before trial, Purkey's brother, Gary Hamilton did not share as many details about their mother's sexual deviancy as he has since shared with Purkey's current counsel.  However, evidence of Purkey's sexual abuse by his mother was presented during the mitigation

4

**SUPP. APP. 0049**

case.  Additionally, Mr. Duchardt states that it is his recollection that he did speak with Peggy Noe, but that there were some problems either in her relationship with Purkey or in her background which is why Mr. Duchardt did not call her to testify. In an affidavit attached to Purkey's Reply Suggestions in Support of his § 2255 motion, Peggy Noe states that Mr. Duchardt did not contact her before or after trial and she never spoke with him.  (Margaret Noe Affidavit, Doc. # 82, Ex. 14).  Evette Noe also states in an Affidavit that Mr. Duchardt did not speak with her either, although she had tried to contact him on numerous occasions. (Evette Noe Affidavit, Doc. # 82, Ex. 15).  Mr. Duchardt notes that the Government was not disputing that Purkey had been sexually abused by his mother, so there was no real need to call Ms. Noe to counter this argument.  Mr. Duchardt also notes in his Affidavit that his recollections with regard to Peggy and Evette Noe were not as clear as the other witnesses because he gave to Purkey's current counsel all the file materials he had regarding these witnesses.

With regard to Dr. Rex Newton, Mr. Duchardt explains that he considered calling Dr. Newton, but decided against it because it would have opened the door and allowed the Government to present unfavorable evidence. Mr. Duchardt notes that while Purkey was housed in the Oregon prison system, he was engaging in activities that were against the rules and were possibly criminal.  Additionally, Mr. Duchardt states that he did not need to call Dr. Newton to testify that Purkey had told him in the late 80's that his mother had sexually abused him because the Government did not dispute the claim that Purkey was sexually abused.

Mr. Duchardt explains why he did not call Floyd Bose or his daughter Dion Leiker. (Duchardt Affidavit, Doc. 73, Ex. A, pp. 70-72).  Mr. Duchardt states that while they could have possibly provided helpful information regarding Purkey's character,

5

there were significant problems with their testimony - such as the fact that Purkey provided them with details regarding the murder of one of their family members who Purkey had known while in prison. Mr. Duchardt worried that presenting their testimony might demonstrate that Purkey was closely connected to prison violence. Additionally, he was worried that since Mr. Bose and Ms. Leiker had given Purkey money while in prison, it might appear that Purkey had provided them with information about the murder only for financial gain. It should be noted that in an Affidavit attached to Purkey's Reply Suggestions, Dion Leiker disagrees with Mr. Duchardt's statement that he had spoken with her. Ms. Leiker states, "I did not talk to Mr. Duchardt before Wes' trial or even before his sentencing. I spoke with Mr. Duchardt twice after Wes was transferred to the prison in Terre Haute, but neither conversation had anything to do with Duane or my friendship with Wes." (Leiker Affidavit, Doc. 82, Ex. 12). Ms. Leiker also states that her brother was not killed while in prison and that Purkey had overheard the information about the murder from another inmate. (Leiker Affidavit, Doc. 47, Ex. 21). Mr. Bose states in his affidavit that he gave Purkey $10.00 or $20.00 dollars a few times, but that Purkey never asked him for the money and it had nothing to do with the information Purkey provided about his son. (Bose Affidavit, Doc. 82, Ex. 13).

In Wong v. Belmontes, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009), defendant alleged that his counsel was ineffective for failing to investigate and present sufficient mitigating evidence during the penalty phase of his trial. The Supreme Court stated:

> To prevail on this claim, Belmontes must meet both the deficient performance and prejudice prongs of Strickland [v. Washington], 466 U.S., at 687, 104 S.Ct. 2052, [80 L.Ed.2d 674 (1984)]. To show deficient performance, Belmontes must establish that "counsel's representation fell below an objective standard of reasonableness." Id. at 688, 104 S.Ct. 2052. In light of "the variety of circumstances faced by defense counsel [and] the range of legitimate decisions regarding how best to represent a

6

criminal defendant," the performance inquiry necessarily turns on "whether counsel's assistance was reasonable considering all the circumstances." Id., at 688-689, 104 S.Ct. 2052. At all points, "[j]udicial scrutiny of counsel's performance must be highly deferential." Id., at 689, 104 S.Ct. 2052.

Id. at 384-385. In reviewing the evidence which was presented and considering the evidence which was not presented, the Court does not find that reasonable jurists would disagree that Mr. Duchardt's performance was reasonable considering all of the circumstances. As he explains in his Affidavit, there were specific and strategic reasons as to why he did not call certain witnesses or inquire into matters with other witnesses. The Court finds that the decisions counsel made were based on a well reasoned trial strategy. Accordingly, the Court hereby **DENIES** a Certificate of Appealability on the claim that Mr. Duchardt failed to Adequately Investigate and Develop the Mitigation Case.

**B. Whether An Evidentiary Hearing Should Been Conducted and Whether This Court's Findings are Sufficient to Provide for Meaningful Review**

Purkey argues that the Court relied on the 117-page Duchardt affidavit and ignored the 31 affidavits filed by Purkey. He argues that these competing affidavits alone establish questions of fact that cannot be resolved without taking testimony. Purkey argues that in a capital case, establishing a "reasonable probability that at least one juror would have struck a different balance," can only be determined by weighing the full body of mitigation evidence that was presented against that which could have been presented and which might have influenced the jury's decision. Purkey argues that without hearing the mitigation evidence that *could have been* presented, the Court has nothing against which to judge whether, when added to the mitigation evidence actually presented, the full body of mitigation evidence might produce a "reasonable

7

**SUPP. APP. 0052**

probability" that at least one juror would have voted to spare Purkey's life. Purkey argues that a "reasonable probability of a different result" is thus *less than a preponderance of the evidence.* It is present when an evaluation of all of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 694 (1984). Purkey argues that the Court's analysis was flawed because by concluding that the jury was not swayed by the mitigation evidence that was presented it also would have rejected the full body of mitigation that *could have been* presented. Purkey argues that this reasoning would make it impossible for any capital defendant to prove prejudice. Purkey also argues that the Order is inconsistent because it states at one point that the jury "simply chose not to give any weight to that evidence [mitigating factors] which under the law they are entitled to do." Later in the Order it is stated that "no jurors voted for a single mitigating factor." Purkey argues that neither statement can be made with any certainty because the Verdict form is blank as to the mitigating factors. Purkey argues that this is the only case from the Western District of Missouri in which the jury simply left the form blank as to all the mitigating factors. He argues that this lack of voting on the mitigating factors made it impossible to ascertain what evidence the jury considered to be mitigating, how it may have weighed that evidence and how the full body of mitigating evidence that could have been presented would have been viewed by each individual juror. Purkey then argues that the jury must have had difficulty in returning its verdict because the jury deliberated for nearly eleven hours over the course of two days.

Purkey also argues that the Order denying his § 2255 claims was conclusory and did not discuss any of the specific claims or evidence that should have been offered at trial. He argues that this does not allow the Eighth Circuit a clear understanding of the

8

**SUPP. APP. 0053**

basis of this Court's decision.

The Government argues that in this case there is no need for an evidentiary hearing, because Mr. Duchardt provided a very extensive, detailed affidavit. The Government also notes that all of the other cases which Purkey cited are distinguishable. Finally, the Government notes that the length of time the jury deliberated does not necessarily mean this was a close case. The jury was required to deliberate on 37 separate factors (10 aggravating and 27 mitigating) after listening to 31 witnesses testify over the course of several days. The Government also notes that the jury is presumed to follow the court's instructions, so Purkey's complaints that they did not fill in the mitigation form is without merit.

Purkey argues that an evidentiary hearing is required in this case because Mr. Duchardt's affidavit contradicts the affidavit of his co-counsel, Laura O'Sullivan as well as the affidavits of other witnesses. Purkey argues that this was the same situation which occurred in Sinisterra v. United States, 600 F.3d 900 (8th Cir. 2010), and the Eighth Circuit recently remanded that case for an evidentiary hearing. Thus, he argues that because he has shown that reasonable jurists could find this Court's refusal to hold an evidentiary hearing debatable, he is entitled to a Certificate of Appealability on this issue.

The Court disagrees and finds that the issues are resolvable based solely on the record and the pleadings. Purkey argues that the affidavits which he submitted create questions of fact which must be resolved by hearing the testimony of these witnesses. The Court has reviewed the affidavits of these witnesses as well as the affidavit of Mr. Duchardt's co-counsel, Laura O'Sullivan, and find the majority of the affidavits do not create issues of fact. Although some of the affidavits dispute Mr. Duchardt's

9

recollection of events, the Court does not find that these differences are significant.

Most of the affidavits are from individuals who state they would have testified in the

mitigation phase had Mr. Duchardt called them.  For example, Mr. Duchardt states in his

Affidavit that Debbie Prothero, who was Purkey's cousin, indicated that she had little

recollection of her relationship with Wes and she was in favor of the death penalty.  Mr.

Duchardt therefore decided not to call her in the mitigation phase.  However, in her

Affidavit, Ms. Prothero states:

> Being confronted with the prospect of my cousin being executed has really
> challenged my support of the death penalty.  I have prayed about it often.
> Wes is family, and I have never wanted to see him executed.  I spent
> hours on the phone with Mr. Duchardt, I helped my mother (Marguerite
> Hotchkiss) write out the details of the dysfunctional family Wes came from,
> and I maintained close communication with Wes while he was in pretrial
> confinement and since then. My actions demonstrate how wrong Mr.
> Duchardt got it.  As I previously stated, I would have been more than
> willing to testify on Wes' behalf.  Mr. Duchardt simply never suggested that
> to me.

 (Prothero Affidavit, Doc. 82, Ex. 6).  In their affidavits they offer details as to what

information they would have provided.  However, this additional information would only

have added to the *quantity* of mitigation evidence and would not have changed the type

or the nature of evidence which was offered.  As previously discussed, in the penalty

phase of the case Mr. Duchardt submitted 27 mitigating factors[1] and called 18

---

[1] The mitigating factors presented included: 1) Purkey's capacity to appreciate
the wrongfulness of his conduct or to conform his conduct to the requirements of the law
was significantly impaired; 2) Purkey committed the offense under severe mental or
emotional disturbance; 3) With proper medications, such as the medications which
Purkey is currently taking, Purkey's mental illness and behaviors can be managed;
4) Purkey suffered brain injuries as a result of car accidents, drug abuse or both;
5) Purkey suffered significant psychological and emotional damage as a result of the
serious physical and emotional abuse of him by his parents; 6) Purkey suffered
significant psychological and emotional damage as a result of sexual abuse of him by
his mother; 7) Purkey suffered significant psychological and emotional damage as a
result of his growing up in a dysfunctional home environment in which alcohol abuse,

SUPP. APP. 0055

witnesses to testify. Purkey argues that the Court's analysis was flawed because by concluding that the jury was not swayed by the evidence that was presented, they would have also rejected the evidence which *could* have been presented. However,

---

sexual promiscuity and incestuous sex were modeled as proper behavior by his parents; 8) Purkey has never received treatment for the psychological and emotional damage which he suffered as a result of his parent's abuse of him; 9) Purkey's past criminal behavior is attributable, at least in part, to the brain injuries and psychological and emotional damage which he suffered earlier in his life; 10) Purkey became dependent upon alcohol and illegal drugs at an early age because of a genetic predisposition inherited from his parents and because such dependence was modeled for him by his parents and his older brother Gary; 11) Purkey's past criminal behavior is attributable, at least in part, to his alcohol and drug dependence; 12) As a child, Purkey suffered from slow speech development, and for his entire life, Wes Purkey has suffered from the disability of stuttering; 13) While incarcerated, Purkey was the victim of serious physical abuse, that is stabbings; 14) While incarcerated, when given the opportunity to do so, Purkey completed a significant number of hours of college coursework; 15) While incarcerated, when given the opportunity to do so, Purkey received training and became qualified as a plumber; 16) Purkey has offered to donate a portion of his liver to his sister-in-law who is dying of liver failure; 17) Purkey should be sentenced to life imprisonment without release because Purkey was led to believe that he would receive that sentence if he provided information regarding the killing of Jennifer Long, and Purkey provided all of the information which was required; 18) The disappearance of Jennifer Long was solved only because Purkey came forward and admitted that he had killed Jennifer Long, and directed authorities to evidence about the killing; 19) By coming forward and admitting that he had killed Jennifer Long, and directing authorities to evidence about the killing, Mr. Purkey has shown remorse for what he did; 20) Purkey has repeatedly expressed his remorse for what he has done; 21) Purkey is the father of Angie Purkey Genail, and the two have carried on a loving, father-daughter relationship, with Purkey providing Angie Purkey Genail advice, nuturance and emotional support, even while he has been incarcerated; 22) Angie Purkey Genail loves her father Mr. Purkey very much; 23) If Purkey is sentenced to life imprisonment without possibility of release, he and Angie Purkey Genail would continue to carry on a loving, nuturing father-daughter relationship; 24) Purkey is the grandfather of Angie Purkey Genails's children Mikey, age 4 and Haley, age 1, and has carried on a loving, grandfatherly relationship, particularly with Mikey, speaking with Mikey on the telephone on numerous occasions; 25) If Purkey is sentenced to life imprisonment without possibility of release, he and his grandchildren Mikey and Haley would continue to carry on a loving, nuturing grandfather/grandchild relationship; 26) Purkey has loving and caring relationships with friends and family, and those relationships would continue if he was sentenced to life imprisonment without possibility of release; 27) In the last three years, Mr. Purkey has volunteered to offer good advice to many young men in trouble about how to avoid a life of crime, and would continue to do so if sentenced to life imprisonment without possibility of release.

11

SUPP. APP. 0056

the Court finds that there is not a "reasonable probability" that this additional evidence would have swayed at least one juror, because despite carefully filling out all the other areas of the Special Verdict Form, and signing their names below the Certification, not one juror indicated that they found the existence of a single mitigating factor. Purkey argues that it is impossible to tell how the jury weighed the mitigation evidence. However, the Verdict Form clearly states in the instructions: "[f]or each of the following mitigating factors, indicate, in the space provided, the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence." Thus, by leaving all of the spaces blank, the logical conclusion is that none of the jurors found the existence of *any* of the mitigating factors. This conclusion is bolstered by the fact that the jury completely filled out the remainder of the nineteen page Special Verdict Form, finding the existence of six Statutory Aggravating Factors and three Non-Statutory Aggravating Factors. The jury did not find that the Government had established beyond a reasonable doubt the future dangerousness of the defendant.

In <u>Paul v. U.S.</u>, 534 F.3d 832 (8th Cir. 2008), <u>cert.</u> <u>denied</u>, 130 S.Ct. 51 (2009), the Eighth Circuit considered a similar argument that an attorney should have presented additional mitigation evidence. The Court rejected that argument stating:

> Viewing Paul's proffer in the context of the trial record as a whole, we are not persuaded that there is a reasonable probability that if Paul's trial counsel had gathered and presented this additional evidence, then the jury would not have selected a sentence of death. Much of the new evidence cited by Paul is largely cumulative of evidence that was presented through his mother at the penalty phase of the trial. Paul's mother testified about Paul's difficult childhood, including the incident in which Paul's father struck Paul in the face with a knife and produced a wound that required extensive surgery. The jury clearly gave weight to her account, unanimously finding three mitigating factors relating to Paul's troubled upbringing. The additional evidence that Paul proffers concerning his compassionate nature is also largely duplicative. Paul's mother testified at trial that he cared for animals, shared a close relationship with

12

**SUPP. APP. 0057**

his great-grandmother, and supported his family financially. Id. at 842.

The Eighth Circuit found that the additional witnesses might also have caused negative repercussions for Paul's case. The Court noted that "[n]othing that Paul offers detracts from the government's strong case in aggravation, and the weight of this evidence is a proper and significant factor in considering whether Paul has established prejudice." Id. at 843.

In Purkey's case, the Government also presented a very strong aggravation case. The jury heard testimony describing how Purkey first raped Jennifer Long, then stabbed her several times. Following the murder, he described how he put her body into a tool box and then used a chainsaw to dismember her body, put her body parts in plastic bags and then burned them in a fireplace. Purkey also described how he swept the ashes out of the fireplace and put any remaining bones into the bags and then threw the bags into a septic pond in Clearwater, Kansas. The jury also heard that Purkey confessed to murdering an eighty year old woman with a claw hammer. Additionally, the jury also heard that Purkey had kidnapped and robbed a man in 1980 and then shot him in the back of the head. The jury certainly weighed this strong aggravating evidence against all the mitigation evidence that Mr. Duchardt presented. The Court is capable without a hearing, of weighing the mitigation case which was presented against the mitigation case which could have been presented. The Court has determined that the additional evidence which Purkey argues should have been presented would have been as in the Paul case, largely cumulative to the evidence that was presented. The Court finds that it is not reasonably possible that the testimony of these additional witnesses would have swayed at least one juror to have voted for a life

13

**SUPP. APP. 0058**

sentence.  Accordingly, the Court finds that reasonable jurists would not find this issue debatable, thus there is no need to issue a Certificate of Appealability on whether the Court Should Have Conducted An Evidentiary Hearing.

## C. <u>Whether Mr. Duchardt's Affidavit Exceeded the Scope of the Privilege</u>

Purkey argues that the District Court should have stricken Mr. Duchardt's affidavit because a) he included more attorney/client privileged communication that what was necessary; b) Purkey was not allowed an opportunity to see the affidavit before it was disclosed to the Government and c) Mr. Duchardt conducted independent legal research and analysis seeking to disprove his former client's legal arguments. Purkey argues that this Court in rejecting his claim that the Affidavit did not exceed the privilege transformed the limited waiver of privilege into a blanket waiver that gave Mr. Duchardt an unfettered license to disclose any and all privileged communications whether relevant to a claim of ineffectiveness or not.

The Government argues that Purkey cites no authority for this Court to strike an affidavit which this Court ordered Mr. Duchardt to prepare.  The Government states that Purkey made numerous and detailed claims of ineffectiveness against Mr. Duchardt and the revelations were necessary in order to rebut those charges.

Purkey argues that Mr. Duchardt in his 117 page affidavit did not merely state the facts as he recalled them, but instead made legal arguments aimed at undermining Purkey's § 2255 motion.  Purkey argues that 21% of the affidavit is devoted to legal argument about the applicability of the cases and the strength of the arguments cited in Purkey's memorandum.  Purkey also argues that Mr. Duchardt disparaged several witnesses who Purkey argues should have been called in the mitigation case.  Purkey argues that reasonable jurists could find this Court's ruling debatable and thus he is

14

entitled to a Certificate of Appealability on this issue.

Purkey argues that the Professional Rules and <u>Tasby v. United States</u>, 504 F.2d 332, 336 (8th Cir.1974), <u>cert. denied</u>, 419 U.S. 1125, 95 S.Ct. 811, 42 L.Ed.2d 826 (1975), require the Court to analyze each of Purkey's seventeen specific allegations of ineffectiveness and determine whether each response in Mr. Duchardt's 117 page affidavit was reasonably necessary to answer the allegations. The Court disagrees and does not find anything in the Rules or in <u>Tasby</u> which requires such an exercise. <u>Tasby</u> states, "[w]hen a client calls into public question the competence of his attorney, the privilege is waived." <u>Id</u>. at 336. <u>See</u> <u>also</u> <u>Bittaker v. Woodford</u>, 331 F.3d 715,716 (9th Cir.), <u>cert. denied</u>, 540 U.S. 1013, 124 S.Ct. 536, 157 L.Ed.2d 424 (2003)("It has long been the rule in the federal courts that, where a habeas petitioner raises a claim of ineffective assistance of counsel, he waives the attorney-client privilege as to all communications with his allegedly ineffective lawyer."). Purkey may not like the way that Mr. Duchardt drafted his affidavit or how he framed the issues, but the Court finds that the disclosures in Mr. Duchardt's affidavit were necessary in order to rebut the numerous charges of ineffectiveness raised by Mr. Purkey. Because the Court does not find that reasonable jurists could disagree regarding this issue, the Court will not issue a Certificate of Appealability on this issue.

### D. Failing to Call Dr. Peterson in Rebuttal

Purkey states that during his interviews with Dr. Peterson in the fall of 2002, he denied kidnaping Ms. Long, telling Dr. Peterson that she had gone with him voluntarily. Before trial, the Court sustained the Government's motion in limine to preclude Dr. Peterson from testifying that Purkey had denied kidnaping Ms. Long. On Nov. 4, 2003, before the court reconvened to begin the defense's case-in-chief, Mr. Duchardt

15

**SUPP. APP. 0060**

informed Purkey that he had to testify because the defense had nothing else on which to base its argument that there had been no kidnaping. Laura O'Sullivan told Purkey that the Court would strike his entire testimony if he mentioned his statements to Dr. Peterson. On cross, the Government asked Purkey if he had recently come up with a story that he had not kidnaped Ms. Long. Purkey responded, "That's true." Purkey argues that Mr. Duchardt should have rebutted this admission by calling Dr. Peterson to testify in order to rehabilitate Purkey.

The Government argues that as Mr. Duchardt points out in his affidavit, calling Dr. Peterson would have accomplished nothing because there is little significance as to when he recanted his confession. The Government also notes that it was certainly reasonable for Mr. Duchardt to not call Dr. Peterson to refute this allegation, because he did not want to risk jeopardizing Dr. Peterson's credibility during the guilt phase. The Government argues that Purkey is simply trying to second guess Mr. Duchardt's trial strategy.

Purkey argues that Mr. Duchardt did not make a reasoned "strategic" decision whether to call Dr. Peterson in rebuttal because immediately following Purkey's testimony, the court recessed for an offer of proof, followed by a brief discussion regarding the schedule for the next day, followed immediately by Mr. Duchardt announcing that the defense was resting its case in the guilt phase of the trial. Purkey argues that Laura O'Sullivan will testify that she did not recall any discussion after Purkey's testimony about calling Dr. Peterson to testify about the kidnaping recantation. Purkey argues that Mr. Duchardt has come up with his rationalization as to why he did not call Dr. Peterson after the fact, and that he did not consider whether he should have called him during the trial. Because reasonable jurists could find this Court's ruling on

16

SUPP. APP. 0061

this issue debatable, Purkey argues that he is entitled to a Certificate of Appealability.

The Court disagrees. As Mr. Duchardt notes in his affidavit, Purkey had discussions with Dr. Peterson in 2002, which was four years *after* Purkey's statements that he had kidnaped Jennifer Long and only one year *before* the trial. Mr. Duchardt also states that he did not want Dr. Peterson to have to testify regarding this issue because he believed that it might color the juror's perceptions of Dr. Peterson's testimony in the penalty phase of the trial. Mr. Duchardt stated in his affidavit:

> I knew that Dr. Peterson's testimony would be crucial in the penalty phase. The conclusions which Dr. Peterson would offer at the penalty phase were in no way dependent upon the truth or falsity of Wes' denial that there had been kidnapping. In fact, Dr. Peterson would not even testify unless the jury disbelieved Wes, and determined that there was a kidnapping. Had we done what Wes was suggesting, we would have brought Dr. Peterson in the first phase for the sole purpose to relate Wes' denial of the kidnapping. I believed that would have caused jurors to indelibly link Dr. Peterson, and therefore what he would say later, with the truthfulness of Wes' denial of the kidndapping.

(Duchardt Affidavit, Doc. 73, Ex. A, pp. 104-105).

In <u>United States v. Monnier</u>, No. 8:02CR429, 2010 WL 2483885, (D.Neb. June 4, 2010), the Court stated:

> Under <u>Strickland</u>, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. <u>Rodela-Aguilar v. United States</u>, 596 F.3d 457, 464 (8th Cir.2010). The Eighth Circuit has "consistently held that a reasoned decision not to call a witness 'is a virtually unchallengeable decision of trial strategy,' in part because 'there is considerable risk inherent in calling any witness because if the witness does not hold up well on cross-examination, the jurors might draw unfavorable inferences.'" <u>Id</u>. (quoting <u>United States v. Staples</u>, 410 F.3d 484, 488-89 (8th Cir.2005)).

<u>Id</u>. at *8. The Court finds that the decision not to call Dr. Peterson was a strategic decision that Mr. Duchardt made after weighing all of the options. Accordingly, because the Court finds that reasonable jurists would not find this point debatable, the Court

17

**SUPP. APP. 0062**

hereby **DENIES** a certificate of appealability on this issue.

### IV.  CONCLUSION

Accordingly, for the reasons stated above, the Court hereby **DENIES**

Purkey's Motion for a Certificate of Appealability (Doc. # 107).

Date:   10/28/10                                **S/ FERNANDO J. GAITAN**, **JR.**
Kansas City, Missouri                      Fernando J. Gaitan, Jr.
                                                          Chief United States District Judge

18

**SUPP. APP. 0063**

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

WESLEY IRA PURKEY,  )
  )
  Petitioner,  )
  )
v.  ) No. 06-8001-CV-W-FJG
  )
UNITED STATES OF AMERICA,  )
  )
  Respondent.  )

## ORDER

Currently pending before the Court is petitioner's Motion to Alter or Amend the

Judgment (Doc. # 91) and Motion to Withdraw Habeas Proceedings (Doc. # 99).

## I. BACKGROUND

On September 29, 2009, this Court entered an order denying Purkey's Motion to

Vacate, Set Aside or Correct His Sentence (Doc. # 89). Purkey has now filed a Motion

Seeking to Alter or Amend that Judgment.

## II. STANDARD

> A motion to alter or amend judgment pursuant to
> Fed.R.Civ.P. 59(e) serves the limited purpose of correcting
> manifest errors of law or fact or presenting newly discovered
> evidence. . . . It is not appropriate to use a Rule 59(e) motion
> to repeat arguments or to raise new arguments that could
> have been made before judgment. . . . District courts have
> broad discretion when deciding whether or not to grant a
> motion to amend judgment.

In re General Motors Corp. Anti-Lock Brake Products Liability Litigation, 174 F.R.D. 444,

446 (E.D.Mo. 1997), aff'd sub nom. Briehl v. General Motors Corp., 172 F.3d 623 (8th

Cir. 1999)(citations and internal quotations omitted). See also, Peters v. General

**SUPP. APP. 0064**

<u>Service Bureau, Inc.</u>, 277 F.3d 1051,1057 (8th Cir. 2002)("Arguments and evidence which could have been presented earlier in the proceedings cannot be presented in a Rule 59(e) motion.").

28 U.S.C. § 2255 states in part:

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.

"A § 2255 motion can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." <u>Baranski v. U.S.</u>, No. 4:05CV657 CAS, 2006 WL 472451, *3 (E.D.Mo. Feb. 27, 2006), <u>aff'd</u>, 515 F.3d 857 (8th Cir. 2008)(internal citations and quotations omitted).

### III.  DISCUSSION

Purkey argues first that the Court misapplied the law and should vacate the judgment and strike the affidavit provided by trial counsel, Fred Duchardt.  Purkey states that the attorney-client privilege was waived, but not to the extent of Mr. Duchardt's disclosures.  Secondly, Purkey argues that the Court misapplied the law and should vacate the judgment and receive testimony as to the allegations in the Motion to Vacate.  Purkey argues that there are disputed facts contained in the affidavits that he presented and Mr. Duchardt's affidavit, which cannot be resolved without a hearing.

The Government argues that there was nothing improper in Mr. Duchardt's affidavit and that he did not inappropriately breach the attorney-client relationship and

2

**SUPP. APP. 0065**

instead revealed only that information that was necessary in order to respond to the numerous allegations of ineffective assistance of counsel. Additionally, the Government argues that Court correctly determined that there was no need for a evidentiary hearing because the trial record, the affidavit of Mr. Duchardt and the affidavits submitted by Purkey were sufficient for the Court to determine that a hearing was not necessary.

With regard to the affidavit of Mr. Duchardt, the Court finds that there is no reason to strike this affidavit. As stated in the Order directing Mr. Duchardt to file the Affidavit, because Purkey argued that Mr. Duchardt was ineffective, he waived his attorney-client privilege. Post-conviction counsel argue that Mr. Duchardt's affidavit goes too far and reveals too much. However, simply because they do not like what was said in the Affidavit is no reason to strike the affidavit. Purkey makes numerous and detailed claims of ineffectiveness against Mr. Duchardt. The revelations in the affidavit were necessary in order to rebut those allegations.

Counsel for Purkey also argues that this Court should hold an Evidentiary Hearing. However, as stated in the Order denying Purkey's Motion to Vacate, Set Aside or Correct His Sentence, "[a] district court does not err in dismissing a movant's § 2255 Motion without a hearing if (1) the movant's 'allegations, accepted as true, would not entitle' the movant to relief, or '(2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" Buster v. United States, 447 F.3d 1130,1132 (8th Cir. 2006) (citing Sanders v. United States, 341 F.3d 720, 722 (8th Cir. 2003), cert. denied, 540 U.S. 1199, 124 S.Ct. 1460, 158 L.Ed.2d 116 (2004)). Purkey argues that this Court must weigh the mitigation evidence that was presented against the mitigation evidence that

3

**SUPP. APP. 0066**

*could* have been presented and that the Court must allow the development of facts outside the record. Purkey cites to <u>Williams. v. Taylor</u>, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), and <u>Nelson v. United States</u>, 297 Fed.Appx. 563 (8th Cir. Oct. 27, 2008)[1] in support of this proposition. In <u>Williams</u>, the attorney failed to introduce five different categories of mitigating evidence. In this case, there is no claim that Mr. Duchardt failed to introduce entire categories of evidence, post-conviction counsel simply claim that he should have introduced *more* mitigation witnesses. Mr. Duchardt submitted twenty-seven mitigating factors to the jury and called eighteen mitigation witnesses who testified concerning the sexual, physical and psychological abuse that petitioner suffered during his childhood and adolescence. In spite of this substantial amount of mitigation testimony, not one juror voted for a single mitigating factor. So, even if petitioner's counsel had called different or additional witnesses or introduced more or additional mental health or abuse evidence, there is not a "reasonable probability" that the result would have been different. In <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052 (1984), the Court stated, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id</u>. at 694. In the instant case, even considering the additional mitigation evidence that Duchardt could have presented, the Court finds that it does not "undermine confidence in the outcome." This conclusion

---

[1] The Court finds <u>Nelson v. United States</u>, 297 Fed.Appx. 563 (8th Cir. Oct. 27, 2008), distinguishable because in that case, both sides agreed that an evidentiary hearing was necessary. In this case, the Government does not concede that a hearing is necessary.

4

**SUPP. APP. 0067**

is supported by the jury's actions in failing to find a single mitigating factor. Accordingly, the Court finds that no hearing is necessary, because even if Purkey's allegations are true, he would not be entitled to relief.

## IV. CONCLUSION

Accordingly, for the reasons stated above, the Court hereby **DENIES** Purkey's Motion to Alter or Amend the Judgment (Doc. # 91).

Purkey had also filed a Pro Se Motion to Withdraw Habeas Proceedings and to Set an Expeditious Execution Date Set (Doc. # 99). However, shortly after he filed this Motion, Purkey's counsel filed a Motion asking that Purkey's pro se motion be withdrawn stating that he had spoken with Purkey and he requested that his counsel notify the Court that he did not wish to dismiss this action or have an execution date set. Accordingly, the Motion to Withdraw is hereby **GRANTED** (Doc. # 100) and Purkey's Pro Se Motion (Doc. # 99) is hereby **WITHDRAWN**.

Date:  12/22/09
Kansas City, Missouri

**S/ FERNANDO J. GAITAN**, **JR.**
Fernando J. Gaitan, Jr.
Chief United States District Judge

5

SUPP. APP. 0068

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

WESLEY IRA PURKEY, )
)
            Movant, )
) Civil Case No.
v. ) 06-8001-CV-W-FJG
)
UNITED STATES OF AMERICA, ) Criminal Case No.
) 01-00308-01-CR-W-FJG
            Respondent. )

## ORDER

Currently pending before the Court is movant's Motion to Vacate, Set Aside or Correct His Sentence Pursuant to 28 U.S.C. § 2255 (Doc. # 47); Motion to Strike Statement of Frederick A. Duchardt, Jr. (Doc. # 83); Motion to Set Matter for an Evidentiary Hearing (Doc. # 84) and Motion for Leave to File Late Response to Motion to Strike Statement of Frederick A. Duchardt Jr. (Doc. # 87).

## I. BACKGROUND

Movant was indicted on October 10, 2001 for the kidnaping, rape and murder of Jennifer Long in violation of 18 U.S.C. § 1201(a), 1201(g) and 3559 (d).  On November 5, 2003, petitioner was convicted of these crimes.  The penalty phase of the trial began on November 10, 2003 and concluded on November 19, 2003.  The jury unanimously concluded that the aggravating factors outweighed the mitigating factors and determined that petitioner should be sentenced to death.  On January 23, 2004, petitioner was sentenced to death.  On February 2, 2004, movant filed his notice of appeal with the Eighth Circuit Court of Appeals.  On November 7, 2005, the Eighth Circuit issued an opinion affirming his conviction and sentence.  See United States v.

SUPP. APP. 0069

<u>Purkey</u>, 428 F.3d 738 (8th Cir. 2005). Rehearing and rehearing en banc were denied on January 13, 2006. Movant's petition for certiorari was denied by the United States Supreme Court on October 16, 2006. <u>Purkey v. United States</u>, 549 U.S. 975 (2006).

## II. STANDARD

28 U.S.C. § 2255(a) provides, in part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

The district court must hold an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). "Accordingly, a claim may be dismissed without an evidentiary hearing if the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." <u>Shaw v. United States</u>, 24 F.3d 1040, 1043 (8th Cir. 1994) (citing <u>Larson v. United States</u>, 905 F.2d 218, 220-21 (8th Cir. 1990), <u>cert. denied</u>, 507 U.S. 919, 113 S.Ct. 1278, 122 L.Ed.2d 672 (1993)).

## III. DISCUSSION

### A. Ineffectiveness of Counsel

To prevail on a claim of ineffective assistance of counsel, a movant must show that the attorney's performance fell below an objective standard of reasonableness and that the performance prejudiced the defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The Court is to adopt an extremely

2

**SUPP. APP. 0070**

deferential approach in evaluating counsel's performance.  466 U.S. at 689, 104 S.Ct. at 2065-66.  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'  <u>See</u>  <u>Michel v. Louisiana</u>, 350 U.S. 91,101, 76 S.Ct.158,164, 100 L.Ed.2d 83 (1955)."  <u>Id.</u>  Additionally, to establish prejudice, the movant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. at 694, 104 S.Ct. at 2068.  "Although the two prongs of the 'ineffective assistance' analysis are described as sequential, courts 'do not . . . need to address the performance prong if petitioner does not affirmatively prove prejudice.'"  <u>United States v. Vesey</u>, No. C06-0075-MWB, 2009 WL 1324076, *5 (N.D. Iowa May 12, 2009) (citing <u>Boysiewick v. Schriro</u>, 179 F.3d 616, 620 (8th Cir. 1999), <u>cert.</u> <u>denied</u>, 528 U.S. 1141, 120 S.Ct. 989, 145 L.Ed.2d 938 (2000)).

In his § 2255 motion, movant makes seventeen allegations regarding the ineffectiveness of his trial and appellate counsel, Mr. Frederick Duchardt, Jr. These allegations focus on Mr. Duchardt's failure to object to certain statements made during the trial, failure to obtain the services of a mitigation expert or to adequately prepare a mitigation case, failure to adequately present expert testimony, failure to call certain witnesses and failure to impeach certain witnesses.   In response to these allegations, Mr. Duchardt filed a 117 page affidavit, in which he goes into extensive detail to refute movant's claims. The Government argues that Mr. Duchardt's affidavit provides

3

<strong>SUPP. APP. 0071</strong>

significant insight into why he made certain strategical decisions before and during the trial.  Additionally, the Government notes that Mr. Duchardt called a total of twenty-two witnesses on movant's behalf.  Eighteen of these witnesses testified as mitigation witnesses who testified concerning the sexual, physical and psychological abuse that movant suffered during his childhood and adolescence.

The Court has reviewed Mr. Duchardt's affidavit, as well as the briefs and arguments presented by counsel and finds that movant has failed to overcome the presumption that Mr. Duchardt's actions were not sound trial strategy.  The Court finds that Mr. Duchardt's actions did not fall below an objective standard of reasonableness.  Additionally, even if Mr. Duchardt's actions were considered to fall below the standard of reasonableness, movant has not shown "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.

Movant filed a Motion to Strike the Affidavit of Mr. Duchardt alleging that he violated his duty of confidentiality and his duty of loyalty.  Movant also argues that he failed to give adequate notice of the contents of the Affidavit or to allow movant to object to portions of the affidavit, before it was provided to the Government.  Movant argues that Mr. Duchardt divulged confidential information that he acquired in the course of his investigation that was otherwise generally unknown.  Movant argues that no attorney could conclude that such disclosure was necessary in order to answer the limited allegations of ineffectiveness.

In Tasby v. United States, 504 F.2d 332, 336 (8th Cir. 1974), cert. denied, 419 U.S. 1125, 95 S.Ct. 811, 42 L.Ed.2d 826 (1975), the Court stated:

4

SUPP. APP. 0072

> It has long been the law that a client may waive protection of the [attorney-client] privilege, either expressly or impliedly. . . . One of the circumstances which may support a conclusion of a waiver is an attack by the client upon his attorney's conduct which calls into question the substance of their communications. A client has a privilege to keep his conversations with his attorney confidential, but that privilege is waived when a client attacks his attorney's competence in giving legal advice, puts in issue that advice and ascribes a course of action to his attorney that raises the specter of ineffectiveness or incompetence. . . . Surely, a client is not free to make various allegations of misconduct and incompetence while the attorney's lips are sealed by invocation of the attorney-client privilege. Such an incongruous result would be inconsistent with the object and purpose of the attorney-client privilege and a patent perversion of the rule.

See also Stobaugh v. U.S., No. 06-3317-CV-S-RED, 2007 WL 628420, *1, n.1 (W.D.Mo. Feb. 27, 2007)("Stobaugh waived the attorney-client privilege when he claimed that his attorney's advice constituted ineffective assistance of counsel."). In the instant case, the Government requested that the Court order Mr. Duchardt to file an Affidavit so that the Government could adequately respond to movant's motion. Mr. Duchardt declined to provide an affidavit unless he had an attorney-client waiver from movant or unless the Court ordered him to provide evidence in response to the allegations. In an Order dated February 1, 2008, this Court found that movant had waived his attorney-client privilege as to his ineffective assistance of counsel claims and directed Mr. Duchardt to prepare an affidavit in response to movant's allegations. The Court finds that Mr. Duchardt did not act improperly in filing the Affidavit nor did he violate his duty or loyalty or his duty of confidentiality, as the attorney-client privilege had been waived. Accordingly, movant's Motion to Strike the Statement of Frederick A. Duchardt, Jr. (Doc. # 83) is hereby **DENIED**.

5

**SUPP. APP. 0073**

## B. Violation of Due Process

Movant argues that he was denied due process due to: 1) certain misconduct on the part of the Government; 2) because no reasonable juror could have found beyond a reasonable doubt that he kidnaped the victim and also because 3) he was sentenced based on arbitrary factors when the jury did not vote on mitigating evidence.

### 1. Alleged Government Misconduct

Movant claims that the Government created the false impression that movant referred to the federal penitentiary as "Club Fed" and that "Club Fed" had more lenient conditions than the Kansas Department of Corrections system. The Government argues that movant did not raise this claim either at trial or on appeal and that the claim is procedurally defaulted. In order to obtain relief, the Government argues that movant must show actual prejudice from this error. Additionally, the Government notes that the prosecution has the right to introduce evidence concerning a defendant's post-defense statements to members of law enforcement as admissions against interest. The Government argues that there was no attempt to mislead the jury that Purkey had used the term "Club Fed." The Court agrees and finds that there was no misconduct on the part of the Government by referencing the term "Club Fed."

Movant also argues that Government counsel created a false impression when he told the jury that movant had just walked into Court and recanted the kidnaping. Movant argues that this was false since he told Agent Tarpley and Detective Howard in December 1998 and told Michael Speakman and Dr. Peterson in 2003 that the victim had come with him voluntarily. However, on direct examination of Agent Tarpley, the

6

SUPP. APP. 0074

Government asked if movant had just changed his story.

The Government argues that neither movant nor the Government ever contended that Jennifer Long was grabbed off the street and kidnaped. The kidnaping crime occurred later when movant pulled a knife out of his glove box and placed it under his right thigh and refused to let Ms. Long out of his truck. This is consistent with what movant said in his statements to Tarpley and Howard and Speakman. The confusion comes when movant met with his psychiatrist, Dr. Peterson and in describing the events of January 22, 1998, he changed his story and claimed that he never kidnaped Ms. Long. In his report, Dr. Peterson wrote, "Ultimately, he killed her at home. He believes she came to his house willingly so it wasn't kidnaping. He told the kidnaping story 'for the FBI so he could get into the federal system.'" The Government did not come into possession of Dr. Peterson's report until August 13, 2003, shortly before trial. Looking at the accounts from Tarpley, Howard and Speakman, it is apparent that movant did change his story when he spoke with Dr. Peterson. Therefore, the Court finds that there was no misconduct in Government counsel asking whether movant had changed his story.

### 2. Denied Due Process Because No Reasonable Juror Could Have Found Beyond A Reasonable Doubt That Movant Kidnaped Jennifer Long.

Movant argues that the only evidence that he kidnaped Ms. Long came from his own mouth and he later repudiated the kidnaping. Movant argues that his confession to Tarpley and Howard was not trustworthy, and that less than a month after the indictment, the government knew from its star witness, Michael Speakman, that movant had denied kidnaping Ms. Long. Movant argues that the corroborating evidence led to

7

**SUPP. APP. 0075**

the inference that Ms. Long voluntarily accompanied him to his home in Kansas, because there were multiple opportunities that she had to escape, but she did not. Movant argues that the Government relied on his confession because that is all it had. Movant argues that the Government mislead the jury by stating that he had repudiated the kidnaping not two years before trial, but right before trial. Without this misleading of the jury, movant argues that no reasonable juror could have found beyond a reasonable doubt that he kidnaped Ms. Long.

As discussed above, the Government did not know from Speakman's statements to the FBI that Purkey was recanting his claim that he kidnaped Ms. Long. The only thing that he told Speakman was that he had not snatched the girl from the street as Keith Nelson had done. Rather, Purkey described his initial contact with the girl as more like they were "partying" and that it was not forcible. This is consistent with what movant told Tarpley and Howard. The Court finds that the Government did not in any way mislead the jury. A reasonable juror could have disbelieved movant's argument and found beyond a reasonable doubt that he kidnaped Ms. Long.

**3. Denied Due Process Because the Jury Did Not Vote On Mitigating Evidence.**

Movant argues that the jury left blank the entire section of the verdict form related to findings upon mitigation evidence. He argues that it is one thing for a jury not to give much weight to mitigation evidence, but it quite another thing for a jury to decide not to acknowledge the evidence at all.

In United States v. Paul, 217 F.3d 989, 999-1000 (8th Cir. 2000), the Court stated, "Neither the FDPA nor Lockett [v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d

8

**SUPP. APP. 0076**

973 (1978)] and <u>Eddings</u> [v. Oklahoma, 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)] require a capital jury to give mitigating effect or weight to any particular evidence. . . . There is only a constitutional violation if there exists a reasonable likelihood that the jurors believed themselves precluded from considering relevant mitigating evidence." In that case, six jury members refused to find the defendant's age to be a mitigating factor, even thought it was undisputed that the defendant was eighteen at the time of his offense. The Court has reviewed the Verdict Form completed in this case and finds no error in the fact that the jury failed to find any mitigating evidence in this case. Movant has not shown that the jurors were precluded from considering any mitigating evidence, they simply chose not to give any weight to that evidence, which under the law they are entitled to do.

### 4. Denial of Due Process Due to Cumulative Effect of Government Counsel's Misconduct.

Movant argues that the cumulative nature of the prosecutorial misconduct requires reversal. In <u>United States v. Hance</u>, 501 F.3d 900 (8th Cir. 2007), the Court stated:

> 'To obtain a reversal for prosecutorial misconduct, the defendant must show that (1) the prosecutor's remarks were improper, and (2) such remarks prejudiced the defendant's rights in obtaining a fair trial.' . . .'If we reach the second step, we consider: (1) the cumulative effect of such misconduct (2) the strength of the properly admitted evidence of [defendant's] guilt; and (3) the curative actions taken by the trial court.'

<u>Id</u>. at 908, (citing <u>United States v. Cannon</u>, 88 F.3d 1495, 1502 (8th Cir. 1996)). The Court has examined the alleged prosecutorial errors and does not find any of them to be improper. Even if the remarks and/or actions were considered to be improper, they did not prejudice the defendant's right to a fair trial.

9

**SUPP. APP. 0077**

**C. Motion for An Evidentiary Hearing**

Movant argues that he is entitled to a hearing because there are disputed issues of fact that cannot conclusively be resolved on the basis of the record alone and those facts if true, would entitle him to relief. Movant argues that many of the allegations of ineffectiveness relate to activity outside the courtroom and the record can shed no light on these allegations. Movant states that the Court cannot determine whether to believe his witnesses or Mr. Duchardt's denials without hearing from the witnesses themselves, as this is the only way to judge their credibility.

The Government argues that an evidentiary hearing is both unwarranted and unnecessary and that all of the issues raised by movant in his § 2255 motion are resolvable by reviewing the record. The Government states that Movant has not shown that Mr. Duchardt's representation fell below an objective standard of reasonableness. Nor has he demonstrated that there is a reasonable probability that but for Mr. Duchardt's errors, the result of the proceeding would have been different.

In reply, Movant cites to the Eighth Circuit decision in <u>Nelson v. United States</u>, No. 07-3071 (8th Cir. Oct. 27, 2008), in which the Court stated, "[o]ur cases teach that issues regarding the ineffectiveness of counsel often require a hearing to consider evidence not disclosed on the face of the trial record."

"A district court does not err in dismissing a movant's § 2255 Motion without a hearing if (1) the movant' 'allegations, accepted as true, would not entitle' the movant to relief, or '(2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" <u>Buster v. United States</u>, 447 F.3d 1130,1132 (8th Cir. 2006) (citing <u>Sanders v. United</u>

10

**SUPP. APP. 0078**

<u>States</u>, 341 F.3d 720, 722 (8th Cir. 2003), <u>cert.</u> <u>denied</u>, 540 U.S. 1199, 124 S.Ct. 1460, 158 L.Ed.2d 116 (2004)). The Court finds that no hearing is necessary in this case, because even if movant's allegations are true, and Mr. Duchardt was ineffective for failing to call certain witnesses or to present a more complete mitigation case, movant would not be entitled to relief. As noted above, of the twenty-seven mitigating factors which were presented to the jury, no jurors voted for a single mitigating factor. So, even if movant's counsel had called different or additional witnesses or introduced more or additional mental health or evidence relating to his abuse as a child and young adult, it is unlikely that the jury would have considered this mitigating evidence or that they would have sentenced movant to life in prison. Accordingly, because the Court finds that the disputed issues would not entitle movant to relief, the Court hereby **DENIES** the Motion for an Evidentiary Hearing (Doc. # 84).

## IV. CONCLUSION

For the reasons stated above, the Court hereby **DENIES** movant's Motion to Vacate, Set Aside or Correct His Sentence Pursuant to 28 U.S.C. § 2255 (Doc. # 47); **DENIES** the Motion to Strike the Statement of Frederick A. Duchardt, Jr. (Doc. # 83); **DENIES** the Motion to Set Matter for an Evidentiary Hearing (Doc. # 84) and **DENIES AS MOOT** the Motion for Leave to File Late Response to Motion to Strike Statement of Frederick A. Duchardt Jr. (Doc. # 87).

Date:  09/29/09           **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri         Fernando J. Gaitan, Jr.
                              Chief United States District Judge

11

**SUPP. APP. 0079**

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1337

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Wesley Ira Purkey, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 23, 2005
Filed: November 7, 2005

_____

Before ARNOLD, McMILLIAN, and COLLOTON, Circuit Judges.

_____

ARNOLD, Circuit Judge.

A jury convicted Wesley Purkey of the kidnapping, rape, and murder of Jennifer Long, and sentenced him to death. *See* 18 U.S.C. §§ 1201(a), (g), 3559(d), 3591-3598. On appeal, Mr. Purkey raises myriad challenges to his conviction and sentence. After careful review, we conclude that his arguments lack merit and therefore affirm the judgment of the district court.[1]

_____

[1]The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri.

SUPP. APP. 0080

Jennifer Long, a sixteen year-old high school sophomore, disappeared in January of 1998. On December 15, 1998, while in the Wyandotte County Jail awaiting a Kansas state prosecution for the murder of eighty-year-old Mary Ruth Bales, Mr. Purkey contacted Detective Bill Howard of the Kansas City, Kansas, Police Department and offered to speak with him about a kidnapping and homicide that had occurred earlier that year. Mr. Purkey told Detective Howard that he also wanted to speak with an FBI agent about this crime because he wanted to spend his time in a federal, rather than a state, institution. Detective Howard asked FBI Special Agent Dirk Tarpley to go with him to meet with Mr. Purkey.

The next day, Mr. Purkey met with Detective Howard and Agent Tarpley. At the beginning of the meeting, Mr. Purkey executed a form indicating that he understood and voluntarily waived his constitutional rights. He then told the officers that he was going to plead guilty in the Kansas case and was therefore willing to confess to the kidnapping, rape, and murder of a Missouri woman, provided that he could serve his state time in a federal penitentiary. Detective Howard and Agent Tarpley informed Mr. Purkey that they could not make any promises but would take whatever he had to say to the United States Attorney. After giving an account of the kidnapping, rape, and murder of the victim (who was later identified as Ms. Long), Mr. Purkey refused to cooperate further unless he received assurances from the United States Attorney that his case would be federally prosecuted.

That afternoon, Detective Howard and Agent Tarpley met with Kurt Shernuk, an Assistant United States Attorney for the District of Kansas. Although he was skeptical of Mr. Purkey, Mr. Shernuk indicated that his office might be willing to prosecute the case if Mr. Purkey fully cooperated with the investigators and provided the location of the victim's remains and other evidence to corroborate his confession.

After meeting with Mr. Shernuk, Detective Howard and Agent Tarpley returned to the Wyandotte County Jail to speak with Mr. Purkey. They told him that

-2-

Appellate Case: 04-1337   Page: 2   Date Filed: 11/07/2005 Entry ID: 1972132

SUPP. APP. 0081

Mr. Shernuk wanted a body and would require full cooperation, but they did not make Mr. Purkey any promises as to the sentence that he might receive. Mr. Purkey then led Messrs. Tarpley and Howard to the crime scene and to the place where he claimed to have discarded the victim's undergarments and jaw bone. He told the officers that because he had taken extraordinary measures to dispose of the body, including dismembering it with a chain saw and burning the remains, the victim's remains were not recoverable.

More meetings occurred over the next several days. On December 17, Detective Howard and Agent Tarpley again met with Mr. Purkey and, after being reminded verbally of his constitutional rights, Mr. Purkey gave a detailed handwritten confession. The next day, Detective Howard met with Mr. Purkey and, after reminding him of his rights, conducted a photo lineup to see if he could identify the victim. Without hesitation, Mr. Purkey identified Ms. Long. Agent Tarpley met with Mr. Purkey three days later, and after being advised of his rights, Mr. Purkey confessed again.

During the guilt phase of his federal trial, Mr. Purkey affirmed his statements about the killing and dismemberment of Ms. Long, but he disavowed his previous statements that he forced Ms. Long to travel with him from Missouri to his home in Kansas. Instead, he stated that Ms. Long, who he said he thought was a prostitute, voluntarily entered his truck and accompanied him to his home. He indicated that he fabricated the kidnapping aspect of the confession to ensure that his actions would be considered, and therefore prosecuted as, a federal crime. After deliberating briefly, the jury returned a verdict of guilty.

During the penalty phase of the trial, the defense submitted and the court instructed on twenty-seven mitigating factors. Mr. Purkey's primary mitigation defense consisted of expert testimony indicating that he suffered brain damage that resulted in diminished mental capacity. The government presented expert testimony

-3-

Appellate Case: 04-1337    Page: 3    Date Filed: 11/07/2005 Entry ID: 1972132

SUPP. APP. 0082

to rebut this assertion and also produced evidence in support of six statutory and four non-statutory aggravating factors.

After deliberating for eleven hours and ten minutes, the jury found the existence of all six of the statutory aggravating factors: (1) that the death of Ms. Long occurred during the commission and attempted commission of her kidnapping; (2) that Mr. Purkey killed Ms. Long in an especially heinous, cruel, and depraved manner in that the killing involved torture and serious physical abuse; (3) that the victim was particularly vulnerable due to her youthful age of sixteen years; (4) that Mr. Purkey had previously been convicted of an offense punishable by a term of imprisonment of more than one year, involving the use, attempted use, and threatened use of a firearm against another person; (5) that Mr. Purkey had previously been convicted of an offense resulting in the death of a person for which a sentence of life imprisonment was authorized by statute; and (6) that Mr. Purkey had previously been convicted of two or more offenses punishable by a term of imprisonment of more than one year, committed on different occasions and involving the infliction and attempted infliction of serious bodily injury and death upon another person. The jury also found the existence of three of the four non-statutory aggravating factors: (1) that the government established loss and harm because of the victim's personal characteristics as an individual human being and the impact of the death upon the victim's family; (2) that the defendant had previously killed Mary Ruth Bales in a vicious manner in that he repeatedly struck her in the head with a hammer until she died; and (3) that Mr. Purkey had a substantial criminal history. The jury did not record any evidence of its findings with regard to the mitigating factors. It then determined that Mr. Purkey should be sentenced to death.

## I.

We begin with Mr. Purkey's arguments pertaining to the district court's denials of his pretrial motions.

-4-

Appellate Case: 04-1337    Page: 4    Date Filed: 11/07/2005 Entry ID: 1972132

SUPP. APP. 0083

A.

Mr. Purkey's primary argument on appeal is that the district court erred in denying his motion to suppress his multiple confessions to the kidnapping, rape, and murder of Ms. Long. He argues that the district court should have suppressed his statements to Messrs. Tarpley and Howard because the statements were involuntary and therefore obtained in violation of the fifth amendment to the Constitution. He bases this argument on his assertion that the officers obtained the confessions through a false promise, *cf. United States v. Pierce*, 152 F.3d 808, 812-13 (8th Cir. 1998), namely, that if he cooperated with the government he would receive a life sentence in a federal institution. As an alternative to suppression, Mr. Purkey moved to prohibit the government from pursuing the death penalty. The district court also denied that motion.

The core of Mr. Purkey's argument is that Detective Howard and Agent Tarpley procured his confession by indicating that the Assistant United States Attorney had accepted Mr. Purkey's alleged quid pro quo offer, that is, that Mr. Purkey would confess to the crime and provide full cooperation in return for a life sentence in a federal institution. Detective Howard and Agent Tarpley testified at the suppression hearing that they never made this representation to Mr. Purkey. The district court, adopting the discussion and conclusions in the report and recommendation of a magistrate judge,[2] squarely rejected Mr. Purkey's version of the events. It found that, "[d]uring all of the time the officers spent with Purkey on December 16, 1998, there were no hints or suggestions made to Purkey ... that Purkey would get a life sentence if he confessed. No one told Purkey that a life sentence would be recommended if he confessed." The court inserted a footnote within this language to make explicit that it found "the testimony of Special Agent Tarpley and Detective Howard more credible than that of defendant Purkey" on the issue of whether Messrs. Tarpley and Howard

---

[2]The Honorable Sarah W. Hays, United States Magistrate Judge for the Western District of Missouri.

-5-

SUPP. APP. 0084

told Mr. Purkey that the Assistant United States Attorney had agreed to give Mr. Purkey a life sentence in the federal system in exchange for a full confession. Finally, the court concluded that during the course of the investigation, "[n]o promises were made to defendant Purkey in exchange for his confessions. While the defendant was apparently surprised to find out that the death penalty was a potential sentence he might receive, the officers did not mislead [the] defendant into believing that there was no federal death penalty."

Because Mr. Purkey's challenges are to the district court's conclusions regarding the facts underlying its decisions to deny his motions, we review the matter for clear error. *See United States v. Kilgore*, 58 F.3d 350, 353 (8th Cir. 1995); *see also United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir. 1995), *cert. denied*, 516 U.S. 892 (1995). After a thorough review of the record, we cannot conclude that the district court clearly erred in arriving at the credibility determinations and factual conclusions that it reached. We therefore affirm the district court's denial of Mr. Purkey's motion to suppress his statements and his motion to prohibit the government from seeking the death penalty.

B.

Mr. Purkey also maintains that the district court erred when it denied his motion to dismiss based on the alleged destruction of notes that Mr. Purkey asserts that he took to document his conversations with Detective Howard and Agent Tarpley in December of 1998. Mr. Purkey testified that these notes were destroyed by prison staff during a "shakedown" of his segregation pod while he was incarcerated at CCA(Corrections Corporation of America)-Leavenworth. He asserts that the destruction of these notes constitutes a denial of due process and requires dismissal of the indictment.

In *United States v. Malbrough*, 922 F.2d 458 (8th Cir. 1990), *cert. denied*, 501 U.S. 1258 (1991), we recognized that the "Supreme Court has held that the state's

-6-

SUPP. APP. 0085

failure to preserve evidence does not constitute a denial of due process unless ... comparable exculpatory evidence was not reasonably available to the defendant." *Id.* at 463 (citing *California v. Trombetta,* 467 U.S. 479, 488-89 (1984)). The district court, adopting the discussion and conclusions of the magistrate judge, concluded that Mr. Purkey's motion must fail because, among other shortcomings, Mr. Purkey could not demonstrate that he was unable to obtain comparable exculpatory evidence by other means. We review the matter to determine whether this conclusion was clearly erroneous, *cf. United States v. Weise*, 89 F.3d 502, 504 (8th Cir. 1996), and we conclude that it was not.

At best, these notes can be characterized as Mr. Purkey's account of his conversations with Detective Howard and Agent Tarpley. They were neither transcripts of the conversations nor were they attested to by Messrs. Howard or Tarpley. They were simply Mr. Purkey's recollections of the conversations as recorded shortly after each conversation concluded. Mr. Purkey had ample opportunity to introduce comparable evidence in the form of his own testimony as to the substance of the conversations. And, although these notes could have been read into evidence to fill gaps in Mr. Purkey's recollection as to the content of those conversations, *see* Fed. R. Evid. 803(5), Mr. Purkey's own testimony belied his assertion of an incomplete recollection of the conversations. We can find no clear error in the magistrate judge's observation that, "Despite Purkey's contention that he needs these notes to assist him with remembering the details of the interrogations, Purkey's testimony would suggest that he has no trouble remembering [those] details ... (at least until defense counsel reminded him that he should not remember)." Hence the district court did not err in denying Mr. Purkey's motion to dismiss based on the alleged destruction of his notes.

## C.

Mr. Purkey also argues that the district court erred in denying his pretrial motion asking the court to prohibit the government from seeking the death penalty

-7-

SUPP. APP. 0086

because of two violations of the fifth amendment's indictment clause. First, Mr. Purkey asserts that the Federal Death Penalty Act (FDPA), 18 U.S.C. § 3591-3598, is facially unconstitutional because it vests the prosecution with unilateral authority to seek the death penalty without ever taking the matter of whether the death penalty is justified to the grand jury, *see* 18 U.S.C. § 3593(a). Second, he argues that his prosecution ran afoul of the indictment clause because the government failed to seek an indictment upon some of the necessary elements of the capital prosecution, namely, the government's non-statutory aggravating factors and the issue of whether the aggravating factors sufficiently outweighed any mitigating factors to justify a sentence of death. Both of these are questions of law, and we therefore review them *de novo*. *See United States v. Koons*, 300 F.3d 985, 990 (8th Cir. 2002); *cf. United States v. Roy*, 408 F.3d 484, 491 (8th Cir. 2005).

In *United States v. Allen*, 406 F.3d 940, 949 (8th Cir. 2005) (en banc), we addressed the same facial challenge that Mr. Purkey now presents. There we recognized that the FDPA does vest the prosecution with authority to charge aggravating factors in a notice of intent to seek the death penalty, and does not specifically require the government to bring those factors before the grand jury for inclusion in the indictment. But because "nothing in the Act precludes the government from also submitting them to the grand jury for inclusion in the indictment," we rejected the contention that the FDPA was unconstitutional. *Id.* Therefore, Mr. Purkey's facial challenge also fails.

To deal with Mr. Purkey's second challenge, we begin with a bit of background. Under the FDPA, once the jury finds the defendant guilty of one of the offenses listed in 18 U.S.C. § 3591, the trial proceeds to a separate phase – the sentencing or penalty phase. In a homicide case, the jury must make three determinations in this latter phase before it can impose the death penalty: First it must find, unanimously and beyond a reasonable doubt, that the defendant acted with the requisite *mens rea*. *See* 18 U.S.C. § 3591(a)(2). Second, again unanimously and beyond a reasonable doubt,

-8-

SUPP. APP. 0087

it must find the existence of at least one statutory aggravating factor. *See* 18 U.S.C. §§ 3592(c), 3593(d). If the above two requirements are satisfied, the jury must then determine whether the aggravating factors, both statutory and non-statutory, "sufficiently outweigh" the mitigating factors presented by the defendant to justify a death sentence, "or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify" that sentence. *See* 18 U.S.C. § 3593(e).

Mr. Purkey maintains that because the jury is required to take this third step before it may impose a sentence of death, the necessary elements for a capital prosecution under the FDPA include all aggravating factors, including non-statutory aggravating factors, and the weighing of aggravating factors versus mitigating factors. He therefore contends that because his superseding indictment did not include non-statutory aggravating factors or a determination that there exists probable cause to believe that aggravating factors sufficiently outweigh mitigating factors so as to justify a sentence of death, it falls short of what the fifth amendment requires. We disagree.

"[T]he same facts that the Sixth Amendment requires to be proven to the petit jury beyond a reasonable doubt in state and federal prosecutions must also be found by the grand jury and charged in the indictment in federal prosecutions." *Allen*, 406 F.3d at 943. For that reason, *Allen* held that to comport with the fifth amendment "at least one statutory aggravating factor and the mens rea requirement [must] be found by the grand jury and charged in the indictment" in a prosecution under the FDPA. *Id.* Mr. Purkey's superseding indictment satisfies both of these requirements.

The indictment must charge at least one of the statutory aggravating factors that is ultimately found by the petit jury because "that is what is required to elevate the available statutory maximum sentence from life imprisonment to death." *Id.* In other words, including that factor in the indictment is required to make the defendant *eligible* for the death penalty. *See United States v. Higgs*, 353 F.3d 281, 299 (4th Cir.

-9-

SUPP. APP. 0088

2003), *cert. denied*, 125 S. Ct. 608 (2004). We now make clear what *Allen* merely implied: "There is no requirement that the indictment allege *all* of the factors that might be weighed by the jury when deciding whether to impose a death sentence." *Higgs*, 353 F.3d at 299. Non-statutory aggravating factors do not increase the maximum punishment to which a defendant is subject. They are neither sufficient nor necessary under the FDPA for a sentence of death. Their purpose is merely to aid the sentencer "in selecting the appropriate sentence from the available options," *id.* at 298, " 'on the basis of the character of the [defendant] and the circumstances of the crime,' " *id.* (quoting *Tuilaepa v. California*, 512 U.S. 967, 972 (1994)).

Further, it makes no sense to speak of the weighing process mandated by 18 U.S.C. § 3593(e) as an elemental fact for which a grand jury must find probable cause. In the words of the statute, it is a "consideration," 18 U.S.C. § 3593(e), – that is, the lens through which the jury must focus the facts that it has found to produce an individualized determination regarding "whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence." *Id.*

We thus conclude that Mr. Purkey's arguments based on the indictment clause of the fifth amendment are without merit.

## II.

Mr. Purkey next challenges the district court's for-cause exclusion of three potential jurors who expressed reluctance to impose the death penalty. In *Wainwright v. Witt*, 469 U.S. 412, 420, 424 (1985), the Supreme Court instructed that a potential juror may be excluded for cause based on his or her views on capital punishment only if those views would " ' prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. ' " (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). We review a district court's removal of death-scrupled venirepersons for an abuse of discretion. *See United States v. Nelson*, 347 F.3d 701, 710-11 (8th Cir. 2003), *cert. denied*, 125 S. Ct. 486 (2004); *United States v. Ortiz*,

-10-

Appellate Case: 04-1337    Page: 10    Date Filed: 11/07/2005 Entry ID: 1972132

SUPP. APP. 0089

315 F.3d 873, 888 (8th Cir. 2002), *cert. denied*, 538 U.S. 1042 & 540 U.S. 1073 (2003).

Mr. Purkey first asks us to find error in the district court's removal of Margaret Fox. He begins by inviting us to adopt the holding of the Tenth Circuit in *United States v. Chanthadara*, 230 F.3d 1237, 1270 (10th Cir. 2000), *cert. denied*, 534 U.S. 992 (2001), and review Ms. Fox's removal *de novo* because the court struck her solely on the basis of her answers to a questionnaire. We do not agree, however, with *Chanthadara*'s implicit assumption that a district court's decision on the qualifications of a juror is entitled to deference only because of that court's superior position to assess a potential juror's demeanor and credibility. *See id.* at 1269-70. Other reasons, such as respect for the trial process, "the expertise developed by trial judges," and the desire to conserve judicial resources also underpin the fundamental principle that "appellate courts are not to decide factual questions *de novo*, reversing any findings they would have made differently." *Maine v. Taylor*, 477 U.S. 131, 145 (1986); *cf. Anderson v. Bessemer City*, 470 U.S. 564, 574-76 (1985); Fed. R. Civ. P. 52(a). Accordingly, we decline this invitation to stray from the standard of review established in our previous cases, which is whether the district court abused its discretion.

The district court did not abuse its discretion by striking Ms. Fox. She repeatedly indicated on the questionnaire that she had serious reservations about capital punishment. When asked in question thirty-eight of the questionnaire to describe her feelings about the death penalty, how strong those feelings were, and how long she had held them, she wrote, "Within the last 50 years I've gained stronger and stronger feelings against [the] use of the death penalty. I believe major criminals should be punished, but taking away their lives should be left to God." Her responses to questions thirty-six and thirty-seven, which asked about the effect that exposure to books, articles, and movies about the death penalty had on her, also indicate that she

-11-

SUPP. APP. 0090

"questioned that the death penalty should be used" and "question[ed] the right of the courts to administer the death penalty."

Question thirty-nine, a multiple choice question, gave each juror an opportunity to mark the choice that best described his or her feelings about the death penalty. Three of the eight choices pertained to people with some degree of opposition to the death penalty. They were as follows:

> a. I am opposed to the death penalty, and I will never vote to impose the death penalty in any case, no matter what the facts.

> b. I am opposed to the death penalty, and I would have a difficult time voting to impose the death penalty.

> c. I am opposed to the death penalty, but could vote to impose the death penalty if I believed that the death penalty was called for in light of the facts and law in the case.

Ms. Fox declined to indicate that she could vote to impose the death penalty by selecting choice "c" and instead chose the ambiguous "b." When we consider this response together with her other answers regarding her views on the death penalty, we find sufficient evidence in the record from which the district court could conclude that her views on the death penalty would " 'substantially impair the performance of her duties as a juror in accordance with h[er] instructions and h[er] oath.' " *Wainwright*, 469 U.S. at 424 (quoting *Adams*, 448 U.S. at 45).

Mr. Purkey also argues that the court erroneously struck Willie Randle after mishearing or incorrectly recollecting his responses during voir dire. During voir dire, the government asked Mr. Randle whether he would "hold the government to a higher

-12-

SUPP. APP. 0091

burden of proof than what is required under the law." He responded, "I think I would." When the government next asked whether he would hold it to a higher burden of proof than "beyond a reasonable doubt" he replied, "It has to be proof without a reasonable doubt." Later, in granting the government's request to strike Mr. Randle, the district judge declared, "My recollection is that he's holding the government to a higher standard than the law provides."

Reviewing the cold record, it is difficult to divine exactly what Mr. Randle meant when he replied that "[i]t has to be proof without a reasonable doubt." Although those words of the transcript, taken literally, may indicate that Mr. Randle had agreed to apply a burden equivalent to the one that the law actually imposes, the transcript cannot provide any insight regarding Mr. Randle's intent in using the phrase "without a reasonable doubt" instead of "beyond a reasonable doubt." This is why the Supreme Court instructed in *Wainwright*, 469 U.S. at 426, that "deference must be paid to the trial judge who sees and hears the juror." The trial judge, who had the opportunity to observe the exchange, could have reasonably interpreted Mr. Randle's refusal to parrot the words of the government and instead use the phrase "without a reasonable doubt" as an affirmation of his earlier statement that he would hold the government to a higher burden of proof than the law provides. Based on the colloquy between Mr. Randle and the government, as well as the court's stated reason for its ruling, we conclude that the district court did not abuse its discretion by striking this potential juror.

Finally, Mr. Purkey argues that the district court erred when it removed Gary Danford for cause after he had been "rehabilitated." When questioned by the government, Mr. Danford insisted that he would hold the government to a higher burden of proof than reasonable doubt. But Mr. Danford reversed course under subsequent questioning by Mr. Purkey's counsel and indicated that he would "follow the law." The district court concluded that, "I think he has kind of made up his mind what the standard is and that the standard he has decided upon is something different

-13-

SUPP. APP. 0092

than what the law provides." Quite simply, the district court made a reasonable judgment based on its impression of Mr. Danford's credibility as was its prerogative. *See Nelson*, 347 F.3d at 710-11; *United States v. Moore*, 149 F.3d 773, 779-80 (8th Cir. 1998), *cert. denied*, 525 U.S. 1030 & 1082 (1998). The record lacks adequate grounds for us to conclude that the district court abused its discretion.

### III.

Mr. Purkey also maintains that the district court erred in several respects during the guilt phase of his trial.

### A.

We begin with Mr. Purkey's contention that the district court erred by refusing to allow certain evidence during the guilt phase of the trial. He asserts that the district court erred in the following ways: by excluding the testimony of defense expert Dr. David Preston; by refusing to allow Mr. Purkey to testify about how his father had introduced him to prostitutes at an early age; and by refusing to permit cross-examination of Michael Speakman regarding his misconduct while he was incarcerated at CCA-Leavenworth. "We review de novo the district court's interpretation and application of the rules of evidence, and review for an abuse of discretion the factual findings supporting its evidentiary ruling." *United States v. Smith*, 383 F.3d 700, 706 (8th Cir. 2004). We may affirm on any ground supported by the record, even if that ground was not relied on by the district court. *See Bilal v. Lockhart*, 993 F.2d 643, 645 (8th Cir. 1993), *cert. denied*, 510 U.S. 924 (1993).

Dr. Preston, a nuclear medicine specialist, conducted positron emission topography and magnetic resonance imaging testing upon Mr. Purkey and would have testified that those tests revealed abnormalities within Mr. Purkey's brain. Mr. Purkey intended to offer this testimony during the guilt phase of the trial to support both his contention that he did not intentionally kidnap Ms. Long (because he thought she was a prostitute and/or voluntarily accompanied him to his home) and to illuminate

-14-

SUPP. APP. 0093

Mr. Purkey's state of mind when he confessed to Detective Howard and Agent Tarpley. The district court concluded that "although Dr. Preston is qualified in the field of nuclear medicine, he is not qualified to testify regarding defendant's state of mind and actions at the time of the offenses or at the time that Mr. Purkey gave his statements to the investigators."

We believe that the district court's conclusion was correct. Although we harbor no doubt that Dr. Preston was qualified to testify regarding the results of the tests that he conducted on Mr. Purkey, there is nothing in the record that indicates that he was qualified to connect that testimony to the inquiry for which it was offered, namely, Mr. Purkey's state of mind and actions either at the time of the offenses or when he gave his statements to the investigators. Indeed, in neither the expert report nor the offer of proof did Dr. Preston even attempt to tie the test results to Mr. Purkey's state of mind on the specific occasions in question. When questioned by the government, moreover, Dr. Preston admitted that the images produced by the tests could not predict behavior and did not have a causal relationship to criminal behavior. There is manifestly no error in the district court's decision to exclude Dr. Preston's testimony.

Mr. Purkey also argues that the court erred when it refused, in the guilt phase of the trial, to allow him to testify that his father had introduced him to the use of prostitutes during his boyhood. (The court did permit some testimony of this nature in the penalty phase.) Mr. Purkey submits that this testimony would have provided the jury with context to understand why he might have mistakenly believed that Ms. Long was a prostitute. This, he argues, would have bolstered his defense that he did not kidnap Ms. Long and that she willingly entered his car and traveled with him from Missouri to Kansas. And, defense counsel argues, if the jury believed that Mr. Purkey did not transport Ms. Long across state lines against her will and did not do so with the intent to rape her, it could not have convicted him of kidnapping. But we fail to see how the method by which Mr. Purkey was introduced to prostitutes more than thirty years before his crime is relevant to explaining why he mistook a

-15-

SUPP. APP. 0094

teenage schoolgirl for a prostitute, and we therefore uphold the district court's decision to exclude the testimony.

Mr. Purkey also argues that the district court erred by refusing to permit him to cross-examine Michael Speakman regarding Mr. Speakman's uncharged misconduct while at CCA-Leavenworth. Mr. Purkey wanted to elicit this testimony to demonstrate that a desire to avoid punishment for these uncharged acts might have motivated Mr. Speakman to provide information and testimony for the prosecution. He asserts that this denial deprived him of his sixth amendment right to confront an adverse witness.

Mr. Purkey calls our attention to the Supreme Court's language in *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974), which recognizes that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316-17. But this passage does not suggest that a judge should be prevented from imposing limits of any sort on defense counsel's inquiry into the potential bias of a prosecution witness. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). "On the contrary, trial judges retain wide latitude ... to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* We will not reverse a trial court's decision to limit cross-examination absent a "clear abuse of discretion and a showing of prejudice to [the] defendant." *United States v. Love*, 329 F.3d 981, 984 (8th Cir. 2003).

Mr. Purkey has failed to demonstrate a violation of the confrontation clause. To do so, he must show that a reasonable jury might have received a different impression of the witness's credibility had Mr. Purkey's counsel been permitted to pursue his proposed line of cross-examination. *See Van Arsdall,* 475 U.S. at 680; *United States v. Drapeau*, 414 F.3d 869, 875-76 (8th Cir. 2005). Here, Mr. Purkey's

Appellate Case: 04-1337    Page: 16    Date Filed: 11/07/2005 Entry ID: 1972132

SUPP. APP. 0095

counsel conclusively demonstrated by other means that Mr. Speakman was driven to testify by a desire for leniency. Mr. Speakman's testimony established that the government had filed a motion under Federal Rule of Criminal Procedure 35, requesting a reduction of Mr. Speakman's sentence. Mr. Purkey's counsel asked Mr. Speakman, "Basically what you're trying to do is do your best to get a reduction to your sentence?" Mr. Speakman replied, "I'd be lying if I said I was sitting here being a good citizen." Mr. Purkey's counsel then asked, "Your sole point in being here is to reduce the sentence that you received?" Mr. Speakman replied, "Yes, ma'am." We have difficulty imagining how further testimony could have shown more definitively that a desire for leniency played a significant part in Mr. Speakman's willingness to testify. Consequently, the district court did not abuse its discretion in limiting cross-examination that would have further established that point.

### B.

Mr. Purkey also submits that the district court incorrectly instructed the jury on the elements contained in the kidnapping statute. *See* 18 U.S.C. § 1201. That statute provides that a person commits the offense of kidnapping if he or she "unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person ... when – (1) the person is willfully transported in interstate or foreign commerce." *Id.* This statute quite clearly requires that the government prove that Mr. Purkey seized Ms. Long "for ransom or reward or otherwise," *id.*, which in this case was for the purpose of forcible rape. Mr. Purkey, however, contends that the statute also requires that the government prove that he transported Ms. Long across state lines for that same reason. He bases this contention on the language of the statute that requires the defendant to have "willfully transported," *id.*, his or her victim. He submits that this phrase requires that the kidnapper transport his or her victim with the intent to do something that the law forbids. *Cf. United States v. Gabaldon*, 389 F.3d 1090, 1094-95 n.1 (10th Cir. 2004), *cert. denied*, 125 S. Ct. 1688 (2005). He therefore maintains that the district court erred by failing to give an instruction that required the government to prove not only

-17-

SUPP. APP. 0096

that he seized the victim for the purpose of forcible rape but also that he transported her across the state line for the purpose of forcible rape. This error is significant, according to Mr. Purkey, because he argued as part of his defense that he transported Ms. Long from Missouri to Kansas without the intent to rape. We will affirm if the instructions correctly stated the law and fairly and adequately submitted the issues to the jury. *Cf. United States v. Kehoe*, 310 F.3d 579, 593 (8th Cir. 2002), *cert. denied*, 538 U.S. 1048 (2003).

The district court instructed the jury that in order to convict it had to find that "the defendant unlawfully seized, confined, kidnapped, abducted, carried away or held Jennifer Long;" that "the defendant did so for the purpose of the forcible rape of Jennifer Long;" that "the defendant willfully, knowingly, and unlawfully transported Jennifer Long across the state line from Missouri to Kansas;" and that "Jennifer Long died as a result of defendant's actions." This instruction precisely tracked the statute's ordering of the elements. *See* 18 U.S.C. § 1201. And, although the Eighth Circuit Manual of Model Jury Instructions (Criminal) (2005) does not contain a recommended instruction on kidnapping, the instruction given by the district court is consistent with the recommended instructions for the Ninth and Eleventh Circuit, *see* Ninth Circuit Manual of Model Jury Instructions (Criminal) § 8.95 (2003 ed.); Eleventh Circuit Pattern Jury Instructions (Criminal) 49 (2003 ed.), as well as the instruction recommended by the Federal Judicial Center, Pattern Criminal Jury Instructions § 84. *Cf.* Eighth Circuit Manual of Model Jury Instructions (Criminal) 12.07A. We disagree with Mr. Purkey's construction of the statute and therefore find no error in the district court's instruction on the elements contained in § 1201.

-18-

SUPP. APP. 0097

C.

In his last contention of error with respect to the guilt phase of his trial, Mr. Purkey maintains that the district court erred in denying his motion for a mistrial based on prosecutorial misconduct. He asserts that the government's efforts to call attention to his tattoos that depicted, among other things, a Nazi swastika and symbols of the Aryan Brotherhood unfairly inflamed the jury and deprived him of his right to a fair trial.

During the government's direct examination of its first witness, it displayed a picture of Mr. Purkey standing shirtless with his tattoos visible. Due to a misunderstanding between the prosecution and the defense, Mr. Purkey's counsel did not have a chance to object before the government displayed the picture to the jury. Mr. Purkey's counsel then objected to the picture's admission into evidence and that objection was sustained. Three days later, during the government's cross-examination of Mr. Purkey, the government again highlighted the tattoos. The prosecutor asked Mr. Purkey whether Ms. Long observed his tattoos, including the "Nazi swastika" tattoo, when she entered his vehicle or while she was, according to Mr. Purkey, voluntarily kissing him while he had his shirt off. The government stated that it made this inquiry to demonstrate the unreasonableness of Mr. Purkey's testimony that Ms. Long voluntarily accompanied him to his home and consented to engaging in foreplay with him. When defense counsel objected to this question, the district court sustained the objection and instructed the jury to disregard the government's questions about Mr. Purkey's tattoos. The defense then asked the judge to declare a mistrial based on the prosecution's referring to the tattoos after the district court had previously sustained the objection regarding the picture showing the tattoos. The district court denied that request.

"The test for reversible prosecutorial misconduct has two parts: (1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such

-19-

SUPP. APP. 0098

remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *United States v. Hernandez*, 779 F.2d 456, 458 (8th Cir.1985). Even assuming *arguendo* that the prosecutor's actions and questions were improper, these actions nevertheless fail to constitute reversible error. When determining whether the prosecutor's remarks and conduct so infected the trial with unfairness that it deprived the defendant of a fair trial, we usually consider three criteria: "(1) the cumulative effect of such misconduct; (2) the strength of the properly admitted evidence of the defendant's guilt; and (3) the curative actions taken by the trial court." *Hernandez*, 779 F.2d at 460. Here the cumulative effect of the prosecutor's references to Mr. Purkey's tattoos was not significant. Although we do not doubt that references of this sort can sometimes result in prejudice, the prosecution referred to Mr. Purkey's tattoos only twice, *cf. id.*, and only briefly at that. There was also considerable evidence of guilt. Although he gave a somewhat different story at trial, there was evidence that Mr. Purkey had confessed to the crime on multiple occasions. Finally, the district court took prompt curative action. It sustained the objections to the admission of the picture and to the questions regarding Mr. Purkey's tattoos. After sustaining the latter objection, the court also instructed the jury to disregard the questions. *Cf. United States v. Uphoff*, 232 F.3d 624, 625-26 (8th Cir. 2000). We therefore reject Mr. Purkey's contention that his assertions of prosecutorial misconduct warrant reversal.

## IV.

We move now to Mr. Purkey's assignments of error regarding the penalty phase of his trial.

## A.

Mr. Purkey makes several arguments relating to the district court's evidentiary rulings. He asserts that the district court erred in the following ways: by refusing to permit evidence that his wife had poisoned him; by excluding the testimony of Dr. Mark Cunningham regarding Mr. Purkey's alleged fetal alcohol exposure; by

-20-

Appellate Case: 04-1337     Page: 20     Date Filed: 11/07/2005 Entry ID: 1972132

SUPP. APP. 0099

refusing to permit the surrebuttal testimony of Dr. Stephen Peterson in response to the testimony of Dr. Helen Mayberg; by limiting the impeachment of Dr. Park Dietz; and by allowing the government to question Dr. Peterson regarding his views on the death penalty.

"The Federal Death Penalty Act (FDPA) erects very low barriers to the admission of evidence at capital sentencing hearings." *United States v. Lee*, 274 F.3d 485, 494 (8th Cir. 2001), *cert. denied*, 537 U.S. 1000 (2002). In the sentencing phase, "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials." *See* 18 U.S.C. § 3593(c). One reason for this more lenient standard is that it affords the defendant additional opportunities to present mitigating evidence consistent with the Supreme Court's directive that to meet constitutional requirements in capital cases " 'the sentencer ... not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion)) (emphasis omitted).

But this does not mean that the defense has *carte blanche* to introduce any and all evidence that it wishes. The trial court retains its traditional authority "to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Lockett*, 438 U.S. at 604 n.12 (plurality opinion). The FDPA, moreover, invests the judge with the authority to exclude probative information during the penalty phase if "its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). We review the record to determine whether the district judge abused the discretion entrusted to him by the FDPA, *see United States v. Johnson*, 223 F.3d 665, 674 (7th Cir. 2000), *cert. denied*, 534 U.S. 829 (2001); *United States v. Hall*, 152 F.3d 381, 397 (5th Cir. 1998), *cert. denied*, 526 U.S. 1117 (1999),

-21-

SUPP. APP. 0100

*abrogated on other grounds in United States v. Martinez-Salazar*, 528 U.S. 304, 310-14 (2000), and we determine *de novo* the question of whether Mr. Purkey's constitutional rights have been violated. *See United States v. Washington*, 318 F.3d 845, 854-55 (8th Cir. 2003), *cert. denied*, 540 U.S. 884 & 899 (2003). Even if we conclude that the district court erred, we cannot reverse or vacate a federal death sentence on account of an error that is harmless beyond a reasonable doubt. *See* 18 U.S.C. § 3595(c)(2); *Jones v. United States*, 527 U.S. 373, 402-05 (1999).

Mr. Purkey contends that the district court erred by refusing to allow evidence that his wife, Jeanette Purkey, had poisoned him. Mr. Purkey wished to use this evidence to demonstrate that because he was operating under the influence of poison when he murdered the elderly Kansas woman or when he killed Ms. Long, his actions took place while he was involuntarily intoxicated or, at the very least, in an altered mental state. When he sought to introduce the evidence in the penalty phase (he also sought to introduce this evidence in the guilt phase), he had no evidence that the poison he allegedly received, rat poison, had any known effect on the mind. Also, his wife's testimony as to whether she had poisoned him during the relevant time period was equivocal at best. During the penalty phase, the government objected to the evidence, asserting that for both of the above reasons the presentation of this evidence was not relevant and would be a "big diversion" for the jury. The district court agreed.

We cannot say that the district court erred in excluding this evidence. The defense admitted that it had no evidence that rat poison has any psychological effects. Therefore, this evidence could not have had any probative value to suggest that Mr. Purkey's mind was operating under the poison's supposed influence when he committed either of the two murders. A reasonable judge could conclude that this evidence was both completely irrelevant to the purpose for which it was offered, *cf. Lockett*, 438 U.S. at 604 n.12 (plurality opinion), and, because of the scandalous and

-22-

**SUPP. APP. 0101**

perplexing nature of the claim, had significant potential to confuse or mislead the jury. *Cf.* 18 U.S.C. § 3593(c).

Mr. Purkey also asserts on appeal that this evidence also demonstrates his difficult home life. Because he did not argue this below, we review for plain error, *see Lee*, 274 F.3d at 493; *United States v. Turner*, 104 F.3d 217, 221 (8th Cir. 1997), and find none. To begin, we note Ms. Purkey's benevolent, if misguided, motivation for poisoning her husband by mixing the poison with his drugs: She asserted that she was trying to scare him into abandoning his illegal use of drugs. This evidence might demonstrate that Mr. Purkey had someone in his life who cared about his well being. To the extent that this evidence could be construed as illustrating Mr. Purkey's difficult home life, we note that the record is replete with evidence of the difficult and dysfunctional environments in which Mr. Purkey has lived, and so we cannot conclude that the omission of this additional evidence affected his substantial rights. *See Turner*, 104 F.3d at 221.

Mr. Purkey also contends that the district court erred by refusing to allow Dr. Cunningham to testify to his opinion that Mr. Purkey suffered from fetal alcohol exposure. The district court excluded the evidence because Mr. Purkey could not adduce specific evidence that his mother drank during the time that she was pregnant with him. Mr. Purkey's offer of proof does indicate, however, that had the court permitted Dr. Cunningham to testify on this issue he would have brought forth significant circumstantial evidence that Mr. Purkey suffered from this affliction. First, there was evidence that Mr. Purkey's mother abused alcohol dating back to at least 1950. (Mr. Purkey was born in 1952.) Second, there was evidence that Mr. Purkey's mother had two other children around the time of Mr. Purkey's birth, both of whom died, one shortly before and one shortly after birth. This, according to Dr. Cunningham, would have been consistent with those children's fetal alcohol exposure. Third, Dr. Cunningham would have testified that Mr. Purkey's brain

-23-

SUPP. APP. 0102

condition is consistent with his having suffered fetal alcohol exposure. We think that Dr. Cunningham's testimony regarding Mr. Purkey's fetal alcohol exposure would have provided probative mitigating evidence. *Cf. Silva v. Woodford*, 279 F.3d 825, 847 n.17 (9th Cir. 2002), *cert. denied*, 537 U.S. 942 (2002). Given that and the relaxed standard set forth by 18 U.S.C. § 3593(c), we conclude that the district court erred when it excluded this evidence simply because there was no direct evidence that Mr. Purkey's mother drank while pregnant with him.

Nevertheless, when we consider the record as a whole, we are satisfied that this error was harmless beyond a reasonable doubt. *See* 18 U.S.C. § 3595(c)(2); *Jones*, 527 U.S. at 402-05; *cf. Hitchcock v. Dugger*, 481 U.S. 393, 398-99 (1987); *Chapman v. California*, 386 U.S. 18, 24 (1967). We are confident that the jury would have reached the sentence that it did even if the court had admitted this evidence. *See Jones*, 527 U.S. at 402; *cf. Sweet v. Delo*, 125 F.3d 1144, 1158-59 (8th Cir. 1997), *cert. denied*, 523 U.S. 1010 (1998). The district court admitted significant expert testimony regarding Mr. Purkey's brain abnormalities and their impact on his mental and emotional health. The jury was not, therefore, precluded from considering Mr. Purkey's mental and emotional impairments as potential mitigating factors; it was merely precluded from considering one of several possible explanations as to the cause of these alleged impairments. And, although we recognize that a jury may be more likely to believe that someone suffers from a problem if its cause is explained, we nevertheless harbor no doubt that considering the minimal probative value of the evidence and the overwhelming evidence and jury findings of serious aggravating factors, its exclusion was harmless. *Cf. United States v. Bernard*, 299 F.3d 467, 487 (5th Cir. 2002), *cert. denied*, 539 U.S. 928 (2003).

Mr. Purkey also assigns error in the district court's refusal to allow him to impeach Dr. Park Dietz by inquiring into an error that the doctor made when testifying in the case of *Yates v. State*, Nos. 01-02-00462/00463, 2005 WL 20416 (Tex. Ct. App.

-24-

Appellate Case: 04-1337     Page: 24     Date Filed: 11/07/2005 Entry ID: 1972132

SUPP. APP. 0103

Jan. 6, 2005). When serving as an expert witness for the state in the *Yates* case, Dr. Dietz erroneously testified that the facts of an episode of a television show on which he consulted, "Law & Order," were very similar to those in *Yates*. In fact, no such episode existed. *Id.* at *3-*4. Dr. Dietz, during a proffer session conducted outside of the hearing of the jury in Mr. Purkey's case, freely admitted to the error that he had made in the *Yates* trial. The district court, however, sustained the government's objection to testimony about the error because it would "create[] confusion and [was] collateral."

In response to Mr. Purkey's argument, the government asserts that the exclusion of this evidence was proper under Federal Rule of Evidence 403. But that is not the controlling law here. This is an FDPA case, and its evidentiary standard must govern. *See Lee*, 274 F.3d at 494-95. Accordingly, we review this issue under the standard of § 3593(c), which provides for the exclusion of evidence "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c); *see Lee*, 274 F.3d at 494.

Although one of the court's reasons, that the testimony would "create[] confusion," is arguably consistent with a permissible reason under the FDPA, we cannot conclude that the district court acted correctly when it refused to permit any inquiry into Dr. Dietz's previous mistake. This testimony would have been relevant to demonstrate the doctor's fallibility. Further, we cannot agree with the district court that this testimony would have resulted in confusion. Dr. Dietz freely admitted that he erred; that was not in dispute. The nature of Dr. Dietz's error, moreover, was not unusually complex or confusing. Therefore we can find no reason to conclude that the probative value of this testimony was "outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury," 18 U.S.C. § 3593(c).

-25-

SUPP. APP. 0104

We nevertheless conclude that the error was harmless. Mr. Purkey's cross-examination of Dr. Dietz was otherwise extensive. During that cross-examination, Mr. Purkey was able to extract concessions from Dr. Dietz that he had made mistakes in two other cases in which he had testified. And, although we do not doubt that the excluded information would have provided a morsel of additional probative evidence of Dr. Dietz's ability to err, given the otherwise extensive cross-examination that allowed the defense to bring out his other errors, and the overwhelming number and the nature of the aggravating factors found by the jury, we cannot conclude that the absence of this additional information affected Mr. Purkey's substantial rights. *See* 18 U.S.C. § 3595(c)(2); *Jones*, 527 U.S. at 402-05; *Hitchcock*, 481 U.S. at 398-99; *cf. Bernard*, 299 F.3d at 487; *Sweet*, 125 F.3d at 1158-59.

Mr. Purkey also maintains that the district court erred by denying his request to allow Dr. Peterson to present surrebuttal testimony in response to the testimony of Dr. Helen Mayberg. Dr. Mayberg's testimony was presented to rebut the conclusions of the defense's experts regarding Mr. Purkey's alleged brain injuries. The defense requested that it be allowed to introduce surrebuttal evidence pertaining to two of Dr. Mayberg's conclusions: that Mr. Purkey could not have suffered significant brain injuries in automobile accidents that occurred in 1968 and 1972, and that Mr. Purkey's functioning as a "jailhouse lawyer" was inconsistent with the sort of brain damage reported by the defense's medical experts.

The government argues that the court did not err in excluding this surrebuttal testimony because Dr. Mayberg's rebuttal testimony did not raise a new matter. The decision of whether to allow a party to present evidence in surrebuttal is generally committed to the discretion of the trial court, *see United States v. Wilford*, 710 F.2d 439, 452 (8th Cir. 1983), *cert. denied*, 464 U.S. 1039 (1984), and surrebuttal is typically thought appropriate only when new matters are raised in the rebuttal

-26-

SUPP. APP. 0105

testimony, *see United States v. Barnette*, 211 F.3d 803, 821 (4th Cir. 2000); *cf. Wilford*, 710 F.2d at 452.

We do not think that the FDPA alters this standard. *Cf. Barnette*, 211 F.3d at 820-21. Although the FDPA dispenses with the rules governing the admission of evidence during criminal trials, it is not sensible to read this statutory imperative as also divesting the trial judge of his or her traditional authority to control the mode and order of the interrogation of witnesses and the presentation of evidence. A contrary reading would transform the FDPA sentencing hearing into an evidentiary mélee.

Even assuming that Dr. Mayberg's testimony that Mr. Purkey's work as a "jailhouse lawyer" demonstrated his lack of significant brain damage presented a new matter, thereby making surrebuttal appropriate, we cannot conclude that this putative error provides an adequate ground for reversal. As mentioned previously, Mr. Purkey presented a significant amount of testimony regarding his assertion that he suffered from brain damage. This additional testimony would have, at best, offered only marginal additional support for this defense. When we consider this fact combined with the significant number and serious nature of the aggravating factors advanced by the government and found by the jury, we cannot conclude that this error affected Mr. Purkey's substantial rights. *See* 18 U.S.C. § 3595(c)(2); *Jones*, 527 U.S. at 402-05; *Hitchcock*, 481 U.S. at 398-99; *cf. Bernard*, 299 F.3d at 487; *Sweet*, 125 F.3d at 1158-59.

Finally, Mr. Purkey asserts that the district court erred by overruling his objection to questions that the government asked on cross-examination of Dr. Peterson, one of Mr. Purkey's expert witnesses. Specifically, Mr. Purkey's counsel objected to the government's inquiry into Dr. Peterson's views on the death penalty.

Even under the traditional rules of evidence, "cross-examination regarding potential bias of a witness is proper." *United States v. Amerson-Bey*, 898 F.2d 681,

-27-

SUPP. APP. 0106

682 (8th Cir. 1990); *see United States v. McCoy*, 131 F.3d 760, 760-61 (8th Cir. 1997) (per curiam). If Dr. Peterson strongly disfavored the death penalty, knowledge of that would be relevant to the jury's evaluation of his credibility in testifying to factors that could mitigate Mr. Purkey's sentence; " 'exposure of a witness' motivation in testifying is a proper and important function of ... cross-examination,' " *Van Arsdall*, 475 U.S. at 678-79 (quoting *Davis*, 415 U.S. at 316-17). To the extent that the FDPA alters this rule, it relaxes it, *see* 18 U.S.C. § 3593(c); *Lee*, 274 F.3d at 495; *a fortiori* the district court did not err in allowing the government to continue its line of inquiry into Dr. Peterson's beliefs about the death penalty.

In addition to considering whether each of the evidentiary errors that we have found is individually sufficient to require reversal, we have also considered, *sua sponte*, what cumulative effect these errors might have had upon Mr. Purkey's substantial rights. *Cf. United States v. Steffen*, 641 F.2d 591, 597-98 (8th Cir. 1981), *cert. denied*, 452 U.S. 943 (1981). After careful review, we also conclude that the errors, even when taken cumulatively, are harmless.

B.

Mr. Purkey next maintains that the district court erred by denying his motion for allocution during the penalty phase of the trial; Mr. Purkey sought to make a statement before the jury without being subject to cross-examination. Although Mr. Purkey was permitted to address the district court before it imposed his sentence, he argues that the court functionally deprived him of his right to allocution, because it lacked any discretion to impose a sentence other than the one that the jury already had recommended, *see* 18 U.S.C. § 3594. The district court's error, he maintains, violated his constitutional rights, Rule 32 of the Federal Rules of Criminal Procedure, and the FDPA, *see* 18 U.S.C. §§ 3592(a)(8), 3593(c). We disagree.

First, our circuit previously has recognized that the right to allocution does not emanate from the Constitution. *See United States v. Patterson*, 128 F.3d 1259, 1260

-28-

SUPP. APP. 0107

(8th Cir. 1997) (per curiam); *see also Barnette*, 211 F.3d at 820; *Hall*, 152 F.3d at 396. Therefore, even if Mr. Purkey were correct that the district court denied him the right to allocution, the error would not be a constitutional one.

Second, Mr. Purkey does not have a statutory right to make statements to a jury during the penalty phase of an FDPA trial without being subject to cross-examination. Rule 32(i)(4)(A)(ii) requires that "[b]efore imposing sentence," the district court must "permit the defendant to speak or present any information to mitigate the sentence." The district court satisfied Rule 32 when it allowed Mr. Purkey to speak "before imposing sentence." *See Hall*, 152 F.3d at 392. Although Mr. Purkey's allocution could not have mitigated his sentence because it followed the jury's recommendation of the death penalty, *see* 18 U.S.C. § 3594, nowhere does Rule 32 grant Mr. Purkey a right to allocution before a jury; Rule 32 speaks only of "the court." We agree with the Fifth Circuit that Rule 32(i)(4)(A)(ii) should not be interpreted to entitle Mr. Purkey to a right of allocution before the jury "when the plain language of the rule does not dictate such an interpretation." *Hall*, 152 F.3d at 393; *see also Barnette*, 211 F.3d at 820. As for the FDPA, nowhere does it mention a right to allocution or anything comparable; Mr. Purkey's claimed right on that ground therefore does not exist.

## C.

Mr. Purkey assigns several errors relating to the jury's special findings and recommendation of his death sentence. We previously noted that, to recommend a death sentence after determining that the defendant is eligible for such a sentence, the jury must unanimously find that the statutory and non-statutory aggravating factors "sufficiently outweigh" the mitigating factors. *See* 18 U.S.C. § 3593(e). For an aggravating factor to enter into the jury's calculation, the government must establish "the existence of such a factor ... beyond a reasonable doubt." *Id.* at § 3593(c). The standard for mitigating factors, however, is less rigorous. The jury may consider any mitigating factor that at least one juror found proved "by a preponderance of the

-29-

SUPP. APP. 0108

information." *Id.* at § 3593(c), (d).  After the jury has completed its deliberations, it must "return special findings identifying any aggravating factor ... found to exist." *Id.* at § 3593(d).

Mr. Purkey first contends that the district court erroneously permitted the prosecution to present the jury with duplicative aggravating factors, thereby skewing the jury's balancing of aggravating and mitigating factors in violation of the eighth amendment.  Because Mr. Purkey challenges the constitutionality of allegedly duplicative aggravating factors, we review the district court's decision *de novo*.  *Cf. Cooks v. Ward*, 165 F.3d 1283, 1289 (10th Cir. 1998).

Mr. Purkey's best case for duplication is that the nonstatutory aggravator for "[s]ubstantial criminal history" mirrors the statutory aggravator for convictions of "two or more offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction and attempted infliction of serious bodily injury and death upon another person."  The convictions that the government offered to support both aggravating factors were identical.

We think that the Tenth Circuit is correct to conclude that the same facts can support different inferences that form different aggravators.  *See Medlock v. Ward*, 200 F.3d 1314, 1319 (10th Cir. 2000) (per curiam), *cert. denied*, 531 U.S. 882 (2000).  Otherwise the government would either have to choose one out of several possible aggravating factors for each instance of a defendant's misconduct or pack into a single aggravator multiple negative inferences that could be drawn from the misconduct and then risk the jury's rejection of the aggravator due to disagreement over just one of the inferences.

Even under the Tenth Circuit's standard, however, we agree with Mr. Purkey that the nonstatutory aggravating factor duplicated the statutory one.  The government used the same set of convictions each time for the same purpose, namely to show the

-30-

SUPP. APP. 0109

defendant's criminal history. The nonstatutory aggravating factor did refer to a fact of Mr. Purkey's criminal history that went unmentioned in the statutory aggravating factor, namely, that Mr. Purkey "shot Gregg W. Carlberg on or about August 3, 1980." Even if this fact were enough to distinguish the two aggravators, though, it overlaps with a separate statutory aggravating factor based on Mr. Purkey's conviction of "an offense punishable by a term of imprisonment of more than one year, involving the use ... of a firearm ... against another person," 18 U.S.C. § 3592(c)(2) – an aggravator that went to the same history of illegal firearm use as did the shooting episode.

Despite the duplication of aggravators in Mr. Purkey's case, we see no basis for the constitutional infirmity of such factors. The Supreme Court has "never before held that aggravating factors could be duplicative so as to render them constitutionally invalid," *Jones*, 527 U.S. at 398 (plurality opinion), and we decline to do so when the FDPA avoids arbitrary death sentences by requiring juries to weigh aggravating and mitigating factors rather than to tally the factors on each side and declare a winner based on sheer numbers. *See* 18 U.S.C. § 3593(e). *But see United States v. Tipton*, 90 F.3d 861, 899 (4th Cir. 1996), *cert. denied*, 520 U.S. 1253 (1997); *United States v. McCullah*, 76 F.3d 1087, 1111-12 (10th Cir. 1996), *cert. denied*, 520 U.S. 1213 (1997). The district court's jury instructions bolster this view as applied to Mr. Purkey's case: The district court ensured that the jury would not employ a tally method of evaluating factors when it instructed the jury that "weighing aggravating and mitigating factors ... is not a mechanical process. In other words, you should not simply count the number of aggravating and mitigating factors. The law contemplates that different factors may be given different weights or values by different jurors."

Of course, had the government introduced an invalid aggravating factor into the jury's weighing process, then the government might have violated Mr. Purkey's rights under the eighth amendment. *See Stringer v. Black*, 503 U.S. 222, 232 (1992). But Mr. Purkey asserts no such error here.

-31-

SUPP. APP. 0110

Mr. Purkey next requests that our circuit reconsider its precedents that have approved jury instructions mandating that a jury recommend a sentence of death should it conclude, after balancing aggravating against mitigating factors, that the former sufficiently outweigh the latter to justify imposition of a death sentence. He recognizes that overruling those precedents would require the action of our *en banc* court and that, as a panel of that court, we are required to give them effect. *See United States v. Provost*, 969 F.2d 617, 622 (8th Cir. 1992). For our part, we believe that our precedents are well-reasoned. *See Nelson*, 347 F.3d at 712; *Ortiz*, 315 F.3d at 900-01.

Finally, Mr. Purkey maintains that the FDPA requires juries to identify any mitigating factor that at least one juror found to exist and that the district court consequently erred by accepting the jury's verdict form. (The verdict form asked the jury to record the number of jurors who found each mitigating factor to exist, and the jury returned that portion of the form blank.) Because Mr. Purkey presents us with a question of law by asking us to interpret the FDPA, we review *de novo* the district court's refusal to order the jury to complete the mitigation portion of the verdict form. *See United States v. Storer*, 413 F.3d 918, 921 (8th Cir. 2005).

In a prior case, we hinted that the FDPA does not mandate that jurors identify the mitigating factors they find to exist, but we ultimately avoided deciding the question. *See United States v. Paul*, 217 F.3d 989, 999 n.6 (8th Cir. 2000) (citing *Hall*, 152 F.3d at 413). We conclude that in *Paul* we correctly, albeit tentatively, construed the FDPA. Section 3593(d) specifically requires the jury to "return special findings identifying any aggravating factor[s] ... found to exist," without any mention of identifying such mitigating factors, and so requires no special findings with respect to the latter. It is true that the jury's identification of proven mitigating factors facilitates appellate review, especially when we have to evaluate the effect of any error on the sentence that the jury recommended. Nevertheless, the jury's failure to identify proven mitigating factors is entirely proper under the FDPA, and therefore the district court did not err by accepting the jury's verdict form.

-32-

SUPP. APP. 0111

D.

In Mr. Purkey's last assignment of error, he argues that the district court erred by denying his motion for a mistrial based on alleged prosecutorial misconduct. During the penalty phase of the trial, Mr. Purkey interrupted the government's cross-examination of a psychiatric expert for the defense, at which point the district court excused the jury and Mr. Purkey gave voice to an additional comment that the prosecutor interpreted as a threat against him. During the government's subsequent cross-examination of a defense expert, who testified to the calming effects of medication that Mr. Purkey was taking, the prosecutor asked the expert whether he was "aware [that Mr. Purkey] threatened to run my head through yesterday in court," to which Mr. Purkey's counsel immediately objected. The district court sustained the objection. Mr. Purkey contends that the prosecutor's question compromised the fairness of the penalty proceedings.

Earlier in our opinion, we rehearsed the legal principles that guide our review of alleged prosecutorial misconduct. *Cf. Jackson*, 41 F.3d at 1233. Even if, as Mr. Purkey claims, the prosecutor's question was improper, we conclude that the question did not deprive Mr. Purkey of due process: Although the district court failed to instruct the jury to disregard the prosecutor's question, it sustained defense counsel's objection. Given that defense counsel did not request the court to give the jury a cautionary instruction and that the question was brief and isolated, the district court's curative action, combined with the overwhelming evidence of aggravating factors, ensured that Mr. Purkey was not denied a fair penalty proceeding. *See id.* This remains true even when we take into account any residual effect on the jury from the instances of improper prosecutorial conduct that related to Mr. Purkey's tattoos and occurred during the guilt phase of Mr. Purkey's trial. We therefore conclude that the district court did not err when it denied Mr. Purkey's motion for a mistrial.

-33-

SUPP. APP. 0112

# V.

Accordingly, we affirm the judgment of the district court.

_____

-34-

Appellate Case: 04-1337    Page: 34    Date Filed: 11/07/2005 Entry ID: 1972132

**SUPP. APP. 0113**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of December, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Alan E. Schoenfeld
ALAN E. SCHOENFELD