**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

| | | |
|---|---|---|
| **WESLEY IRA PURKEY**, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | CIVIL ACTION |
| vs. | ) | |
| | ) | Appeal No.: 19-3318 |
| **WARDEN OF USP TERRE HAUTE**, | ) | |
| **UNITED STATES OF AMERICA,** | ) | DEATH PENALTY CASE |
| | ) | EXECUTION SCHEDULED |
| | ) | FOR JULY 15, 2020 |
| Respondents-Appellees. | ) | |

---

### APPELLANT'S MOTION TO STAY EXECUTION

---

Today is Wednesday, June 17, and less than 24 hours ago this Court heard

oral argument in this appeal. In it, Wesley Ira Purkey presents meritorious

challenges to his conviction and sentence—including that he was convicted and

sentenced to death by a juror who was biased as a matter of law. He presents these

claims now under 28 U.S.C. § 2241 because he received ineffective assistance of

both his trial counsel and statutorily guaranteed initial collateral review counsel.

Whether § 2241 is available to him and whether his underlying claims have "some

merit" are hard and important questions, both for Mr. Purkey—whose life is at

stake—and for other federal death-sentenced prisoners in this Circuit.

Less than 24 hours before oral argument, the Government set a date for

Mr. Purkey's execution—July 15, 2020.  Four weeks from argument is not enough time for this Court to resolve the difficult claims presented by this appeal. Mr. Purkey is likely to succeed on these claims, he did not unnecessarily delay in pursuing them, and he will indisputably suffer irreparable harm if the Government executes him before they are adjudicated.  Mr. Purkey therefore moves for a stay of execution under Seventh Circuit Rule 22(h).[1]

## BACKGROUND

Mr. Purkey was convicted and sentenced to death in federal court in Missouri in 2003 and 2004.  During a pretrial suppression hearing, on the advice of counsel, Mr. Purkey gave false, inculpatory testimony concerning his guilt on an element of the charged offenses.  He was then tried before a jury that included an impliedly biased juror who had been the victim of a similar crime, at the same age,

---

[1] As required by Seventh Circuit Rule 22(h)(3)(ii) and (iv), the following documents are exhibits to this Motion: Mr. Purkey's § 2241 petition (Ex. A); Mr. Purkey's motion in the district court to stay execution (Ex. B); the government's combined opposition to the petition and motion to stay (Ex. C); and Mr. Purkey's reply in support of the petition and motion to stay (Ex. D).  A certificate of appealability (COA) is not attached per Circuit Rule 22(h)(3)(i) because the appeal is from a § 2241 petition, which has is no COA requirement.  *See* 28 U.S.C. § 2253(c)(1)(A)-(B) (requiring a COA for habeas proceedings challenging state court convictions and final orders in § 2255 proceedings); 7th Cir. R. 22(h) (requiring attachment of COA to a stay of execution or, in the alternative, an explanation for why the COA is not attached); Fed. R. App. P. 22.  The district court's decision on both the merits and the motion to stay is not attached per Circuit Rule 22(h)(3)(iii) and (v) because that decision has already "been filed with this court as part of the record."  7th Cir. R. 22(h)(3).

and who bore the same name, as the victim in Mr. Purkey's case. When the Government used Mr. Purkey's testimony from the suppression hearing at trial to impeach him, trial counsel never objected or made a meaningful attempt to rehabilitate Mr. Purkey; nor did counsel object when, contrary to established Supreme Court precedent, the Government offered the testimony from the suppression hearing as evidence of Mr. Purkey's guilt. And during the penalty phase—again, infected by a juror whose experiences made her biased as a matter of law—his trial counsel put on only a meager mitigation case after a halfhearted investigation that omitted generations of important family history and any mention of the extensive abuse Mr. Purkey suffered outside his home while at school or at church at the hands of his parish priest. This ineffective assistance fit the track record of Mr. Purkey's trial counsel, who is single-handedly responsible for more clients sentenced to death in the federal system than any other attorney.

In October 2007, Mr. Purkey brought a challenge to his conviction and sentence under 28 U.S.C. § 2255. There, his § 2255 counsel managed to raise none of these issues. Section 2255 counsel missed the biased juror, the mishandling of the suppression testimony, and extensive overlooked mitigation evidence. In short, Mr. Purkey's § 2255 counsel, one of whom has since been suspended from the practice of law by the Missouri Supreme Court, provided ineffective assistance.

3

Because of the ineffective assistance of his trial and § 2255 counsel, the first time Mr. Purkey brought his ineffective assistance of trial counsel claims to the attention of any court was in August 2019, when he petitioned for habeas corpus under 28 U.S.C. § 2241 in the Southern District of Indiana. The district court denied his petition in November 2019 and this appeal followed.

Meanwhile, in July 2019—a decade and a half after Mr. Purkey's conviction and sentence—the Government for the first time set a date for his execution (for December 2019) under a newly announced federal lethal-injection protocol. In November 2019, however, U.S. District Court for the District of Columbia preliminarily enjoined his execution (and three others) under the new protocol, which the court held contravened the requirements of the Federal Death Penalty Act. *Roane v. Barr*, No. 19-mc-145 (D.D.C. Nov. 20, 2019), ECF No. 50. The Government appealed the injunction and, on April 7, 2020, a divided panel of the U.S. Court of Appeals for the District of Columbia Circuit vacated it. *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19-5322 (D.C. Cir. Apr. 7, 2020). A petition for certiorari is now pending before the U.S. Supreme Court.[2] The D.C. Circuit's mandate issued on Friday, June 12, and on Monday, June 15— the day before argument in this appeal—the Government scheduled Mr. Purkey's

---

[2] Petitioners initially requested that the D.C. Circuit's mandate be stayed; once the mandate issued on June 12, the request was converted to a request for a recall and stay of the mandate.

execution for four weeks later: for July 15, 2020.

## ARGUMENT

This Court should stay Mr. Purkey's execution while it resolves the merits of his appeal. This Court has explained that "[t]he law governing stays of death sentences is, in general, the same as that employed in other situations." *Williams v. Chrans*, 50 F.3d 1358, 1360 (7th Cir. 1995). Thus "the moving party must demonstrate" four things: (1) "a likelihood of success on the merits"; (2) "a lack of an adequate remedy at law"; (3) that "an irreparable harm will result if the injunction is not granted"; and (4) "that a balancing of the equities falls in [the movant's] favor," with the "critical factor" being "whether the inmate has delayed unnecessarily in bringing the claim." *Lambert v. Buss*, 498 F.3d 446, 451-452 (7th Cir. 2007) (citation omitted). These factors favor staying Mr. Purkey's execution while this Court resolves his appeal.

## I. Mr. Purkey Is Likely To Succeed On The Merits

The merits of Mr. Purkey's claims are well understood by this Court, which heard oral argument on them just yesterday. In short, it follows inexorably from *Martinez v. Ryan*, 566 U.S. 1 (2012), *Trevino v. Thaler*, 569 U.S. 413 (2013), and *Ramirez v. United States*, 799 F.3d 845 (7th Cir. 2015), that a federal prisoner like Mr. Purkey—who, because of the ineffective assistance of initial collateral review counsel, was denied a reasonable opportunity to present his meritorious ineffective

assistance of trial counsel claim—may seek habeas relief under § 2241.  Under

those circumstances, § 2255 is "inadequate or ineffective" to test the legality of his

conviction and sentence and the Savings Clause of § 2255(e) is triggered.  That is

because Mr. Purkey has simply never had "'a reasonable opportunity to obtain a

reliable judicial determination of the fundamental legality of his conviction and

sentence.'"  *Webster v. Daniels*, 784 F.3d 1123, 1136 (7th Cir. 2015) (en banc)

(quoting *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998)).

Having established that this Court has jurisdiction over his petition, to be

entitled to a stay, Mr. Purkey need only show a "substantial" ineffective assistance

claim, which is one that has "some merit."  *Martinez*, 566 U.S. at 14 (citing *Miller-

El v. Cockrell*, 537 U.S. 322 (2003)).  Even a cursory review of Mr. Purkey's

claims—an exercise that the district court did not undertake—shows that his

petition satisfies this modest standard.  Trial counsel failed to challenge a juror

with the same name as the victim whose jury questionnaire revealed that she had

been the victim of an attempted rape at the same age as the victim in Mr. Purkey's

case—allowing, as one member of the panel suggested at argument, a clone of the

victim to sit on the jury.  Trial counsel advised Mr. Purkey at a suppression hearing

to adopt his prior inculpatory statements and then failed to mitigate the resulting

negative consequences, including by failing to object to the Government's later use

of suppression testimony to prove guilt.  And he investigated and presented a

6

wholly inadequate mitigation case, under which the jury never learned about essential family history; the physical abuse, degradation, and humiliation that Mr. Purkey suffered outside home, at school in particular; and evidence of the three years Mr. Purkey was sexually abused by his parish priest, from age 11 to 13.

Mr. Purkey has therefore shown "a significant probability of success on the merits," *Lambert*, 498 F.3d at 451—that is, a significant probability that this Court will conclude that § 2241 is available to him and that at least one of his underlying claims has some merit.

## II. Mr. Purkey Has No Adequate Remedy At Law

This Court has recognized that "'a stay of execution is an equitable remedy,'" and capital prisoners have "no adequate remedy at law." *Lambert*, 498 F.3d at 452 (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)). "This factor weighs in [Mr. Purkey's] favor." *Id.*

## III. Mr. Purkey Will Suffer Irreparable Harm Without A Stay

This Court has explained that, while "[t]he law governing stays of death sentences is, in general, the same as that employed in other situations," the "inquiry with respect to irreparable injury is, however, different." *Chrans*, 50 F.3d at 1360. That is because "death is different"—"execution is the most irremediable and unfathomable of penalties." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986). So "[t]here can be no doubt that a defendant facing the death penalty at the hands

of the state faces irreparable injury." *Chrans*, 50 F.3d at 1360; *see also*

*Wainwright v. Booker*, 473 U.S. 935, 935 n.1 (1985) (Powell, J., concurring) ("The

third requirement—that irreparable harm will result if a stay is not granted—is

necessarily present in capital cases."). Thus, "the issue of irreparable injury is

taken as established in a capital case." *Chrans*, 50 F.3d at 1360.

In *this* capital case, Mr. Purkey has raised substantial challenges to the

fundamental legality of his conviction and sentence—challenges that he has had no

reasonable opportunity to present for judicial determination before now. The

district court dismissed his petition without commenting on the substance of those

claims—and so no court has *ever* considered them on the merits. And on the

merits, they are powerful: Mr. Purkey was convicted and sentenced to die by a

juror who was biased as a matter of law—a fundamental structural defect that

deprived Mr. Purkey of his constitutional right to a trial by an impartial tribunal.

*See, e.g.*, *Oswald v. Bertrand*, 374 F.3d 475, 482 (7th Cir. 2004); *see also Johnson

v. Armontrout*, 961 F.2d 748, 754-756 (8th Cir. 1992) ("Trying a defendant before

a biased jury is akin to providing him no trial at all."). So there can be "no doubt"

that Mr. Purkey faces irreparable harm absent a stay from this Court. *Chrans*, 50

F.3d at 1360.

**IV. The Equities Favor Mr. Purkey, Who Has Not Unnecessarily Delayed**

The equities also favor a stay of execution. The Government does have a "significant interest in enforcing its criminal judgment." *Nelson v. Campbell*, 541 U.S. 637, 649-650 (2004). But it is now operating in a way that would undermine the judicial process. It at first failed to schedule Mr. Purkey's execution for years, which "undermines any urgency surrounding" its need to do so. *Osorio-Martinez v. Attorney Gen. of the U.S.*, 893 F.3d 153, 179 (3d Cir. 2018). And yet now it moves with a frenzied pace. In July 2019, it simultaneously announced a new lethal-injection protocol—after having no protocol in place for years—and set Mr. Purkey's execution for a few short months later. After the injunction barring Mr. Purkey's execution was vacated, the Government then chose to set Mr. Purkey's execution *immediately* after the D.C. Circuit's mandate issued, entirely disregarding that oral argument in this case was the very next day.

And the Government set Mr. Purkey's execution for a mere month after argument, when it must know that this case is extremely unlikely to be decided yet. Indeed, this Court's own internal operating procedures provide that a draft published opinion should circulate within *90 days* of the argument (or 180 days if the case is "unusually complex," which this case is, since it presents a novel jurisdictional question and rests on a 221-page habeas petition). *See* 7th Cir. I.O.P. 9(b). Under the Government's timing, Mr. Purkey will be long dead before this

Court even drafts a decision resolving his appeal. The message the Government is sending with this feverish approach is that it is prepared to proceed with Mr. Purkey's execution irrespective of this Court's decision. The Government's position notwithstanding, however, this Court has made clear that it has "its own right and responsibility to conduct its judicial work in a manner that reflects the seriousness of inflicting the death penalty upon a human being." *Chrans*, 50 F.3d at 1360. A stay of execution pending appeal supports that serious judicial work.

Mr. Purkey, on the other hand, has not "delayed unnecessarily," and certainly has not engaged in "obvious dilatory tactics" designed to "manipulate the judicial process." *Lambert*, 498 F.3d at 452 (citations omitted). To begin with, Mr. Purkey is promptly seeking this stay of execution—the Government set his execution date on Monday, oral argument was Tuesday, and Mr. Purkey brings this motion to stay on Wednesday. This is not an eleventh hour stay request on the eve of his execution. The Supreme Court has said that "[a] court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief." *Gomez v. United States Dist. Ct.*, 503 U.S. 653, 654 (1992); *see, e.g.*, *Lambert*, 498 F.3d at 447, 455 (June 14 decision denying stay of execution scheduled "before sunrise on June 15"); *Woods v. Buss*, 496 F.3d 620, 622 (7th Cir. 2007) (May 3 decision denying stay of execution scheduled for "May 4 … at 12:01 A.M."); *Bieghler v. Donahue*, 163 F. App'x 419, 420 (7th Cir. 2006)

(Kanne, J., dissenting) (dissenting from grant of stay in part because the inmate "waited until the day before his execution to make the request"). That consideration supports granting a stay here, because Mr. Purkey is moving as early as possible to stay an execution that is still four weeks away.

Nor did Mr. Purkey strategically delay in bringing his § 2241 petition. Before the Government's unexpected announcement in July 2019, there was no sign that Mr. Purkey would be executed imminently. On the contrary, for the prior *eight years*, the Government had reported to federal court in D.C. that it was still working to revise its lethal-injection protocol, including six years engaged in the "final phases of finalizing the protocol." *See Roane v. Gonzales*, No. 1:05-cv-02337-TSC (D.D.C.), ECF No. 323 (Defendant's Status Report of July 3, 2013). The July 2019 announcement and execution date came as a complete surprise to Mr. Purkey and his counsel, who then urgently finalized and filed his 221-page § 2241 petition and 2,500-page appendix only four weeks later—rather than waiting until the eve of his December 2019 execution date. And the time between the end of Mr. Purkey's § 2255 proceedings and the filing of his § 2241 petition was spent investigating his claims (something trial and § 2255 counsel never did), as shown by the fact that Mr. Purkey's August 2019 petition relies on evidence obtained throughout that period up to the very month of filing. *See* Dist. Ct. ECF No. 23 (Appendix) at 78-88 (August 2019 declarations). In short, Mr. Purkey and

11

his counsel have not "delayed unnecessarily" but have diligently advanced his

§ 2241 claims, which could not "have been brought at such a time as to allow

consideration of the merits without requiring entry of a stay." *Nelson*, 541 U.S. at

650.

## CONCLUSION

For these reasons, the Court should stay Mr. Purkey's execution pending

final resolution of this appeal.

Respectfully submitted.

/s/ Alan E. Schoenfeld

REBECCA E. WOODMAN
ATTORNEY AT LAW, L.C.
1263 W. 72nd Terrace
Kansas City, MO 64114
(785) 979-3672

MICHELLE M. LAW
ASSISTANT FEDERAL PUBLIC DEFENDER
WESTERN DISTRICT OF MISSOURI
901 St. Louis Street, Suite 801
Springfield, MO 65806
(417) 873-9022

ALAN E. SCHOENFELD
STEPHANIE SIMON
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

June 17, 2020

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A).

1.      Exclusive of the exempted portions of the motion, as provided in Fed. R. App. P. 32(f), the motion contains 2,771 words.

2.      The motion has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied on the word count feature of this word processing system in preparing this certificate.


/s/ Alan E. Schoenfeld
ALAN E. SCHOENFELD

June 17, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of June, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Alan E. Schoenfeld
ALAN E. SCHOENFELD

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| **WESLEY IRA PURKEY**, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | CIVIL ACTION |
| vs. | ) | |
| | ) | Case No.: 2:19-cv-414 |
| **WARDEN OF USP TERRE HAUTE**, | ) | |
| **UNITED STATES OF AMERICA** | ) | DEATH PENALTY CASE |
| | ) | EXECUTION SCHEDULED |
| | ) | FOR DECEMBER 13, 2019 |
| Respondents. | ) | |

---

**AMENDED
PETITION FOR WRIT OF HABEAS CORPUS**

---

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
Telephone:  (785) 979-3672
Email: rewlaw@outlook.com

Michelle M. Law
Assistant Federal Public Defender
Western District of Missouri
901 Saint Louis Street, Suite 801
Springfield, Missouri 65806
Telephone: (417) 873-9022
Facsimile:  (417) 873-9038
Email: michelle_law@fd.org

Dated: September 13, 2019

*Counsel for Petitioner*

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................1

II.     JURISDICTION ....................................................................................5

III.    WES PURKEY'S SOCIAL AND FAMILY HISTORY .......................13

        A. Wes's family history is marked by hardship and resilience,
        long undisclosed narratives of traumatic exposure to multiple
        generations of family members, and susceptibility to mental
        illness and neurodegenerative disease .........................................13

        B. Wes's father Jack married his mother Velma against the
        wishes of Jack's family, and their first marriage ended in
        divorce after just six months. Velma re-married, but after two
        of her three sons born during that marriage died shortly after
        childbirth, she divorced again and then married Jack a second
        time, and Wes was born.................................................................20

        C. Born into a chaotic family environment of alcoholic, violent
        parents who were ill-equipped to provide love or support, Wes
        suffered unspeakable physical, emotional, and sexual violence
        at the hands of both of his parents, which left Wes in constant
        fear of being targeted for abuse and unable to trust other people ........22

        D. As a young child, Wes's only escape from the relentless
        violence he experienced at home was among his friends and
        their families in the neighborhood...............................................30

        E. For Wes, school provided no safety or respite from the
        violence at home, because he was ridiculed by the nuns for his
        stuttering, and subjected to ongoing sexual abuse by the parish
        priest, leaving him feeling increasingly alone, isolated, and
        vulnerable......................................................................................33

        F. Finding no safety, comfort or security either at home or
        school, Wes began to turn to alcohol and drugs, and fell in
        with a group of rough boys in the neighborhood ..........................41

G. After graduating from St. Joe's, Wes's is sent to a local public high school with no resources for struggling students and a reputation for being rough and violent. Wes dropped out of school altogether in the ninth grade. After that Wes began to experience distinct physical and psychological symptoms that were never meaningfully treated, suffered two serious head injuries, and he became dependent on alcohol and drugs ...................... 48

H. Despite his difficulties, into adulthood Wes attempted to create a meaningful life for himself through work and sought treatment for his symptoms and his substance use when he could, but he could not overcome the extreme trauma he suffered growing up, and the addictions that resulted ........................... 59

I. The institutionalization from being incarcerated for much of his adult life, combined with his untreated trauma symptoms, left Wes ill-equipped to adjust to the outside world or to foster healthy relationships after he was released on parole in 1997, despite his best efforts and his deep love for his young daughter ....... 65

J. To this day Wes maintains a close bond with his daughter Angie and his grandchildren, and continues to provide all the love and support he can to his family from prison ................................. 78

IV.    FACTS AND PROCEDURAL HISTORY OF THIS CASE .............. 82

A. The Crime ................................................................................. 82

B. The Trial Defense Team ........................................................... 85

C. The Trial ................................................................................... 90

D. The § 2255 Proceeding ............................................................ 96

CLAIM I:    Trial counsel was constitutionally ineffective for failing to challenge Juror 13, whose name is Jennifer, and who was selected to serve on Mr. Purkey's jury despite, and without any questioning about, her disclosure on her juror questionnaire that she was the victim of an attempted rape

ii

when she was 16 years old, where the underlying facts of the crime charged against Mr. Purkey alleged that he raped a 16-year-old girl named Jennifer ........................................................98

CLAIM 2:   Trial counsel was constitutionally ineffective in failing to investigate, develop and present readily available, compelling mitigating evidence to the jury at Mr. Purkey's capital trial, in violation of the Sixth, Eighth, and Fourteenth Amendments ................................................ 107

A. Trial counsels' failure to conduct an adequate mitigation investigation is directly attributable to the substitution of a uniquely unqualified investigator in place of a qualified mitigation specialist as part of the defense team................................... 110

B. Trial counsel was ineffective in failing to investigate, develop and present Mr. Purkey's full trauma history and the long-term consequences and effects of his trauma exposure and its connection to his behavior to explain why he committed the crime that led to his federal conviction.................. 116

C. Trial counsel were ineffective in failing to investigate, discover, and present expert mental health evidence of Mr. Purkey's complex PTSD symptoms and behavior throughout his life up to and including the crime....................................... 126

CLAIM 3:   Fred Duchardt perpetrated a fraud on the court requiring relief setting aside the judgment on his 28 U.S.C § 2255 petition by making false and misleading statements to the court in the § 2255 proceeding intended to secure denial of Mr. Purkey's claims of ineffective assistance of counsel alleged against Mr. Duchardt, and which the habeas court subsequently relied upon in denying Mr. Purkey relief .......... 140

CLAIM 4:   Because there is a substantial possibility that the jury at Mr. Purkey's penalty trial understood the instructions in a way that rendered jurors unable to consider and give effect to mitigating evidence in determining whether to sentence Mr. Purkey to death, Mr. Purkey's death sentence is unconstitutional under the Eighth Amendment........................155

CLAIM 5:   Mr. Purkey's death sentence is unconstitutional in light of *Hurst v. Florida* because his sentencing jury did not find, beyond a reasonable doubt, each fact necessary to impose a sentence of death ................................................................................ 162

CLAIM 6:   Imposition of the Death Penalty under the Federal Death Penalty Act (FDPA) Constitutes Cruel and Unusual Punishment in Violation of the Eighth Amendment ................ 165

   A. The death penalty is a disproportionate punishment ...................... 168

      1. The death penalty is being increasingly rejected throughout the country ................................................................... 168

      2. The death penalty is excessive ................................................... 177

      3. The United States is out of step with the international community's consensus against the death penalty ................... 179

   B. *Gregg* has failed to significantly further the goals of reliability, consistency, and equal justice ................................................... 182

      1. The Death Penalty is Unreliable ............................................... 182

      2. The death penalty is arbitrary ................................................... 183

      3. The death penalty causes excessive delays and results in cruel conditions of confinement ................................................... 191

CLAIM 7:   The Eighth Amendment categorically prohibits a death sentence for people who, like Mr. Mr. Purkey, suffer from severe mental illness ................................................................ 193

   A. Infliction of capital punishment upon individuals who were severely mentally ill at the time of the offense makes no measurable contribution to the acceptable goals of punishment ............................................................................... 193

iv

B. There is a national consensus against executing the mentally ill.................................................................................................. 198

    1. Our refusal to execute intellectually disabled people and children logically shows a consensus against executing the severely mentally ill ............................................... 198

    2. There is a consensus specifically against executing the mentally ill ................................................................................ 199

CLAIM 8:  Trial counsel was constitutionally ineffective in his advice to Mr. Purkey prior to his suppression testimony that trial counsel knew directly contradicted Mr. Purkey's reasons for confessing to a federal kidnapping in reliance on the promise of a life-sentence plea offer, and in subsequently failing to file a motion in limine to prevent the government from using Mr. Purkey's suppression testimony to impeach his trial testimony that he did not kidnap Jennifer Long, and arguing that his suppression statements were true ............ 202

REQUEST FOR RELIEF ................................................................... 220

CERTIFICATE OF SERVICE ............................................................ 222

v

## I.   INTRODUCTION

Wesley Ira Purkey is a death-sentenced inmate housed at the United States Penitentiary in Terre Haute. Mr. Purkey moves to vacate his conviction and sentence because both court-appointed trial counsel and post-conviction counsel were constitutionally ineffective, and rendered Mr. Purkey's trial and post-conviction proceedings fundamentally and structurally unfair in ways never scrutinized by any court.

The basis for Mr. Purkey's motion is grounded in fundamental concepts of reliability and what it means to have a fair trial in a capital case. It is also grounded in the unacceptability of leaving challenges to the fairness of Mr. Purkey's trial and fundamental legality of his death sentence un-reviewed by any court because the prior court appointed lawyers charged with protecting Mr. Purkey's constitutional rights failed to do so.

Mr. Purkey was appointed a lead trial lawyer who is responsible for more individuals on federal death row than any other lawyer in America. That lawyer, instead of obtaining a qualified mitigation specialist to conduct an adequate investigation of Mr. Purkey's life history, hired a friend who had been terminated from his previous employment in the public defender office for serious misconduct and incompetency as a *fact* investigator, and against whom his prior bosses at the public defender office had to obtain protective orders after he stalked, assaulted,

1

and threatened them following his termination. The lawyer then lied to the trial court judge about his friend's qualifications in order to obtain funding for mitigation services in Mr. Purkey's case, and later repeated the lie to the same judge in Mr. Purkey's § 2255 proceedings.

Mr. Purkey's lawyer then presided over a dysfunctional trial team that failed to conduct an investigation of Mr. Purkey's background and life history consistent with their professional and constitutional obligations in a capital case. Had they conducted an appropriate investigation, they would have uncovered the vast and readily available information of Mr. Purkey's lifelong, extraordinary trauma history and mental impairments that would have given the jury a meaningful understanding of the constellation of symptoms suffered by Mr. Purkey throughout his life and the connection of those symptoms to his behavior that would have helped explain to the jury why he committed the crime that led to his federal conviction. The information uncovered by Mr. Purkey's current counsel was readily available to both trial and post-conviction counsel through extensive records as well as family members and friends, who would have been more than willing to provide relevant, detailed information about Mr. Purkey to prior counsel if they had been asked. Had Mr. Purkey's jurors heard this information, at least one of them might have voted for a life sentence.

2

As it was, trial counsel collected only partial and incomplete records, and contacted only a few people from Mr. Purkey's life. Even then, trial counsel and his investigator treated the witnesses rudely, dismissively, and ineptly. For example, trial counsel showed up with his teenage son to interview Mr. Purkey's brother, who, it turns out, possessed sensitive and crucial information relating to Mr. Purkey's trauma history that trial counsel never obtained. Trial counsel and his investigator sought to interview Mr. Purkey's daughter by crashing her wedding. The investigator showed up to interview Mr. Purkey's ex-wife by kicking her door and yelling at her. Predictably, trial counsel secured only the most rudimentary information from witnesses. Mr. Purkey's § 2255 counsel cast a slightly wider net of witnesses than trial counsel did, and were certainly more polite in their interviews than was trial counsel. Nevertheless, post-conviction counsel also failed to conduct an adequate investigation into Mr. Purkey's life history and mental health, in part because they were denied the funding that would have enabled them to conduct the constitutionally-requisite investigation that trial counsel failed to do.

Mr. Purkey's trial counsel also failed to protect his client's fundamental rights to a fair trial and impartial jury. Counsel allowed a presumptively biased juror to sit on Mr. Purkey's jury, ignorant of the fact that the juror had disclosed on her questionnaire that she had been the victim of an attempted rape when she was 16 years old, substantially similar to the underlying facts of the charge against Mr.

3

Purkey. The juror even bore the same first name as the alleged victim. Mr. Purkey's § 2255 counsel was also ignorant of the presumptively biased juror, and the matter was never brought to any prior court's attention.

At the penalty phase, the jury returned a special verdict form for death that left blank the section on mitigating factors that would allow courts to understand the reasons for sentencing Mr. Purkey to death. Yet when the trial judge offered to send the jury back for further deliberations, Mr. Purkey's trial lawyer acquiesced to the Government's opposition. While the issue of the blank verdict form was presented in Mr. Purkey's § 2255 petition, post-conviction counsel never interviewed the jurors who deliberated on Mr. Purkey's case, and thus never presented to the court necessary information to establish the significance of the blank verdict form and its prejudice to Mr. Purkey. This failure to investigate permitted the courts reviewing the § 2255 petition to misinterpret the blank verdict form as a finding of no mitigating factors and to deny an evidentiary hearing.

To make matters even worse, in denying an evidentiary hearing the § 2255 trial judge relied on a 117-page affidavit submitted to the court by Mr. Purkey's trial counsel. The sworn statement of trial counsel not only amounted to an unethical brief against his former client, but investigation by current counsel shows that the affidavit contained material falsehoods constituting a fraud on the court, submitted for no other purpose than to interfere with the administration of justice

4

and the § 2255 court's impartial adjudication of those claims of ineffective assistance of trial counsel that *were* raised in Mr. Purkey's § 2255 petition.

As set forth in detail below, this petition is properly brought under 28 U.S.C. § 2241 and under the law of this Circuit, because there is no mechanism under 28 U.S.C. § 2255 to consider the fundamental issues presented. Absent review pursuant to § 2241, no court will have had the opportunity to review them. Mr. Purkey should not be executed without full and fair review of the important and fundamental challenges to the legality of his conviction and death sentence presented in this petition.

## II.   JURISDICTION

Mr. Purkey has not had a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence. As this petition shows, current counsel's investigation of this case has uncovered voluminous evidence establishing violations of Mr. Purkey's constitutional rights, particularly the rights to counsel, due process, and freedom from cruel and unusual punishment. Although Mr. Purkey (through prior counsel) has previously filed one § 2255 motion containing certain claims of ineffective assistance of trial counsel, because § 2255 counsel failed to investigate the case, counsel did not raise the ineffective assistance of trial counsel claims included in this petition. Accordingly,

5

no court has ever determined whether, in light of this new evidence, Mr. Purkey's conviction or sentence violate his constitutional rights.

Due to the structure of § 2255 review, § 2255 is inadequate or ineffective for providing redress of these substantial ineffective-assistance-of-trial-counsel claims. Federal courts have no established procedure for developing ineffective assistance claims in direct appeal proceedings, which means that a petitioner's "first opportunity to present a claim of ineffective assistance of trial or direct appellate counsel is almost always on collateral review, in a motion under section 2255." *Ramirez v. United States*, 799 F.3d 845, 853 (7th Cir. 2015). Because a motion under § 2255 is a petitioner's first opportunity to present such a claim, § 2255 counsel's failure to present a claim (due to § 2255 counsel's ineffective assistance) does not prevent federal review of such a claim and provides cause for federal courts to do so. *Id.* at 853-54. However, Mr. Purkey cannot meet the requirements for filing a successive petition under § 2255 review. *See* 28 U.S.C. § 2255(h) (stating that a second or successive motion must be based on: 1) newly discovered evidence that would establish actual innocence, or 2) a new rule of constitutional law, previously unavailable, made retroactive to cases on collateral review by the Supreme Court of the United States).

6

Under these circumstances, the "saving clause" in § 2255(e) provides an available remedy for a judicial determination of Mr. Purkey's claims. The "saving clause" states as follows:

> An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

28 U.S.C. § 2255(e).

In *Webster v. Daniels*, the Seventh Circuit considered the meaning of § 2255(e)'s "inadequate or ineffective" language, and the court held that "whether § 2255 is inadequate or ineffective depends on whether it allows the petitioner 'a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence.'" *Webster v. Daniels*, 784 F.3d 1123, 1136 (7th Cir. 2015) (*en banc*) (quoting *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998)) (permitting § 2241 relief on claim asserting that petitioner's intellectual disability made him constitutionally ineligible for the death penalty where additional evidence of disability was discovered after the denial of his § 2255 motion). Based on its review of Seventh Circuit precedent regarding § 2255's savings clause, the *Webster* court found that "that there must be some kind of structural problem with section 2255 before section 2241 becomes available." *Id*.

7

"In other words, something more than a lack of success with a section 2255 motion must exist before the savings clause is satisfied." *Id*.

The *Webster* court identified one type of "something more" as a circumstance in which the operation of the successive petition rules absolutely prevent a petitioner from having a meaningful opportunity to raise a challenge to the legality of his sentence. *Id.* at 1136-37.  The court explained that the case of *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001), provides an example of "something more":

> In *Garza,* we found that "something more" in the form of an intervening decision of an international tribunal. Juan Garza had been sentenced to death in federal court under 18 U.S.C. § 848(e). After exhausting both his direct appeals and his opportunity for collateral relief under section 2255, Garza filed a petition with the Inter–American Commission on Human Rights. After reviewing the case, the Commission concluded that the introduction of evidence of murders in Mexico—crimes for which Garza had never been charged but which were necessary predicates to his death sentence—violated Garza's rights under the American Declaration of the Rights and Duties of Man. Shortly after the Commission issued its report, Garza filed a habeas corpus petition under section 2241 in the Southern District of Indiana, the place of his incarceration. He argued in that petition that the United States was bound by treaty to abide by the Commission's decision. Construing Garza's petition as an unauthorized effort to file a successive motion under section 2255, the district court held that it lacked jurisdiction to decide the case and dismissed the action.
>
> Garza appealed that unfavorable ruling to this court. We identified two issues that had to be resolved: first, whether Garza qualified for section 2255's savings clause, thereby enabling him to bring a petition under section 2241; and second, if 2241 was available, whether he was entitled to relief. We began by recognizing that "the mere fact

8

> that Garza's petition would be barred as a successive petition under §
> 2255 ... is not enough to bring the petition under § 2255's savings
> clause; otherwise, the careful structure Congress has created to avoid
> repetitive filings would mean little or nothing." *Garza,* 253 F.3d at
> 921. We concluded, however, that in rare circumstances "the
> operation of the successive petition rules [would] absolutely prevent[ ]
> the petitioner from ever having an opportunity to raise a challenge to
> the legality of his sentence." *Id.* at 922. Garza presented such a case,
> we concluded. On the merits, we decided that the Commission's report
> was advisory only and thus did not support the relief Garza sought.

*Id.*

In the present case, due to the structure of § 2255 relief itself as well as §

2255's successive petition rules, Mr. Purkey has not had a meaningful opportunity

to present the ineffective assistance of trial counsel claims included in this petition.

Because the federal courts have no established procedure for developing

ineffective assistance claims in direct appeal proceedings, Mr. Purkey did not have

a reasonable opportunity to present his claims at that time. Similarly, because §

2255 counsel failed to investigate the case adequately, counsel were not aware of

these claims, and Mr. Purkey accordingly was unable to obtain judicial review of

them during his initial-review § 2255 proceeding.

Like the petitioners in *Garza* and *Davenport*, Mr. Purkey now is

procedurally barred from raising these substantial claims in a successive § 2255

petition. *See* 28 U.S.C. § 2255(h). Thus, as in *Webster* and *Garza* and *Davenport*,

operation of the successive petition rules absolutely prevent Mr. Purkey from ever

having an opportunity to raise these challenges to the legality of his sentence.

Mr. Purkey's case similarly presents a "something more": the development

of the *Martinez-Trevino* doctrine and the Seventh Circuit's application of it to

initial-review collateral proceedings under § 2255. Since AEDPA's enactment, the

United States Supreme Court has decided two intervening cases centering on a

petitioner's right for a judicial determination of ineffective assistance of trial

counsel claims that post-conviction counsel failed to investigate and present. In

*Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court of the United States held

that where initial-review collateral proceedings provide the first occasion for a

petitioner to raise an ineffective assistance of trial counsel claim, courts must hear

substantial—though procedurally defaulted—constitutional claims of ineffective

assistance of trial counsel if the petitioner can establish that counsel in the initial-

review collateral proceeding caused the default by providing ineffective assistance.

566 U.S. at 9-10. "When an attorney errs in initial-review collateral proceedings,"

the Court explained, "it is likely that no state court at any level will hear the

prisoner's claim." *Id.* at 10.  The Court thus concluded that "if, in the [State's]

initial-review collateral proceeding, there was no counsel *or counsel in that*

*proceeding was ineffective*," procedural default will not "bar a federal habeas court

from hearing a substantial claim of ineffective assistance at trial." *Id.* at 17

(emphasis added). A year later, in *Trevino v. Thaler*, 569 U.S. 413 (2013), the

Court held that based on the principles of *Martinez*, courts can excuse procedural

default even in a jurisdiction that does not require ineffective assistance claims to be raised on initial collateral review.

The Seventh Circuit has recognized that "[t]hose two decisions . . . have changed how courts should view claims of ineffective assistance of counsel at initial-review collateral proceedings." *Adams v. United States*, 911 F.3d 397, 411 (7th Cir. 2018).[1] Furthermore, the Seventh Circuit has recognized that the circumstances justifying judicial review of claims defaulted due to the failures of post-conviction counsel are identical to the situation described in *Trevino*. *Ramirez*, 799 F.3d at 853 ("[T]he federal courts have no established procedure . . . to develop ineffective assistance claims for direct appeal," so "the situation of a federal petitioner is the same as the one the Court described in *Trevino*."). Accordingly, the Seventh Circuit applies the *Martinez-Trevino* doctrine to federal prisoners who bring motions for post-conviction relief under § 2255. *See, e.g., Brown v. Brown*, 847 F.3d 502, 509-10 (7th Cir. 2017); *Ramirez*, 799 F.3d at 854; *Choice Hotels Intern., Inc. v. Grover*, 792 F.3d 753, 755 (7th Cir. 2015).

Given that (1) the Seventh Circuit applies the *Martinez-Trevino* doctrine to federal prisoners who bring motions for post-conviction relief under § 2255; (2) initial-review collateral counsel's failure to investigate and present substantial

---

[1] To the extent that the Seventh Circuit recognizes a prisoner's constitutional right to effective counsel in collateral proceedings providing the first occasion to raise a claim of ineffective assistance at trial, this recognition further entitles Mr. Purkey to a judicial determination of his claims under section 2241.

11

claims of ineffective assistance of trial counsel prevented Mr. Purkey from meaningful judicial review of these claims; and (3) the operation of the successive petition rules absolutely prevents Mr. Purkey from ever having an opportunity to raise these challenges to the legality of his conviction or sentence; the saving clause of § 2255(e) is available to Mr. Purkey. *See Adams*, 911 F.3d 397, 411; *Brown*, 847 F.3d 502, 509-10; *Ramirez*, 799 F.3d at 854; *Webster*, 784 F.3d 1123, 1136-37; *Garza*, 253 F.3d at 922. Otherwise, initial-review collateral counsel's failure to raise the claims would "deprive [Mr. Purkey] of any review of [those claims] at all." *Trevino*, 569 U.S. at 423.

The principles of due process, reliability, and fundamental fairness undergirding post-conviction review, all of which are particularly important when a petitioner's life is at stake, support the application of the saving clause to the circumstances of this case.  The writ of habeas corpus has always been "a bulwark against convictions that violate fundamental fairness." *Engle v. Isaac*, 456 U.S. 107, 126 (1982). Ultimately, the writ of habeas corpus is an equitable remedy. *Gomez v. U.S. District Court*, 503 U.S. 653, 653-54 (1992). Thus, the application of § 2255(e) is this case is not only consistent with the statutory language of the provision but also the principles supporting the provision's inclusion in § 2255 in the first place. *See Webster*, 784 F.3d at 1136.

12

Because Mr. Purkey presents new, substantial constitutional claims challenging the legality of his conviction and sentence but § 2255 is structurally "inadequate or ineffective to test the legality" of his conviction and sentence in light of these claims, Mr. Purkey properly has requested relief in this original habeas petition under 28 U.S.C. § 2241. This Court has jurisdiction to hear the merits of those claims and grant all legal and equitable relief to which Mr. Purkey is entitled.

## III.   WES PURKEY'S SOCIAL AND FAMILY HISTORY

**A. Wes's family history is marked by hardship and resilience, long-undisclosed narratives of traumatic exposure to multiple generations of family members, and susceptibility to mental illness and neurodegenerative disease.**

Now a 67-year-old man with dementia, Wesley Ira Purkey ("Wes") was born on January 6, 1952 to Jack Wesley Purkey and Velma Johnson, then in their second marriage. The Purkey and Johnson families, prior to and following Wes's birth, primarily lived in and around Wichita, Kansas, having migrated westward from Missouri in the preceding decades. Their family histories are marked by hardship and resilience, and long-undisclosed narratives of traumatic exposure to multiple generations of family members.

When Wes's mother Velma was born to Susana ("Bobbie Sue") Haberthier on June 21, 1925, Velma's father, Ernie Johnson, was no longer present in the household because he and Bobbie Sue had divorced less than two months earlier

due to Ernie's "gross neglect." App. 1 at 1; App. 2 at 2. Little else is known of Ernie Johnson. In September 1940 Velma listed her father as deceased when she started high school. App. 3 at 4. Bobbie Sue's older sister, Carrie Burke, would become Wes's guardian years later.

Several members of Bobbie Sue's family suffered from neurogenerative diseases as they aged. Carrie Burke had "organic brain syndrome" at the time of her death. App. 4 at 6. A brother, William Haberthier, suffered from Parkinson's Disease. App. 5 at 7. Their mother, Anna Haberthier, developed "senility" in 1948, and in 1949 was found incompetent by doctors. Anna's daughter, Carrie Burke, was appointed her guardian. App. 6 at 8; App. 7 at 13.

Bobbie Sue raised her daughter Velma in the Catholic Church, and Velma went to Catholic schools, first attending St. Joseph's Catholic School, and later Mt. Carmel Academy and Cathedral High School for her secondary education. App. 3 at 4-5. For much of high school, Velma was a well-below average student, although she did ultimately receive her diploma in May 1943. App. 3 at 5.

Throughout her life, Velma struggled with anxiety and depression, which she self-medicated by misusing prescription drugs and alcohol. App. 8 at 16. Velma was often tense, nervous, unable to sleep, and she suffered chronic headaches, panic attacks, and episodes of dizziness and feeling faint. App. 8 at 16,

14

19; App. 9 at 21; App. 10 at 22-24; App 11 at 25-26; App. 12 at 30-31; App. 13 at 43-47.

Velma's struggles with anxiety and depression and all their accompanying symptoms left her fragile and broken. She was admitted at least five times to the psychiatric ward at St. Francis Hospital, staying there over three months total. App. 8 at 16, 18-19; App. 10 at 21-24; App. 13 at 43-47; App. 14 at 48-52; App. 15 at 53-56. During her psychiatric in-patient treatments, doctors interpreted Velma's symptoms as exhibiting characteristics consistent with personality disorganization. App. 10 at 23. She was described as manipulative, distrustful of others, self-centered and critical, and prone to projecting blame onto others. App. 16 at 64-65.

Wes's father, Jack Wesley Purkey, was born on Halloween in 1923 to Ira and Opal Purkey in Wichita, Kansas. App. 18 at 68. Jack was the seventh of eight siblings, two of who died shortly after birth. App. 19 at 73.

Jack's mother Opal was quite stern and strict. App. 20 at 79. She became even stricter after having "a deep religious experience" in her middle age. App. 20 at 79. Opal's new strong religious beliefs clashed with Ira, a Mason, and also a smoker and coffee drinker, which caused increasing tension within their marriage. App. 19 at 72; App. 20 at 79.

Jack's father Ira Purkey was the authoritarian type, who would put his children in fear of physical violence so they wouldn't misbehave. App. 20 at 79.

15

Jack's sister Marguerite would be terrified of her father's warning that he would "box her ears" if she did not do what he said, because she knew he would do it if she did not obey. Ira had been a prize fighter, and Marguerite saw him beat on her brothers Jack and Russell. App. 20 at 79.

Ira's physical violence rubbed off on his children. Jack's brother Russell would literally have fistfights with Ira. Jack and his siblings used violence to resolve conflicts between them, and between others. App. 19 at 72; App. 20 at 80. Russell Prothero, who later married Jack's sister Marguerite's daughter Debbie, recalls that it was the Purkey family's nature to be unhappy, always struggling, and always having problems that they could never resolve. They especially struggled in their relationships with one another. Russell Prothero admits that his own family had their struggles and difficulties, too, but they could still have a good time and drink together and enjoy each other's company. App. 21 at 86. Not so with the Purkeys. Any time the family got together it would end up with people arguing loudly and fighting with each other, often physically. App. 20 at 80; App. 21 at 86.

The violence in the family also included sexual violence. For example, Jack's brother Russell sexually abused his sisters Irene, Eloise, and Marguerite. Russell would come to the house drunk and then sexually abuse them. App. 19 at 72; App. 20 at 79-80. Due to few informants still living, it is unknown if Jack Purkey was also a victim of family sexual violence.

16

The violence imbued by Ira profoundly impacted future generations of the Purkey family. Ira's sons Russell and Jack beat their own children. App. 19 at 72; App. 20 at 80-81. Many of Ira's daughters entered abusive, volatile relationships. For instance, Pauline's marital home was so full of conflict and abuse that it got to the point where Pauline's husband pushed her against a wall and put a knife to her throat. Pauline begged her husband to kill her, telling him she would rather die because living with him was unbearable. App. 19 at 72; App. 20 at 80. There was always yelling in the household of Marguerite and her husband, Guy. Marguerite tolerated her husband's physical abuse of her son because she grew up with the same type of discipline. App. 20 at 80-81.

Outside the home, Jack Purkey attended school regularly through elementary and middle school. He was an average student. App. 22 at 89-104. High school was much the same, with Jack graduating in the lower third of his class in May 1942. App. 22 at 105-106.

After graduation, in July 1942, Jack enlisted in the U.S. Coast Guard. By November 1942, Jack was sent to Honolulu, just before the bombing of Pearl Harbor. Jack's military records indicate little about his duties during his enlistment. What is known is that his service in the Coast Guard was cut short because of frequent, debilitating headaches caused by a depressed skull fracture he had suffered previously in a car accident in Wichita at age sixteen. App. 20 at 81; App.

17

24 at 113, 116; App. 25 at 168. During his military service, Jack's suffering was exacerbated by the steel helmet he had to wear and standing long watches that caused almost daily headaches. App. 24 at 113. Jack was honorably discharged from the U.S. Coast Guard in March 1943, less than a year after his enlistment. App. 24 at 122, 124, 130. Many years later, Jack confided to his sister Marguerite that he shot and killed a Japanese Prisoner of War in the line of duty. Jack could never forgive himself for this act. App. 19 at 74; App. 20 at 82.

Jack continued to suffer debilitating headaches the rest of his life, even though he had surgery in 1946 to insert a metal plate on his skull. App. 25 at 168; App. 26 at 174; App. 27 at 189. Jack's personality and behavior changed with his suffering. Jack became withdrawn and generally absent, and rarely smiled. App. 20 at 81-82.

Like Wes's mother Velma, his father Jack also struggled throughout much of his life with anxiety.[2] The earliest known incidence occurred circa 1953 when he was diagnosed with a "nervous spasm." App. 25 at 168. Jack was admitted to the hospital twice within four years for recurring chest pains. During the first of these two admissions, it was noted that Jack showed "some degree of apprehension", his breathing exacerbated the pain, and his pulse rate was elevated above normal. His

---

[2] It is believed by current counsel that Jack Purkey at some point during his early adulthood was admitted to Larned State Hospital for mental health treatment. The specifics are unknown to date as legal counsel for the hospital has declined to release his records to counsel, despite authorizations from both of Mr. Purkey's heirs, without a court order. These records were available at the time of trial.

physical examinations were inconclusive for any heart-related ailment. App. 28 at 191-192; App. 29 at 195-196. The symptoms Jack experienced during these visits are consistent with that of a panic attack. App. 30 at 197-200. He had also become an alcoholic. In 1971, after being admitted to in-patient care due to his chronic alcoholism, Jack admitted to his treating physician that "[h]e is always nervous and worrying about something," and he was formally diagnosed with "Anxiety Syndrome". App. 25 at 168-169.

For years Jack struggled to hold his life together, but as he aged, his health deteriorated quite significantly. In September 1978 Jack suffered a heart attack, and by March of 1980 he needed a coronary bypass. App. 27 at 187, 189-190. Alone and destitute, Jack committed suicide in 1984 at the age of 60. Jack was found sitting in an overstuffed chair, his body beginning to decompose, with a bullet hole behind his right ear and a revolver nearby. App. 31 at 201.

In taking his life when he did, Jack did avoid the family affliction of dementia. Like Velma's family, many of Jack's family members suffered from neurodegenerative diseases, including his uncle, Roy Purkey, his paternal grandmother, Nancy Ida Purkey, and his sisters, Marguerite Hotchkiss and Irene Bartlett. App. 20 at 83-85; App. 32 at 205; App. 33 at 206; App. 34 at 207.

19

**B. Wes's father Jack married his mother Velma against the wishes of Jack's family, and their first marriage ended in divorce after just six months. Velma re-married, but after two of her three sons born during that marriage died shortly after childbirth, she divorced again and then married Jack a second time, and Wes was born.**

Because so many family members have died, little is known about the courtship of Velma Johnson and Jack Purkey. Less than a year after Velma graduated from high school, and about 14 months after Jack was discharged from the military, Velma and Jack were married on May 5, 1944 in Wichita, Kansas. App. 35 at 209. Jack was 21 years old, and Velma was 18. App. 36 at 216. From the start, Jack's family, especially his mother Opal, was not happy about her son's marriage to Velma. App. 20 at 81-82. Citing Velma's "gross neglect of duty and extreme cruelty" towards him, Jack petitioned for divorce on November 15, 1944 after barely six months of marriage. App. 35 at 209-210, 215.

A year after her divorce from Jack, Velma married Milo Hamilton on December 17, 1945 in Bartlesville, Oklahoma. App. 37 at 217. Of the three sons born to the marriage, only the middle child survived. The other two died a few days after birth, one from unknown causes and the other from a congenital heart defect. App. 12 at 31; App. 38 at 238.

The death of two infant sons haunted Velma for the rest of her life. She struggled to cope, and would give voice to her sorrow only when drunk. Velma and Milo's surviving son Gary remembers that his "Momma would get drunk and

20

talk about these babies" but otherwise would not talk about them. When she was drunk, she "cried and cried" and would tell him there were "two little angels watching over" him. When Gary was a teenager, he found two little cushions when he was looking for money in his momma's drawer, and inside the cushions were two photographs of babies in caskets. App. 39 at 239-240.

Within a year of the death of her third son with Milo, Velma divorced Milo Hamilton due to "gross neglect of duty and extreme cruelty." She was granted primary custody of her then two-year-old son, Gary, and the small laundry business they had was sold to split between Milo and her. App. 37 at 217, 219-220. Milo died in 2013 (App. 40 at 245), and was never interviewed by prior counsel, so it is unknown whether the stress of having lost another son may have too much to bear for Velma and Milo and led to the divorce.

Alone, dealing with the recent loss of a second son, and raising her surviving young son Gary on her own, Velma returned to the person she knew, Jack Purkey. Velma and Jack remarried on May 28, 1951, eight months after Velma's divorce from Milo. App. 41 at 246. Wes Purkey was born seven months later, on January 6, 1952. App. 42 at 247. Because prior counsel never investigated it, and due to the destruction of medical records and a lack of surviving family members since, at this time it is unknown if Wes was born prematurely or if his conception was the reason Velma and Jack married a second time.

21

**C. Born into a chaotic family environment of alcoholic, violent parents who were ill-equipped to provide love or support, Wes suffered unspeakable physical, emotional, and sexual violence at the hands of both of his parents, which left Wes in constant fear of being targeted for abuse and unable to trust other people.**

From his earliest moments in life, Wes struggled to communicate. He did not speak until he was six years old. His Aunt Marguerite observed that "[a]ll [Wes] could do was point and grunt" and "there was something very wrong." If anyone tried to hug baby Wes, "he'd scream and run away." App. 43 at 248.

Once Wes did begin to speak at age six, he stuttered very badly. App. 43 at 248. From the beginning "everyone knew he would need to be in a hospital or somewhere that would help him." App. 43 at 248. Wes inherited this brain abnormality from his father's side. Jack Purkey, as well as several of his siblings, also stuttered. App. 20 at 83; App. 43 at 249.

Wes's parents were ill-equipped to offer the patience, care and support that he needed during his developmental years. Instead, Wes was born and raised in an "extremely chaotic" family environment. App. 44 at 256-257; App. 45 at 265. Velma and Jack's house was a mess, and smelled of liquor and cigarettes. They constantly yelled at the kids, and expressed little love for them. App. 43 at 248-249. Velma was known more as a party girl than as a loving, supportive mother. She would often drop Wes and Gary off at her mother's house. Velma did not like

22

being there because her mother would not let her smoke or drink, so her mother was often left to watch the boys. App. 43 at 248.

Velma began drinking excessively in 1952, the same year Wes was born. App. 12 at 28, 30, 32; App. 16 at 66. It only worsened from there. She mostly drank hard liquor like scotch, vodka, or bourbon, consuming anywhere from a pint to a fifth per day. App. 16 at 66. Velma's first admission to in-patient detoxification for her alcoholism was in December 1973. App. 14 at 50, 52. She was admitted again in 1975. App. 15 at 53, 55. During this latter stint, it was suggested she receive continued treatment from a halfway house for alcoholics, but she did "not fully accept the plan proposed." App. 15 at 55-56. Velma was admitted a third time around 1978, and yet again in 1980, but she was inconsistent with her treatment, often leaving and returning several times. App. 16 at 58. Velma did not stop her heavy drinking until she began noticing increasing nausea, vomiting, and abdominal pain and was admitted for a final time in January 1981. Velma died in February of that year of pancreatic cancer. App. 12 at 29, 31; App. 17 at 67; App. 46 at 268.

Like Velma, Jack Purkey was also an alcoholic. App. 25 at 167; App. 43 at 249. Wes's brother Gary described his step-father as always being drunk, and that Jack "was a mean drunk." App. 47 at 284. Jack's niece Debbie Prothero remembers that her uncle "drank a lot" and "never said more than two words at family

23

gatherings" but "kept to himself." App. 20 at 81-82. Jack tried to overcome his chronic alcoholism numerous times throughout his life, but could never succeed. App. 25 at 168; App. 26 at 173-174, 176, 179-184; App. 48 at 287-288.

As chronic alcoholics so often do, Jack and Velma directed much of their agitation, anger, and aggression at each other and their family. *See* App. 49 at 291. (noting Velma's aunt, Carrie Burke, reported following an incident in which Velma had been drinking and driven home by her older son, that Velma "called her a 'son-of-a-bitch" and a "god-damned liar"). Some of this anger and aggression was aimed at Wes's problems with speech. According to Wes's brother Gary, Velma and Jack ridiculed Wes for his stuttering. App. 47 at 284. Velma would throw drinks in Wes's face when he stuttered. App. 20 at 83; App. 50 at 300.  One Thanksgiving when he stuttered while trying to ask for the mashed potatoes, his father threw a bowl full of jelly in his face. App. 51 at 312. This left Wes unable to ask for things he needed as a child and in constant fear that he would be targeted for abuse for behaviors he could not control. App. 46 at 273.

Beyond the ridicule and humiliation for his stuttering, Wes's home environment was also marked by horrific violence. Though Jack Purkey would often retreat to his parents' home because his alcoholism rendered him unable to provide for his family and he and Velma fought constantly as a result, other times Jack terrorized Velma in front of their sons. Gary

24

described the home as "always violent," and remembered he and Wes stood there watching one time when Jack punched at Velma so hard that he punched a hole in the wall when she ducked. Another time, Jack slammed Velma's arm in a door and kept slamming the door until her arm broke. App. 47 at 284. Another time, Wes watched his father drag his naked mother down the hallway by her hair as she screamed for help after trying to escape. App. 46 at 274; App. 52 at 354. These beatings occurred several times a week, and caused Wes to fear for his mother's life. App. 46 at 274. When Wes tried to stop him, his father turned his rage against Wes. App. 52 at 354.

Wes was singled out by his father for beatings, using his open hands, fists, and whippings with a belt. App. 46 at 274; App. 56 at 460. These beatings were severe enough to cause intense pain, bruises and even bleeding. App. 46 at 274. During one of these beatings, when Wes was six years old, his head was battered through a wall. App. 46 at 280. Wes could only endure these beatings, even when he screamed at his father to leave him alone, because there was no one there to help him. His mother just stood by and watched. From the ages of five through ten, in addition to the beatings, Wes endured humiliation and verbal threats of physical violence from his father that left him afraid for his life and in constant worry and anticipation of brutal attacks. App. 46 at 274-275; App. 56 at 460.

25

It was during these most formative years of development that Wes learned he was alone in this world and could not rely on or trust others, especially those who were supposed to care for and protect him to do so.

When Jack and Velma were married, extended family members such as Grandma Opal and Grandpa Ira and Aunt Marguerite tried to shelter Wes from his parents by having him and Gary come over to their houses to escape the chaos and violence of home temporarily. App. 39 at 240-241; App. 43 at 248.

However, even these minimal supports vanished when Jack and Velma divorced. In July 1961, when Wes was nine years old, Velma filed for divorce from Jack, and she was granted a restraining order to prevent Jack from interacting with her or their sons. App. 53 at 360. Over the ensuing months while the divorce was pending, the court granted a succession of restraining orders, preventing Jack from seeing Velma and limiting his time with his sons. App. 53 at 363, 369, 372, 376, 380, 386.

After the divorce, Jack and his extended family distanced themselves from Velma and the boys. Visits to Grandma Opal and Grandpa Ira came to an end. App. 39 at 241. While Grandma Purkey and Aunt Marguerite tried to help Wes during the moments they had with him, their reach was limited because they did not have that much time with him. App. 20 at 83. The last time Wes's cousin

26

Debbie recalled seeing the boys was at Christmas 1964, which was also Grandma and Grandpa Purkey's 50th wedding anniversary. App. 19 at 74-75; App. 20 at 78.

Wes's father Jack went into a tailspin after the divorce. Having nowhere to live, Jack went from sibling to sibling, but each time he was asked to leave, even from jobs they had given him. App. 19 at 74; App. 20 at 82. Essentially homeless, Jack failed to pay his child support obligations, despite being ordered to do so numerous times by the Sedgwick County courts. At one point, Jack was found guilty of contempt for nonpayment, and placed on probation for 30 days in September 1966. App. 53 at 407.

Velma allowed Jack to see Wes occasionally after the divorce, which permitted the beatings to continue until Wes was about twelve years old. In addition to the physical violence that left Wes injured in many ways, Jack also forced his son to have sex with prostitutes. Jack would command the prostitutes to molest Wes by climbing on top of him, stimulate his genitals and perform fellatio. Wes would pretend to be asleep when this happened. As a child, this made Wes feel unsafe, in danger, and fearful of assault and sexual abuse. App. 46 at 275.

In the meantime, Wes's mother Velma began behaving ever more erratically. Velma had been gainfully employed from 1952 through 1963 with Boeing in Wichita. By 1964, however, when Wes had just turned twelve years old, Velma had no stable, consistent employment for the remainder of Wes's childhood and

27

adolescence. Instead, Velma bounced from one low-wage job to another, often working no more than a few months at a time. App. 54 at 414-422.

As her employment waned, Velma's erratic drinking behavior increased. She hung around after-hours clubs drinking and dancing. Velma began taking her young teenage son Gary with her. App. 47 at 285; *see also* App. 55 at 424-426.

Velma engaged in increasingly risky behaviors, both for her and her sons. App. 44 at 257. She brought home various men with whom she would have sex. Many of these partners abused her in front of Wes, some of who left her with black eyes. In this insecure environment, Wes learned not to ask what had happened. App. 56 at 459. He felt abandoned by his mother. App. 57 at 483; App. 58 at 485. One of Velma's lovers was even suspected of raping a young girl. App. 59 at 491.

Velma's struggles with healthy sexual relationships extended beyond the interactions she had with various men. Velma also sexualized both of her sons. When Velma began taking her son Gary to clubs, she also began using him for sexual stimulation. She would take Gary into the bathroom stalls at the bars. At home, she would force him to watch her shower. App. 47 at 285.

Velma began molesting Wes when he was around nine years old, and it did not end until he was about twenty-two. App. 52 at 354-355; App. 56 at 459-460; App. 60 at 492; App. 61 at 494-495; App. 62 at 496. The sexual abuse initially included his mother inappropriately touching his genitals, having Wes sleep with

28

her and manually stimulate her sexually or penetrate her with a hairbrush. As Wes

grew older, the abuse included his mother forcing him to perform cunnilingus on

her and engage in sexual intercourse with her. App. 46 at 275. Wes was ashamed

of the abuse and hated that his home life was so horrible. Whenever he tried to talk

about it he would become very emotional and stuttered badly. App. 52 at 354-355;

App. 60 at 492.

Wes and Gary were taken advantage of sexually by other family members as

well. On the weekends that they spent with their maternal grandmother, Bobbie

Sue, which were rotated between Wes and Gary, she did some of the same things

to them that Velma had. Gary recounts his grandmother walking around the house

naked, making him watch her shower, standing naked in front of a mirror in the

bedroom, and staring at him in her bed while he pretended to be asleep. App. 47 at

285.

Sharon Fisher, Gary's ex-wife, recalls numerous instances of Velma's

odd sexual behaviors and discussions between Gary and Wes about the

sexual abuse they suffered. Once when Gary and Wes were drinking, Sharon

heard them "talking about how Velma, their mom, used to play with them,

like molested them, as kids, and taught them how to give oral sex and do

other sexual acts" and Velma talked about how she had sex with some of

their friends, too. Another time, Sharon heard Wes remark that "momma,

29

she screwed us into good grades." App. 63 at 503. She doesn't recall seeing Velma without a drink nearby, and Velma was always drunk. The first time Sharon ever went to Velma's house to meet Gary there, the door to house was open, and when she walked in she could see all the way to the back bedroom, where Velma, naked on the bed, was giving Gary oral sex while Gary stood next to her. Before Sharon finally left Gary a few months later, he brought her over to Velma's house "so they could get to know each other better." Velma was already drunk. Gary's mother sat on the arm of the couch, practically in Gary's lap, and "[w]hile she talked, she stroked his hair like a lover does." When Sharon yelled at Gary that his mom "was acting like a whore," Gary was furious and "started yelling at me that we were in her house and how dare I say something like that." Gary told her to leave, so she did. "Gary chose her over me." App. 63 at 503, 505.

**D. As a young child, Wes's only escape from the relentless violence he experienced at home was among his friends and their families in the neighborhood.**

Though he was generally quiet as a young child, Wes tended to be a jokester amongst his friends and "seemed really happy when he was outside". App. 64 at 507. Unlike in his house, outside with his friends he did not feel like he had to try to hide his stutter. App. 64 at 507. Wes played sports, including basketball, baseball, and football. He rode bikes, and played "Red Rover" and "Hide n' Seek"

30

with all the neighborhood kids. App. 64 at 507. In the fourth and fifth grades, Wes

participated in a select group of ten to twelve neighborhood children that went

caroling at Christmas time. Wes's childhood friend James Haggard remembers that

"Wes sang well . . . like the country singer, Mel Tillis." Wes "couldn't get five

words out without stuttering, but he could sing real well." App. 65 at 514.

Wes did not speak to his childhood friends about the abuse and violence he

experienced at home, but his friends did sense that something was off. James

Haggard would often go to Wes's house after school to invite him out to play, but

Wes "didn't come out much" and often said he couldn't, but never said why. "He

did come out sometimes, but it got less and less as we got older." App. 65 at 514.

Garry Monty remembers that the boys in the neighborhood "seldom ever went to

Wes's house; I couldn't have gone there more than a handful of times in all the

years I knew him." App. 64 at 507. Wes's friend Don Aaron particularly

remembers how little involved Wes's parents were, and that when any of Wes's

caretakers were present, the mood and atmosphere was palpably uncomfortable:

> In 6th grade we played organized baseball against other parishes.
> Several boys including me and Wes played on the team. The mom's
> used to organize a carpool to and from the games and practices
> because we played at another Catholic school outside of our
> neighborhood. Wes was part of the carpool, but his mom never drove
> us. I do remember an older man picked us up a couple of times with
> Wes. As a little kid I thought it was Wes's dad. I know it was

31

someone who watched Wes, maybe his grandfather.[3] Those car rides were very different than the norm. Typically we laughed and joked together during the rides, but during those car rides we were silent. No one spoke, not even Wes. It was very strange.

App. 66 at 519. Garry Monty's family stepped in for a time, becoming somewhat of

a surrogate family for Wes:

> Because Wes didn't have a reliable family, Wes spent a lot of time at my house when we were young. He did homework with me sometimes, but we mostly played in the neighborhood. He ate dinner with us, too. He was very polite to my parents and grateful to get a hot meal. It always seemed like Wes never wanted to go back to his house, which makes sense to me; he had nothing to go home to. His mom was hardly around and when she was I don't think it was easy because of her drinking.

App. 64 at 508. Garry's aunt, Armeline Monty, took particular interest in Wes and

for a brief time even provided him with academic support he desperately needed

during the sixth grade, the one time he would ever receive such assistance from an

adult during his early life:

> In 6th grade Wes and some other boys were at my house. My Aunt Armeline - we called her Army for short - was asking all of us about our science fair projects. That year St. Joe's held a science fair in which all the 6th grade students had to participate. We were talking about our ideas with my aunt. When she asked Wes, he kind of shook his head. He avoided the question. Aunt Army told him that she had the perfect project for him. She worked at Boeing for many years before retiring from there. At that time she had something to do with training pilots, so she had one of their survival kits. It had a few things in it like a tin cup and plastic. From that day until the science fair, Wes was at my house every day after school working with Aunt Army

---

[3] The man who Don Aaron remembers was O.L. Darling, Wesley's step-grandfather.

on the project. He used the survival kit to make water from air. He got
first or second place in that fair. Me and all the boys were jealous of
his project. It was really cool. After that science project, my Aunt
Army took an interest in Wes. Whenever he was over she made sure
to always ask Wes how he was doing. She really took a liking to him.

App. 64 at 510. This project was the single instance of Wes thriving academically

in school.

**E. For Wes, school provided no safety or respite from the violence at home, because he was ridiculed by the nuns for his stuttering, and subjected to ongoing sexual abuse by the parish priest, leaving him feeling increasingly alone, isolated, and vulnerable.**

Wes attended local parochial schools for elementary and middle school -- at

Christ the King for first grade, and then at St. Joseph's Catholic School for grades

two through eight. App. 67 at 523; App. 68 at 525. Wes struggled academically,

and neither school offered the supportive, caring environment that Wes needed.

Indeed, it turns out that the schools only added to Wes's trauma.

St. Joseph's Catholic School, or "St. Joe's" as it was commonly known, did

not offer any academic assistance for struggling students or for students needing

extra attention, and the nuns did not offer any extra help after school. App. 65 at

515; App. 66 at 518; App. 70 at 548. As Garry Monty puts it, "Students had to

learn it on their own, or get help at home." App. 64 at 510. James Haggard credits

his own parents as the reason for his turnaround when he was struggling

academically at St. Joe's. They had the financial means to find James a private

33

tutor. App. 65 at 515. Wes's family did not have such means so he was left to do the best he could on his own.

Moreover, the environment at St. Joe's was downright oppressive, with violence directed at its students. The nuns who taught and ran the school were a part of the Sisters of Charity of the Blessed Virgin Mary ("BVM") order of Catholic nuns, which claimed core values of freedom, education, charity and justice. The BVM nuns focus their works of charity on causes of social justice and education.[4] Unfortunately, for Wes and some of his fellow students, these nuns did not practice the virtues of patience, understanding, and temperance. The nuns inspired fear in their students, often inflicting corporal punishment on the kids who needed the most help. Students were afraid of the nuns and referred to them as "Black Veiled Monsters." App. 66 at 519-520. The nuns at St. Joe's were "real mean" and inflicted corporal punishment, "sometimes even pulling students out of Sunday church to discipline them." App. 66 at 519. They inflicted corporal punishment and "pulled hair," "hit students' knuckles with a pointer," and "sometimes smacked students in the face." App. 65 at 515. Students were also sent to sit on the trash barrel in the corner of the classroom, and the student would have to balance themselves on the edge of the barrel for as long as the nun wanted. "If we tipped the barrel or fell off, we got in even more trouble." App. 64 at 509.

---

[4] *See* http://www.bvmcong.org/about.cfm

34

Some students got it worse than others. App. 64 at 508. For instance, Garry Monty remembers one student who struggled to tie his shoes. Instead of helping him or taking the time to teach him, the nuns made him take off his shoes and stand on paper plates, and then they tied the plates around his feet with pink ribbon and "[h]e had to walk around school all day until he learned to tie his shoes. I'll never forget it; I felt terrible for him." App. 64 at 508-509. Monty remembers another boy in the second or third grade who frequently raised his hand to go to the bathroom. The nuns refused to let him go, and he wet himself several times in the classroom. "The nuns probably thought they were teaching him to hold it. All they did was make it worse." App. 64 at 509.

The nuns were not trained to recognize academic struggles that were due to disability or other condition. Instead, the nuns ascribed it as the student purposely performing poorly. Edward Ring recalls that the nuns responded to his poor performance in school by slapping his wrists and pulling his ears. He later learned he had dyslexia, and "[l]ooking back it is clear to me that the nuns didn't care to try to help me when I was struggling. They seemed to think that I was doing something I could control and hitting me was the way to get me to learn." App. 70 at 548.

One of the nuns at St. Joe's, Sister Gertrudis, was particularly mean-spirited and abusive towards her students. Both Wes and Garry Monty had Sister Gertrudis

35

for sixth grade. Garry describes her as "a horrible person" and "[f]or many years after I had a hard time getting over her treatment towards me and other students." For some reason, she called him "Pie Face" instead of calling him by his real name. It made him so angry that one day "I stood up in the middle of class and yelled at her to call me by my real name." Sister Gertrudis yelled back at him. She said that she would call him what she wanted, and would be calling his father, but "[a]fter she and my father met, she never called me Pie Face again." App. 64 at 509. Another time that same year when Garry had broken his ankle playing basketball, his father went with him to school that first day back and spoke to Sister Gertrudis about the need for Garry to keep his ankle elevated. Sister Gertrudis agreed with Garry's father that Garry could use a second chair to keep it elevated while he sat at his desk, "[b]ut after my dad left, Sister Gertrudis walked away" and didn't let him use the chair. When Garry asked her about it, "all she did was snap at me that I didn't need it." App. 64 at 509.

Though Garry Monty describes his personal, painful memories of Sister Gertrudis and her treatment towards him, he acknowledges she singled out other students besides him, but he does not remember who they were any more because "I was so overwhelmed by her treatment towards me that I just don't remember specifics of what she did to others that year." App. 64 at 509.

36

Wes struggled mightily in Sister Gertrudis's sixth grade class. It was his poorest academic performance in any grade. He received six failing grades that year. App. 73 at 568. Even though he tried to avoid the nuns' ire as best he could by keeping quiet, keeping his head down, and speaking little, he was still a target. App. 64 at 510; App. 66 at 518-519. Wes "was one of those who got it worse the most." App. 65 at 515. Wes's classmate Don Aaron remembers that, during their sixth or seventh grade year, a rumor began floating around the school that BVM actually stood for "Black Veiled Monster" and the nuns blamed Wes for starting the rumor. One day a nun came and pulled Wes out of the classroom, and when Wes returned, his face was red and he was holding his hand over his face and looked like he had been crying. "It was obvious that the nun had whacked him in the face." App. 66 at 519-520.

After the incident where Wes had been pulled from class, Wes was made to stand in front of the whole school following morning Mass and tell the students what "BVM" stood for:

> It was painful to watch. Wes couldn't get the words out. I remember hearing his stutter, Bl Bl Bl Blessed V V V Virgin ... The longer it went the more Wes stuttered. He could barely get the words out of his mouth. I felt so bad for him, horrible really. I was in my seat cringing the whole time. The nuns knew Wes had a stutter; Wes stuttered all the time, but on stage in front of everyone it was really awful.

App. 66 at 520.

37

This form of punishment brought upon Wes was not one meant to correct poor behavior, but instead sought pointless retribution through embarrassment and shaming. The nuns were aware that Wes would struggle to enunciate the words in front of the entire student body.

Wes's life at St. Joe's worsened still further in the seventh grade. He was taught by Sister Andrienne, considered to be the "worst of all the nuns". App. 65 at 515. Though Wesley's academic grades improved over the course of the year from those he achieved in the sixth grade, Wes continued to be singled out for gratuitous punishment. James Haggard remembers Sister Andrienne being especially brutal towards Wes:

> For one thing, she didn't believe that Wes couldn't control his stuttering. She singled him out all the time. A lot of students had to recite poetry or read in the middle of class, but she called on Wes more than others. He had to stand at his desk and read aloud to the class. Wes wasn't a good reader to begin with, so he always looked embarrassed and that made his stuttering worse. Once he started stuttering he couldn't stop. Sister Mary Adrienne made Wes continue to stand and read even as the stuttering got worse and worse. It was really awful.

App. 65 at 515.

Sister Andrienne's methods only damaged Wes more. This sort of humiliation reinforced and deepened the great anxiety, emotional stress, shame and embarrassment Wes felt because of his stuttering, which played

38

an important role in Wes's inability to maintain attendance in school, ultimately leading him to drop out. App. 46 at 273.

Though Wes had some friends, many students were not kind to him. Wes was made fun of for the way he looked, and for the way he spoke. He got teased by other students at St. Joe because of his large front teeth, and because of his stutter. App. 70 at 548. Wes's brother Gary recalls that,

> When Wesley was a kid he could barely speak his stutter was so bad. He couldn't get words out of his mouth. Kids made fun of him at school. They also made fun of him for his big buck teeth. They were real bucked as a kid. Kids used to call him Bucky the Beaver cause of those teeth.

App. 39 at 242.

Wes's experience of abuse at St. Joe's coincided with his family were becoming more ostracized in the community around them. Following his parents' divorce, Wes, Gary, and their mother Velma were not as welcome at St. Joseph's Catholic Church as they once had been. People in the Church talked poorly about Velma's behavior. Gary recalls that "[t]hey wanted to kick her out from the church cause she wasn't married and had a lot of boyfriends. They called her a slut and a drunk. It hurt me then and it still hurts me now." App. 39 at 242.

The talk and judgment extended to the parents of Wes's childhood buddies, too. Sometimes Wes's friends would hear these conversations. Garry Monty

39

overheard adults in his family talking about Wes's mother sleeping around with a lot of men. Garry never talked about it with Wes, "[b]ut Wes has to know because people gossiped." App. 64 at 507-508.

Sex offenders know who the easiest targets are within a community and this was especially true of the parish priest at St. Joe's who molested Wes. Like many young, pre-adolescent boys raised in the Catholic Church, Wes became an altar server at St. Joseph's Catholic Church around the fifth grade. Wes served Sunday Mass as well as some weddings and funerals. App. 65 at 514.

Wes was sexually molested by a parish priest on many occasions over a three-year period, from the ages of eleven to thirteen. Wes "felt very alone when this happened," and "[h]e did not feel comfortable telling his parents because he assumed one, or both of them would smack him around and blame him for it." App. 69 at 545. Psychologist Dr. Frederic Sautter's 2018 report of his evaluation of Wes describes that the sexual abuse by the priest was one of the experiences that elicited the most intense emotions from Wes. App. 46 at 267, 275.

Wes was just a child and could discern that there was no safe person to tell. He was already a victim of severe violence and abuse in his home, and knew if he disclosed the assault to either of his parents they'd blame him. He couldn't go to the members of his church because, more than likely, they would protect the priest,

40

not him. And his teachers at school were off limits, not only because they were affiliated with this priest, but they too were using Wes's vulnerabilities against him. All Wes could do was push these experiences deep within him.

**F. Finding no safety, comfort or security either at home or school, Wes began to turn to alcohol and drugs, and fell in with a group of rough boys in the neighborhood.**

Beginning in the fifth grade, but more so in the sixth grade, Wes's absences from school increased. In sixth grade Wes missed 20 days of school, followed by 20 ½ days in the seventh grade, and 25 ½ days during the eighth grade. His grades, as noted previously, were at their worst in the sixth grade while he was being shamed and humiliated by Sister Gertrudis, but his grades improved little during the seventh and eighth grades. App. 73 at 568.

Around the seventh grade, Wes started spending less time with people, even his friends with whom he had felt a semblance of comfort and safety. James Haggard recalls that "[s]tarting towards the end of the 7th grade I saw less and less of Wes, in school and outside of school," which he attributed "in part to Sister Mary Adrienne's treatment of Wes and the embarrassment it caused him." App. 65 at 515-516.

Making new friends had its challenges for Wes. As Wes's brother Gary's friend Stephen Seely observed, "[o]ther kids were often cruel towards Wesley, so much so that sometimes Gary and I had to protect him." Sometimes it took Wes

41

two to three minutes to say one sentence, and if Stephen or anyone else said the word Wes was trying to say, it made it worse. Wes just got frustrated and stuttered more, so they had to be patient and let him try. But other kids called Wes names and teased him:

> Some boys asked him questions so they could then make fun of him when he spoke. Gary and I stepped in when those same boys pushed Wesley to the ground. Sometimes Wesley fought back. It would come out of nowhere, but he'd become very upset and emotional and tackle the other boy to the ground. Gary and I didn't intervene in those instances because we thought those other boys got what they deserved for antagonizing Wesley.

App. 71 at 552-553. Wes would sometimes tag along with Stephen and Gary to Friday night dances for kids in the neighboring area. Wes didn't talk to or dance with any girls because "[h]e was too afraid to stutter." App. 71 at 552-553.

Wes gravitated towards his older brother Gary, and Gary's friends, in part because they stepped in to protect him when possible. Wes had always looked up to Gary, and like many older brothers, Gary had undue influence over Wes. App. 66 at 520-521. Wes tried to follow Gary around, but he was too young to hang out with them. App. 71 at 551. Wes idolized Gary. App. 39 at 239. Over time, Wes's idolization of his older brother would have serious negative consequences for Wes, as Gary succumbed to his own personal trauma and struggles, and while doing so, modeled inappropriate behavior for Wes.

Gary survived much of the same traumatic exposure and victimization that Wesley did as a child. A key difference is that Wes had a stutter that made him a

42

target for shaming and abuse by his mother, teachers, students, and other children, to which Gary was not exposed. But like Wes, Gary was abandoned by his father, survived Jack Purkey's assaults, and became witness to and a victim of his mother's and maternal grandmother's sexual abuse. These traumatic exposures, as with Wes, impacted Gary's mental health, influencing his behavior and setting up a life of substance abuse.

Gary began drinking alcohol as a young child. By the age of thirteen he was drinking in bars and getting drunk with friends. App. 57 at 42-43; App. 71 at 553. Gary escalated quickly to marijuana and LSD. App. 71 at 553. Even though Gary and Wes did spent limited time together (*see* App. 57 at 482), Gary was slowly introducing Wesley to alcohol and drugs. Wes looked up to Gary and wanted to be just like him, so when Gary started drinking, Wes started drinking. Once when Gary and his friends took Wes out and got him drunk, Wes got really sick, and they thought it would end there, but it only escalated, and Wes never stopped. App. 47 at 284. Wes would have been eleven or twelve years old at that time. Gary's friend Lee Hatfield remembers the strong influence Gary had on Wes. App. 58 at 487. Around this time, Wes was sexually abused by Gary's friend "Hup," who would come into Wes's bedroom at night and perform fellatio on him. App. 46 at 275.

43

Although Wes looked up to Gary and mimicked his behavior, Wes's friends from St. Joe's recognized that Gary was trouble. Gary slicked his hair back and rolled up his sleeves. He had a reputation as a tough guy, associated with an older crowd from other neighborhoods in Wichita, and everyone knew not to mess with him. App. 64 at 508; App. 66 at 520-521.

Gary struggled academically, too, and never performed well in school. He ended up being kicked out of Allison Junior High in the ninth grade for skipping school and getting into fights. He took preliminary steps to enroll in another school, but did not follow through and dropped out. App. 39 at 241-242; App. 71 at 551.

As Gary entered late adolescence and early adulthood, he began using whatever substances he could get his hands on -- pills like Quaaludes and other downers were easily gotten from doctors in Wichita. Gary's addiction to pills turned into a heavy heroin addiction. App. 58 at 486-487; App. 71 at 553-554.

In addition to pills and heroin, Gary also huffed Tolio (App. 58 at 486; App. 63 at 502), also known as Toluene, a common ingredient in paint thinner that causes a high. App. 72 at 556.

Gary committed burglaries, most often of pharmacies, in order to get drugs. A common one was to break into pharmacies. According to Stephen Seely, back then pharmacies did not have alarm systems, so Gary and another friend would

44

break through the roofs and lower themselves down to obtain pills for their own consumption. App. 71 at 553-554. Gary would also drop Wes through the hole in the ceiling to steal the drugs. App. 21 at 87. Gary and his friends were also known to burglarize houses in their neighborhood, and commit thefts against local business owners, particularly those selling alcohol. App. 74 at 571; App. 75 at 607.

Gary did periodically receive treatment for his drug addiction. Following his arrest for reckless driving in April of 1969, Gary's attorney referred him to a local psychologist. App. 76 at 649-650. For a time, Gary began to show some improvement. App. 76 at 650. However, the improvement did not last. Gary's treatment with Dr. Henderson ended in January of 1970 when he was committed to the Kansas State Penitentiary for committing felony forgery and uttering, and served nearly 20 months there. App. 77 at 663.

Following his release from prison, Gary attempted to straighten out his life. In August 1972 Gary married Sharon Fisher in Wichita, Kansas. App. 79 at 672. In less than a year, though, Sharon sought a divorce from Gary, alleging "gross neglect, non-support and being an habitual drunkard." App. 79 at 672. Gary rarely had a job, and partied all night, every night. On top of that, he physically abused and assaulted Sharon. Just prior to filing for a divorce, Gary threw her out of a second story window when he came in to their apartment, drunk and angry. After

45

that, Sharon knew she had to leave. They were divorced in July 1973. App. 63 at 505; App. 79 at 677-678.

In 1974, at age twenty-five, Gary voluntarily admitted himself to Larned State Hospital with the assistance of his probation officer. He entered the Addiction Unit because of his heroin dependence, only after he overdosed and nearly died. App. 80 at 679, 681. Gary remained at Larned State Hospital for six weeks. His treatment was ultimately terminated because of his positive motivation for rehabilitation. App. 80 at 682.

In the ensuing years, Gary has continued to struggle with addiction. In 1977 he was sent to the Central Plains Drug Treatment Center by a Sedgwick County Court for an evaluation following his conviction for felony theft. App. 81 at 687-688. Gary continued using cocaine throughout the 1980s. He overcame an addiction to methamphetamines around 2013. App. 211 at 2361. During the 1990s he was diagnosed with bi-polar disorder and was prescribed various medications for his mood disorder, including Amitriptyline, Librium, Lithium, and Elavil. App. 39 at 243; App. 212 at 2364. Gary married his second wife Becky, whom he met when they were both patients at Larned State Hospital. Although he was devastated when she died in 2007, Gary credits Becky for "teaching me what love was" and getting him out of Wichita and "away from everything." App. 39 at 243.

46

Since Wes was younger than Gary and, according to Stephen Seely, "lived in his own fantasy world" (App. 71 at 551), Wes did not hang out with Gary frequently as a pre-adolescent. Instead, Wes fell in with a group of rougher neighborhood boys.

One of these boys was Bobby Bentley, who grew up in Wes's neighborhood but did not attend St. Joe's. Bobby was widely known because of his rough attitude and penchant for bullying and fighting other neighborhood kids. As James Haggard describes, "Even though Bobby was smaller, he was the ringleader of his group of friends." App. 65 at 516. There were always lots of parties and fights at Bobby's house, and Bobby and his friends were often drunk. Don Aaron "avoided walking past the front of the house because often times Bobby or one of the others came out of the house to pick a fight." Bobby punched Don in the face one time, so he and other kids went out of their way to walk down other streets "just to avoid being harassed or beaten up." App. 66 at 521.

James Haggard and Don Aaron both started seeing Wes hanging out with Bobby and his group of friends in the eighth grade. App. 65 at 515-516; App. 66 at 521. Wes and Bobby met through their older brothers, who were friends. Bobby recalls that he and Wes bonded over music. They both liked to play the bass guitar, and they played music with other friends. App. 57 at 481. They ended up hanging

out together most days, and they spent so much time together Wes hardly attended school. App. 57 at 481.

Wes really started sustained drinking when he became friends with Bobby. There were half a dozen bars within walking distance from their houses, and they would walk through the back door and buy beer. Even though the bar owners did not want thirteen and fourteen year old boys hanging out in the bar, "they sold us beer and we went on our way." App. 57 at 482-483. They drank at friends' houses or in a local cemetery, and thought they were cool. Bobby remembers Wes "drank a couple 3-quarts of beer at a time." App. 57 at 482-483.

Many of Wes's friends from this time period, including Bobby, would eventually end up in prison or die young because of drugs or drug-related crimes. App. 57 at 483-484; App. 71 at 554. Gary's friend Stephen Seely laments that "[i]t would have been very hard for someone like Wes[] to get out of that situation without some help" since Wes "wasn't as capable as Gary and because of his stutter was usually more isolated." App. 71 at 554.

**G. After graduating from St. Joe's, Wes's is sent to a local public high school with no resources for struggling students and a reputation for being rough and violent. Wes dropped out of school altogether in the ninth grade. After that Wes began to experience distinct physical and psychological symptoms that were never meaningfully treated, suffered two serious head injuries, and he became dependent on alcohol and drugs.**

Wes graduated from St. Joe's in the spring of 1966. App. 68 at 526. Many of Wes's male classmates went on to attend Bishop Carroll High School ("Bishop

48

Carroll") a Catholic high school in Wichita well-regarded for its supportive environment. App. 64 at 511; App 65 at 516; App. 66 at 522. For a brief, fleeting moment, it looked like Wes might be able to attend, too. Garry Monty's aunt pleaded with the Christian Brothers to let Wes go to Bishop Carroll. All of his St. Joe friends wanted him there. Garry does not know what happened except that "Wes didn't end up going to Bishop Carroll." All he knows is that "my aunt was very upset after Wes wasn't able to attend." App. 64 at 511.

Instead, Wes enrolled at the local public school, Allison Junior High. Like St. Joe's, no resources were allocated for struggling students. The teachers at Allison provided waivers to struggling students so they would be exempt from certain tests. App. 70 at 548-549. It was common for Allison students to drop out of school altogether. App. 65 at 516.

Allison had a reputation as a rough school. App. 65 at 516; App. 66 at 522; App. 70 at 549. Fights were the norm there. Edward Ring was jumped on his first day there when he was just walking down the sidewalk. App. 70 at 549. Wes's older brother Gary had been kicked out of Allison for fighting a few years earlier. App. 39 at 241-242.

In this environment, Wes did not receive the services and structure he needed, particularly as he began exhibiting behavior symptoms associated with severe trauma exposure, and employed coping mechanisms such as alcohol and

49

drug use. App. 46 at 268. Wes stopped attending school shortly after his enrollment in 1966. App. 58 at 486. Wes dropped out of Allison in September 1968, while still enrolled in the ninth grade. App. 73 at 569. After dropping out of Allison, Wes did enroll for a time in the Wichita Auto Mechanics School to learn a trade, but he only attended for a short period of time. App. 44 at 257-258.

From 1966 to 1968, Wes began experiencing numerous physical and psychological symptoms, and exhibiting behavior very different from times past. He was arrested three times in short order by local police beginning in September 1966 and was declared a "miscreant." App. 83 at 707. He wanted to show his brother Gary and Gary's friends that he could fit in. Stephen Seely observes that even when Wes got in trouble for the first time, he was embarrassed of his stutter. Seely describes an incident when Wes, at age thirteen or fourteen, tried to steal from a neighborhood convenience store. The owner of the store knew Wes well because Wes had been buying candy there for years. Wes walked in with his hand in his jacket pocket as if he had a gun, and put a piece of paper that said "robbery" on the countertop. Wes "wouldn't have been able to say the word without stuttering," and the owner wrestled Wes to the ground and held him down until police arrived. App. 71 at 553.

Following his second arrest in October 1966, at age fourteen, Wes was released to the temporary custody of his great aunt Carrie Burke, i.e., Gaga.[5] App. 83 at 707. Aunt Gaga subsequently petitioned for and was appointed Wes's guardian, against his mother Velma's wishes, because of Velma's abusive treatment of Wes. Velma had always objected to either Wes or Gary having any psychiatric care, and one hospital noted that their mother was a "very rejecting and ill person emotionally." Gaga wanted to get Wes into treatment. App. 213 at 2373. At the time, Wes's father Jack Purkey's whereabouts were unknown. App. 44 at 257.

At the time she became Wes's guardian and took him into her custody, Gaga was already 72 years old. App. 4 at 6. Despite her age, though, Gaga provided a much safer living environment for Wes than he had experienced with his mother Velma. Though her home was small and austere, and she did not have much money, Gaga loved Wes and Gary, and gave them as much as she could. App. 57 at 483; App. 58 at 485; App. 63 at 501.

---

[5] Nearly three years earlier, on January 20, 1964, Gary Purkey's biological father, Milo Hamilton, petitioned a Sedgwick County Court to grant custody him custody so that he could move Gary to North Little Rock, Arkansas. Gary was age 15 at the time. Milo's grounds for the petition was that Gary "has expressed a desire to reside with the defendant [Milo Hamilton]…that at the present time the said minor child is not passing in school" and that Gary "is in need of parental guidance of a father". Milo's witnesses in support of his petition were Carrie Burke, Ira Purkey, and Opal Purkey. His petition ultimately was unsuccessful. App. 37 at 221.

Having adolescent boys around her house was difficult for Gaga given her age. She likely could not appreciate the full extent of their problems. App. 63 at 501-502; App. 71 at 552; App. 84 at 708. At times, Gaga did have Wes admitted to the hospital with the intent of getting him medicated and treated for various physical and mental ailments.

For example, on December 29, 1966 Wes was admitted to St. Francis Hospital in Wichita due to ongoing severe headaches, blackout spells, and dizziness. App. 44 at 257; App. 85 at 710, 719, 721. He had previously acquired a prescription for nerve pills, but he needed additional medical attention. App. 85 at 712, 725. Wes was admitted for in-patient care and remained at the hospital until January 11, 1967. His admitting diagnosis was "headaches" and notations were made that he suffered possibly from a "tumor" or "temporal lobe syndrome". App. 85 at 711-712.

During the two weeks Wes received in-patient care at St. Francis, he was treated with Librium, an anti-anxiety drug, and showed "mild depression of cortical activity in the left frontal and temporal regions" on an EEG, suggestive of brain impairment in those regions. App. 85 at 719, 723; App. 87 at 1169. It was also noted that he showed depressive symptoms and at one point "apparently hit fist on wall because of family situation." App. 85 at 732. The records of this admission reveal no suggested follow-up with Wes about this incident, his

symptoms, and his admitted feelings. The only thing the treating physician appears to have inquired about is whether Wes is a homosexual because he has "[l]ong hair even tho[ugh] makes him look like a girl". App. 85 at 721.

Wes was again admitted to St. Francis Hospital on February 9, 1967, this time through a juvenile court order requiring that Wes be evaluated at Larned State Hospital because of his family's inability to pay for private treatment. App. 88 at 773, 774, 778. While there, Wes was treated with Placidyl and discharged nine days later at the behest of physicians who informed the court that Larned State Hospital likely would not be able to offer meaningful treatment to someone of Wes's age. Wes was released without a treatment plan. App. 88 at 780-781. The court, accepting the opinions of the physicians, dismissed Wes's case. App. 83 at 707.

Simultaneous to these early hospitalizations for anxiety, depression, and headaches, Wes's alcohol consumption increased exponentially. Though Wes had already started drinking with his friend Bobby Bentley, and had gotten drunk with his brother, Gary in his pre-adolescent years, by his mid-adolescence Wes was alcohol-dependent. He and his friends bought alcohol from the back of liquor stores and local taverns. The alcohol helped Wes to try to ease and regulate his nerves. Lee Hatfield describes that "[i]t seemed like he couldn't control his fits" and that "Wes yelled and sometime threw stuff." Every time Lee was at his house,

"Wes walked out of the house to look for beer or liquor." App. 58 at 486. In one of

Wes's hospital admissions at St. Francis, they had to give Wes his whiskey to get

him back. App. 213 at 2374. These incidents led to additional juvenile arrests, and

at one point, a juvenile court judge included "stay out of taverns" as a special

condition to Wes's probation. App. 83 at 707; App. 89 at 792.

Adding to the profound and complex trauma resulting from Wes's early life

exposure to extreme physical and sexual violence inside the home and at school,

Wes suffered several car accidents resulting in serious head injuries.

The first was on March 7, 1968, when a semi-trailer truck ran a red light and

plowed into Wes's car. Wes was rendered unconscious, and glass from the window

went into Wes's throat and face. He vomited blood in the emergency room. App.

58 at 488; App. 90 at 798; App. 91 at 812-813.

Wes was in St. Joseph Hospital in Wichita for several days. His

injuries included multiple lacerations to his face and other body parts. He

also suffered a cerebral concussion, loss of memory, headaches and light-

headedness. App. 90 at 797-798, 799. He was discharged from the hospital

after a week of close observation. App. 90 at 797-803.

Less than two months later, on April 29, 1968, Wes sustained injuries

in another car accident and was admitted to St. Joseph again. This time,

Wes's injuries included multiple abrasions and contusions to his face and a

54

large abrasion to his left elbow. App. 92 at 818. He was discharged from the hospital the same night as the accident, despite evidence of a slipped vertebrae in his spine that was on the bone below it. App. 92 at 819.

In November that same year, Wes was admitted to in-patient treatment at St. Francis Hospital in Wichita at Gaga's request due to changes in his behavior. When Wes arrived at the hospital, he was "[d]isheveled and dirty – shaking and nervous" but "cooperative." He was treated with Thorazine while on the ward and dismissed to the custody of his aunt Gaga only four days after this admittance. App. 93 at 821, 827, 831.

Despite these hospitalizations and other care Wes received from local hospitals, including prescription medication and occasional in-patient treatment, his symptoms never resolved. Wes continued to suffer blackouts. According to Gary, there were times when Wes would wake up in the morning in someone else's house and didn't know where he was. Wes would get out and come home and tell Gary that "he just came to in someone's house and he couldn't remember how he got there." App. 39 at 242. Wes also continued to lack the capacity to effectively regulate his internal emotional state and impulsivity. Lee Hatfield remembers that Wes was about fifteen or sixteen when he started having his uncontrollable "fits" of yelling and getting upset when he was not able to get something he needed. That's

55

when Wes would go out to look for beer or liquor. Wes would typically get drunk after one of these fits. App. 58 at 486.

Wes was again admitted to St. Francis Hospital on November 5, 1969, at a time when his interaction with law enforcement increased and he demonstrated periods of amnesia and impulsive behavior. Aunt Gaga, together with the juvenile court, had Wes hospitalized for treatment there for a period of time to offer structure and initiate prescription for them to try on an outpatient basis. App. 213 at 2374.

Even after a month at St. Francis, and treatment with the prescription drugs Sparine and Mellaril, Wes complained of dizziness and anxiety, and he did not yet feel confident in being able to handle his impulses. App. 87 at 764-765. Nevertheless, the hospital discharged Wes while he was still being medicated with Mellaril, a drug used to treat schizophrenia.

It was around this time that Wes began experimenting with drugs. As with alcohol, Wes's brother Gary was one of the first to introduce Wes to drugs, including heroin and acid. App. 47 at 284. Wes started using drugs often. As Lee Hatfield explains, "Whatever Gary did, Wes followed. That included shooting up heroin, huffing, and taking pills." App. 58 at 487.

As Wes became more and more dependent on drugs and alcohol to reduce his symptoms, the environs in which he sought relief became increasingly more

56

dangerous. A house where Wes and Lee Hatfield had bought alcohol since they were teenagers began selling Quaaludes, LSD, speed, and other drugs as Wes and Lee got older. There were lots of nights where they would stay up all through the night, running around town, drinking and doing drugs. App. 58 at 487. Wichita was a dry city then, but they were still able to buy plenty of alcohol on Sunday at an old seedy hotel in downtown Wichita. App. 58 at 486-487.

In spite of this significant period of upheaval and change in Wes's life, he still often took time to say hello and catch up with his old friends from St. Joe's whenever he saw them. Garry Monty remembers bumping into Wes sometimes around the neighborhood in the first couple of years after St. Joe's. He and Wes always talked, but that was it; they never would hang out or meet up. App. 64 at 511. Don Aaron recalls times when his group of friends scuffled with Bobby Bentley's group of friends. Wes would always be there, but in the back. Don and Wes often stepped aside from these scuffles to catch up, and Wes "always seemed interested to hear how I was doing at Bishop Carroll." App. 66 at 522. James Haggard viewed Wes as more of a follower in Bobby Bentley's group. Wes always said hello and talked to James. App. 65 at 516.

Had a different set of events unfolded during this period of Wes's adolescence, his life would have been much different. Instead of having early interactions with law enforcement and running with a rougher crowd, with a more

supportive environment Wes might have been able develop positive life skills; but no one in close proximity to Wes was looking out for him. Bobby Bentley puts it this way: "Wes didn't have a head start at life. He had no anchor and no one was watching out for him other than himself. It's hard to make good decisions or good choices with no direction and no guidance" App. 57 at 484. Ending up at Allison instead of Bishop Carroll, Wesley went to a school much less safe and supportive than many of his classmates from St. Joe's experienced. Had Wesley been afforded the opportunity to attend Bishop Carroll, he would have had supports that he did not otherwise have. The Christian Brothers at Bishop Carroll were disciplined and tough on students, but they also knew how to assist struggling students or to get help for them. Garry Monty experienced this first hand when the brothers sat him down and told him he wasn't doing well, but also encouraged him by talking to him about how he could do better with their help. App. 64 at 511-512. James Haggard believes that Wes's life could have been different if Wes had been able to go to Bishop Carroll, which was a more supportive place but expensive to attend. James recalls a student who stuttered like Wes, and the brothers helped the student to get into a good regional vocational school. That student "has since become a renowned machinist, one of the best in the country. It is hard not to think that Wes's life would have been different if only he also had some kind of support." App. 65 at 516.

Unfortunately for Wes, this kind of help or intervention did not materialize. While many of his classmates and friends from St. Joe's went on to develop successful professional careers as small business owners, and a well-respected high school football coach and teacher, Wes spiraled. Lacking positive, caring supports, Wes could not address the outcomes of the untreated complex PTSD from which he suffered after the many years of physical and sexual abuse, abandonment, and neglect.

**H. Despite his difficulties, into adulthood Wes attempted to create a meaningful life for himself through work and sought treatment for his symptoms and his substance use when he could, but he could not overcome the extreme trauma he suffered growing up, and the addictions that resulted.**

Entering into adulthood, Wes continued to struggle emotionally and mentally, and exhibit bizarre behavior. App. 44 at 259; App. 94 at 848. He was diagnosed multiple times with depressive symptoms or a depressive disorder. App. 44 at 250; App. 94 at 837; App. 95 at 848.

Exacerbating these symptoms, and intensifying the negative effects of Wes's earlier head injuries, were two more serious blunt traumas to his head. In August 1972 Wes was admitted to St. Joseph Hospital with "[m]ultiple lacerations, face and forehead…[and an] acute cerebral concussion" following a major motor vehicle accident. App. 94 at 833-837. Wes was working on repairs under the hood of a vehicle late at night when the car was rear-ended by another vehicle, causing the hood to slam down on Wes's head. As he had in earlier accidents, Wes lost

consciousness for some time. App. 94 at 834. Then in May 1976, following an altercation with Wichita police, Wes sustained significant injuries to the left side of his face that required medical treatment. App. 96 at 850-851. It was during this admittance to St. Francis Hospital that x-rays showed evidence of an old greenstick skull fracture from prior injuries. App. 96 at 854.[6]

Despite these extreme adversities, Wes still tried to build a meaningful life for himself. When given the opportunity, he took advantage of mental health treatment. He took medication for his nerves, and he sought psychiatric treatment. App. 94 at 838; App. 97 at 856. In December 1972 Wes voluntarily entered Larned State Hospital at the suggestion of the Kansas Parole Board. App. 44 at 250. Wes received treatment at Larned for nearly four-and-a-half months, and was eventually released to Dodge City, Kansas, not Wichita, with full employment with the Mayrath Company. App. 44 at 252; App. 98 at 862. Wes's parole officer requested that Wes not be returned to Wichita, stating that Wes "gets along better away from his mother."  App. 44 at 256; App. 94 at 836. He continued efforts to cope with the wounds he suffered as a child at the hands of his mother, the extreme anxiety produced by the trauma, and the feelings of abandonment, loneliness, and hopelessness underlying it. App. 84 at 708-709; App. 99 at 869; App. 100 at 871.

---

[6] A greenstick fracture occurs when a bone bends and cracks, instead of breaking completely into multiple pieces. App. 87 at 764.

While in the community, Wes maintained consistent employment, and got himself up for work. App. 63 at 502. He demonstrated a strong work ethic even when he didn't particularly like the work he was doing. App. 44 at 252. During this time his jobs consisted mainly of construction work, including welding and roofing. App. 98 at 857-866.

Wes was also caring for and protecting his sister-in-law, Sharon Fisher. Sharon describes Wes as "a very caring person for you if you knew each other." Wes was like a big brother to her. App. 63 at 503. In particular, Wes formed a bond with Sharon's baby son, who he called "Little Buddy," and Wes was very good to her son even though he was often drunk or high. App. 63 at 502. And when Wes was around, he would always step in to protect Sharon from Gary's abuse. App. 63 at 502-503.

Even so, Wes continued to confront many hardships and setbacks stemming from the ongoing struggles of the damaging relationship with his mother and substance abuse. In addition to intermittent psychiatric treatment, Wes continued to self-medicate with drugs and alcohol the same way he had done as an adolescent years. Sharon Fisher recalls that Wes and Gary drank quarts of whiskey and 30 packs of beer every day, and they huffed Tolio in her walk-in closet. She only knew them when they were drunk or high. App. 44 at 258; App. 63 at 502; App. 99 at 868; App. 101 at 878. Wes used to such excess that he experienced

61

hallucinations; he overdosed on prescription drugs and alcohol. App. 99 at 867; App. 101 at 874, 879-880. Wes didn't realize what his consumption of drugs and alcohol would do to him; all he wanted was to get high. App. 101 at 878. Wes's drug use was so excessive that he spent two full days at the hospital and needed 18 hours to recover and regain coherence. App. 101 at 879-880. This was not Wes's only drug overdose. It happened five or six times. App. 99 at 869.

As Wes struggled with substance abuse, his mother Velma not only provided no support to him. Worse, she actively encouraged Wes to get high as a way to continue her sexual and psychological control over him. App. 99 at 869-870. The day after Christmas 1972, Velma brought liquor to Wes's house and convinced him to drink. App. 44 at 257; App. 102 at 882-884. As the drinking ensued and everyone became more and more drunk, the incident turned violent. Wes was finished with his mother sexually abusing him and Gary. Sharon Fisher, who by then had withdrawn her divorce petition against Gary, describes the events:

> Wesley came over to my parents' house one night. I was staying there for a little while trying to figure things out. He was beating on the door. My dad wasn't too happy that Wesley was there, but he liked Wesley so he let him in. My dad hated Gary. Wes had blood on his clothing. He told me and my dad that he had just beaten Velma up because she made Gary do sexual acts on her. Wesley was trying to protect Gary. I offered Wesley a place to stay in the house, but he chose to stay in his car outside. After Wesley went outside my dad and I talked and we decided it best to call the police. We didn't want them to start looking for Wesley and then find him on their own. He could turn himself in. I went outside to tell Wesley what my dad and I

62

had discussed and he was okay with it. When the cops came he turned himself in. Velma alleged that Wesley raped her that night, too, but I never believed that. I saw Wesley out on the streets a couple days later, so the charges must have been dropped.

App. 63 at 504.

Velma went to the hospital and, while there, accused her son of raping her. App. 44 at 258; App. 103 at 891. Velma was quite inebriated at the time of her accusation; her blood alcohol was at 0.212. App. 103 at 899. When police arrived at the hospital to question Velma, the responding officer noted "she was very intoxicated and also appeared to have a mental problem" and was "very uncooperative." App. 102 at 882. Upon investigation there was no evidence to confirm Velma's accusation was truthful, and the doctor on duty advised that in his professional opinion he did not believe she had been sexually assaulted. App. 102 at 883. Velma later retracted her accusation, App. 44 at 258, and no charges were pursued. The prosecution recognized that Velma had serious mental health issues of her own. App. 102 at 885.

It is not surprising that Wes responded under threat the way he did towards Velma, not only because of the trauma he had experienced from her since he was a young child, but also considering the lack of guidance and positive modeling he had from the few men in his life. Both Wes's father Jack and Wes's brother Gary expressed their emotions by violently brutalizing the women in their lives.

Another negative male caregiver of Wes's was O.L. Darling, his step-grandfather. O.L. Darling was the second husband to Wes's maternal grandmother Bobbie Sue. O.L. was the only grandpa Wes knew on his mother's side of the family. O.L. Darling was a womanizer, and made sexual advances on any woman he could. This included Bobbie Sue's widowed sister-in-law, whose husband had been Wes's godfather, and both of Wes's brother Gary's wives. App. 39 at 240. It was well-known that O.L. Darling also used his relative wealth and privilege to carry on a sexual relationship with his step-daughter and Wes's mother, Velma, who lived with O.L. off and on. While Bobbie Sue was still alive, Velma stayed in the back apartment of their house, and O.L. would pay nighttime visits to Velma. App. 47 at 285. At one point Velma lived in a duplex that O.L. owned, and she drove a nice tan car that O.L. had bought for her. Everyone knew she was sleeping with her step-father then, too. App. 63 at 504-505.

The times when Velma refused to go along with O.L.'s sexual advances, O.L. turned violent. The police were called more than once. App. 104 at 906; App. 105 at 908; App. 106 at 911. O.L. was known to be the jealous type, and he would beat any man he perceived to be a threat to his relationship with Velma. Wes's brother Gary recounts an incident at Gaga's funeral, when the family was all gathered at Velma's house. O.L. came over and was furious with Velma because she was living with her boyfriend Dick, and tried to grab her. App. 47 at 285.

64

When Jack Purkey was still alive, O.L. did not like him, either. A police report describes an incident in which O.L. came to Velma's house when Jack was there, and Velma was in the bathtub while both men talked, though she could not see or hear them. App. 107 at 913.

**I. The institutionalization from being incarcerated for much of his adult life, combined with his untreated trauma symptoms, left Wes ill-equipped to adjust to the outside world or to foster healthy relationships after he was released on parole in 1997, despite his best efforts and his deep love for his young daughter.**

Wes had been incarcerated most of his adult life. He spent much of the decade of the 1970s going in and out of the Kansas prison system. From 1970 through 1979 he spent a little over seven years in prison.[7] His convictions during that time were primarily for robbery, theft, and burglary, as well as parole violations. App. 108 at 916.

During his incarceration in the 1970s, Wes spent at least several months of solitary confinement in the windowless Adjustment and Treatment ("A & T") building at Lansing State Penitentiary in Leavenworth, Kansas.[8] App. 57 at 483-484; App. 109 at 917-928. Even a few months in A & T at Lansing is significant,

---

[7] During the decade of the 1970s Wes spent less than three years living in society. He was incarcerated in the Kansas State Prison System from 07/29/1970 to 07/18/1972, 05/15/1973 to 01/28/1974, 08/02/1974 to 12/08/1975, and 10/11/1976 until 07/15/1980. App. 214 at 2431. These figures do not include Wesley's time in local county jails and detention centers in which he awaited hearings and trials.

[8] It is likely that Wesley spent more time in segregation in the A&T Building as it appears his segregation log records are incomplete.

65

because A & T was known to be one of the most debilitating, draconian, and torturous prison units in the country at that time. Its conditions were detrimental to both inmates and staff, and staff that worked at Lansing then "know only too well the emotional and physical injuries inflicted upon inmates and staff who spend any considerable time in this bleak windowless building with continuous echoing noises." App. 110 at 934-935.

The A & T unit was known as the "Agony & Torture" unit among inmates and staff at Lansing. Bobby Bentley, who spent in the A & T unit, described the unit as "like a penitentiary within a penitentiary." App. 57 at 483.  Many inmates reached their breaking point and suffered mental health breakdowns, self-mutilated or committed suicide. The Kansas Ombudsman for Corrections concluded that the A & T unit made some persons confined there worse than when they entered: " Regression and deterioration has been observed in the forms of adjustment difficulties when released to general population, violence, bitterness, self-mutilation, suicide and general mental health deterioration, including psychosis." App. 110 at 934. The unit was like a "concrete tomb" with complete deprivation, little interaction between inmates, and only basic necessities. The prisoners there ate in their cells and they were hosed down for showers. Several parts of the A & T had standing sewer water up to the ankles. If an officer felt disrespected by an inmate, they would beat the inmate down. Many men self-mutilated in the hope of

getting transferred off the unit; others committed suicide. App. 57 at 484. Wes self-mutilated twice when he was in the A & T. App. 111 at 939.

Wes also experienced desegregation of the Kansas prison system in the 1970s, a particularly volatile time that included numerous prison riots. Wes and his friend Lee Hatfield experienced the riots first hand. The older guys in the prison opposed desegregation and had planned a riot in the jailhouse to protest. When the riot started, the guards began separating prisoners and locking them down. Wes and Lee were escorted to another unit and put in the "hole," where they spent several days. The guards didn't even let them put on their shoes. App. 58 at 488.

During the less than three years Wes was not in prison during that decade, he met Claire Berry. Like Wes, Claire was born and raised in Wichita. From an early age, Claire exhibited serious behavioral problems. At her father's funeral she had to be pulled off her dad's casket. After that, Claire started sneaking out of the house and doing whatever she wanted. Claire screamed and kicked and cussed at her mother when she tried to get Claire out of bed, and Claire often hit her mother. App. 112 at 940, 942. Like Wes, Claire began using drugs at an early age, which were introduced to her by her brothers. They huffed Tolio or whatever they could get their hands on. App. 112 at 942. Claire's substance abuse led to multiple interactions with law enforcement and the need for treatment. App. 113 at 944.

67

Wes and Claire eventually established a common-law marriage. App. 114 at 946. At that time they declared their marriage, Claire already had a child from a previous relationship. Wes recognized early in his relationship with Claire that she was not a positive influence in his life. App. 99 at 867-868. Claire was untrustworthy and openly cheated on Wes, including with one of Wes's friends. App. 39 at 243.

Yet, to his detriment, Wes returned to Claire when he was released from prison in 1980. Wes's release coincided with the death of his beloved great aunt Gaga, the one consistent caregiver he had in his life. Gaga died four days prior to his release. App. 4 at 6. Her wake was held the night of Wes's release from prison. App. 115 at 956. Wes returned to Wichita to attend Gaga's service, and in doing so, Wes returned to Claire. App. 116 at 964-965. In great despair, the only joy in Wes's return to Wichita was seeing his infant daughter, Angie, who had been born in March 1979. App. 117 at 966.

Wes's fears about returning to Claire materialized when, less than three weeks with her, he relapsed into substance abuse and criminal behavior. App. 116 at 964-965. On August 4, 1980, Wes was arrested for aggravated assault and possession of a firearm after felony conviction. App. 118 at 967. He eventually pled guilty to these charges plus kidnapping, aggravated robbery, and aggravated

battery. App. 108 at 916. Wes would not be freed from prison again until March 1, 1997. App. 119 at 968.

Claire influenced Wes's every step. She too was arrested and later convicted and sentenced to prison. A few nights before her arrest, Claire left their baby Angie with her brother Pat. Angie was less than a year old. Pat called his sister Becky for help because he didn't know what to do. Claire had not even left any diapers or milk for Angie. Fortunately, Angie was taken in and raised by Becky and her husband, Mike Hornecker. App. 112 at 940. The love and care of Becky and Mike was a godsend because Claire hadn't even wanted Angie in the first place, something she stated regularly. Claire used drugs and huffed Tolio during her pregnancy with Angie, and even tried to abort Angie with a coat hanger. App. 112 at 942. Claire later told Angie herself that she had tried to abort her with a coat hanger, as well as by throwing herself down a flight of stairs during her pregnancy. App. 50 at 293.

While incarcerated, Claire filed for divorce from Wes. Their divorce became final on September 18, 1981. App. 114 at 952-953. Claire's sole reason for divorcing Wes was so that she could manipulate the parole system to gain an early release, and it worked. App. 50 at 292.

Instead of thanking her sister and brother-in-law for raising Angie, Claire's first instinct after her release from prison was to kidnap four-year-old Angie and

69

threaten her sister and brother-in-law. App. 50 at 292. Claire told Becky and Mike

that she wanted to take Angie out for ice cream. They were hesitant, but Angie

wanted to go so they reluctantly agreed. Claire's boyfriend at the time was hiding

in the back seat of the car. He gagged Angie so she wouldn't scream, and they took

her to their home. Angie remembers Claire "kicking open the front door and saying

that this was where I was living now." App. 50 at 292. Claire called Becky and

Mike later that night and told them Angie was her child and she wasn't bringing her

back. A few weeks later Angie got real sick. Becky and Mike went to Claire's

home. When they got there, Claire stepped out of the house and pulled a gun on

them. Claire put the gun in Mike's face and yelled at them to leave or she'd shoot

them. They called the police, but the police said there was nothing they could do.

App. 112 at 941. Claire's reaction stands in stark contrast to the genuine gratitude

that Wes expressed to the Horneckers for raising Angie. Years later, after Angie

began visiting Wes, the Horneckers received a card from Wes wishing them Merry

Christmas and thanking them for raising Angie and looking after her over the

years. App. 112 at 942-943.

Claire was incapable of being a loving parent. App. 50 at 293. Instead, she

exposed Angie to levels of violence Angie had not fathomed. Angie remembers

that, during a meal when she was at Claire's house, she was eating potatoes and

saw a bunch of blood spurt across her plate. Angie got up and walked away from

70

it, but Claire's boyfriend Steve lifted her up and put her back in her seat. The rule

in Claire's house was that no one left the table until they were finished eating.

When Angie looked at Steve she saw blood pouring out of his chest. Claire had

stabbed him several times. App. 50 at 292-293. Claire and Steve had a lot of

violent fights. Sometimes the violence was directed at Angie, as when they were

driving down the highway and Claire stopped the car at an overpass and tried to

throw Angie and her half-sister Carri out of the car. Claire finally concluded she

did not want to raise her daughter and returned her to the Horneckers, who became

Angie's legal guardians. App. 112 at 941.

While Claire was exposing their young daughter to horrific levels of

violence and abuse, Wes was trying to avoid death threats in prison. He was

transferred to protective custody, which was located in the A & T unit. App. 120 at

969. This time, Wes spent at least 409 days in the A & T. App. 109 at 917-928. It

remained just as depraved and inhumane as it had always been. In 1989, the

Kansas Attorney General condemned the deplorable conditions at the A & T unit,

citing inadequate heating and ventilation, sanitation problems, threat to life in the

event of a fire (a not infrequent occurrence), daily plumbing repairs, inadequate

electrical system, and the fact that some inmates are housed there for years,

"particularly inmates with mental conditions who need treatment which cannot be

71

provided by A & T." App. 121 at 975. The A & T building at Lansing was eventually closed, and torn down.

The threats against Wes's life were real. When Wes was not having to endure the inhumanity of the A & T unit, he was exposed to numerous attempts on his life. Such attacks resulted in stabbings to Wes's abdomen and neck, and being hit on the head with a lead pipe, which resulted in a visible bump and permanent scarring. App. 122 at 984-985. As a result, Wes had to be transferred multiple times to serve his time in other state prisons, including Iowa, Arizona, and Oregon.

It was during his time away from Kansas that Wes began to take advantage of the positive programming that the other states' institutions afforded inmates. He sought counseling services and began to address the sexual and physical violence inflicted upon him as a child and adolescent. App. 61 at 494-495. Having previously completed his GED during his incarceration in the 1970s, App. 123 at 986, Wes enrolled in community college classes while in the Oregon State Penitentiary. He took classes on Anger Management, General Psychology, Alcohol and Other Drugs, Principles of Economics, Typing, Introduction to Poetry, and Algebra, and earned a cumulative GPA of 3.13 with 86 total credits. App. 124 at 987. He was awarded an Associate of Science Degree in Literature in 1989. App. 125 at 988. This was no small achievement; when Wes began these studies, he was at a sixth grade reading level. It took hard work and dedication for Wes to earn his

72

degree. Given structure, Wes was able to thrive academically, something he never could accomplish as a child surrounded by chaos.

Wes also continued to focus his efforts on drug rehabilitation and positive mental health. App. 125 at 988. He enhanced his job skills as a welder and plumber through various community programs, including "6 ½ months at the county jail program," during which "[h]e received exceptional evaluations while there," living in residence at the jail. App. 125 at 988. Because of his positive development, Wes would eventually be paroled on March 1, 1997. App. 119 at 968.

Wes's involvement in programming coincided with his developing relationship with his daughter, Angie. When Angie was 13, she wanted to meet her biological father so she began visiting Wes regularly with Claire at Hutchinson Correctional Facility. App. 50 at 294; App. 112 at 942. Angie enjoyed these early visits, when she and her dad could sit outside in the sun, and buy snacks and sodas from the vending machines. Having her father in her life meant a lot to Angie, so much so that for the first several months, she began visiting him every weekend and wrote to him during the week. App. 50 at 294.

Difficulties remained, however. Wes had married Jeanette Broyles in 1993, around the same time he and his daughter Angie were getting to know each other. App. 126 at 989. Jeanette was struggling to maintain custody of her three sons, who had been taken by the state after one of them set their trailer home on fire.

73

Two of the sons were put into foster care, and the third was sent to a mental hospital. Wes was helping Jeanette get through this period of her life by listening to her and sending her sweet cards and letters of encouragement. App. 126 at 989. Jeanette was also monopolizing Wes's time, though, often cutting into his visits with Angie. This caused ongoing friction between Claire and Jeanette, and Angie often ended up in the middle. As Angie describes it, "Claire was obsessed with my dad. She had me fight with Jeanette because I was a juvenile and wouldn't go to jail." App. 50 at 295. Despite the tension, Wes and his daughter continued to build and strengthen their relationship up to his parole on March 1, 1997.

Upon his parole, Wes moved into Jeanette's parents' house in Leavenworth, Kansas with Jeanette and her sons. Jeanette had been in public housing, but it did not allow ex-felons so they had to live with Jeanette's parents initially. App. 50 at 295; App. 126 at 989-990. Wes was given no time to adjust to life outside of prison. Instead, Wes became instantly responsible for the well-being of Jeanette and her sons. Up to that point Jeanette and the boys had been living on food stamps, and she told Wes he needed to feed her boys for a month. Wes told Jeanette not to worry about it; he would feed them. App. 126 at 990. Wes recognized that these circumstances would compound the stress and anxiety he already felt outside of prison, so he sought support from the guidance counselor who had been assigned to Jeanette to address her problems with past drug use and

parenting issues. App. 128 at 1081-1085. Wes also developed a regular work-out to help alleviate some of the stress. App. 126 at 990. Jeanette remembers his work-out routine was very important to Wes, and he would get upset if his routine was interrupted or if he wasn't able to exercise. App. 126 at 990.

Despite his coping strategies and search for support, the transition was difficult for Wes; all those years surviving in prison came with a lot of institutional baggage. Wes's parole officer noted that Wes was trying. App. 128 at 1081-1085. The situation with Jeanette and her boys was more difficult than Wes anticipated, and Jeanette had her own difficult past. Wes's daughter Angie observed that "Jeanette is a troubled person and I don't think that she would have been able to be supportive to dad when he was struggling with being on the outside and with [his] own issues." App. 50 at 296.

During the early months of Wes's transition, he and Jeanette were fighting with Kansas's Department of Children and Families (formerly Social and Rehabilitation Services, or SRS) for Jeanette to regain custody her son, who was at Kaw Valley, which consisted of Kaw Valley Center, a home for children in need, or the Kaw Valley Psychiatric Hospital, dedicated to children and adolescents with significant behavioral problems. Wes and Jeanette had to prove their ability to handle the son, who had attention deficit disorder (ADD) issues. App. 128 at 1081-1085.

While trying to be the best father figure and husband he could during this time, Wes also was forced to navigate his relationship with Claire. After Wes's release from prison, Claire would regularly drive the three hours from Wichita to Leavenworth just to iron Wes's clothes. Although Jeanette did not seem to mind and it appeared that Jeanette and Claire were close friends, her dad was having a relationship with both women, and each was very demanding of his time. App. 50 at 296. Claire had never overcome her own struggles with drugs and mental health issues. She was a bad influence on Wes, both because she was very unstable and because connections with Claire returned Wes to spending time with people he knew before he went to prison. App. 126 at 990-991. At the same time, Wes was trying to be a supportive, loving father to his teenage daughter Angie, who had gotten into trouble with the law was having some of her own legal problems around the time of his release from prison. App. 126 at 990-991; App. 129 at 1086-1087.

Wes wanted so much to be there for Angie, to help her and support her. Angie recalls that, after she was arrested, her dad came to Wichita to try to help. It was important to her that "[h]e showed up and was caring." App. 50 at 297. Angie knew that this was another source of stress for her dad; he tried hard but "didn't know how to help me and he wanted to." App. 50 at 297. As a teenager, Angie also was not ready for her dad to be in her life consistently. She loved her dad, but it

was a hard transition for her, too, and she did not know how to have him in her life every day. No one really prepares family members for the homecoming of someone who has been incarcerated. Experiencing her own troubles and being immature, Angie ignored Wes for a little while after he got out and when he came to Wichita, she took off for Leavenworth. App. 50 at 295.

It did not take too long before the numerous stressors overcame Wes's fragile coping skills. He became overwhelmed, and started having flashbacks of traumatic events he suffered as a child. App. 50 at 296; App. 126 at 991-992.

In time, Wes self-medicated his stress and anxiety. First, he began drinking in bars. App. 50 at 295; App. 126 at 991. Wes eventually turned back to drugs, and would disappear for days at a time. App. 126 at 992.

As Wes's alcohol and drug use increased, his wife Jeanette did the unthinkable: she poisoned Wes, not just once, but repeatedly. Wes was behaving bizarrely, so, scared and worried for him, Jeanette started slipping rat poison into her husband's food. She thought it would make Wes sick and "then he would have go to the hospital to finally get help." App. 126 at 992. The combination of the poison and drugs only made Wes's anxiety and paranoia much worse. App. 50 at 296.

**J. To this day Wes maintains a close bond with his daughter Angie and his grandchildren, and continues to provide all the love and support he can to his family from prison.**

Wes's relationship with his daughter Angie has only grown stronger during his most recent period of incarceration. Wes meets with his Buddhist monk, Dale Hertkmeyer (Dharma name "Seigen"), every month for spiritual guidance. Seigen reports that every time he visits, Wes "always reports the newest news about his daughter and grandkids. He is very proud of his daughter and how she has managed to live her life despite her parents." Wes "loves his family very much." App. 69 at 545. Wes telephones Angie frequently to make sure they are all doing alright. App. 50 at 301-302. Any chance he is given, Wes supports his daughter both financially and emotionally. Wes gave to Angie most of the settlement money he obtained from a lawsuit against Leavenworth prison for having been severely beaten during his pretrial confinement at the CCA (Corrections Corporation of America) facility in Leavenworth. App. 50 at 298-299. Wes encourages Angie to pursue her education. Angie struggled in school just like him, and dropped out in the 9th grade. She eventually obtained her GED, and her dad encourages her to go back to school because "[h]e sees my potential and wants the best for me." App. 50 at 301.

When Angie's son Matthew ("Matty") passed away as a child in 2007, Wes was ever-present, supporting his daughter. He continues to provide emotional

support to his daughter each year at the anniversary of Matty's death. Angie is grateful for her dad being "one of the few people in my life who remembers that time of year and offers me support and encouragement." App. 50 at 300. When Angie lost her beloved dog in 2017, Wes consoled her, and sent her a drawing of the dog. She keeps the picture in her family room of her house so that it is always close. App. 50 at 301.

Wes loves his grandchildren, too, and they love him. App. 50 at 299. According to Wes's spiritual advisor Seigen, "his face lights up when he talks about his grandchildren." App. 69 at 545. Wes sends care packages to his grandchildren, and makes gifts for them on their birthdays. App. 50 at 301. When Wes's grandson Michael struggled with a stutter early on in his life, Wes advised Angie to be patient with Michael, that sometimes it would just take a little longer for the words to get out, but he would get there. "It is a very sensitive topic for my dad because he was ridiculed so much for his stuttering." App. 50 at 300.

Wes has expanded his family beyond his biological relations. For many years Wes has corresponded with a group of pen pals. He has supported these friends and encouraged them through some of their darkest times. For example, when Seigen's mother passed away in 2013, "Wesley showed me great care and support, given the limitations of his circumstances. He offered encouraging words at our visits and took the time to offer his condolences soon after he learned of her

79

passing." App. 69 at 546. Wes is very close to some of his pen pals, too, and he often reaches out to people when they are in need. Seigen describes an instance when Wes had not heard from a pen pal in Minnesota in a while, and Wes became genuinely concerned for her well being. "It's Wesley's goodheartedness." App. 69 at 545-546. Wes's good-heartedness extends even to strangers. During Seigen's visits, if Wes learns of friends of his that are going through tough times, "he has always asked that I pass along his support to them." Seigen's friend Tony is a good example: "Even though Wesley and Tony have never met, Wesley always inquires of how Tony is doing and passes along his well wishes." App. 69 at 546.

Wes's care and concern for others has been enhanced over the years by his ongoing practice of Zen Buddhism. He practices Soto, a specific branch of Zen, which is "about being present to everything, observing one's own mind and body." App. 69 at 544. He first began practicing during the early 2000s, not long after his conviction, and his practice has continued to the present through the guidance of Seigen, who met Wes in 2009 and has visited him regularly since 2013. App. 69 at 542.

Wes's quest for self-education also continues to this day. He has learned Spanish with the help of Seigen, who also happens to be a Spanish teacher. App. 69 at 544-545. Wes initiated the lessons on his own and has created a structured learning environment, despite having no classroom setup or structure. App. 69 at

80

544-545. According to Seigen, Wes's ability to learn Spanish has been remarkable because Wes had no previous basis to understand a second language. As they began to study together, "it also became apparent that Wesley didn't even know what a noun or verb was so I had to teach him that." And even though Wes became frustrated at times, he stayed with it. Wes continues to be an active learner, collecting questions and bringing them to his visits with Seigen, who is impressed with Wes's initiative and dedication. App. 69 at 544-545.

When Wes is not practicing Zen, corresponding with his family and pen pals, or practicing Spanish, he is a prolific writer, both for the magazine *Compassion* and as a litigator of internal prison issues on behalf of himself and other inmates on death row at Terre Haute. App. 86 at 736-761. Though it creates additional problems for himself at times, Wes feels compelled to help others that he perceives as being unjustly treated. It is the same care and concern he shows for his family and friends that motivates him to protect his neighbors. As Seigen explains: "He sticks up for others whose rights are being ignored. It's very powerful. Wesley feels he has to fight, to be the antagonist, when people around him are being unjustly treated because no one else will. Wesley can be vehement in his views; at times they can be sharp and edgy, and may instigate Wesley's own problems, but given the gravity of his situation and the environment in which he

81

lives, I appreciate and understand his actions. It is all a part of Wesley's sense of wanting to help others." App. 69 at 546.

Apart from these pursuits in prison, age continues to take a toll on Wes. Like several of his relatives before him, Wes was diagnosed in 2017 as "suffering from the beginning stages of a cortical neurodegenerative disease, such as dementia," most likely Alzheimer's disease, "considering his multiple risk factors and current symptoms." App. 87 at 771-772. Wes's current symptoms include "significant learning and memory deficits," "relative motor weakness on the non-dominant side indicating possible right hemispheric deficits as well as mild impairments on some measures of executive functioning," and "significant declines" in memory since testing in 2003 as well as executive functioning. App. 87 at 771. The average life expectancy after diagnosis, under normal circumstances, is eight to ten years, but in some cases, as short as three years. App. 87 at 772.

## IV.   FACTS AND PROCEDURAL HISTORY OF THIS CASE

### A.  The Crime

Wes Purkey was convicted by a federal jury in the Western District of Missouri of one count of interstate kidnapping resulting in death. Western District of Missouri (WDMO) Case No. 01-CR-00308-FJG (Dkt. 433). At the close of the penalty trial, the jury returned a verdict for death, and a sentence of death was subsequently imposed by United States District Judge Fernando J.

Gaitan, Jr. *Id.* (Dkt. 461, 487 and 505).

Mr. Purkey originally confessed to the crime in December 1998 to local authorities in Kansas, where he was incarcerated in the county jail awaiting trial for the murder of an elderly woman, Mary Ruth Bales, to which he had also confessed and, ultimately, pled guilty. Mr. Purkey sent a note to Kansas City, Kansas police detective Bill Howard, stating he wanted to speak to him about a kidnapping and homicide that had occurred earlier that year. Mr. Purkey told Detective Howard that he also wanted to speak to an FBI agent about the crime, because he knew that he was facing a life sentence in the Kansas Department of Corrections, and would rather serve a life sentence in federal prison. Mr. Purkey had several subsequent meetings with Detective Howard and FBI Special Agent Dirk Tarpley, in which he expressed his intent to plead guilty in the Kansas case and promised to confess to the murder of a 16-year old woman who had disappeared in January 1998 in exchange for a life sentence in federal prison. Detective Howard and Agent Tarpley promised to take whatever Mr. Purkey had to say to the United States Attorney (USA) in Kansas.

Mr. Purkey then confessed to Howard and Tarpley that, nine months earlier, he had kidnapped a young woman named Jennifer (later identified as

83

Jennifer Long) in Kansas City, Missouri, and transported her to his home in Lansing, Kansas, where he raped and murdered her, then dismembered her dead body with a chain saw, placed the body parts in plastic bags mixed with leaves from his backyard, burned the body parts in his fireplace, bagged up the ashes, and disposed of the bags a few months later by throwing them into a septic pond on property in Kansas where Mr. Purkey and his family had rented a mobile home. Mr. Purkey promised his further cooperation if he received assurances from the USA in Kansas that the case would be federally prosecuted. The same day, Howard and Tarpley met with the USA in Kansas, who indicated he might be willing to prosecute the case if Mr. Purkey fully cooperated and provided the location of the body's remains.

Mr. Purkey fulfilled his end of the proposed deal, took Howard and Tarpley to the crime scene, and showed them the pond where he had disposed of Jennifer's remains. Over the course of several days, Howard and Tarpley met with Mr. Purkey multiple times, during which Mr. Purkey gave additional handwritten and oral confessions, and identified Jennifer's photo from a lineup. Howard and Tarpley denied they ever made any promises to Mr. Purkey of a life sentence in a federal penitentiary.

In 2001, after Mr. Purkey entered a guilty plea in the Kansas case, federal charges were filed against him for Jennifer's murder, not in Kansas, but in Missouri, and the government filed notice that it would seek to impose the death penalty.

## B. The Trial Defense Team

Mr. Purkey was represented at his trial by court-appointed lead counsel Fred Duchardt, Jr., and co-counsel Laura O'Sullivan. Mr. Duchardt has the dubious distinction of having more clients on federal death row than any other lawyer in the United States. *See* App. 133 at 1153 (David Rose, "Death Row: the lawyer who keeps losing," The Guardian, Nov. 24, 2016). Laura O'Sullivan had significant litigation experience in Missouri state courts, but she had no significant federal court experience and no capital case experience at the time of Mr. Purkey's trial. She thought she could gain such experience by joining Mr. Purkey's trial team. App. 134 at 1166-1167.

Mr. Duchardt hired his friend, Michael ("Mic") Armstrong, initially as a fact investigator in Mr. Purkey's case. In his initial budget request, Mr. Duchardt requested separate funding for an investigator and a mitigation specialist, and he secured $35,000 in funding for Armstrong as an investigator. App. 135 at 1173-1176; App. 136 at 1177-1180; App. 187 at 2129. Mr. Duchardt never hired a mitigation specialist for Mr. Purkey's case, despite repeated entreaties to do so

85

from his co-counsel. App. 186 at 2115-2116. Instead, Mr. Duchardt presented a supplemental budget request to the court asking for additional funds for Mr. Armstrong so he could serve in the dual role of both fact investigator and mitigation specialist, under the guise of "budgetary savings." App. 136 at 1178-1179.

At the time he requested and obtained funding to hire Mic Armstrong for the "dual role" of both fact investigator and mitigation specialist in Mr. Purkey's case, Mr. Duchardt knew facts about Mr. Armstrong that disqualified him.

Indeed, Mr. Duchardt and Michael Armstrong had a long-standing business relationship.  In May of 1985, eighteen years before Mr. Purkey's trial, Mr. Duchardt hired Mr. Armstrong to work as an investigator in the Missouri State Public Defender (MSPD) office located in Liberty, Missouri, an office managed by Mr. Duchardt in his role as the District Defender. App. 137 at 1182-1183; App. 176 at 1784. During his entire tenure at MSPD, Mr. Armstrong was employed as a criminal investigator. He was never a mitigation specialist, by training or experience. If a case required mitigation work, lawyers at MSPD would use either an in-house Alternative Sentencing Specialist, or an outside mitigation specialist. App. 138 at 1190-1191. Armstrong's job responsibilities at MSPD consisted mostly of serving subpoenas. App. 138 at 1190.

86

Mr. Armstrong's performance of even basic investigative tasks was severely criticized by lawyers who worked directly with him in the Liberty office. The complaints centered on Mr. Armstrong's failure to complete investigative tasks in a timely manner, and his demeanor with witnesses. For example, there were instances when an MSPD lawyer, relying on Armstrong's assurances that he had served witness subpoenas, would announce to the court at a docket call the Thursday before trial that they were ready for trial, only to learn from Armstrong just before trial the next Monday that the subpoenas had actually not been served and the witnesses would not be present. App. 138 at 1188-1190; App. 139 at 1194. There were also complaints that Mr. Armstrong had an angry and aggressive way of dealing with people, including potential friendly witnesses, which would sometimes result in a lawyer having to apologize to a witness repelled by Armstrong's behavior. App. 139 at 1194. It was known around the MSPD office that Mr. Armstrong had a prior conviction of misdemeanor assault resulting from a fight at a local bar. App. 139 at 1195; App. 140 at 1210. Despite Armstrong's incompetence, lawyers in the Liberty office felt that Mr. Duchardt was very protective of Mr. Armstrong, and that Armstrong was insulated from any adverse action as long as Mr. Duchardt had supervisory authority over the office. App. 138 at 1190; App. 139 at 1194.

Mr. Armstrong was fired from his employment with the MSPD in September of 1995, just two months after Mr. Duchardt left the MSPD system to pursue the private practice of law. App. 137 at 1182; App. 176 at 1784. Katherine Ladesh, who was then the district defender in the Liberty office, terminated Mr. Armstrong's employment upon learning of another instance where Armstrong had failed to serve witness subpoenas after representing that he had done so. App. 138 at 1189-1190.

In his private practice after leaving MSPD, Mr. Duchardt continued to employ Mr. Armstrong as an investigator on cases assigned to him under a contract with the MSPD, even though Armstrong never obtained a private investigator's license. *See* App. 142 at 1438; App. 143 at 1439. Duchardt was subsequently informed by MSPD that it would be inappropriate to pay Armstrong as an investigator on public defender cases after being terminated from MSPD. Duchardt agreed to seek the services of a new investigator in his pending cases. App. 141 at 1434.

After he was prohibited from working on MSPD cases, Mr. Armstrong lashed out at those he deemed responsible. Armstrong stalked and harassed both Katherine Ladesh, his former supervisor, and Anita Burns, an assistant public defender in the Liberty office. App. 140 at 1258-1259; App. 144 at 1486-1488. In one instance, Armstrong followed Ms. Burns to the grocery store in Liberty where,

in public and in front of other people, he threatened to kill her. In another instance, Armstrong threatened Katherine Ladesh, in front of her children, that he would kill her, and he threw a brick through the plate glass front door of her home in Gladstone, Missouri. App. 140 at 1258-1259; App. 144 at 1486-1488. Both women obtained full protective orders against Mr. Armstrong. The incident against Anita Burns led to an assault charge against Armstrong, but he was acquitted at trial on a technical error of the inexperienced special prosecutor relating to amendment of the complaint. App. 140 at 1195-1196; App. 144 at 1486-1488; App. 177 at 1785. Even after the trial, however, both Anita Burns and Katherine Ladesh obtained extensions of their full protective orders against Armstrong. App. 140 at 1198-1200; App. 144 at 1440-1441.

Two years after he was fired from the MSPD, and while the full orders of protection were in effect, Michael Armstrong sued the MSPD, and Katherine Ladesh individually, for wrongful termination. App. 141 at 1268-1437. In his lawsuit, Mr. Armstrong claimed that, even though he was an "at will" employee of the MSPD, at the time he was hired Mr. Duchardt made promises that he could not be terminated except for cause. The complaint stated that he had dedicated his life "to the defense of the clients of the Missouri State Public Defender System based on the representations of [Fred] Duchardt that Plaintiff should give up his business and come to work for the System and Plaintiff could retire from the System and

enjoy the various benefits of the System and would not be fired but for cause and that the System was set up to resolve disputes between personnel as the System recognizes the investment in its employees and desires to keep those employees[]" describing the arrangement with Duchardt as "an express contract." App. 141 at 1370.

Mr. Armstrong's lawsuit was dismissed on January 5, 2001 for failure to prosecute, over three years after it was filed. App. 141 at 1268-1271. Later the same year, when Mr. Duchardt was assembling the defense team in Mr. Purkey's case, Duchardt petitioned the district court for funds to hire Mr. Armstrong as the fact investigator *and* mitigation specialist, without disclosing Armstrong's troubled past and poor investigative work history.

### C. The Trial

Mr. Purkey's defense at the guilt phase was that he falsely confessed to an interstate kidnapping of Jennifer Long because he was trying to make her unsolved disappearance a federal offense, thereby presenting a situation where he could negotiate a life sentence in a federal prison instead of the Kansas Department of Corrections. The Government countered this defense by eliciting testimony from the lead investigative agent that "right before trial" was the first time he had ever heard that Mr. Purkey claimed that no kidnapping occurred. App. 145 at 1495. However, this testimony of an eleventh hour recantation was undermined by facts

90

that were known or should have been known to defense counsel Mr. Duchardt, but the jury never heard them.

Mr. Duchardt must have been aware that, two years before trial, FBI Agent Tarpley interviewed a prison inmate named Michael Speakman, who had shared a jail cell with Mr. Purkey. Speakman told the agent that Mr. Purkey had told him "[the] girl was with him partying," "[he] did not snatch [her]" and "[it was] not forcible with the girl." Further, Mr. Duchardt knew that Stephen E. Peterson, M.D., an expert that Duchardt hired to evaluate Mr. Purkey, recalled that Mr. Purkey told him during his evaluation that he did not kidnap Jennifer Long, that she went with him voluntarily, and that he confessed to interstate kidnapping only because he wanted to serve a life sentence in federal prison instead of the Kansas Department of Corrections. Yet Mr. Duchardt did not offer this readily available evidence to refute the Government's contention that Mr. Purkey recanted the kidnapping only on the eve of trial in his effort to avoid the death penalty.

Mr. Purkey's defense was further complicated by his testimony during the hearing on his Motion to Suppress Statements, a motion based on his contention that his original statements to law enforcement were not voluntary because they were made in exchange for a promise of a life sentence in a federal prison. Mr. Purkey testified during the hearing, and on cross-examination without objection of Mr. Duchardt. Mr. Purkey testified that one of his pre-indictment confessions to

91

kidnapping was in fact true. Mr. Duchardt failed to file a motion to exclude the use

of Mr. Purkey's statements during the government's case-in-chief at the guilt phase

despite having a legal basis to do so.[9] This was problematic because, at trial, the

government used Mr. Purkey's suppression testimony to not only impeach his

claim that he did not kidnap Jennifer Long, but to also argue the truthfulness of the

statement itself with no objection from Mr. Duchardt.

Mr. Duchardt went on to argue to the jury that both the defense and the

government "are absolutely dependent on [Mr. Purkey]'s credibility and

believability in this case[.]" App. 151 at 1510. The jury returned a verdict

finding Mr. Purkey guilty as charged.

Even though he was hired for the role, Michael Armstrong did not provide

input into Mr. Purkey's mitigation case, but simply found some witnesses and

gathered some records. The witness interviews that he participated in were

unproductive. For instance, when Mr. Armstrong and Mr. Duchardt went to

conduct an in-person interview of Mr. Purkey's daughter, Angie Genail, with

whom Mr. Purkey had and still has a very close and loving relationship, they

showed up unannounced at her wedding and tried to interview her in front of her

---

[9] *See generally Simmons v. United States*, 390 U.S. 377 (1968)(Supreme Court recognized in the context of a suppression hearing that "when a defendant testifies in support of a motion to suppress on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt).

guests. App. 50 at 297; App. 153 at 1512. The inappropriate manner in which

Mr. Armstrong dealt with witnesses while he was at the MSPD became

apparent in Mr. Purkey's case as well. Mr. Purkey's ex-wife, Jeanette (Purkey)

Broyles, described Mr. Armstrong's behavior as "real aggressive" when he came

to visit with her and her oldest son. Instead of ringing the doorbell or knocking,

he would kick the front door until someone answered. Mr. Duchardt's own

treatment of her was similar. App. 126 at 993.

When Dr. Cunningham, one of the trial defense experts, identified possible

childhood sexual abuse against Mr. Purkey by his mother as a red flag for further

investigation, the defense team never followed through. Although Mr. Purkey's

brother Gary could have provided valuable information about their mother's sexual

abuse, Mr. Duchardt took his teenage son with him to interview Gary, and never

asked him about family sexual abuse. App. 47 at 286. Neither Gary nor any of the

other lay witnesses who testified at the penalty phase addressed the question of

whether Mr. Purkey had been sexually abused by his mother.

While defense experts Dr. Peterson and Dr. Cunningham each testified at

the penalty trial that Mr. Purkey had reported to them he had been sexually

abused by his mother, the defense presented no evidence that Mr. Purkey had

ever reported the abuse before he had been charged and was facing the death

93

penalty in this case, even though there were an abundant number of readily available witnesses who could have done so if defense counsel had located and interviewed them. Consequently, both Dr. Peterson and Dr. Cunningham were forced to concede on cross-examination that the sexual abuse could not be confirmed, and that there was nothing in the records to indicate that Mr. Purkey had reported the sexual abuse to anyone else. *See* App. 155 at 1522.

The state's expert, Dr. Park Dietz, subsequently testified that, while there are records from Mr. Purkey's adolescence showing promiscuous behavior by his mother and that Mr. Purkey had some unidentified psychosexual problem, "up until he's facing capital murder charges, that's all that was in the record." App. 218 at 2457.  Dietz agreed that Mr. Purkey "might" have been abused by his mother, but it was a matter in dispute. Trial Tr. 2193. On the other hand, "If I have corroborative evidence, I'll accept it as a fact and I don't think it's a matter in dispute." App. 218 at 2457-2458. When defense counsel proposed to Dietz that it would not be in the interest of a person in prison to report that he was sexually abused by his mother, Dr. Dietz responded, "[i]t is when you're facing capital murder charges and have people looking for bad things in your childhood to help use in mitigation." App. 218

94

at 2459.[10] The prosecution went on to paint the evidence as "a fairy tale" and "the old abuse excuse" under the theory that Mr. Purkey had recently fabricated the allegation of abuse in order to avoid the death penalty. App. 157 at 1527-1528.

At the close of the penalty trial, the jury was instructed to complete a special verdict form and record its findings with respect to six statutory and four non-statutory aggravating circumstances in Parts I-IV, and with respect to mitigating circumstances in Part V. Part V of the special verdict form listed 27 mitigating circumstances, each containing an adjacent blank space, and instructed the jury to enter the "number of jurors who so find" in the blank spaces. App. 158 at 1529-1538. The trial judge twice instructed the jurors that they were required to record their findings as to mitigating circumstances on the special verdict form. App. 159 at 1539. The jury deliberated for approximately eleven hours over two days. App. 160 at 1540; App. 161 at 1541; App. 162 at 1542. When the special verdict form recommending a death sentence was returned, the jury had completed Parts I-IV, but Part V was left blank. App. 158 at 1529-1538. Following defense counsel's objection, the trial judge offered to

---

[10] In his report, Dr. Dietz left open the possibility of changing his opinion "through additional information that may be forthcoming." App. 127 at 1079.

send the jury back to complete the form "if the government wants," noting that it would have been preferable for the jury to make the requisite findings. However, after government counsel responded, "Absolutely no," Mr. Duchardt said nothing and the judge accepted the jury's verdict. App. 163 at 1543.

The Court of Appeals for the Eighth Circuit affirmed Mr. Purkey's conviction and sentence on direct appeal, and the Supreme Court denied *certiorari*. *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005), *cert. denied sub nom. Purkey v. United States*, 549 U.S. 975 (2006).

### C. The § 2255 Proceeding

In 2007, Mr. Purkey filed a petition under 28 U.S.C. § 2255. Mr. Purkey was represented by Teresa Norris, a lawyer with significant capital litigation experience in state and federal courts, and Gary Brotherton, an attorney who, at the time he represented Mr. Purkey, was licensed in the State of Missouri, but who has since been suspended from the practice of law by the Missouri Supreme Court. App. 164 at 1544-1545.

Mr. Purkey's § 2255 petition alleged various claims, including claims that his trial counsel was ineffective in violation of the Sixth Amendment at both the guilt and penalty phases of his trial. App. 165 at 1546-1601. In response to the § 2255 petition, the government secured a 117-page sworn statement from Mr.

96

Duchardt, in which he, *inter alia*: falsely claimed that § 2255 counsel had not objected to his statement before he sent it to the government; made false claims about Mic Armstrong's qualifications; disparaged his co-counsel, Laura O'Sullivan and made false statements about her prior experience; purported to interview witnesses who were never contacted; revealed unrelated confidential information learned in the course of representing his former client; and affirmatively advocated against Mr. Purkey's claims, arguing that they were without legal or factual support. App. 166 at 1602-1718. The government's response to Mr. Purkey's claims relied almost exclusively on the contents of Mr. Duchardt's statement, which was nearly double the size of the government's response brief. App. 183 at 1921-2097.

The district court denied the § 2255 motion without an evidentiary hearing. In its order denying the motion, the extent of the court's finding on the ineffective assistance of counsel claims was as follows:

> The Court has reviewed Mr. Duchardt's affidavit, as well as the briefs and arguments presented by counsel and finds that movant has failed to overcome the presumption that Mr. Duchardt's actions were not sound trial strategy. The Court finds that Mr. Duchardt's actions did not fall below an objective standard of reasonableness. Additionally, even if Duchardt's actions were considered to fall below the standard of reasonableness, movant has not shown "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland [v. Washington]*, 466 U.S. [668], []694 [(1984)].

97

App. 184 at 2102. The district court further found that no evidentiary hearing was necessary, stating that, even if Mr. Purkey's allegations are true and Duchardt was ineffective for failing to call certain witnesses or to present a more complete mitigation case, he would not be entitled to relief because "no jurors voted for a single mitigating factor." App. 184 at 2102.

The Eighth Circuit subsequently affirmed, and *certiorari* was denied by the Supreme Court. *Purkey v. United States*, 729 F.3d 860 (8th Cir. 2013), *cert. denied* 135 S.Ct. 355 (2014).

## GROUNDS FOR RELIEF

**CLAIM I:** **Trial counsel was constitutionally ineffective for failing to challenge Juror 13, whose name is Jennifer, and who was selected to serve on Mr. Purkey's jury despite, and without any questioning about, her disclosure on her juror questionnaire that she was the victim of an attempted rape when she was 16 years old, where the underlying facts of the crime charged against Mr. Purkey alleged that he raped a 16-year-old girl named Jennifer.**

The Sixth Amendment guarantees a criminal defendant the right to be tried by impartial and unbiased jurors. *See Morgan v. Illinois*, 504 U.S. 719 (1992). Among the most essential responsibilities of defense counsel is to protect his or her client's constitutional right to a fair and impartial jury by using *voir dire* to identify and ferret out jurors who are biased against the defense. *See Miller v. Francis*, 269 F.3d 609 (6th Cir. 2001). The primary purpose of *voir dire* is to make possible the

98

empaneling of an impartial jury through questions that permit the intelligent

exercise of challenges by counsel. *See Rosales-Lopez v. United States*, 451 U.S.

182 (1981) (voir dire plays a critical function in assuring the criminal defendant

that his Sixth Amendment right to an impartial jury will be honored) *and Mu'Min*

*v. Virginia*, 500 U.S. 415 (1991) (*voir dire* serves the dual purpose of enabling the

court to select an impartial jury and assisting counsel in exercising peremptory

challenges).

In her questionnaire completed at the courthouse prior to jury selection,

Juror 13, whose name is Jennifer, responded to a question about whether she or her

spouse, relative, or close friend had ever been the victim of a crime that she had

been the victim of an attempted rape in 1991, when she would have been about 16

years old.[11] She further disclosed that she had assisted law enforcement with the

investigation, that the man who attacked her was going to court for other rapes, and

that she was subpoenaed but did not end up testifying. App. 167 at 1742. The

district court judge read the charge against Mr. Purkey, which included an

allegation that he forcibly raped a 16-year old girl named Jennifer. App. 216 at

2441-2454. Juror 13 was present when the judge read the charge. App. 216 at

---

[11] At the time she completed her questionnaire, Juror 13 wrote that she was 27 years old. Given that her attempted rape occurred in 1991, and Mr. Purkey's trial was twelve years later in 2003, Juror 13 could have been 15 years old at the time of her attempted rape.

99

2441-2454 (judge explaining that the only missing venire members are venirepersons 49 and 16).

Disclosure of such information by Juror 13 provided a valid basis for a challenge for cause. *See English v. Berguis*, 900 F.3d 804, 818 (6th Cir. 2018). It is well established that implied bias may be found on the basis of similarities between the juror's own experiences and the facts giving rise to trial. *Gonzales v. Thomas*, 99 F.3d 978, 987 (10th Cir. 1996) (citing *Hunley v. Godinez*, 975 F.2d 316, 319 (7th Cir. 1992) ("courts have presumed bias in cases where the prospective juror has been the victim of a crime or has experienced a situation similar to the one at issue in the trial)). Similarities must inherently create in a juror a "substantial emotional involvement, adversely affecting impartiality." *Gonzales*, 99 F.3d at 989 (citing *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977); *Burton v. Johnson*, 948 F.2d 1150, 1159 (10th Cir. 1991), *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988) (inquiring whether "it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances")). Because the right to an impartial jury is part of the basic structure underlying the fundamental right to a fair trial, "[d]oubts regarding bias must be resolved against the juror." *United States v. Gonzalez*, 214 F.3d 1109, 1114 (9th Cir. 2000) (quoting *Burton*, 948 F.2d at 1158). *See also United States v. Polichemi*, 219 F.3d 698, 704 (7th Cir. 2000) (explaining that a juror who belongs to a class presumed biased "may well be

100

objective in fact, but the relationship is so close that the law errs on the side of caution").

Juror 13's disclosure was a red flag that her personal experience as a teenaged attempted rape victim made her biased against Mr. Purkey, given that the facts of his case included an allegation that he raped and killed a teenaged girl named Jennifer. Despite this red flag, Mr. Purkey's trial counsel did not question Juror 13 about her disclosure during *voir dire*, and did not move to strike Juror 13 for cause or through the use of a peremptory challenge. Juror 13 thus became a member of the petit jury that convicted Mr. Purkey and sentenced him to death.

The normal avenue of relief available to a party who is asserting that he did not have the benefit of an impartial jury is a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred. *Gonzales v. Thomas*, *supra*, 99 F.3d at 985 (citing *McDonough Power Equip., Inc., v. Greenwood*, 464 U.S. 548, 555 (1984) (emphasis added). Here, though, the issue of Juror 13's actual or implied bias based on her disclosure of a similar experience of attempted rape as a teenager has never been heard by any previous court because Mr. Purkey's prior counsel never presented it.

In fact, it is evident that trial counsel missed Juror 13's disclosure completely. No effort at all was made to question or remove Juror 13 despite the

101

obvious specter of bias her disclosure presented, nor was the disclosure ever mentioned by trial counsel. Juror 13 did not bring it to the attention of the parties or the court during *voir dire,* and neither the trial court nor the Government mentioned the disclosure or asked Juror 13 any questions about it. The only questions Fred Duchardt, Mr. Purkey's lead trial counsel who conducted *voir dire,* individually asked of Juror 13, aside from her views on the death penalty, were whether the fact that she had a young son would present a potential problem for her to serve on a jury for an extended period of time. App. 169 at 1754.

Trial counsel Duchardt and his co-counsel, Laura O'Sullivan, reviewed the jury questionnaires together prior to trial at Mr. Duchardt's office. Despite their review, Ms. O'Sullivan had no knowledge of Juror 13's disclosure before she was made aware of it by Mr. Purkey's current counsel. O'Sullivan now believes that she completely missed Juror 13's disclosure, because she has no recollection of Juror 13's disclosure despite its obvious significance. and because no effort was made to question or exclude Juror 13 even though the disclosure presented an obvious bias issue. Juror 13's disclosure presented a situation where the juror's experience was so similar to the facts of Mr. Purkey's case that she would have "wanted to make sure that this juror did not sit on the jury." Lead counsel Mr. Duchardt neither mentioned the disclosure nor raised it during *voir dire*. O'Sullivan believes the district court would have sustained a motion to strike Juror 13 for cause, even if

102

Juror 13 would have insisted she could be fair and impartial, because of the similarity of Juror 13's experience with the facts of Mr. Purkey's case. App. 134 at 1170-1171.

That trial counsel did not notice Juror 13's disclosure is supported by the trial record. First, prior to the commencement of *voir dire*, trial counsel did not file a pretrial motion to have Juror 13 struck for cause based on her questionnaire disclosure, despite moving pretrial to strike other jurors for cause based on personal experiences disclosed on their questionnaires, motions to strike that were sustained by the district court.[12] Second, during *voir dire*, Mr. Duchardt failed to ask Juror 13 any questions about her attempted rape experience.  Mr. Duchardt did not inquire about her experience as an attempted rape victim, despite knowing enough about her questionnaire disclosures to know that she was the mother of a young son. Further, Mr. Duchardt made no effort to conduct individual *voir dire* of Juror 13, an option available to him based on his own pretrial motion request to have individual *voir dire* available in order to question potential jurors about

---

[12] Based on Juror 13's questionnaire responses to Questions 82 and 83, Mr. Duchardt could have moved to strike her from the venire panel even before voir dire began. *See* App. 170 at 2228. In fact, Mr. Duchardt moved to strike two other potential jurors before voir dire began based in part on their answers to questions 82 and 83, strikes that were ultimately sustained by the district court. *See* App. 131 at 1565 (Dkt. #s 370 and 371). Mr. Duchardt failed, however, to make an identical motion to exclude Juror 13 for cause based on her questionnaire responses that she had been the victim of an attempted rape as a teenager, and as a result, Juror 13 was included in the group of jurors reporting to the courthouse for *voir dire*.

"matters which, due to their personal/private nature, might need to be taken up individually." App. 172 at 1765.

Significantly, during *voir dire*, Mr. Duchardt was aware that a mere allegation of child rape evoked emotions strong enough to exclude a juror for cause (even if the juror had no personal experience as a rape victim), because he moved to strike for cause a potential juror for disclosing such emotions. Venireperson 103 disclosed the firmly held opinion that any adult who "violates a child" does not deserve to live, and that a 16-year-old teenager would be considered a child in her view. App. 173 at 1772. Mr. Duchardt moved to strike Venireperson 103 for cause, and with agreement of the Government, the district court removed that prospective juror. App. 174 at 1773. Yet Mr. Duchardt asked no relevant questions and made no motion to strike Juror 13 based on her *actual* experience as a teenage attempted rape victim.

Trial counsel's failure to request removal of Juror 13 cannot be strategic or reasonable when counsel was unaware of the disclosure on her jury questionnaire that provided a valid basis for her removal. *See Strickland v. Washington*, 466 U.S. 668, 690-691 (1984). *See, e.g., Hinton v. Alabama*, 134 S.Ct. 1081, 1089 (2014) (an attorney's ignorance of the law that is fundamental to his case and failure to perform basic research on the point is quintessentially unreasonable performance under *Strickland*) (citing *Williams v. Taylor*, 529 U.S. 362, 395 (2000)). Indeed,

104

counsel's failure to request the removal of Juror 13 was objectively *unreasonable* because Juror 13's disclosure was the kind of experience so similar to the one at issue in Mr. Purkey's trial that rendered her presumptively biased. *See id.*, 466 U.S. at 688 (question regarding deficient performance is whether counsel's representation "fell below an objective standard of reasonableness"). *See also United States v. Lathrop*, 634 F.3d 931, 937-38 (7th Cir. 2011) (an attorney's failure to question jurors regarding possible bias can constitute deficient performance); *Johnson v. Armontrout*, 961 F.2d 748, 755 (8th Cir. 1992) (absent the showing of a strategic decision, failure to request the removal of a biased juror can constitute ineffective assistance of counsel). Under these circumstances, trial counsel's failure to request Juror 13's removal is presumptively prejudicial. *See United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000)(the seating of a biased juror who should have been dismissed for cause requires reversal of the conviction); *Wolfe v. Brigano*, 232 F.3d 499, 502-03 (6th Cir. 2000) (failure to remove biased jurors taints the entire trial, and therefore conviction must be overturned); *Johnson v. Armontrout*, 961 F.2d 748 (8th Cir. 1992)(the presence of a biased juror is no less a fundamental structural defect than the presence of a biased judge, and such a defect defies analysis by harmless error standards (citing *Arizona v. Fulminante*, 499 U.S. 279 (1991)).

Trial counsel's failure to remove Juror 13 constitutes a substantial claim of ineffective assistance of counsel, yet Mr. Purkey's § 2255 counsel admittedly did not know of Juror 13's disclosure, and consequently, no ineffective assistance of trial counsel claim based on trial counsel's failure to adequately *voir dire* or move to strike Juror 13 was raised in the § 2255 petition. App. 175 at 1775-1776. Nor did § 2255 counsel raise any claim that the trial court had a duty to adequately *voir dire* Juror 13 and that this failure resulted in a deprivation of Mr. Purkey's Sixth Amendment right to a fair and impartial jury. Section 2255 counsel's plainly deficient performance establishes cause for the default of this substantial ineffective assistance of counsel claim under the *Martinez-Trevino* doctrine, *Brown v. Brown*, 847 F.3d 502, 513 (7th Cir. 2017), and Mr. Purkey is entitled to present his substantial claim here. *See Adams*, 911 F.3d 397, 411; *Brown*, 847 F.3d 502, 509-10; *Ramirez*, 799 F.3d at 854; *Webster*, 784 F.3d 1123, 1136-37; *Garza*, 253 F.3d at 922. Otherwise, initial-review collateral counsel's failure to raise the claims would "deprive [Mr. Purkey] of any review of [those claims] at all." *Trevino*, 569 U.S. at 423.

106

**CLAIM 2:   Trial counsel was constitutionally ineffective in failing to investigate, develop and present readily available, compelling mitigating evidence to the jury at Mr. Purkey's capital trial, in violation of the Sixth, Eighth, and Fourteenth Amendments.**

"[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensible part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). This individualization doctrine is rooted in the notion that, in determining whether to fix the ultimate punishment at death, the process must not exclude from consideration "the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." *Id.* At stake is the "reliability in the determination that death is the appropriate punishment in a specific case." *Id.* at 305. This means that the sentencer in a capital case must "'not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)) (emphasis in original). Accordingly, it is firmly established that a defendant has a constitutional right, not only to place before the sentencer any relevant evidence in mitigation of punishment (*Hitchcock v. Dugger*,

107

481 U.S. 393 (1987); *Skipper v. South Carolina*, 476 U.S. 1 (1986)), but to have the sentencer meaningfully consider and give effect to all relevant mitigating circumstances. *Abdul-Dabir v. Quarterman*, 530 U.S. 223 (2007).

In order to ensure that these constitutional requisites under the Eighth Amendment are fully realized, defense counsel has an obligation to thoroughly investigate his or her client's background for mitigating evidence. *See Williams v. Taylor*, 529 U.S. 362, 396 (2000). Investigations by defense counsel into mitigating evidence "'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor,'" and "among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences.'" *Wiggins v. Smith*, 539 U.S. 510, 525 (2003) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 11.4.1(C), p. 93 (1989)) (emphasis in original). The fact that some evidence was introduced in mitigation at trial does not "foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant." *Sears v. Upton*, 130 S.Ct. 3259, 3266 (2010). *See also Porter v. McCollum*, 558 U.S. 30, 40-44 (2009) (Sixth Amendment was violated under *Strickland v. Washington*, 466 U.S. 668 (1984),

even where trial counsel presented a superficially reasonable mitigation theory during the penalty phase but had failed to discover other significant mitigating evidence that came to light only during post-conviction proceedings).

In Mr. Purkey's case, an investigation conducted by his current habeas counsel, and by a qualified mitigation specialist under the supervision of current counsel, has revealed extensive, relevant, and compelling evidence that was available to both his trial and § 2255 counsel but was either inadequately investigated or not investigated at all, and thus was never presented. This new, non-cumulative evidence establishes, not only that trial counsels' prejudicial failure to conduct a thorough mitigation investigation was foreordained by lead counsel Fred Duchardt's conscious and knowing decision to hire an unqualified, untrained individual to act as the "mitigation investigator," but that, as a result of trial counsel's failure to investigate, Mr. Purkey's jury never heard the readily available evidence of Mr. Purkey's extensive history of profound physical, emotional, and sexual abuse and other trauma, and the resulting complex PTSD that Mr. Purkey suffers, that would have given the jury compelling reasons to spare his life. Because this new evidence forms the basis for this substantial claim of ineffective assistance of Mr. Purkey's trial counsel, § 2255 counsel's own ineffective assistance in failing to investigate and present this evidence establishes cause for the procedural default of this substantial claim and entitles Mr. Purkey to present

109

his new claim in this § 2241 petition. *Webster v. Daniels*, 784 F.3d 1123, 1124-25

(7th Cir. 2015) (§ 2241 is the appropriate avenue of relief where petitioner

challenges the "fundamental legality" of his or her sentence); *Brown v. Brown*, 847

F.3d 502, 513 (7th Cir. 2017); *Ramirez v. United States*, 799 F.3d 845, 853 (7th

Cir. 2015).

**A. Trial counsels' failure to conduct an adequate mitigation investigation is directly attributable to the substitution of a uniquely unqualified investigator in place of a qualified mitigation specialist as part of the defense team**.

Mr. Duchardt did not hire a qualified mitigation specialist to work on the

defense team, even though he represented to the trial court in his original funding

motion that he would do so, and he requested funding for that purpose. App. 187 at

2129. Instead, he hired Mic Armstrong, a friend whom Duchardt knew was

unqualified.

While Mr. Purkey's § 2255 counsel argued that Mr. Duchardt was

ineffective for failing to hire a mitigation specialist despite his co-counsel's

entreaties to do so, App. 165 at 1555, § 2255 counsel themselves never conducted

the investigation that would have exposed *why* Duchardt's substitution of Mic

Armstrong in the role of mitigation investigator was so prejudicial to Mr. Purkey's

defense. Had § 2255 counsel investigated the matter, they would have learned that

Mr. Armstrong was uniquely unsuited and unqualified to assume the role of a

mitigation investigator, let alone fact investigator, in a capital case.

110

What the evidence uncovered by Mr. Purkey's current counsel clearly shows is that, in obtaining additional funding for Mr. Armstrong to assume the "dual role" of fact investigator and mitigation investigator under the guise of "budgetary savings" App. 136 at 1178-1179, Mr. Duchardt was not acting in Mr. Purkey's best interests, or in accord with prevailing professional standards, which insist on a trained mitigation specialist as "an indispensible member of the defense team throughout all capital proceedings" because "they possess clinical and information-gathering skills and training that most lawyers simply do not have." ABA Guidelines, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Rev.Ed. 2003), Guideline 4.1, Commentary, 31 HOFSTRA L. REV. 913, 959 (2003). *See also id*., Guidelines 4.1(A)(1) (defense team "should consist of *no fewer* that two attorneys qualified in accordance with Guideline 5.1, an investigator, and a mitigation specialist") (emphasis added). Instead, he was simply doing a favor for a friend.

In fact, Mr. Duchardt advocated against hiring a mitigation specialist, App. 186 at 2115-2116, deciding instead that the work of a mitigation specialist could be accomplished by himself and his fact investigator, Mr. Armstrong. And, new evidence proves that at the time Mr. Duchardt hired Mic Armstrong as an investigator in Mr. Purkey's case, Duchardt knew that Armstrong had none of the

111

specialized qualifications and experience required of a mitigation investigator in a death penalty case, and was unqualified for the role.

Mr. Duchardt had hired Mr. Armstrong in May 1985 as an investigator in the Liberty, Missouri office of the Missouri State Public Defender ("MSPD") office of Clay County, Missouri, when Duchardt was employed as the district defender there. Duchardt later became a regional director for MSPD, and served in that capacity until 1994, when he returned to an assistant public defender position with MSDP due to the elimination of all regional defender positions. Duchardt left the MSPD in June 1995. App. 176 at 1784.

Mr. Armstrong was employed as a criminal case investigator during his entire tenure at MSPD. He was not a mitigation investigator, either by training or experience. If a case required mitigation work, lawyers at MSPD would use either an in-house Alternative Sentencing Specialist, or an outside mitigation specialist. App. 138 at 1190-1191. Armstrong's job responsibilities while at MSPD consisted mostly of serving subpoenas. App. 138 at 1190.

During his tenure at MSPD, Mr. Armstrong's performance of investigative tasks was severely criticized by lawyers who worked directly with him in the Liberty office. The complaints centered on Mr. Armstrong's failure to complete investigative tasks in a timely manner, and his demeanor with witnesses. For example, there were instances when an MSPD lawyer, relying on Armstrong's

112

assurances that he had served the witness subpoenas, would announce to the court at a docket call the Thursday before trial that they were ready for trial, only to learn from Armstrong just before trial the next Monday that the subpoenas had actually not been served and the witnesses would not be present. App. 138 at 1188-1190; App. 139 at 1194. There were also complaints that Mr. Armstrong had an angry and aggressive way of dealing with people, including potential friendly witnesses, which would sometimes result in a lawyer having to apologize to a witness repelled by Armstrong's behavior. App. 139 at 1194. It was known around the MSPD office that Mr. Armstrong had a prior conviction of misdemeanor assault resulting from a fight at a local bar. App. 139 at 1195; App. 140 at 1210.

By all accounts, lawyers in the Liberty office felt that Mr. Duchardt was very protective of Mr. Armstrong, and that Armstrong was insulated from any adverse action as long as Duchardt had supervisory authority over the office. App.138 at 1190; App. 139 at 1194. In September 1995, a few months after Mr. Duchardt left MSPD, Katherine Ladesh, who was then the district defender in the Liberty office, fired Mic Armstrong upon learning of another instance where Armstrong had failed to serve witness subpoenas after representing that he had done so. App. 137 at 1182; App. 138 at 1189-1190; App. 176 at 1784.

After he was fired from MSPD, Mic Armstrong stalked and harassed both Katherine Ladesh, his former supervisor, and Anita Burns, an assistant public

113

defender in the Liberty office. App. 140 at 1258-1259; App. 144 at 1486-1488. In one instance, Armstrong followed Ms. Burns to the grocery store in Liberty where, in public and in front of other people, he threatened to kill her. In another instance, Armstrong threatened Katherine Ladesh, in front of her children, that he would kill her, and he threw a brick through the plate glass front door of her home in Gladstone, Missouri. App. 140 at 1258-1259; App. 144 at 1486-1488. Both women obtained full protective orders against Mr. Armstrong. The incident against Anita Burns led to an assault charge against Armstrong, but he was acquitted at trial on a technical error of the inexperienced special prosecutor relating to amendment of the complaint. App. 140 at 1195-1196; App. 144 at 1486-1488; App. 177 at 1785. Even after the trial, however, both Anita Burns and Katherine Ladesh obtained extensions of their full protective orders against Armstrong. App. 140 at 1198-1200; App. 144 at 1440-1441.

Armstrong subsequently sued the MSPD, and Katherine Ladesh individually, for wrongful termination. App. 141 at 1268-1437. In the complaint, Mr. Armstrong stated that he had dedicated his life "to the defense of the clients of the Missouri State Public Defender System based on the representations of [Fred] Duchardt that Plaintiff should give up his business and come to work for the System and Plaintiff could retire from the System and enjoy the various benefits of the System and would not be fired but for cause and that the System was set up to

114

resolve disputes between personnel as the System recognizes the investment in its employees and desires to keep those employees[]" describing his arrangement with Duchardt as "an express contract." App. 141 at 1370. The lawsuit was dismissed in January 2001. App. 141 at 1268-1271.

In his private practice after leaving MSPD, Mr. Duchardt continued to employ Armstrong as an investigator on cases assigned to him under a contract with the MSPD. Duchardt was subsequently informed by MSPD that it would be inappropriate to pay Armstrong as an investigator on public defender cases in light of his termination from MSPD. Duchardt agreed to seek the services of a new investigator in cases then pending. App. 141 at 1740; App. 142 at 1438; App. 143 at 1439.

It was later in 2001, when Mr. Duchardt was assembling the defense team in Mr. Purkey's *federal* death penalty case, that Duchardt petitioned the district court for funds to hire Mr. Armstrong as the fact investigator *and* mitigation specialist, without disclosing Armstrong's troubled past and poor investigative work history. The actions of Mr. Duchardt in hiring a wholly unqualified individual to play the role of mitigation specialist in Mr. Purkey's federal capital trial not only violated the most basic standards of competent capital representation, but it brought the same investigative incompetence into Mr. Purkey's case that Armstrong had shown in his work for MSPD, directly contributing to the failure to conduct a

115

constitutionally-requisite mitigation investigation that, properly investigated, would have produced a wealth of readily available mitigating evidence that might have caused at least one juror to vote for life. *See Wiggins v. Smith*, 539 U.S. at 537; *see also Rompilla v. Beard*, 545 U.S. 374 (2005).

**B. Trial counsel was ineffective in failing to investigate, develop and present Mr. Purkey's full trauma history and the long-term consequences and effects of his trauma exposure and its connection to his behavior to explain why he committed the crime that led to his federal conviction.**

Given the volume of evidence uncovered by current counsel in investigating Mr. Purkey's life history with the assistance of a highly qualified mitigation specialist, set forth in Part III of this petition, there is a "reasonable probability" that the result of his penalty trial would have been different if trial counsel had thoroughly investigated and presented this evidence. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Trial counsel's failure to do so was objectively unreasonable, as "a competent attorney, aware of this history, would have introduced it at sentencing." *Wiggins v. Smith*, 539 U.S. at 537. This failure clearly prejudiced Mr. Purkey because, had his trial counsel been able to place such evidence on the mitigating side of the scale, "there is a reasonable probability that at least one juror would have struck a different balance of aggravating and mitigating circumstances." *Id*. at 537.

The vast information of Mr. Purkey's extraordinary trauma history and its effect on his behavior was readily available to trial counsel through extensive

116

records and through Mr. Purkey's family members and other witnesses who were more than willing to provide the information, had they been asked. Yet trial counsel failed to investigate beyond obtaining limited records and talking to a few people from Mr. Purkey's life. Even then, Mr. Armstrong and Mr. Duchardt mistreated the witnesses they did interview, and thus obtained only superficial information about Mr. Purkey.

For instance, Mr. Purkey's ex-wife, Jeanette (Purkey) Broyles, experienced the same kind of aggressive tactics from Mr. Armstrong that he had displayed during his tenure at the MSPD. When Mr. Armstrong came to visit with her and her eldest son, Armstrong was "real aggressive," and instead of ringing the doorbell or knocking, he would kick the front door until someone answered. Mr. Duchardt was just as rude and aggressive -- Ms. Broyles described Duchardt as "a mean person" who "kept saying over and over that I was lying to him." App. 126 at 993. Had they listened to her, they would have learned that Jeanette witnessed multiple episodes consistent with Mr. Purkey's trauma exposure during the time she and Mr. Purkey were married. App. 126 at 991. Mr. Duchardt and Mr. Armstrong sought to interview Mr. Purkey's beloved daughter Angie by crashing her wedding and trying to interview her in front of her guests. App. 50 at 297; App. 153 at 1512. Mr. Duchardt took his teenage son with him to interview Mr. Purkey's brother Gary, who, as current counsel's investigation shows, possessed crucial

117

information about their family and Mr. Purkey's traumatic experiences that Mr. Duchardt never obtained. App. 47 at 286.

Even one of the state's witnesses could have provided crucial mitigating evidence had trial counsel bothered to investigate and interview him. Michael Speakman, who testified for the Government at the guilt phase, was Mr. Purkey's former cellmate at the Correction Corporation of America (CCA) facility in Leavenworth, Kansas where Mr. Purkey was housed pretrial. Had trial counsel asked Mr. Speakman about his memories and experiences of living with Mr. Purkey, they would have learned about some of Mr. Purkey's positive attributes, including his neatness and cleanliness, his unwavering pursuit of fair treatment for all inmates, and his apologetic nature. App. 178 at 1817-1821. More crucially, they also would have learned key details about Mr. Purkey's mental health functioning leading up to and during his capital trial:

> Purkey was a light sleeper. He woke up at most noise. Whenever Purkey heard something he sat up and looked around. Sometimes I saw him; other times I felt his bunk shake. Purkey went back to sleep after a few minutes, but if there was more noise he woke back up.
>
> * * *
>
> Some days Purkey was real quiet. He hardly talked. He might not even get out of his bunk on those days. He just stared at the ceiling or the wall all day long. In retrospect, it reminds me of my son, who is autistic. Purkey went into his own world some days. Other days he was much more active. It was a day-to-day thing with Purkey.

118

\* \* \*

> Purkey ranted and raved a lot. When he was set off, he just went on and on. It could happen at any time. I never knew when it was going to happen. It was nerve-wracking sometimes. His face changed. It was like he was a different person. Purkey just stood at the door yelling and hollering. It could last ten minutes, it could last a lot longer. The other Purkey was gone until the ranting ended. It stopped as abruptly as it started.

App. 178 at 1818, 1819, 1820.

Trial counsel failed to interview extended family members, anyone from the neighborhood where Mr. Purkey grew up, or the schools and church he attended. They only collected a two-page document from the Wichita Unified School District showing Wesley's grades during elementary and high school. Trial counsel thus did not elicit the crucial descriptions of Mr. Purkey's symptomology and behavior consistent with his trauma exposure, without which they themselves could not have any understanding of the long-term consequences and effects of his trauma exposure and its connection to his behavioral issues that would have helped explain to the jury why he committed the crime that led to his federal conviction.

Trial counsel were on notice that Mr. Purkey's trauma history needed to be investigated, because two of their defense experts had flagged the issue. Mr. Duchardt retained psychiatric expert Dr. Stephen Peterson, who had conducted an earlier evaluation of Mr. Purkey when he was facing non-capital Kansas charges in the Mary Ruth Bales case. In his April 2000 report in the Bales case, Dr. Peterson identified some of Mr. Purkey's childhood emotional, physical, and sexual abuse

119

by his parents and other family members, and the likely effect such trauma would have in terms of child and adult anger control problems, a lack of understanding of the boundaries between children and adults, and problems of psychosexual identity. App. 56 at 476. When Mr. Duchardt contacted Dr. Peterson in 2001 to evaluate Mr. Purkey in this case, Duchardt informed Dr. Peterson that he was well aware of Peterson's prior report in the Bales case and that duplication of his prior assessment "was to be avoided." App. 147 at 1500; App. 213 at 2367. Dr. Peterson's August 2003 report contained little detail from his previous report, although the report did note Mr. Purkey's chaotic home life, that "his intoxicated mother engaged him in sexual activity" as a child and that a hospital report in 1968 judged him to have "severe psychosexual problems." App. 213 at 2368.

Mr. Duchardt retained Mark Cunningham for the purpose of rebutting future dangerousness, and Cunningham generated a report for that purpose just before trial in October 2003. App. 190 at 2146-2149; App. 192 at 2150. In a letter Dr. Cunningham wrote to Mr. Duchardt in December 2002, however, Cunningham listed various emerging "mitigation themes/hypotheses and associated investigation needs" based on his interviews with Mr. Purkey and the records he had reviewed, identifying numerous red flags and the need to conduct investigation into Mr. Purkey's multi-generational family history and genetic predisposition to substance dependence and mental illness, family violence, physical and emotional

120

abuse, traumatic sexual exposure, childhood speech impediment and social avoidance, peer isolation and alienation, corruptive influence of Mr. Purkey's brother, childhood onset psychological disorders, and neuropsychological deficits, among other things. App. 154 at 1515-1521.

Trial counsel simply ignored these significant red flags, and failed to follow up. *See Rompilla*, 545 U.S. at 391 (trial counsel ineffective for failing to follow up on "red flags" in school, medical, and prison records, and to follow up on findings in those records and obtain additional records).

Moreover, had trial counsel undertaken the constitutionally-requisite mitigation investigation at the time, not only would they have been able to locate and interview the classmates and neighborhood friends that current counsel interviewed, but they would also have been able to interview five nuns that taught at St. Joseph's Catholic School during the time period that Mr. Purkey attended. The nuns would have provided firsthand and insightful details about the school and parish communities, and likely would have been able to offer descriptions of Mr. Purkey's older brother, mother and father. Unfortunately, current counsel has confirmed that the nuns have since died. App. 179 at 1822.

There can be no reasonable strategic decision for failing to thoroughly investigate and present this substantial, powerful mitigating evidence at Mr. Purkey's trial. As established in *Strickland*, "strategic choices made after less than

121

complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." In light of what the evidence now reveals about the extent of Mr. Purkey's trauma history and its long-term consequences and effects on his behavior leading up to the federal crime for which he has been sentenced to death, trial counsel's failure to investigate clearly "fell below an objective standard of reasonableness." *Id*. at 688. *See also Wiggins*, 539 U.S. at 527-28 ("In light of what the [family and social history] records actually revealed, however, counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible").

Section 2255 counsel's investigation was also unreasonably limited. Like trial counsel, § 2255 counsel failed to investigate Mr. Purkey's childhood family, neighborhood, school, and religious environments. They only interviewed one childhood friend, Peggy Noe. *See* App. 60 at 492. Indeed, § 2255 counsel's investigation was limited to showing that Mr. Purkey had reported being sexually abused by his mother to others -- namely, Peggy Noe, and Dr. Rex Newton, the prison psychologist with the Oregon Department of Corrections -- prior to being charged in this case. *See* App. 60 at 492; App. 61 at 494. While that limited investigation produced enough new evidence to demonstrate trial counsel's deficient performance in failing to follow leads in Mr. Purkey's prior reports that

122

would have rebutted the government's argument at the penalty phase that Mr. Purkey fabricated the sexual abuse only after he was facing the death penalty and dismissal of the evidence as "the old abuse excuse" (App. 157 at 1527), the reviewing courts found that the evidence was merely cumulative of the evidence of sexual abuse presented at trial, and did not establish prejudice. App. 184 at 2098; *see also Purkey v. United States*, 729 F.3d 860 (8th Cir. 2013). Like trial counsel before them, § 2255 counsel ignored the obvious leads to Mr. Purkey's extraordinary, horrific trauma history that went far beyond sexual abuse by his mother. Had § 2255 counsel pursued those leads, they would have uncovered the extensive evidence of Mr. Purkey's trauma history set forth in Part III of this petition that *does* establish the prejudice from trial counsel's failure to investigate.

Unlike trial counsel, § 2255 counsel's unreasonably limited mitigation investigation was due in part to seriously inadequate funding. Although they retained a qualified mitigation specialist, the court authorized only $7,500 for her services, and an additional $1,300 for travel expenses. The court denied a supplementary budget request to cover the costs of an investigation trip and to cover cost overages. The additional travel expenses denied by the court were covered out-of-pocket by § 2255 counsel. App. 175 at 1776-1778; App. 180 at 1823.

Nevertheless, § 2255 counsel failed to hire the mitigation specialist in a timely manner, employing her in August 2007, only two months prior to the October 2007 filing deadline for the § 2255 motion. App. 180 at 1823. Under these circumstances, an adequate mitigation investigation was impossible. Moreover, if § 2255 counsel had not waited eight months from the date of their appointment to begin the mitigation investigation, they could have interviewed the lone surviving nun from Mr. Purkey's time at St. Joseph's Catholic School, Sister Ann Corita, who died in July of 2007. App. 179 at 1822.

Perhaps most disconcerting was § 2255 counsel's failure to work with and communicate productively with their client throughout the period of the § 2255 proceedings. Though she was involved in the case for barely two months, the mitigation specialist sensed almost immediately that § 2255 counsel had a strained relationship with their client, whom she knew to have serious mental health issues. In her past experience with cases involving clients with severe mental health issues, experts had been hired to assist the defense team in building a relationship with the clients, but "[g]iven the funding issues in this case, that was not possible." App. 180 at 1827. There appeared to have been a real breakdown in the attorney-client relationship. App. 175 at 1781-1782; App. 180 at 1827.

Though prior counsel presented some limited, isolated aspects of Mr. Purkey's trauma history, trial and § 2255 counsel each failed, for different reasons,

124

to uncover the readily available evidence set forth in this petition that provides a detailed, accurate description of the long-term consequences and lifelong effects of the emotional, physical, and sexual trauma experienced by Mr. Purkey throughout his childhood and adolescence. *See Sears v. Upton*, 130 S.Ct. 3259, 3266 (2010); *Porter v. McCollum*, 558 U.S. 30, 40-44 (2009). This evidence is quantitatively and qualitatively different than the evidence presented to Mr. Purkey's trial jury or to the court in the § 2255 proceedings, and none of his prior counsel investigated the extensive, multi-generational family history of alcoholism and devastating levels of emotional, physical, and sexual abuse that reveals Mr. Purkey's "genetic and familial vulnerability to PTSD, substance abuse and addiction, and a propensity for violence when experiencing co-occurring posttraumatic stress and intoxication." App. 82 at 704. *See, e.g., Poindexter v. Mitchell*, 454 F.3d 564, 579 (6th Cir. 2006) (forensic psychologist noting "four generations of alcoholism and physical abuse and emotional abuse"); *Bloom v. Calderon*, 132 F.3d 1267, 1273 (9th Cir. 1997) (trial counsel failed to discover, among other mitigation, that Bloom was "born into a family plagued by generations of mental illness and domestic abuse"). *See also* ABA Guidelines (Rev. Ed. 2003), Guideline 10.7, Commentary, 31 HOFSTRA L. REV. at 1025 ("A multi-generational investigation extending as far as possible vertically and horizontally frequently discloses

125

significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment").

**C. Trial counsel were ineffective in failing to investigate, discover, and present expert mental health evidence of Mr. Purkey's complex PTSD symptoms and behavior throughout his life up to and including the crime.**

Because trial failed to conduct a thorough investigation of Mr. Purkey's life history that would have revealed the extent of his lifelong trauma, and failed to learn about the constellation of Mr. Purkey's behavioral and psychological symptoms that are the long-term consequences of those experiences, trial counsel also failed to identify and engage appropriate mental health experts to reliably evaluate his trauma symptomology and explain its impact on Mr. Purkey's development, personality and behavior throughout his life and leading up to and including the crime.

Trial counsel's failure to identify and locate appropriate experts to evaluate Mr. Purkey in this case is a function of Mr. Duchardt's ineffective assistance in failing to obtain a qualified mitigation specialist. It is the mitigation specialist who compiles the comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation, analyzes the significance of that information in terms of impact on development, personality, and behavior, identifies the need for expert assistance, assists in locating appropriate experts, and provides social history information to experts to enable them to conduct competent

126

and reliable evaluations. ABA Guidelines, Guideline 4.1, Commentary, 31 HOFSTRA L. REV. at 959. None of that happened in Mr. Purkey's case.

Indeed, Mr. Duchardt put the proverbial cart before the horse by hiring neuropsychologist Dr. Bruce Leeson soon after he was appointed to represent Mr. Purkey. Dr. Leeson was asked by Mr. Duchardt only to assess his client for brain damage, specifically focusing on various head injuries Mr. Purkey had sustained. Based on the tests he administered, and the few records he was provided by Mr. Duchardt, Dr. Leeson concluded that Mr. Purkey had damage to his frontal lobes, most likely from a motor vehicle accident in 1968, and that Mr. Purkey's behavioral deficits were reflective of the frontal lobe damage. App. 215 at 2432-2440. The government countered Dr. Leeson's opinion at trial by getting him to agree on cross-examination that Mr. Purkey showed a high correlation with anti-social personality disorder, and by presenting their own mental health experts, Dr. Martell and Dr. Dietz, both of whom disagreed with Dr. Leeson's conclusion of frontal lobe damage. Dr. Martell, who did not examine Mr. Purkey, even suggested that although he found no problems with Dr. Leeson's raw data, Dr. Leeson had blown his testing results out of proportion to show brain damage. Dr. Dietz conducted his own evaluation and testing of Mr. Purkey, App. 127 at 994, and testified he found no evidence that Mr. Purkey suffered from frontal lobe damage.

Dr. Leeson did note during his testimony that his testing showed Mr. Purkey had a significantly elevated level of anxiety associated with traumatic stress that one would not expect to see simply as a function of anticipating a prison sentence or some other punishment. In addition, he testified that Mr. Purkey showed a high correlation for major depression and PTSD, but he did not further elaborate. Significantly, the government's expert, Dr. Dietz, stated in his report that, although he found no evidence of mental disease or defect affecting either criminal responsibility, or in mitigation of punishment based on neglect, psychological and physical abuse during childhood, and the possibility that Mr. Purkey was the victim of sexual abuse, Dietz reserved the right to change his opinion regarding mitigation "through additional information that may be forthcoming." App. 127 at 1080. That information never came, because trial counsel never investigated it.

Therein lies the problem. Because of trial counsel's narrow, incomplete investigation of Mr. Purkey's life history, the mental health experts trial counsel retained came to erroneous or incomplete conclusions, and simply could not accurately assess Mr. Purkey's underlying psychological condition. In *Rompilla*, the Supreme Court found that trial counsel was ineffective for precisely the same reasons: Trial counsel failed to follow up on red flags in the records that pointed to the need for further mental health testing, failed to follow up on findings in those records and obtain additional records, and limited their investigation to

128

interviewing a few family witnesses. As a result of their narrow, incomplete investigation, the mental health experts retained by Rompilla's trial counsel concluded, erroneously, that Mr. Rompilla was anti-social and did not suffer from any mental disease. A later, thorough investigation produced evidence establishing that Rompilla suffered from Fetal Alcohol Syndrome, borderline intellectual disability, and possibly schizophrenia and PTSD. *Rompilla*, 545 U.S. at 391.

Similarly here, the investigation conducted by current counsel for Mr. Purkey shows that the mental health experts retained by Mr. Purkey's trial counsel failed to accurately assess Mr. Purkey's underlying symptoms of complex PTSD, and thus could not adequately explain Mr. Purkey's traumatic exposure and describe its ongoing deleterious effects on Mr. Purkey's behavior throughout his life up to and including the commission of his crime. As Dr. Fred Sautter, a clinical psychologist and recognized expert in PTSD retained by current counsel explains:

> Individuals who are exposed to high levels of trauma throughout their childhood often develop "complex" forms of PTSD that are characterized by an inability to regulate their emotions, high levels of substance abuse, self-injurious and suicidal behavior, interpersonal violence, interpersonal deficits and pervasive problems with relationships, and dissociative symptoms that appear to be psychotic-like to those that are not trained in the assessment of complex PTSD. These individuals are prone to addictions and destructive behavior and their complex presentation of symptoms may not be recognized by professionals without high levels of expertise in posttraumatic stress.

App. 82 at 704. In addition,

129

> Children exposed to high levels of traumatic stress have been shown in countless scientific studies to be vulnerable to damage of their developing brains. This damage may sensitize their HPA axis and increase their vulnerability to posttraumatic stress while damaging their executive functions and decreasing their complex reasoning abilities and their capacity to regulate their emotions and their behaviors. The impact of these potential abnormalities would be expected to interact with any possible traumatic brain injuries suffered by Mr. Purkey to decrease his ability to control his emotional behaviors and posttraumatic stress.

App. 82 at 705.

Even though the assessments of both trial defense experts Dr. Leeson and Dr. Peterson "showed many of the chronic psychological problems (posttraumatic stress, depression, and alcohol and substance abuse) that are associated with childhood trauma exposure[,]" the assessments "did not report that Mr. Purkey met DSM-IV-TR criteria for PTSD even though the PTSD contained in the testing instruments showed Mr. Purkey's scores surpassed the cut-off for a PTSD diagnosis[.]" App. 82 at 698. This was a significant omitted finding, in light of the now-available information of Mr. Purkey's extensive and extraordinary emotional, physical, and sexual trauma history. App. 82 at 698. Further, "[d]espite reports that Mr. Purkey had experienced high levels of childhood adversity and traumatic stress not one of these reports included the use of a specialized PTSD assessment instrument to assess PTSD." App. 82 at 699.

Nor did the government's expert, Dr. Dietz, conduct a trauma or PTSD assessment of Mr. Purkey that employed any of the instruments considered the

"best practices" of trauma experts. Moreover, Dr. Sautter notes that the unstructured clinical interview Dr. Dietz conducted with Mr. Purkey is not optimal for evaluating PTSD because "[p]eople with trauma histories and PTSD seldom volunteer information related to their trauma, especially when their trauma involves early sexual abuse" and Dr. Dietz avoided necessary questions required to accurately assess PTSD. App. 82 at 700-701.

Dr. Sautter conducted a trauma and PTSD assessment based on the evidence current counsel's psycho-social history investigation of Mr. Purkey. The trauma assessment revealed several risk factors for PTSD:

> **Mr. Purkey's Family History of Psychiatric Disorder:** "Family history information indicates that Mr. Purkey's first- and second-degree relatives show a preponderance of alcoholism, domestic violence, and child abuse. This is important because alcohol intoxication increases risk for domestic violence. Both of Mr. Purkey's parents were alcohol dependent individuals who committed acts of domestic violence and child abuse with regularity; this couple directed violent behavior toward each other and toward their children as their alcohol intoxication fueled their aggression and violence. This familial pattern of alcoholism and domestic violence and psychiatric disorder in a family was associated with familiar depression as Mr. Purkey's mother, half-brother (maternal), and daughter have all been treated for major depression. Because the presence of domestic violence and psychiatric disorder in a family is associated with an increased risk for posttraumatic stress, we may infer from this family information data that Mr. Purkey was vulnerable to developing PTSD and that his victimization to extensive physical, emotional, and sexual abuse, and observed abuse in others, would further increase his risk for PTSD and trauma-related disorders like alcohol abuse and dependence and depression."

> **Identification of Childhood Adversity:** "Childhood adversity was assessed because it has been established that both childhood adversity and childhood trauma exposure increase a child's risk for developing PTSD and trauma-

131

related exposures as an adult. This is relevant for this assessment because the examiner had learned there was a likelihood that Mr. Purkey was exposed to high levels of psychological adversity as a child and adult. This childhood adversity is important because early life adversity affects a child's brain development thus increasing the child's vulnerability to developing mental disorders and posttraumatic stress while limiting the child's intellectual development and coping skills."

App. 46 at 270-271. Dr. Sautter found several adversities that Mr. Purkey had been exposed to as a child:

- Economic deprivation that affected Mr. Purkey's opportunities for education and "limited Mr. Purkey's access to the kinds of mental health and special education programs that might have identified some of his early problems and secured remediation and therapy that would have allowed him to overcome some of his early life brain and behavior deficits"

- Lack of acceptable medical and mental health care "was damaging to Mr. Purkey who was confronted with a range of mental health and medical challenges as a child and young person[,]" including signs of Fetal Alcohol Effects and polio as a young child, and traumatic brain injuries from serious motor vehicle accidents between the ages of sixteen and twenty, reports of neurological tests indicating deficits in his brain functioning as early as his teenage years, all of which "suggests that Mr. Purkey may have experienced life-changing benefits if he had received more intensive diagnostic testing and treatments during childhood and early adolescence"

- Despite records documenting Mr. Purkey's early life depression and trauma exposure, " he was never provided an evidence-based treatment for depression (e.g., Cognitive Behavioral Therapy for Depression) nor did he ever, as a child or as an adult, receive a trauma assessment or an evidence-based PTSD treatment (e.g., Prolonged Exposure (PE), Cognitive Processing Therapy (CPT))," the lack of which has "had a significant negative impact on his psychological functioning"

- "Mr. Purkey grew up in a family environment that modeled alcohol abuse, sexual exploitation and aggression, thus exposing him to

132

models that normalize those unhealthy behaviors and increase tolerance of behaviors that increase his risk of developing psychological problems and self-destructive coping mechanisms" and he "lacked exposure to healthy adult male role models that would have taught him to avoid alcohol and drugs and unhealthy sexual behaviors and would have encouraged him to engage in healthy prosocial behaviors"

- Mr. Purkey's family system "consisted of multiple generations of alcoholism, mood disorder, violence, and child emotional, physical, and sexual abuse" and most of these mental health problems occurred within a family system lacking social structures "that reinforced the importance of psychological boundaries, emotional self-control, and the desirability of responsible behavior"

- Mr. Purkey was raised by parents who had no knowledge of parenting practices "that encourage offspring behavioral self-control and emotional self-regulation" but instead engaged in parenting practices that "encouraged sexual incest and domestic violence and promoted attitudes and behaviors that promote mental illness, pathological adult relationships, and domestic violence"

- The Purkey family never modeled the "ability to disclose and discuss emotions, vulnerabilities, and challenging life experiences with another human being" and the fact his mother sexually abused him from a young age into his young adult life "prevented him from disclosing his personal psychological history and his uncomfortable emotions to other people" which meant he could never ask for mental health treatment or receive help in trying to confront his own trauma issues

- Mr. Purkey's stuttering "made him an easy target of frequent ridicule and abuse from others, including adults" that "left him constantly fearing that he would be targeted for abuse" and "was a source of great anxiety and emotional distress and played an important role in his inability to maintain attendance in school, ultimately leading him to drop out in the ninth grade"

- Research has shown that "[p]eople who have endured trauma and adversity often suffer damage to their beliefs about how the world works that undermine their ability to maintain good mental health and leave them unable to believe that life will treat them fairly" and "[t]he

133

emotional, physical, and sexual abuse suffered by Mr. Purkey when he was victimized by his mother and priest dampened his expectations of safety, trust, and loyalty making it difficult for him to experience hope about his future"

App. 46 at 271-273.

Dr. Sautter administered testing to determine whether Mr. Purkey was exposed to traumatic life events that meet the DSM-IV-TR PTSD Criteria A for trauma, which is a necessary condition for the development of PTSD. Dr. Sautter found eleven major traumatic life events in Mr. Purkey's family and social history that meet the DSM criteria:

- Physical assault from his father from the approximate age of five to twelve that included "beatings with the father's open hands, fists, and whipping with his belt" that "were of sufficient severity as to cause Mr. Purkey intense pain and often left bruises or caused bleeding"

- Observing his father commit physical assaults on his mother during the same time he suffered his father's beatings, that included throwing furniture and household objects at his wife as he threatened to kill her, chased her as she tried to escape his threats, one time dragging her down the hall by her hair as she screamed for help; these assaults often occurred several times a week and "were of sufficient severity as to cause Mr. Purkey to fear for his mother's life"

- Humiliation and verbal threats from his father during this same age range that "left Mr. Purkey afraid for his life as he worried that brutal physical attacks that could cause him bodily harm might be forthcoming in the future"

- Witnessing his father direct intense verbal threats of violence to his mother almost daily during the same age range

- Sexual abuse from his mother from ages nine through twenty-two

- Sexual abuse by a priest from his church on many occasions over a three-year period, which "was devastating because the priest was an authority

134

figure who was revered by everyone in the community" and "the memory of this abuse remains one of the most upsetting trauma-related memories that even today intrude into Mr. Purkey's conscious mind daily"

- Sexual abuse by his older half-brother's friend "Hup" when Mr. Purkey was eleven years old

- At twelve years old, Mr. Purkey's father on several occasions "commanded prostitutes to molest him as they climbed on top of him as he pretended to lay asleep in bed" that "made him feel unsafe and 'in danger' as he was a small boy that feared assault and sexual abuse"

- Being physically beaten by his older half-brother who severely beat him and bloodied him on several occasions between the ages of ten and twelve

- Two motor vehicle accidents between the ages of sixteen and twenty that resulted in a loss of consciousness and may have caused traumatic brain injury, especially the accident at age sixteen that was reported to have left him unconscious for two days

- Emotional and physical abuse from the nuns who taught at St. Joseph Catholic School that Mr. Purkey attended from ages seven through fourteen, for his stuttering and for perceived transgressions under the guise of corporal punishment, that left Mr. Purkey feeling that his physical integrity was in danger and that he might suffer permanent physical injury

App. 46 at 274-276. Dr. Sautter's testing also shows that Mr. Purkey meets all of

the other criteria for a PTSD diagnosis, which includes "intrusive memories of his

trauma, distressing dreams, flashbacks of his trauma, and high levels of emotional

stress and physiological reactivity when exposed to trauma-reminders" (Criteria

B), "avoidance of trauma reminders and emotional numbing as he reported

avoiding trauma-related thoughts and emotions, traumatic forgetting, loss of

interest in significant activities when reminded of trauma, and feelings of

135

detachment and emotional numbing associated with trauma-related stimuli" (Criteria C), "the presence of insomnia, irritability, concentration problems, hyper-vigilance in addition to hyper-startle responses to trauma-related cues" (Criteria D), experiencing the PTSD symptoms "over periods of time that far exceeded one month" (Criteria E), and the PTSD symptoms "elicited extremely high levels of distress" (Criteria F). Dr. Sautter concluded that Mr. Purkey meets all of the diagnostic criteria for PTSD. App. 46 at 276-277. The testing administered to Mr. Purkey further yielded a "lifetime" diagnosis of PTSD that met the criteria for PTSD over the month preceding the commission of the crime in this case, and that he suffered from increased PTSD at the time of the homicide. App. 46 at 277. Extreme elevations on the avoidance scale support the hypothesis that "Mr. Purkey's drug abuse functions to help him avoid trauma-related emotions and memories, suggesting his drug use is secondary to PTSD." App. 46 at 277-278. The pattern of scores on Dr. Sautter's testing show that Mr. Purkey's symptoms of posttraumatic stress as a result of his childhood trauma are characteristic of complex PTSD. These are important findings "because they are consistent with his history of emotion regulation problems and intoxication and Mr. Purkey's long-standing history of emotionally fueled aggression and self-destructive behavior." App. 46 at 281. Mr. Purkey's frontal lobe deficits -- reaffirmed through neuropsychological testing conducted by Dr. Robert Ouaou, an expert

136

neuropsychologist retained by current counsel, App. 87 at 771, further limit Mr. Purkey's capacity to regulate his thoughts, emotions and behavior. App. 46 at 278-279, 282-283.

In addition to Mr. Purkey's lifetime PTSD, Dr. Sautter also concluded from his testing that Mr. Purkey meets the lifetime criteria of Axis I Major Depressive Disorder, secondary to his PTSD "as the onset of his major depression did not occur until after his onset of PTSD and his depressive episodes typically occur after he has experienced an increase in re-experiencing symptoms." App. 46 at 278-279.

It cannot be understated just how detrimental the physical, emotional, and sexual abuse was on Mr. Purkey. This severe childhood trauma is at the heart of Mr. Purkey's diagnosable complex PTSD, which, as Dr. Sautter's testing shows, had a profound influence on Mr. Purkey's behavioral problems beginning in his adolescence and continuing throughout his adulthood, including at the time of the crime that led to his federal conviction. App. 46 at 281-283.

Trial counsel never obtained comprehensive, appropriate or meaningful assessments from their experts because counsel never investigated, and the experts were never provided, a comprehensive family and psycho-social history of Mr. Purkey that was essential to an accurate assessment of Mr. Purkey's symptomology, and Mr. Duchardt never utilized even the lay witnesses who did

137

testify to shed any light on Mr. Purkey's symptomology. He could not, because he did not ask. Mr. Purkey's jury thus never heard a detailed, accurate presentation of the long-term consequences and effects of Mr. Purkey's multi-generational family history or the extent of his childhood adversity and traumatic life events that would have explained Mr. Purkey's behavioral difficulties and how his crime happened that, although certainly not excusing his crime, would have given the jury a compelling reason to return a life sentence. Placing this substantial evidence before Mr. Purkey's jury "might well have influenced the jury's appraisal of [Mr. Purkey's] moral culpability," *Wiggins*, 539 U.S. at 538 (quoting *Williams v. Taylor*, 529 U.S. 362, 393, 398 (2000)), and "the likelihood of a different result if the evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing." *Rompilla*, 545 U.S. at 393 (quoting *Strickland*, 466 U.S. at 694)).

Section 2255 counsel did not hire any new experts to evaluate Mr. Purkey, and instead relied on Dr. Peterson and obtained a declaration from him. App. 62 at 496. Because § 2255 counsel also failed to conduct the comprehensive investigation that was necessary to an accurate mental health assessment of Mr. Purkey, Dr. Peterson had nothing new to offer about what Mr. Purkey's symptoms actually mean. Rather, Dr. Peterson's declaration, along with Dr. Cunningham's, was used in the § 2255 proceedings primarily to refute Mr. Duchardt's affidavit

138

claiming that he had actually hired Dr. Peterson and Dr. Cunningham to serve as mitigation specialists. App. 166 at 1611-1615. Both experts made clear that they were hired as experts, not mitigation specialists, that they were not even qualified as mitigation specialists, and that they were never provided a social history to review that should have been provided by a qualified mitigation specialist. App. 62 at 497; App. 191 at 2146. Beyond that, § 2255 counsel's mitigation-related ineffective assistance claim against trial counsel focused on the fact that Mr. Purkey had reported that he had been sexually abused by his mother years earlier to his friend Peggy Noe and Dr. Rex Newton at the Oregon Department of Corrections, which would have countered the government's accusation at trial that Mr. Purkey fabricated the claim of sexual abuse only after he was charged and facing the death penalty. App. 165 at 1565-1569.

For all of the reasons set forth above, Mr. Purkey has stated a substantial claim of ineffective assistance of his trial counsel that no court has ever had the opportunity to review. The ineffective assistance of Mr. Purkey's § 2255 counsel establishes cause for the default of this substantial ineffective assistance of counsel claim under the *Martinez-Trevino* doctrine, *Brown v. Brown*, 847 F.3d 502, 513 (7th Cir. 2017), and Mr. Purkey is entitled to present his substantial claim here. *See Adams*, 911 F.3d 397, 411; *Brown*, 847 F.3d 502, 509-10; *Ramirez*, 799 F.3d at 854; *Webster*, 784 F.3d 1123, 1136-37; *Garza*, 253 F.3d at 922. Otherwise, initial-

139

review collateral counsel's failure to raise the claims would "deprive [Mr. Purkey] of any review of [those claims] at all." *Trevino*, 569 U.S. at 423.

**CLAIM 3:  Fred Duchardt perpetrated a fraud on the court requiring relief setting aside the judgment on his 28 U.S.C § 2255 petition by making false and misleading statements to the court in the § 2255 proceeding intended to secure denial of Mr. Purkey's claims of ineffective assistance of counsel alleged against Mr. Duchardt, and which the habeas court subsequently relied upon in denying Mr. Purkey relief.**

"[T]he inherent power of federal courts to vacate a fraudulently obtained judgment -- even years after the judgment was entered -- has long been recognized by the Supreme Court." *In re Bressman.*, 874 F.3d 142, 149 (3rd Cir. 2017) (citing *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248-249 (1944)). *See also Cleveland Demolition Co., Inc. v. Azcon Scrap Corp.*, 827 F.2d 984, 986 (4th Cir. 1987) ("district courts may entertain an independent action in equity to set aside a judgment for fraud on the court").

The power of a federal court to set aside "fraudulently begotten judgments" is based on a firmly established rule of equity rooted in English practice predating the founding of the American Republic. *Hazel-Atlas*, *supra*, 322 U.S. at 245. Fraud on the court embraces "'that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of [adjudging] cases that are presented for adjudication.'" *Konigsberg v. Security Nat. Bank*, 66

140

F.R.D. 439, 442 (1975) (quoting 7 J. Moore Federal Practice ¶60.33 at 515 (2nd

ed. 1974); *id*. (citing *Serzysko v. Chase Manhattan Bank*, 461 F.2d 699 (2nd Cir.),

*cert. denied* 409 U.S. 883, *reh'g denied* 409 U.S. 1029 (1972)). *See also Bulloch v.*

*United States*, 763 F.2d 1115, 1121 (10th Cir. 1985) (en banc); *United States v.*

*Smiley*, 553 F.3d 1137, 1144 (8th Cir. 2009); *Gleason v. Jandrucko*, 860 F.2d 556,

559 (2nd Cir. 1988); *Bankers Mortgage Co. v. United States*, 423 F.2d 73, 79 (5th

Cir.), *cert. denied* 399 U.S. 927 (1970); *Drobny v. Commissioner*, 113 F.3d 670,

677-78 (7th Cir. 1997). As explained by the Supreme Court in *Hazel-Atlas*,

"[T]ampering with the administration of justice . . . involves far more than an

injury to a single litigant. It is a wrong against the institutions set up to protect and

safeguard the public, institutions in which fraud cannot complacently be tolerated

consistently with the good order of society." 322 U.S. at 246.

In his § 2255 petition, Mr. Purkey raised claims that his trial attorney, Fred

Duchardt, rendered constitutionally ineffective assistance of counsel at trial. App.

165 at 1551-1591, 1595-1596; App. 181 at 1834-1864. Many of these claims

centered around Duchardt's failure to hire a mitigation specialist, and his related

failure to investigate and present certain mitigating evidence to the jury at Mr.

Purkey's penalty trial.[13]

---

[13] Although, for the reasons set forth elsewhere in this petition, § 2255 counsel were ineffective because they, too, failed to adequately investigate. *See, e.g.*, Claims 1 and 2.

141

After Mr. Purkey's § 2255 petition was filed, the government filed a motion for an order requiring Mr. Duchardt to prepare an affidavit in response to the allegations of ineffective assistance of counsel, App. 182 at 1913, and the district court subsequently issued an order directing Duchardt to provide the affidavit. Mr. Duchardt subsequently prepared and submitted a 117-page signed and notarized statement, replete with irrelevant confidential information he learned in the course of representing Mr. Purkey, and in which he purported to interview witnesses who were never contacted, disparaged other witnesses proffered by Mr. Purkey's habeas counsel, claimed to possess certain evidence refuting some of the ineffective assistance of counsel claims while simultaneously claiming he had turned over his entire file to habeas counsel, opined as to the strength of Mr. Purkey's habeas claims, and directly advocated against those claims, arguing that the claims were without factual and legal support. App. 166 at 1602-1718.[14]

The government's response to Mr. Purkey's § 2255 petition relied almost exclusively on the contents of Duchardt's statement. App. 183 at 1921-2097. In denying the habeas petition without an evidentiary hearing, the district court also

---

[14] Lawrence Fox, an ethics expert from Yale, submitted an affidavit in Mr. Purkey's § 2255 proceedings expressing his opinion that Mr. Duchardt's statement was unethical, in breach of his continuing duty of loyalty to his client. App. 196 at 2295-2304. Duchardt's statement was also the subject of an academic law review article as a prime example of unethical behavior of a lawyer towards his former client in the face of allegations of ineffective assistance of counsel. *See* Tigran W. Eldred, "Motivation Matters: Guideline 10.13 and Other Mechanisms for Preventing Lawyers From Surrendering to Self-Interest in Responding to Allegations of Ineffective Assistance in Death Penalty Cases," 42 HOFSTRA L. REV. 473 (2013).

relied on Duchardt's statement in finding that Mr. Purkey "failed to overcome the presumption that Mr. Duchardt's actions were not sound trial strategy." App. 184 at 2099.

But Mr. Duchardt's statement to the court is more than an unethical brief against his former client. In fact, investigation by current counsel shows that Mr. Duchardt's statement amounted to a fraud on the court, perpetrated with intent to interfere with the administration of justice and the court's impartial adjudication of Mr. Purkey's claims of ineffective assistance of counsel in his § 2255 petition. The statement sets forth materially false and misleading assertions that could have had no other purpose than to deceive the court and thereby interfere with the court's impartial task of adjudicating Mr. Purkey's claims. For example:

1. The very first paragraph of Fred Duchardt's sworn statement asserted that, "[N]o objections have been interposed by Mr. Purkey or his Counsel." App. 166 at 1602. In fact, Mr. Purkey's § 2555 counsel had objected to the statement. Mr. Duchardt e-mailed his 117-page "draft" statement to Mr. Purkey's counsel just before noon on May 7, 2008, ostensibly to give counsel an opportunity to object. At the same time, Duchardt informed counsel that if there were no objections he would forward the statement to government counsel that afternoon. Though given little time to review the statement, Mr. Purkey's counsel quickly did so, and, just before 2:00 p.m. on May 7, counsel e-mailed Mr. Duchardt to object that the

143

statement was inappropriate and crossed ethical boundaries. However, Mr. Duchardt ignored counsel's objection and forwarded the statement that same afternoon to government counsel, who asked him to notarize and formally submit the statement. The next day, May 8, Mr. Duchardt mailed a copy of his statement to Mr. Purkey, and told his former client the statement was being provided to him because no objections had been interposed by his counsel, even though Duchardt knew that counsel had objected the previous day. Mr. Duchardt executed his sworn statement the following day, on May 9, 2008. App. 185 at 2104, 2107. Clearly, the false statement was intended to deceive the district court into believing that Mr. Purkey's § 2255 counsel, by voicing no initial objection to the statement, had acquiesced to its contents, making later objections by § 2255 counsel in moving to strike the statement more difficult to sustain.

2. Mr. Duchardt's co-counsel, Laura O'Sullivan, provided a declaration that Mr. Purkey's § 2255 counsel attached to his federal habeas petition. App. 186 at 2113. In that declaration, Ms. O'Sullivan stated, among other things, that Mr. Duchardt as lead counsel never provided her with any clearly-defined role in the case, that she had no involvement in many of the issues and decisions made in the case, that while she and Mr. Duchardt had telephone discussions they did not meet in person on a weekly or even monthly basis throughout the case, that Mr. Duchardt was taking actions in the case that she was not aware of, and that she was

144

concerned that Mr. Duchardt was actively undermining her relationship with Mr. Purkey which caused her to consider the possibility of withdrawing from the case. Ms. O'Sullivan stated she had virtually no involvement with the retained mental health experts. App. 186 at 2113-2114.

In his sworn statement, Mr. Duchardt did not dispute the specific statements in Ms. O'Sullivan's declaration. Instead, Duchardt sought to justify sidelining Ms. O'Sullivan in the case by suggesting that she was simply not up to the task, either because of her "lack of initiative" or because she "deferr[ed] too much to my greater experience in cases of this sort," which required him to take over the tasks himself. App. 166 at 1603-1609. Mr. Duchardt stated that, from the beginning, he expected to and did "take on the lion's share" of duties with respect to mental health matters in the case "because of my extensive experience with capital and mental health case practice," and asserted that Ms. O'Sullivan "had never before tried a case involving the death penalty or a mental defense." App. 166 at 1603-1609.

While it was true that Ms. O'Sullivan had never tried a case involving the death penalty -- a fact that Mr. Duchardt and Ms. O'Sullivan both acknowledged App. 134 at 1166; App. 166 at 1603-1609  -- Mr. Duchardt's assertion that Ms. O'Sullivan had never tried a case involving a mental defense was simply false. By the time Ms. O'Sullivan was appointed as co-counsel on Mr. Purkey's case, she had

145

represented many clients with mental health issues. Her prior cases included litigating a trial where a client's frontal lobe damage was a key issue, negotiating an NGRI (not guilty by reason of insanity) plea on behalf of a client, litigating another trial involving Battered Women's Syndrome, and many other cases involving issues of incompetency where clients had to undergo mental health evaluations. App. 134 at 1167-1168. In fact, Mr. Duchardt never even bothered to ask Ms. O'Sullivan about her prior experience with cases involving mental health issues. App. 134 at 1171-1172. Duchardt's false assertion that Ms. O'Sullivan had never before tried a mental defense case was made either in willful ignorance or willful disregard of the truth, and was clearly made in an effort to deceive the court into discrediting Ms. O'Sullivan's declaration in favor of his own false and misleading sworn statement to shift blame from himself against allegations of deficient performance.

3. Mr. Duchardt asserted in his sworn statement that he chose Mic Armstrong from the beginning to serve in the dual role of both investigator and mitigation specialist "because of his extensive experience and training." App. 166 at 1609-1611. Mr. Duchardt further asserted that Mic Armstrong was his lead investigator during the time Duchardt was employed as a supervising Missouri Public Defender, where Armstrong "had performed very successfully for me in the dual role of fact and mitigation investigator" in four capital cases Duchardt tried

146

during that time, and that Armstrong "availed himself of training opportunities which subsequently served him well in discharging both of these dual roles." App. 166 at 1609-1610. Mr. Duchardt stated that he "rekindled" his professional relationship with Mic Armstrong after being appointed to a federal capital case in 2000, where, he again asserted, "as in the previous state cases, Mr. Armstrong distinguished himself in both aspects of his dual investigator role," and because of Armstrong's "success in these five previous cases in the dual investigator role, I believed that he could successfully handle this dual role in the *Purkey* case." App. 166 at 1609-1610. Duchardt's statement asserted further that Mic Armstrong "has the skill set to, by himself, both locate and interview [mitigation] witnesses." App. 166 at 1647-1648.

Aside from violating the most basic standard of care for capital defense, these sworn statements from Mr. Duchardt about Mic Armstrong's qualifications for mitigation investigation are at turns both false and misleading. First of all, Duchardt's statements are contradicted by his own budget requests to the district court. The initial proposed budget submitted to the court on January 29, 2002, requested separate funding for an investigator *and* a mitigation specialist, requesting $35,000 for an investigator, and $45,000 for a mitigation specialist. App. 187 at 2129. At the time the initial proposed budget was submitted, Duchardt had already submitted a separate request to hire Mic Armstrong as an investigator,

147

which he noted in the proposed budget to the court. App. 187 at 2129. In that separate request, submitted on January 25, 2002, Duchardt asked for an initial payment of $2,500 for Mr. Armstrong while he awaited necessary approval for the expenditure of funds in excess of $7,500. App. 135 at 1173.

In a later request for supplemental funds for Mr. Armstrong filed on August 20, 2003, Mr. Duchardt confirmed to the court that his original request for $35,000 in funding for Mr. Armstrong, which had been approved by the district court in April 2002, was for Armstrong's appointment as an investigator, and that the request was "based on the assumption that a mitigation specialist would be hired." App. 136 at 1177. It was here that Mr. Duchardt requested additional funds for Mr. Armstrong to serve in place of a mitigation specialist, at a rate of $45 per hour. In this supplemental request, Duchardt asserted that he had "learned" since his initial budget request that the cost for a mitigation specialist had increased from $45,000 to $80,000, and that he "determined that the services of a mitigation specialist could be dispensed with, and budgetary savings realized, by reassigning to the investigator and to counsel the investigative work traditionally done by a mitigation specialist." App. 136 at 1178-1179.[15] Duchardt requested an additional

---

[15] Mr. Duchardt made similar statements about dispensing with the need for a mitigation specialist in requests for additional funding for experts Dr. Peterson and Dr. Cunningham, who charged $225 per hour and $240 per hour, respectively. App. 188 at 2132-2137; App. 189 at 2138-2142. Drs. Peterson and Cunningham each submitted a declaration in the § 2255 proceeding stating they neither performed the work of a mitigation specialist in Mr. Purkey's case, nor did they have the training and experience to do so. App. 62 at 497; App. 191 at 2146.

148

$10,000 for Mr. Armstrong, bringing the total for Armstrong's services to $45,000, App. 136 at 1179, the amount, it so happens, that Duchardt had originally budgeted for a mitigation specialist. The request provided no support for Duchardt's claim that the cost of a mitigation specialist had nearly doubled, from $45,000 to $80,000, nor did the request set forth any information suggesting that Mr. Armstrong had the skills and training to conduct a qualified mitigation investigation.

Second, new evidence proves that Mic Armstrong was uniquely *unqualified* to assume the role of a mitigation specialist, which Mr. Duchardt would have known at the time he made his sworn statement in this case. The relevant facts from Claim 2-A are incorporated here.

Given these facts, there are only two alternative interpretations of Mr. Duchardt's sworn statement submitted in Mr. Purkey's case regarding Mic Armstrong, each of which demonstrates a fraud on the court: 1) If, as he stated in his sworn statement, Duchardt in fact *did* intend from the beginning of the case for

---

In his initial request for the services of those two experts, Duchardt claimed he had hired a separate mitigation specialist in a previous death penalty case, *United States v. German Sinisterra*, 00-395-02-CR-W-GAF. App. 188 at 2133; App. 193 at 2227-2228. This too was false. In a sworn statement strikingly similar to that in the present case, submitted by Mr. Duchardt in Mr. Sinisterra's § 2255 proceedings, Duchardt stated that he had hired another investigator to perform the "dual role" of fact investigator and mitigation specialist, at an increased rate of $45 per hour from the $35 per hour normally paid to fact investigators in the Western District of Missouri. App. 194 at 2261-2284. Like Mic Armstrong, the investigator Mr. Duchardt hired in the Sinisterra case had no training or experience that qualified him to be a mitigation specialist. App. 195 at 2285-2294.

Mic Armstrong to serve a dual role as both fact investigator and mitigation specialist, then his assertions to the court in his budget requests were made to manipulate the process toward that end by deceiving the court into approving more money for Mr. Armstrong under the guise of saving money by dispensing with the need for a mitigation specialist, knowing that Armstrong was unqualified to serve as a mitigation specialist; or 2) his sworn statement that he intended from the beginning of the case for Armstrong to serve the dual role of fact investigator and mitigation specialist was itself false, and was made to deceive the court into believing that Mic Armstrong was, and had always been, a qualified mitigation specialist who could easily assume that role in Mr. Purkey's case.

In *Bressman*, *supra*, the Third Circuit Court of Appeals affirmed a lower bankruptcy court's determination that the attorney for plaintiffs on an adversary complaint against the debtor committed fraud on the court. The court found that the attorney intentionally deceived the court by submitting an affidavit that failed to mention a multi-million dollar settlement obtained by plaintiffs in a separate civil action for securities fraud and RICO claims against the adversary's co-defendants in that case. In explicit reliance on the attorney's affidavit, the bankruptcy court entered a default judgment and RICO judgment plus attorneys' fees against plaintiffs' adversary. It was not until over ten years later that the debtor's attorney learned of the settlement. The debtor moved to vacate the default

150

judgment and RICO judgment based upon the plaintiffs attorney's fraud on the court. The bankruptcy court agreed, and vacated the judgments. The judgment was affirmed by the district court. 874 F.3d at 145-48.

Upholding the lower court's judgments on appeal, the Third Circuit found that, while "direct evidence of intent will rarely be available," the attorney's intent to deceive the bankruptcy court into awarding an unjustified recovery could be inferred from the surrounding circumstances, and so his intent to commit fraud on the court was clear from his failure to disclose the settlement. The Court recognized "an important distinction between perjury that is committed by a witness and fraudulent conduct that is directed at the court by one of its own officers." *Id*. at 152. In a case involving the latter, there is "a much greater likelihood of undermining the working of the normal process of adjudication because courts rely on the integrity of their officers." *Id*. The fraud on the court was committed by "a licensed attorney who exploited his privilege to practice before the courts by not revealing the details of a relevant settlement payment" and was a "deceit [that] maximized his client's recovery and, in turn, his fee." *Id*.

The seminal fraud on the court case of *Hazel-Atlas*, *supra*, itself involved an affidavit procured by an attorney with the intent to deceive the court. In that case, plaintiff Hartford filed a patent infringement suit against the defendant Hazel, based on a patent obtained through a published article ostensibly written by a

151

disinterested expert, but actually written by attorneys and other officials of Hartford. 322 U.S. at 240-241. The suit was dismissed in the district court, but Hartford appealed. On appeal, one of the attorneys who had played a part in getting the bogus article prepared for publication quoted the article at length in the appellate brief. The Circuit Court of Appeals reversed the district court's judgment. *Id*. at 241.

In the meantime, Hazel had heard rumors that Hartford's attorney was the true author of the article, and began to investigate the matter after the Court of Appeals' opinion was issued, hoping to secure an affidavit from the expert who had signed the article to confirm the article was written by Hartford's attorney, but the expert refused to sign an affidavit. Hartford learned about the investigation, and a representative of Hartford subsequently procured an affidavit from the expert stating that the expert had signed the article and released it for publication. Shortly after, Hazel agreed to pay a settlement to Hartford and enter into certain licensing agreements.

The true facts surrounding the bogus article were brought to light years later in discovery produced through an anti-trust lawsuit against Hartford. *Id*. at 243. Hazel brought an action against Hartford for fraud on the court. The Circuit Court refused to grant relief, stating that the fraud was not newly discovered and, in any event, was not the primary basis of the Court's earlier decision. *Id*. at 243-44. The

152

U.S. Supreme Court reversed, finding that the case "demands the exercise of the historic power of equity to set aside fraudulently begotten judgments," and that the evidence demonstrated a "deliberately planned and executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals." *Id*. at 245. The Supreme Court concluded further that relief was required even if the bogus article was not the primary basis for the Court of Appeals' ruling. "[T]ampering with the administration of justice in the manner indisputably shown here involves far more than injury to a single litigant [. . .] It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Id*. at 246.

In Mr. Purkey's case, the evidence shows that Fred Duchardt, an officer of the court, tampered with the administration of justice through a sworn statement containing false and misleading statements intended to deceive the court to rule against Mr. Purkey on his ineffective assistance of counsel allegations in his § 2255 petition. Duchardt made false statements, not only about 2255 counsel's objection to his statement and his co-counsel's professional experience, but about Mic Armstrong's qualifications for mitigation investigation, the truth of which, known but concealed by Mr. Duchardt at the time, and only now known by Mr. Purkey's counsel, shows Armstrong to have been supremely unqualified to perform in the role of a mitigation specialist. Mr. Duchardt's fraudulent assertions about Mr.

153

Armstrong's qualifications likely played a significant role in the denial of Mr. Purkey's ineffective assistance of counsel claims, which were centered around Duchardt's failure to hire a mitigation specialist and the consequent failure to conduct constitutionally-requisite mitigation investigation in Mr. Purkey's case. Had the truth of Mic Armstrong's background been disclosed, his claims of ineffective assistance of counsel would have been cast in a completely different light. By relying on Mr. Duchardt's sworn statement to successfully argue to the court against relief for Mr. Purkey, the government was complicit in Mr. Duchardt's fraud on the court. The judgment against Mr. Purkey was the result of an intentional deceit "perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of [adjudging] cases that are presented for adjudication.'" *Konigsberg v. Security Nat. Bank*, 66 F.R.D. 439, 442 (1975) (quoting 7 J. Moore Federal Practice ¶60.33 at 515 (2nd ed. 1974). *See also Bressman, supra,* at 150 ("As officers of the court, attorneys are required 'to conduct themselves in a manner compatible with the role of courts in the administration of justice[]' [. . .]When, however, counsel has failed to act with candor, preservation of the integrity of the judicial process may require courts to depart from their usual adherence to the principle that final judgments should be left undisturbed [. . .]We confront such situation here" (quoting *In re Snyder*, 472 U.S. 634, 644-645 (1985)).

154

**CLAIM 4:**   **Because there is a substantial possibility that the jury at Mr. Purkey's penalty trial understood the instructions in a way that rendered jurors unable to consider and give effect to mitigating evidence in determining whether to sentence Mr. Purkey to death, Mr. Purkey's death sentence is unconstitutional under the Eighth Amendment.**

Because of the qualitative difference between death and life imprisonment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 304-305 (1976) (plurality opinion). Under the Eighth Amendment, a sentencer in a capital case "'must . . . be able to consider and give effect to [mitigating] evidence in imposing sentence.'" *Penry v. Johnson*, 532 U.S. 782, 788 (2001) ("*Penry II*") (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("Penry *I*")). Just as a sentencer may "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (emphasis in original), "[t]he corollary that 'the sentencer may not refuse to consider *or be precluded from considering* "any relevant evidence"' is equally 'well-established.'" *Mills v. Maryland*, 486 U.S. 367, 374-75 (1988) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)). A sentencer must be allowed to give full consideration and full effect to mitigating circumstances to fulfill the twin requirements of "measured,

155

consistent application and fairness to the accused" under the Eighth Amendment. *Eddings*, 455 U.S. at 111. In regard to a death sentence, the Eighth Amendment demands greater certainty that the jury's conclusions rested on proper grounds. *Mills*, 486 U.S. at 376 (citing *Lockett*, 438 U.S. at 605; *Andres v. United States*, 333 U.S. 740, 752 (1948)). "[T]he risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . is unacceptable and incompatible with the commands" of the Eighth Amendment. *Lockett, supra*.

At the close of the penalty trial in Mr. Purkey's case, the jury was instructed to complete a "Special Verdict Form" and record its findings with respect to six statutory and four non-statutory aggravating circumstances in Parts I-IV, and with respect to mitigating circumstances in Part V. Part V of the special verdict form listed 27 mitigating circumstances, each containing an adjacent blank space for "number of jurors who so find." App. 158 at 1533. Instruction 34 of the trial court's penalty phase jury instructions told the jury, in Part V, to "identify any mitigating factors that any one of you finds has been proved by a preponderance of the evidence" in Part V of the form. App. 197 at 2308. Instruction 38 instructed the jury that: "Section I of the Special Verdict Form contains space to record your findings on defendant's age; Section II contains space to record your findings on the requisite mental state; and Section IV contains space to record your findings on

156

nonstatutory aggravating factors. Section V of the Special Verdict Form contains space to record your findings on mitigating factors." App. 198 at 2309.

The jury deliberated for approximately eleven hours over two days. App. 199 at 2310; App. 200 at 2311; App. 201 at 2312. When the special verdict form was returned recommending a death sentence for Mr. Purkey, the jury had completed Parts I-IV of the form, but Part V was left blank. App. 158 at 1533-1536. Following defense counsel's objection, the trial judge offered to send the jury back to complete the form "if the government wants," noting that it would have been preferable for the jury to make the requisite findings. Nevertheless, after government counsel responded, "Absolutely no," Mr. Duchardt said nothing and the judge accepted the jury's verdict. App. 202 at 2313. In all federal capital cases except this one, the jury has memorialized their findings on mitigating factors.

One possible interpretation from the blank Part V of the special verdict form is that the jury simply refused to follow its instructions to complete that part of the form, in which case it is impossible to know one way or the other whether the jurors actually considered the evidence in mitigation, and the trial judge should have followed its own advice and sent the jury back into deliberations to complete the form instead of deferring to the government on the matter. *Cf. Penry v. Johnson*, 532 U.S. 782, 798-799 (2001) (jurors are presumed to follow their instructions); *Soltys v. Costello*, 520 F.3d 727, 744 (7th Cir. 2008) (same). The

157

other possibility, however, is that jurors understood from the instructions that they had to unanimously agree as to the existence of a particular mitigating factor in order to consider it, and blank spaces on the special verdict form represented a failure to reach unanimous agreement on the existence of the mitigating factors. That this was a substantial probability in Mr. Purkey's case is borne out by new evidence from the jurors themselves. The evidence shows that the jurors did discuss the mitigating factors, but in doing so they understood they had to reach unanimous agreement on each of the factors. App. 203 at 2315-2316; App. 204 at 2318-2319; App. 205 at 2322-2323; App. 206 at 2325-2326.[16] According to one juror, they "got stuck on a few factors for a long time, and when that happened, the jury foreman moved us along and sometimes we circled back." App. 206 at 2325-2326. Part V of the special verdict form only required the jurors to register a positive decision that a particular mitigating factor existed. App. 158 at 1533. If the jurors believed they had to reach unanimous agreement as to the existence of a

---

[16] The juror declarations are not prohibited by *Warger v. Shauers*, 135 S.Ct. 521 (2014), a non-capital, non-criminal personal injury case. *See also* FRE Rule 606(b)(2) (exception to rule prohibiting inquiry into validity of verdict where the inquiry goes to the verdict's accuracy in capturing what the jurors had agreed upon). In capital cases, the Eighth Amendment imposes a heightened requirement for accuracy and reliability in the determination that death is an appropriate punishment. *See Woodson*, *supra*, at 304-05. *See also Williams v. Norris*, 612 F.3d 941, 956 (8th Cir. 2010) (evidence that a jury was precluded from considering mitigating circumstances or that it was mistaken about its ability to do violates the Eighth Amendment). Indeed, the Supreme Court's decision in *Pena-Rodriquez v. Colorado*, 137 S.Ct. 855 (2017) is more apt, where the Court reiterated its earlier cautions that "the no-impeachment rule might recognize exceptions 'in the gravest and most important cases' where exclusion of juror affidavits might well violate 'the plainest principles of justice.'" *Id.* at 864 (quoting *McDonald v. Pless*, 238 U.S. 264, 269 (1915) (internal quotation omitted)).

mitigating factor, a blank space next to the factor could mean that the jurors either unanimously agreed that the mitigating factor had not been proven, *or* that they had failed to agree unanimously that a mitigating factor existed. The latter possibility was real, since the jurors "moved on" and only "sometimes . . . circled back" when they got "stuck" on a mitigating factor. App. 206 at 2325-2326.

This is strikingly similar to the scenario under which a death sentence was found to be unconstitutional in *Mills v. Maryland*, *supra*, 486 U.S. 367. In *Mills*, the Supreme Court addressed the constitutionality of a death sentence imposed under Maryland's then-existing capital sentencing scheme as explained to the jury by the instructions and verdict form. On the verdict form provided to the jury, the jury was permitted to mark "yes" or "no" in the blank space beside each mitigating circumstance. The jury marked "no" beside each referenced mitigating circumstance and returned a sentence of death. *Id*. at 370. Mills argued that his sentence was unconstitutional because it was reasonably possible that a "no" answer on the verdict form represented a failure to find unanimously the existence of a mitigating circumstance. Thus, for example, if eleven jurors agreed that there were six mitigating circumstances, the result would be that no mitigating circumstance is found and there would be nothing to weigh against aggravating circumstances found. Even if all twelve jurors agreed that some mitigating circumstance were present, and even that those mitigating circumstances were

159

significant enough to outweigh the aggravating circumstances found to exist, unless all twelve jurors could agree that a mitigating circumstance was present, again there would be nothing to weigh in the weighing process. *Id*. at 373-74. Under this interpretation, "a jury that does not unanimously agree on the existence of any mitigating circumstances may not give any mitigating evidence any effect whatsoever, and must impose a sentence of death." *Id*. at 375.

The Supreme Court in *Mills* found that the cause of the barrier to the sentencer's consideration of all mitigating evidence, whether interposed by statute, the sentencing court, or by evidentiary ruling, is irrelevant. If Mills' interpretation of the sentencing process was correct, then whatever the cause, the conclusion was the same: "'Because the [sentencer's] failure to consider all of the mitigating evidence risks erroneous imposition of the death sentence, in plain violation of *Lockett*, it is our duty to remand this case for resentencing.'" *Id*. (quoting *Eddings*, *supra*, 455 U.S. at 117 n. (O'Connor, J., concurring)). The Court acknowledged the "plausible" alternative explanation, but concluded it must remand for resentencing because it could not rule out the "substantial possibility" that the jury may have rested its verdict on the improper ground. *Id.* at 377.

The same result is required here. There is not merely a possibility, but a substantial probability that the blank spaces in Part V of the verdict form represented a failure to find unanimously the existence of a mitigating

160

circumstance, and precluded jurors from giving effect to any of Mr. Purkey's mitigating evidence. Nor were jurors in Mr. Purkey's case free to consider the mitigating evidence at the weighing stage of the sentencing process, because, as was the case in *Mills*, Part VI of the verdict form instructed jurors to weigh against the aggravating circumstances only those mitigating circumstances that were found to exist. App. 158 at 2001. Jurors may well have thought they were precluded from considering any mitigating evidence unless all twelve of them agreed on the existence of a particular circumstance. Consequently, "[the] jury following the instructions set out in the verdict form could be 'precluded from considering, *as a mitigating factor*, [an] aspect of [Mr. Purkey's] character or record [or a] circumstance[e] of the offense that [Mr. Purkey] proffered as a basis for a sentence less than death,' *Skipper v. South Carolina*, 476 U.S. at 4, if even a single juror adhered to the view that such a factor should not be so considered." *Mills*. at 380.

Mr. Purkey must be granted a new penalty trial. As the Supreme Court stated in *Mills*:

> The decision to exercise the power of the [government] to execute a defendant is unlike any other decision citizens and public officials are called upon to make. Evolving standards of societal decency have imposed a correspondingly high requirement of reliability on the determination that death is the appropriate penalty in a particular case. The possibility that petitioner's jury conducted its task improperly certainly is great enough to require resentencing.

*Id.* at 383-84.

161

**CLAIM 5:   Mr. Purkey's death sentence is unconstitutional in light of *Hurst v. Florida* because his sentencing jury did not find, beyond a reasonable doubt, each fact necessary to impose a sentence of death.**

In *Hurst v. Florida*, the Supreme Court of the United States held that "[t]he Sixth Amendment requires a jury, not a judge, to find *each fact necessary* to impose a sentence of death." 136 S.Ct. at 619 (emphasis added). In so holding, the Court went beyond *Ring*'s "tightly delineated" claim that concerned only a judge-made finding of aggravating circumstances and did not assert a Sixth Amendment right to ultimate sentencing by the jury or argue against a judicial finding on the relative weights of aggravating and mitigating circumstances. *Ring*, 536 U.S. at 597 n. 4.

Indeed, the Court in *Hurst* rejected the State's assertion that the Sixth Amendment was satisfied once the jury implicitly found a statutory aggravating circumstance beyond a reasonable doubt. The Court noted that, to the contrary, a defendant was not eligible for the death penalty under Florida law until further factual findings were made "that sufficient aggravating circumstances exist and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances." 136 S.Ct. at 622. *Hurst*'s holding also included a proof requirement that was not present in *Ring. See Hurst*, 136 S.Ct. at 621 ("The Sixth Amendment provides: 'In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . .' This right, in

162

conjunction with the Due Process Clause, requires that each element of a crime be proved to a jury beyond a reasonable doubt") (citing *Alleyne v. United States*, 570 U.S. 99, 133 S.Ct. 2151, 2156 (2013)). *See also Apprendi v. New Jersey*, 530 U.S. 466, 484-485 (2000) (citing *In Re Winship*, 397 U.S. 358 (1970)); *Jones v. United States*, 526 U.S. 227(1999). Unlike *Ring*, which was limited to the jury trial right (*see* 536 U.S. at 588), *Hurst* went further by specifying that if any finding of fact is necessary as a pre-condition to a death sentence, the Sixth and Fourteenth Amendments require that finding to be made by a jury beyond a reasonable doubt.

The Supreme Courts of Florida and Delaware have each declared their capital sentencing schemes unconstitutional based on *Hurst*, interpreting *Hurst* as requiring proof beyond a reasonable doubt that the mitigating circumstances are insufficient to outweigh the aggravating circumstances (as in Florida) or that the aggravating circumstances outweigh the mitigating circumstances (as in Delaware). *See Perry v. State*, 210 So.3d 630, 639 (Del. 2016) (in light of *Hurst* and following remand from Supreme Court of the United States, construing Florida's sentencing statute "to require the penalty phase jury to unanimously find beyond a reasonable doubt that each aggravating factor exists, that sufficient aggravating factors exist to impose death, and that they outweigh the mitigating circumstances found to exist"); *Rauf v. State*, 145 A.3d 430, 434 (Del. 2016).

163

The Federal Death Penalty Act (FDPA) conditions the imposition of a death sentence on certain factual findings by the jury. The jury must first find the existence of at least one of four statutory *mens rea* requirements. 18 U.S.C. § 3591(a)(2). The jury must then find the existence of at least one statutory aggravating circumstance. 18 U.S.C. § 3592(c). Finally, the jury must weigh the aggravating factors, both statutory and non-statutory, against any mitigating factors to determine whether the aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death. 18 U.S.C. § 3593(e). Without the necessary factual findings by a jury, the maximum sentence Mr. Purkey could receive was life imprisonment without the possibility of parole.

The jury in this case was instructed that it must find an aggravating factor, both statutory and non-statutory, beyond a reasonable doubt. App. 158 at 1530-1532; App. 207 at 2328-2331; App. 208 at 2332-2333.  However, jurors were not instructed that they must find beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors. App. 209 at 2335 (jury instructed that "if you unanimously conclude that the aggravating factor of factors found to exist sufficiently outweigh any mitigating factor or factors which any of you found to exist to justify a sentence of death, and that therefore death is the appropriate sentence in this case, you must record your determination that a sentence of death shall be imposed in Section VI on page 17 of the Special Verdict Form"). The

164

jury's instructions assigned no burden of proof to this inquiry, which – considering the instruction expressly requiring proof beyond a reasonable doubt of the *existence* of aggravating factors – suggested that no such burden applied to the weighing analysis.

Under *Hurst* as applied to the FDPA, a constitutional death sentence requires a jury to find, as a fact necessary to impose a sentence of death, that aggravating factors sufficiently outweigh mitigating factors, and such finding must be made beyond a reasonable doubt. *Hurst*, 136 S.Ct. at 621-22; *Perry*, 2016 WL 6036982 at *7; *Rauf*, 145 A.3d at 434.[17] Mr. Purkey's death sentence cannot stand because his jury did not make this necessary finding.

**CLAIM 6: Imposition of the Death Penalty under the Federal Death Penalty Act (FDPA) Constitutes Cruel and Unusual Punishment in Violation of Eighth Amendment**

Since the Supreme Court last addressed the *per se* constitutionality of the death penalty in *Gregg v. Georgia*, 428 U.S. 153 (1976), a number of factors have

---

[17] *United States v. Con-ui*, 2017 WL 1393485 (M.D. Pa. 2017) is not to the contrary. There, the issue was whether the penalty-phase consideration and weighing of aggravating factors under the FDPA is an essential "element" of the offense that was constitutionally required to be charged in the indictment and submitted to a grand jury. The burden of proof of facts necessary to impose a death sentence was not at issue in *Con-ui*. The court noted, for instance, that non-statutory aggravating factors did not need to be charged in the indictment and submitted to a grand jury. *Id.* at *2-*3. Nevertheless, the government is required to prove non-statutory aggravating factors to the jury beyond a reasonable doubt under the FPDA. In *United States v. Sampson*, 2016 WL 3102003 (D. Mass 2016) (not reported), the court opined that the constitution did not mandate application of a beyond-a-reasonable-doubt standard to the weighing determination under the FPDA, but the court's opinion is mere *dicta* in light of the fact that Sampson's jury *was* instructed to apply a reasonable doubt standard to the weighing process and the final determination of whether death was justified, and the government consented.

coalesced such that it can no longer be said this severe punishment comports with our standards of decency. *See Trop v. Dulles*, 356 U.S. 86 (1958). These factors apply with equal force in the states and in the federal system. *United States v. Fell*, 224 F.Supp.3d 327 (2016). Mr. Purkey's death sentence violates the Eighth Amendment to the United States Constitution.

In *Fell*, the presiding federal district court judge held an evidentiary hearing and heard extensive evidence on the question of whether the FDPA is unconstitutional under the Eighth Amendment, in light of Justice Breyer's dissenting opinion in *Glossip v. Gross*, 136 S.Ct. 2726, 2755 (2016), joined by Justice Ginsburg, "calling for full briefing on a more basic question: whether the death penalty violates the Constitution." The district court in *Fell* concluded from the evidence that "[t]he time has surely arrived to recognize that the reforms introduced by *Gregg* [*v. Georgia, supra*] and subsequent decisions have largely failed to remedy the problems identified in *Furman* [*v. Georgia*, 408 U.S. 238 (1972),]" 224 F.Supp.3d at 359, but ultimately determined that "[i]nstitutional authority to change this body of law is reserved to the Supreme Court." *Id*.

This Court has inherent jurisdiction to declare the FDPA unconstitutional. *See United States v. Raines*, 362 U.S. 17, 20-21 (1960) ("The very foundation of the power of the federal courts to declare Acts of Congress unconstitutional lies in the power and duty of those courts to decide cases and controversies properly

166

before them . . . .") (citing *Marbury v. Madison*, 1 Cranch 137, 177-180 (1803).

Because it is now clear that the FDPA does not comport with "evolving standards

of decency" and is a disproportionate punishment under the Eighth Amendment,

this Court should declare the FDPA unconstitutional. At minimum, the Court

should address the issue, and allow evidence to be presented in support of the

claim so that Mr. Purkey can preserve the issue for further review.

In his dissenting opinion in *Glossip*, Justice Breyer identified several

constitutional defects in the administration of the death penalty in the United States

that call into question the constitutionality of that punishment: "(1) serious

unreliability, (2) arbitrariness in application, and (3) unconscionably long delays

that undermine the death penalty's penological purpose[,]" along with the fact that

"most places within the United States have abandoned its use." 135 S.Ct. at 2755-

56.

Indeed, the trend in the United States against the death penalty is clear. Nine

states have repealed their death penalty statutes in recent years, four others are

currently under a moratorium, and over the last decade the death penalty's use has

been negligible in several more states and the federal government. The result is

that the death penalty is now actively practiced in just a handful of jurisdictions.

New death sentences have consistently trended downward, as have executions,

recently reaching all-time lows. Prominent professional and religious groups are

increasingly questioning the fairness and utility of the punishment. And, the death penalty has now been abandoned by most of the rest of the world. Empirical evidence now demonstrates that heightened protections have not achieved the reliability needed to eliminate wrongful executions; the guided discretion formula established by *Gregg v. Georgia*, 428 U.S. 153 (1976), has not significantly limited arbitrariness, and operation of the system of capital punishment is plagued by bias and caprice. It can only be concluded that our standards of decency have evolved to the point where the FDPA, on its face and as applied, is unconstitutional.

## A.     The death penalty is a disproportionate punishment

Recent trends and events have coalesced, marking the steady and progressive abandonment of capital punishment throughout the country such that it can now be fairly concluded that the death penalty is a disproportionate punishment, even for the gravest and most heinous of offenses.

### 1.     The death penalty is being increasingly rejected throughout the country

The Supreme Court has recognized that "the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Atkins v. Virginia,* 536 U.S. 304, 312 (2002) (quoting *Penry v. Lynaugh*, 492 U.S. 302, 331 (1989)). But the Court has consistently looked to *actual* practices, rather than simply whether the punishment was legislatively *authorized*, when assessing constitutionality. *See Atkins*, 536 U.S. 304, 316 (2002)

("[E]ven among those States that regularly execute offenders and that have no prohibition with regard to the mentally retarded, only five have executed offenders possessing a known IQ less than 70 since we decided *Penry*."); *Roper v. Simmons*, 543 U.S. 551, 564-65 (2005) (noting that although twenty states authorized death for juveniles, the practice was infrequent, with only three states, Oklahoma, Texas, and Virginia, actually executing juveniles in the prior ten years); *Graham v. Florida*, 560 U.S. 48, 62 (2010) ("Here, an examination of actual sentencing practices in jurisdictions where the sentence in question is permitted by statute discloses a consensus against its use. Although these statutory schemes contain no explicit prohibition on sentences of life without parole for juvenile nonhomicide offenders, those sentences are most infrequent."); *Miller v. Alabama*, 132 S. Ct. 2455, 2459 (2012) ("[S]imply counting legislative enactments can present a distorted view. . . .").

Across the country, each passing year has seen an increasing rejection of the death penalty. The starkest attribute of this trend is its unwavering progression toward disuse, thus forming a reliable metric of contemporary standards of decency in the United States. In 2004, a time when 38 states still authorized the punishment, the New York Court of Appeals declared a portion of the state's death penalty law unconstitutional and invalidated the sentencing portion of the law.

169

*People v. LaValle*, 817 N.E.2d 341 (N.Y. 2004).[18] In 2007, the court reaffirmed the

unconstitutionality of the law and ruled that its prior holding applied to the last

remaining person on the state's death row. *People v. Taylor*, 878 N.E.2d 969, 971

(N.Y. 2007). New Jersey repealed its death penalty in 2007,[19] and New Mexico

followed suit in 2009.[20] Illinois was next in 2011, a few years after concerns about

fairness and wrongful convictions prompted the governor to commute all death

sentences in the state.[21] In 2012, Connecticut repealed the death penalty

prospectively, and in 2015, the state's highest court subsequently declared the

death penalty unconstitutional under its state constitution for all those on

Connecticut's death row. *State v. Santiago*, 122 A.3d 1, 81-85 (2015). In 2013,

---

[18] The state legislature subsequently has voted down attempts to restore the death penalty statute. Michael Powell, *In N.Y., Lawmakers Vote Not to Reinstate Capital Punishment*, THE WASHINGTON POST, April 13, 2005, http://www.washingtonpost.com/wp-dyn/articles/A47871-2005Apr12.html.

[19] Jeremy W. Peters, *Death Penalty Repealed in New Jersey*, THE NEW YORK TIMES, Dec. 17, 2007, http://www.nytimes.com/2007/12/17/nyregion/17cnd-jersey.html?_r=0; *Death Penalty Is Repealed in New Mexico*, THE NEW YORK TIMES, Mar. 18, 2009, http://www.nytimes.com/2009/03/19/us/19execute.html.

[20] The New Mexico repeal was not retroactive and left two people on the state's death row. On June 28, 2019, the New Mexico Supreme Court held that the sentences of these two prisoners were disproportionate to the penalties imposed and similar cases and remanded the prisoners' cases to the lower court for resentencing to life in prison. *Fry v. Lopez*, No. S-1-SC-34372, 2019 WL 2710810, at *1 (N.M. June 28, 2019).

[21] John Schwartz & Emma G. Fitzsimmons, *Illinois Governor Signs Capital Punishment Ban*, THE NEW YORK TIMES, Mar. 9, 2011, http://www.nytimes.com/2011/03/10/us/10illinois.html.

170

Maryland abolished its death penalty.[22] In 2016, in *Rauf v. State*, 145 A.3d 430

(Del. 2016), the Delaware Supreme Court struck down that state's death penalty

law under *Hurst v. Florida*, 136 S.Ct. 616 (2016) and then applied its decision

retroactively in *Powell v. Delaware*, 153 A.3d 69 (2016), effectively clearing the

state's death row. The Delaware Attorney General did not seek review of the

rulings. On October 11, 2018, the Washington Supreme Court declared the state's

death penalty statute unconstitutional because its application was arbitrary and

racially discriminatory. *State v. Gregory*, 427 P.3d 621, 627 (Wa. 2018). In May

2019, the New Hampshire legislature voted to abolish the death penalty.[23]

Moratoria on the death penalty remain in place in four other states: Oregon,

Colorado, Pennsylvania, and California.[24]

Currently, the federal government and 29 states legally authorize the death

penalty,[25] but its infrequency in practice tells a larger story. Although the federal

government recently scheduled five executions, it has not carried out any

---

[22] *Maryland: Governor Signs Repeal of the Death Penalty*, THE NEW YORK TIMES, May 2, 2013, http://www.nytimes.com/2013/05/03/us/maryland-governor-signs-repeal-of-the-death-penalty.html.

[23] Bill Chappell, *New Hampshire Abolishes Death Penalty As Lawmakers Override Governor's Veto*, https://www.npr.org/2019/05/30/728288240/new-hampshire-abolishes-death-penalty-as-lawmakers-override-governors-veto. The repeal was not retroactive and left one person on death row. *Id.*

[24] DPIC, States With and Without the Death Penalty – 2019, https://deathpenaltyinfo.org/states-and-without-death-penalty.

[25] *Id.*

executions since 2003,[26] and the military authorities have not since 1961.[27] Ten current or former death penalty states have not executed anyone during the last ten years: California, Colorado, Kansas, Kentucky, Montana, Nevada, New Hampshire, Oregon, Pennsylvania, and Wyoming.[28] Four more have carried out only one execution in the last ten years: Indiana, Louisiana, Nebraska, and Utah (and in one of these cases, Louisiana, the prisoner abandoned his appeal).[29]

In only ten states have executions averaged more than one per year over the last ten years: Alabama, Arizona, Florida, Georgia, Mississippi, Missouri, Ohio, Oklahoma, Texas, and Virginia. These ten states accounted for 93% of all executions (330/354) over this time period, with a single state, Texas, responsible for 38% (135/354).[30]

Even those states still routinely employing the death penalty have seen a marked drop in executions, as reflected in a consistent decline nationally. The high came in 1999 when 98 offenders were executed. The last ten years have shown a steady decline in executions: 2009(56); 2010(46); 2011(43); 2012(43); 2013(39);

---

[26] DPIC, Searchable Execution Database, http://www.deathpenaltyinfo.org/views-executions

[27] DPIC, The U.S. Military Death Penalty, http://www.deathpenaltyinfo.org/us-military-death-penalty

[28] DPIC, Searchable Execution Database, http://www.deathpenaltyinfo.org/views-executions

[29] *Id.*

[30] *Id.*

172

2014(35); 2015(28); 2016(20); 2017(23); 2018(25)).[31] 2018 was the fourth year in a row with fewer than 30 executions.[32] Just eight states carried out executions in 2018, and Texas accounted for more than half of all executions (13) for the year.[33] In 2018, "there were fewer executions in the rest of the country than in any year since 1991."[34]

The decline in new death sentences is just as stark. The year 1996 saw 315 new death sentences, which was more than halved by 2004 (138), nearly halved again by 2014 to 73, plummeted to 49 in 2015 and to 31 in 2016, the lowest total since the death penalty was declared unconstitutional in *Furman v. Georgia*, 408 U.S. 238 (1972).[35] The 39 new death sentences imposed in 2017 represented the second lowest number since *Furman*, and down more than 90% from the peak year of 1996.[36]

---

[31] DPIC, Executions By Year, http://www.deathpenaltyinfo.org/executions-year. The high in 2009 reflects the end of the stays of execution issued pending *Baze v. Rees*, 553 U.S. 35 (2008).

[32] DPIC, The Death Penalty in 2018: Year-End Report, https://deathpenaltyinfo.org/facts-and-research/dpic-reports/dpic-year-end-reports/the-death-penalty-in-2018-year-end-report. "Before 2015, 1991 was the last year with fewer than 30 executions." *Id.*

[33] *Id.*

[34] *Id.*

[35] DPIC, Death Sentences in the United States From 1977 By State and By Year, http://www.deathpenaltyinfo.org/death-sentences-united-states-1977-2008.

[36] DPIC, Year-End Report at 3, https://deathpenaltyinfo.org/documents/2017YrEnd.pdf.

Although in 2018 the number of new death sentences rose to 43, 2018 marked the fourth consecutive year with fewer than 50 death sentences.[37] Moreover, for the first time in the modern era of the death penalty (after the U.S. Supreme Court struck down all death penalty statutes in 1972), no county imposed more than two death sentences.[38] 56% of the 43 sentences came from just four states: Texas and Florida (both with seven) and California and Ohio (both with five).[39]

Questions of fairness continue to undermine the death penalty. Even forty years after *Gregg*, some states statutes still fail to meet minimal constitutional standards. *Hurst v. Florida, supra* (Florida's death penalty statute violates Sixth Amendment right to trial by jury); *Gregory, supra*, at 633 (concluding that "[t]t is now apparent that Washington's death penalty is administered in an arbitrary and

---

[37] DPIC, The Death Penalty in 2018: Year-End Report, https://deathpenaltyinfo.org/facts-and-research/dpic-reports/dpic-year-end-reports/the-death-penalty-in-2018-year-end-report; DPIC, 2018 Death Sentences by Name, Race, and County, https://deathpenaltyinfo.org/facts-and-research/sentencing-data/death-sentences-by-name-race-and-county.

[38] *Id*.

[39] DPIC, 2018 Death Sentences by Name, Race, and County, https://deathpenaltyinfo.org/facts-and-research/sentencing-data/death-sentences-by-name-race-and-county. This same geographic clustering occurred in 2016 as well, with just four states accounting for over half of the new death sentences in that year: (California (9), Ohio (4), Texas (4), Alabama (3), and Florida (2)). DPIC, The Death Penalty in 2016: Year-End Report, https://deathpenaltyinfo.org/facts-and-research/dpic-year-end-reports/the-death-penalty-in-2016-year-end-report. In 2017, "fewer than one-tenth of 1% of counties in the U.S. accounted for more than 30% of all the death sentences imposed in the United States in 2017. Three outlier counties—Riverside, California; Clark County, Nevada, and Maricopa, Arizona—imposed 12 [of 39] death sentences." DPIC, 2017 Death Sentences by Name, Race, and County, https://deathpenaltyinfo.org/facts-and-research/sentencing-data/death-sentences-by-name-race-and-county/2017-death-sentences-by-name-race-and-county.

174

racially biased manner."); *Hurst v. State*, 202 So.3d 40, 53 (Fla. 2016), *cert. denied*

137 S.Ct. 2161 (2017) (declaring Florida's statute unconstitutional on remand from

*Hurst v. Florida*); *Rauf v. State*, *supra* ("Delaware's current death penalty statute

violates the Sixth Amendment role of the jury as set forth in *Hurst*."). Moreover, in

2018, "[m]ore than 70% of the people executed showed evidence of serious mental

illness, brain damage, intellectual impairment, or chronic abuse and trauma, and

four were executed despite substantial innocence claims."[40]

Several states that still authorize the death penalty have expressed

reservations about its continued use. The legislatures in California, Oklahoma,

Pennsylvania, and Tennessee have commissioned reports on their state's death

penalties. Louisiana has established a Capital Punishment Fiscal Commission to

investigate the cost of the death penalty, and Oklahoma created a bipartisan

Oklahoma Death Penalty Review Commission to conduct a comprehensive review

of that state's death penalty. Significantly, four states that have recently joined the

abolitionist ranks, New Jersey, Illinois, Connecticut, Maryland, and New

Hampshire, all commissioned reports before approving bills abolishing the death

penalty. The executive branches of multiple states have signaled their concerns

---

[40] DPIC, The Death Penalty in 2018: Year-End Report, https://deathpenaltyinfo.org/facts-and-research/dpic-reports/dpic-year-end-reports/the-death-penalty-in-2018-year-end-report.

175

over the fairness of the death penalty as well. Governors of California,[41] Colorado,[42] Oregon,[43] and Pennsylvania,[44] have declared official moratoriums on executions. And public support for the death penalty has reached a 45-year low.[45]

Over 40 years ago, when the death penalty was in far greater favor than today, one Justice of the Supreme Court commented: "The progressive decline in, and the current rarity of, the infliction of death demonstrate that our society seriously questions the appropriateness of this punishment today." *Furman v. Georgia*, 408 U.S. at 299 (Brennan, J., concurring). In *Fell*, the district court,

---

[41] Scott Shafer and Marisa Lagos, *Gov. Gavin Newsom Suspends Death Penalty In California*, March 12, 2019, https://www.npr.org/2019/03/12/702873258/gov-gavin-newsom-suspends-death-penalty-in-california.

[42] Exec. Order No. D 2013-006, at 2 (Colo. May 22, 2013), *available at* http://www.cofpd.org/docs-dun/governor-executive-order.pdf.

[43] William Yardley, *Oregon Governor Says He Will Block Executions*, THE NEW YORK TIMES, Nov. 22, 2011,http://www.nytimes.com/2011/11/23/us/oregon-executions-to-be-blocked-by-gov-kitzhaber.html.

[44]Gov. Tom Wolf, Death Penalty Moratorium Declaration (Feb. 13, 2015), *available at* https://www.scribd.com/doc/255668788/Death-Penalty-Moratorium-Declaration.

[45] Niraj Chokshi, *Death Penalty Loses Majority Support for First Time in 45 Years*, THE NEW YORK TIMES, October 3, 2016, *available at* http://www.nytimes.com/2016/10/04/us/death-penalty-loses-majority-support-for-first-time-in-45-years.html?smprod=nytcore-iphone&smid=nytcore-iphone-share&_r=0 (only 49 percent of Americans support capital punishment, down from a peak of 80 percent in 1994); *see also* DPIC, The Death Penalty in 2018: Year-End Report, https://deathpenaltyinfo.org/facts-and-research/dpic-reports/dpic-year-end-reports/the-death-penalty-in-2018-year-end-report ("The 2018 Gallup poll found that fewer than half of Americans (49%) now believe that the death penalty is 'applied fairly.' This was the lowest level since Gallup began asking the question in 2000. Overall support for the death penalty remained essentially unchanged from 2017's 45-year low.").

[46] Amnesty International, Death Sentences and Executions: 2014, 2, 62 (2015), https://www.amnestyusa.org/pdfs/DeathSentencesAndExecutions2014_EN.pdf

although finding that "public opinion is turning against the death penalty and state legislatures have done so as well," found that "the change is insufficiently broad to meet the *Atkins* requirement of consensus at this time." 224 F.Supp.3d at 356. Under *Atkins*, however, "[i]t is not so much the number of these States that is significant, but the consistency of the direction of change." 536 U.S. at 315. Contrary to the district court's conclusion in *Fell*, the evidence now is compelling; capital punishment is infrequently practiced, save for in a handful of states, and new death sentences are rapidly and consistently in decline. Its infrequent use relative to the number of death eligible offenders renders the death penalty "truly unusual" and thus it can now be concluded that a "national consensus has developed against it." *Atkins,* 536 U.S. at 316.

### 2.      The death penalty is excessive

The Eighth Amendment proscribes "all excessive punishments, as well as cruel and unusual punishments that may or may not be excessive." *Atkins*, 536 U.S. at 311, n.7 (2002). *Gregg* made clear that to be constitutional "punishment must not involve the *unnecessary* and wanton infliction of pain." *Gregg*, 428 U.S. at 173. *See also Furman*, 408 U.S. at 325 (Marshall, J., concurring) ("The Court [in *Weems v. United States*, 217 U.S. 349 (1910)] made it plain beyond any reasonable doubt that excessive punishments were as objectionable as those that were

177

inherently cruel"). It must now be concluded that the death penalty is an excessive punishment, even for the gravest of offenses.

The traditional goals of punishment—deterrence, retribution, incapacitation, and rehabilitation—form the baseline for analyzing excessiveness. *Graham v. Florida*, 560 U.S. 48, 71 (2010) (discussing "penological justifications" relevant to the Eighth Amendment analysis). The death penalty fails to further these goals in any measurable degree over life imprisonment. *See, e.g.*, Justin F. Marceau & Hollis A. Whitson, *The Cost of Colorado's Death Penalty*, 3 U. DENV. CRIM. L. REV. 145, 162 (2013) ("[S]ocial scientists increasingly agree that the deterrence benefits of the death penalty are entirely speculative"); Michael L. Radelet & Traci L. Lacock, *Do Executions Lower Homicide Rates?: The Views Of Leading Criminologists*, 99 J. CRIM. LAW & CRIMINOLOGY 489, 489-90 (2013); *Ring v. Arizona*, 536 U.S. 584, 615 (2002) (Breyer, J., concurring) (concluding that "[s]tudies of deterrence are, at most, inconclusive") (citation omitted); *Glossip v. Gross*, 135 S. Ct. 2726, 2767 (2015) (Breyer, J., dissenting) ("Capital punishment by definition does not rehabilitate. It does, of course, incapacitate the offender. But the major alternative to capital punishment—namely, life in prison without possibility of parole—also incapacitates"); *id.* at 2269 ("[W]hatever interest in retribution might be served by the death penalty as currently administered, that

178

interest can be served almost as well by a sentence of life in prison without parole

. . . .").

The court in *Fell* declined to make any finding as to whether the FDPA undermined the penological purpose of deterrence, on the ground that the evidence was inconclusive either way. 224 F.Supp.3d at 349. Nevertheless, if the death penalty fails to measurably promote any of the principal penological goals over life imprisonment, it is excessive, and violates the Eighth Amendment. *Furman*, 408 U.S. at 279 (Brennan, J, concurring) ("If there is a significantly less severe punishment adequate to achieve the purposes for which the punishment is inflicted, the punishment inflicted is unnecessary and therefore excessive.") (internal citation omitted.).

### 3.   The United States is out of step with the international community's consensus against the death penalty

The United States has historically been the world's principal champion of human rights, yet it stubbornly retains the use of capital punishment for its own citizens. This country had 35 executions in 2014.[46] Only China, Iran, Saudi Arabia,

---

[46] Amnesty International, Death Sentences and Executions: 2014, 2, 62 (2015), https://www.amnestyusa.org/pdfs/DeathSentencesAndExecutions2014_EN.pdf

and Iraq had more.[47] In 2016, the United States ranked seventh, behind only China, Iran, Saudi Arabia, Iraq, Pakistan, and Egypt.[48]

106 countries have abolished the death penalty for all crimes.[49] Another seven countries have abolished the death penalty for ordinary crimes such as murder, and another 29 countries are abolitionist in practice as they have not executed anyone during the last ten years and are understood to have an established policy or practice of not carrying out executions.[50] The General Assembly of the United Nations, comprising all 193 members of the UN, has repeatedly adopted resolutions calling for countries that still maintain the death penalty "to establish a moratorium on executions with a view to abolishing it."[51]

---

[47] *Id.*

[48] Amnesty International, The Death penalty in 2016: Facts and figures, https://www.amnesty.org/en/latest/news/2017/04/death-penalty-2016-facts-and-figures/.

[49] DPIC, Abolitionist and Retentionist Countries, https://deathpenaltyinfo.org/policy-issues/international/abolitionist-and-retentionist-countries. Two countries did so in 2016. Amnesty International, The Death penalty in 2016: Facts and figures, https://www.amnesty.org/en/latest/news/2017/04/death-penalty-2016-facts-and-figures/. In 2017, "[t]wo countries abolished the death penalty for all crimes and a third country became abolitionist for ordinary crimes such as murder." Amnesty International, Death Sentences and Executions 2017, *available at* https://www.amnesty.org/download/Documents/ACT5079552018ENGLISH.PDF.

[50] DPIC, Abolitionist and Retentionist Countries, https://deathpenaltyinfo.org/policy-issues/international/abolitionist-and-retentionist-countries; Amnesty International, Death Sentences and Executions 2017, *available at* https://www.amnesty.org/download/Documents/ACT5079552018ENGLISH.PDF.

[51] G.A. Res. 69/186 ¶ 4, U.N. Doc. A/RES/69/186 (Dec. 18, 2014), *available at* http://www.un.org/en/ga/search/view_doc.asp?symbol=A/RES/69/186.

But the death penalty finds its greatest opposition among European states, whose social and political interests most closely align with those of the United States. Article 2(2) of the *Charter of Fundamental Rights of the European Union* prohibits the use of capital punishment.[52] In 1982, the Council of Europe adopted *Protocol No. 6 to the European Convention on Human Rights*, the first legally binding instrument calling for the abolition of the death penalty in peacetime, and ratification is a prerequisite to membership in the Council of Europe.[53]

The United States Supreme Court has routinely taken into account the climate of international opinion in its Eighth Amendment jurisprudence. *See, e.g.*, *Graham*, 560 U.S. at 80 (the Court may look "beyond our nation's borders for support for its independent conclusion that a particular punishment is cruel and unusual"); *Roper v. Simmons*, 543 U.S. 551, 575 (2005) ("[F]rom the time of the Court's decision in *Trop*, the Court has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments.'").

---

[52] Charter of Fundamental Rights of the European Union, Art. 2 (2) (2000 OJ C364/1) ("No one shall be condemned to the death penalty, or executed.").

[53] Council of Europe—Human Rights Law and Policy: Abolition of the Death Penalty, http://www.coe.int/t/dghl/standardsetting/hrpolicy/Others_issues/Death_Penalty/. *See also* Protocol No. 13 to the European Convention on Human Rights (providing for the total abolition of the death penalty in *all* circumstances). Amnesty International, Death Sentences and Executions: 2014, 67 (2015), *available at* http://www.amnestyusa.org/pdfs/DeathSentencesAndExecutions2014_EN.pdf.

**B.** *Gregg* **has failed to significantly further the goals of reliability, consistency, and equal justice**

The many procedural protections imposed post-*Furman* have not eliminated wrongful executions, and the process remains plagued by arbitrariness, discrimination, and excessive delay. In practice the death penalty, even with the post-*Gregg* modifications, has failed to meet the minimal constitutional requirements of rationality and fairness.

**1.     The Death Penalty is Unreliable**

Despite the constitutional guarantees of competent counsel and a fair trial, the system remains insufficiently reliable to justify retaining the death penalty. Today, there have been at least 166 exonerations in capital cases[54] in comparison to the 1,490 executions since *Gregg*.[55] The state of Missouri, for example, has executed 88 prisoners in the post-*Gregg* era, but four of its death-sentenced prisoners have been exonerated: Clarence Dexter, Eric Clemmons, Joseph Amrine, and Reginald Griffin.[56] A fifth, Lloyd Schlup, pleaded guilty to a lesser offense

---

[54] DPIC, Innocence By the Numbers, https://deathpenaltyinfo.org/policy-issues/innocence/innocence-by-the-numbers.

[55] DPIC, Executions by State and Region Since 1976, https://deathpenaltyinfo.org/executions/executions-overview/number-of-executions-by-state-and-region-since-1976.

[56] *Id.*

during his retrial in order to avoid the death penalty.[57] Researchers have estimated

that nearly one in twenty (4.1%) of those sentenced to death are actually

innocent,[58] an unacceptably high error rate by any measure. *See also Fell*, 224

F.Supp.3d at 331.

### 2. The death penalty is arbitrary

As the court in *Fell* concluded from the factual record, the FDPA "falls short

of the standard required in *Furman v. Georgia*, 408 U.S. 238 (1972), and in *Gregg*

for identifying defendants who meet objective criteria for imposition of the death

penalty." 224 F.Supp.3d at 329. Thus, "[l]ike the state statutes enacted after

*Furman*, the FDPA operates in an arbitrary manner in which chance and bias play

a leading role." *Id*. *See Gregg*, *supra*, 428 U.S. at 189 (stating the central mandate

of *Furman* is that "where discretion is afforded a sentencing body on a matter so

grave as the determination of whether a human life should be taken or spared, that

discretion must be suitably directed and limited so as to minimize the risk of

wholly arbitrary and capricious action.").

The *Fell* court agreed with updated social science expert research on juries

produced by the process of "death-qualification," which results in capital juries

---

[57] DPIC, Additional Innocence Information, https://www.deathpenaltyinfo. org/additional-innocence-information

[58] *See* Gross, O'Brien, Hu, & Kennedy, *Rate of False Conviction of Criminal Defendants Who are Sentenced to Death* (2014), https://www.law.umich.edu/ newsandinfo/Documents/Gross_ProceedingsNationalAcademyofSciences_Exonerations.pdf.

that are biased in favor of the prosecution and more likely to impose a death sentence. *Fell*, 224 F.Supp.3d at 332-38 (citing studies and testimony of Dr. Craig Haney). The court found that, "[w]ith respect to the compositional bias of the death-qualified jury, it can no longer be seriously questioned that panels who have announced their openness to a death penalty verdict and have been selected on that basis are more likely to convict than jurors who more closely mirror the full range of moral values in our society." *Id*. at 333. Capital jury studies have shown that death-qualified jurors are also biased in favor of imposing the death penalty, that a majority of such jurors make up their minds about the death penalty before completing the guilt phase of trial, and that jurors demonstrate a consistent inability to understand and apply the court's instructions concerning the guilt and penalty phases of trial, the different burdens of proof for aggravating and mitigating circumstances. *Id*. at 335-36 (citing testimony of Dr. Wanda Foglia). Substantial numbers of such jurors also believe that a death sentence is mandatory if aggravating circumstances are present, believe that others actors are responsible for the death decision, that race played a role in jurors death penalty decision, that jurors frequently do not understand or believe that defendants sentenced to life without parole will not be released in the future. *Id*. at 336-37. The capital jury studies also show that, if there are three or fewer who favor a life sentence on the first vote, the ultimate decision is almost always for death, that jurors employ

184

unpredictable and unguided, subjective factors in their decisionmaking, uncertainty over potential mitigating circumstances, such as mental illness or neurological deficits, that can support mitigation but can also be understood to support future dangerousness, which is an additional source of arbitrariness. *Id*. at 338 (citing testimony of Scott Sundby). The court thus found that the social science studies since 1980 "have converged on a common conclusion that the process by which jurors are selected does not measure up to the standards of detached objectivity required by *Gregg*[,]" *id*. at 338, and the FDPA "remains inherently unreliable as it seeks to identify those cases in which death is the just outcome." *Id*. at 340.

The court in *Fell* also heard testimony from Kevin McNally of the Federal Death Penalty Resource Counsel Project about the application of the FDPA, and specifically, the effects of race, geography, and the absence of discernable standards for the determination of who is sentenced to life imprisonment and who is sentenced to death. Mr. McNally's testimony showed that, based on the number of cases potentially subject to the death penalty and the number in which the death penalty was actually sought by the government, and the few number of the latter in which the death penalty was imposed, "the extreme rarity of the imposition of the death penalty and actual executions has been present since the enactment of the FDPA." 224 F.Supp.3d at 340.

185

Moreover, through a comparison of federal death penalty cases, the court in *Fell* found that the decision to impose death "is subjective, multi-factorial, unreproducible, and, for these reasons, irremediably arbitrary." *Id*. at 341. This is because "[w]hen large groups of cases which qualified for the FDPA but did not result in death sentences are compared with the much smaller groups which did, it is not possible to identify principled distinctions between the groups." *Id*. at 345. Consequently, "[t]he imposition of the death penalty through the FDPA remains arbitrary despite the efforts of the prosecution and the courts to impose legal standards to guide the decisions leading to a death sentence." *Id*.

Indeed, factors of geography and race remain unmistakable and primary predictors of whether a death sentence will be imposed on federal defendants. As the court noted in *Fell*, federal death penalty cases since 1988 have been concentrated in just three states -- Virginia, Texas, and Missouri – "in a pattern consistent with the concentration of state death penalty cases." *Id*. Thus, whether a federal death sentence will be imposed depends greatly on geography, and the evidence showed that "the state in which a crime occurs is the strongest predictor of whether a death sentence will result." *Id*. at 345. Mr. Purkey was sentenced to death in Missouri.

In addition, the court in *Fell* heard statistical evidence establishing unequivocally that, in federal death penalty cases, "[a] defendant charged with

186

killing a white female victim was 2.7 times more likely to be sentenced to death

than a defendant charged with killing a victim of another race." *Id*. at 342. Mr.

Purkey is one of these defendants, and is among a group that is overrepresented

among federal death sentenced defendants, findings that were "highly unlikely to

be explained by other variables or conditions." *Id*. Thus, "[w]hether the murder

victim is white is also a significant predictor" of the likelihood that a federal

defendant will be sentenced to death. *Id*. at 345.

The Eighth Amendment mandate to eliminate arbitrariness in capital

sentencing is undermined by the conflicting demands of consistency in application,

*California v. Brown*, 479 U.S. 538, 541 (1987) ("[D]eath penalty statutes [must] be

structured so as to prevent the penalty from being administered in an arbitrary and

unpredictable fashion"), and a capital defendant's right to individualized

sentencing. *Lockett v. Ohio,* 438 U.S. 586, 605 (1978) (plurality opinion) ("The

nonavailability of corrective or modifying mechanisms with respect to an executed

capital sentence underscores the need for individualized consideration as a

constitutional requirement in imposing the death sentence.").

Experience has shown these competing goals, each indispensable to a

constitutional system, are irreconcilable. *Walton v. Arizona*, 497 U.S. 639, 664-65

(1990) (Scalia, J., concurring in part and concurring in judgment) ("The latter

requirement quite obviously destroys whatever rationality and predictability the

187

former requirement was designed to achieve."); *Callins v. Collins*, 510 U.S. 1141, 1144-45 (1994) (Blackmun, J., dissenting) ("Experience has taught us that the constitutional goal of eliminating arbitrariness and discrimination from the administration of death can never be achieved without compromising an equally essential component of fundamental fairness—individualized sentencing.") (internal citation omitted). Today, these conflicting goals are still "in search of a unifying principle." *Kennedy v. Louisiana*, 554 U.S. 407, 435-37 (2008).

And there are significant, as yet unaddressed, concerns. For example, *Simmons* and *Atkins* recognized that certain classes of offenders are on average sufficiently lacking in culpability so as to render their execution unconstitutional. Yet, the severely mentally ill, whose illness may defy ready categorization but who nevertheless occupy the less-culpable end of the spectrum, remain subject to the death penalty.[59] Indeed, there is growing evidence that the categorical approach to death penalty exclusions exemplified in *Simmons* and *Atkins* may have missed the larger picture, and even introduced unintended arbitrariness.[60] It is estimated that

---

[59] *See, e.g.*, *Corcoran v. State*, 774 N.E.2d 495, 502 (Ind. 2002) (Rucker, J., dissenting) ("[T]he underlying rationale for prohibiting executions of the mentally retarded is just as compelling for prohibiting executions of the seriously mentally ill . . . ."); American Bar Association, Recommendation 122A (recommending "prohibit[ing] execution of persons with severe mental disabilities whose demonstrated impairments of mental and emotional functioning at the time of the offense would render a death sentence disproportionate to their culpability"), *available at* http://www.americanbar.org/content/dam/aba/uncategorized/Death_Penalty_Representation/2006_am_122a.authcheckdam.pdf.

[60] *Graham*, 560 U.S. at 75 (acknowledging that "[c]ategorical rules tend to be imperfect . . . ."); Stephen B. Bright, *The Role of Race, Poverty, Intellectual Disability, and Mental Illness in the*

188

as many as 25% of the approximately 3,000 inmates on death row have a serious mental illness,[61] and even this number may significantly underestimate its prevalence.[62] There is a troubling randomness in excluding some groups of less-culpable defendants from execution while allowing the execution of others whose culpability is equally reduced.

There are also wide disparities in the quality of capital counsel and the resources provided for capital defense, also introducing arbitrariness. *See Fell*, 224 F.Supp.3d at 343-345 (citing testimony on the quality of counsel and effect of defense costs on federal death sentences, evidencing geographical disparity and correlation between higher levels of death sentences and lower levels of defense expenditure); *id*. at 344 (citing testimony of Scott Sundby that his research "led him to conclude that many defense attorneys in capital cases 'do just enough to get

---

*Decline of the Death Penalty*, 49 U. RICH. L. REV. 671, 687-88 (2015) ("Another reason for arbitrariness is the impossibility of measuring the mental state or level of intellectual functioning of a person accused of a capital crime.").

[61] Rebecca Covarrubias, *Lives in Defense Counsel's Hands: The Problems and Responsibilities of Defense Counsel Representing Mentally Ill or Mentally Retarded Capital Defendants*, 11 SCHOLAR: ST MARY'S LAW REVIEW ON MINORITY ISSUES 413, 416 (2009); DPIC, Death Row Inmates by State and Size of Death Row by Year, http://www.deathpenaltyinfo.org/death-row-inmates-state-and-size-death-row-year?scid=9&did=188#year

[62] *Id.* at 440 (noting that mentally ill defendants often mask their symptoms because of the enduring stigma associated with mental illness; counsel often fail to recognize their clients' mental health problems; and lack of funding, before and after conviction, often precludes thorough mental health examinations). *See also* Robert J. Smith, *Forgetting Furman*, 100 IOWA L. REV. 1149, 1153 (2015) ("Juvenile offenders and the intellectually disabled are categorically exempt from capital punishment due to their insufficient culpability; yet, most of the last hundred people executed in America possessed functional impairments that rivaled or outpaced those endured by the typical adolescent or intellectually disabled person.").

189

their client executed.'"). This is far from rare. *See* Cory Isaacson, *How Resource Disparity Makes the Death Penalty Unconstitutional: An Eighth Amendment Argument Against Structurally Imbalanced Capital Trials*, 17 Berkeley J. Crim. L. 297, 300 (2012) ("An inadequately resourced defense, when pitted against a much better resourced prosecution, yields distorted capital trials and a consequential risk of arbitrary sentencing outcomes."); *Commonwealth v. McGarrell*, 87 A.3d 809, 810 (Pa. 2014) (Saylor, J., dissenting, with Todd, J., and McCaffery, J., joining) ("During my tenure on the Court I have been dismayed by the deficient performance of defense counsel in numerous Pennsylvania death-penalty cases."). Lack of resources and lack of quality counsel are still endemic in capital proceedings.

Notwithstanding the Supreme Court's efforts, the fact remains we have achieved nothing close to the consistency the Constitution requires. *See Glossip*, 135 S. Ct. at 2760 (Breyer, J., dissenting) ("Despite the *Gregg* Court's hope for fair administration of the death penalty, 40 years of further experience make it increasingly clear that the death penalty is imposed arbitrarily, *i.e.*, without the 'reasonable consistency' legally necessary to reconcile its use with the Constitution's commands."). Unacceptable levels of arbitrariness persist, and the problem appears to be growing, not abating.

190

### 3.      The death penalty causes excessive delays and results in cruel conditions of confinement

There can be no question that delay and the attendant uncertainty as to when the execution may come is cruel[63] and otherwise diminishes the utility of the punishment.[64] Yet these delays, often in excess of twenty years[65] ultimately produce an extraordinarily high rate of reversal in capital cases.

In *Fell*, the court agreed with evidence demonstrating that excessive delay between conviction and execution, along with the extreme rarity of executions, and especially the appalling effects of solitary confinement, raised substantial Eighth Amendment concerns. With respect to excessive delay, the court recognized that "the process was choked with delay . . . in virtually all cases brought under the FDPA," but that the reasons for delay are generally a result of the painstaking process required of death penalty cases. 224 F.Supp.3d at 345.

The *Fell* court was more troubled by the evidence of severe psychological harm caused by solitary confinement of federal death row prisoners. The evidence heard by the court focused on USP-Terre Haute, where Mr. Purkey is incarcerated,

---

[63] *In re Medley*, 134 U.S. 160, 172 (1890) ("Nor can we withhold our conviction of the proposition that when a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it . . . as to the precise time when his execution shall take place.").

[64] *Coleman v. Balkcom*, 451 U.S. 949, 952 (1981) (Stevens, J., respecting denial of certiorari) ("The deterrent value of any punishment is, of course, related to the promptness with which it is inflicted.")

[65] DPIC, Time on Death Row, http://www.deathpenaltyinfo.org/time-death-row

191

where isolation is particularly heightened by the manner in which prisoners are housed. Not only are death row inmates at Terre Haute confined to their cells in the Secure Housing Unit (SCU) for 23 out of every 24 hours, but the SCU is set up to minimize contact by prisoners with others. There is no view to the outside, and even the one-hour of exercise only permits a view of the sky. This severe isolation produces trauma, distress, high rates of depression, and social withdrawal. The psychological distress experienced by these prisoners is heightened by uncertainty about their fate. Of the 62 prisoners on federal death row, more than half, including Mr. Purkey, have been there over 10 years, and ten have been there 18 years or longer. *Id*. at 346-347 (citing testimony of Dr. Haney).

When over half of capital convictions suffer from a constitutional infirmity,[66] delay seems to be not only unavoidable, but indispensable. It is a system that forces a defendant to sacrifice one right in order to secure another, a conflict the Supreme Court has found to be unacceptable. *See Simmons v. United States*, 390 U.S. 377, 394 (1968) ("[W]e find it intolerable that one constitutional right should have to be surrendered in order to assert another").

---

[66] James S. Liebman, Jeffrey Fagan, & Valerie West, *A Broken System: Error Rates in Capital Cases 1973-1995*, COLUM. L. SCH., PUBLIC LAW RESEARCH PAPER NO. 15, 8-9 (2000), *available at* www2.law.columbia.edu/instructionalservices/liebman/ (fixing the overall error rate in capital cases between 1973 and 1995 at 68%); *Capital Punishment 1998*, U.S. Department of Justice Bureau of Justice Statistics, Dec. 1999, NCJ 179012, 12-13 (confirming results of Liebman study, finding that of all death sentences imposed in 1989, state and federal courts overturned 76% of the cases); *Whitmore v. Arkansas*, 495 U.S. 149, 170 (1990) (Marshall, J., dissenting) ("The high percentage of capital cases reversed on appeal vividly demonstrates that appellate review is an indispensable safeguard").

192

For all of the foregoing reasons, this Court should find that the FDPA is unconstitutional in violation of the Eighth Amendment.

**CLAIM 7:   The Eighth Amendment categorically prohibits a death sentence for people who, like Mr. Mr. Purkey, suffer from severe mental illness.**

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the United States Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibits the execution of the mentally retarded. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). *See also Hall v. Florida*, 134 S.Ct. 1986 (2014) (substituting the term "intellectual disability"). The Court's rationale in *Atkins* applies with equal force to persons with severe mental illness.

**A.   Infliction of capital punishment upon individuals who were severely mentally ill at the time of the offense makes no measurable contribution to the acceptable goals of punishment.**

*Gregg v. Georgia*, 428 U.S. 153, 183 (1976), set out two purposes for the death penalty: retribution and deterrence. "Unless the imposition of the death penalty . . . 'measurably contributes to one or both of these goals, it "is nothing more than the purposeless and needless imposition of pain and suffering," and hence an unconstitutional punishment.'" *Atkins v. Virginia*, 536 U.S. 304, 319 (2002), citing *Enmund v. Florida*, 458 U.S. 782, 798 (1982).

The Court's reasoning in *Atkins* dictates that capital punishment inflicted on individuals who were mentally ill at the time of the offense is nothing more than

193

the purposeless and needless imposition of pain and suffering. It makes no measurable contribution to the acceptable goals of punishment and fails to serve any legitimate penal purpose more effectively than a less severe penalty. *See* American Bar Association Recommendation 122A, adopted by the House of Delegates on August 7-8, 2006. *Recommendation and Report on the Death Penalty and Persons with Mental Disabilities*, 30 Mental & Physical Disability L. Rep. 668, 670 (2006) (specifically listing schizophrenia, psychotic disorders, and major depressive disorder as illnesses which, along with "significant impairment" ought to exclude a person from execution). Because there is no legitimate penological objective in executing a person with severe mental illness, like Mr. Purkey, his death sentence is cruel and unusual in violation of the Eighth Amendment.

Intellectually disabled people are less culpable because of their "diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins*, 536 U.S. at 318. Children are less culpable because of their lack of maturity, natural recklessness, susceptibility to peer pressure, and less static character. *Roper v. Simmons*, 543 U.S. 551, 569-70 (2005).

People with severe mental illness share extremely similar qualities. Offenders with the most serious, "Axis I" diagnoses commonly have "delusions

194

(fixed, clearly false beliefs), hallucinations (clearly erroneous perceptions of reality), extremely disorganized thinking, or very significant disruption of consciousness, memory and perception of the environment." ABA Recommendation Number 122A at 670. In summary, they have problems perceiving the world correctly and responding appropriately.

> Punishing people with severe mental illness does not further the retributive goals of the punishment because this population simply does not have the requisite moral culpability as their illness can impair their ability to interpret reality accurately, to comprehend fully the consequences of their actions, and to control their actions.

American Bar Association Death Penalty Due Process Review Project White Paper, *Severe Mental Illness and the Death Penalty*, 25, (2016) (hereinafter "ABA *Severe Mental Illness*").

With regard to deterrence, the *Atkins* Court found that the same cognitive and behavioral impairments that make intellectually disabled people less personally culpable also did not measurably further the goal of deterrence. 536 U.S. at 320. The same applies to the severely mentally ill. Moreover, as the *Roper* Court said—precisely because of their diminished culpability—the likelihood that such a person "'has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent.'" *Roper*, 543 U.S. at 572.

195

In *Atkins*, the Court stated that "[t]he risk 'that the death penalty will be imposed in spite of factors which may call for a less severe penalty' . . . is enhanced," in part, "by the lesser ability of mentally retarded defendants to make a persuasive showing of mitigation…." *Atkins*, 536 U.S. at 320 (quoting *Lockett v. Ohio*, 438 U.S. 586, 605 (1978)). "Mentally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." *Atkins*, 536 U.S. at 320.

Moreover, intellectual disability as a mitigating factor can act as a "two-edged sword" by increasing the likelihood the defendant will be considered a future danger by the jury. *Id.* at 321. This concern also applies to mentally ill defendants:

> Juries and judges, like people generally, harbor hostile attitudes toward people with mental disability. Numerous studies document that capital sentencing juries tend to devalue evidence of significant mental disorder, often treating it as an aggravating circumstance rather than a mitigating one. And prosecutors routinely play to this bias.

Christopher Slobogin, *Mental Disorder as an Exemption from the Death Penalty: The ABA-IRR Task Force Recommendations*, 54 Cath. U. L. Rev. 1133, 1150-51 (2005); *see also* John Parry, *The Death Penalty and Persons with Mental Disabilities:  A Lethal Dose of Stigma, Sanism, Fear of Violence, and Faulty Predictions of Dangerousness*, 29 Mental & Physical Disability L. Rep. 667, 667

196

& n.7 (2005) (criticizing the "misconception that persons with mental illness are inherently violent and are generally dangerous to themselves or others") (citing John Monahan & Jean Arnold, *Violence by People with Mental Illness: A Consensus Statement by Advocates and Researchers*, 19 Psychiatric Rehabilitation J. 67 (1996); Patrick W. Corrigan *et al.*, *Implications of Educating the Public on Mental Illness, Violence, and Stigma*, 55 Psychiatric Services 577 (2004); John Junginger & Lynanne McGuire, *Psychotic Motivation and the Paradox of Current Research on Serious Mental Illness and Rates of Violence*, 30 Schizophrenia Bull. 21 (2004)). See ABA *Severe Mental Illness* at 15, 17 (noting the prevalence of bias against the mentally ill in the criminal justice system and the general criminalization of mental illness).

The Supreme Court has noted that a state may not attach the aggravating label "to conduct that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness." *Zant v. Stephens*, 462 U.S. 862, 885 (1983). The Court cited *Miller v. State*, 373 So. 2d 882, 885-86 (Fla. 1979), which found a constitutional violation where it was "clear from the trial judge's sentencing order that he considered as an aggravating factor the defendant's allegedly incurable and dangerous mental illness." *Miller v. State*, 373 So. 2d 882, 885-86 (Fla. 1979). The risk that a jury will treat evidence of mental illness as an aggravating factor based on a misunderstanding of future dangerousness, due

197

process, and the Eighth Amendment requires that such decisions be removed from the purview of the jury.

**B.     There is a national consensus against executing the mentally ill.**

Taken together, *Atkins* and *Roper* stand for the idea that there is a broad trend against executing people who, because of something about themselves they did not cause and cannot change, are less culpable for their crimes, which, logically, must include the mentally ill.

### 1. Our refusal to execute intellectually disabled people and children logically shows a consensus against executing the severely mentally ill.

In addition to focusing on conditions that render a person less culpable and less amenable to deterrence, *Atkins* and *Roper* had another thing in common—both focused on characteristics that people have no control over and cannot change. While *Atkins* did not set out a specific definition for intellectual disability, it suggested "subaverage intellectual functioning" and adaptive deficits that manifest before age 18 as reasonable benchmarks. 536 U.S. at 318. Those benchmarks recognize that intellectual disability is a condition people do not choose to have and cannot change. Age is a result of the number of years since a person was born. It is a number people do not choose and cannot change.

Neither does a person choose to have a mental illness. *See* ABA *Severe Mental Illness* at 26 ("People with mental illness did not choose their condition").

198

In that respect, in addition to lowered culpability and unamenability to deterrence, there is no distinction between mental illness and intellectual disability or age.

Underlying both *Atkins* and *Roper* is the idea that the condition that lowers culpability and renders one unamenable to deterrence is a condition that the person did not choose. As such, both decisions should be considered together as establishing a consensus against executing people who likewise have lowered culpability and unamenability to deterrence. Those with mental illness also fit in that category, and, thus, by extension, there is a broad national consensus against their execution.

### 2. There is a consensus specifically against executing the mentally ill.

In finding that there was no national consensus against executing the mentally ill, *Kleypas* and *Kahler* focused on the fact that no state had yet passed legislation barring the practice. *Kahler*, 410 P.3d at 128-30; *Kleypas*, 305 Kan. at 332-35. But *Hall v. Florida*, 134 S.Ct. at 1996-99, makes it clear that this is not the correct approach to consensus.

In *Hall v. Florida*, the Supreme Court considered whether a strict IQ cutoff of 70 was tolerable under *Atkins*. *Hall*, 134 S.Ct. at 1990. In looking at legislative consensus against a strict cutoff, however, the court found that all of the states that have abolished the death penalty entirely counted against the practice. *Id*. at 1997 ("In those States, of course, a person in Hall's position could not be executed [at

199

all].").), *citing Roper*, 543 U.S. at 574 ("[The] Court should have considered those States that had abandoned the death penalty altogether as part of the consensus against the juvenile death penalty".) *Hall* also included in the calculus of national consensus states that still have the death penalty but do not carry out executions. *Id*.

Currently, the federal government and 29 states legally authorize the death penalty,[67] but its infrequency in practice tells a larger story. Although the federal government recently scheduled five executions, it has not carried out any executions since 2003,[68] and the military authorities have not since 1961.[69] Ten current or former death penalty states have not executed anyone during the last ten years: California, Colorado, Kansas, Kentucky, Montana, Nevada, New Hampshire, Oregon, Pennsylvania, and Wyoming.[70] Four more have carried out only one execution in the last ten years: Indiana, Louisiana, Nebraska, and Utah (and in one of these cases, Louisiana, the prisoner abandoned his appeal).[71] visited May 8, 2018). Thus, only 18 states and the federal government realistically permit a mentally ill person to be executed.

---

[67] *Id.*

[68] DPIC, Searchable Execution Database, http://www.deathpenaltyinfo.org/views-executions

[69] DPIC, The U.S. Military Death Penalty, http://www.deathpenaltyinfo.org/us-military-death-penalty

[70] DPIC, Searchable Execution Database, http://www.deathpenaltyinfo.org/views-executions

[71] *Id.*

At least eight states have proposed legislation in the past three years that would bar the death penalty for the severely mentally ill. Thus, even though no state has passed a bill, yet, about two-thirds of the fifty states do not execute the mentally ill, and of those remaining, almost half are considering change. See H.B. 136, 133rd Gen. Assem. (Ohio 2019); S.B. 1137, Gen. Assem. (Va. 2019); H.B. 1123, 93rd Gen. Assem. (S.D. 2018); S.B. 107, 2018 Gen. Assem. (Ky. 2018); S.B. 0378, 2018 Gen. Assem. (Tn. 2018); H.B. 3080 2018 Leg. (Tx. 2017); S.B. 155, 2017 Gen. Assem. (Ind. 2017); H.B. 2170 91st Gen. Assem. (Ark. 2017); S.B. DRS35276-MM-69-E, 2017 Gen. Assem. (N.C. 2017).

"Consensus is not dispositive" (see *Kennedy v. Louisiana*, 554 U.S. 407, 421 [2008]), but rather, it is "the consistency of the direction of change" that is significant. *Atkins*, 536 U.S. at 315.

For all of the foregoing reasons, this Court should find that executing the mentally ill is a categorically disproportionate punishment barred by the Eighth Amendment.

**CLAIM 8:   Trial counsel was constitutionally ineffective in his advice to Mr. Purkey prior to his suppression testimony that trial counsel knew directly contradicted Mr. Purkey's reasons for confessing to a federal kidnapping in reliance on the promise of a life-sentence plea offer, and in subsequently failing to file a motion in limine to prevent the government from using Mr. Purkey's suppression testimony to impeach his trial testimony that he did not kidnap Jennifer Long, and arguing that his suppression statements were true.**

Except for his pre-indictment statements and his motion to suppress testimony affirming his pre-indictment statements, Mr. Purkey has consistently maintained that he did not kidnap Jennifer Long – she voluntarily went with him from Kansas City, Missouri, to his home in Lansing, Kansas.  From the beginning of the case, Mr. Purkey told his lead trial attorney, Fred Duchardt, that he did not kidnap Jennifer Long. App. 210 at 2339-2340. Mr. Purkey also told other people, including government witnesses Michael Speakman and Dr. Park Dietz, and defense expert witness Dr. Peterson, well before trial that he did not kidnap Jennifer Long.

Accordingly, Mr. Purkey's trial defense was that because Jennifer Long voluntarily went with Mr. Purkey and he did not kidnap her, no federal jurisdiction existed. Federal courts recognize this defense because, in order to secure a conviction for the federal offense of kidnapping, the government must prove that the victim was *involuntarily* transported in interstate commerce.  *See United States*

202

*v. Hernandez-Orozco*, 151 F.3d 866, 869 (8th Cir. 1998); *United States v. Wright*, 340 F.3d 724, 730-31 (8th Cir. 2003).

Unfortunately for Mr. Purkey, trial counsel committed several acts that contradicted the defense, and failed to present known facts or take actions that supported it. Some of these specific actions (or inactions) occurred during the hearing on Mr. Purkey's motion to suppress his inculpatory pre-indictment statements made to law enforcement. The basis of the motion to suppress was that Mr. Purkey's statements were involuntary because he made them in exchange for the promise of a federal life sentence, a promise on which the government later reneged.[72] Prior to Mr. Purkey's indictment (and prior to appointment of counsel on the federal case), Mr. Purkey made statements to Agent Tarpley and Detective Howard indicating that he took Jennifer Long against her will from an area in Kansas City, Missouri, to his home in Lansing, Kansas, where he raped and killed her. Mr. Purkey contended that although he in fact *did not* take Jennifer Long against her will, he nonetheless told the agents he did so in the hope of securing a life sentence in federal prison instead of the Kansas Department of Corrections.

During the suppression hearing, the court ruled that the government could question Mr. Purkey about the substance of the criminal allegation for purposes of

---

[72] FBI Agent Tarpley and Wyandotte County Detective Howard did not record their interviews of Mr. Purkey.

203

that hearing.  The court made this ruling because it found that Mr. Purkey had placed at issue his recollection regarding what transpired during his meetings with Agent Tarpley and Detective Howard, the meetings during which Mr. Purkey claimed that law enforcement made the promise of a life sentence.[73] However, when the government elicited cross-examination testimony from Mr. Purkey endorsing the truth of his pre-indictment written statement indicating that he kidnapped Jennifer Long, Mr. Duchardt failed to object or direct his client not to answer. The written statement, dated December 17, 1998, was a handwritten confession to the interstate kidnapping of Jennifer Long, and the cross-examination exchange was particularly damaging because of Mr. Purkey's endorsement:

Q:  Is that the document – or a copy of the document you wrote out?

A:  Yes.

Q:  You signed that on the back page. Is that right?

A:  That's correct.

Q:  Dated it 12/17/98?

---

[73] On direct examination during the motion to suppress testimony, Mr. Purkey testified that after each meeting with Agent Tarpley and Detective Howard, he went back to his jail cell and made notes about the substance of their conversation, including the details of what he believed was a promise for a life sentence in federal court.  He testified that he kept those notes as part of the legal materials kept in his jail cell at the federal pretrail detention facility, Community Corrections of America (CCA), in Leavenworth, Kansas. Mr. Purkey testified that his notes were the best evidence of what transpired during the conversations, but that his notes were destroyed by CCA staff during a shakedown of his jail cell.  Mr. Purkey testified that because his notes were destroyed and discarded, his best recollection of what transpired during his interviews with Tarpley and Howard was lost.

204

A:  That's correct.

Q:  And then it was witnessed by Agent Tarpley and Detective Howard?

A:  That's correct.

Q:  And did you write that down in your own handwriting?

A:  Yes, I did.

Q:  And did you tell the truth when you wrote this?

A:  Yes, I did.

Q:  And that is a confession to the kidnapping, rape and murder of this young lady, correct?

A.  That's correct.

App. 148 at 1504.

After Mr. Purkey endorsed the truth of his prior written statement, Mr. Duchardt recognized that the endorsement would have damaging consequences at trial. Mr. Duchardt stated:

> Let me explain my concern, Judge, and maybe we can end run my concerns with a concession by the Government.  What I don't want to hear come time of trial, if, for the sake of argument, that the Court would overrule our motion and that Judge Gaitan would affirm the ruling, is that Mr. Purkey has separately in these proceedings affirmed the content of admissions that are purportedly in these documents at a separate hearing that was conducted at this time.  If that is not the Government's intentions, I won't have a problem with Mr. Whitworth asking any of these questions of Mr. Purkey.

App. 219 at 2460.

> With all due respect, I think what's happening is that, what the Government wishes to do, is have Mr. Purkey reaffirm the statements that were made to the officers for potential use at the time of trial. I am objecting to that and I am specifically directing Mr. Purkey not to answer because, quite honestly, that's the only purpose behind this questioning.

App. 219 at 2461-2462 . Mr. Duchardt's objection, however, came too late to prevent Mr. Purkey's damaging endorsement.

The government admitted that they intended to use Mr. Purkey's admissions made during the hearing against him at trial. The suppression court indicated that "what happens down the line to this testimony is, I think, totally outside this Court's purview, and some other court then, would have to decide how that testimony can be used [.]" App. 220 at 2463.[74]

Despite the government's stated intent to use Mr. Purkey's endorsements made during the hearing against him at trial, Mr. Duchardt did not rehabilitate Mr. Purkey on redirect examination by asking him to clarify his testimony regarding the admission and endorsements. App. 221 2464-2465. Even though Mr. Duchardt knew that (1) from the beginning of the case, Mr. Purkey disavowed the kidnapping, (2) the reason Mr. Purkey lied to investigators regarding the kidnapping was to secure a federal life sentence, and (3) Mr. Purkey's endorsements during the motion to suppress could devastate the defense, Mr.

---

[74] United States Magistrate Judge Sarah Hays conducted the hearing on the motion to suppress, but rulings regarding the admissibility of evidence at trial would have been ultimately made by the trial judge, United States District Court Judge Fernando Gaitan.

206

Duchardt's only question on redirect concerned the reason why Mr. Purkey did not ask for counsel during the interrogations. App. 221 at 2464-2465.

Similarly, despite knowing that the motion court had not made any rulings regarding the admissibility of Mr. Purkey's suppression testimony at trial and despite concerns that the government would try to use the motion to suppress testimony at trial, Mr. Duchardt failed to take any action prior to trial to exclude the motion to suppress statements.

As Mr. Duchardt feared, the government did in fact use Mr. Purkey's suppression testimony against him during trial. The government first used Mr. Purkey's testimony to impeach his direct examination testimony that he did not kidnap Jennifer Long:

> Q:  Now, all throughout December in the four times you met with the agents you said you had kidnapped Jennifer Long, right?
>
> A:  Right.
>
> Q:  You wrote it down on paper in the note you sent and in the written confession that you wrote out yourself, that you had kidnapped Jennifer Long?
>
> A.  Right.
>
> Q:  And you even testified under oath on October 25, 2002, that that was true, that you had kidnapped Jennifer Long, right?
>
> A:  Right.
>
> Q:  And now you want this jury to believe that you never kidnapped her; is that your testimony?

A:  That is my testimony.

App. 217 at 2455.

Trial counsel did not object to the use of the suppression testimony in this manner.  On redirect, co-counsel Laura O'Sullivan did try to rehabilitate Mr. Purkey's testimony by attempting to clarify that his motion to suppress answers were not admissions to kidnapping but instead were merely acknowledgements that he originally told Agent Tarpley and Detective Howard that he kidnapped Jennifer Long in order to create a federal case:

> REDIRECT EXAMINATION BY MS. O'SULLIVAN
>
> Q:  Mr. Purkey, in October of 2002, the testimony that Mr. Whitworth was asking you about, you weren't asked whether or not – let me put it to you this way:  The question was whether that was a confession to kidnapping, rape and murder of the young lady, right?
>
> A.  That's right.
>
> Q:  And in the written statement, that is what the written statement said, right?
>
> A:  That's true.
>
> Q:  And basically most of the questions you were talking about had to do with the deal that you had with the police, is that fair?
>
> A:  That's a fair statement.
>
> Q:  And there's no doubt that you lied to the police when you said that you kidnapped Jennifer Long, right?
>
> A:  No doubt at all.

208

Q: Because what would happen – what was your understanding of what would happen if you told the truth and told that there was no kidnapping?

A: If I did that, it would have turned into a state jurisdiction case.

Q: And that would have been what state?

A: Kansas.

App. 217 at 2455-2456. However, these questions did not address Mr. Purkey's reason for his suppression testimony.

On re-cross, the government again sought to use Mr. Purkey's admission from the suppression hearing against him. The government specifically confronted Mr. Purkey with the transcript of his testimony from the motion to suppress hearing:

Q: (By Mr. Whitworth) Are you with me on line 19?

A: Uh-huh.

Q: And I asked you the question, "And did you tell the truth when you wrote this? And you responded, "Yes, I did."

A: That's what I responded.

App. 149 at 1505. Again, Ms. O'Sullivan did not ask Mr. Purkey *why* he endorsed the December 17, 1998, statement as the truth during the motion to suppress hearing.

The government also used Mr. Purkey's suppression testimony during closing arguments to undermine his trial defense that he did not kidnap Jennifer

209

Long.  Moreover, the government argued that Mr. Purkey's claim that he did not

kidnap Jennifer Long was a recent fabrication made to avoid the death penalty:

> The guy even testified in federal court on October 25, 2001, under oath, that everything that he had said about the kidnapping was the truth.  Now, what could possibly be better evidence than that?  All right.  Do you follow me?
>
> Now, the defendant created this new story because he knew the only way he could get out of this is if he could try to convince a jury that there was no federal jurisdiction.  But, you know, it's too late because he put everything on paper.  He testified to it.

App. 150 at 1508-1509.

Even though he was aware of evidence indicating that Mr. Purkey's

recantation of the kidnapping was not recent, Mr. Duchardt did not offer such

evidence to refute the government's claim of recent fabrication.  As a result of Mr.

Duchardt's failure to elicit this evidence, the jury did not hear any evidence other

than Mr. Purkey's trial testimony suggesting that Mr. Purkey in fact did not kidnap

Jennifer Long.

Trial counsel's failure to prevent the jury from hearing Mr. Purkey's

suppression hearing endorsement or otherwise explain it violated Mr. Purkey's

rights to counsel, protection from self-incrimination, due process, and freedom

from cruel and unusual punishment.  Counsel knew that Mr. Purkey's motion to

suppress testimony could eviscerate the defense, but counsel nonetheless failed to

take reasonable steps to prevent the use of the suppression testimony at trial or

mitigate the damage of its use.  Because of these failures, the government was able

210

to impeach Mr. Purkey with the admission made under oath during the suppression hearing, argue that Mr. Purkey's sworn admission was consistent with his prior written statements, argue that Mr. Purkey's admission was proof that he in fact took Jennifer Long against her will, and convince the jury to convict and recommend a sentence of death.

Mr. Purkey's trial defense was in such conflict with his motion to suppress testimony that it begs two important questions:  (1) why would Mr. Purkey endorse as the truth his prior written statement that he kidnapped Jennifer Long, when he told his trial counsel from the beginning that he did not kidnap Jennifer Long, and (2) knowing that the government had obtained this suppression testimony and intended to use it to establish Mr. Purkey's guilt, why would counsel fail to employ available methods of excluding the suppression testimony at trial?

As to the first question, Mr. Purkey contends that he endorsed his written statement as the truth during the motion to suppress hearing based on Mr. Duchardt's advice, given to him just prior to his motion to suppress testimony, to maintain his previous story in order to preserve the chance of a plea offer for a life sentence.  Mr. Purkey understood Mr. Duchardt to mean that the best chance of securing a life-sentence plea offer was to be cooperative and persist in original statements made to law enforcement that he kidnapped Jennifer Long.  Mr. Purkey followed the advice and perpetuated the truthfulness of his prior statements.

However, the government denied ever contemplating such a plea offer, and the government never did extend such an offer.

As to the second question, the only plausible answer is that trial counsel failed to investigate and request enforcement of the law barring the use of suppression statements in this manner. Clearly established federal law prohibits the use of a defendant's suppression testimony to establish guilt: "[W]hen a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." *Simmons v. United States*, 390 U.S. 377, 394 (1968). Thus, although trial counsel could have prevented the government from using Mr. Purkey's suppression testimony at trial, counsel instead – by failing to object – *ensured* that the jury would hear the suppression testimony.

Counsel's performance regarding the suppression hearing constituted ineffective assistance of counsel. A violation of the defendant's Sixth Amendment rights occurs when (1) trial counsel's performance was so deficient as to fall below an objective standard of the customary skill and diligence displayed by a reasonably competent attorney, and (2) trial counsel's deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 – 94 (1984). Trial counsel have a duty to investigate both the law and facts relevant to

212

the case. *Strickland,* 466 U.S. at 690 -91. Choices "resulting from lack of diligence in preparation and investigation [are] not protected by [a] presumption in favor of counsel. *Kenley v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir. 1991); *see also Wiggins v. Smith*, 539 U.S. 510, 527 (2003)("*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy" (citing *Strickland*, 466 U.S. at 691)). Attorneys also have a duty to be ethical. *See Strickland* at 688 (basing analysis on "prevailing professional norms" of practice as reflected in the American Bar Association Standard and the like as guides to determining what is reasonable); ABA Standards for Criminal Justice 4-4.1(b)(4th ed. 2015)("[I]n any case a lawyer should always read and comply with the rules of professional conduct and other authorities that are binding in the specific jurisdiction or matter, including choice of law principles that may regulate the lawyer's ethical conduct").

To establish prejudice, a petitioner need only demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, 466 U.S. at 694.

213

Under the circumstances of this case, reasonable counsel would not have advised Mr. Purkey – who was in the process of challenging the voluntariness of his prior statement – to admit that the prior statement was in fact true.  Any purported belief that such testimony would further plea negotiations was unreasonable in light of the fact that the government had not shown any willingness to forego the death penalty in exchange for a guilty plea.  In fact, during the suppression hearing, the government explicitly disputed Mr. Purkey's claim that it previously had made such an offer.

Moreover, any advice suggesting that Mr. Purkey perpetuate what he insisted to be a lie would have been a violation of the Missouri Rules of Professional Conduct.  The rules in effect at the time prescribed that a lawyer shall not:  (1) counsel or assist a witness to testify falsely; (2) knowingly offer evidence the lawyer knows to be false; or (3) engage in conduct involving dishonesty, fraud, deceit or misrepresentations, or engage in conduct that is prejudicial to the administration of justice.  *See* MO. SUP. CT. R. 4-3.3(a)(3)(b)(a lawyer shall not knowingly fail to disclose a material act necessary to avoid assisting a fraudulent act by the client), 4-3.3(a)(3)(a lawyer shall not offer evidence the lawyer knows to be false); 4-3.4(b)(a lawyer shall not counsel or assist a witness to testify falsely); 4-8.4(c)(a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation; and 4-8.4(d)(a lawyer shall not engage in conduct prejudicial to

214

the administration of justice)(1986).  Violations of these rules in the context of

advising witnesses to testify falsely results in disbarment.  *See e.g. In re Ver*

*Dught*, 825 S.W.2d 847, 851 (Mo. banc 1992) (attorney advice to lie about status

of marriage in administrative hearing, and asking questions eliciting answers he

knew to be false, violated Missouri Rules of Professional Conduct, even though

status of marriage was not material to administrative determination, resulting in

disbarment for six months); *In re Storment*, 873 S.W.2d 227, 230 (Mo. banc 1994)

(disbarment is appropriate because lawyer with intent to deceive advised a witness

to make a false statement, submitted a false document and withheld material

information causing a serious injury to a party with a significant adverse effect on

the legal proceeding); *In re Krigel*, 480 S.W.2d 294, 299 (Mo. banc 2016)

(attorney eliciting testimony while technically truthful, but misleading through

omission violated ethical rule that lawyer shall not knowingly offer evidence the

lawyer knows to be false resulting in disbarment for six months and two years'

probation).  A reasonably competent attorney would not intentionally violate

ethical rules.

Regardless of whether Mr. Duchardt's plan was for Mr. Purkey to testify

falsely at the suppression hearing, a reasonably competent attorney would have

investigated the law regarding the use of defendant's suppression testimony as

evidence of guilty and recognized that the law prohibits such use (assuming the

defendant objects to it).  *Simmons,* 390 U.S. at 394.  In *Armstrong v. Kemna*, the Eighth Circuit considered a similar failure-to-investigate-applicable-law questions. 534 F.3d 857, 865 (8th Cir. 2008).  Part of the defense in Armstrong involved the testimony of three out-of-state witnesses.  *Id.* at 859, 861, 865.  The law relevant to subpoenaing out-of-state witnesses provided a mechanism for counsel to subpoena effectively the out-of-state witnesses.  *Id.* at 863.  However, because defense counsel failed to investigate adequately the law relevant to subpoenaing out-of-state witnesses, counsel decided not to subpoena the out-of-state witnesses.  *Id.* at 865.  Thus, the testimonies of the witnesses were not included as part of the defense.  *Id.* at 861-62.

The court concluded that counsel failed to investigate the law relevant to the defense:  "Evaluating the reasonableness of trial counsel's conduct from her perspective before and during the trial, we cannot say trial counsel satisfied her duty to investigate thoroughly and diligently the law relevant to subpoenaing the out-of-state witnesses."  *Id*. at 863.  Given trial counsel's familiarity with Missouri's out-of-state witness procedures, awareness of some similar procedure in the other state in question, and the importance of the witnesses to the defense, the court found that a reasonably competent attorney would have researched the law and determined that it provided trial counsel the ability to subpoena the out-of-state witnesses.  *Id.* at 863.

216

In the present case, defense counsel knew that the government intended to use the suppression hearing testimony against Mr. Purkey.  Defense counsel further knew that whether Jennifer Long voluntarily went with Mr. Purkey was the central issue of the defense and therefore the importance to the defense of preventing the jury from hearing the suppression testimony endorsement.  However, defense counsel failed to investigate the applicable law regarding the use of defendant's suppression testimony. Had defense counsel done so, counsel could have prevented the jury from considering the suppression testimony evidence as evidence of guilt. *Simmons*, 390 U.S. at 394.  Under the circumstances of the case, a reasonably competent attorney would have researched the law relevant to the central issue of the defense and prevented the government from using the suppression testimony to establish the disputed element of the crime.  As in Armstrong, this failure to investigate constituted deficient performance under *Strickland*.

Mr. Duchardt's advice in this case, combined with his failure to investigate the law regarding the admission of Mr. Purkey's suppression testimony at trial, fundamentally discredited the trial defense.  Having Mr. Purkey go along with his original statements in order to preserve the hope of a presently non-existent life-sentence plea offer was not reasonable, and once the government obtained the suppression statement and made clear that it intended to use the testimony against Mr. Purkey at trial, counsel's failure to rely on applicable law preventing the

217

government's use of the testimony at trial was egregiously unreasonable. *See Hinton v. Alabama*, 134 S.Ct. 1081, 1089 (2014) (an attorney's ignorance of the law that is fundamental to his case and failure to perform basic research on the point is quintessentially unreasonable performance under *Strickland*).

In the event the evidence nonetheless came in during trial, reasonably competent counsel at least would have asked Mr. Purkey to explain why he testified inconsistently at the suppression hearing.  Furthermore, given that counsel possessed evidence indicating that Mr. Purkey's disavowal of his pre-indictment statements was not new, reasonably competent counsel would have presented such evidence and prevented the government from arguing that the disavowal was not a "new story."  Because of counsel's failures, the jury heard that Mr. Purkey admitted the central element of his defense but did not hear the reason for his inconsistent testimony – that his trial counsel advised him to perpetuate the truthfulness of his written statements in order to optimize the chance of a life-sentence plea offer.  Moreover, the jury had no reason to believe that Mr. Purkey's disavowal was not a "new story" concocted for the purpose of the trial. Particularly because trial counsel's deficient performance related to the central issue in the case, the deficient performance prejudiced Mr. Purkey.

Courts have described confessions as "the most compelling possible evidence of guilt . . ." *Miranda v. Arizona*, 384 U.S. 436, 466 (1966)(quoting

218

*Mapp v. Ohio*, 367 U.S. 643, 685 (1961)(Harlan, J., dissenting)).  As explained above, defense counsel could have prevented the jury from hearing Mr. Purkey's suppression testimony confession at all.  However, because of trial counsel's deficient performance, the government was able to argue to the jury that (1) Mr. Purkey's admission made under oath at the motion to suppress hearing that his pre-indictment confession was in fact true and (2) his trial testimony was a recent recantation of the kidnapping made to avoid the death penalty.  Given that the only evidence establishing how Jennifer Long got from Missouri to Kansas came from Mr. Purkey's statements, a reasonable probability exists that had the jury not heard Mr. Purkey's endorsement of his initial confession or at least heard the explanation for the endorsement, at least one juror would have assessed differently whether a reasonable doubt existed as to whether Jennifer Long voluntarily went with Mr. Purkey.

Either Mr. Duchardt's advice or his failure to investigate the law regarding the admission of Mr. Purkey's suppression testimony at trial, or the combination of these two errors, constituted ineffective assistance of counsel and rendered Mr. Purkey's trial fundamentally unfair. Section 2255 counsel's failure to present this substantial claim of ineffective assistance of counsel in Mr. Purkey's federal post-conviction proceedings establishes cause for the procedural default of the issue under the *Martinez-Trevino* doctrine, and entitles Mr. Purkey to present his new

219

claim in this § 2241 petition. *Webster v. Daniels*, 784 F.3d 1123, 1124-25 (7th Cir. 2015); *Brown v. Brown*, 847 F.3d 502, 513 (7th Cir. 2017); *Ramirez v. United States*, 799 F.3d 845, 853 (7th Cir. 2015).

## REQUEST FOR RELIEF

For all of the foregoing reasons, and based upon the full record of this matter, Petitioner requests that the Court provide the following relief:

1.    That Petitioner be granted a stay of execution pending a final resolution of the claim raised in this Petition;

2.     That leave to amend this Petition, if necessary, be granted;

3.    That Respondents be Ordered to respond to this Petition;

4.    That Petitioner be permitted to file a Reply and/or a Traverse addressing Respondents' affirmative defenses and arguments;

5.    That an evidentiary hearing be conducted on the merits of Petitioner's claims, any procedural issues, and all disputed issues of fact;

6.    That habeas relief from Petitioner's convictions and sentences, including his sentence of death, be granted.

Respectfully submitted,

/s/Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

/s/Michelle M. Law
Assistant Federal Public Defender
Western District of Missouri
901 Saint Louis Street, Suite 801
Springfield, Missouri 65806
(417) 873-9022
michelle_law@fd.org


Counsel for Petitioner

221

**CERTIFICATE OF SERVICE**

I hereby certify that on September 13, 2019, the foregoing Amended Petition for Writ of Habeas Corpus was filed electronically with the Clerk of the Court via CM/ECF to be served on the parties authorized to be noticed.

/s/Rebecca E. Woodman
Counsel for Petitioner

222

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| **WESLEY IRA PURKEY**, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | CIVIL ACTION |
| vs. | ) | |
| | ) | Case No.: 2:19-cv-414-JPH-DL |
| **WARDEN OF USP TERRE HAUTE**, | **)** | |
| **UNITED STATES OF AMERICA** | ) | DEATH PENALTY CASE |
| | ) | EXECUTION SCHEDULED |
| | ) | FOR DECEMBER 13, 2019 |
| Respondents. | ) | |

## MOTION FOR STAY OF EXECUTION

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
Telephone:  (785) 979-3672
Email: rewlaw@outlook.com

Michelle M. Law, MO bar no. 45487*
Assistant Federal Public Defender
Western District of Missouri
901 Saint Louis Street, Suite 801
Springfield, Missouri 65806
Telephone: (417) 873-9022
Facsimile:  (417) 873-9038
Email: michelle_law@fd.org
*to be admitted pro hac vice

Dated: August 26, 2019

*Counsel for Petitioner*

## I. PRELIMINARY STATEMENT

Pursuant to Local Criminal Rule 6-1(h), the following documents are included in the Appendix filed with this Motion: (i) a listing of prior petitions, with docket numbers, filed in any state or federal court challenging the conviction and sentence challenged in the current petition; and (ii) a copy of, or a citation to, each state or federal court opinion, memorandum, decision, order, transcript of oral statement of reasons, or judgment involving an issue presented in the petition.

## II. INTRODUCTION

Petitioner Wesley Ira Purkey respectfully requests a stay of execution pending the Court's consideration of his Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 ("Petition").

In his Petition, Mr. Purkey establishes that his court-appointed trial counsel - - a lawyer who is responsible for more individuals on federal death row than any other lawyer in America -- was constitutionally ineffective, and rendered Mr. Purkey's trial fundamentally and structurally unfair in ways never scrutinized by any court. Mr. Purkey also demonstrates that the reason the claims presented in Mr. Purkey's Petition have never been scrutinized by any other court is because Mr. Purkey's § 2255 counsel failed to investigate the case, and thus did not raise the substantial claims of ineffective assistance of counsel included in his Petition. Because a motion under § 2255 is a petitioner's first opportunity to present such a

claim, § 2255 counsel's failure to present a claim (due to § 2255 counsel's ineffective assistance) does not prevent federal review of such a claim and provides cause for federal courts to do so. *Ramirez v. United States*, 799 F.3d 845, 853-854 (7th Cir. 2015). However, Mr. Purkey cannot meet the requirements for filing a successive petition under § 2255 review, and habeas relief is thus unavailable to him under § 2255. *See* 28 U.S.C. § 2255(h). Under these circumstances, the "saving clause" in § 2255(e) provides an available remedy for a judicial determination of Mr. Purkey's claims, and he now seeks review of his meritorious claims before this Court under § 2241. *See* 28 U.S.C. § 2255(e) (federal habeas petitioner entitled to review under § 2241 when § 2255 is "inadequate or ineffective" to test the legality of his detention). *See also Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015).

On July 25, 2019, the Government notified Mr. Purkey that his execution has been scheduled for December 13, 2019. Mr. Purkey had no reason to anticipate the setting of his execution date, as the federal government has not carried out an execution since 2003 and has had no execution protocol in place since 2011.[1] Yet

---

[1] See Roane, et al. v. Barr, et al., Case 1:05–cv–02337–TSC–DAR (D.D.C.), Parties' Joint Motion to Continue the August 2, 2011 Status Conference and Briefing Schedule Governing the Above-Captioned Case (July 28, 2011) (ECF No. 288) (Government informing the court presiding over litigation challenging the previously-existing lethal injection protocol "that the Federal Bureau of Prisons has decided to modify its lethal injection protocol"). Subsequent status reports filed by the Government with the court indicated that it was continuing to develop a new protocol, but it was not until July 25, 2019 -- the day Mr. Purkey received his warrant -- that any new protocol was announced.

Mr. Purkey now stands to be among the first individuals federally executed in over fifteen years, even though his scheduled execution is unconstitutional, and even though no court has ever reviewed his substantial claims of ineffective assistance of counsel and other constitutional claims, and thus has not had a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence. Given the fact–intensive nature of his claims, Mr. Purkey's Petition includes requests for further pleadings by the parties and an evidentiary hearing before this Court. He also seeks a stay of execution so that the Court can fully and fairly review his compelling claims for relief.

## III. PROCEDURAL HISTORY

In January of 2004, Mr. Purkey was sentenced to death in the United States District Court for the Western District of Missouri (Kansas City) for the federal offense of interstate kidnapping resulting in death.  The Eighth Circuit Court of Appeals affirmed Mr. Purkey's conviction and death sentence on direct appeal, and the Supreme Court denied Mr. Purkey's petition for writ of certiorari. *United States v. Purkey*, 482 F.3d 738 (8th Cir.), *cert. denied*, 549 U.S. 975 (2006).

On October 16, 2007, Mr. Purkey filed a motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C § 2255, a motion the district court denied without evidentiary hearing. *Purkey v. United States*, 2009 WL 3160774 (W.D.

Mo. Sept. 29, 2009).  The Eighth Circuit Court of Appeals affirmed the district court's denial of Mr. Purkey's § 2255 motion, and the Supreme Court denied the petition for writ of certiorari.  *Purkey v. United States*, 729 F.3d 860 (8th Cir.), *cert. denied*, 135 S.Ct. 355 (2014).

## IV. MR. PURKEY IS ENTITLED TO A STAY OF EXECUTION

The standard for issuance of a stay of execution is like that for issuance of a preliminary injunction. The moving party must show:  (1) a significant possibility of success on the merits; (2) irreparable harm will result in the absence of a stay; (3) the balance of harm is in favor of the moving party; and (4) the public interest supports a stay. *Hill v. McDonough*, 547 U.S. 573, 584 (2006). Mr. Purkey meets these requirements.

### A. Mr. Purkey Can Demonstrate a Significant Possibility of Success on the Merits of His Claim.

Mr. Purkey is able to demonstrate a "significant possibility of success on the merits" of his claims. *Hill*, 547 U.S. at 584. As discussed in detail in his Petition, current counsel's investigation has uncovered voluminous evidence establishing egregiously ineffective assistance of both his trial and post-conviction counsel:

> • Instead of hiring a qualified mitigation specialist, Mr. Purkey's lead trial lawyer hired a friend who had been terminated from his previous employment in the public defender office for serious misconduct and incompetency as a *fact* investigator, and against whom his prior bosses at the public defender office had to obtain protective orders after he stalked, assaulted, and threatened them following his termination. The lawyer then lied to the trial court judge about his friend's qualifications in order to obtain

funding for mitigation services in Mr. Purkey's case, and later repeated the lie to the same judge in Mr. Purkey's § 2255 proceedings.

• The trial lawyer presided over a dysfunctional trial team that failed to conduct an investigation of Mr. Purkey's background and life history consistent with their professional and constitutional obligations in a capital case.  Had they conducted an appropriate investigation, they would have uncovered the vast and readily available information of Mr. Purkey's lifelong, extraordinary trauma history and mental impairments that would have given the jury a meaningful understanding of the constellation of symptoms suffered by Mr. Purkey throughout his life and the connection of those symptoms to his behavior that would have helped explain to the jury why he committed the crime that led to his federal conviction. Had Mr. Purkey's jury heard this information, at least one juror might have voted for a life sentence.

• Trial counsel allowed a presumptively biased juror to sit on Mr. Purkey's jury, ignorant of the fact the juror had disclosed on her questionnaire that she had been the victim of an attempted rape when she was 16 years old, substantially similar to the underlying facts of the charge against Mr. Purkey. The juror even bore the same first name as the alleged victim in the case.

• At the penalty phase, the jury returned a special verdict form for death that left blank the section on mitigating factors that would allow courts to understand the reasons for sentencing Mr. Purkey to death. Yet when the trial judge offered to send the jury back for further deliberations, Mr. Purkey's trial lawyer acquiesced to the Government's opposition. While the issue of the blank verdict form was presented in Mr. Purkey's § 2255 petition, post-conviction counsel never interviewed the jurors who deliberated on Mr. Purkey's case, and thus never presented to the court necessary information to establish the significance of the blank verdict form and its prejudice to Mr. Purkey. This failure to investigate permitted the courts reviewing the § 2255 petition to misinterpret the blank verdict form as a finding of no mitigating factors and to deny an evidentiary hearing.

• In denying an evidentiary hearing, the § 2255 trial judge relied on a 117-page affidavit submitted to the court by Mr. Purkey's trial counsel.  The sworn statement of trial counsel not only amounted to

an unethical brief against his former client, but investigation by current counsel shows that the affidavit contained material falsehoods constituting a fraud on the court, submitted for no other purpose than to interfere with the administration of justice and the § 2255 court's impartial adjudication of those claims of ineffective assistance of trial counsel that *were* raised in Mr. Purkey's § 2255 petition.

Mr. Purkey's Petition also demonstrates that his claim is cognizable under § 2241. A federal habeas petitioner is entitled to review under § 2241 when § 2255 is "inadequate or ineffective to test the legality of his detention" or sentence. 28 U.S.C. § 2255(e); see also *Brown v. Caraway*, 719 F.3d 583 (7th Cir. 2013) (§ 2241 applies to challenges to a habeas petitioner's sentence, in addition to his conviction). Cognizable claims include those that rely on a new legal or factual basis not available at the time of the petitioner's trial proceedings or his § 2255 proceedings. See, e.g., *Webster*, 784 F.3d at 1136 (7th Cir. 2015) (petitioner's Atkins claim cognizable under § 2241 based on newly–discovered evidence establishing innocence of death penalty); *In re Davenport*, 147 F.3d 605, 607-11 (7th Cir. 1998) (legal claim was unavailable to petitioner at time of initial habeas proceedings because circuit precedent would have required the district court and appellate panel to erroneously reject petitioner's claim at the time of his § 2255 motion). Section 2241 is also the appropriate vehicle where a petitioner challenges the execution of the sentence. *Kramer v. Olson*, 347 F.3d 214, 217 (7th Cir. 2003); *Valona v. United States*, 138 F.3d 693, 694 (7th Cir. 1998).

Due to the structure of § 2255 relief itself as well as § 2255's successive

petition rules, Mr. Purkey has not had a meaningful opportunity to present the ineffective assistance of trial counsel claims included in this petition. Because the federal courts have no established procedure for developing ineffective assistance claims in direct appeal proceedings, Mr. Purkey did not have a reasonable opportunity to present his claims at that time. Similarly, because § 2255 counsel failed to investigate the case adequately, § 2255 counsel were not aware of these claims, and Mr. Purkey accordingly was unable to obtain judicial review of them during his initial-review § 2255 proceeding. He is now procedurally barred from raising these substantial claims in a successive § 2255 petition. *See* 28 U.S.C. § 2255(h). *Webster v. Daniels*, 784 F.3d at 1136-37; *In re Davenport*, 147 F.3d at 609.

Mr. Purkey establishes "something more" than a lack of success with a § 2255 motion that permits him to pursue his claims under § 2241. *See Webster*, 784 F.3d 1123, 1136 (7th Cir. 2015). The "something more" in Mr. Purkey's case is the development of the *Martinez-Trevino* doctrine and the Seventh Circuit's application of it to federal prisoners who bring motions for post-conviction relief under § 2255. *See, e.g., Brown v. Brown*, 847 F.3d 502, 509-10 (7th Cir. 2017); *Ramirez*, 799 F.3d at 854; *Choice Hotels Intern., Inc. v. Grover*, 792 F.3d 753, 755 (7th Cir. 2015). *See also Martinez v. Ryan*, 566 U.S. 1 (2012); *Trevino v. Thaler*, 569 U.S. 413 (2013). Given that (1) the Seventh Circuit applies the *Martinez-*

*Trevino* doctrine to federal prisoners who bring motions for post-conviction relief under § 2255; (2) initial-review collateral counsel's failure to investigate and present substantial claims of ineffective assistance of trial counsel prevented Mr. Purkey from meaningful judicial review of these claims; and (3) the operation of the successive petition rules absolutely prevents Mr. Purkey from ever having an opportunity to raise these challenges to the legality of his conviction or sentence; the saving clause of § 2255(e) is available to Mr. Purkey. *See Adams*, 911 F.3d 397, 411; *Brown*, 847 F.3d 502, 509-10; *Ramirez*, 799 F.3d at 854; *Webster*, 784 F.3d 1123, 1136-37; *Garza*, 253 F.3d at 922. Otherwise, initial-review collateral counsel's failure to raise the claims would "deprive [Mr. Purkey] of any review of [those claims] at all." *Trevino*, 569 U.S. at 423.

**B. Mr. Purkey Will Suffer Irreparable Injury Without a Stay**.

The harm to Mr. Purkey of being put to death without ever receiving full and fair review of the constitutionality of his conviction and sentence, and his execution, cannot be overstated. Mr. Purkey raises claims involving egregiously incompetent and prejudicial performance of his trial counsel arising from trial counsel's failure to investigate his case that have never been heard by any court because of § 2255 counsel also failed to investigate. Mr. Purkey deserves the opportunity to make this showing. Yet is no stay of execution is granted, Mr. Purkey will be killed on December 13, 2019, before any court has the opportunity

to review his substantial claims. This would clearly constitute irreparable harm. See, e.g., *Wainwright v. Booker*, 473 U.S. 935, 935 n.1 (1985) (Powell, J., concurring in decision to vacate stay of execution) ("The third requirement—that irreparable harm will result if a stay is not granted—is necessarily present in capital cases."); *Evans v. Bennett*, 440 U.S. 1301, 1306 (1979) (granting stay of execution in light of the "obviously irreversible nature of the death penalty"); *Williams v. Chrans*, 50 F.3d 1358, 1360 (7th Cir. 1995) ("There can be no doubt that a defendant facing the death penalty at the hands of the state faces irreparable injury").

### C. The Balance of Harm is in Mr. Purkey's Favor.

The government's interest in securing Mr. Purkey's execution before full and fair judicial review of his Atkins claim is adherence to an arbitrary schedule announced just weeks ago. Mr. Purkey's request for a stay is not based on any delay on his part. He moved diligently and was in the process of preparing his claims well before the execution notice was issued. As noted above, Mr. Purkey had no reason to anticipate the setting of his execution date, as the federal government has not carried out an execution since 2003 and has had no execution protocol in place since 2011.

Given the circumstances, Mr. Purkey was undeniably diligent in bringing his § 2241 petition, and the posture of his litigation therefore stands in contrast to

those cases where last–minute stay requests have been denied due to a prisoner's delay. See, *e.g.*, *Nelson v. Campbell*, 541 U.S. 637, 649 (2004); *Hill*, 547 U.S. at 584. In any event, under no scenario can the Government's interest in adhering to an execution schedule set more than fifteen years after the last federal execution outweigh the interest of Mr. Purkey and the public in ensuring that a person not be put to death without full, fair, and reliable review of the important and fundamental challenges to the legality of his conviction and death sentence presented in this petition.

### D. The Public Interest Weighs Heavily in Favor of a Stay

There can be no public interest in an unconstitutional execution. "The public interest clearly favors the protection of constitutional rights." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 1992) (affirming preliminary injunction to protect plaintiffs' free exercise rights where the harm to the borough of posting items on utility poles is outweighed by the harm to plaintiffs of being unable to practice their religion). Injunctive relief, in fact, will serve the Government's and the public's interest in executing the death sentence in a manner consistent with the Constitution. See *Trop v. Dulles*, 356 U.S. 86, 100 (1958) ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized

standards."). To the extent there is a public interest in timely enforcement of a death sentence, that interest does not outweigh the public interest in knowing that the federal government will carry out an execution in conformity with the Constitution and the will of Congress. See 28 U.S.C. § 3596(c).

<b>REQUEST FOR RELIEF</b>

WHEREFORE, for the foregoing reasons and those explained in his § 2241 Petition, Mr. Purkey respectfully requests that the Court stay his execution pending its consideration of his claims.

Respectfully submitted,

| /s/Rebecca E. Woodman | /s/Michelle M. Law |
|---|---|
| Rebecca E. Woodman | Michelle M. Law, MO Bar: 45487* |
| Attorney at Law, L.C. | Assistant Federal Public Defender |
| 1263 W. 72nd Ter. | Western District of Missouri |
| Kansas City, Missouri 64114 | 901 Saint Louis Street, Suite 801 |
| Telephone:  (785) 979-3672 | Springfield, Missouri 65806 |
| Email: rewlaw@outlook.com | Telephone: (417) 873-9022 |
| | Facsimile:  (417) 873-9038 |
| | Email:  michelle_law@fd.org |
| | *to be admitted pro hac vice |

<i>Attorneys for Petitioner Wesley Ira Purkey</i>

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2019, a copy of this Motion for Stay of Execution has been served upon the following party via first class U.S. mail at the addresses listed below:

Warden, USP Terre Haute
4700 Bureau Road South
Terre Haute, Indiana 47802

Timothy A. Garrison
United States Attorney
Charles Evans Whittaker Courthouse
Room 5510
400 E. 9th Street
Kansas City, MO 64106

/s/ Rebecca E. Woodman
REBECCA E. WOODMAN

## APPENDIX TO MOTION FOR STAY OF EXECUTION

1. Listing of prior petitions, with docket numbers, filed in any state or federal court challenging the conviction and sentence challenged in the current petition:

*Purkey v. United States*, Case No. 4:06-cv-08001-FJG, Dkt. # 47 (§ 2255 Motion), Dkt. # 52 (Memorandum of Law)

2. Copy of, or a citation to, each state or federal court opinion, memorandum, decision, order, transcript of oral statement of reasons, or judgment involving an issue presented in the petition:

*Purkey v. United States*, Case No. 4:06-cv-08001-FJG, Dkt. #89 (Order Denying movant's Motion to Vacate, Set Aside or Correct His Sentence Pursuant to 28 U.S.C. § 2255), 2009 WL 3160774 (W.D. Mo. Sept. 29, 2009)

*Purkey v. United States*, 729 F.3d 860 (8th Cir. 2014)

*Purkey v. United States*, 135 S.Ct. 355 (2014) (mem)

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

| | |
|---|---|
| **WESLEY IRA PURKEY**, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Cause No. 2:19-cv-00414-JPH-DLP |
| | ) |
| **WARDEN OF USP TERRE HAUTE,** | ) |
| **UNITED STATES OF AMERICA**, | ) |
| | ) |
| Respondents. | ) |

## <u>RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS</u>

Wesley Purkey's § 2241 habeas petition raises the wrong claims, before the wrong court, and at the wrong time. This Court should dismiss it with prejudice.

Purkey cannot file a petition under § 2241 unless he shows that § 2255 is inadequate or ineffective, and he has failed to do so. For three claims, he argues that ineffectiveness of § 2255 counsel renders § 2255 inadequate or ineffective, but no court has ever accepted this argument, and this Court should not be the first. For one claim, he argues that his trial counsel committed fraud on the court in the Western District of Missouri, but that claim must be raised in that court. For his remaining four claims, he gives no explanation for why § 2255 is inadequate or ineffective. For these reasons, the Court should dismiss his claims with prejudice.

Further, every claim his petition contains is barred because it either was or could have been presented during his trial, his initial § 2255 motion, or appellate proceedings on both. If Purkey had a procedural recourse, it would be in the Western District of Missouri,

the court of his conviction, and only if he could show extraordinary circumstances justifying the decade of delay between his § 2255 motion and this filing. Because Purkey has failed to overcome these procedural bars to his petition, this Court should dismiss it with prejudice.

Purkey's claims also fail on the merits. His trial counsel was not ineffective: he was not deficient in failing to object to a juror when Eighth Circuit law on juror bias was unsettled; he presented adequate mitigation evidence; and there is no basis for concluding that he instructed Purkey to perjure himself. Further, trial counsel did not perpetrate a fraud on the court with his § 2255 affidavit, which in any case the Eighth Circuit disregarded in ruling on his § 2255 claim. There is no possibility that the jury misunderstood the mitigating factor instructions; a sentencing jury need not find the weighing consideration beyond a reasonable doubt; the death penalty does not facially violate the Eighth Amendment; and this Court should not extend the *Atkins* bar on capital punishment of the intellectually disabled to those with mental illnesses.

Purkey's claims all lack merit, but the Court need not resolve them to resolve this case. Purkey has no basis to revive these claims here and now, most of which he raised and all of which he could have raised at trial or in his § 2255 motion in his court of conviction a decade and more ago. Congress limited second and successive § 2255 motions in the Anti-Terrorism and Effective Death Penalty Act of 1996 to stop petitions like this one. The Court should dismiss it with prejudice.

**Table of Contents**

**Page**

I.  Background..................................................................................................... 4

      A.  Procedural History................................................................................ 4

      B.  Jury Trial and Appeal .......................................................................... 5

      C.  Section 2255 Motion and Appeal....................................................... 28

      D.  The Present § 2241 Petition .............................................................. 33

II.  Section 2241 Does Not Permit Purkey to Avoid the § 2255(h) Limits
     on Second and Successive Motions........................................................... 34

      A.  Purkey Has Not Shown that § 2255 is Inadequate or Ineffective under
          Existing Precedent............................................................................. 37

      B.  This Court Should Not Extend *Ramirez*, *Martinez*, and *Trevino* to
          § 2241 ............................................................................................... 42

      C.  Purkey Cannot Rely on § 2241 to Escape the Law of the Circuit of
          Conviction ........................................................................................ 47

III.  Purkey's Claims Are Procedurally Barred and Otherwise Lack Merit.................. 50

      A.  Claim 1 - Trial Counsel Was Not Ineffective for Failing to Strike a Juror
          with the Same Name as the Victim ..................................................... 50

      B.  Claim 2 – Trial Counsel Investigated and Presented Abundant Mitigation
          Evidence, so That the Proffered "New" Evidence is Cumulative.............. 62

      C.  Claim 3 – Trial Counsel's Affidavit Contained No Lies but in Any Case
          Was Disregarded by the Eighth Circuit in Its Review of Purkey's § 2255
          Motion .............................................................................................. 79

      D.  Claim 4 – There Is No Possibility that the Jury Misunderstood the
          Instructions Regarding Mitigating Factors.................................................. 87

      E.  Claim 5 - *Hurst v. Florida* Provides No Support to Purkey's Claim and a
          Capital Sentencing Jury Does Not Need to Find That Aggravating Factors
          Outweigh Mitigating Factors Beyond a Reasonable Doubt........................ 96

F.     Claim 6 - Imposition of the Death Penalty Under the Federal Death Penalty Act is Not Cruel and Unusual Punishment.................................................. 102

G.     Claim 7 - The Categorical Exemption from Capital Punishment Does Not Extend Beyond Intellectual Disability as Held in *Atkins v. Virginia* ........ 106

H.     Claim 8 – Trial Counsel Was Not Ineffective in Filing A Motion to Suppress, or in Dealing With Collateral Issues Related to the Suppression Motion ............................................................................................... 116

IV.   Purkey is Not Entitled to a Stay ......................................................... 124

A.     Purkey Has No Possibility of Success on the Merits of His Claims......... 124

B.     The Irreparable Harm Prong Must Be Considered in Context.................. 124

C.     Purkey Has Not Diligently Pursued His Claims ....................................... 125

D.     Public Interest Weighs in Favor of Enforcing the Law............................. 126

V.    Conclusion ................................................................................................. 127

# I.
# __Background__

## A.  __*Procedural History*__

On November 5, 2003, a jury in the Western District of Missouri convicted Wesley Purkey of the kidnaping, rape, and the murder of Jennifer Long, in violation of 18 U.S.C. §§ 1201(a), 1201(g), and 3559(d).  After a seven-day penalty phase, which encompassed the testimony of 13 government witnesses who testified in support of 10 aggravating factors, and 18 defense witnesses who testified in support of 27 mitigating factors, the jury found 9 aggravating factors, no mitigating factors, and recommended a sentence of death. On January 23, 2004, following a denial of Purkey's motion for a new trial, the district court sentenced him to death.  The Eighth Circuit affirmed his conviction and sentence. *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005), *cert. denied*, 549 U.S. 975 (2006).

Purkey then filed a motion under 28 U.S.C. § 2255, which the trial court denied. The Eighth Circuit affirmed the district court's denial of Purkey's § 2255 petition.  *Purkey v. United States*, 729 F. 3d 860 (8th Cir. 2013), *cert. denied*, 135 S.Ct. 355 (2014).

On July 25, 2019, the United States Department of Justice set an execution date for Purkey for December 13, 2019.  On August 22, 2019, Purkey filed a petition for clemency with the Office of the Pardon Attorney, United States Department of Justice.

Purkey has now filed a petition under 28 U.S.C. § 2241, raising many of the same claims he raised on appeal and in his § 2255 motion.  He has also filed a motion for a stay of his execution.  His claims, made sixteen years after his trial, are procedurally barred and substantively without merit.  This Court should deny his petition without a hearing.

### B.      *Jury Trial and Appeal*

#### 1.      *Guilt Phase Evidence*

Wesley Purkey was tried and convicted of kidnaping, raping, and murdering 16-year-old Jennifer Long.  On December 15, 1998, while in the Wyandotte County jail awaiting trial for the robbery and first-degree murder of 80-year-old Mary Ruth Bales, Purkey contacted law enforcement and offered to speak about a murder and kidnaping that had occurred earlier that year.  Purkey said he wanted to spend his time in a federal prison, rather than a state prison.  After giving an account of the kidnaping, rape, and murder of the victim, later identified as Jennifer Long, Purkey refused to cooperate further unless he was assured he would be federally prosecuted.

Frederick Duchardt was appointed to represent Purkey at trial.  Laura O'Sullivan served as second-chair.  (T. Tr. Vol. I at 1.)[1]

At trial, the Government established that on January 22, 1998, Purkey applied for a position as a plumber with the Roto-Rooter plumbing company, located in Kansas City, Missouri.  Following the interview, Purkey stopped his truck in a parking lot and smoked a rock of crack cocaine and then proceeded east on Truman Road.  (T. Tr. Vol. VII at 925.)  Purkey planned to go buy something to drink before heading back to his home in Lansing, Kansas.  (T. Tr. Vol. IV at 485.)  At that point, Purkey saw a young woman whom he believed to be approximately 17 to 19 years of age.  During a conversation with the girl he learned that her name was Jennifer.  (Dkt. 48-1.)  Purkey asked the girl if she wanted to get

---

[1]"T. Tr." refers to the trial transcripts by volume and page number, which were filed with this Court as docket entries 28 through 45.

something to drink with him.  Jennifer entered the pickup without any threats or force, according to Purkey.  (T. Tr. Vol. IV at 485.)  The two then drove to a liquor store a few miles away and purchased gin and orange juice.  Purkey soon learned that Jennifer was in high school and that she had left school during the morning after arguing with some female classmates.  (T. Tr. Vol. IV at 485.)

Purkey then informed Jennifer that he wanted to go to his home, which was in Kansas, for a few minutes.  Jennifer told Purkey that she did not want to go to Kansas and that she wanted to be dropped off.  At that point, Purkey reached over into the glove box, pulled out what he described as a boning knife and placed it under his right thigh in the presence of Jennifer.  Purkey claimed that it was at that point that he decided not to let Jennifer out of his truck.  (T. Tr. Vol. IV at 487.)

Purkey then drove west on Interstate 70 from Missouri into Kansas, to his home in Lansing.  (T. Tr. Vol. IV at 487, 493-94.)  Upon arrival, Purkey took Jennifer into his basement; she asked him to please take her back home.  (T. Tr. Vol. IV at 510.)  Holding a knife in his hand, Purkey ordered Jennifer to take her clothes off and lie down on the floor, where he then raped her.  (T. Tr. Vol. VII at 997.)

Following the rape, Purkey told her that he had just finished a long sentence in the penitentiary and did not want to return.  Jennifer told Purkey that she had been a virgin. Purkey became fearful.  (T. Tr. Vol. VII at 942.)  Jennifer begged Purkey to let her leave. (T. Tr.  Vol. VII at 1017.)  A brief struggle ensued and Purkey became enraged and began stabbing Jennifer in the chest, neck, and face, eventually breaking off the blade of the knife inside her body.  (T. Tr. Vol. VII at 942-43, 1017-18, 1024.)

Following the murder, Purkey put Jennifer into a large tool box designed to fit into the back of a pickup truck.  (T. Tr. Vol. VII at 1024-25.)  Purkey changed his clothes and got rid of Jennifer's backpack.  Purkey then drove to Snoopy's Bar in Lansing and had several drinks.  (T. Tr. Vol. VII at 1025-26.)  Purkey next drove to the Sears store in Lansing and purchased an electric chainsaw for $59.[2]

Over the next several days, while his wife was at work and his stepchildren were at school, Purkey dismembered Jennifer Long with the chainsaw while she was lying inside the tool box.  (T. Tr. Vol. VII at 1028-29.)[3]  Purkey put her body parts in plastic bags and mixed in leaves and debris from his back yard.  (T. Tr. Vol. VII at 1029-30.)  Purkey purchased two cords of wood to burn her body parts in his fireplace, using diesel fuel to accelerate the burning process.  (T. Tr. Vol. IV at 492; T. Tr. Vol. V at 646-47; T. Tr. Vol. VII at 1030.)

Purkey next cleaned up the chainsaw using gasoline to remove the blood and human debris.  (T. Tr. Vol. VII at 1032.)[4]  Purkey made his three stepsons help him wash down the basement although they had no idea that a murder had taken place there.  (T. Tr. Vol. V

---

[2]Investigators later recovered a copy of the receipt from Sears confirming Purkey purchased the electric chainsaw on January 22, 1998.  (T. Tr. Vol. IV at 501; Vol. VII at 1022.)

[3]The tool box was later recovered by investigators at the home of Purkey's friend, Patrick Howe.  Purkey gave the tool box to Howe following the murder.  (T. Tr. Vol. VI at 730-32.)  The box has several chainsaw cut marks in the bottom and on the sides.  (T. Tr. Vol. VI at 730, 810-18; Vol. VII at 1029.)

[4]The chainsaw was recovered by investigators from the home of Purkey's stepfather, Edward Wiley.  (T. Tr. Vol. 5, 639-40.)

at 648-49; Vol. VII at 1030-31.)  Purkey also swept the ashes out of the fireplace after burning Jennifer's body parts.  Purkey used a hammer to crush the bones that did not burn up.  (T. Tr. Vol. VII at 1033.)  The bags with the bones and ashes were taken by Purkey south to Clearwater, Kansas, after his family moved from Lansing in March 1998.  (T. Tr. Vol. IV at 517; T. Tr. Vol. VII at 1034.)

Purkey threw the bags with Jennifer's ashes and bones into a septic pond located on the property in Clearwater.  Crushed human bones of an individual under the age of 25 were recovered from the pond in the area where Purkey indicated he had thrown Jennifer's remains.  (T. Tr. Vol. VI at 789.)  Human bones were also found in the sweepings from the ash pit of the fireplace at Purkey's former home.  (T. Tr. Vol. VI at 781-83.)  All of the bones recovered by the FBI appeared to have been burned.  (T. Tr. Vol. VI at 781-94.)  Purkey admitted the bones recovered from the septic pond were those of Jennifer Long. (T. Tr. Vol. VII at 1034.)

Purkey's defense at trial was that he did not kidnap the 16-year-old victim and that she had gone with him to Kansas voluntarily.  (T. Tr. Vol. VII at 934, 1014.)  Purkey's testimony at trial was inconsistent with all four of his previous statements to investigators in which he steadfastly insisted that he had kidnaped Jennifer Long.  Significantly, Purkey's testimony also contradicted his own prior sworn testimony in the same case, while represented by the same attorneys as at trial, in a suppression hearing held October 25, 2002.  (Supp. Tr. at 59, Dkt. 26; T. Tr. Vol. VII at 1002-08, 1041-43.)  The jury rejected Purkey's testimony and defense, returning a guilty verdict on November 5, 2003.

    2.     *Penalty Phase Evidence*

The Government called nine witnesses in its case-in-chief during the penalty phase in support of its submission of six statutory and four non-statutory aggravating factors. (T. Tr. Vols. IX-XI at 1210-1403.) Purkey called 18 witnesses in support of his submission of 27 mitigating factors, including four doctors that testified concerning his alleged mental disorders. (T. Tr. Vols. XI-XV at 1406-1955.) In rebuttal, the Government called four expert witnesses, including three doctors, in response to Purkey's diminished mental capacity and brain damage claims. (T. Tr. Vols. XVI-XVII at 1962-2225.)

    a.     *Aggravation Evidence*

The Government submitted six statutory aggravating factors to the jury, and the jury found all six, namely, that: (1) the death of Jennifer Long occurred during the commission and attempted commission of her kidnaping; (2) Purkey killed Jennifer Long in an especially heinous, cruel, and depraved manner in that the killing involved torture and serious physical abuse; (3) the victim was particularly vulnerable due to her youthful age of 16 years; (4) Purkey had previously been convicted of an offense punishable by a term of imprisonment of more than one year involving the use, attempted use, and threatened use of a firearm against another person; (5) Purkey had previously been convicted of an offense resulting in the death of a person for which a sentence of life imprisonment was authorized by statute; and (6) Purkey had previously been convicted of two or more offenses punishable by a term of imprisonment of more than one year, committed on different occasions and involving the infliction and attempted infliction of serious bodily injury and death upon another person. (Dkt. 23-37 at 91-92.)

-10-

The Government submitted four non-statutory aggravating factors to the jury, of which the jury found three: (1) the Government established loss and harm because of the victim's personal characteristics as an individual human being and the impact of the death upon the victim's family; (2) Purkey had previously killed Mary Ruth Bales in a vicious manner in that he repeatedly struck her in the head with a hammer until she died; and (3) Purkey had a substantial criminal history.  The Government also submitted a non-statutory aggravating factor that the jury did not find – the future dangerousness of Purkey.  (Dkt. 23-37 at 92-93)

Before Purkey murdered Jennifer Long and Mary Ruth Bales, he spent most of his adult life incarcerated in various prisons in the states of Kansas, Arizona, and Oregon. Purkey had 13 prior felony convictions before receiving the sentence of death in this case, including:  a 1971 conviction for first-degree burglary; 1976 convictions for robbery and theft; a 1978 conviction for aggravated escape from custody; a series of convictions for aggravated robbery, kidnaping, aggravated battery, and firearms violations stemming from a 1980 crime spree which included two home invasion robberies plus the kidnaping and aggravated battery of Gregg Carlberg described below; and Purkey's May 2000 convictions for the first-degree murder and aggravated robbery of Bales.  (T. Tr. Vol. VII at 975-86; T. Tr. Vol. IX at 1211-14; T. Tr. Vol. XVII at 2166.)  Purkey received a life sentence as part of his 1980 crime spree but was paroled in March 1997 after serving approximately 16½ years on the life sentence.  (T. Tr. Vol. VII at 985.)

Evidence in the Government's aggravation case established that on October 27, 1998, approximately nine months after kidnaping, raping, murdering, and dismembering

Jennifer Long, Purkey went to the Kansas City, Kansas, home of Mary Ruth Bales, an 80-year-old widow who walked using a cane.  (Dkt. 48-2.)  Bales had called Reddi-Root'r about a leaking pipe.  Purkey, who had been working at Reddi-Root'r for about ten weeks, agreed to make the necessary repairs for Bales.

The next day, October 28, 1998, Purkey smoked crack cocaine with a prostitute and then drove to the home of Bales with the prostitute in his work van.  While the prostitute waited outside, Purkey went into Bales' bedroom, and when Bales asked him what he was doing there, he viciously bludgeoned the 80-year-old grandmother to death with a claw hammer.  Using the claw side of the hammer, Purkey caved in Bales' cranium and face.  She had defensive wounds on both of her hands, apparently having tried to ward off the hammer blows from Purkey.  (T. Tr. Vol. IX at 1236.)  While Bales lay dead in her bedroom, Purkey stole $200 from her purse, after which he and the prostitute smoked some more crack cocaine and ate food from Bales's kitchen.  Purkey planned to burn down Bales's house to eliminate evidence, but before he could, he was arrested for these crimes and confessed.

He was charged with first-degree murder and aggravated robbery in Wyandotte County, Kansas, District Court and pled guilty as charged on April 28, 2000.  Purkey was sentenced to a term of life imprisonment with eligibility for parole after 15 years.  (T. Tr. Vol. IX at 1215-43.)

As additional aggravation evidence, Gregg Carlberg testified that he was the victim of a kidnaping, aggravated battery, and aggravated assault by Purkey in 1980.  Purkey kidnapped Carlberg from a convenience store in the summer of 1980 in Wichita, Kansas.

(T. Tr. Vol. X at 1245.)  Purkey and an accomplice put Carlberg into the trunk of a car, drove him to a wooded area, robbed of him $40, and later shot him in the head and shoulder while forcing him to lie down in an abandoned bathtub in the woods even though he did not resist the robbery.  (T. Tr. Vol. X at 1250-54.)  Purkey later admitted to shooting Carlberg in the back of the head. (T. Tr. Vol. X at 1256.) Carlberg suffered serious injuries including paralyzation for several months, a stroke, and permanent neurological damage. Part of the bullet Purkey fired into Carlberg's head remained lodged in the back of his skull.  (T. Tr. Vol. X at 1253-54.)

Ken Lucas, a gang expert with the Arizona Department of Corrections, testified that Purkey was an active member of the Arizona Aryan Brotherhood, a violent white supremacist prison gang, while confined in a Florence, Arizona, prison in the early 1980's. (Dkt. 48-3, 48-4; T. Tr. Vol. X at 1340-48, 1352-54, 1360.)  Lucas also explained the meaning of many of the tattoos that appeared on Purkey's body and their association with the Aryan Brotherhood.  Purkey had a large "Aryan Brotherhood" tattoo on his back, a Nazi swastika surrounded by "Aryan Pride" on his arm, another swastika tattoo on his right forearm, and a tattoo of a Ku Klux Klansman with a shotgun and a noose.  (T. Tr. Vol. X at 1361-66.)

Gary Lee Hatfield, a former inmate of slight stature who briefly served time with Purkey in the Oregon Department of Corrections in 1987, testified that Purkey forcibly sodomized him at knife-point and then beat him in the kitchen of the prison camp where they were serving prison sentences.  (T. Tr. Vol. X at 1270, 1273-77.)

-13-

William Porter, District Attorney for Tillamook County, Oregon, was the prosecuting attorney assigned to prosecute the Hatfield sodomy case. (T. Tr. Vol. X at 1315-17.) He testified he eventually dismissed the forcible sodomy charge against Purkey because Purkey cooperated in an internal prison investigation that resulted in criminal charges against prison employees. Porter testified that Hatfield never recanted his allegations that Purkey had beaten and forcibly sodomized him in the kitchen of the prison camp. In addition, Porter described the incriminating evidence contained in his files, including photographs of injuries to Hatfield as a result of the assault. (T. Tr. Vol. X at 1318-29.)

The parents of Jennifer Long as well as one of her close personal friends testified, explaining what her loss meant to their lives and how it affected their families. (T. Tr. Vol. XI at 1396-1406.)

### b.     Mitigation Evidence

Purkey called 18 witnesses to support the 27 mitigating factors he submitted to the jury. His mitigation case lasted approximately three days and consumed more than 500 pages of trial transcript. (T. Tr. Vols. XI-XV at 1406-1955.) The 27 mitigating factors Purkey submitted to the jury were: (1) Purkey's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired; (2) Purkey committed the offense under severe mental or emotional disturbance; (3) With proper medications, such as the medications that Purkey is currently taking, Purkey's mental illness and behaviors can be managed; (4) Purkey suffered brain injuries as a result of car accidents, drug abuse, or both; (5) Purkey suffered significant

psychological and emotional damage as a result of the serious physical and emotional abuse of him by his parents; (6) Purkey suffered significant psychological and emotional damage as a result of sexual abuse of him by his mother; (7) Purkey suffered significant psychological and emotional damage as a result of his growing up in a dysfunctional home environment in which alcohol abuse, sexual promiscuity, and incestuous sex were modeled as proper behavior by his parents; (8) Purkey has never received treatment for the psychological and emotional damage that he suffered as a result of his parents' abuse of him; (9) Purkey's past criminal behavior is attributable, at least in part, to the brain injuries and psychological and emotional damage that he suffered earlier in his life; (10) Purkey became dependent upon alcohol and illegal drugs at an early age because of a genetic predisposition inherited from his parents and because such dependence was modeled for him by his parents and his older brother Gary; (11) Purkey's past criminal behavior is attributable, at least in part, to his alcohol and drug dependence; (12) as a child, Purkey suffered from slow speech development, and for his entire life, Purkey has suffered from the disability of stuttering; (13) while incarcerated, Purkey was the victim of serious physical abuse, that is stabbings; (14) while incarcerated, when given the opportunity to do so, Purkey completed a significant number of hours of college course work; (15) while incarcerated, when given the opportunity to do so, Purkey received training and became qualified as a plumber; (16) Purkey has offered to donate a portion of his liver to his sister-in-law who is dying of liver failure; (17) Purkey should be sentenced to life imprisonment without release because Purkey was led to believe that he would receive that sentence if he provided information regarding the killing of Jennifer Long, and Purkey provided all of the

-15-

information which was required; (18) the disappearance of Jennifer Long was solved only because Purkey came forward and admitted that he had killed Jennifer Long, and directed authorities to evidence about the killing; (19) by coming forward and admitting that he had killed Jennifer Long, and directing authorities to evidence about the killing, Purkey has shown remorse for what he did; (20) Purkey has repeatedly expressed his remorse for what he has done; (21) Purkey is the father of Angie Purkey Genail, and the two have carried on a loving, father-daughter relationship, with Purkey providing Angie Purkey Genail advice, nurturance, and emotional support, even while he has been incarcerated; (22) Angie Purkey Genail loves her father very much; (23) if Purkey is sentenced to life imprisonment without possibility of release, he and Angie Purkey Genail would continue to carry on a loving, nurturing father-daughter relationship; (24) Purkey is the grandfather of Angie Purkey Genail's children Mikey, age 4, and Haley, age 1, and has carried on a loving, grandfatherly relationship, particularly with Mikey, speaking with Mikey on the telephone on numerous occasions; (25) if Purkey is sentenced to life imprisonment without possibility of release, he and his grandchildren, Mikey and Haley, would continue to carry on a loving, nurturing grandfather/grandchild relationship; (26) Purkey has loving and caring relationships with friends and family, and those relationships would continue if he was sentenced to life imprisonment without possibility of release; and (27) for the last three years, Purkey has volunteered to offer good advice to many young men in trouble about how to avoid a life of crime, and would continue to do so if sentenced to life imprisonment without possibility of release.  (Dkt. 23-37 at 94-97)

Dr. William Grant, a Bureau of Prisons psychiatrist, testified that he had prescribed three medications for Purkey that were designed to address Purkey's depression, anxiety, anger, and aggression.  Dr. Grant testified that he used the best medications that were available.  (T. Tr. Vol. XI at 1406-16.)

Dennis Messoline, an Oregon attorney who represented Purkey in the Gary Hatfield sodomy case, testified that he had planned to assert a consent defense and had filed a motion with the court seeking permission to elicit Hatfield's prior sexual history at trial before the case was eventually dismissed.  (T. Tr. Vol. XI at 1422-48.)

Nealy Vinson, a former inmate who was incarcerated with Purkey and Hatfield in Oregon, was called to discredit Hatfield's account of the sexual assault by Purkey.  Vinson testified that Purkey got along well with other inmates and that he was not a racist.  Vinson also testified that Purkey was not violent during his incarceration in Oregon.  (T. Tr. Vol. XI at 1449-64.)

Randy Masterson, another inmate who was incarcerated with Purkey in Oregon, testified Purkey was not a racist, got along well with the other inmates, and was not involved with the Aryan Brotherhood prison gang in Oregon.  Purkey also offered Masterson's testimony to discredit Hatfield.  Masterson testified that he had sexual relations with Hatfield in a broom closet at the prison.  Masterson also testified that he was the homosexual lover of Purkey for two and a half years.  (T. Tr. Vol. XI at 1468-76.)

Linda Skeen, a pastor at the Faith and Evangelistic Center in Leavenworth, Kansas, testified that she became a friend of Purkey's while he was on parole in 1997 and 1998.

-17-

Skeen testified that Purkey was always nice when in her home and that she and her husband referred to Purkey as "Uncle Wes." (T. Tr. Vol. XI at 1478-84.)

Patrick Howe, a friend of Purkey's and a tattoo artist, testified that Purkey asked him to cover up his Nazi swastikas and Aryan Brotherhood tattoos. Howe testified that he tried to cover up the tattoos with skin toned ink, but the process was unsuccessful. Howe also testified that Purkey was friendly to people of other races in prison. (T. Tr. Vol. XI at 1485-91.)

Dominic Genuik, a Public Service Administrator at the Hutchinson Correctional Facility in Kansas, testified that Purkey was an auditorium custodian while incarcerated at his institution. Genuik testified that Purkey participated in a program called JAIL (Juvenile Assistance Information Liaison), a program similar to the Scared Straight program. The purpose of the program was to counsel juvenile offenders not to violate the law and to share prison experiences. Inmates participating in the program would share with the juveniles the consequences of negative behavior in an effort to discourage participation in criminal activity. Genuik testified that Purkey was not a racist, counseled both African-American and Hispanic juveniles, and he did not consider Purkey to be a security threat at the institution. (T. Tr. Vol. XI at 1491-1501.)

Michael Gibbons, a correctional counselor from the Lansing Correctional Facility, testified that he was Purkey's former parole officer in Kansas. Gibbons testified that Purkey participated in a drug and alcohol counseling program, a family counseling program, and that he was employed while on parole. Gibbons testified that Purkey had no employment problems while under his supervision. Gibbons further testified that while

-18-

Purkey was on parole he tested positive for alcohol, and although he denied using cocaine, he sought to gain admission into a drug counseling program at the Kansas University Medical Center.  (T. Tr. Vol. XI at 1502-17.)

Marguerite Hotchkiss, Purkey's 78-year-old aunt, testified she was the sister of Purkey's father.  She testified in detail about Purkey's neglectful and disadvantaged childhood.  She further testified that when Purkey was five years old, he could not speak words and would only grunt.  She said that Purkey was a stutterer as he got older and that stuttering was a common trait in Purkey's family.  Hotchkiss testified that Purkey's father, Jack, had suffered a head injury requiring a metal plate to be inserted in his head, that he had terrible headaches, and that he was an alcoholic who was always drunk.  She also testified that Jack Purkey lost a good job at Boeing Aircraft in Wichita, Kansas, because of his alcohol problem.  She further testified that Jack Purkey committed suicide in 1984.  She testified that Purkey was involved in a terrible automobile accident and was hospitalized. Hotchkiss also testified about her love for Purkey and that she would continue her relationship with him if he was granted a sentence of life without parole.  (T. Tr. Vol. XII at 1520-29.)

Robert Lopez, a fellow inmate who was incarcerated with Purkey at the Hutchinson Correctional Facility in Kansas, worked as a custodian with Purkey.  Lopez testified that Purkey was not associated with the Aryan Brotherhood prison gang at the Hutchinson facility.  He testified that Purkey read the Bible frequently and he considered Purkey to be a friend who had counseled him about staying out of gangs while in prison.  Lopez also testified Purkey was not a racist and would help African-American inmates with legal

work.  He testified Purkey represented other inmates, never fought with other inmates, counseled juvenile offenders, and did not use drugs in prison.  Finally, Lopez also testified that in his opinion, Purkey loved his daughter very much.  (T. Tr. Vol. XII at 1530-40.)

Angie Genail, Purkey's daughter, testified about her relationship with her father. She displayed a large number of photographs of Purkey's family and described for the jury the individuals in each photo.  She testified Purkey's parents were alcoholics.  She testified that Purkey had shared with her that his mother had thrown alcoholic drinks in his face when he was a child.  She testified that she had a good and loving relationship with Purkey and he had always kept in contact with her even though most of his adult life was spent in prison.  She testified that Purkey was a good grandfather to her son, was supportive to her, that she loved him, and that she would maintain a relationship with Purkey if he was given a life sentence.  (T. Tr. Vol. XII at 1541-48.)

Gary Hamilton, Purkey's brother, testified that Jack Purkey was his stepfather and Purkey's father.  Hamilton testified that Jack Purkey was an alcoholic who had lost his job at Boeing Aircraft, after which he lived on skid row in Wichita.  He testified that Jack Purkey beat Purkey, himself (Gary), and their mother frequently.  He testified that Purkey's mother, Velma Purkey, was also an alcoholic and would bring men home to have sex in front of both him and Purkey when they were children and in their teen years.  He testified those men beat both him and Purkey.  Hamilton further testified his mother sexually abused him, but Hamilton did not know if she had also sexually abused Purkey.  He also testified that both he and Purkey had been diagnosed as bipolar.  He testified that he had prior felony convictions for property theft crimes, but he had decided to change his life in the 1970's

-20-

and had not been in trouble with the law since that time.  He further testified that Purkey had volunteered to donate part of his liver to help Hamilton's sick wife who had liver disease.  On cross-examination, Hamilton admitted that Purkey had been an aggressive, self-centered, and manipulating con man.  (T. Tr. Vol. XII at 1548-64.)

Reverend John Otto, a prison minister at the Hutchinson Correctional Facility, testified that he counseled Purkey in prison.  He further testified that in his belief, Purkey was a Christian and was remorseful for his criminal conduct.  (T. Tr. Vol. XII at 1564-69.)

Dr. Bruce Leeson, a clinical psychologist with the Missouri Department of Corrections, testified that he was retained as an expert witness for Purkey and had administered neuropsychological tests to Purkey.  Dr. Leeson testified that in his opinion Purkey was depressed and anxious and had a significant amount of frontal and temporal lobe brain impairment, which detrimentally affected his ability to plan ahead and focus. He further testified that the brain damage could explain Purkey's impulsive behavior.  On cross-examination, Dr. Leeson said that Purkey had scored well on intelligence tests, and that Purkey's test results correlated with classification profiles for drug abuse, assault, rape, and antisocial personality disorder.  (T. Tr. Vols. XII-XIII at 1577-1650.)

Mark Russell, a correctional counselor at the United States Penitentiary in Leavenworth, Kansas, testified that while Purkey was incarcerated in the special housing unit at Leavenworth he had no disciplinary violations.  He further testified that Purkey had submitted a request to have his tattoos surgically removed or covered.  (T. Tr. Vol. XIII at 1651-63.)

Dr. David Preston, a physician, testified that according to Positron Emission Tomography (PET) tests he performed on Purkey's brain, Purkey had frontal and temporal lobe brain damage.  He testified that frontal lobe damage could lead to poor planning and poor judgment by a person.  Dr. Preston testified the damage could have been caused by car accidents Purkey had been in and could have been exacerbated by Purkey's drug and alcohol abuse.  (T. Tr. Vol. XIII at 1664-1736.)

Dr. Stephen Peterson, a forensic psychiatrist, was another expert witness who testified on Purkey's behalf.  Dr. Peterson said that he testifies as an expert witness about 10 to 20 times per year, usually for the defense, and has previously testified in capital cases. Dr. Peterson testified he had received and reviewed a stack of Purkey's records from trial counsel that was about three feet, three inches high.

Dr. Peterson opined that Purkey had a longstanding chronic mental illness that had been untreated at the time of the murders of Jennifer Long and Mary Ruth Bales.  He testified that Purkey suffered severe sexual, physical, and emotional abuse during childhood.  He testified that Purkey was extremely impulsive and angry, and concluded that Purkey had substantial problems with substance abuse beginning in his teens, "that persons such as Mr. Purkey, who have had severe untreated traumas, very frequently then impair themselves with severe substance abuse."  (T. Tr. Vol. XIV at 1770.)

He testified that Purkey suffered from depression and was dysthymic, and had a severe personality disorder with anti-social features, obsessive-compulsive, and dependency features.  (T. Tr. Vol. XIV at 1738-58.)

Dr. Peterson further described in detail three closed-head injuries that Purkey allegedly suffered in 1968, 1972, and 1974.  He testified in great detail about Purkey's abusive, chaotic, and neglectful home life as a child and teenager.  He described Purkey's parents as alcoholics and told the jury that Purkey's father had committed suicide.  In conclusion, Dr. Peterson testified that Purkey did not have the capacity to form the intent to kill Jennifer Long because of severe psychiatric illness.  Dr. Peterson testified that "generally children who have been sexually or physically or emotionally abused, if they receive adequate treatment, get some healing and get some control over things, which Mr. Purkey never had."  (T. Tr. Vol. XIV at 1749-85.)

On cross-examination, Dr. Peterson admitted that Purkey had most if not all of the characteristics of antisocial personality disorder, and that 12 or 13 psychologists/psychiatrists had concluded that Purkey was a sociopath and/or had antisocial personality disorder.  (T. Tr. Vol. XIV at 1785-1832.)

Dr. Mark Cunningham, a clinical and forensic psychologist, testified as a mitigation specialist on behalf of Purkey.  Dr. Cunningham testified that he had reviewed a total of ten binders of information from Purkey's incarcerations from prisons in Kansas, Iowa, Arizona, Oregon, and USP Leavenworth, that he reviewed medical and psychiatric records of Purkey's parents, Jack and Velma Purkey, and that he reviewed all Purkey's medical records, prison discipline records, psychiatric records, and school records. Dr. Cunningham also reviewed transcripts of prior hearings and the reports of all the medical experts for both the defense and prosecution, as well as interview summaries of

Purkey's friends and family.  Finally, Dr. Cunningham interviewed Purkey himself a number of times.  (T. Tr. Vol. XV at 1840-56.)

Dr. Cunningham testified that Purkey was a profoundly damaged person in both his neurological and neuro-developmental history and diagnosed Purkey as having neurobehavioral disinhibition.  He described in great detail Purkey's abusive, neglectful, and alcoholic parents.  He testified that because both of Purkey's parents were alcoholics, Purkey had a genetic predisposition to alcoholism.  He informed the jury of their poor parenting skills and how these had impacted Purkey's development. He testified that Purkey as a child was "traumatized by watching his father beat his mother up, by awakening to the chaos of their coming in drunk and yelling and screaming and that sort of thing, by those violent exchanges between his parents sometimes having a sexual component to them as his mother is thrown naked out into the hall."  (T. Tr. Vol. XV at 1862.)

Dr. Cunningham also testified that Purkey had been in car accidents resulting in probable brain damage, consistent with frontal and temporal lobe brain damage.  (T. Tr. Vol. XV at 1840-72.)

Dr. Cunningham testified that Purkey's mother had been sexually promiscuous with several boyfriends in front of Purkey and his brother.  He also testified that Purkey's mother sexually abused him as a child and as a teenager, and described the abuse.  He said Purkey was made to penetrate his mother with a hairbrush and have intercourse with his mother. Dr. Cunningham described reports from Purkey's aunt and brother as corroboration of the sexual abuse.  Dr. Cunningham further testified that Purkey was sexually abused by an

-24-

older male friend of his brother when he was about 12 or 13 years old on one or two occasions. He also described Purkey's significant alcohol and drug addictions, including addiction to methamphetamine, cocaine, and Ritalin. (T. Tr. Vol. XV at 1864-79.)

Dr. Cunningham testified that homicide rates in federal prison were lower than those in American cities, and that there was an extremely high level of security at the Federal Bureau of Prisons facility at ADX Florence, Colorado. He described it as a super-max facility in which the likelihood of violence had been substantially reduced from rates in federal penitentiaries generally, because of the high level of security. Dr. Cunningham also testified that in his opinion, because Purkey was taking appropriate medications to control his behavior, because of his age (then 51 years old), and because of the high security precautions within the Bureau of Prisons, he believed that Purkey would not be a significant threat to others in the future. (T. Tr. Vol. XV at 1879-1908.)

Dr. Cunningham admitted on cross-examination that there was a very high probability that Purkey would assault someone again, "80, 90 percent or more." (T. Tr. Vol. XV at 1914.) He acknowledged Purkey had numerous disciplinary infractions in prison, including assaulting numerous other inmates. (T. Tr. Vol. XV at 1924-28.) He also admitted that for a good part of Purkey's childhood, Purkey's father worked at Boeing and Purkey attended private Catholic schools. (T. Tr. Vol. XV at 1935.)

          *c.*      *Additional Evidence Duchardt Sought to Introduce in Mitigation.*

Trial counsel sought to introduce even more mitigation evidence, but was prohibited by the district court. Duchardt proffered evidence that Purkey's wife, Jeannette Purkey, had poisoned him, under the theory that Purkey was operating under the influence of poison

-25-

when he murdered Jennifer Long and Mary Ruth Bales, but the district court ruled the evidence was not releveant.  (T. Tr. Vol. XVII at 2237-49; *United States v. Purkey*, 428 F.3d 738, 757 (8th Cir. 2005).)

Duchardt also sought to have Dr. Cunningham testify that Purkey suffered from fetal alcohol exposure, but district court prohibited the evidence, ruling that there was no specific evidence that Purkey's mother drank while she was pregnant with Purkey.  (T. Tr. Vol. XV at 1855-56.)

Finally, the district court denied Duchardt's request to allow Dr. Peterson testify in surrebuttal in response to testimony by a Government expert that Purkey had not suffered significant brain injuries and that Purkey's actions as a "jailhouse lawyer" were inconsistent with the sort of brain damage claimed by defense experts.

### d.      Rebuttal Evidence

The Government called four witnesses in rebuttal.  Helen Mayberg, M.D., a neurologist, testified that Purkey's brain scans were normal.  She also testified that she reviewed Purkey's medical records and he had normal neurological exams after his three car accidents.  She further testified that Purkey's actions before, during, and after the murders of Jennifer Long and Mary Ruth Bales, particularly his efforts at concealment, were inconsistent with the kind of brain damage described by defense experts.  (T. Tr. Vol. XVI at 1962-2045.)

FBI Supervisory Special Agent James McNamara testified as to Purkey's future dangerousness and described Purkey as manipulative.  McNamara noted for the jury that in 1981, a doctor in the Kansas prison system filed a report stating that Purkey was quite

manipulative and would appease an interviewer for secondary gains.  In 2000, 19 years later, another doctor at the Kansas Department of Corrections stated that Purkey would try to manipulate the system to get what he wanted.  (T. Tr. Vol. XVII at 2052-2110.)

David Martell, Ph.D., an expert in mental disorders, testified that Purkey's test data was entirely within normal limits, and that Dr. Leeson had found minor errors in testing which he blew out of proportion to come to a different conclusion.  Dr. Martell testified that Purkey had one area of legitimate impairment – he had a problem with attention. Dr. Martell also testified that Purkey's personality test results corresponded with those of drug abusers, rapists, those with assault histories, and those with antisocial personality disorder.  (T. Tr. Vol. XVII at 2112-35.)

Park Dietz, M.D., Ph.D., testified that he examined Purkey's police, prison, and medical records, as well as those of defense experts.  Dr. Dietz diagnosed Purkey with antisocial personality disorder and polysubstance abuse.  Dr. Dietz testified that to be diagnosed with antisocial personality disorder, a person must exhibit three of seven specified kinds of bad behavior:  1) failure to conform to social norms with respect to lawful behavior; 2) deceitfulness and manipulation; 3) impulsivity; 4) irritability and aggressiveness; 5) reckless disregard for the safety of self or others; 6) irresponsibility; and 7) a lack of remorse.  With "respect to the seven particular kinds of behavior that are features of anti-social personality disorder, I think Mr. Purkey has abundant evidence of all of them so I don't think there is any ambiguity of the diagnosis."  (T. Tr. Vol. XVII at 2170.)

Dr. Dietz further testified that Purkey had no mental disease either at the time of trial or at the time he murdered Jennifer Long, as evidenced by Purkey's extensive efforts to cover up the crime. Dr. Dietz testified that Purkey's actions showed he knew his behavior was wrong, in that he concealed Long's body in a trunk, he dismembered her body, he burned dismembered body parts in the fireplace using diesel fuel as an accelerant and wood as fuel, he removed the ashes from the fireplace with a wet/dry vacuum and shovel, he crushed unburned bond fragments, he cleaned the crime scene with bleach and water, even the rafters, and he cleaned the chain saw with bleach and water. Then to further remove evidence of Long, Purkey used the chain saw to cut wood, and disposed of Long's bones and ashes in plastic bags in a septic pond. He even washed his truck that she'd been in and washed the garage floor with bleach and water. All Purkey's actions were taken to prevent people from detecting what he did so that he would not be sent back to prison, and all those actions reflect that he knew what he did was wrong. Dr. Dietz testified Purkey's thoughts and actions were "ordinary, rational planning to evade detection for a crime." (T. Tr. Vol. XVII at 2170-73.)

Dr. Dietz testified he did consider Purkey's bad childhood, that it harmed his emotional development in ways that are poorly understood. (T. Tr. Vol. XVII at 2174.)

The jurors unanimously found nine aggravating factors, no mitigating factors, and unanimously recommended that Purkey be sentenced to death. (T. Tr. Vol. XVIII at 2311.)

### 3.    *Appeal of the Conviction and Sentence*

Purkey, through trial counsel, appealed his conviction and sentence. *See United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005). Among his claims, Purkey argued the

district court erred by not requiring the jury to complete the mitigating factors portion of the verdict form.  The verdict form asked the jury to record the number of jurors who found each mitigating factor to exist, and the jury returned the form blank regarding all 27 mitigating factors.  *Id.* at 763.  The Eighth Circuit reviewed *de novo* the district court's refusal to order the jury to complete the mitigation portion of the verdict form.  *Id.*  The court held that the Federal Death Penalty Act, "Section 3593(d) specifically requires the jury to 'return special findings identifying any aggravating factor[s] . . . found to exist,' without any mention of identifying such mitigating factors, and so requires no special findings with respect to the latter."  *Id.* (quoting *United States v. Paul*, 217 F.3d 989, 999 (8th Cir. 2000)).

The court noted that a jury's identification of proven mitigating factors facilitates appellate review, especially in evaluating effect of an error on the sentence the jury recommended.  *Id.*  "Nevertheless, the jury's failure to identify proven mitigating factors is entirely proper under the FDPA, and therefore the district court did not err by accepting the jury's verdict form."  *Id.*

The Eighth Circuit denied all Purkey's claims and affirmed his conviction and sentence.  *Id.* at 764.

## C.     *Section 2255 Motion and Appeal*

On October 16, 2007, Purkey moved for a writ of habeas corpus under 28 U.S.C. § 2255.  He asserted 22 grounds for relief, arguing primarily that he was denied his Sixth Amendment right to effective assistance of counsel at trial and sentencing.  (Dkt. 48-6.) On November 30, 2007, Purkey filed a memorandum of law in support of his § 2255

motion.  (Dkt. 48-7.)  Also in support of the motion, Purkey submitted a proffer of "new"

mitigating evidence including affidavits from several family members, friends, and expert

witnesses who testified at trial.  *Purkey v. United States*, 729 F.3d 860, 861 (8th Cir. 2013).

The "new' evidence related to Purkey's alleged mental issues, his abuse as a child, his drug

and alcohol abuse, his family's love for him, and his good works in prison.  *Id.*

Pursuant to the district court's order, trial counsel Fred Duchardt prepared an

affidavit detailing his investigation, representation, and trial strategy with Purkey.  The

district court denied relief without a hearing, concluding that the proffered new evidence,

taken as true, provided no basis for finding prejudice.  (Dkt. 48-8.)

Purkey's § 2255 counsel then filed a motion to alter or amend the judgment.

(Dkt. 48-9.)  The district court denied the motion to alter or amend the judgment, finding

that "even if Purkey's allegations are true, he would not be entitled to relief."  (Dkt. 48-

10,)

Purkey sought a certificate of appealability (COA) from the district court

(Dkt. 48-11), which was denied, (Dkt. 48-12.)

Purkey then applied for a COA with the Eighth Circuit on the following issues:

1) Whether counsel was ineffective for failing to hire a mitigation specialist;

2) Whether counsel was ineffective for failure to investigate mitigation witnesses;

3) Whether counsel was ineffective for failing to properly prepare and present the
   testimony of Drs. Stephen Peterson, Mark Cunningham, and Bruce Leeson;

4) Whether counsel was ineffective for failing to investigate and prepare the
   testimony of Dr. William Grant and Mark Russell, which led to them being
   prejudicial;

5) Whether the district court erred in entering an order that was conclusory and insufficient for appellate review;

6) Whether the district court erred in denying the § 2255 motion without a hearing;

7) Whether counsel's affidavit should have been stricken, with four sub-parts; and

8) Whether counsel rendered ineffective assistance in not calling Dr. Peterson in the guilt phase of the trial to rebut a claim of recent fabrication.

(Dkt. 48-13.)

The Eighth Circuit granted Purkey's application for a COA in part, allowing Purkey to challenge three aspects of trial counsel's performance:  (1) his alleged failure to adequately prepare and present the testimony of Drs. Stephen Peterson, Mark Cunningham, and Bruce Leeson; (2) his alleged failure to adequately investigate and prepare Dr. William Grant and Mark Russell, which resulted in their testimony being more prejudicial than beneficial; and (3) his alleged failure to adequately investigate and present other mitigating evidence.  (Dkt. 48-14; *Purkey*, 729 F.3d at 862.)

The court also granted a COA to determine whether the district court abused its discretion in denying Purkey's request for an evidentiary hearing.  (Dkt. 48-14; *Purkey*, 729 F.3d at 862.)  The court did not grant a COA on the issue of whether trial counsel was ineffective for failing to hire a mitigation specialist, nor on the issue of whether trial counsel was ineffective in the guilt phase of trial for not calling Dr. Stephen Peterson to testify that Purkey had recanted kidnaping Jennifer Long some time before trial.  (Dkt. 48-14; *Purkey*, 729 F.3d at 862.)

Purkey briefed two issues for which he was not granted a COA: the adequacy of the district court's order denying Purkey's § 2255 motion, and whether trial counsel's affidavit prepared in response to the 2255 motion should have been stricken.

The Eighth Circuit found that trial counsel had presented a "lengthy and detailed mitigation case on behalf of Purkey, with testimony from eighteen witnesses spanning more than two days." *Purkey*, 729 F.3d at 863. The court detailed the mitigation evidence, finding that "the jury listened to witnesses testify that Purkey is a positive influence in their lives and that society would be better off if he were to receive a life sentence rather than a death sentence. The jury also heard, in significant detail, that Purkey's parents abused him sexually throughout his childhood, causing him to develop abnormal sexual tendencies." *Id.* at 864.

The court then examined Purkey's proffered new evidence. Several witnesses testified that trial counsel's techniques were ineffective. Gary Hamilton, Purkey's brother, said he withheld evidence because Duchardt's son was present during their interview. *Id.* Hamilton recounted an incident in which their father slammed their mother's arm in a door until it broke, indicating he would have told the jury about that if the investigation had been more thorough. *Id.* Similarly, Purkey's daughter criticized Duchardt because he first contacted her on her wedding day and failed to follow up when she asked to reschedule. *Id.* If better prepared, she would have testified about poems, songs, and stories Purkey wrote for her. *Id.* Purkey's aunt testified she felt unprepared and awkward testifying via teleconference. *Id.* Had Duchardt adequately prepared her, she would have testified that

-32-

Purkey's childhood home was unkempt and reeked of liquor and cigarettes, and that Purkey's mother was a "party girl" with poor parenting skills. *Id.*

Section 2255 counsel also presented affidavits of several individuals who did not testify at trial, either because Duchardt did not contact them or because he chose not to use them. *Id.* at 865. Purkey's cousin and two childhood friends reiterated that Purkey grew up in an abusive home but was nevertheless a positive influence in their lives. Family friends and a volunteer prison minister offered positive testimony about Purkey. Dr. Rex Newton, a prison psychologist who knew Purkey in 1987, believed, based on Purkey's behavior in prison, that he was sexually abused as a child. *Id.*

Purkey complained that Duchardt failed to adequately prepare and present the testimony of Dr. Peterson, Dr. Cunningham, and Dr. Leeson. He claimed that Drs. Peterson and Cunningham should have testified in greater detail about Purkey's sexual abuse. *Id.* Purkey also argued that two mitigation witnesses, Dr. William Grant and Mark Russell, were more prejudicial than helpful because Duchardt didn't adequately prepare them. *Id.* Dr. Grant acknowledged on cross-examination that Purkey was belligerent and irritable, and Russell revealed on cross-examination that Purkey was housed in a special unit due to his history of behavioral problems. *Id.*

The Eighth Circuit held that all of Purkey's proffered evidence in the § 2255 petition did nothing to establish prejudice because it was entirely cumulative. *Id.* at 866. The court held that Purkey's proffered new evidence added nothing of substance. *Id.* The court further held that "the examples of 'prejudicial' mitigation testimony [we]re insignificant compared to the rest of the extensive case in mitigation." *Id.*

-33-

Significantly, the court held that even assuming Duchardt's performance was constitutionally defective, Purkey suffered no prejudice. Because the court concluded that Purkey failed to establish prejudice, the court did not consider any of the contents of Duchardt's affidavit. *Id.* at 866 n.2.

The court then recounted the Government's extremely strong case in aggravation, including his murder of Long, his murder of Bales, his crimes against Carlberg, his rape of Hatfield, his membership in the Aryan Brotherhood prison gang, and his "thirteen prior felony convictions, including:  first-degree burglary in 1970; robbery and theft in 1976; aggravated escape from custody in 1978; and multiple counts of aggravated robbery, kidnaping, aggravated battery, and firearms violations in 1981." *Id.* at 866-68.  The court reviewed the issue of prejudice *de novo*, and held:

> In light of the heinous abduction, rape and murder of sixteen-year-old Jennifer Long and the similarly heinous bludgeoning murder of eighty-year-old Mary Ruth Bales, both committed by someone who also had been convicted of first-degree burglary, aggravated robbery, theft, aggravated escape from custody, aggravated battery, and who also kidnaped and tried to kill an innocent bystander and raped a man in prison, we conclude that it is not substantially likely that the jury would have returned a different sentence had Purkey's proffered evidence been presented to it.

*Id.* at 868.

The Eighth Circuit therefore affirmed the district court's denial of Purkey's motion under 28 U.S.C. § 2255.  *Id.* at 869.

### D.     *The Present § 2241 Petition*

Purkey has now filed a petition pursuant to 28 U.S.C. § 2241, raising eight claims: 1) trial counsel was ineffective for not striking a juror; 2) trial counsel was ineffective for

-34-

failing to investigate and present mitigation evidence; 3) trial counsel lied in the affidavit he presented responding to Purkey's § 2255 motion; 4) the jury did not complete the verdict forms properly regarding Purkey's mitigation factors; 5) the federal death penalty act is unconstitutional; 6) the death penalty is unconstitutional; 7) the death penalty is unconstitutional as applied those with severe mental illness; and 8) trial counsel was ineffective in allowing Purkey to commit perjury in a suppression hearing.

In Purkey's latest filing, he again claims his trial counsel was ineffective, and in an attempt to circumvent the ban on successive motions pursuant to 28 U.S.C. § 2255, he claims his post-conviction counsel were also ineffective. Purkey again challenges his trial counsel's affidavit and the jury verdict forms. Thus, Purkey's current counsel raise many of the same claims of the ineffectiveness of trial counsel that the allegedly ineffective post-conviction counsel raised. None of Purkey's claims, past, present, or both, provide grounds for a new trial or new sentencing.

## II.
## Section 2241 Does Not Permit Purkey to Avoid
## the § 2255(h) Limits on Second and Successive Motions.

In Claims 1, 2 and 8, Purkey argues that his § 2255 counsel ineffectively failed to argue that his trial counsel ineffectively failed to argue his claims, and that § 2241 permits him to raise this recursive ineffectiveness now, more than a decade after the last ineffectiveness of which he complains; and here, in a different district and circuit than that of his conviction. For his remaining five claims, Purkey merely assumes that he can bring them here and now. He is incorrect on both fronts. Section 2241 is not M.C. Escher's never-

ending staircase. It does not permit Purkey's claims, and this Court should dismiss them with prejudice.

"As a general matter, § 2255 provides the exclusive means for a federal prisoner to collaterally attack his conviction or sentence," *Beason v. Marske*, 926 F.3d 932, 935 (7th Cir. 2019), and he must do so in the district of his conviction—in this case, the Western District of Missouri.[5] *Chazen v. Marske*, __ F.3d __, No. 18-3268, 2019 WL 4254295, at *3 (7th Cir. Sept. 9, 2019). "Section 2255 is by far the primary route for federal prisoners to challenge the lawfulness of their convictions and sentences." *Shepherd v. Krueger*, 911 F.3d 861, 862 (7th Cir. 2018).

Section 2255(h), however, "sharply limits the ability of a prisoner to bring a second or successive motion under that section." *Id.* A prospective second or successive movant must show either (1) newly discovered evidence that by clear and convincing evidence shows that no reasonable factfinder would have found the movant guilty of the offense, or (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable. 28 U.S.C. § 2255(h). Purkey filed an unsuccessful § 2255 motion in 2007 and concedes that he cannot satisfy either condition to file a second. (Purkey Pet. at 6.)[6]

---

[5]Purkey filed an initial motion under § 2255 in the Western District of Missouri that the court denied. (Dkt. 48-8.)

[6]"Purkey Pet." refers to Purkey's amended petition for writ of habeas corpus. (Dkt. 23.)

Purkey attempts to avoid the bar on second and successive motions under § 2255 by raising his claims here, in a petition under § 2241. The Court should reject his claims for three reasons: (A) § 2241 is not available because he has not shown that § 2255 is "inadequate or ineffective" under existing precedent; (B) this Court should not be the first to find § 2255 "inadequate or ineffective" by applying distinguisable prior cases from § 2254 and Rule 60(b); and (C) Purkey's procedural avenues to bring his claims, if they exist at all, exist only in the district court for the Western District of Missouri, his court of conviction.

**A.      *Purkey Has Not Shown that § 2255 is Inadequate or Ineffective under Existing Precedent.***

"Section 2255(e) steers almost all prisoner challenges to their convictions and sentences toward § 2255"—including its limits on second and successive petitions—"but it recognizes an exception." *Shepherd*, 911 F.3d at 862. "A habeas corpus petition under § 2241 may be allowed if the prisoner can show 'that the remedy by motion [under § 2255] is inadequate or ineffective to test the legality of his detention.'" *Id.*; *see* 28 U.S.C. § 2255(e). "This generally requires 'a structural problem in § 2255 that forecloses *even one* round of effective collateral review, unrelated to the petitioner's own mistakes." *Camacho v. English*, 827 F.3d 811, 813 (7th Cir. 2017) (emphasis added) (quoting *Poe v. LaRiva*, 834 F.3d 770, 772 (7th Cir. 2016)). A prisoner challenging his conviction or sentence under § 2241 bears the burden to show that § 2255 is inadequate or ineffective. *McCarthan v. Dir. Of Goodwill Industries-Suncoast, Inc.*, 851 F.3d 1076, 1081 (11th Cir. 2017) (en

banc); *Prost v. Anderson*, 636 F.3d 578, 584 (10th Cir. 2011); *Lopez-Lopez v. Sanders*, 590 F.3d 905, 907 (8th Cir. 2010); *Jeffers v. Chandler*, 253 F.3d 827, 830 (5th Cir. 2001).

A prisoner cannot show that § 2255 is "inadequate or ineffective" just because § 2225(h) bars his second or successive claim; "otherwise, the careful structure Congress has created to avoid repetitive filings would mean little or nothing." *Webster v. Daniels*, 784 F.3d 1123, 1137 (7th Cir. 2015) (en banc) (quoting *Garza v. Lappin*, 253 F.3d 918, 921 (7th Cir. 2001)); *cf. In re Davenport*, 147 F.3d 605, 610 (7th Cir. 1998) ("Society, however, is unwilling to expend indefinitely large judicial resources on repeated testing of the accuracy of a determination of guilt.").

The Seventh Circuit has found § 2255 inadequate or ineffective only in limited circumstances. *Fulks v. Krueger*, No. 2:15-cv-00033, 2019 WL 4600210, at *3 (S.D. Ind. Sept. 20, 2019). The claims in Purkey's petition do not qualify under any of them.

*First*, *In re Davenport* held that § 2255(e) permits certain § 2241 claims that changes in interpretation of statutes render the prisoner's conviction or sentence unlawful. 147 F.3d at 610-12. For these claims, the court "established a three-part test to determine whether a petitioner satisfies § 2255(e)'s savings clause." *Chazen*, __ F.3d at __, 2019 WL 4254295, at *3. "To pursue relief under § 2241, a petitioner must establish that '(1) the claim relies on a statutory interpretation case, not a constitutional case, and thus could not have been invoked by a successive § 2255 motion; (2) the petitioner could not have invoked the decision in his first § 2255 motion and the decision applies retroactively; and (3) the error is grave enough to be deemed a miscarriage of justice.'" *Id.* (quoting *Beason v. Marske*, 926 F.3d 932, 935 (7th Cir. 2019)); *accord Davis v. Cross*, 863 F.3d 962, 964 (7th

Cir. 2017) (describing the three parts as "requirements"); *In re Davenport*, 147 F.3d at 610-12. A miscarriage of justice can include the conviction of an innocent defendant or the imposition of an illegal sentence. *Prevatte v. Merlak*, 865 F.3d 894, 897, 899 (7th Cir. 2017) (petitioner failed to show a miscarriage of justice in *Burrage* claim because trial evidence showed pipe bomb was the but-for cause of the death and petitioner deserved enhanced sentence).

The Government's position is that a prisoner who has already unsuccessfully sought relief under § 2255 cannot establish his eligibility to file a habeas petition under the saving clause to assert a statutory challenge to his conviction or his sentence on a ground that was cognizable in his initial § 2255 motion. Application of the saving clause in that circumstance would circumvent Congress's express limitation under § 2255(h) of second or successive motions to cases involving newly discovered evidence or new rules of constitutional law made retroactive on collateral review by the Supreme Court. *See McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1079 (11th Cir. 2017) (en banc), *cert. denied,* 138 S.Ct. 502 (Dec. 4, 2017), and *Prost v. Anderson*, 636 F.3d 578 (10th Cir. 2011) (Gorsuch, J.), *cert. denied*, 565 U.S. 1111 (2012). The Seventh Circuit held otherwise in *In re Davenport*, and the majority of other circuits agreed.[7] The

---

[7]*See United States v. Barrett*, 178 F.3d 34 (1st Cir. 1999), *cert. denied*, 528 U.S. 1176 (2000); *Triestman v. United States*, 124 F.3d 361 (2d Cir. 1997); *In re Dorsainvil*, 119 F.3d 245 (3d Cir. 1997); *In re Jones*, 226 F.3d 328 (4th Cir. 2000); *Reyes-Requena v. United States*, 243 F.3d 893 (5th Cir. 2001); *Martin v. Perez*, 319 F.3d 799 (6th Cir. 2003); *Alaimalo v. United States*, 645 F.3d 1042 (9th Cir. 2011); *In re Smith*, 285 F.3d 6 (D.C. Cir. 2002).

Government respectfully submits, however, that the Tenth and Eleventh Circuits have the better view of the relevant statutory provisions.

Nonetheless, the Government is not seeking reconsideration of *Davenport* at this time, because even under *Davenport*, Purkey is not entitled to relief. He has not satisfied the three requirements of *Davenport*. In none of his eight claims does he identify a retroactive case of statutory interpretation that renders his conduct noncriminal or his sentence unlawful.

*Second*, *Garza* permitted a prisoner to raise under § 2241 a claim that his death sentence should be vacated because the Inter-American Commission on Human Rights found that his rights were violated. 253 F.3d at 920-21. The court permitted the claim (though rejecting it on the merits) because § 2255 "does not now and has never provided an adequate avenue for testing Garza's present challenge to the legality of his sentence." 253 F.3d at 923.

Unlike in *Garza*, however, Purkey either could have or did raise all of his current claims at trial, on direct appeal, or in his initial § 2255. Where he offers an excuse for failing to do so, it is not that § 2255 would not have permitted the claims, but that his counsel failed to raise them. But for the reasons discussed at length below, ineffective assistance of post-conviction counsel does not render § 2255 inadequate or ineffective.

*Third*, Purkey incorrectly cites *Webster v. Daniels* for the proposition that the Seventh Circuit permits a § 2241 petition where "the operation of the successive petition rules absolutely prevent a petitioner from having a meaningful opportunity to raise a

challenge to the legality of his sentence." (Purkey Pet. at 8 (citing *Webster*, 784 F.3d at 1136-37).)

*Webster* stands for a more limited proposition than Purkey asserts: there, unlike here, the petitioner sought to present "newly discovered evidence that would demonstrate that he is categorically and constitutionally ineligible for the death penalty" under *Atkins v. Virginia*, 536 U.S. 304 (2002). 784 F.3d at 1125. Noting that *Atkins* had not been decided when Congress amended § 2255, the Seventh Circuit concluded that "the narrow set of cases presenting issues of constitutional ineligibility for execution is another lacuna in the statute." *Id.* at 1138, 1140 n.9 ("Because the Supreme Court has declared only two types of persons (minors and the intellectually disabled) categorically ineligible for a particular type of punishment, our ruling is as a matter of law limited to that set of people—those who assert that they fell into one of these categories at the time of the offense."). The *Webster* court was careful to limit that narrow set further to those cases where the "newly discovered evidence" existed *before* the time of trial and escaped diligent efforts of counsel to discover it. *Id.* at 1140 & n.9 (noting that "the evidence sought to be presented must have existed at the time of the original proceedings," "the evidence must have been unavailable at the time of trial despite diligent efforts to obtain it," and "the evidence must show that the petitioner is constitutionally ineligible for the penalty he received.").

Unlike in *Webster*, Purkey does not claim that he has newly discovered evidence that predates his trial and demonstrates that he is "so intellectually disabled that he is categorically ineligible for the death penalty under *Atkins* and *Hall* [*v. Florida*, 572 U.S. 701 (2014)]." 784 F.3d at 1146; *see Fulks*, 2019 WL 4600210, at *13 ("In short, the

-41-

Seventh Circuit made clear that simply arguing that new evidence shows one's sentence is unconstitutional is not enough to meet the Savings Clause."). *Webster* is a limited departure from the *Davenport* line of cases that does not apply to Purkey.

Because Purkey has failed to satisfy any existing application of the saving clause, this Court cannot grant Purkey relief and should dismiss his petition with prejudice. *See Prevatte*, 865 F.3d at 901 (holding that dismissal of a § 2241 petition for failure to satisfy § 2255(e) is not jurisdictional and therefore with prejudice); *but see Garza*, 253 F.3d at 920-21 (discussing § 2255(e) as "jurisdictional").

**B.      *This Court Should Not Extend* Ramirez, Martinez, *and* Trevino *to § 2241.***

To avoid this conclusion for Claims 1, 2, and 8, Purkey asks this Court to find a new lacuna in § 2255: he argues that § 2255(e) permits him to use § 2241 to now raise claims that his § 2255 counsel and trial counsel were both ineffective—claims that he describes as "challenges to the legality of his sentence." (Purkey Pet. at 9.) Purkey relies on *Ramirez v. United States*, 799 F.3d 845 (7th Cir. 2015), to extend *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), from state prisoners seeking federal habeas under 28 U.S.C. § 2254 to federal prisoners seeking federal habeas under 28 U.S.C. § 2255. (Purkey Pet. at 10-11.) He then, without any authority, asks this Court to further extend *Ramirez* from a Rule 60(b) motion to reopen a § 2255 motion before the same district court to a § 2241 petition in not only a different district, but in an entirely different circuit. No court has ever made this leap, and this Court should not be the first.

Generally speaking, ineffectiveness of post-conviction counsel does not excuse procedural default because the attorney's actions are chargeable to the client. *Coleman v.*

-42-

*Thompson*, 501 U.S. 722, 752-53 (1991). Following *Coleman*, *Martinez* considered a state prisoner's § 2254 claim that his trial counsel was ineffective. 566 U.S. at 7. He had failed to raise the claim in state habeas proceedings, but held that ineffectiveness of his state habeas counsel excused his procedural default. *Id.* As an equitable exception to *Coleman*, *Martinez* held that, where the state required prisoners to raise ineffective-trial-counsel claims in habeas proceedings, ineffectiveness of state habeas counsel could excuse procedural default. *Id.* at 9-11, 18. *Trevino* extended the rule of *Martinez* to state regimes where the structure and design of a state system make it "virtually impossible" for a defendant to present his ineffective-trial-counsel claim on direct review. 569 U.S. at 423-29. Relying on *Martinez* and *Trevino*, *Ramirez* held that a federal prisoner's claim that his § 2255 counsel ineffectively missing an appeal deadline presented a circumstance that justified relief from the § 2255 judgment under Rule 60(b)(6). 799 F.3d at 849; *see Crutchfield v. Dennison*, 910 F.3d 968, 975 (7th Cir. 2018).

Purkey's attempt to extend *Martinez*, *Trevino*, and *Ramirez* to his case lacks merit. The Seventh Circuit has refused to extend *Ramirez*—even to other doctrines that require a similar showing of "extraordinary circumstances," and even where refusing to extend *Ramirez* would result in a bar to initial review of an ineffective-assistance-of-trial-counsel claim. *Lombardo v. United States*, 860 F.3d 547, 558-59 (7th Cir. 2017), *cert. denied*, 138 S.Ct. 1032 (2018). Lombardo's § 2255 counsel miscalculated the statute of limitations and filed an untimely § 2255 raising multiple claims of ineffective assistance of trial counsel. Lombardo then argued that his § 2255 counsel's ineffectiveness was an extraordinary circumstance justifying equitable tolling of the statute of limitations. 860 F.3d at 551.

The court refused to extend *Ramirez* to the equitable tolling doctrine in part because "*Ramirez* rested not on a miscalculation of a deadline, but on a finding that Ramirez's counsel abandoned him." *Id.* at 559. "[N]otwithstanding its discussion of *Martinez* and *Trevino* and its embracing of the principles underlying those cases, *Ramirez*'s holding is best construed as resting on abandonment under *Maples* [*v. Thomas*, 565 U.S. 266 (2012)] and *Holland* [*v. Florida*, 560 U.S. 631 (2010)]." *Id.* at 559 & n.8. As a result, Lombardo's claim failed because he could "not make the showing of abandonment or egregious attorney misconduct required of those cases." *Id.* at 559; *see Adams v. United States*, 911 F.3d 397, 411 (7th Cir. 2018) (distinguishing *Ramirez* because Ramirez was raising a *procedural* defect—abandonment of § 2255 counsel after judgment—where Adams sought only to relitigate his § 2255).

The Seventh Circuit also refused to extend *Ramirez* because it would "greatly erode the statute of limitations." *Lombardo*, 860 F.3d at 559-60. Because most § 2255 filers are pro se, they would no longer have to show any actual extraordinary circumstances to excuse their untimely filing. *Id.* at 560.

*Lombardo* undermines Purkey's claim in five ways. First, it shows that *Ramirez* (and *Martinez* and *Trevino*) do not stand for the proposition that equity requires sweeping away all procedural bars so that every ineffective assistance claim can be heard. Second, it shows that the *Ramirez* will not be extended where it would undermine congressionally enacted limits on § 2255 motions—for example, where it would undermine the § 2255(h) limits on second and successive petitions. Third, it creates an untenable conflict with Purkey's position: a defendant (like Lombardo) whose counsel ineffectively fails to file a

§ 2255 petition at all forever loses his opportunity to assert any claims, but a defendant (like Purkey) whose counsel merely omits claims from a timely § 2255 motion that later § 2241 counsel believes should have been brought may get a third bite at the apple. Fourth, it shows that *Ramirez* applies not to mine-run negligence or even ineffectiveness but only to full abandonment, and Purkey makes no attempt to show abandonment here. Fifth, it shows that the holding of *Ramirez* is limited to its facts: it does not even extend to every doctrine where "extraordinary circumstances" is the test, and it should not be pushed further afield to the question of whether § 2255 is "inadequate or ineffective"—a question with a separate test based on separate grounds, as discussed above.

*Ramirez* is inapposite for another reason: Ramirez was not attempting to present new claims under § 2241, but was instead attempting to overcome his § 2255 attorney's abandonment of his claims and failure to seek a certificate of appealability. 799 F.3d at 847, 850. *Ramirez*'s decision to permit the movant to reopen his § 2255 using Rule 60(b) in the court of conviction expressly relied on its conclusion that his claim was not a disguised second or successive motion under § 2255:

> We are satisfied that Ramirez's motion was not a disguised second or successive motion under section 2255, and thus may be evaluated on its own merit. Ramirez is not trying to present a new reason why he should be relieved of either his conviction or his sentence, as provided in § 28 U.S.C. § 2255(a). He is instead trying to reopen his existing section 2255 proceeding and overcome a procedural bar to its adjudication.

799 F.3d at 850. Unlike Ramirez, however, Purkey both attempts to raise new claims that have never before been litigated at any stage and also to relitigate claims that he lost in his initial § 2255. Furthermore, his habeas counsel did not abandon him but instead extensively

litigated a request for a certificate of appealability in both the district court and the Eighth Circuit.[8] *Cf. Roundtree v. Krueger*, 910 F.3d 312, 314 (7th Cir. 2018) ("Roundtree litigated and lost in the Eighth Circuit. The Supreme Court of the United States, not another court of appeals, is the right forum for his argument that the Eighth Circuit erred.").

*Martinez* and *Trevino* are also inapposite because Purkey is a federal prisoner.[9] *Martinez* and *Trevino* held that ineffectiveness of state post-conviction counsel can excuse procedural default and permit a federal court to hear a defaulted § 2254 claim. But whether a state prisoner has shown "cause" for his procedural default is a different question than whether a federal prisoner has shown that § 2255 is inadequate or ineffective to permit him to bring what is essentially a second or successive § 2255 claim. As discussed above, the Seventh Circuit has specifically and narrowly defined what it means to be "inadequate or ineffective," and it has never included claims that § 2255 counsel was ineffective.

---

[8]In Eighth Circuit Case No. 10-3462, habeas counsel filed a 78-page initial request on November 4, 2010 and a 137-page application on April 7, 2011. The Eighth Circuit granted the request in part, granting a certificate of appealability as to some of Purkey's claims, and set a briefing schedule on June 10, 2011. Habeas counsel filed a brief on November 16, 2011, that included legal argument to two claims for which a certificate of appealability was not issued, and following a response, filed Purkey's reply brief on May 5, 2012. The Eighth Circuit held argument on September 20, 2012, and ultimately affirmed the judgment. 729 F.3d at 860-69. Habeas counsel filed a request for rehearing and filed a petition for a writ of certiorari, which were denied. *Purkey v. United States*, 135 S.Ct. 355 (2014).

[9]Some courts have refused to apply *Martinez* and *Trevino* to federal prisoners at all, contra *Ramirez*. *See Toohey v. Wilson*, No. 3:17-cv-422, 2018 WL 3130411, at *2 n.6 (E.D. Va. June 26, 2018); *Villarreal v. Beasley*, 2:17-cv-00118, 2017 WL 7053973 (E.D. Ark. Aug. 31, 2017), *report and recommendation adopted by* 2018 WL 575783 (E.D. Ark. Jan. 26, 2018); *United States v. Sheppard*, No. 10-cr-119, 2017 WL 1128247, at *1-2 (W.D. Pa. Mar. 23, 2017), *aff'd* 742 Fed.Appx. 599 (3d Cir. 2018); *Garcon v. Cruz*, No. 6:14-cv-72, 2014 WL 819467, at *5 (D.S.C. Feb. 28, 2014), *aff'd* 581 Fed.Appx. 193 (4th Cir. 2014).

It is in part for these reasons that courts have repeatedly rejected invitations to extend the holdings of *Martinez*, *Trevino*, and *Rarmirez* to § 2241 and the § 2255(e) saving clause. *See*, *e.g.*, *Jackson v. Shartle*, 535 Fed.Appx. 87, 89 n.5 (3d Cir. Aug. 20, 2013); *Kapenekas v. Snyder-Norris*, No. 16-6310, 2017 WL 3725355 (6th Cir. Apr. 10, 2017) ("[T]hose cases deal solely with the procedural default of ineffective-assistance-of-counsel claims in state habeas corpus proceedings; they have no bearing whatsoever on the § 2255(e) savings clause." (quotation omitted)). As one court explained its reasoning for rejecting the claim that Purkey makes here:

> Simply stated, *Martinez* and *Trevino* were based on the narrow ground of procedural default in the context of a § 2254 petition. The reasoning of these cases has never been extended by any court to a § 2241 petition. . . . Such a conclusion would effectively eviscerate the escape hatch; it would also undermine the bar on successive § 2255 petitioners because a petitioner could resort to a § 2241 by simply claiming ineffective assistance of counsel—again, either for the first time or based on some new ground."

*Rojas v. Unknown Party*, No. 16-cv-00509, 2017 WL 4286186, at *5-6 & n.6 (D. Ariz. May 16, 2017), *report and recommendation adopted by* 2017 WL 4238735 (D. Ariz. Sept. 25, 2017).

*Ramirez*, *Martinez*, and *Trevino* do not permit a prisoner to use § 2241 to assert serial claims of ineffective assistance of counsel. This Court should dismiss his petition with prejudice.

**C.**     ***Purkey Cannot Rely on § 2241 to Escape the Law of the Circuit of Conviction.***

By placing his weight on *Ramirez*, Purkey reveals his motivation for bringing these claims here under § 2241, rather than in his district of conviction as a motion under Rule

60(b) or a successive motion under § 2255.[10] *Ramirez* permitted a defendant to reopen his

§ 2255 under Rule 60(b) because his counsel abandoned him following adverse judgment

on his unsuccessful § 2255 motion, denying him the chance to appeal. Prior to *Ramirez*,

however, the Eighth Circuit held that a prisoner's Rule 60(b) motion claiming ineffective

assistance of both § 2255 counsel and trial counsel was a second or successive § 2255

motion in disguise. *United States v. Lee*, 792 F.3d 1021, 1023-24 (8th Cir. 2015); *see also*

*Boyd v. United States*, 304 F.3d 813, 814 (8th Cir. 2002) (per curiam) (holding that district

courts should scrutinize purported Rule 60(b) motions and dismiss or transfer to the Court

of Appeals those that are unauthorized second or successive § 2255 motions).[11] Had Purkey

attempted to raise his claims as Ramirez did, he would fail because  district court in the

Eighth Circuit would, consistent with *Lee*, treat his motion as an unauthorized second or

successive motion under § 2255 and dismiss it.  And rightly so, as Purkey concedes that he

cannot satisfy the § 2255(h) requirements to file a second or successive motion.

---

[10]Purkey's justification for this Court's jurisdiction over his third claim demonstrates the awkwardness of his choice of forum. He claims that this Court may grant him relief using its equitable power to vacate a judgment because of fraud on the court. (Purkey Pet. at 140.) He fails to note that such a motion must be brought in the court that entered the judgment in the first place—the Western District of Missouri. *Taft v. Donellan Jerome, Inc.*, 407 F.2d 807, 809 (7th Cir. 1969).

[11]Like Purkey, Boyd attempted to use § 2241 to raise claims in a district court in the Seventh Circuit that he had previously litigated and lost in both the district court and the Court of Appeals for the Eighth Circuit. *Boyd v. Cross*, No. 13-3337, 2014 U.S. App. LEXIS 25119, at *3-4 (7th Cir. Jan. 13, 2014) ("In this petition Boyd argues the same claim that we repeatedly have told him is unavailing."). The Seventh Circuit rejected Boyd's attempt and sanctioned him for repeatedly raising the same frivolous claims. *Id.*

Even if Purkey had raised his Rule 60(b) motion in the district of his conviction, he has failed to demonstrate the "extraordinary circumstances" necessary to explain the years of delay between his initial § 2255 and his most recent motion under § 2241. *See Williams v. Kelley*, 858 F.3d 464, 471 (8th Cir. 2017) (finding no extraordinary circumstances where prisoner was not diligent in pursuing evidence of claims and presented it "mere days" before his scheduled execution); *cf. Morales v. Bezy*, 499 F.3d 668, 672 (7th Cir. 2007) ("A prisoner cannot be permitted to lever his way into section 2241 by *making* his section 2255 remedy inadequate, here by failing to appeal from the denial of his section 2255 motion.").

Despite the weight of authority against doing so, were this Court to reach the merits of Purkey's claims, it should apply Eighth Circuit law to decide them. Though the Seventh Circuit has not definitively addressed this choice-of-law question, *Chazen*, __ F.3d at __, 2019 WL 4254295, at *12 (Barrett, J., concurring), some district courts have, *Cano v. Warden USP-Terre Haute*, No. 17-cv-441, 2018 WL 3389746, at *3 (S.D. Ind. July 12, 2018) (joining other district courts that "have concluded that they should apply the law of the circuit of conviction in reviewing a sentence or conviction under section 2241, in part to avoid inconsistent results with motions under § 2255, which apply the law of the circuit where the petitioner was convicted"), and the Seventh Circuit has applied the law of the circuit of conviction to resolve one § 2241 claim. *Light v. Caraway*, 761 F.3d 809, 816 (7th Cir. 2014) (following Eighth Circuit and declining to create circuit split).

Had Purkey's counsel performed as effectively as he insists that they should have, all of his claims would have been decided under Eighth Circuit law. There is no reason to

-49-

treat his claims differently merely because his counsel's alleged ineffectiveness led to this Court, rather than a district court in the Western District of Missouri, deciding his claims. To apply this Circuit's law would be to reward and encourage the kind of forum shopping that § 2255 was designed to prohibit. *Chazen*, __ F.3d at __, 2019 WL 4254295, at \*11-12 (Barrett, J., concurring). As the Seventh Circuit has explained in a slightly different context, a prisoner may not use § 2241 to exploit a circuit split. *See In re Davenport*, 147 F.3d at 612 (holding that the "change in law" necessary to support § 2241 cannot result from the different in venue between the district of incarceration and the district of conviction). If this Court does reach the merits, it should apply Eighth Circuit law and, as discussed further below, deny Purkey's petition.

### III.
### Purkey's Claims Are Procedurally Barred and Otherwise Lack Merit.

**A.** ***Claim 1 - Trial Counsel Was Not Ineffective for Failing to Strike a Juror with the Same Name as the Victim.***

Purkey's first claim, that his counsel was ineffective for not moving to strike Juror 13 for cause because of answers she provided on her juror questionnaire, is not properly brought under 28 U.S.C. § 2241. This claim does not challenge the execution of Purkey's sentence, but rather is an ineffective-assistance-of-counsel claim challenging his conviction that must be brought under 28 U.S.C. § 2255. For the reasons, discussed above, however, this claim cannot be brought now because he has not shown that § 2255 is inadequate or ineffective.

Even were this Court to consider his claim of ineffective assistance, it fails because the performance of Purkey's trial counsel was not constitutionally suspect, and Purkey

suffered no prejudice. While Purkey claims that Juror 13's disclosure that she was the victim of a prior, attempted sexual assault was sufficient to imply disqualifying bias, Eighth Circuit law does not clearly allow for juror disqualification on the ground of implied bias alone, and likely requires a showing of actual bias, which the record refutes as to Juror 13. Because the law was, at best, not settled, Purkey's counsel was not deficient in deciding not to raise an implied bias challenge, especially where Juror 13 also disclosed possible sympathy to his primary defense at trial.

### 1.   *Claim 1 is Procedurally Barred.*

For the first time in this § 2241 petition, Purkey argues that his trial counsel ineffectively failed to challenge a juror and that his § 2255 counsel ineffectively failed to raise this claim in his 2007 § 2255 motion.

For the reasons discussed above, Purkey's claim is procedurally barred because he has not shown that § 2255 is inadequate or ineffective. His claim does not fit under any of the three circumstances where the Seventh Circuit has recognized § 2255 as inadequate or ineffective: *Davenport*'s three-element test for new rules of statutory interpretation; *Garza*'s reliance on an intervening international tribunal; or *Webster*'s limited exception for newly discovered, but pre-existing, evidence that renders capital punishment categorically unconstitutional. This Court should not extend *Ramirez* to create a new exception for ineffective assistance of post-conviction counsel. Because Purkey's claim does not satisfy § 2255(e), this Court need not resolve the merits and should dismiss the claim with prejudice.

-51-

2.      *Purkey Fails to Show Ineffective Assistance of Counsel with Regard to Juror 13.*

Because Purkey bears the burden to prove ineffective assistance whenever that claim is properly raised, *Tucker v. United States*, 889 F.3d 881, 884 (7th Cir. 2018), if this Court considers the merits of this claim, Purkey bears the burden to prove that his counsel provided ineffective assistance.  He does not carry that burden.

Claims alleging ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  "This standard requires [the applicant] to show that his 'trial counsel's performance was so deficient as to fall below an objective standard of reasonable competence, and that the deficient performance prejudiced his defense.'"  *Nave v. Delo*, 62 F.3d 1024, 1035 (8th Cir. 1995) (quoting *Lawrence v. Armontrout*, 961 F.2d 113, 115 (8th Cir. 1992)).  This analysis contains two components: a performance prong and a prejudice prong.

> Under the performance prong, the court must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance, while at the same time refraining from engaging in hindsight or second guessing of trial counsel's strategic decisions.  Assuming the performance was deficient, the prejudice prong requires proof that there is a reasonable probability that, but for a counsel's unprofessional errors, the result of the proceeding would have been different.

*Nave*, 62 F.3d at 1035 (cleaned up).

As shown below, Purkey's claim fails both prongs.

a.   *Duchardt's Performance Fell Well Within the Range of Professionally Competent Assistance Because There Were Trial Strategy Reasons to Seat Juror 13 and the Ability to Strike on Implied Bias Alone Is Not Settled in the Eighth Circuit.*

This Court begins with a presumption that Duchardt "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Strickland,* 466 U.S. at 690, which places the burden on Purkey to show that Duchardt's performance "fell below an objective standard of reasonableness" based on prevailing norms of professional conduct, *id.* at 688.  Purkey fails to make that showing because Eighth Circuit law, the law Duchardt was practicing under at trial, did not recognize the type of implied bias claim Purkey now raises and because there were tactical considerations that justified Duchardt's decisions on voir dire.

*First*, Purkey's counsel's performance could not be defective because the law did not support, or at best was unsettled, the objection Purkey's alleges he should have raised. Purkey was tried in the Eighth Circuit, meaning the reasonableness of his attorney's conduct would be judged by Eighth Circuit law, but that court has specifically noted that "[o]ur case law is inconsistent as to whether juror bias *may ever* be presumed." *Sanders v. Norris*, 529 F.3d 787, 791 (8th Cir. 2008) (emphasis added).  In the Eighth Circuit, "when faced with conflicting panel opinions, the earliest opinion must be followed" *Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011) (en banc), and that court's earlier line of cases holds that to show prejudice, Purkey must show that Juror 13 was actually biased against him.  *See Goeders v. Hundley*, 59 F.3d 73, 75-76 (8th Cir. 1995) (citing *Smith v. Phillips*, 455 U.S. 209, 215 (1981); *United States v. Kelton*, 518 F.2d 531, 531 (8th Cir.

-53-

1975) (per curium) (noting that "this circuit has rejected the per se theory of implied bias in favor of a requirement that actual prejudice be demonstrated" (quotation omitted)).

If bias can never be presumed, Purkey's claim must fail, especially in light of Juror 13's unequivocal answers during voir dire, discussed below, that she could follow the law and pick the appropriate sentence. *See Sanders*, 529 F.3d at 792. In fact, questioning Juror 13 to establish an implied bias would have been poor trial strategy as the Eighth Circuit did not recognize that as a grounds for disqualification, but such questions would have highlighted the topic of sexual assault in the minds of other jurors.

Even if Eighth Circuit law was unclear on the requirement to prove actual bias, "[a] failure to raise arguments that require the resolution of unsettled legal questions generally does not render a lawyer's services 'outside the wide range of professionally competent assistance' sufficient to satisfy the Sixth Amendment." *New v. United States,* 652 F.3d 949, 952 (8th Cir. 2011) (citing *Strickland,* 466 U.S. at 690); *see also Fields v. United States,* 201 F.3d 1025, 1027–28 (8th Cir. 2000) (holding attorney who did not object to a jury instruction acted within the range of professional competence because there was no Eighth Circuit or Supreme Court authority on the issue and because the two circuits that had addressed the issue had reached opposite conclusions); *Parker v. Bowersox,* 188 F.3d 923, 929 (8th Cir.1999) (holding that "failing to anticipate a change in the law . . . does not constitute ineffective assistance").

If counsel is not required "to raise arguments that anticipate changes in the law or raise unsettled issues of law, then it cannot be considered professionally unreasonable for counsel to fail to object to the correct application of settled law within our circuit."

-54-

*Hamberg v. United States*, 675 F.3d 1170, 1173 (8th Cir. 2012).  Thus, under Eighth Circuit law, the performance of Purkey's counsel could not have been deficient.

*Second*, while "an attorney's failure to question jurors regarding possible bias can potentially constitute deficient performance . . . trial strategy can also justify an attorney's decision not to seek an assurance of impartiality from a juror, even after a juror has made statements implying possible bias."  *United States v. Lathrop*, 634 F.3d 931, 937-38 (7th Cir. 2011) (citations omitted); *see also Johnson v. Armontrout*, 961 F.2d 748, 755 (8th Cir. 1992) ("Absent the showing of a strategic decision, failure to request the removal of a biased juror can constitute ineffective assistance of counsel.").  "Even when jurors have gone so far as to make a statement of implied bias and no clear assurance of impartiality was subsequently obtained, . . . a strategy of silence by counsel could be reasonable." *Lathrop*, 634 F.3d at 938 (citing *Cage v. McCaughtry*, 305 F.3d 625, 627 (7th Cir. 2002)). "So long as counsel's reasons for not questioning further were not 'so far off the wall that we can refuse the usual deference that we give tactical decisions by counsel,' his performance will not qualify as deficient."  *Id.* (quoting *Cage*, 305 F.3d at 627.)

Purkey's claim is predicated on his mere speculation that because Duchardt did not ask Juror 13 any follow-up questions regarding her reported assault, he "missed Juror 13's disclosure completely."  (Purkey Pet. at 101.)  Reading Juror 13's questionnaire, however, it is just as easy to speculate that Duchardt wanted her on the jury.  A significant portion of Purkey's mitigation case was that he was abused by both of his parents, and Juror 13 stated in her questionnaire that the most important cause of crime was "bad parenting." (Dkt. 23-37 at 304.)   That statement alone, which showed a significant sensitivity to

Purkey's planned defense, made it entirely reasonable for Purkey's counsel to view Juror 13 favorably.  Moreover, while Purkey presented a defense at the guilt phase that he did not kidnap Jennifer Long, he never contested sexually assaulting or murdering her.  That is, Juror 13's claimed similarity of experience to the crime was to a portion of the evidence that Purkey did not contest.  Rather, in her questionnaire she showed a significant sympathy for Purkey's defense that abuse by his parents sufficiently mitigated his conduct to avoid the death penalty.  Taken as a whole, it is entirely reasonable for Duchardt to have viewed Juror 13 as favorable to Purkey's case.

Purkey notes that during voir dire, Duchardt asked Juror 13 about the effect having a young child would have on her participation, and she confirmed that she could be present for the entire trial.  (T. Tr. Vol. I at 55.)  Duchardt's questions on that topic do not show a lack of familiarity with her questionnaire as Purkey implies.  Rather, those questions can reasonably be viewed as Duhardt's attempt to ensure a juror he found favorable would be available throughout the trial.

More importantly, Duchardt's questioning of Juror 13 did not end with her availability.  In her questionnaire, Juror 13 stated that she could vote for the death penalty but noted that she would "need strong evidence to make sure they are guilty," that she could vote for a sentence of life without parole if called for by the facts in the case, and that the problems in the criminal justice system could be solved by "tak[ing] more time to prove guilty or not."  (Dkt. 23-37 at 287-88, 304.)  Consistent with these statements, during voir dire Juror 13 not only confirmed for Government counsel that she could vote for a sentence

-56-

of death (Tr. Tr. Vol I at 38), but also confirmed for Purkey's counsel her openness to

imposing a life sentence:

> MR. DUCHARDT: . . . Now, you have indicated that you could consider the death penalty in a case that you thought was appropriate.
>
> VENIREPERSON 13: Uh-huh.
>
> MR. DUCHARDT: We've done a lot of talking about this whole thing, aggravating and mitigating factors. Do you think you've got a handle on what we're talking about on those things?
>
> VENIREPERSON 13: Yes.
>
> MR. DUCHARDT: Do you think you would be able to follow the law and consider all of those things in deciding the right punishment?
>
> VENIREPERSON 13: Yes.
>
> MR. DUCHARDT: And in a case even if it was proven that the person was guilty of a deliberate killing, do you think you'd be able to still consider the possibility of life imprisonment without parole?
>
> VENIREPERSON 13: Yes.
>
> MR. DUCHARDT: And obviously you have already indicated you could consider the death penalty?
>
> VENIREPERSON 13: Uh-huh, yes.
>
> MR. DUCHARDT: And pick the right sentence as you thought appropriate in that case?
>
> VENIREPERSON 13: Yes.

(Tr. Tr. Vol I at 55-56.)  Duchardt's questioning showed both his knowledge of Juror 13's

questionnaire, beyond knowing that she recently had a child, and Juror 13's lack of actual

bias in the case.

Purkey's sole attempt to provide any factual basis for his claim that Duchardt was

not aware of Juror 13's answers in her jury questionnaire comes from his references to the

-57-

affidavit of his other trial counsel Laura O'Sullivan.  (Purkey Pet. at 102-03.)  O'Sullivan states that "I had no knowledge until I was shown the questionnaire by Mr. Purkey's current counsel that Juror #13 . . . was the victim of an attempted rape when she was fifteen years old."  (Dkt. 23-36 at 5.)  Tellingly, O'Sullivan does not state what portions of the jury questionnaire Purkey's post-conviction counsel showed her or whether she knew what Juror 13 said about bad parenting causing crime.

This should be expected, because in their respective affidavits, O'Sullivan and Duchardt disagree greatly over O'Sullivan's investment in the facts of the case but agree completely that Duchardt handled jury selection, including the jury questionnaire and voir dire.  (Dkt. 23-37 at 165, 169; Dkt. 23-36 at 5-6.)  O'Sullivan executed her affidavit in 2017, and her long-after-the-fact, admittedly ill-informed, and motivationally suspect statements about what she would have done have no relevance to whether Duchardt's decision not to question Juror 13 about answers in her jury questionnaire fell within reasonable professional judgment.

Purkey's attempts to show that Duchardt must not have been familiar with Juror 13's questionnaire because he succeeded in striking jurors for cause further misses the mark.  (*See* Purkey Pet. at 103-04 & n.12.)  Purkey correctly notes that based on their questionnaires alone, the parties agreed that some jurors could be stricken for cause, but ignores that those jurors were stricken for either hardship or actual bias "based on the dictates of *Wainwright v. Witt*, 469 U.S. 412, 423 (1985), or *Morgan v. Illinois*, 504 U.S. 719 (1991), or based on familiarity with counsel for the parties, or based on serious questions whether the venireperson could follow other aspects of the law as instructed by

-58-

the Court." (Dkt. 23-37 at 318.) The jurors that Purkey notes were stricken "based in part on their answers to questions 82 and 83" (Purkey Pet. at 103 n.12), were actually stricken by consent of the parties based on their answers to a number of questions. (Dkt. 23-37 at 318) (Juror 3 "other 35, 39, 81, 82, 85, 86 and others"; Juror 30 "other 60, 61, 63, 64, 83, 86, 95".) Purkey does not show any instance where the court struck a juror on implied bias alone.

Duchardt's motions to strike show just how thoroughly he reviewed the jury questionnaires, and rather than demonstrate his ignorance of Juror 13's answers, those motions also show the upmost competence by which he completed that task. (*See* Dkt. 23-37 at 317.) As there were strategic reasons to include Juror 13, and no legal basis for exclusion outside of actual bias, which Juror 13 did not exhibit, Duchardt's decision to not ask specific voir dire questions based on Juror 13's questionnaire answers was not constitutionally ineffective.

> b.      *Purkey Cannot Show Prejudice Where Juror 13 Was Not Presumed Biased and Demonstrated No Actual Bias.*

At most, the Eighth Circuit notes the possibility of relief based on an implied bias claim, absent a showing of actual bias, only in "extreme cases." *United States v. Tucker*, 2423 F.3d 499, 509 (8th Cir. 2001) ("But without resolving whether or not presumed bias can support a grant of a new trial in our circuit, we observe that the idea of presumed bias is reserved for extreme cases, such as when a juror is a close relative of a party or victim in the case.") The *Tucker* court, citing the concurrence in *Phillips*, noted that such "extreme situations" would include "a revelation that a juror is an actual employee of the prosecuting

agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Id.* (quoting *Smith v. Phillips,* 455 U.S. 209, 222 (1982) (J. O'Connor concurring)); *see also United States v. Needham*, 852 F.3d 830, 840 (8th Cir. 2017). Juror 13 presented none of those extreme situations, and the alleged similarity between her questionnaire disclosure and the facts of the case alone does not create disqualifying bias, especially where the juror affirmed her ability to follow the facts and law of the case.

Underplaying how extreme the situation must be to disqualify a juror on implied bias alone, Purkey claims that Juror 13's questionnaire answers alone would have justified striking her for cause due to the "implied bias . . . found on the basis of similarities between the juror's own experiences and the facts giving rise to trial."   (Purkey Pet. at 100.) Although the Eighth Circuit recognized in *Sanders* that other circuits "have implied bias in circumstances that have potential for substantial emotional involvement," 529 F.3d at 793, that court has never explicitly adopted that rule.

Even when citing to those circuits that have implied bias based on the similarity of experience, Purkey fails to cite a single case where a court found error in seating a juror who was unrelated to a party or victim fully disclosed the ground for any alleged bias before or during voir dire and also unequivocally stated her ability to impartially decide the case based on the facts and the evidence. *See*, *e.g.*, *English v. Berghuis*, 900 F.3d 804, 817-18 (6th Cir. 2018) (juror deliberately omitted material information); *United States v. Gonzalez*, 214 F.3d 1109, 1114 (9th Cir. 2000) (reversing where "juror is unable to state that she will serve fairly and impartially despite being asked repeatedly for such

-60-

assurances"); *Burton v. Johnson*, 948 F.2d 1150, 1158-59 (10th Cir. 1991) (juror was dishonest in failing to disclose past abuse when asked during voir dire); *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977) (jurors were tellers at different branch of bank robbed); *see also Logan v. Lockhardt*, 994 F.2d 1324, 1327 (8th Cir. 1993) (holding that juror that stated that defense counsel had "'to show [ ] that . . . he's innocent'" should not have been stricken for implied bias because she "went on to say that she has no bias in the matter").

Adding speculation to speculation, Purkey merely assumes that Juror 13's statement that she was the victim of "attempted rape, but I dropped the charges" when she was a teenager bears any resemblance to his kidnapping, rape, and murder of Jennifer Long. There are no details of Juror 13's alleged assault in the questionnaire and that assault may have been significantly different from his crimes. As the Tenth Circuit observed in *Gonzales v. Thomas*, "to hold that no rape victim could ever be an impartial juror in a rape trial would, we think, insult not only all rape victims, but also our entire jury system, which is built upon the assumption that jurors will honestly try to live up to the sanctity of their oath." 99 F.3d 978, 989-90 (10th Cir. 1996) (quotation and alteration omitted) (holding juror that suffered a prior rape was not disqualified as impliedly bias in rape case because experience was different); *see also United States v. Thompson*, 450 F.3d 840, 843 (8th Cir. 2006) (holding no error in bank robbery trial for refusing to strike juror who was a bank teller in a different state for cause for implied bias because "the fact that someone holds a position similar to that of a key witness is not a basis for excluding her where there is no indication of bias").

-61-

Purkey cannot show prejudice for failing to strike Juror 13 for implied bias because he cannot make a claim of implied bias.  Juror 13 answered the questions put to her, both in the questionnaire and in voir dire, honestly and stated she could decide the case based on the facts and the law.  There is no ground to assume she lacked the ability to be impartial, and therefore, Purkey has no ground for relief.

Had Purkey brought this claim through the proper process, a motion under § 2255, in the proper venue, the Western District of Missouri, at most he would have received an evidentiary hearing before any other relief.  But because he fails to meet his factual burden on either prong of *Strickland*, and because his claim fails as a matter of law, he would not have been granted even that.  *See Anjulo-Lopez v. United States*, 541 F.3d 814, 817 (8th Cir. 2008) ("No hearing is required, however, where the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based.").

**B.     Claim 2 – _Trial Counsel Investigated and Presented Abundant Mitigation Evidence, so That the Proffered "New" Evidence is Cumulative._**

As in his § 2255 motion, Purkey again claims his trial counsel was ineffective in investigating and presenting mitigation evidence at the penalty phase of his trial.  Purkey separates this claim into three parts:  A) trial counsel was ineffective for not hiring a designated "mitigation specialist" to lead the defense team investigation into Purkey's background; B) trial counsel failed to investigate, develop, and present Purkey's full trauma history to the jury; and C) trial counsel failed to investigate, discover, and present expert mental health evidence of Purkey's PTSD.  (Purkey Pet. at 106-38.)

*1.*     *Claim 2 Is Procedurally Barred.*

Purkey's second claim is barred for two reasons.

*First*, Purkey's claim is barred because he already litigated and lost it in his initial § 2255. 28 U.S.C. § 2244(a); *Swanson v. Lariva*, No. 2:14-cv-187-WTL-WGH, 2014 WL 4705396, at *1 (S.D. Ind. Sept. 22, 2014) ("[The prisoner's] habeas challenge was presented and rejected in his 28 U.S.C. § 2255 action.  It is not available for further review here."). A federal prisoner may "seek habeas corpus only if he has had no reasonable opportunity to obtain earlier judicial correction of a fundamental defect in his conviction or sentence because the law changed after his first § 2255 motion." *Montana v. Cross*, 829 F.3d 775, 783 (7th Cir. 2016); *see also Adams v. United States*, 911 F.3d 397, 410 (7th Cir. 2018) (court will not hear second post-conviction motion attacking merits of issues already decided).

Section 2255 counsel raised this same claim in the § 2255 motion and in their motion for certificate of appealability to the district court.  (Dkt. 48-6 at 10-33; Dkt. 48-11 at 84-87.)  Section 2255 counsel again raised the same claims in their application for COA to the Eighth Circuit.  (Dkt. 48-13 at 8-77.)  The Eighth Circuit declined to issue a COA on the claim that trial counsel was ineffective for failing to hire a "mitigation specialist." (Dkt. 48-14; *Purkey v. United States*, 729 F.3d 860, 862 (8th Cir. 2013).)  The Eighth Circuit heard and decided on the merits the claims of failure to present abuse and mental health evidence in mitigation, holding "[t]he aggravating evidence is too overwhelming and the 'new' mitigating evidence too redundant for us to conclude that even 'one juror

would have struck a different balance.'"  *Purkey*, 729 F.3d at 868 (quoting *Wiggins v. Smith*, 539 U.S. 510, 537 (2003)).

*Second*, to the extent Purkey contends that he is advancing a different argument here, it is still barred because he has identified no reason that would enable him to fit within the savings clause of § 2255(e). Purkey attempts to salvage his claims by arguing his § 2255 attorneys were ineffective.  But no court has ever held that ineffectiveness of § 2255 counsel renders § 2255 inadequate and ineffective.

Purkey cites *Ramirez* and *Brown v. Brown*, 847 F.3d 502, 513 (7th Cir. 2017), in support of his position that ineffective assistance of § 2255 counsel allows him to relitigate the issue of trial counsel's alleged ineffective assistance for failing to properly investigate mitigation evidence.

This Court should not extend *Ramirez* to § 2255 proceedings, because *Ramirez* applies only where post-conviction counsel abandoned the prisoner.[12] *Lombardo v. United States*, 860 F.3d at 559 & n.9. Purkey's counsel did not abandon him. Section 2255 counsel filed a 55-page motion, supplemented with 89-page suggestions and memorandum in support, raising 22 claims. (Dkt. 48-6, 48-7.)  Section 2255 counsel supported those claims with 31 declarations or affidavits.  After losing at the district court level, § 2255 counsel filed a motion to alter or amend the judgement.  (Dkt. 48-9.)  When that was denied (Dkt. 48-10), § 2255 counsel sought a COA from the district court (Dkt. 48-11), and then filed a

---

[12] *Brown* merely applies the doctrine of *Martinez* and *Trevino* to Indiana state habeas proceedings. 847 F.3d at 517. It adds nothing to Purkey's claim to apply that doctrine to the saving clause of § 2255(e).

134-page application for a COA with the Eighth Circuit.  (Dkt. 48-13.)  Section 2255 counsel filed a 135-page brief with the Eighth Circuit, a 12-page reply brief, and after losing in the Eighth Circuit, an application for a writ of certiorari with the U.S. Supreme Court.  *Purkey v. United States*, 729 F. 3d 860 (8th Cir. 2013), *cert. denied* 135 S.Ct. 355 (2014).

Purkey argues that even though § 2255 counsel hired a mitigation specialist, they did not spend enough money on the specialist and therefore were ineffective.  (Purkey Pet. at 123.)  The Eighth Circuit did not even deem the original § 2255 claim that trial counsel did not hire a mitigation specialist worthy of review.  (Dkt. 48-14; *Purkey*, 729 F.3d at 862.)  As detailed above, the court denied the claims of failure to investigate and present even more mitigation evidence.  Purkey should not be allowed to relitigate the alleged ineffectiveness of trial counsel by bootstrapping the alleged ineffectiveness of § 2255 counsel.

In contrast to post-conviction counsel in *Brown*, who raised one post-conviction claim, Purkey's § 2255 counsel raised 22 claims and submitted 31 affidavits.  In contrast to post-conviction counsel in *Ramirez*, who failed to even notify Ramirez that his motion had been denied, Purkey's § 2255 counsel filed two applications for certificates of appealability, a 135-page brief on appeal, a petition for rehearing, and an application for a writ of certiorari with the United States Supreme Court.  Purkey cannot show that § 2255 counsel was inadequate or ineffective in his case.

2. *Claim 2 Fails on the Merits.*

a. *Trial Counsel's Decision to Not Hire a Mitigation Specialist Was Not Ineffective Assistance.*

Purkey elevates form over substance in arguing once again that his trial counsel should have hired a social worker with the title "mitigation specialist." In support of his position that a failure to hire a social worker mitigation specialist is ineffective assistance of counsel, Purkey cites American Bar Association Guidelines and a law review article. However, the Eighth Circuit has held that if trial counsel conducted a proper mitigation investigation, the need for a mitigation specialist is obviated. *United States v. Sinisterra*, 600 F.3d 900, 909 (8th Cir. 2010).

Purkey's current counsel, in again claiming that trial counsel should have hired a mitigation specialist, argues that the investigator trial counsel hired, Michael Armstrong, was unqualified. (Purkey Pet. at 111.) In support of this claim, Purkey argues the irrelevant facts that Armstrong was fired from a previous job and that former co-workers filed orders of protection against him. (Purkey Pet. at 113-15.)

b. *Trial Counsel Presented Abundant Evidence of Purkey's Alleged Abuse as a Child.*

In an attempt to argue prejudice from the failure to hire a mitigation specialist, Purkey states, "trial counsel failed to investigate beyond obtaining limited records and talking to a few people from Mr. Purkey's life." (Purkey Pet. at 117.) However, trial counsel introduced testimony from 18 witnesses. And trial counsel provided his experts with voluminous records and interview summaries.

-66-

Trial counsel presented five witnesses who testified to Purkey's abuse as a child: Angie Genail, Gary Hamilton, Marguerite Hotchkiss, Dr. Stephen Peterson, and Dr. Mark Cunningham all testified to abuse Purkey suffered as a child. Trial counsel submitted to the jury mitigation factors 5-10, which all involved Purkey's abuse as a child, cited at length by Purkey in his current claim. Mitigation Factor 12, that Purkey stuttered as a child, also involves the same claim Purkey cites in his current petition.

Purkey fails to show any prejudice from the allegedly ineffective investigator. Purkey claims the way in which Armstrong and Duchardt interviewed witnesses was not proper. Purkey alleges Armstrong was "real aggressive" in contacting one of Purkey's ex-wives, Jeannette Purkey Broyles. Purkey claims that had Duchardt and Armstrong listened better to Broyles, they would have learned that she "witnessed multiple episodes consistent with Mr. Purkey's trauma exposure during the time she and Mr. Purkey were married." (Purkey Pet. at 117.) Purkey then cites to Broyles declaration as proffered evidence. In her declaration, Broyles said Purkey called his father a son-of-a-bitch. He twice crawled into spaces and said, "don't hurt me." He was paranoid, used drugs, and caused her to lose everything. She fed him rat poison so he'd have to go to the hospital and get help. She said she loved him, but he caused a lot of pain for her boys. As noted above, trial counsel did attempt to present the poisoning evidence. It is unclear how the proffered evidence that Purkey cursed about his father, crawled into spaces, used drugs, and caused pain to her sons would have improved the mitigation case.

Likewise, Purkey currently claims that a former inmate housed with him, Michael Speakman, could have provided helpful evidence, such as that Purkey was a light sleeper,

-67-

and that he ranted and raved a lot.  (Purkey Pet. at 118-19.)  Speakman testified in the guilt

phase of the trial that Purkey got angry at a visitation, and yelled that he was a real "m'f'r,"

and that he was in prison for killing people.  (T. Tr. Vol. V at 681-82.)  Speakman's

testimony confirmed what the judge and jury saw firsthand, as they witnessed Purkey's

angry outbursts during the trial.  (T. Tr. Vol. XIV at 1798-180; T. Tr. Vol. XV at 1931; T.

Tr. Vol. XVI at 1956-62; T. Tr. Vol. XVIII at 2298-2301.)  It is unclear how Speakman's

newly proffered evidence that Purkey was a light sleeper and that he ranted and raved a lot

would have improved the mitigation case.

As § 2255 counsel did, Purkey again claims trial counsel should have interviewed

Angie Genail and Gary Hamilton better.  Purkey fails to delineate what information Genail

and Hamilton would have offered had they been interviewed in a more sensitive manner.

Trial counsel did interview Broyles, Speakman, Genail, and Hamilton. Information

from those interviews was elicited at trial and continues to be used today by Purkey.  As

noted in detail above, trial counsel presented multiple witnesses who testified about

Purkey's alleged mental illnesses and alleged good character.  Dr. William Grant, Dr. Bruce

Leeson, Dr. Stephen Peterson, and Dr. Mark Cunningham all testified that Purkey had

mental issues.  Angie Genail, Gary Hamilton, Marguerite Hotchkiss, Linda Skeen, Patrick

Howe, Robert Lopez, and the Reverend John Otto all testified that Purkey had good

character traits.

Purkey claims that both trial counsel and § 2255 counsel failed to uncover and

present Purkey's family history of alcoholism, and emotional, physical, and sexual abuse

that led to his PTSD, substance abuse, and propensity for violence. (Purkey Pet. at 125.)

However, mitigation factors 5-12, submitted by trial counsel, belie Purkey's latest claim.

> (5) Purkey suffered significant psychological and emotional damage as a result of the serious physical and emotional abuse of him by his parents; (6) Purkey suffered significant psychological and emotional damage as a result of sexual abuse of him by his mother; (7) Purkey suffered significant psychological and emotional damage as a result of his growing up in a dysfunctional home environment in which alcohol abuse, sexual promiscuity, and incestuous sex were modeled as proper behavior by his parents; (8) Purkey has never received treatment for the psychological and emotional damage that he suffered as a result of his parents' abuse of him; (9) Purkey's past criminal behavior is attributable, at least in part, to the brain injuries and psychological and emotional damage that he suffered earlier in his life; (10) Purkey became dependent upon alcohol and illegal drugs at an early age because of a genetic predisposition inherited from his parents and because such dependence was modeled for him by his parents and his older brother Gary; (11) Purkey's past criminal behavior is attributable, at least in part, to his alcohol and drug dependence; (12) As a child, Purkey suffered from slow speech development, and for his entire life, Purkey has suffered from the disability of stuttering.

Trial counsel presented five witnesses who testified to Purkey's abuse as a child to support his four experts who attempted to provide a better explanation of his vicious murders than Purkey's anti-social personality disorder, or sociopathy.

Purkey presents nothing new that would change the mitigation case. He presents a few classmates who said that some of the nuns who taught them were mean. Purkey has now apparently recently recovered memories that he was also abused by a priest. At trial, Purkey accused practically everyone he ever knew growing up – his father, his mother, his mother's boyfriends, his brother, his brother's friend, and his grandmother – of abuse[13]

---

[13]Gary Hamilton, Purkey's brother and the only relative accused of abusing Purkey who was alive at time of trial, did not admit at trial, nor in either of his declarations (Dkt. 23-7 at 23; Dkt. 23-10 at 1) to abusing Purkey.

But not until he was on death row did Purkey mention being abused by a (deceased) priest. It is unclear how this extraordinarily late, suspect disclosure, could be trial counsel's fault.

In *Worthington v. Roper*, 631 F.3d 487 (8th Cir. 2010), the Eighth Circuit examined Supreme Court law regarding claims of counsel's failure to investigate mitigation evidence. Worthington was sentenced to death in the Circuit Court of St. Charles County, Missouri, after he pled guilty to one count of first-degree murder, one count of first-degree burglary, and one count of forcible rape. *Id.* at 491. Following unsuccessful state appeals and post-conviction motions, Worthington filed a petition for writ of habeas corpus with the federal district court, alleging seven grounds for relief. *Id.*

In his mitigation investigation, Worthington's trial counsel contacted only two of the defendant's relatives, and despite having the names of other family members and acquaintances, he did not contact them or travel to Peoria, Illinois, Worthington's hometown, to investigate or interview witnesses. *Id.* at 500. Trial counsel consulted with two mental health experts, after which he elected to not present psychological mitigation evidence. *Id.* at 501.

The federal district court found that trial counsel had failed to adequately investigate Worthington's social and medical history, including his family's background, and failed to pursue psychological mitigation evidence, and ordered that Worthington either be sentenced to life in prison without the possibility of parole or be given a new penalty phase hearing. *Id.* at 494. The district court rejected Worthington's argument that his trial counsel was ineffective for failing to investigate and present further mitigation evidence,

-70-

in particular, that counsel did not present the testimony of Worthington's parents as to his troubled upbringing. Worthington cross-appealed this decision. *Id.* at 503.

The Eighth Circuit reversed the district court's finding of ineffective assistance, holding that counsel had obtained the services of a qualified expert on the issue of the defendant's sanity and had conducted a reasonable investigation into psychological mitigating evidence. *Id.* at 502-03. On the cross-appeal, the Eighth Circuit affirmed the district court's finding that counsel made a reasonable decision to not call Worthington's parents to testify. *Id.* at 505-06.

The opinion examined three Supreme Court cases cited by Worthington in which trial counsel was found ineffective for failing to investigate. The first was *Williams v. Taylor*, 529 U.S. 362 (2000), in which trial counsel did not begin to prepare for the penalty phase until a week before the trial, failed to introduce evidence of Williams's exemplary prison behavior or his borderline mental retardation, and neglected to uncover records describing his "nightmarish" childhood. *Id.* at 395.

In the second case, *Wiggins v. Smith*, 539 U.S. 510 (2003), trial counsel was found to have unreasonably limited his investigation when he abandoned any form of mitigation based on personal history after having acquired only the presentence investigation report and city social service records documenting Wiggins's placements in the state foster care system. *Id.* at 523.

The third case examined was *Rompilla v. Beard*, 545 U.S. 374 (2005), in which the petitioner argued trial counsel was ineffective for failing to obtain his school records, juvenile records, evidence of alcohol dependence, and the court file of his prior conviction.

-71-

*Id.* at 382-83.  The Court held trial counsel was deficient for failing to examine the easily obtained court file of Rompilla's prior conviction, which the prosecution had provided notice of its intent to introduce at sentencing.  *Id.* at 389-90.  This failure was found to be prejudicial, as entries in the file "would have destroyed the benign conception of Rompilla's upbringing and mental capacity" that trial counsel had supposed.  *Id.* at 391.

The Eighth Circuit found Worthington's trial counsel's investigation was reasonable in contrast with the three above-mentioned Supreme Court cases:

> Cases in which the Supreme Court has held counsel's failure to investigate to be constitutionally ineffective involved a level of deficiency absent from the present case.  Counsel in *Williams* neglected to prepare for the penalty phase until one week before the hearing and erroneously believed that state law barred access to their client's records.  Counsel in *Wiggins* based their decision not to present any mitigating evidence solely on one page in a presentence investigation report and a collection of social service records that documented their client's placement history in the foster care system.  And counsel in *Rompilla* failed to examine a readily available court file that they knew the prosecution planned to introduce as evidence of aggravating factors.

*Id.* at 502.

The court held that counsel reasonably decided not to further investigate or present expert psychological evidence at the penalty phase: "[q]uestioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there."  *Id.* at 502-03 (quoting *Rompilla*, 545 U.S. at 390); *see also Strickland*, 466 U.S. at 689.  The court found that Worthington's counsel presented a meaningful mitigation case that focused on Worthington's abusive background and persuaded the sentencing court to find as mitigating factors his dysfunctional family life, his abuse and neglect as a child, and his

history of drug abuse, and therefore reversed the district court's grant of habeas relief. *Id.* at 503.

With regard to Worthington's cross-appeal of the denial of his claim that counsel should have presented the testimony of Worthington's parents, the court affirmed the district court's finding that the testimony was cumulative: "[t]he additional testimony 'did not cover any new subject matter and was not substantially more persuasive' than that actually presented, and 'would barely have altered the sentencing profile presented' during the penalty phase. *Id.* at 506 (internal citations omitted) (quoting *Eley v. Bagley*, 604 F.3d 958, 969 (6th Cir. 2010), and *Strickland*, 466 U.S. at 700).

Purkey's claim that his trial counsel's investigation was deficient is far weaker than Worthington's was. Instead, Purkey's claims exactly fit the scenario in which his proposed new evidence "would barely have altered the sentencing profile presented during the penalty phase."

Purkey asks this Court to find his trial counsel ineffective because he did not "scour the globe on the off-chance something will turn up." *Rompilla*, 545 U.S. at 383. Yet even with the benefit of hindsight and 16 years of additional investigation, Purkey proposes at best a new label of mitigation (PTSD) that Duchardt should have pursued in an area that was pursued – mental health. This claim is without merit and should be denied.

> c.   *Trial Counsel Hired and Presented Four Experts on Purkey's Mental Issues, Three of Whom Testified to Trauma Purkey Suffered as a Child.*

Purkey claims his trial counsel was ineffective in failing to investigate and present mental health evidence of Purkey's new diagnosis of complex PTSD. (Purkey Pet. at 126.)

Section 2255 counsel similarly claimed trial counsel was ineffective for failing to prepare and present the expert testimony of Drs. Leeson, Peterson, and Cunningham. (Dkt. 48-6 at 25-31.)  As noted above, these claims were denied by the district court and Eighth Circuit.

Purkey acquired an expert in 2016, Dr. Frederic Sautter, who diagnosed him with complex PTSD, concluding he "experienced high levels of posttraumatic stress and depression and became highly intoxicated before the homicide that his thinking became very disorganized" and "[t]hese problems apparently left him unable to control his aggressive behavior with Ms. Long ensuring that his conflict with her would lead to a tragic outcome." (Dkt. 23-9 at 10.)

Purkey claims that trial counsel failed to investigate Purkey's comprehensive and psycho-social history, including Purkey's multi-generational family history or the extent of his childhood adversity and traumatic life events, which then could not be provided to defense mental health experts.  (Purkey Pet. at 137-38.)  Purkey now embraces a PTSD diagnosis as key to his defense.  (Purkey Pet. at 136.)

However, just like current counsel, trial counsel also acquired experts and provided them with abundant records of Purkey's childhood, who opined that Purkey was not responsible for the murder of Jennifer Long due to mental problems.  Dr. Stephen Peterson reviewed background documentation about Purkey's physical, medical, and mental health that measured "about three feet and three inches worth of records for this case."  (T. Tr. Vol. XIV at 1744.)  Dr. Peterson testified at trial in the penalty phase that, "Mr. Purkey did not have the capacity to form the intent to kill Jennifer Long.  That this was a nearly reflexive response based on his very severe psychiatric illness, and that prevented him from

thinking about what was happening until after it was over . . . . So after having been severely and sexually abused by his parents, beaten by them and not really learning the ways normal people interact, was then socialized in the penitentiary environment where effectively much of the day many men basically survive by managing their own violence and managing the violence around them." (Tr. Vol. XIV at 1775-77.)

Defense experts at trial used the abundant family and childhood history provided by trial counsel to conclude Purkey was either not responsible for his crimes or had diminished capacity due to childhood trauma.  Dr. Peterson used the words "trauma" or "traumatic" approximately 26 times in his testimony about Purkey's mental condition.  (T. Tr. Vol. XIV at 1749, 1750, 1751, 1754, 1757, 1762, 1763, 1765, 1770, 1778, 1794, 1808, 1813, 1814, 1815, 1823.)  For one example, on cross-examination Dr. Peterson testified, "in my opinion, he's not malingering the consequences of his sexual trauma and physical trauma and emotional trauma as a child.  It has festered for many years."  (T. Tr. Vol. XIV at 1823.)

Similar to Purkey's current expert Dr. Sautter, Dr. Peterson was critical of prior psychological exams concluding Purkey had anti-social personality disorder, because they did not perform a "psychosexual history of Mr. Purkey, and the records don't indicate that they actually did, so they can't really answer the question of something other than antisocial because they didn't really ask." (T. Tr. Vol. XIV at 1823.)

Likewise, trial counsel hired Dr. Mark Cunningham, who reviewed ten binders of information from Purkey's incarcerations, medical and psychiatric records of Purkey's parents, and all Purkey's medical records, psychiatric records, and school records, reports

of medical experts for both the defense and prosecution, and interview summaries of Purkey's friends and family.  Dr. Cunningham used the words "trauma" or "traumatic" approximately 16 times in his testimony about Purkey's mental condition.  (T. Tr. Vol. XV at 1862, 1863, 1864, 1865, 1871, 1873, 1874, 1878, 1934, 1936.)   For example, Dr. Cunningham testified that Purkey suffered "sexually damaging exposures and trauma of a number of different sorts."  (T. Tr. Vol. XV at 1864.)  And in testimony that sounds very much like Dr. Sautter's report, Dr. Cunningham testified, "That's a part of the algebra of violence, that it's often compromised brain functioning and substance dependence and traumatic history and unstructured community.  It's all of those things that result or help produce a violent outcome."  (T. Tr. Vol. XV at 1871.)

Similarly, trial counsel hired Dr. Bruce Leeson, who conducted neuropsychological testing of Purkey, including a battery of nine tests, which he described in detail to the jury. (Tr Vol.. 12, 1579-1605.) Like another expert hired by Purkey's current counsel, Dr. Leeson testified that Purkey had frontal lobe damage:  "the frontal lobes do not work the way they should to inhibit responses."  (T. Tr. Vol. XII at 1611.)  He also testified that Purkey's test results correlated with "major depression" and "post traumatic stress disorder."  (T. Tr. Vol. XIII at 1644.)

Finally, trial counsel hired Dr. David Preston, who performed Positron Emission Tomography (PET) tests on Purkey and testified that Purkey had frontal and temporal lobe brain damage.  He testified that frontal lobe damage would cause poor planning and poor judgment in a person, and that drug use would exacerbate the problems.  (T. Tr. Vol. XIII at 1667-93.)

The Eighth Circuit recently affirmed the denial of post-conviction relief in a capital case with very similar claims. *Anderson v. Kelly*, – F.3d – No. 17-2456, 2019 WL 4280360 (8th Cir. Sept. 11, 2019.)  Anderson was convicted of capital murder and sentenced to death in Arkansas. *Anderson* at *5-6.  His appeal and post-conviction motion were denied at the state level. *Id.* at *6.  He then filed a motion for federal habeas corpus relief in the United States District Court for the Eastern District of Arkansas.  His petition was denied, and the Eighth Circuit granted a certificate of appealability. *Id.* Anderson claimed his trial counsel was ineffective because she "unreasonably failed to identify PTSD" despite "ample evidence" of childhood abuse. *Id.*

Anderson's post-conviction counsel presented an expert witness who diagnosed him with PTSD. *Id.*  The Eighth Circuit reviewed the claim on the merits, and held that Anderson's trial counsel's performance did not fall below an objective standard of reasonableness, and even if it did, Anderson could not prove prejudice. *Id.*  The court found that trial counsel had explored and presented evidence of childhood abuse and its effect on Anderson, who was 19 years old when he murdered an 87-year-old woman in her yard.  An expert testified at trial that Anderson was abused as a child, that there was alcoholism in his family, and that Anderson was depressed. *Id.*

Anderson claimed trial counsel should have pursued a PTSD diagnosis, because a psychologist they consulted sent them articles on PTSD.  The court held that counsel was not required to "scour the globe on the off chance something will turn up." *Id.* (quoting *Rompilla*, 545 U.S. at 383).  The court further found that even if counsel were ineffective, Anderson did not show prejudice. *Id.* at *8.  The court found it was not reasonably probable

that the jury would have reached a different conclusion even if they had been presented with a PTSD diagnosis. *Id.* The court noted that many of the mitigating factors the jury found related to Anderson's childhood, for example, that he grew up in an abusive, neglectful household, that he witnessed his mother's boyfriend verbally and physically abuse his mother, and that he had a family history of alcoholism. *Id.* The Eighth Circuit agreed with the district court "that Anderson's counsel may have missed the label . . . but they told the story." *Id.*; *see also Ward v. Neal*, 835 F.3d 698, 704 (7th Cir. 2018) (counsel not ineffective for failing to present more mitigation evidence where aggravating circumstances were strong.)

Purkey's trial counsel likewise told the story, presenting multiple witnesses that Purkey had been abused as a child, that he had endured trauma, and that he had mental conditions because of the abuse and trauma. However, Purkey's claim of prejudice is far weaker than Anderson's, given that Purkey was 46 at the time he killed Jennifer Long and Mary Ruth Bales, whereas Anderson was 19 at the time he committed murder.

Purkey's current counsel, his § 2255 counsel, and his trial counsel all face the same intractable problem. Purkey's extraordinarily violent murders and his planned, elaborate concealments do not fit with his claims of frontal lobe impairment or mental disease relieving him of responsibility for his crimes. Any unbiased person, including all the jurors and judges who have examined the evidence put forth by Purkey, could only reasonably conclude that any abuse he suffered as a child does not excuse or mitigate the murders he committed, and concealed or attempted to conceal, as a 46-year-old man. The label matters

not, whether it is depressive disorder, neurobehavioral disinhibition, substance abuse disorder, or PTSD.

While Purkey claims both trial and § 2255 counsel were ineffective for failing to hire or spend enough money on a mitigation specialist, he alleges no area of mitigation that was not presented at trial. Just as Purkey's § 2255 counsel did not present one new area of mitigation evidence despite years of additional investigation and the benefit of hindsight, Purkey's current counsel, with even more years of investigation and more hindsight, presents no new area of mitigation evidence. This claim should be denied, as it was previously.

**C.     Claim 3 – _Trial Counsel's Affidavit Contained No Lies but in Any Case Was Disregarded by the Eighth Circuit in Its Review of Purkey's § 2255 Motion._**

Duchardt prepared an affidavit pursuant to the district court's order. Section 2255 counsel moved to strike the affidavit, which the district court denied. Section 2255 counsel then appealed that denial to the Eighth Circuit, which ultimately found no prejudice even assuming trial counsel was ineffective and so disregarded the affidavit. *Purkey*, 729 F.3d at 866 n.2. Purkey's third challenge to the affidavit is procedurally barred, without merit, and moot, and should be denied.

**1.     _Claim 3 Is Procedurally Barred._**

Purkey's third claim is procedurally barred for two reasons, and cannot be litigated in this Court for a third.

*First*, as he did in his motion for a certificate of appealability from his § 2255 motion, and on the appeal of the district court's denial of his § 2255 motion, Purkey challenges his trial counsel's affidavit.  Purkey adds a twist to this claim, by arguing that his trial counsel lied in his affidavit, whereas he previously argued that his trial counsel violated the attorney-client privilege.  Nevertheless, the issue of Duchardt's affidavit has been litigated and held to be moot by the Eighth Circuit, and cannot be raised again here. 28 U.S.C. § 2244(a); *Swanson v. Lariva*, No. 2:14-cv-187-WTL-WGH, 2014 WL 4705396, at *1 (S.D. Ind. Sept. 22, 2014); *see also Adams v. United States*, 911 F.3d 397, 410 (7th Cir. 2018) (court will not hear second post-conviction motion attacking merits of issues already decided).

To recount, Purkey's § 2255 counsel moved to strike Duchardt's affidavit in the § 2255 proceedings.  The district court denied the motion to strike at the same time it denied the § 2255 motion.  (Dkt. 48-8 at 11.)

Purkey's § 2255 counsel then moved before the district court for a COA on that issue and several others.  (Dkt. 48-11.)  Purkey challenged the affidavit on three grounds: 1) Duchardt included more attorney-client privileged information than was necessary; 2) Purkey was not allowed an opportunity to see the affidavit before it was disclosed to the Government; and 3) Duchardt conducted independent legal research and analysis in seeking to disprove Purkey's legal arguments.  (Dkt. 48-11 at 15-17.)  Section 2255 counsel also sought a COA on the district court's denial of a hearing, arguing that the 31 declarations they submitted with the § 2255 motion created factual disputes requiring a hearing.  (Dkt. 48-11 at 8-14.)

The district court denied a COA on all issues. (Dkt. 48-12.) On the issue of striking Duchardt's affidavit, the court ruled, "Purkey may not like the way that Mr. Duchardt drafted his affidavit or how he framed the issues, but the Court finds that the disclosures in Mr. Duchardt's affidavit were necessary in order to rebut the numerous charges of ineffectiveness raised by Mr. Purkey." (Dkt. 48-12 at 15.) On its denial of a hearing, the court ruled that it was "capable, without a hearing, of weighing the mitigation case which was presented against the mitigation case which could have been presented . . . the additional evidence which Purkey argues should have been presented would have been . . . largely cumulative," and therefore denied a certificate of appealability on that issue. (Dkt. 48-12 at 13.)

Purkey then sought a COA from the Eighth Circuit, arguing the district court erred by not striking Duchardt's affidavit. (Dkt. 48-13 at 107-29.) The Eighth Circuit did not include this claim in its order of certificate of appealability. (Dkt. 48-14; *Purkey*, 729 F.3d at 862). The Government moved to strike the claim from the brief, as outside the scope of the COA. *Purkey*, 729 F.3d at 866 n.2. However, Purkey argued that the question of the affidavit was intertwined with issues identified in the COA. *Id.* The court ultimately held that because Purkey failed to "establish prejudice without reaching the only matter addressed in the affidavit – whether Duchardt's performance fell below an objective standard or reasonableness – we need not consider any of the contents of Duchardt's affidavit." *Id.* Accordingly, the court denied as moot the Government's motion to strike. *Id.*

-81-

Purkey thus achieved what he seeks on this claim, that is, Duchardt's affidavit was not considered.

*Second*, to the extent Purkey contends that he is advancing a different argument here, it is still barred because he has identified no reason that would enable him to fit within the saving clause of § 2255(e). Purkey attempts to salvage his claims by arguing his § 2255 counsel were ineffective. But no court has ever held that ineffectiveness of § 2255 counsel renders § 2255 inadequate and ineffective.

This Court should not extend *Ramirez* to § 2255 proceedings, because *Ramirez* applies only where post-conviction counsel abandoned the prisoner.[14] *Lombardo v. United States*, 860 F.3d at 559 & n.9. Purkey's counsel did not abandon him. Section 2255 counsel filed a 55-page motion, supplemented with 89-page suggestions and memo in support, raising 22 claims. (Dkt. 48-6, 48-7.) Section 2255 counsel supported those claims with 31 declarations or affidavits. After losing at the district court level, § 2255 counsel filed a motion to alter or amend the judgement. (Dkt. 48-9.) When that was denied (Dkt. 48-10), § 2255 counsel sought a COA from the district court (Dkt. 48-11), and then filed a 134-page application for a COA with the Eighth Circuit. (Dkt. 48-13.) Section 2255 counsel filed a 135-page brief with the Eighth Circuit, a 12-page reply brief, and after losing in the Eighth Circuit, an application for a writ of certiorari with the U.S. Supreme Court. *Purkey v. United States*, 729 F. 3d 860 (8th Cir. 2013), *cert. denied* 135 S.Ct. 355 (2014).

---

[14] *Brown* merely applies the doctrine of *Martinez* and *Trevino* to Indiana state habeas proceedings. 847 F.3d at 517. It adds nothing to Purkey's claim to apply that doctrine to the saving clause of § 2255(e).

Section 2255 counsel challenged Duchardt's affidavit on multiple occasions, and prevailed in that the Eighth Circuit did not consider the affidavit in making its ruling. Purkey should not be allowed to relitigate the issue of Duchardt's affidavit here.

*Third*, Purkey's argument that a court has equitable jurisdiction to vacate a judgment based on fraud on the court does not permit this Court to rule on his claim, because such claims must be raised in the court that rendered the judgment in the first place—in this case, the Western District of Missouri. *Taft v. Donellan Jerome, Inc.*, 407 F.2d 807, 809 (7th Cir. 1969).

2.      *Claim 3 Fails on the Merits Because Purkey Has Not Shown Duchardt Made Any Misrepresentations.*

Assuming for the sake of argument that Purkey's renewed challenge to Duchardt's affidavit should be considered, he is far from showing Duchardt misrepresented anything in the affidavit.  Purkey claims three falsehoods by Duchardt.

In the first claim, Purkey argues that Duchardt lied in the affidavit by saying "no objections have been interposed by Mr. Purkey or his Counsel" to the affidavit itself. Purkey argues that § 2255 counsel objected soon after receiving the affidavit via email and responded with an email to Duchardt so that statement was a lie.  (Purkey Pet. at 143-44.) First, at the time that statement in the affidavit was written, counsel had apparently not yet objected.  Second, although § 2255 counsel may have emailed Duchardt, nothing shows that he received or read the email before he sent the affidavit to government counsel.  Third, as noted above, there was no prejudice from this statement.  Purkey's § 2255 counsel did challenge the affidavit with the district court and the Eighth Circuit.  Purkey's current

counsel makes the conclusory claim that the "later objections by § 2255 counsel in moving to strike the statement" were more difficult to sustain. (Purkey Pet. at 144.)  No facts or law are offered in support of this conclusion.

Purkey's second example of Duchardt supposedly misrepresenting facts relates to a disagreement between Duchardt and Purkey's other trial counsel, Laura O'Sullivan. Duchardt stated in his affidavit that O'Sullivan "had never before tried a case involving the death penalty or a mental defense."  As proof that this statement was a lie, Purkey cites a trial O'Sullivan participated in that involving frontal lobe damage and some cases O'Sullivan pled or handled involving competency or mental issues.  First, if Duchardt was wrong, he was not far off the mark.  O'Sullivan admittedly had no death penalty trial experience, and only one or two trials with any mental health issue.  Second, for this statement to be a lie rather than a mistake, Purkey must show that Duchardt knew about O'Sullivan's experience in her trials with frontal lobe damage and battered woman's syndrome.  Purkey states the opposite, that Duchardt did not know about O'Sullivan's experience:  "Duchardt never even bothered to ask Ms. O'Sullivan about her prior experience with cases involving mental health issues."  (Purkey Pet. at 146.)

Purkey accuses Duchardt of a third lie—that the investigator Mic Armstrong was qualified to be a fact and mitigation investigator.  Duchardt's affidavit states, "I asked Michael (Mic) Armstrong to act as an investigator related to both phases of the case, and to help with duties often assigned to a person commonly referred to as a 'mitigation specialist'.  I chose Mr. Armstrong for this dual role because of his extensive experience and training."  (Dkt. 23-37 at 170.)

Purkey argues the claims regarding Armstrong's qualifications were shown to be false because initially Duchardt submitted a budget to the court requesting separate funding for an investigator and a mitigation specialist.  Duchardt requested funds to pay Armstrong an initial payment of $2,500 as an investigator.  Purkey then recounts that Duchardt submitted a supplemental request for money stating that he "determined that the cost of a mitigation specialist had increased and he determined that budgetary savings could be realized by "reassigning to the investigator (Armstrong) and to counsel (Duchardt) the investigative work traditionally done by a mitigation specialist." (Purkey Pet. at 148.)

The budget requests therefore mirror Duchardt's affidavit, that is, Duchardt wanted Armstrong to perform investigation for both the guilt and penalty phases of the trial, and he did not want to use money in his budget to hire a "mitigation specialist."  Purkey claims Duchardt did not set forth Armstrong's qualifications, and states that Armstrong "was uniquely *unqualified*."  However, Purkey's current opinion of Armstrong is no proof that Duchardt has ever shared that opinion, much less in 2002 when he submitted budget requests to the court, nor in 2008 when Duchardt wrote his affidavit.

Notwithstanding the similarity between the budget requests and the affidavit, Purkey argues Duchardt lied to the court in the affidavit.  Purkey speculates only two possibilities, both of which he argues would be a "fraud on the court."  First, that Duchardt from the beginning intended for Armstrong to serve as both fact and mitigation investigator, but lied to the court that he would hire a mitigation specialist in order to get more money for Armstrong, knowing Armstrong to be unqualified.  Second, that Duchardt lied in the affidavit that he intended from the beginning to have Armstrong serve the dual

role of fact and mitigation investigator to deceive the court that Armstrong was a qualified mitigation specialist.  (Purkey Pet. at 149-50.)

Purkey does not come close to proving that Duchardt knowingly lied in either his affidavit or his budget requests.  Duchardt could have believed Armstrong would be a qualified fact and mitigation investigator.  Purkey claims Duchardt knew Armstrong to be unqualified.  However, Purkey does not show that Duchardt knew or believed any such thing.  The fact that Armstrong left a prior job under bad circumstances doesn't prove that Duchardt knew or believed him to be unqualified.  After all, Purkey's current counsel presents only one side of what would no doubt be a contested issue – the circumstances under which Armstrong left the public defender's office.  Duchardt did work with Armstrong on multiple cases and had extensive personal experience with Armstrong and even at the time he wrote his affidavit in 2008, believed Armstrong to have performed well in this case.  Duchardt recounted that it was Armstrong's persistence that obtained the admission from Jeannette Purkey that she poisoned Purkey.  (Dkt. 23-37 at 171-72.) Purkey's current counsel uses the poisoning  information as mitigation in their § 2241 motion.  (Purkey Pet. at 77.)

Despite Purkey's argument that only two interpretations are possible, there are many, many interpretations, including difference of opinion, mistake of fact, misinterpretation of meaning, or condensing the timeline.

For example, when Duchardt recounted in his affidavit that he asked Armstrong to serve as both fact and mitigation investigator, he did not state when that conversation occurred.  It could have been early in the case, or it could have been later as the case

progressed and Duchardt determined to dispense with a traditional "mitigation specialist."

Another possibility is that when Duchardt stated in his affidavit that he asked Armstrong

to serve the dual role of fact and mitigation investigator, Duchardt still intended to hire a

mitigation specialist and have Armstrong work with and for the mitigation specialist.

Another possibility is that Duchardt felt hiring a mitigation specialist was unlikely, but left

open the possibility of hiring one for budget purposes and decided as the case progressed

that the expense was not worth it.

Finally, even assuming for the sake of argument that there were lies in the affidavit,

which Purkey has far from proved, he cannot show any linkage to the outcome of his § 2255

motion, given that the Eighth Circuit explicitly disregarded Duchardt's affidavit.  *Purkey*,

729 F.3d at 866 n.2.

Purkey makes this and other salacious claims in the hope that one of them will catch

the attention of a judge.  His claims are barred and provide no ground for relief.

**D.**     **Claim 4 –** *There Is No Possibility that the Jury Misunderstood the Instructions*
         *Regarding Mitigating Factors.*

Purkey argues that there is a "substantial possibility" that the jury mistakenly

believed that jurors could not consider mitigating factors unless the jury first unanimously

found those factors to exist. (Purkey Pet. at 155.)  Purkey contends that the jury's confusion

is shown by the fact that the jury left blank a part of the verdict form that included spaces

to record the number of jurors that found any of a list of 27 proposed mitigating factors.

(Purkey Pet. at 157-58.)  This is not the first time Purkey has advanced this argument,

which has been rejected before and is now barred.  Moreover, Purkey's argument fails on

the merits, because the jury was correctly and clearly instructed that jurors could consider mitigating factors that any one juror found to be established.

### 1.      *Claim 4 Is Procedurally Barred.*

Purkey claim is barred for three independent reasons.

*First*, Purkey's claim is barred because he previously raised it on direct appeal in the Eighth Circuit. Under the law of the case doctrine, a prisoner may not "relitigate in a collateral proceeding an issue that was decided on his direct appeal." *White v. United States*, 371 F.3d 900, 902 (7th Cir. 2004); *see also Johnson v. Warden*, No. 18-cv-1415-SLD, 2019 WL 2717764, at *2 (C.D. Ill. June 28, 2019) (applying the law of the case doctrine to a § 2241 petition). On direct appeal, Purkey argued that "because the District Court did not require Purkey's jury to return findings regarding pled and proven mitigating factors, it failed to require the jury to fully consider and give Constitutional effect to Purkey's evidence and arguments in mitigation of punishment." Reply Bfr. at 24, *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005) (No. 04-1337), 2005 WL 5627242. Purkey cited to *Mills v. Maryland*, 486 U.S. 367 (1988), which is the very case upon which he relies most heavily in his current Petition. *See id.* The Eighth Circuit rejected Purkey's argument and held that the Federal Death Penalty Act does not require the jury to specifically identify any mitigating factors that one or more jurors found to exist. *See Purkey*, 428 F.3d at 763. Purkey is raising here the same argument he raised and lost on direct appeal, and it is therefore barred. Purkey has not attempted to argue that any exceptions to the law of the case doctrine apply, nor could he succeed in doing so. *See White*, 371 F.3d at 902 (identifying three exceptions).

-88-

*Second*, Purkey's claim is also barred because he also previously raised it in his § 2255 motion in the Western District of Missouri.  *See* 28 U.S.C. § 2244(a); *Swanson v. Lariva*, No. 2:14-cv-187-WTL-WGH, 2014 WL 4705396, at \*1 (S.D. Ind. Sept. 22, 2014) ("[The prisoner's] habeas challenge was presented and rejected in his 28 U.S.C. § 2255 action.  It is not available for further review here.").  In his § 2255 motion, Purkey argued that he "was denied due process in violation of the Fifth Amendment and was sentenced based on arbitrary factors in violation of the Eighth Amendment when his jury did not vote on obvious mitigating evidence."  (Dkt. 48-7 at 74.)  The district court rejected this argument because Purkey had "not shown that the jurors were precluded from considering any mitigating evidence, they simply chose not to give any weight to that evidence, which under the law they are entitled to do."  (Dkt. 48-10 at 9).  Purkey is raising here the same argument he raised and lost in his § 2255 motion, and it is therefore barred.

*Third*, to the extent Purkey contends that he is advancing a different argument here, it is still barred because he has identified no reason that would enable him to fit within the saving clause of § 2255(e).  His claim does not fit into any of the circumstances where the Seventh Circuit has found § 2255 inadequate or ineffective: is not a *Davenport* claim based on a new retroactive case of statutory interpretation that undermines his conviction or sentence; it is not a *Garza*-claim based on the intervening decision of an international tribunal; and it is not a *Webster*-claim that newly discovered but pre-existing evidence shows that he is constitutionally ineligible for capital punishment. Rather, it is a claim based on a Supreme Court case decided in 1988 that could have been, and in fact was, raised in both his direct appeal and his § 2255 motion and is now barred from relitigation.

-89-

2.      *The Jury Was Clearly and Correctly Instructed on Mitigation Factors.*

Purkey's fourth claim also fails on the merits.  The jury was explicitly and clearly

instructed that it was not required to reach unanimous agreement as to mitigating factors.

Instruction 33 provided as follows:

> Unlike aggravating factors, which you must unanimously find proved
> beyond a reasonable doubt in order to consider them in your deliberations,
> the law does not require unanimous agreement with regard to mitigating
> factors.  *Any* juror persuaded of the existence of a mitigating factor *must*
> consider it in this case.  Further *any* juror *may* consider a mitigating factor
> found by another juror, even if he or she did not find that factor to be
> mitigating.

(Dkt. 48-5 at 11.)

The jury was also told in Instruction 33 that it could, but was not required to, report

on the verdict form the number of jurors that found particular mitigating factors:

> In Part V of the Special Verdict Form relating to mitigating factors, you are
> asked, but not required to report the total number of jurors that find a
> particular mitigating factor established by a preponderance of the evidence.

(Dkt. 48-5 at 11-12.)

The verdict form itself further emphasized that the jury was not required to reach

unanimous agreement as to mitigating factors.  Part V of the verdict form provided as

follows:

> Instructions:  For each of the following mitigating factors, indicate, in
> the space provided, the number of jurors who have found the existence of
> that mitigating factor to be proven by a preponderance of the evidence.
>
> A finding with respect to a mitigating factor may be made by one or
> more of the members of the jury, and any member of the jury who finds the
> existence of a mitigating factor may consider such a factor established in
> considering whether or not a sentence of death shall be imposed, regardless
> of the number of other jurors who agree that the factor has been established.

> Further, any juror may also weigh a mitigating factor found by another juror, even if he or she did not also find that factor to be mitigating.

(Dkt. 23-37 at 94.)

In sum, the jury was clearly instructed that unanimous agreement was not required for it to consider mitigating factors. It was also clearly instructed that it could—but was not required to—record on the verdict form the total number of jurors that found a particular mitigating factor established by a preponderance of the evidence. Given these instructions, there is no chance that the jury mistakenly believed it was required to reach unanimous agreement before it could consider mitigating factors. *See Penry v. Johnson*, 532 U.S. 782, 789 (2001) ("We generally presume that jurors follow their instructions."); *United States v. Warner*, 498 F.3d 666, 683 (7th Cir. 2007) ("There is a general presumption that juries follow their instructions," and "[t]his presumption is only overcome if there is an overwhelming possibility that [the] jury was unable to follow the instructions.") (quotation omitted); *United States v. Harper*, 466 F.3d 634, 647 (8th Cir. 2006) ("[O]ur theory of trial by jury is dependant upon the ability of jurors to follow instructions.").

As the district court concluded when denying Purkey's motion for a certificate of appealability from the denial of his § 2255 motion, "by leaving all of the spaces blank, the logical conclusion is that none of the jurors found the existence of *any* of the mitigating factors." (Dkt. 48-12 at 12); *see also United States v. Mikhel*, 889 F.3d 1003, 1065 (9th Cir. 2018), *petition for cert. filed* (U.S. Feb. 4, 2019) (No. 18-7835) ("'There is no constitutional requirement that the jury find a mitigating factor even when it is supported

-91-

by uncontradicted evidence.'") (quoting *United States v. Higgs*, 353 F.3d 281, 327 (4th Cir. 2003)).  An alternative logical conclusion is that the jury simply decided not to enter on the form the number of jurors who had found mitigating factors, which the jury had been instructed was not required.  Either way, these explanations are much more plausible than unfounded speculation that the jury misunderstood its clear instructions.

Purkey's reliance on *Mills v. Maryland*, 486 U.S. 367 (1988), is misplaced.  In *Mills*, the jury verdict form provided that "[b]ased on the evidence we unanimously find that each of the following mitigating circumstances which is marked 'yes' has been proven to exist by A PREPONDERANCE OF THE EVIDENCE and each mitigating circumstance marked 'no' has not been proven by A PREPONDERANCE OF THE EVIDENCE."  *Id.* at 387.  The Supreme Court concluded that "there [was] a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance."  *Id.* at 384.  Here, by contrast, the verdict form explicitly provided that "[a] finding with respect to a mitigating factor may be made by one or more of the members of the jury," and the jury was specifically instructed that "the law does not require unanimous agreement with regard to mitigating factors."  No reasonable juror could have misinterpreted these instructions to preclude a juror from considering a mitigating factor unless all the jurors agreed on it.

Indeed, the jury instruction on mitigation in Purkey's case was specifically designed to comply with the Supreme Court's holding in *Mills*.  Instruction 33 was drawn verbatim

-92-

from the Eighth Circuit Model Jury Instruction on mitigation. *Compare* Instr. No. 33 *with Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit*, Instr. No. 12.09, 643 (2003 ed.). The Committee Comments to the Model Jury Instruction cite *Mills* as one of the cases upon which the model instruction was based. *See id.*, Comm. Cmt.. Purkey cannot plausibly contend the jury instructions ran afoul of *Mills* because they were specifically designed to (and did) comport with *Mills*.

The juror declarations appended to Purkey's petition lend no support to his position that the jury was confused.[15] As an initial matter, Federal Rule of Evidence 606(b) prohibits consideration of these declarations. This rule provides that "[d]uring an inquiry into the validity of a verdict or indictment," "[t]he court may not receive a juror's affidavit or evidence of a juror's statement regarding" "any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote, or any juror's mental processes concerning the verdict or indictment." In particular, Rule 606(b) bars evidence that a juror misunderstood or failed to follow an instruction. *See Stults v. Am. Pop Corn Co.*, 815 F.3d 409, 416 (8th Cir. 2016) (holding that Rule 606(b) barred juror testimony that they relied upon stricken evidence in violation of a curative instruction); *Peterson v. Fabian*, 491 F.3d 816, 829 (8th Cir. 2007) (indicating that Rule 606(b) would bar evidence indicating the juror may not have applied a presumption of innocence); *United States v. Muthana*, 60 F.3d 1217, 1223 (7th Cir. 1995) (holding that

---

[15]One of the "juror declarations" is not actually a declaration by a juror, but rather a declaration prepared by a law student who participated in an interview with a juror in November 2015 and then prepared a declaration purporting to summarize that interview in April 2016. (*See* Dkt. 23-40 at 98.) This declaration is therefore double-hearsay.

Rule 606(b) barred "post-verdict comments by jurors expressing confusion concerning" an instruction); *United States v. Jones*, 132 F.3d 232, 246 (5th Cir. 1998), *aff'd*, 527 U.S. 373 (observing that "Rule 606(b) has consistently been used to bar testimony when the jury misunderstood instructions"); *Karl v. Burlington Northern R. Co.*, 880 F.2d 68, 75 (8th Cir. 1989) (holding that Rule 606(b) bars "evidence of the jury's misinterpretation of its instructions"); *see also* Victor J. Gold, *Federal Practice and Procedure* § 6074 (2d ed. 2019).  Although Rule 606(b) has three exceptions, none applies here.[16]

Purkey argues that Rule 606(b)(1) should not apply in a criminal capital case, but he has no support for this argument.  To the contrary, Rule 606(b)(1) is  routinely applied to exclude juror testimony or affidavits in post-conviction proceedings in capital cases. *See, e.g.*, *Fullwood v. Lee*, 290 F.3d 663, 680 (4th Cir. 2002) (applying Rule 606(b) to bar portion of juror affidavit in capital habeas proceeding); *United States v. Jones*, 132 F.3d 232, 246 (5th Cir. 1998), *aff'd*, 527 U.S. 373 ("Noting that the Eighth Amendment requires a 'greater degree of reliability when the death sentence is imposed,' we are convinced that Rule 606(b) does not harm but helps guarantee the reliability of jury determinations in death penalty cases.") (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)); *Silagy v. Peters*, 905 F.2d 986, 1008-09 (7th Cir. 1990) (applying Rule 606(b) to bar juror testimony in capital habeas proceeding); *Leisure v. Bowersox*, 990 F. Supp. 769, 787 (E.D. Mo. 1998) (holding that Rule 606(b) barred consideration of a juror affidavit in capital habeas

---

[16]The exceptions are that "[a] juror may testify about whether: (A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake was made in entering the verdict on the verdict form."  Fed. R. Evid. 606(b)(2).

proceeding); *Bannister v. Armontrout*, 807 F. Supp. 516, 543-44 (W.D. Mo. 1991) (holding that Rule 606(b) barred consideration of an affidavit containing jurors' statements in capital habeas proceeding).  The Supreme Court's decision in *Pena-Rodriquez v. Colorodo*, 137 S.Ct. 855 (2017), does not shift the law in Purkey's favor, first because it applies very narrowly to evidence of juror racial bias—which the Court described as "a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice," *id.* at 868—and second because it does not apply retroactively.  *See Tharpe v. Warden*, 898 F.3d 1342, 1346 (11th Cir. 2018).

Even if it were proper to consider the juror declarations, they do not support Purkey's position.  Purkey's assertion that the declarations show the jury "understood they had to reach unanimous agreement on each of the [mitigating] factors," (Purkey Pet. at 158), is a mischaracterization—none of the declarations actually says this or indicates that the jury misunderstood the instructions regarding consideration of mitigating factors. (Dkt. 23-40 at 92-105.)   Instead, the declarations demonstrate that although the jury considered and discussed the proposed mitigating factors, it was not persuaded by them and concluded that the death penalty was appropriate in light of the severity of Purkey's crimes.  (Dkt. 23-40 at 92) ("I became certain that Purkey deserved to die once I heard about how he cut up Jennifer's body into pieces and burned it. . . . After seeing those pictures there was nothing that was presented to me that changed my mind."); (Dkt. 23-40 at 96) ("I voted for death up front.  I knew as soon as I walked into the jury room."); (Dkt. 23-40 at 101) ("She was a hundred percent convinced about sentencing the defendant to

death once the murder of the 80-year-old woman was introduced. At that point nothing else mattered to her."); (Dkt. 23-40 at 104) ("Imposing death was fair.").

The jury's decision is hardly surprising "[i]n light of the heinous abduction, rape, and murder of sixteen-year-old Jennifer Long and the similarly heinous bludgeoning murder of eighty-year-old Mary Ruth Bales, both committed by someone who also had been convicted of first-degree burglary, aggravated robbery, theft, aggravated escape from custody, aggravated battery, and who also kidnaped and tried to kill an innocent bystander and raped a man in prison." *Purkey v. United States*, 729 F.3d 860, 868 (8th Cir. 2013). In short, the jury voted for the death penalty, not because they misunderstood their clear instructions regarding mitigating factors, but because they were not persuaded by the proposed mitigating factors and determined that the death penalty was appropriate due to the heinous nature of Purkey's crimes.

E.     *Claim 5 -* **Hurst v. Florida** *Provides No Support to Purkey's Claim and a Capital Sentencing Jury Does Not Need to Find That Aggravating Factors Outweigh Mitigating Factors Beyond a Reasonable Doubt.*

*Hurst v. Florida* provides no support for Purkey's claim. A capital sentencing jury is not required to weigh the aggravating factors and the mitigating factors using the beyond a reasonable doubt standard. Every appellate court to consider the issue has rejected Purkey's argument. As an initial matter, however, Purkey's weighing argument is procedurally barred because, at a minimum, he cannot re-litigate issues brought on direct appeal in a collateral attack.

1.     *Claim 5 Is Procedurally Barred.*

Purkey's claim is barred for two independent reasons.

*First*, Purkey's claim is barred because he previously raised a similar claim—that the weighing consideration is an elemental fact that must be presented to the grand jury—on direct appeal in the Eighth Circuit.  Under the law of the case doctrine, a prisoner may not "relitigate in a collateral proceeding an issue that was decided on his direct appeal." *White v. United States*, 371 F.3d 900, 902 (7th Cir. 2004); *see also Johnson v. Warden*, No. 18-cv-1415-SLD, 2019 WL 2717764, at *2 (C.D. Ill. June 28, 2019) (applying the law of the case doctrine to a § 2241 petition).

The Eighth Circuit rejected the essence of this claim in this very case.  *United States v. Purkey*, 428 F.3d 738, 750 (8th Cir. 2005).  It reaffirmed its long standing holding that a sentencing jury need only be informed that "the jury must unanimously find that the statutory and non-statutory aggravating factors 'sufficiently outweigh' the mitigating factors." *Purkey*, 428 F.3d at 761 (citing *United States v. Nelson*, 347 F. 3d 701, 712 (8th Cir. 2003)); *United States v. Ortiz*, 315 F. 3d 873, 900-01 (8th Cir. 2002).  In fact, the court's analysis in *Purkey* also showed why the subsequent Supreme Court decision in *Hurst* did not affect the validity of the decision.  This is so because the Court found that the "weighing process mandated by 18 U.S.C. § 3593(e)" is not "an elemental fact for which a grand jury must find probable cause." *Purkey*, 428 F.3d at 750.

This precise issue, and procedural posture, was raised and rejected in *Runyon v. United States*, 228 F. Supp. 3d 569, 588 (E.D. Va. 2017).  In *Runyon*, the petitioner was tried and convicted of a capital murder under the FDPA.  He was sentenced to death, and on direct appeal complained that the jury was improperly charged that they must find that the aggravating factors "sufficiently outweigh" all the mitigating factors to justify a

-97-

sentence of death, as opposed to a beyond a reasonable doubt standard.  *United States v. Runyon*, 707 F. 3d 475, 516 (4th Cir. 2013).  Subsequently, on habeas appeal, the petitioner again argued that the jury instructions "unconstitutionally lowered the government's burden of proof" by providing that the jury must agree that the aggravating factors must "sufficiently outweigh" any mitigating factors instead of using a beyond a reasonable doubt standard.  *Runyon*, 228 F. Supp. 3d at 633.  The petitioner in *Runyon* argued that *Hurst v. Florida*, 136 S. Ct. 616 (2016), created an intervening change in the controlling law that would allow him to re-litigate his claim.  The court rejected that argument and found the claim procedurally barred and substantively meritless, holding:

> the court finds that *Hurst* does not represent an intervening change in the law, with respect to the issue the Petitioner raised on appeal, and it does not affect the Fourth Circuit's earlier finding that the FDPA requires only that the jury decide "whether all the aggravating . . . factors found to exist sufficiently outweigh all the mitigating . . . factors found to exist," and that this court's instructions during the penalty phase were proper. *Runyon*, 707 F.3d at 516 (quoting 18 U.S.C. § 3593(e)). The Fourth Circuit found no error here. *Id*. at 516.
>
> For the above reasons, the Petitioner is barred from relitigating this claim, and Claim Ten is DENIED.

*Id.* at 634.  Accordingly, Purkey's claim is procedurally barred and should be denied.

*Second*, to the extent Purkey contends that he is advancing a different argument here, it is still barred because he has identified no reason that would enable him to fit within the saving clause of § 2255(e).  His claim does not fit into any of the circumstances where the Seventh Circuit has found § 2255 inadequate or ineffective: is not a *Davenport* claim based on a new retroactive case of statutory interpretation that undermines his conviction or sentence; it is not a *Garza*-claim based on the intervening decision of an international

tribunal; and it is not a *Webster*-claim that newly discovered but pre-existing evidence shows that he is constitutionally ineligible for capital punishment. Rather, it is a claim that could have been, and in fact was, raised in his direct appeal and is now barred from relitigation.

2.      *No Appellate Court Has Held That a Capital Sentencing Jury Needs to Find That Aggravating Factors Outweigh Mitigating Factors Beyond a Reasonable Doubt.*

Purkey's claim is also meritless and has been rejected by every appellate court to consider the issue.

For the jury to impose a sentence of death, the FDPA requires the United States to prove that "the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death." 18 U.S.C. § 3593(e).  *See United States v. Gabrion*, 719 F.3d 511, 532-33 (6th Cir. 2013) (the BRD weighing argument is meritless).

Each of the seven circuit courts of appeals to have addressed this issue has concluded that the Sixth Amendment's requirement that findings of fact be made beyond a reasonable doubt does not apply to the FDPA's weighing determination. *United States v. Gabrion*, 719 F.3d 511, 532-33 (6th Cir. 2013); *United States v. Runyon*, 707 F.3d 475, 516 (4th Cir. 2013); *United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008); *United States v. Mitchell*, 502 F.3d 931, 993-94 (9th Cir. 2007), *cert. denied*, 553 U.S. 1094 (2008); *United States v. Sampson*, 486 F.3d 13, 32 (1st Cir. 2007); *United States v. Fields*, 483 F.3d 313, 345-46 (5th Cir. 2007), *cert. denied*, 552 U.S. 1144 (2008); *cf. United States*

*v. Purkey*, 428 F.3d 738, 750 (8th Cir. 2005) (weighing consideration not an "elemental fact" that must be presented to a grand jury.

The Sixth Circuit explained that the FDPA's weighing process does not require a finding of fact. *Gabrion*, 719 F.3d at 533. Thus, the jury need not be instructed on the beyond a reasonable doubt standard as if it was making a finding of fact. *Id*. In rejecting the defendant's beyond a reasonable doubt weighing argument, the Sixth Circuit stated "Every circuit to have addressed the argument that Gabrion makes here—six circuits so far—has rejected it. Today we become the seventh. Gabrion's argument is meritless." *Id.*, at 532 (citations omitted). The First Circuit also held in *Sampson* that the "requisite weighing constitutes a process, not a fact to be found." 486 F.3d at 32 ("The outcome of the weighing process is not an objective truth that is susceptible to further proof by either party. Hence, the weighing of aggravators and mitigators does not need to be 'found.'").

Purkey seeks to do an end run around this circuit court consensus by claiming that *Hurst v. Florida* changed the analysis. Purkey is wrong and ignores the plain language of the circuit court opinions. It is clear from those analyses that the decisions were based upon the determination, under *Apprendi v. New Jersey*, that a federal capital sentencing jury's weighing decision does not involve an element that raises the statutory maximum penalty. *See Gabrion*, 719 F.3d at 531; *Sampson*, 486 F.3d at 32.

Every court to consider the issue, post *Hurst*, has also agreed that the Constitution does not require a capital sentencing jury to weigh their sentencing decision beyond a reasonable doubt. *See United States v. Christensen*, No. 17-cr-20037-JES-JEH, 2019 WL 1976442 (C.D. Ill. May 3, 2019) ("This Court agrees, and does not read *Hurst* to require

-100-

instruction that the jury make a finding about the relative weight of the aggravating and mitigating factors beyond a reasonable doubt"); *United States v. Roof*, 225 F. Supp. 3d 413, 419 (D.S.C. 2016) ("Nothing in *Hurst* invites this Court to reconsider [the Fourth Circuit jurisprudence that the weighing process does not need to be conducted beyond a reasonable doubt]); *United States v. Con-Ui*, No. 3:13-CR-123, 2017 WL 1393485 (M.D. PA Apr. 18, 2017) ("Nothing in *Hurst* aims to invalidate my previous findings, informed by *Apprendi* and recognized by courts across the nation, that the FDPA's weighing process is not a 'fact' to be 'found' by the jury but a deeply personal decision based on private beliefs, values, and experiences whereby juries, guided by mercy, make a reasoned and subjective moral judgment about the appropriate sentence"); *Runyon*, 228 F. Supp. 3d at 588; *United States v. Ofomata*, No. 17-201, 2019 WL 527696 (E.D. LA Feb. 11, 2019) ("The Court has already noted that nothing in *Hurst* indicates that the Supreme Court intended to alter the law as it is set forth in *Apprendi* and *Ring*"); *United States v. Sampson*, No. 01-10384-LTS, 2016 WL 3102003, at *4 (D. Mass. Jun. 2, 2016) ("the Court is not persuaded that the Constitution mandates application of the reasonable doubt standard of proof to the jury's weighing of aggravating and mitigating factors under the FDPA"). *See also Ybarra v. Filson*, 869 F.3d 1016, 1030-31 (9th Cir. 2017) (expressing extreme skepticism at the defendant's argument that, under *Hurst*, the weighing process in Nevada's capital sentencing scheme is like an element of a capital offense). Accordingly, Purkey's petition should be denied.

### F.   Claim 6 - *Imposition of the Death Penalty Under the Federal Death Penalty Act is Not Cruel and Unusual Punishment.*

Purkey raises in his § 2241 petition a facial challenge to the constitutionality of the federal death penalty, on the ground that it is cruel and unusual punishment prohibited by the Eighth Amendment.  As an initial matter, this claim is procedurally barred.  On the merits, Purkey's claim asks this Court to overrule the Supreme Court, which it cannot do.  Indeed, the Supreme Court re-affirmed the constitutionality of the death penalty less than six months ago.  *See Bucklew v. Precyth*, 139 S.Ct. 1112, 1122 (2019) ("The Constitution allows capital punishment.").  Claim 6 must be denied.

#### 1.   *Claim 6 Is Procedurally Barred.*

This claim is procedurally barred because Purkey has identified no reason that would enable him to fit within the savings clause of § 2255(e).  His claim does not fit into any of the circumstances where the Seventh Circuit has found § 2255 inadequate or ineffective: it is not a *Davenport* claim based on a new retroactive case of statutory interpretation that undermines his conviction or sentence; it is not a *Garza*-claim based on the intervening decision of an international tribunal; and it is not a *Webster*-claim that newly discovered but pre-existing evidence shows that he is constitutionally ineligible for capital punishment.  Rather, it is a claim that could have been raised in his direct appeal and is now barred.

#### 2.   *Capital Punishment Is Constitutional.*

This Court is bound to follow Supreme Court precedent holding that capital punishment is constitutional.  *See Bucklew*, 139 S. Ct. at 1122 ("The Constitution allows

capital punishment."); *Glossip v. Gross*, 135 S. Ct. 2726, 2732–33 (2015); *Gregg v. Georgia*, 428 U.S. 153, 187 (1976); *see also Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("We reaffirm that if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (quotation and punctuation omitted)); *United States v. Christensen*, Case No. 17-cr-20037-JES-JEH, 2019 WL 651501, at *3 (C.D. Ill. Feb. 15, 2019) ("Because *Gregg* and its progeny squarely foreclose Defendant's constitutional challenge to the death penalty, his Motion is denied.").

The death penalty is not categorically disproportionate or excessive under the Eighth Amendment. *See Bucklew*, 139 S. Ct. at 1122 ("[T]he Fifth Amendment, added to the Constitution at the same time as the Eighth, expressly contemplates that a defendant may be tried for a 'capital' crime and 'deprived of life' as a penalty, so long as proper procedures are followed. And the First Congress, which proposed both Amendments, made a number of crimes punishable by death."). Controlling precedent aside, Purkey's disproportionality argument ignores the severity of his crimes, the lives he quite literally destroyed, and the irreversible impact of his conduct on Jennifer Long's mother, her father, and her community. (T. Tr. Vol. XI at 1402-06.) As the Supreme Court reminds us, "just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to [her] family." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). It is important not to lose sight of the fact that Purkey actively schemed to spend life in federal prison, so anything short of the death penalty

could hardly be viewed as punishment.  The Government submits, and twelve of Purkey's peers agreed, that any sentence other than death would be disproportionate.

The death penalty is not per se unreliable.  (Purkey Pet. at 182-83.)  *See Kansas v. March*, 548 U.S. 163, 198-99 (2006) (Scalia, J., concurring).  There is no conceivable issue with the reliability of the death penalty in this case.  Purkey does not dispute that he murdered Jennifer Long,[17] and none of his arguments raised here or elsewhere cast legitimate doubt on his guilt of the crime of conviction.

The death penalty is not per se arbitrary, as Purkey contends.  (Purkey Pet. at 183.) *See Gregg*, 428 U.S. at 195 ("[T]he concerns expressed in Furman that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance."). There was nothing arbitrary about the process by which Purkey himself was convicted and sentenced.  Moreover, "[a]nytime a decisionmaker has discretion, facially similar cases are going to turn out differently because every case is unique. . . . The fact that the government

---

[17]Purkey testified at trial:

Q     So you raped her?

A     I raped her.

    \*       \*       \*

A     . . . I yanked the knife out of her hand and the next thing I know is her and I was laying on the floor ten or twelve feet from the weight bench. I stabbed her several times and she's dead and I'm sitting there on the floor with her.

(T. Tr. Vol. VII at 68, 71.)

-104-

is selective in seeking the death penalty and juries are even more careful in applying it isn't an argument against it." *United States v. Briseño*, No. 2:11-cr-00077-PPS, 2015 WL 163526, at *4 (N.D. Ind. Jan. 12, 2015).

Finally, Purkey's argument that the "death penalty causes excessive delays and results in cruel conditions of confinement" (Purkey Pet. at 191) is meritless.  *See Thompson v. Secretary for Dept. of Corr.*, 517 F.3d 1279, 1283 (11th Cir. 2008) ("Petitioner can identify no case in which the Supreme Court has held that prolonged confinement on death row violates a prisoner's constitutional rights.").  The delays inherent in executing capital sentences are typically directly attributable to the processes initiated by capital defendants themselves.  *See United States v. Fell*, 224 F. Supp. 3d 327, 344 (D. Vt. 2016) ("It is fair to say that the delay is generally the result of searching examination of the cases on appeal and, especially, on collateral review").  Purkey's description of the conditions of confinement at USP-Terre Haute (Purkey Pet. at 191-92) is difficult to reconcile with his account of his own experiences, which include regular meetings with a Buddhist monk, phone calls with his daughter, making gifts for his grandchildren, "practicing Zen, corresponding with his family and pen pals, or practicing Spanish."  (Purkey Pet. at 78-81.)

In sum, Purkey's facial challenge to the constitutionality of the death penalty cannot overcome controlling precedent and must be denied.

**G.      Claim 7 - _The Categorical Exemption from Capital Punishment Does Not Extend Beyond Intellectual Disability as Held in_ Atkins v. Virginia.**

Mirroring arguments made, and rejected, in other federal death penalty habeas petitions, Purkey claims for the first time that mental illness categorically exempts him from capital punishment.  As an initial matter, the claim is procedurally defaulted because Purkey did not raise it at trial or on appeal.  In addition, this identical claim has been rejected by every court to consider the claim.

**1.      _Claim 7 Is Procedurally Barred._**

This claim is procedurally defaulted because Purkey has identified no reason that would enable him to fit within the saving clause of § 2255(e).  His claim does not fit into any of the circumstances where the Seventh Circuit has found § 2255 inadequate or ineffective: is not a _Davenport_ claim based on a new retroactive case of statutory interpretation that undermines his conviction or sentence; it is not a _Garza_-claim based on the intervening decision of an international tribunal; and it is not a _Webster_-claim that newly discovered but pre-existing evidence shows that he is constitutionally ineligible for capital punishment. Rather, it is a claim that could have been, and in fact was, raised in his direct appeal and is now barred from relitigation.

Furthermore, even assuming he could demonstrate that § 2255 is inadequate or ineffective, Purkey has never raised this claim before and would be required to show "cause" and "prejudice" so as to excuse the default. _United States v. Frady_, 456 U.S. 152, 170 (1982).  The cause and prejudice standard requires Purkey to show not only that some objective factor external to the defense impeded his effort to raise the issue as required by

-106-

each relevant procedural rule, but also that the error alleged worked against his actual and substantial disadvantage, infecting his entire trial with error. *Id.* at 170; *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). This is a "significantly higher hurdle" than the plain error standard required to overcome the default. *United States v. Olano*, 507 U.S. 725 (1993); *Frady*, 456 U.S. at 166. The only other exception—actual innocence—does not apply to this claim because it does not purport to establish that he is innocent of the crime.

This precise issue, and procedural posture, was also raised and rejected in *Runyon v. United States*, 228 F. Supp. 3d at 648. *See also Gabrion*, No. 1:15-cv-447, 2018 WL 4786310, at *97 (W.D. Mich. Oct. 4, 2018) ("Gabrion's claim is both meritless and procedurally defaulted"). In *Runyon*, the petitioner was tried and convicted of a capital murder under the FDPA. He was sentenced to death, and on collateral appeal claimed that he was severely mentally ill, and that sentencing him to death violated the Eighth Amendment's ban on cruel and unusual punishment. *Id.* He claimed, as does Purkey, that his attorneys were ineffective for not raising the claim, and that such ineffectiveness is its own constitutional claim, as well as cause to excuse procedural default. The court disagreed, holding:

> As the court finds the claim to extend *Roper* and *Atkins* has no merit, the Petitioner has failed to show a reasonable probability of success had counsel presented this argument at trial or on appeal. Further, appellate counsel was not deficient, as this argument is not stronger than any brought on appeal, and trial counsel was not deficient for choosing to forego a claim that is not based on any existing constitutional grounds. Accordingly, the Petitioner is unable to show ineffective assistance of counsel, and this claim is both procedurally defaulted and without merit. Claim Fourteen is DENIED.

*Id.* at 649. The claim should also be denied as procedurally barred.

Purkey's claim is also *Teague* barred.  Collateral relief is limited to claims based on established law. *Teague*, 489 U.S. at 310.  A petitioner cannot receive habeas relief "unless reasonable jurists hearing the claim at the time the conviction became final would have felt compelled by existing precedent to rule in his favor." *Graham*, 506 U.S. at 467 (internal quotation marks omitted); *see also Saffle*, 494 U.S. at 487 (holding the Court generally would "neither announce nor apply" a new rule on collateral review).  In view of *Teague* and its progeny, lower courts may not grant collateral relief based on their own newly-announced rules. *See Caspari v. Bohlen*, 510 U.S. 383, 390-396 (1994); *see also Petrovich v. Leonardo*, 229 F.3d 384, 387 (2d Cir. 2000) (holding *Teague* bars this Court from "announc[ing] a new rule [that is] not dictated by precedent"); *Lackey v. Scott*, 28 F.3d 486, 490 (5th Cir. 1994) (holding "acceptance of [the petitioner's] claim would require this Court to announce a new rule of constitutional law . . . . foreclosed [under *Teague*]"). The Teague bar applies unless the new rule substantively limits criminal liability or falls within a small set of "watershed" doctrines that implicate the fundamental fairness of a criminal proceeding. *Cousins*, 455 F.3d at 1126 n.6 (citing *Schriro v. Summerlin*, 542 U.S. 348 (2004)).

Purkey's *Atkins* extension claim is also not properly brought under 28 U.S.C. § 2241 pursuant to this Court's recent decision in *Fulks v. Krueger*, No. 2:15-cv-00033-JRS-MJD, 2019 WL 4600210 (S.D. Ind. Sep. 20, 2019).  In *Fulks*, this Court found that the petitioner's claim that his alleged mental illness is "functionally equivalent to one who is intellectually disabled and the corresponding argument that *Atkins* should be extended to cover such persons" was not properly brought under § 2241.  This Court first found that because the

petitioner was "challenging the constitutionality of his sentence" under the Eighth Amendment, his claim "falls within § 2255(a), [and] he must meet the requirements of the Savings Clause to proceed under § 2241." *Fulks*, 2019 WL 4600210, at \*9.  This Court ultimately held that "Mr. Fulks does not point to any federal court that found the Savings Clause met in a remotely analogous case. . . .  Accordingly, Mr. Fulks' claims are barred by the Savings Clause, and the Court cannot reach the merits of them in this § 2241 proceeding." *Id.* at \*16.  The *Atkins* extension claim *Fulks* made, and which was rejected by this Court, is identical to Purkey's request here and this Court should likewise also reject application of 28 U.S.C. § 2241 as a vehicle to have his claim heard.

> 2.      *Claim 7 Is Contrary to Firmly Established Law.*

Purkey cites no law that supports his claim that the "Eighth Amendment categorically prohibits a death sentence for people who, like Mr. Mr. [sic] Purkey, suffer from severe mental illness."  (Purkey Pet. at 193.)  Rather, as his sole legal support to extend the categorical exemptions enunciated in *Atkins* and *Roper*, Purkey cites to *State v. Kahler*, 410 P.3d 105, 128 (Kan. 2018).  *Kahler*, however, specifically rejected the arguments Purkey now makes.  *See Kahler*, 410. P.3d at 128 (quoting *State v. Kleypas*, 382 P. 3d 373 (Kan. 2016) ("We, therefore, deny his Eighth Amendment categorical proportionality challenge and conclude the Eighth Amendment does not categorically prohibit the execution of offenders who are severely mentally ill at the time of their crimes").  In addition to attempting to use contrary authority in support of his petition, Purkey also relies upon American Bar Association Reports as well as other social science papers which have been uniformly rejected by federal courts.

At the outset, it is clear and undisputed that the Supreme Court has not recognized mental illness as a *per se* bar to execution.  *See Mays v. Stephens,* 757 F.3d 211, 219 (5th Cir. 2014) (holding neither *Roper* nor *Atkins* created a new rule of constitutional law making the execution of mentally ill persons unconstitutional); *Franklin v. Bradshaw*, 695 F.3d 439, 455 (6th Cir. 2012) (noting absence of case law extending *Atkins* to prohibit the execution of those with mental illnesses); *Baird v. Davis*, 388 F.3d 1110, 1114 (7th Cir. 2004) (recognizing Supreme Court's exemptions from execution for the mentally retarded and minors, but that "it has not yet ruled out the execution of persons who kill under a mental illness");  *Runyon v. United States,* 228 F. Supp. 3d 569, 649 (E.D. Va. 2017); *Gabrion v. United States*, No. 1:15-cv-447, 2018 WL 4786310 (W.D. Mich. Oct. 4, 2018). In addition, many state high courts have also acknowledged the lack of a bar against imposing the death penalty on the severely mentally ill, and absent meeting the criteria for insanity, courts generally have permitted application of the death penalty against defendants with serious mental illness.  *See Runyon*, 228 F. Supp. 3d at 649 (collecting cases).  Indeed, in *Atkins*, the Supreme Court expressly limited its holding to the mentally retarded.  *Atkins*, 536 U.S. at 320 ("[Offenders who are not mentally retarded] are unprotected by the exemption and will continue to face the threat of execution.").

Nor do the "evolving standards of decency" command that the Supreme Court's reasoning in *Atkins* or *Roper* should be extended to insulate from capital punishment those with mental illness for the first time by this Court.  *See Thacker v. Workman*, Case No. 06-CV-0028, 2010 WL 3466707, *23-24 (N.D. Okla. Sept. 2, 2010) (declining the petitioner's "invitation to extend the Supreme Court's prohibition on executions of mentally retarded

persons and minors to person with mental health issues based on 'evolving standards of decency'" ).  Indeed, Purkey points to no "objective indicia of society's standards," *Atkins*, 536 U.S. at 312, indicating that modern sensibilities favor such a prohibition on subjecting the mentally ill to capital prosecution.  *See id.* ("Proportionality review under those evolving standards should be informed by objective factors to the maximum possible extent." (internal quotations omitted)); *Roper*, 543 U.S. at 563 (holding same).

The clearest and most reliable objective evidence of contemporary values is the laws enacted by the country's legislatures.  *Atkins*, 536 U.S. at 312.  For example, at the time *Atkins* was handed down, the Court tallied that 14 states prohibited the death penalty outright, 18 states plus the federal government prohibited imposition of the death penalty upon mentally retarded individuals, and three more states had similar bills pending.  *Id.* at 315.  Here, however, Purkey has not cited, and the Government has not found, a single legislative act prohibiting the imposition of capital punishment upon individuals who displayed mental illness at the time they committed a capital offense, other than, of course, those who satisfy the time-tested defense of insanity.  Although the government is aware that bills have been proposed in several jurisdictions establishing a categorical exemption, no such legislation has actually been passed into law.  Even the death penalty abolitionist organization the Death Penalty Information Center (DPIC) candidly acknowledges that there "is no categorical ban on the execution of people with mental illness." *See* https://deathpenaltyinfo.org/policy-issues/mental-illness, last accessed Sept. 13, 2019.

Courts considering the issue have also uniformly rejected Purkey's claim for a new constitutional rule categorically exempting the mentally ill from capital punishment.  The

wave of post-*Atkins* authority from state courts demonstrates that the national consensus is against an absolute bar to capital punishment for the mentally ill.  *See State v. Kahler,* 410 P.3d 105, 128 (Kan. 2018); *People v. Hajek*, 324 P.3d 88, 173-74 (Cal. 2014) (holding serious mental illness does not necessarily negate moral responsibility for killing and declining "to say that executing a mentally ill murderer would not serve societal goals of retribution and deterrence" ); *State v. Dunlap*, 313 P.3d 1, 35-36 (Idaho 2013) (joining several state and federal courts "in holding that a defendant's mental illness does not prevent imposition of a capital sentence"); *Malone v. State*, 293 P.3d 198, 216 (Okla. Crim. App. 2013) ("We expressly reject that the *Atkins* rule or rationale applies to the mentally ill."); *Mays v. State*, 318 S.W.3d 368, 379 (Tex. Crim. App. 2010) (holding prohibition under *Atkins* against execution of mentally retarded as cruel and unusual punishment did not extend to a mentally ill defendant); *Dotch v. State*, 67 So.3d 936, 1006 (Ala. 2010) ("Under constitutional guidelines, in order to be exempt from the imposition of the death penalty, a defendant must meet the definition of mentally retarded or the definition of legal insanity. . . . and this Court will not extend or expand the constitutional prohibitions against the application of the death penalty in this case.") (citations omitted); *State v. Hancock*, 840 N.E.2d 1032, 1059-60 (Ohio 2006) (holding Eighth Amendment's prohibition against execution of mentally retarded persons did not extend to mentally ill defendant; rather, mental illness was mitigating factor that jury could consider); *Diaz v. State*, 945 So.2d 1136, 1152 (Fla. 2006) (holding that even if petitioner could prove he suffered from mental illness, this fact "would not automatically exempt him from execution as there is no per se 'mental illness' bar to execution"), abrogated in part on other grounds by *Darling v. State*,

45 So.3d 444 (Fla. 2010); *People v. Runge*, 917 N.E.2d 940, 985-86 (Ill. 2009) (declining to extend *Atkins* or *Roper*, and holding that even a finding of "guilty but mentally ill" does not preclude imposition of the death penalty); *State v. Johnson*, 207 S.W.3d 24, 51 (Mo. 2006) (noting that "federal and state courts have refused to extend *Atkins* to mental illness situations");  *Baird v. State*, 831 N.E.2d 109, 115-16 (Ind. 2005) (holding neither evolving standards of decency, changes in legal landscape, nor development of statewide consensus since petitioner was sentenced to death indicated that death sentence had come to constitute cruel and unusual punishment for persons with mental illness); *Lewis v. State*, 620 S.E.2d 778, 786 (Ga. 2005) (stating defendant failed to "cite any authority that establishes a constitutional prohibition on convicting and sentencing to death a defendant who is competent but mentally ill," and declining to extend the holding of *Atkins*).  The Florida and Indiana Supreme Courts have also rejected equal protection challenges to the imposition of the death penalty upon mentally ill persons because such persons are not similarly situated to persons with mental retardation or persons aged younger than 18 at the times of their crimes. *See Carroll v. State*, 114 So.3d 883 (Fla. 2013); *Matheny v. State*, 833 N.E. 2d 454 (Ind. 2005).

Purkey's attempt to create a new categorical exemption for mental illness for the first time on habeas appeal also mirrors tactics that have been raised by other capital habeas petitioners, and been rejected by federal courts. *See Gabrion*, No. 1:15-cv-447, 2018 WL 4786310 (W.D. Mich. Oct. 4, 2018); *Runyon*, 228 F. Supp. 3d at 649; *Anderson v. Kelley*, __ F.3d __, No. 17-2456, 2019 WL 4280360, at \*9 (8th Cir. Sept. 11, 2019); *see also United States v. Madison*, 337 F. Supp. 3d 1186, 1199 (M.D. Fla. Oct. 10, 2018) ("The

Court is bound to apply the law as written, and currently, the Eighth Amendment does not exclude individuals with severe mental illnesses and serious brain damage from the death penalty. The motion is denied.").

In *Gabrion*, the petitioner argued for the first time on collateral appeal that he was seriously mentally ill and, therefore, categorically exempt from a capital sentence. He argued that the logic of *Atkins v. Virginia* and *Roper v. Simmons* "should be extended to offenders who are 'mentally ill' or 'severely mentally ill.'" *Gabrion*, 2018 WL 4786310, at *95. The District Court rejected the argument, holding:

> Gabrion's argument falters on many levels. First, he has not offered any evidence of a consensus against the execution of criminally responsible individuals who may suffer from mental illness, "as expressed . . . by the enactments of legislatures that have addressed the question." *See id*. He does not point to any state laws that exclude such individuals from the death penalty. Instead, he cites a resolution by the American Bar Association (ABA) . . .

>           *           *           *

> Furthermore, in the Court's own judgment, the death penalty is not automatically an excessive punishment for all criminally responsible people who have some form of mental illness. Here, the Court "considers whether the challenged sentencing practice serves legitimate penological goals." *Graham v. Florida*, 560 U.S. 48, 67, 130 S.Ct. 2011, 176 L. Ed. 2d 825 (2010). Retribution and deterrence are legitimate goals for the death penalty.

>           *           *           *

> The Government also asserts that this claim is procedurally defaulted because Gabrion did not raise it at trial or on appeal, and he has not alleged "cause" and "prejudice" to excuse his default. *See United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L. Ed. 2d 816 (1982). Gabrion does not respond to this assertion in his reply, and does not contend that he qualifies for the "actual innocence" exception to procedural default. Accordingly, Gabrion's claim is both meritless and procedurally defaulted.

*Id.* at 96-97.  Accordingly, Purkey's petition should be denied as meritless and procedurally barred.  *See also Runyon*, 228 F. Supp. 3d at 649 ("After evaluating the decisions by both federal and state courts that have chosen not to extend *Roper* and *Atkins*, this court finds it inappropriate to extend the holdings or the reasoning in *Atkins* and *Roper* to defendants with severe mental illness, absent Supreme Court authority.").

Most recently, in *Anderson v. Kelley,* the Eighth Circuit rejected the habeas petitioner's attempt to create a new categorical exemption to the death penalty for defendants with serious mental illness.  The court also rejected the petitioner's attempt to excuse his procedural default by claiming that the claim was "novel."  The Eighth Circuit found that the "tools were available to the petitioner to construct the legal argument" at the time of his original appeal.  *Anderson*, 2019 WL 4280360, at \*28.  The court found that the tools to claim a mental illness categorical exemption were available to petitioner after the Supreme Court's decision in *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Atkins v. Virginia*, 536 U.S. 304 (2002), were announced.  The Government notes that Purkey's trial was not commenced until well after the *Atkins* decision, and almost two decades after the Supreme Court's *Ford* decision.

### 3. *Other Remedies Were Available.*

Of course, individuals with severe mental illness are not without recourse. Congress has clearly defined and federal courts have for years applied a defense for the legally insane. "It is an affirmative defense . . . that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C.

§ 17(a).  Mental disease or defect does not otherwise constitute a defense. *Id*. A defendant bears the burden of proving the defense of insanity by clear and convincing evidence. 18  U.S.C. § 17(b). Should a capital defendant satisfy the elements of the insanity defense, that defendant may not only avoid capital punishment, but criminal responsibility altogether. *See* 18 U.S.C. § 4242. Thus, it is wholly unnecessary to hold a separate pretrial hearing to determine whether a capital defendant is mentally fit for capital prosecution.

Furthermore, Purkey was able to present mental health information in mitigation at his capital trial, and the jury was able to consider such information.  The jury was able to consider Purkey's mitigation claim that he "committed the offense under severe mental or emotional disturbance."  (Dkt. 23-37 at 94.)  The jury was able to consider his claim that he "suffered brain injuries as a result of car accidents, drug abuse, or both." *Id*.  The jury was able to consider his claim that he "suffered significant psychological and emotional damage as a result of the serious physical and emotional abuse of him by his parents, Jack and Velma Purkey."  *Id*.  The jury was able to consider his claim that he "suffered significant psychological and emotional damage as a result of sexual abuse of him by his mother Velma Purkey."  *Id*.  Consequently, his petition should be denied.

**H.**      ***Claim 8 – <u>Trial Counsel Was Not Ineffective in Filing A Motion to Suppress, or in Dealing With Collateral Issues Related to the Suppression Motion.</u>***

Claim 8 of Purkey's § 2241 petition raises the argument that one of his trial attorneys, Fred Duchardt, instructed Purkey to "lie" during the suppression hearing and admit that he had forcibly abducted the victim, Jennifer Long, across state lines, and then failed to file a motion in limine to prevent the Government's use of that testimony at trial

to impeach Purkey's assertion that Long willingly accompanied him to his home in Lansing, Kansas.  (Purkey Pet. at 202-20.)  Not only is this claim barred but the record is also devoid of any evidence to support it.

### 1.     _Claim 8 is Procedurally Barred._

As the Government has repeatedly emphasized throughout this response, this is a claim of ineffectiveness of trial counsel that could and should have been raised in Purkey's motion under 28 U.S.C. § 2255.  Since it was not, it cannot be raised for the first time in a petition under 28 U.S.C. § 2241.  Although it is clear that these allegations, even if true, would not justify a successive motion under § 2255(h), Purkey's inability to meet the gatekeeping requirements of this subsection does not make the remedy afforded by § 2255 "inadequate or ineffective" within the meaning of § 2255(e).

### 2.     _There is No Evidence to Support this Claim._

Even if this claim had been presented in Purkey's § 2255 motion, it would not entitle him to relief, and for a variety of reasons.  First of all, the record is devoid of any evidence that Duchardt instructed Purkey to lie at the suppression hearing or coached him to "falsely" admit that he had forcibly kidnapped Long, thereby sabotaging the only viable defense that Purkey had to the federal kidnapping charge.  In fact, the record of the suppression hearing showed that Duchardt was completely blindsided by Purkey's admission, and immediately went into full damage-control mode, objecting to the Government's questions and incorrectly suggesting to the court that the Government could not use that admission to impeach his client's testimony at trial.  (Dkt. 23-40 at 238-40.)

-117-

In addition to claiming or hypothesizing – without any support in the record – that Duchardt foolishly instructed his client to commit perjury at the suppression hearing, Purkey also asserts in his petition that Duchardt exacerbated his duplicity by failing to file a motion in limine to prevent the Government from using Purkey's admission to impeach his testimony at trial. As Purkey correctly notes in his petition, after Purkey repeatedly testified at trial that the 16-year-old Long willingly accompanied him from Kansas City, Missouri, to his home in Lansing, Kansas, the Government impeached him with his suppression-hearing testimony, where he testified to the contrary, and referred to that admission during its closing argument. (Dkt. 23-37 at 66; 23-37 at 69-70; 23-40 at 233.)

But contrary to what Purkey speculates in his petition, nothing in the record supports his preposterous suggestion that Duchardt instructed Purkey to "lie" at the suppression hearing, and foolishly affirm the statements he made to an FBI agent and a detective with the Wyandotte County, Kansas Sheriff's Department, in which he admitted forcibly transporting the victim from Missouri to Kansas. Such a tactic, as Purkey acknowledges, would have wholly undermined his defense that Long willingly accompanied him to his home in Lansing, Kansas.

Purkey speculates that Duchardt might have told Purkey to lie in the misguided hope that the Government would follow through with its supposed promise not to seek the death penalty in Purkey's case—a promise the Government denied throughout the entire case, including during the suppression hearing. (Purkey Pet. at 217-18.) But since it is clear from the record that Duchardt realized that an admission by Purkey that he forcibly transported Long to his Kansas residence could be used to impeach Purkey's trial

-118-

testimony, and since he also was aware that there was no reasonable probability that the Government would take the death penalty off the table, Purkey's claim that he lied at the suppression hearing because of Duchardt's advice – at least as he purportedly "understood" it (Purkey Pet. at 211)[18]—is simply preposterous, and is contradicted by the record.

It should suffice to say that, except for Purkey's belated claims, made for the first time in his § 2241 petition, that he "understood" Duchardt's advice was to lie at the suppression hearing, the record is devoid of any evidence to support this ridiculous, self-contradictory claim.  And the burden of proof in an action under § 2241 is on Purkey.  *See Espinoza v. Sabol*, 558 F.3d 83, 89 (1st Cir. 2009).  As previously noted, the only reasonable inference from the record is that Duchardt was completely blindsided when Purkey admitted, during the suppression hearing, that he had forcibly abducted Long across state lines, and did his best to try to salvage the situation.  However, once the cat was out of the bag, there was little he could do to "rehabilitate" Purkey except to get him to reaffirm at trial that Long had willingly accompanied him to his home in Lansing.

As Purkey candidly concedes in his petition (Purkey Pet. at 208-09), his co-counsel, Laura O'Sullivan, did her best to rehabilitate Purkey on redirect examination, when she got Purkey to suggest that he was merely acknowledging what he had said to police in his earlier statements, and did not mean to admit at the suppression hearing that he had actually

---

[18]Purkey asseverates in his petition that he "understood Mr. Duchardt to mean that the best chance of securing a life-sentence plea offer was to be cooperative and persist in original statements made to law enforcement that he kidnapped Jennifer Long" without actually quoting or even paraphrasing what Duchardt supposedly said to him. (Purkey Pet. at 211.)

kidnapped Long. (Dkt. 23-40 at 233-34.) In fact, she asked him on redirect examination, "And there's no doubt that you lied to the police when you said that you kidnapped Jennifer Long, right?" – to which Purkey unhesitatingly answered, "No doubt at all." (Dkt. 23-40 at 234.)

Although Purkey repeatedly complains that his trial attorneys were ineffective in failing to do a better job of rehabilitating him, it is clear that they did the best they could under extremely difficult circumstances. Purkey faults them for not allowing him to explain why, during his suppression testimony, he attested to the truth of his admissions to kidnapping Long, but it is not clear from the record what that explanation would have been. As the Government has previously emphasized, Purkey's proposed explanation—that Duchardt told him to lie—makes no sense whatsoever and is contradicted by the record.

Quite simply, the record is clear that Purkey caught his attorneys off guard at the suppression hearing by admitting the obvious truth—that he had kidnapped Jennifer Long—and once that admission was on the record, the defense was stuck with it. Although Purkey, citing *United States v. Simmons*, 390 U.S. 377 (1968), argues that his attorneys were ineffective in failing to seek to exclude his suppression-hearing admissions at trial, *Simmons* merely holds that the Government cannot use a defendant's suppression-hearing testimony in the prosecution's case-in-chief; it does not preclude the use of such testimony to *impeach* a defendant's trial testimony. *Simmons*, 390 U.S. at 394 (holding "that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial *on the issue of guilt*") (emphasis supplied).

In *United States v. Salvucci*, 448 U.S. 83, 93-94 (1980), the Supreme Court reserved the question whether *Simmons*, which was decided 12 years earlier, precludes the use of a defendant's testimony at a suppression hearing to *impeach* his testimony at trial.  The Court noted, however, that a number of courts to consider the question had held that such testimony is admissible as evidence of impeachment.  *Id.* at 94 & n.8 (citing *Gray v. State*, 403 A.2d 853, 858 (Ct. Spec. App. 1979) (noting that nothing in *Simmons* precludes use of defendant's testimony at suppression hearing for purpose of impeachment at trial); *People v. Sturgis*, 317 N.E.2d 545, 547-48 (1974) (same); *People v. Douglas*, 136 Cal. Rptr. 358, 363 (Cal. 1977) (defendant's testimony at suppression   hearing was admissible for impeachment purposes because defendant took the stand in his trial and testified in a manner inconsistent with his pretrial testimony)).  *See generally Harris v. New York*, 401 U.S. 222, 225 (1971) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury."); *United States v. Kahan*, 415 U.S. 239, 243 (1974) ("the protective shield of *Simmons* is not to be converted into a license for false representations").

Although neither the Supreme Court nor the Seventh or the Eighth Circuits has definitively ruled on this issue, every federal circuit to have considered this question has held that a defendant's testimony at a suppression hearing may be used to impeach his testimony at trial.  *United States v. Smith*, 940 F.2d 710, 713 (1st Cir. 1991); *United States v. Jaswal*, 47 F.3d 539, 543-44 (2d Cir. 1995); *United States v. Beltran-Gutierrez*, 19 F.3d 1287, 1289-91 (9th Cir. 1994); *United States v. Quesada-Rosadal*, 685 F.2d 1281, 1283

-121-

(11th Cir. 1982) (same); *see also United States v. Geraldo*, 271 F.3d 1112, 1116 (D.C. Cir. 2001) (suggesting same).

In his petition, Purkey attempts to analogize his situation to that of *Armstrong v. Kemna*, 534 F.3d 857, 865 (8th Cir. 2008), where a defendant's attorney was found to have been ineffective for failing to subpoena three key out-of-state defense witnesses, simply because he was unfamiliar with the statute that governed the procedure for securing the attendance of those witnesses. (Purkey Pet. at 216.) However, in this case, it is clear that Purkey's attorneys understood that case law from both federal and state courts allowed the Government to use Purkey's suppression-hearing statements to impeach his trial testimony. Thus, making such an objection would have been an exercise in futility.

It is not ineffectiveness of counsel for an attorney to refrain from making a meritless objection or argument. *See Lafler v. Cooper*, 566 U.S. 156, 167 (2012) ("Because the objection upon which his ineffective-assistance-of-counsel claim was premised was meritless, [petitioner] could not demonstrate an error entitling him to relief."); *see also Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite.")

In this case, the defense's initial strategy was to attempt to suppress Purkey's statements to authorities by showing that they were obtained in reliance upon an unkept promise not to seek the death penalty. To make that case, they needed Purkey to testify at the suppression hearing. It is clear that his attorneys—particularly Duchardt—were taken by surprise when Purkey unexpectedly acknowledged that the entirety of his prior statements were truthful, since they reasonably expected that he would deny forcibly

kidnapping Long.  However, once he blurted out what the jury ultimately determined was the truth, Purkey's attorneys' hands were tied.  Although they did the best they could to rehabilitate him, and to ensure that the jury knew that Purkey still was maintaining that he had not kidnapped Long, once Purkey testified otherwise at the suppression hearing, they faced an uphill battle.  And they certainly had no legal basis for preventing the Government from impeaching Purkey with his suppression-hearing admissions, notwithstanding *Simmons*.

Purkey argues that, had his attorneys not mishandled the issue, there was a reasonable probability that the jury might have found that he did not kidnap Long. However, he admitted to authorities that he had kidnapped her, and it was abundantly clear from the record that he retracted that admission only to avoid the possibility of receiving the death penalty.  In other words, even if Purkey's attorneys could or should have done more to "rehabilitate" him on this issue, there is no reasonable probability that the jury would have acquitted him on the utterly implausible theory that Long had voluntarily accompanied him to his Kansas residence.  "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal prosecution if the error had no effect on the judgment." *Strickland v. Washington*, 466 U.S. 668, 691 (1984).

Purkey cannot overcome the "strong presumption" that his attorneys' conduct fell within the wide range of reasonable professional assistance, or that his attorneys' handling of this issue "might not be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks omitted).  Accordingly, this claim would not have entitled Purkey to relief even if it had been raised in his § 2255 motion.

-123-

## IV.
## Purkey is Not Entitled to a Stay

**A.**      *Purkey Has No Possibility of Success on the Merits of His Claims.*

As demonstrated above, Purkey cannot overcome the procedural bars to his claims,

and even if he could, his claims are utterly without merit.  He argues the *Martinez-Trevino*

doctrine is the "something more" he needs in order to proceed with his petition.  As shown

above, the doctrine does not apply to his case.

**B.**      *The Irreparable Harm Prong Must Be Considered in Context.*

Purkey cites to the Seventh Circuit's decision in *Williams v. Chrans*, 50 F.3d 1358,

1360 (7th Cir. 1995), for the proposition that "[t]here can be no doubt that a defendant

facing the death penalty at the hands of the state faces irreparable injury."  *Williams* does

contain that language, but also qualifies the "irreparable "harm" prong by continuing:

> Nevertheless, as Justice White, writing for the Court in *Barefoot v. Estelle*,
> 463 U.S. 880, 895 (1983), made clear, "stays of execution are not automatic
> pending the filing and consideration of a petition for a writ of certiorari."  It
> is necessary that the applicant establish that there is a reasonable probability
> that four members of the Court will vote to grant certiorari and that five
> members of the Court will vote to reverse the judgment of the Court of
> Appeals. *Id.*  In a second or successive habeas appeal, we must be especially
> circumspect in assessing the merits of the applicant's case. We must
> determine that there are "substantial grounds" upon which relief may be
> granted.

*Williams*, 50 F.3d at 1360.  Following its analysis, including the irreparable harm prong,

the Seventh Circuit denied the petitioner's motion for a stay of execution. *Id*. at 1361.

Significantly, courts of appeals have rejected the argument that the equities favor a

stay because a defendant will suffer irreparable harm if executed, whereas the state will

only suffer a minimal inconvenience.  *See Bowles v. Desantis*, 934 F.3d 1230 (11th Cir.

2019).  Those courts have recognized that the state, the victim, and the victim's family also have an important interest in the timely enforcement of the defendant's sentence.  *Id.* (citing *Brooks v. Warden*, 810 F. 3d 812, 825 (11th Cir. 2016)); s*ee also Moran v. Burbine*, 475 U.S. 412, 426 (1986) (courts must recognize "society's compelling interest in finding, convicting, and punishing those who violate the law"); *Timberlake v. Buss*, No. 1:06-cv-1859-RLY-WTL, 2007 WL 1280664, at *9 (S.D. Ind. May 1, 2007) (same).  In fact, as a district court in the Southern District of Indiana has noted, the Supreme Court has emphasized "two critical factors in evaluating whether a stay of execution should issue: (1) whether the inmate has delayed unnecessarily in bringing the claim; and (2) whether the inmate shows a significant probability of success on the merits."  *Timberlake*, 2007 WL 1280664, at *5.  *See also Gomez v. United States Dist. Ct.*, 503 U.S. 653, 654 (1992) ("A court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief.").

### C.      *Purkey Has Not Diligently Pursued His Claims.*

Purkey states he has moved diligently in pursuing his claims.  But he waited until the Department of Justice set an execution date to file this petition.  Although the Eighth Circuit affirmed the denial of his § 2255 motion in 2013, Purkey apparently began his second post-conviction investigation in 2016, as shown by his appendices.  Purkey has submitted as appendices to his current motion declarations that were prepared in 2007 and 2008 and were attached to his original § 2255 motion and supplement.  (Dkt. 23-7 at 32; 23-10 at 1; 23-12 at 1; 23-13 at 65; 23-13 at 67; 23-13 at 69; 23-37 at 60; 23-37 at 73; 23-39 at 16; 23-39 at 49.)  Other declarations were signed in 2016.  (Dkt. 23-13 at 54; 23-13

at 58; 23-13 at 80, 86, 91; 23-20 at 33; 23-38 at 34; 23-40 at 92, 95, 98, 103.) Purkey was examined by two doctors in 2016 who wrote their reports later. (Dkt. 23-8 at 1; 23-16 at 84.) Some declarations were signed in 2017. (Dkt. 23-7 at 23; 23-10 at 9; 23-13 at 74; 23-14 at 26; 23-14 at 29; 23-21 at 6; 23-36 at 1; 23-37 at 335; 23-38 at 40.) Two declarations were signed in 2018 (Dkt. 23-36 at 23; 23-36 at 28) and one in 2019 (Dkt. 23-5 at 22.)

Purkey thus conducted the majority of his second post-conviction investigation in 2016 and 2017 which was still years after his § 2255 motion was denied, and then waited even longer - until an execution date was set, before filing this petition. Had Purkey believed there was any merit to his claims, he would have filed them sooner and not used this petition as a delaying tactic. The balance of harm is thus not in Purkey's favor. *See Nelson v. Campbell*, 541 U.S. 637, 649 (2004).

**D.      _Public Interest Weighs in Favor of Enforcing the Law._**

As argued earlier in this response, all of Purkey's claims are procedurally barred and substantively lack merit. Most of Purkey's claims have been litigated and affirmed on appeal. There is no public interest in continuing to delay the execution of Purkey's sentence in order to relitigate the same claims. The State has a "strong interest in proceeding with its judgment." *Id.* (quoting *Gomez v. United States District Court for the Northern District of California*, 503 U.S. 653, 654 (1992)).

## V.
## Conclusion

For the foregoing reasons, Purkey's petition for habeas corpus and motion for stay

should be denied with prejudice.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

By:   */s/Brian P. Casey*
      KATHLEEN D. MAHONEY
      BRIAN P. CASEY
      Special Assistant United States Attorneys

      Charles Evans Whittaker Courthouse
      400 East 9th Street, Fifth Floor
      Kansas City, Missouri  64106
      Telephone:  (816) 426-3122
      Fax:  (816) 426-3126
      E-mail:  Kate.Mahoney@usdoj.gov
               Brian.Casey@usdoj.gov

      *Attorneys for Respondent*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was electronically filed and provided to all counsel of record this 27th day of September 2019.

Rebecca E. Woodman
6155 Oak Street, Suite C
Kansas City, Missouri  64113

Michelle M. Law, Assistant Federal Public Defender
901 St. Louis Street, Suite 801
Springfield, Missouri  65806


*/s/ Brian P. Casey*
Brian P. Casey
Special Assistant United States Attorney

# EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| **WESLEY IRA PURKEY**, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | CIVIL ACTION |
| vs. | ) | |
| | ) | Case No.: 2:19-cv-414 |
| **WARDEN OF USP TERRE HAUTE**, | **)** | |
| **UNITED STATES OF AMERICA** | ) | DEATH PENALTY CASE |
| | ) | EXECUTION SCHEDULED |
| | ) | FOR DECEMBER 13, 2019 |
| Respondents. | ) | |

---

## REPLY TO GOVERNMENT'S RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS AND MOTION FOR STAY OF EXECUTION

---

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
Telephone:  (785) 979-3672
Email: rewlaw@outlook.com

Michelle M. Law
Assistant Federal Public Defender
Western District of Missouri
901 Saint Louis Street, Suite 801
Springfield, Missouri 65806
Telephone: (417) 873-9022
Facsimile:  (417) 873-9038
Email: michelle_law@fd.org

Dated: October 28, 2019

*Counsel for Petitioner*

## TABLE OF CONTENTS

I.  This Court, and only this Court, is the proper venue for this case ..................... 1

    A.  Seventh Circuit law is binding on this Court's determination of whether the savings clause provides an available remedy ....................... 2

    B.  Remedy by motion under § 2255 is inadequate or ineffective to test the legality of Mr. Purkey's conviction or sentence .......................... 2

    C.  Initial-review post-conviction counsel's failure to present the defaulted ineffective assistance of trial counsel claims does not preclude the invocation of the savings clause ............................................. 9

    D.  The Seventh's Circuit decision in *Lombardo* does not diminish this Court's obligation to follow existing Seventh Circuit precedent establishing that the nature of § 2255 post-conviction review involves the precise circumstances requiring the application of the *Martinez-Trevino* doctrine ............................................................................... 12

    E.  United States Supreme Court law controls the merits of Mr. Purkey's ineffective assistance of counsel claims .................................. 15

II. Trial counsel and § 2255 counsel were constitutionally ineffective for failing to challenge Juror 13, whose name is Jennifer, and who was selected to serve on Mr. Purkey's jury despite, and without any questioning about, her disclosure on her juror questionnaire that she was the victim of an attempted rape when she was 16 years old, where the underlying facts of the crime charged against Mr. Purkey alleged that he raped a 16-year-old girl named Jennifer (CLAIM 1) ......................................................... 16

III. Trial counsel was constitutionally ineffective in failing to investigate, develop and present readily available, compelling mitigating evidence to the jury at Mr. Purkey's capital trial, in violation of the Sixth, Eighth, and Fourteenth Amendments (CLAIM 2) ................................................. 29

    A.  Trial counsels' failure to conduct an adequate mitigation investigation is directly attributable to the substitution of a uniquely unqualified investigator in place of a qualified mitigation specialist as part of the defense team ................................... 30

i

B.      Trial counsel was ineffective in failing to investigate,
         develop and present Mr. Purkey's full trauma history and
         the long-term consequences and effects of his trauma
         exposure and its connection to his behavior to explain why
         he committed the crime that led to his federal conviction ....................32

C.      Trial counsel were ineffective in failing to investigate,
         discover, and present expert mental health evidence of Mr.
         Purkey's complex PTSD symptoms and behavior throughout
         his life up to and including the crime ..........................................45

IV.    Fred Duchardt perpetrated a fraud on the court requiring relief setting
        aside the judgment on his 28 U.S.C § 2255 petition by making false and
        misleading statements to the court in the § 2255 proceeding intended to
        secure denial of Mr. Purkey's claims of ineffective assistance of counsel
        alleged against Mr. Duchardt, and which the habeas court
        subsequently relied upon in denying Mr. Purkey relief (CLAIM 3) ...............51

V.     Because there is a substantial possibility that the jury at Mr.
        Purkey's penalty trial understood the instructions in a way
        that rendered jurors unable to consider and give effect to
        mitigating evidence in determining whether to sentence Mr.
        Purkey to death, Mr. Purkey's death sentence is
        unconstitutional under the Eighth Amendment (CLAIM 4) .............................61

VI.    Mr. Purkey's death sentence is unconstitutional in light of
        *Hurst v. Florida* because his sentencing jury did not find,
        beyond a reasonable doubt, each fact necessary to impose a
        sentence of death (CLAIM 5) .................................................................64

VII.   Trial counsel was constitutionally ineffective in his advice
        to Mr. Purkey prior to his suppression testimony that trial
        counsel knew directly contradicted Mr. Purkey's reasons
        for confessing to a federal kidnapping in reliance on the
        promise of a life-sentence plea offer, and in subsequently
        failing to file a motion in limine to prevent the government
        from using Mr. Purkey's suppression testimony to impeach
        his trial testimony that he did not kidnap Jennifer Long,
        and arguing that his suppression statements were true ......................................65

VIII.  Mr. Purkey is entitled to a stay of execution ...........................................69

REQUEST FOR RELIEF ...............................................................................................71

CERTIFICATE OF SERVICE.........................................................................................73

**I.      This Court, and only this Court, is the proper venue for this case.**

In an apparent attempt to persuade this Court that Mr. Purkey has an illegitimate reason for bringing his claims in this Court as opposed in his district of conviction, Respondent suggests that seeking relief in this Court is improper. R. 49 at 35, 48-49. However, Respondent concedes that Mr. Purkey cannot satisfy the requirements for filing a second or successive motion in his district of conviction. *Id.* at 36, 49. Respondent further recognizes that under 28 U.S. § 2255(e), when remedy by motion under § 2255 is inadequate or ineffective to the test the legality of a prisoner's detention, the prisoner may seek relief under § 2241. *Id.* at 37.

Respondent's argument is meritless. Mr. Purkey's request for relief under §§ 2255(e) and 2241 is due only to the inadequacy and ineffectiveness of § 2255 to address his defaulted claims. In these circumstances, Mr. Purkey has no choice but to file his petition in this Court: "The venue requirement in § 2241 is different from the venue requirement in § 2255: while an action under the latter must be brought in the district of conviction, a petition under § 2241 *must* be brought in the district of incarceration." *Light v. Caraway*, 761 F.3d 809, 812 (7th Cir. 2014) (emphasis added); *see also Rumsfeld v. Padilla*, 542 U.S. 426 (2004) (noting that there is only one proper respondent to a habeas petition: the person who has custody over the petitioner); *Webster v. Daniels*, 784 F.3d 1123, 1144 (7th Cir. 2015) (en banc) (explaining that *Rumsfeld* held that the one and only proper venue for a § 2241

1

petition is the petitioner's district of incarceration). As Mr. Purkey has turned to §

2241 only as a result of the inadequacy and ineffectiveness of § 2255 to address his

substantial but defaulted claims, and because § 2241 requires Mr. Purkey to file his

petition in the district of incarceration, this Court should reject any contention

suggesting that Mr. Purkey improperly sought relief in this Court.

A.     **Seventh Circuit law is binding on this Court's determination of whether the savings clause provides an available remedy.**

Respondent does not dispute that this Court must apply Seventh Circuit law

to determine whether the savings clause provides an available remedy to Mr.

Purkey. Mr. Purkey agrees that that this Court must apply Seventh Circuit law to

determine whether the savings clause provides an available remedy to Mr. Purkey.

Because this Court lies in the Seventh Circuit, decisions of the Seventh Circuit are

binding on this Court. *United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994).

B.     **Remedy by motion under § 2255 is inadequate or ineffective to test the legality of Mr. Purkey's conviction or sentence.**

As mentioned above, Respondent concedes that remedy by motion under §

2255 does not provide an avenue for relief for Mr. Purkey's claims, including his

defaulted ineffective assistance of trial counsel claims that no court has ever

reviewed. R. 49 at 36, 49. Thus, the parties agree that Mr. Purkey cannot assert

these defaulted claims under § 2255.

2

Despite this concession, Respondent nonetheless contends that Mr. Purkey has not shown that § 2255 is inadequate or ineffective under existing precedent. R. 49 at 37. Respondent recognizes that the Seventh Circuit has identified at least three kinds of circumstances in which § 2255 is "inadequate and ineffective" to test the legality of a petitioner's detention: (1) claims asserting that changes in statutory interpretation render the prisoner's conviction or sentence unlawful, (2) claims in which § 2255 does not now and has never provided an adequate avenue for testing the petitioner's present challenge to the legality of his sentence, and (3) claims involving newly discovered evidence demonstrating that a petitioner is categorically and constitutionally ineligible for the death penalty. R. 49 at 38-42. Respondent then posits that because the claims in the present case are not factually similar enough to claims in prior cases establishing the inadequacy or ineffectiveness of § 2255, (in that the claims do not involve a retroactive case of statutory interpretation or newly discovered evidence of intellectual disability or could have been raised before), Mr. Purkey has not met his burden of showing that remedy by motion under § 2255 is inadequate or ineffective to test the legality of Mr. Purkey's detention. *Id.*

Respondent's argument lacks merit. Mr. Purkey's burden does not require identifying a prior case presenting the *exact* circumstances present in this case. Rather, Mr. Purkey's burden simply involves identifying the applicable rule of law

3

and showing how the circumstances of this case satisfy the criteria of that rule. Because Mr. Purkey has done so, he has met his burden, and he is entitled to invoke the savings clause.

The Seventh Circuit has interpreted § 2255(e)'s "inadequate or ineffective" language and identified a rule for establishing the inadequacy or ineffectiveness of § 2255—whether section 2255 allows the petitioner "'a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence.'" *Webster*, 784 F.3d at 1136 (*quoting In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998)). Based on its review of Seventh Circuit precedent regarding § 2255's savings clause, the *Webster* court found that "that there must be some kind of structural problem with section 2255 before section 2241 becomes available." *Id*. "In other words, something more than a lack of success with a section 2255 motion must exist before the savings clause is satisfied." *Id*.

Here, structural problems with § 2255 prevent Mr. Purkey from presenting his defaulted ineffective assistance of trial counsel claims. Although these claims challenge the fundamental legality of his conviction or sentence, they do not fit within § 2255's criteria for a second or successive petition. Mr. Purkey therefore cannot obtain a judicial determination of them via a § 2255 motion. Thus, as in each of the cases cited by Respondent as examples of situations in which § 2255 is

4

inadequate or ineffective, *Webster* and *Garza* and *Davenport*, the operation of the successive petition rules absolutely prevent Mr. Purkey from now having an opportunity to raise these challenges to the legality of his sentence.

Mr. Purkey's case shares another characteristic of each of these cases: an intervening decision recognizing a right that did not exist at the time of the AEDPA's enactment (as well as the petitioner's initial 2255 proceedings).[1] In this case, the intervening decisions include several United States Supreme Court cases and Seventh Circuit cases involving the *Martinez-Trevino* doctrine:

> (1) the Supreme Court decision in *Martinez* establishing that where initial-review collateral proceedings provide the first occasion for a petitioner to raise an ineffective assistance of trial counsel claim, courts must hear substantial—though procedurally defaulted—constitutional claims of ineffective assistance of trial counsel if the petitioner can establish that counsel in the initial-review collateral proceeding caused the default by providing ineffective assistance, *Martinez v. Ryan*, 566 U.S. 1, 9-10, 17 (2012);

---

[1] In *Davenport*, the United States Supreme definitively ruled that the conduct for which the petitioner was convicted and imprisoned was not an offense under the relevant statute, and the remedy under § 2255 was "inadequate or ineffective" to test the legality of the petitioner's detention in light of the new Supreme Court ruling. *Davenport*, 147 F.3d at 610; *see also Webster*, 784 F.3d at 1138 (recognizing the import of the intervening decision addressed in *Davenport*). In *Garza*, the Inter-American Commission on Human Rights ruled that the introduction of evidence of uncharged murders in Mexico violated the petitioner's rights under the American Declaration of the Rights and Duties of Man, and the

(2)    the Supreme Court decision in *Trevino* holding that, under the principles of *Martinez*, courts can excuse procedural default even in a jurisdiction that does not require ineffective assistance claims to be raised on initial collateral review, *Trevino v. Thaler*, 569 U.S. 413, 428-29 (2013);

(3)    decisions of the Seventh Circuit recognizing that the structure of § 2255 places a federal petitioner in the same situation analyzed in *Trevino*, *Ramirez v. United States*, 799 F.3d 845, 853 (7th Cir. 2015) (("[T]he federal courts have no established procedure . . . to develop ineffective assistance claims for direct appeal," so "the situation of a federal petitioner is the same as the one the Court described in *Trevino*."); *id.* at 854 (same); *Brown v. Brown*, 847 F.3d 502, 509-10 (7th Cir. 2017) (noting that the *Martinez-Trevino* doctrine applies to federal prisoners who bring motions for post-conviction relief under § 2255); *Adams v. United States*, 911 F.3d 397, 411 (7th Cir. 2018) (concluding that the district court erred in finding that a petitioner has no ability to challenge the effectiveness of his § 2255 counsel); and

(4)    the Seventh Circuit's recognition that *Martinez* and *Trevino* have expanded a federal petitioner's ability to challenge the effectiveness of § 2255 counsel and the Seventh Circuit's application of the *Martinez-Trevino* doctrine to 2255 cases, *see, e.g., Ramirez*, 799 F.3d at 848

(concluding that in *Martinez* and *Trevino*, "the Court significantly changed its approach to claims of ineffective assistance of counsel at initial-review collateral proceedings."); *Adams*, 911 F.3d at 411 (concluding that the district court erred in finding that a petitioner has no ability to challenge the effectiveness of his § 2255 counsel and explaining that *Martinez* and *Trevino* "have changed how courts should view claims of ineffective assistance of counsel at initial-review collateral proceedings.").

Prior to the *Martinez* and *Trevino* decisions and the Seventh Circuit decisions recognizing that the *Martinez-Trevino* doctrine applies to § 2255 cases, Mr. Purkey did not have any right to obtain a judicial determination of claims that his initial post-conviction counsel failed to raise in his initial § 2255 proceeding. Now he does have that right. Under the *Martinez-Trevino* doctrine, § 2255 counsel's failure to present substantial claims of ineffective assistance of trial counsel does not bar Mr. Purkey from now presenting them. *See Ramirez*, 799 F.3d at 848; *Adams*, 911 F.3d at 411.

This right is not inconsequential or trivial. *Martinez*, 566 U.S. at 12 ("A prisoner's inability to present a claim of trial error is *of particular concern* when the claim is one of ineffective assistance of counsel.") (emphasis added). It stems from the constitutional right to counsel, which "is the foundation for our adversary system." *Id*. "The right to the effective assistance of counsel at trial is a bedrock

7

principle in our justice system." *Id.* Violations of this right impermissibly affect the reliability of judicial proceedings. *Strickland*, 466 U.S. at 696 (explaining that "guiding inquiry" in effective assistance of counsel cases is whether "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.").

However, like the inadequacy and ineffectiveness of § 2255 demonstrated in *Davenport*, *Garza*, and *Webster*, the structure of § 2255 absolutely prevents Mr. Purkey from testing the legality of his detention in light of his unadjudicated ineffective-assistance-of-trial-counsel claims. Because the ineffective assistance of initial-review post-conviction counsel prevented resolution of these claims during the initial-review post-conviction proceedings and because Mr. Purkey now (for the first time) has a right to judicial review of these claims, Mr. Purkey has not had "a *reasonable* opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *Webster*, 784 F.3d at 1136 (emphasis added). Moreover, particularly because no court has ever heard these claims and the claims center on the reliability of his conviction or sentence, Mr. Purkey has not had "a reasonable opportunity to obtain a *reliable* judicial determination of the fundamental legality of his conviction and sentence." *Id.* (emphasis added). Thus, § 2255 is inadequate or ineffective to test the legality of

8

Mr. Purkey's detention, and the savings clause of § 2255(e) provides an available remedy for a judicial determination of Mr. Purkey's claims.

### C.   Initial-review post-conviction counsel's failure to present the defaulted ineffective assistance of trial counsel claims does not preclude the invocation of the savings clause.

Respondent argues that the fact that Mr. Purkey—if he had been represented by effective counsel during his initial post-conviction review proceedings—could have raised the defaulted ineffective assistance of trial counsel claims in his initial post-conviction review proceedings now prohibits Mr. Purkey's invocation of the savings clause. R. 49 at 40. Respondent further contends that *Martinez* and *Trevino* are inapposite because Purkey is a federal prisoner and not a state prisoner. R. 49 at 46.

The problem with these arguments is two-fold: (1) the very purpose of the application of the *Martinez-Trevino* doctrine is to adjudicate ineffective assistance of trial counsel claims that erroneously were omitted from initial post-conviction review due to the ineffectiveness of initial post-conviction counsel, and (2) the Seventh Circuit applies the *Martinez-Trevino* doctrine to § 2255 cases (involving federal prisoners).

First, if the Supreme Court were not concerned about a prisoner's ability to test the reliability of his conviction or sentence in light of erroneously omitted claims asserting a violation of the right to counsel, then the Court would have

9

decided *Martinez* and *Trevino* in the opposite way. Instead, the court recognized the importance of both (1) the right to counsel and (2) a prisoner's opportunity for adjudication of previously omitted right-to-counsel claims. *Martinez*, 566 U.S. at 12 ("A prisoner's inability to present a claim of trial error is *of particular concern* when the claim is one of ineffective assistance of counsel.") (emphasis added). Because the right to counsel is the foundation of our adversary system and violations of that right undermine the reliability of convictions or sentences obtained in violation of that right, the Court determined that courts must not bar substantial—but defaulted—claims alleging abridgment of the right to counsel. *Id.* at 12, 17. Otherwise, the Court explained, initial-review collateral counsel's failure to raise such a claim would "deprive a defendant of any review of that claim at all." *Trevino*, 569 U.S. at 423.

Second, the Seventh Circuit applies the *Martinez-Trevino* doctrine to all federal prisoners who bring motions for post-conviction relief under § 2255. In *Ramirez*, the court stated:

> The question is whether [*Martinez* and *Trevino*] apply to some or all federal prisoners who bring motions for postconviction relief under section 2255. We already have answered this in the affirmative, in *Choice Hotels Intern., Inc. v. Grover,* 792 F.3d 753 (7th Cir.2015), where we wrote that "[a]lthough *Maples* and *Holland* [*v. Florida,* 560 U.S. 631, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010) ] were capital cases, we do not doubt that their holdings apply to all collateral litigation under 28 U.S.C. § 2254 or § 2255." *Id.* at 755. A closer look

10

at the issue convinces us that this position was correct.

*Ramirez*, 799 F.3d at 852. In so holding, the court specifically rejected the

Government's argument contending that the *Martinez-Trevino* doctrine applies

only to state prisoners and not federal prisoners:

> Neither *Martinez* nor *Trevino* suggested that, for these purposes, the
> difference between sections 2254 and 2255 was material. What does
> matter is the way in which ineffective assistance of counsel claims
> must be presented in the particular procedural system. This varies
> among the states, and between the states and the federal system, but
> we already have explained why in the great majority of federal cases,
> ineffectiveness claims must await the first round of collateral review.
> Moreover, if review were to be more restricted on either the state or
> the federal side, federalism concerns suggest that it would be the state
> side. Most of the rules that govern petitions under section 2254 are
> mirrored in section 2255, including importantly the procedure for
> handling second or successive petitions. We can think of no reason
> why *Martinez* and *Trevino* should be read in the way the government
> advocates.

*Id.* at 854.

Subsequently, in *Brown*, the Seventh Circuit noted that it applies "the

*Martinez-Trevino* doctrine to federal prisoners who bring motions for post-

conviction relief under § 2255." *Brown*, 847 F.3d at 509-10. In *Adams*, the Seventh

Circuit found that the district court erred in concluding that a petitioner has no

ability to challenge the effectiveness of his § 2255 counsel and explained that

*Martinez* and *Trevino* "have changed how courts should view claims of ineffective

assistance of counsel at initial-review collateral proceedings." *Adams*, 911 F.3d at

411. Because the Seventh Circuit applies the *Martinez-Trevino* doctrine to § 2255

11

proceedings, and because the *Martinez-Trevino* doctrine specifically authorizes consideration of claims that initial post-conviction should have raised but did not due to ineffectiveness, neither the fact that Mr. Purkey is a federal prisoner nor the fact that the defaulted post-conviction claims were not presented during the initial-review § 2255 proceedings precludes the invocation of the savings clause. On the contrary, the fact that the claims previously were not presented but should have been justifies the invocation of the savings clause to now allow Mr. Purkey a reasonable opportunity to obtain a judicial determination of the fundamental legality of his conviction and sentence. *See Martinez*, 566 U.S. at 12 ("A prisoner's inability to present a claim of trial error is *of particular concern* when the claim is one of ineffective assistance of counsel.") (emphasis added); *Trevino*, 569 U.S. at 423 (justifying judicial review of defaulted claims of ineffective assistance of trial counsel because initial-review post-conviction counsel's failure to raise such a claim would have "deprive[d] a defendant of any review of that claim at all.").

Under the above authorities, Respondent's argument has no merit. The savings clause of § 2255(e) provides an available remedy for a judicial determination of Mr. Purkey's claims.

> **D.    The Seventh's Circuit decision in *Lombardo* does not diminish this Court's obligation to follow existing Seventh Circuit precedent establishing that the nature of § 2255 post-conviction review involves the precise circumstances requiring the application of the *Martinez-Trevino* doctrine.**

Respondent contends that this Court should not apply the *Martinez-Trevino* doctrine in this case because the Seventh Circuit has not "extended" the doctrine to equitable tolling cases. R. 49 at 43. Respondent relies on *Lombardo v. United States*, 860 F.3d 547 (7th Cir. 2017), as support for this position. R. 49 at 43-45.

Respondent's position lacks merit because it overlooks a critical difference between the application of the *Martinez-Trevino* doctrine to defaulted post-conviction claims versus its application to equitable tolling cases. In the equitable tolling context, both the Supreme Court and the Seventh Circuit have held that that the specific type of error at issue in *Lombardo*—Lombardo's attorney's miscalculation of the statute of limitations deadline—does not justify equitable tolling relief. *Lombardo*, 860 F.3d at 557 (explaining that the petitioner's argument "runs headlong" into Supreme Court precedent holding "that attorney negligence, such as miscalculating a filing deadline, does not constitute an extraordinary circumstance for the purposes of equitable tolling."); *id.* at 558 (explaining that the Seventh Circuit already has squarely addressed this precise scenario and "held that errors identical to that of Lombardo's counsel do not constitute extraordinary circumstances, even when the petitioners wished to assert ineffective-assistance-of-trial-counsel claims in the first instance."). This difference explains why Seventh Circuit was free to apply the *Martinez-Trevino* doctrine in *Ramirez* but not in *Lombardo*: "*Ramirez* did not have to contend with the longstanding precedent in

13

the equitable tolling context holding that this sort of error by counsel does not justify equitable tolling." *Lombardo*, 860 F.3d at 559.

Here, unlike *Lombardo*, there is no longstanding Supreme Court or Seventh Circuit precedent establishing that the *Martinez-Trevino* doctrine does not apply to § 2255 counsel's failure to raise substantial post-conviction claims. On the contrary, the precedent establishes that the nature of § 2255 review presents the precise circumstances requiring the application of the doctrine. As the Seventh Circuit has explained, in light of *Martinez* and *Trevino*, what "matter[s] is the way in which ineffective assistance of counsel claims must be presented in the particular procedural system." *Ramirez*, 799 F.3d at 853. The Seventh Circuit further concluded that, in the federal system, the way such claims must be presented requires the application of the doctrine:

> Because the federal courts have no established procedure . . . to develop ineffective assistance claims for direct appeal, the situation of a federal petitioner is the same as the one the Court described in *Trevino*: as a practical matter, the first opportunity to present a claim of ineffective assistance of trial or direct appellate counsel is almost always on collateral review, in a motion under section 2255.

*Id.*; *see also Brown*, 847 F.3d at 509-10 (affirming that the Seventh Circuit applies the *Martinez-Trevino* doctrine to federal prisoners because the procedural system of § 2255 review presents the same situation that the Supreme Court analyzed in *Trevino*).

14

Thus, unlike the equitable tolling context of *Lombardo*, longstanding precedent does not preclude the application of the *Martinez-Trevino* doctrine to the defaulted claims in this case. Rather, existing precedent requires application of the doctrine. This Court must follow that precedent. *Glaser*, 14 F.3d at 1216 (explaining that decisions of the Seventh Circuit are binding on district courts of the Seventh Circuit).

**E.      United States Supreme Court law controls the merits of Mr. Purkey's ineffective assistance of counsel claims.**

Respondent contends that if this Court reaches the merits of Mr. Purkey's defaulted claims, this Court should apply the law of the circuit of conviction instead of the circuit of incarceration. R. 49 at 49. If this Court applies Seventh Circuit law, Respondent warns, this Court will "reward and encourage the kind of forum shopping that § 2255 was designed to prohibit." R. 49 at 50. Respondent further cautions that this Court's decision applying Seventh Circuit law to the merits of Mr. Purkey's claims may permit Mr. Purkey or a future prisoner to exploit a circuit split. See *id.*

Mr. Purkey's position is that, due to the nature of Mr. Purkey's defaulted claims, this Court need not decide whether Eighth Circuit or Seventh Circuit law is controlling. The claims at issue are ineffective assistance of trial counsel claims. In *Strickland*, the United States Supreme Court established the governing standard for ineffective assistance of counsel claims. *Wiggins v. Smith*, 539 U.S. 510, 521

15

(2003) ("We established the legal principles that govern claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984)."). *Strickland* also established that these principles apply in federal collateral proceedings. *Wright v. West*, 505 U.S. 277, 302 (1992). Given that the United States Supreme Court has established the governing standards for ineffective assistance of counsel claims in *Strickland* and its progeny, and given that the decisions of the United States Supreme Court are binding on all lower courts, *Strickland* and its progeny provide the controlling law for these claims. Thus, this Court need not answer the choice of law question Respondent posits.

Moreover, by recognizing that United States Supreme Court law controls the merits of the defaulted claims, this Court will avoid the forum shopping concerns the Respondent raises. Similarly, this Court's recognition that United States Supreme Court controls will remove any potential of Mr. Purkey (or any future prisoner relying on this Court's decision) exploiting a circuit split.

II.   **Trial counsel and § 2255 counsel were constitutionally ineffective for failing to challenge Juror 13, whose name is Jennifer, and who was selected to serve on Mr. Purkey's jury despite, and without any questioning about, her disclosure on her juror questionnaire that she was the victim of an attempted rape when she was 16 years old, where the underlying facts of the crime charged against Mr. Purkey alleged that he raped a 16-year-old girl named Jennifer (CLAIM 1)**

Mr. Purkey has already shown why § 2255(e) and § 2241 allow him to bring his new claims in this Petition, and those arguments are incorporated but need not

16

be repeated here. *See* Section I. Under applicable *Martinez/Trevino* doctrine, a defaulted claim of ineffective assistance of trial counsel can be brought if the claim is substantial and the default was due to the ineffective assistance of initial-review postconviction counsel. A "substantial" ineffective assistance claim is one that has "some merit." *Martinez*, 132 S.Ct. at 1318-1319 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). There is more than "some merit" in Mr. Purkey's claim that trial counsel was constitutionally ineffective for failing to question Juror 13 regarding actual bias and failing to move to strike her for cause based on implied bias. Section 2255 counsel themselves admit that they completely missed Juror 13's disclosure of being an attempted rape victim at age 16, and therefore, "as an equitable matter," the initial-review postconviction proceeding was "not . . . sufficient to ensure that proper consideration was given to a substantial claim." *Id.* at 1318. Thus, § 2255 counsel's own ineffectiveness establishes cause for the default, allowing for full merits review of Mr. Purkey's substantial claim of ineffective assistance of trial counsel.

Among the most essential responsibilities of defense counsel is to protect his or her client's constitutional right to a fair and impartial jury by using *voir dire* to identify and ferret out jurors who are biased against the defense. *See Miller v. Francis*, 269 F.3d 609 (6ᵗʰ Cir. 2001). The primary purpose of *voir dire* is to make possible the empaneling of an impartial jury through *questions* that permit the

17

*intelligent exercise of challenges* by counsel. *See Rosales-Lopez v. United States*, 451 U.S. 182 (1981)(*voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored)(emphasis added) *and United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976)(citing *Swain v. Alabama*, 380 U.S. 202 (1965), the principle way in which the Sixth Amendment right to an impartial jury is guaranteed is through the system of challenges exercised during *voir dire* of prospective jurors).  Mr. Purkey argues that trial counsels' *voir dire* performance was constitutionally ineffective resulting in the abrogation of Mr. Purkey's Sixth Amendment right to a fair and impartial jury, based on the undisputed fact that trial counsel asked Juror 13 not one single question regarding her questionnaire disclosure that at age 16, she was the victim of an attempted rape, even though the facts of Mr. Purkey's case included the rape of a 16 year-old girl.  Trial counsels' abject failure to question Juror 13 regarding her questionnaire disclosure of being the victim of attempted rape, resulted in a situation where the answer to the question of whether she was actually bias *in light of her personal experience as a crime victim* was unknown, thus proscribing the intelligent exercise of challenges by trial counsel.

In response to Mr. Purkey's claim that trial counsel was constitutionally ineffective for failing to question Juror 13 regarding actual bias in light of her questionnaire disclosure that mirrored the facts of Mr. Purkey's case, and failure to

18

move to strike her for cause based on implied bias, Respondent makes three main arguments.  First, Respondent argues trial counsel was not constitutionally ineffective because strategic reasons existed for trial counsel's failure to question Juror 13 about her questionnaire disclosure, and that in any event, trial counsel obtained Juror 13 general assurance of impartiality. Second, Respondent argues that trial counsels' *voir dire* performance cannot be constitutionally inadequate because at the time of Mr. Purkey's trial, Eighth Circuit law regarding juror implied bias was unsettled, and trial counsel's decisions made in the context of unsettled law can never be professionally unreasonable.  Third, Respondent argues that Mr. Purkey's claim should fail because he was not prejudiced by trial counsels' failure to question Juror 13 about her attempted rape experience. Respondent does not address post-conviction counsels' failure to raise claims related to Juror 13 bias in Mr. Purkey's § 2255 petition filed in the Western District of Missouri other than to argue that Mr. Purkey is procedurally defaulted because post-conviction counsel failed to raise a claim concerning the issue.

Although Respondent argues that the law regarding juror *implied bias* was unsettled in the Eighth Circuit at the time of Mr. Purkey's trial, the failure to question a juror regarding *actual bias* was at the time of Mr. Purkey's trial, and is today, ineffective assistance of counsel absent the showing of sound trial strategy. *United States v. Lathrop*, 634 F.3d 931, 937 -38 (7th Cir. 2011); *Cage v.*

19

*McCaughtry*, 305 F.3d 625, 627 (7th Cir. 2002); and *Johnson v. Armontrout*, 961 F.2d 748, 755 (8th Cir. 1992)(cases cited by Respondent, Dkt 49, p. 55). Respondent, accuses Mr. Purkey of speculation for concluding that trial counsel missed Juror 13 questionnaire disclosure, but nevertheless engages in speculation to argue that trial counsel had strategic reasons for not asking a single question of Juror 13 regarding her disclosure, and argues that in any event, Mr. Purkey's claim must fail because Juror 13 affirmed through general questioning that she could be fair and impartial. Dkt. 49, p. 55, 57. Respondent's proffered strategic reasons, in addition to being speculative, are not objectively reasonable as is required to survive an ineffective assistance of counsel claim. *See Strickland* at 681. Further, Juror 13's general assurances of impartiality were not made in the context required to assure impartiality, because trial counsel did not ask Juror 13 whether she could be fair and impartial *despite* her experience that mirrored the facts of Mr. Purkey's case.

Despite the strong presumption that defense counsel's decisions are guided by sound trial strategy, it is not sufficient for counsel to merely articulate a reason for an act or omission alleged to constitute ineffective assistance of counsel – the trial strategy itself must be objectively reasonable. *See Strickland* at 681. The word "strategy" is not a trial lawyer's talisman that necessarily defeats a charge of constitutional ineffectiveness – the strategy must be within the range of logical

20

choices an ordinarily competent attorney would assess as reasonable to achieve a specific goal.  *Cone v. Bell*, 243 F.3d 961 (6th Cir. 2001).

Mr. Purkey argues that trail counsel missed Juror 13's disclosure and consequently, trial counsel could not form a sound trial strategy for bypassing questions regarding actual bias at the time of trial.  Respondent is dismissive of Mr. Purkey's argument that trial counsel must have completely missed Juror 13 disclosure, and therefore did not ask questions regarding actual bias, calling this conclusion "mere speculation."  Dkt. 49, p. 55. Mr. Purkey's argument is not speculative, however, because one of Mr. Purkey's trial lawyers admits that the issue was missed, and the trial record supports this conclusion.

In her declaration dated May 3, 2017, Laura O'Sullivan, one of Mr. Purkey's trial lawyers, concedes that Juror 13's disclosure was missed because she and co-counsel Fred Duchardt "looked over" the jury questionnaires together at his office, and Juror 13's disclosure was never mentioned.  See generally Dkt. 23-36, p. 1 - 7. She states that "she would have remembered this information about Juror 13 is she had seen it, given how similar the disclosure was to the facts of Mr. Purkey's case. She doesn't believe Fred Duchardt noticed it because "he never mentioned it, nor did he raise it during voir dire."  Further, according to Ms. O'Sullivan, if she had known about Juror 13 disclosure, she would have wanted to make sure that Juror 13 did not sit on the jury, and she believes the trial judge may have agreed and

21

would have sustained a challenge for cause given the facts of Mr. Purkey's case. The fact that it wasn't brought to the trial judge's attention by any party, further substantiates Mr. Purkey's claim that trial counsel missed Juror 13's disclosure.

Respondent criticizes Ms. O'Sullivan's declaration regarding Juror 13, calling her declaration statement "long-after-the-fact," "ill-informed" and "motivationally suspect." Dkt. 49, p. 58. Ms. O'Sullivan's declaration regarding Juror 13's disclosure, is however, nothing more than an admission that based on what she now knows, a mistake was made at the time of trial by not pursuing disqualification of Juror 13 based on her questionnaire disclosure, and that she was unaware of the mistake until Juror 13's disclosure was more recently brought to her attention. The fact that Ms. O'Sullivan's statement was first made long after trial is merely proof that those involved in Mr. Purkey's trial and 2255 proceedings did not notice the issue. Her statement is more informed now that it has ever been because she now knows of Juror 13's disclosure. And perhaps most importantly, her motivation is not suspect because she is admitting a mistake, not trying to cover it up.

But as Respondent dismisses Mr. Purkey's substantiated conclusion that trial counsel missed Juror 13's disclosure, it engages in speculation to proffer a reason for why trial counsel might want Juror 13 to serve on the jury.  Respondent speculates that trial counsel wanted Juror 13 on the jury," because she disclosed

that the most important cause of crime was "bad parenting" a sentiment they argue

is consistent with Mr. Purkey's mitigation claim of parental abuse, which was his

"defense." Dkt. 49, p. 55. This response mischaracterizes mitigation evidence as a

trial defense, and ignores that Mr. Purkey has a Sixth Amendment right to a fair

and impartial jury during both the guilt and penalty phase of a capital trial. But

most importantly, Respondent does not explain why their proffered justification

might outweigh the risk associated with actual bias, a risk never ascertained

because Juror 13 was never asked about bias associated with her real-life

experience as attempted rape victim at age 16.

Respondent also argues that trial counsel may not have questioned Juror 13

because he did not want to emphasize the sexual abuse aspect of the case. This

head-in-the-sand theory fails for three reasons. First, it is simply not logical that

trial counsel could do anything to avoid the obvious sexual assault aspect of the

case – it simply could not be downplayed. Second, trial counsel had no

reservations about discussing child sexual assault with Venireperson 103, a

venireperson he questioned in front of other venirepersons and ultimately moved to

strike based on her strongly held feeling that any adult who violates a child does

not deserve to live. Dkt. 23, p. 110. Third, and perhaps most significantly, if trial

counsel truly wanted to avoid emphasizing the sexual assault aspects of the case by

questioning Juror 13 about her experience in front the entire panel, he had the

23

opportunity to employ individual *voir dire* to question Juror 13 pursuant to a

procedure he advocated in a pretrial motion entitled "Request and Proposed

Procedure for Attorney-Conducted, Small Group Voir Dire Upon Penalty Phase

Issues and Certain Other Selected Matters." Dkt. 23, p. 109 - 110.  In the request,

trial counsel wrote:

> Questions regarding details of publicity, or other private matters,
> would be taken up individually, at the end of the small group process,
> out of the hearing of other members of the group.  This would insure
> that other members of the panel would not hear any private or
> prejudicial matters which might be contained in individual answers to
> such questions.

Dkt. 23-37, p. 327.  In the pretrial motion, trial counsel noted that this proposed

procedure was "precisely the same as those which this Court employed in the case

of *United States v. Haskell*, et al, Case Number 00-395-01-CR-W-FJG, tried before

this very court in 2002," thus establishing that the option for individual *voir dire*

for private or sensitive matters was a standard of practice in death penalty jury

selection.  Dkt. 23-37, p. 326.

Trial counsel's failure to utilize this standard of practice to question Juror 13

outside the presence of the venirepanel further substantiates that trial counsel

overlooked Juror 13's questionnaire disclosure – otherwise, why wouldn't he have

utilized the very process he advocated?  Strategically, there was nothing to lose by

utilizing individual *voir dire* to question Juror 13 about actual bias in light of her

childhood experience, and no proffered strategic reason for not asking her about

24

actual bias can overcome this fact. Trial counsel's failure to follow this practice standard is further evidence of his constitutional ineffectiveness.

Respondent also argues that trial counsel's failure to question Juror 13 about her attempted rape questionnaire disclosure is inconsequential because trial counsel obtained general assurances of impartiality through his questions. Dkt. 49, p. 56 – 57. Once again, Respondent's argument misses the mark because Juror 13 general assurances give little insight to whether she could be fair and impartial *despite* her childhood experience that mirrors the facts of Mr. Purkey's case. The requirement of an impartial jury is met only when the prospective juror has given final, unequivocal assurances deemed credible by the judge, that for the purposes of deciding the case, she can set aside any opinion she might hold, relinquish her prior beliefs, or lay aside her biases *or her prejudicial personal experiences*. *United States v. Taylor*, 777 F.3d 434, 441 (7th Cir. 2015)(emphasis added). Trial counsel obtained no such assurances from Juror 13 because he did not ask a single question about how her attempted rape experience might affect her impartiality, despite having a risk-free method to do so.

Respondent also argues that trial counsels' *voir dire* performance cannot be constitutionally inadequate because at the time of Mr. Purkey's trial, Eighth Circuit law regarding juror implied bias was unsettled, and trial counsel's decisions made in the context of unsettled law can never be professionally unreasonable. Dkt. 49,

25

p. 53.  Respondent further argues that because Eighth Circuit panel decisions were in conflict, earlier precedent must be followed and earlier panel decisions proscribe the doctrine of implied bias. Dkt. 49, p. 53 -54.

Prior to Mr. Purkey's trial, however, the Eighth Circuit held "that for habeas corpus purposes, bias may be found either by an express admission, or by proof of specific facts which show a close connection to the facts that bias is presumed. *Fuller v. Bowersox*, 202 F.3d 1053, 1056-58 (8th Cir. 2000).  Although in *Fuller*, the Eighth Circuit denied relief on the juror bias issue, it did not discount it out of hand, as Respondent asks this Court to do.  Instead, the Eighth Circuit analyzed the situation to decide the issue, and relied on decisions from other circuit courts to define the boundaries of implied bias, including the Seventh Circuit's decision in *Hunley v. Godinez*, 975 F.2d 316, 320 (7th Cir. 1992), a case not adopting a *per se* rule that courts presume bias when a juror is a victim, but holding that in rare circumstances, implied bias can be found.  *See also Smith v. Phillips*, 455 U.S. 209, 222 (1982)(O'Connor, J., concurring)(even without a showing of actual bias, prejudice may be implied in certain egregious situations).

Given how closely Juror 13's childhood experience mirrors the facts Mr. Purkey's case, Juror 13's service is an egregious situation where her bias should be presumed.  *See Gonzales v. Thomas*, 99 F.3d 989 (10th Cir. 1996)("the crux of implied bias analysis . . . is found in the examination of the similarities between the

26

juror's experiences and the incident giving rise to trial); *see also e.g. United States v. Allsup*, 566 F.2d 68 (9th Cir. 1977)(bank teller presumed biased in bank robbery case) *and United States v. Torres*, 128 F.3d 38 (2nd Cir. 1997)(prospective juror's own experience with the crime of structuring rendered her unable to serve on jury because she "would be unable to divorce her consideration" of the structuring case "from her own structuring experience").  Juror 13 responded on her questionnaire that she had been the victim of an attempted rape in 1991, a year in which she was about 16 years old, the same age as the victim in Mr. Purkey's case.  Dkt. 23-37, p. 303.  Juror 13's experience was also connected to a court proceeding where she assisted law enforcement with the investigation of her attempted rape, and she was a prosecution witness.  Dkt. 23-37, p. 303 (writing the "man who attacked me was going to court for other rapes," and "I was supenoed [sic], but they never ended up using me.").  Juror 13's experience is an extreme situation where her life experience mirrors the facts of the case to the extent that it is unlikely that she could remain impartial during deliberations under the circumstances.  *See Sanders v. Norris*, 529 F.3d 787, 792 (8th Cir. 2008)(explaining that Eighth Circuit law allows finding of implied bias in certain egregious situations, and that a significant number of circuits have adopted the doctrine of implied bias in extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain

27

impartial during deliberations).  In circumstances such as these, where Juror 13's personal experience is so similar to the victim's experience, the law should err on the side of caution to find bias.  *See e.g. United States v. Polichemi*, 219 F.3d 698, 704 (7th Cir. 2000)(writing "the concept of implied bias in well-established in the law," examining issue in context of a juror being employed by the same office as the prosecuting attorneys trying the case, and explaining that a juror who belongs to a class presumed biased "may well be objective in fact, but the relationship is so close that the law errs on the side of caution").

Ultimately, however, if this Court is unwilling to impute bias, due process requires that at the very least, a hearing be held to determine whether Juror 13 was actually biased.  *See Smith v. Phillips*, 455 U.S. 209, 216 - 18 (1982)(writing that juror bias determinations may be properly made at a post-trial hearing); *see also Gonzales v. Thomas*, 99 F.3d 978, 985 (10th Cir. 1996)(the normal avenue of relief available to a party asserting juror bias is a post-trial hearing at which actual or, in exception circumstances, implied bias may be demonstrated).  Mr. Purkey has been deprived of a hearing on this issue because his 2255 counsel missed Juror 13's questionnaire disclosure.

Finally, Respondent argues that in any event, Mr. Purkey has not demonstrated prejudice from Juror 13's service on the jury.  The presence of a biased juror, however, is a fundamental structural defect and is outside the gamut

28

of harmless error analysis. *Johnson v. Armontrout*, 961 F.2d 748, 756 (8th Cir.

1992)(citing *Arizona v. Fulminate*, 499 U.S. 279 (1991)).

**III.   Trial counsel was constitutionally ineffective in failing to investigate, develop and present readily available, compelling mitigating evidence to the jury at Mr. Purkey's capital trial, in violation of the Sixth, Eighth, and Fourteenth Amendments (CLAIM 2)**

Mr. Purkey has already shown why § 2255(e) and § 2241 allow him to bring

his new claims in this Petition, and those arguments are incorporated but need not

be repeated here. *See* Section I. Under applicable *Martinez/Trevino* doctrine, a

defaulted claim of ineffective assistance of trial counsel can be brought if the claim

is substantial and the default was due to the ineffective assistance of initial-review

postconviction counsel. A "substantial" ineffective assistance claim is one that has

"some merit." *Martinez*, 132 S.Ct. at 1318-1319 (citing *Miller-El v. Cockrell*, 537

U.S. 322 (2003)). There is more than "some merit" in Mr. Purkey's claim that trial

counsel failed to investigate and present readily available, compelling evidence of

Mr. Purkey's extraordinary and profound trauma history and its lifelong effects on

his mental health and behavior that would have given the jurors a compelling

picture of Mr. Purkey's life history and an accurate explanation of his constellation

of symptoms that would have resulted in at least one juror voting to spare his life.

Section 2255 counsel themselves failed to investigate and present this compelling

evidence, and therefore, "as an equitable matter," the initial-review postconviction

proceeding was "not . . . sufficient to ensure that proper consideration was given to

29

a substantial claim." *Id*. at 1318. Thus, § 2255 counsel's own ineffectiveness establishes cause for the default, allowing for full merits review of Mr. Purkey's substantial claim of ineffective assistance of trial counsel.

**A. The failure of trial and § 2255 counsel to conduct an adequate mitigation investigation is directly attributable to the substitution of a uniquely unqualified investigator in place of a qualified mitigation specialist as part of the defense team**.

Respondent sidesteps this aspect of Mr. Purkey's claim by mischaracterizing it as one alleging an abstract failure to hire a "social worker" with the title "mitigation specialist." Rsp. at 66. That is essentially what § 2255 counsel argued. Dkt. 23-28 at 56-64. Mr. Purkey's argument here is not abstract at all, but specific to his case: Mr. Duchardt's decision to substitute Mic Armstrong in the role of a qualified mitigation specialist directly contributed to trial counsel's ineffective assistance in failing to investigate and present the full picture of Mr. Purkey's life to the jury in his case because, in fact, Mr. Armstrong was uniquely unqualified to conduct mitigation investigation. Section 2255 counsel never presented these facts because they did not investigate whether Mr. Armstrong was qualified as a mitigation investigator. Consequently, § 2255 counsel could show no prejudice resulting from Mr. Duchardt's failure to obtain a mitigation specialist, nor could they rebut Mr. Duchardt's affidavit claiming that Mr. Armstrong was qualified to serve in the dual role of fact and mitigation investigator, which the evidence now

30

exposes as false and amounting to a fraud on the court. *See* Dkt. 23 at 146 (Claim 3).

Perhaps stemming from its mischaracterization of Mr. Purkey's argument, Respondent chooses to ignore the facts about Mr. Armstrong's gross lack of qualifications by dismissing them as "irrelevant." Rsp. at 66. On the contrary, it is highly relevant to Mr. Purkey's substantial ineffective assistance of counsel claim that Mr. Armstrong was fired from the Liberty office of the Missouri State Public Defender (MSPD) for incompetence in his job as a fact investigator only a few months after Mr. Duchardt left his own employment with the MSPD; that Mr. Duchardt originally hired Mr. Armstrong when he supervised the Liberty office, and protected Armstrong's position there for ten years despite ongoing complaints about his incompetence as an investigator from lawyers who worked directly with Armstrong in the Liberty office; that Mr. Armstrong was never a mitigation investigator either by training or experience; that Mr. Armstrong claimed in a lawsuit against MSPD for wrongful termination that he had an arrangement with Mr. Duchardt to give up his business in exchange for lifetime employment at MSPD, describing his arrangement with Mr. Duchardt as "an express contract"; that in his private practice Mr. Duchardt continued to hire Mr. Armstrong as an investigator on MSDP contract cases, and had to be told by MSPD to stop using Armstrong as an investigator on public defender cases because of his termination

31

from MSPD. Dkt. 23-36 at 205, 208, 273-274. These facts are highly relevant to Mr. Purkey's claim because Mr. Duchardt had knowledge of them, yet he held Mr. Armstrong out to the trial court as a qualified fact investigator *and* mitigation investigator in Mr. Purkey's federal death penalty case in order to obtain funding for Mr. Armstrong, when, in reality, Armstrong was neither.

As Mr. Purkey argues in his Petition, *see* Dkt. 23 at 153, the actions of Mr. Duchardt in hiring a wholly unqualified friend to play the role of mitigation specialist in Mr. Purkey's federal capital trial violated the most basic standards of competent capital representation, and was objectively unreasonable. *See Strickland v. Washington*, 466 U.S. at 688. It also prejudiced Mr. Purkey by bringing into Mr. Purkey's death penalty case the same investigative incompetence that Mr. Armstrong had shown in his work for MSPD, directly contributing to the failure to conduct a constitutionally-requisite mitigation investigation that, properly investigated, would have produced a wealth of readily available mitigating evidence that would have caused at least one juror to vote for life. *See Wiggins v. Smith*, 539 U.S. at 537; *Rompilla v. Beard*, 545 U.S. 374 (2005).

**B. Trial counsel and § 2255 counsel were ineffective in failing to investigate, develop and present Mr. Purkey's full trauma history and the long-term consequences and effects of his trauma exposure and its connection to his behavior to explain why he committed the crime that led to his federal conviction.**

32

Respondent claims -- in the face of the vast, comprehensive new evidence detailing Mr. Purkey's multi-generational family history of trauma exposure and susceptibility to mental illness and neurogenerative disease, and Mr. Purkey's own extraordinary trauma history from childhood to adulthood and its long-term consequences and effects on Mr. Purkey's mental health and behavior presented in his Petition -- that the new evidence "would barely have altered the sentencing profile" and thus is merely cumulative of the evidence presented by trial counsel at the penalty phase. Rsp. at 70, 73. Respondent relies heavily on the facts of *Worthington v. Roper*, 631 F.3d 487 (8th Cir. 2010), to argue that Mr. Purkey's claim should be denied.

However, a determination of counsel's effectiveness must be grounded in the specific circumstances of the case. *Strickland*, 466 U.S. at 688. The issue before the Court in this case is whether the substantial newly discovered evidence in mitigation presented in Mr. Purkey's Petition (which Respondent goes to great lengths to avoid discussing) that both trial counsel and § 2255 counsel failed to investigate, even though it was readily available to them, establishes ineffective assistance of counsel under clearly established law of the Supreme Court. *See, e.g., Strickland*, 466 U.S. 668; *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins*, 539 U.S. 510; *Rompilla*, 545 U.S. 374; *Sears v. Upton*, 130 S.Ct. 3259 (2010), *Porter v. McCollum*, 558 U.S. 30 (2009).

33

On the merits, Respondent points to the number of witnesses called by trial counsel at the penalty phase and the list of mitigating factors presented to the jury, and contends that this shows trial counsel presented "abundant evidence of Purkey's alleged abuse as a child." Dkt. 49 at 66-67. Respondent also brags that the defense "mitigation case lasted approximately three days and consumed more than 500 pages of trial transcript." Dkt. 49 at 14. However, as Respondent points out, Dkt. 49. at 67, only five of the eighteen witnesses called by trial counsel at the penalty phase even mentioned Mr. Purkey's family history, let alone any abuse he suffered, and two of those were expert witnesses Dr. Peterson and Dr. Cunningham, who were primarily focused, respectively, on providing opinions related to a mental disease or defect negating intent, and future dangerousness. The remaining lay witnesses at the penalty phase were called to provide testimony to rebut the government's statutory and non-statutory aggravating circumstances, and some of the testimony turned out to be quite damaging to Mr. Purkey on cross-examination.[2]

The record demonstrates how woefully unprepared trial counsel was in presenting even those witnesses. Mr. Duchardt notified the trial court just prior to

---

[2] For example, Mr. Duchardt called Dr. William Grant, a psychiatrist at the Federal Bureau of Prisons Medical Center in Springfield, Missouri, to testify about medications Mr. Purkey had been taking during trial, including Klonopin. Dkt. 38-1 at 28. On cross-examination, Dr. Grant testifed that the justification for Klonopin came from Dr. Peterson, not him, and stated "I think [Dr. Peterson] invoked anxiety where many of the rest of us would have invoked an attitude, belligerent, irritable attitude." Dkt. 38-1 at 37. Dr. Grant agreed with government counsel that Klonopin was being given to Mr. Purkey because of a "real anger problem." Dkt. 38-1 at 37.

the defense case-in-chief at the penalty phase that three of its witnesses for the penalty phase had just been endorsed, and one of those witnesses, a minister at Hutchinson State Correctional Facility, was found by the defense "literally now." Dkt. 38-1 at 15-16. Mr. Purkey's aunt, Marguerite Hotchkiss, testified she did not even know about the crime for which Mr. Purkey was on trial "until just a few days ago." Dkt. 39-1 at 22. Mr. Duchardt told the trial court "[w]e have also been throughout this process attempting to locate witnesses for this stage of the hearing," and that "[w]e have done our best to try to put on the best case for Mr. Purkey and we're continuing to try to find people and will continue until this case is over with, and even beyond, to find all of the best witnesses we can." Dkt. 38-1 at 14, 16. Given the paucity of family and social history witnesses that trial counsel actually presented at the penalty trial, Mr. Duchardt's statement was a startling if inadvertent confirmation that the defense investigation was not only unreasonably limited, but that they waited far too long, in some cases literally until the eve of the penalty trial, to conduct what appears to have been a rather cursory investigation. *See Neal v. Puckett*, 286 F.3d 230, 237 (5th Cir. 2002) ("In assessing counsel's performance, we look to such factors as what counsel did to prepare for sentencing, what mitigating evidence he had accumulated, what additional 'leads' he had, and what results he might reasonably have expected from these leads").

35

The direct testimony of the family witnesses called by trial counsel -- Mr. Purkey's aunt Marguerite Hotchkiss, his daughter Angie Genail, and his step-brother Gary Hamilton (Purkey) -- comprises a total of twenty-one pages of transcript. Dkt. 39-1 at (transcript cites). Trial counsel elicited testimony from these three witnesses that briefly mentioned the following: at five years old Wes could not speak but would "just point to things and grunt", Dkt. 39-1 at 16; Wes stuttered, as did his father Jack Purkey and several of his father's siblings, Dkt. 39-1 at 17; Wes's mother "threw drinks in his face" once when he was stuttering, Dkt. 39-1 at 38; Wes's mother and father were alcoholics, Dkt. 39-1 at 38, 43, 44; Wes, his half-brother Gary, and their mother were frequently beaten by Jack Purkey, mostly when he was drunk, Dkt. 39-1 at 43-47; Gary was taken by his mother to bars as a young boy, where she would sexually abuse him in the bathroom, Dkt. 39-1 at 43-47; Jack Purkey suffered headaches because of a metal plate in his head, could not hold down a job, and ultimately committed suicide, Dkt. 39-1 at 16-20. The substance of their testimony was skeletal and conclusory at best, and did not even begin to present the true picture of Mr. Purkey's horrific childhood and the relentless trauma he suffered that is contained in Mr. Purkey's Petition and that would have been beneficial to the jury. Dkt. 23 at 19-88. *See Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003) ("skeletal" testimony from family witness was "wholly inadequate to present to the jury a true picture of the tortured childhood

36

experienced by Lewis") (citing *Wiggins*); *Ainsworth v. Woodford*, 268 F.3d 868, 874 (9th Cir.) (jurors saw "only glimmers of [the defendant's] history, and received no evidence about its significance vis-a-vis mitigating circumstances") (citations omitted)).

Mr. Duchardt hired Dr. Peterson and Dr. Cunningham as experts to opine on matters other than mitigating evidence. The focus of Dr. Peterson's testimony was on the question of whether Mr. Purkey suffered from a mental disease or defect that rendered him incapable of forming the intent to kill Jennifer Long, which was a preliminary question the jury had to decide before it could proceed to a consideration of aggravating and mitigating factors. Dkt. 23-37 at 90; Dkt. 41-1 at 21. Dr. Peterson testified that Mr. Purkey suffered from a mental disease or defect at the time of the homicides of both Jennifer Long and Mary Bales. Dkt. 41-1 at 21-22.

In making his diagnosis of a mental disease or defect, Dr. Peterson conducted no new psychological testing. Instead, he relied on his report written three years earlier in the Mary Bales case (at the behest of other counsel), and a competency evaluation of Mr. Purkey conducted at the United States Medical Center in Springfield, Missouri. Dkt. 23-13 at 1-53; Dkt. 23-40 at 145. Though during his testimony Dr. Peterson agreed with Mr. Duchardt that defense counsel had provided him with "interview materials from those who knew about Mr.

Purkey's development and those who were involved in his life, either when he was a child, when he was an adult, or presently[,]" Dkt. 41-1 at 20, Peterson's report noted that the only additional information he was given consisted of some medical records of Mr. Purkey, much of which overlapped information that had already been compiled in the Bales matter. Dkt. 23-40 at 144. He also interviewed Mr. Purkey. Dkt. 23-40 at 144.

The record flatly contradicts Respondent's assertion that Dr. Peterson utilized "abundant family and childhood history provided by trial counsel" in forming his opinion. *See* Dkt. 49 at 75. While Dr. Peterson did recount aspects of Mr. Purkey's history of abuse in his childhood, and sexual abuse by Mr. Purkey's mother in particular, that evidence came from Mr. Purkey's self-report to Dr. Peterson, not from any investigation by defense counsel. Dkt. 41-1 at 24. This left Dr. Peterson forced to admit on cross-examination that he found no corroboration of the sexual abuse in the records he reviewed. Dkt. 41-1 at 82.

Moreover, Dr. Peterson discussed Mr. Purkey's trauma history in the context of reaching his conclusion that, because of his mental disease or defect, "Mr. Purkey did not have the capacity to form the intent to kill Jennifer Long." Dkt. 41-1 at 49-50. The only question trial counsel asked of Dr. Peterson remotely related to mitigation was whether he believed, "to a medical degree of certainty, that at the time of the killing of Jennifer Long that Wesley Purkey was suffering from a

38

severe mental or emotional disturbance[,]" and Peterson testified that he did. Dkt. 41-1 at 58-59.

Respondent asserts that Dr. Cunningham testified as a "mitigation specialist." Dkt. 49 at 23. He did not. Dr. Cunningham was hired by Mr. Duchardt to do a risk assessment for future dangerousness, which is his specialty, and his testimony was focused on rebutting that non-statutory aggravating circumstance. Dkt. 23-39 at 46-47; Dkt. 42-1 at 58-59. Though Mr. Duchardt later sought to abdicate responsibility for mitigation to Dr. Cunningham in his affidavit in the § 2255 proceedings, Dkt. 23-37 at 175-176, Dr. Cunningham flatly denied that he performed the work of a mitigation specialist in Mr. Purkey's case, and averred that he lacked the requisite knowledge, experience, and training of a mitigation specialist. Dkt. 23-39 at 49. He undertook no "comprehensive investigation to identify, locate, and interview persons having knowledge of Mr. Purkey's background." *Id*.

The various "mitigation themes/hypotheses and associated investigation needs" listed in the letter Dr. Cunningham wrote to Mr. Duchardt prior to trial identified "red flags" for investigation and follow-up. Dkt. 23 at 126-127; Dkt. 23-37 at 76-82. They were not mitigating evidence, but instead constituted suggested areas of potential mitigation. Had trial counsel conducted the investigation that Dr. Cunningham advised was necessary, they would have uncovered a vast trove of

39

readily available, non-cumulative information that would have painted a complete and compelling picture of Mr. Purkey's extended family and social history, and extraordinary trauma history that he presents here. Instead of investigating and substantiating these themes, trial counsel merely had Cunningham recite them during his testimony, without any evidence to support them, and without any broader context in which the jury could place them, especially given that Dr. Cunningham was testifying in rebuttal to future dangerousness, not in mitigation. Such an investigation does not amount to "scouring the globe on the off-chance something will turn up." Dkt. 49 at 73 (citing *Rompilla*, 545 U.S. at 383). It is reasonable and necessary investigation of readily available mitigation evidence based on identifiable red flags that counsel had a duty to pursue, and they failed to do so. *Rompilla*, 545 U.S. at 391 .

Respondent places great weight on the list of mitigating factors provided to the jury as evidence that an "abundance" of mitigating evidence was presented. Dkt. 49 at 69. The list of mitigating factors given to the jurors, that only parrots the glimmers of information provided to them and the uninvestigated "themes" identified by Dr. Cunningham, hardly matters when counsel failed to investigate and develop the background material and did not present the jury with the information they needed to make an informed, reliable determination of whether the death penalty should be imposed. *Ainsworth v. Woodford*, 268 F.3d 868, 877

40

(9th Cir. 2001). *See Strickland*, at 466 U.S. at 695; *Woodson v. North Carolina*, 428 U.S. 280, 305 (1978) (because of the qualitative difference between life imprisonment and death, "there is a corresponding difference in the need for reliability in the determination that death is an appropriate punishment"). Moreover, if, as Respondent argues, and as the § 2255 court concluded, the blank special verdict form on the mitigating factors means that no mitigating factors were found by the jury, then Respondent is hardly in a position to argue that the mitigating evidence trial counsel placed before the jury was "abundant." *See Hall v. Washington*, 106 F.3d 742, 752 (1997) (where no mitigating factors are found, "it is logically impossible for the new evidence to be 'cumulative' to something in the earlier record").

Respondent casually dismisses aspects of the new mitigation Mr. Purkey presents in his Petition and, viewing each in isolation, asserts that it adds "nothing new" to the mitigation that was presented by trial counsel. Dkt. 49 at 69. But each aspect of this new mitigating evidence provides concrete examples of Mr. Purkey's trauma experiences, symptoms and behavior exhibited across the span of his life that jurors could understand and visualize and that are characteristic of his lifelong complex PTSD.

For example, the new evidence of Mr. Purkey's childhood experience at St. Joseph's Catholic School ("St. Joe's") -- which neither trial counsel nor § 2255

41

counsel obtained -- is far more significant than the "nuns who were . . . mean" characterization by Respondent. Dkt. 49 at 69. Mr. Purkey's childhood classmates at St. Joe's, who were interviewed by current counsel, consistently describe the medieval-like oppression and violence that took place at the school, and how Wes was a particular target for abuse by the nuns because of his stuttering.

In one instance, even after Wes had been subjected to corporal punishment upon being accused by the nuns of starting a rumor that their BVM (Blessed Virgin Mary) Order actually stood for "Black Veiled Monster," Wes was made to stand in front of the whole school following the morning Mass and tell the students what BVM stood for. The nuns knew Wes had a stutter, and that he would struggle to enunciate the words, so it was nothing more than pointless retribution and humiliation. Wes's classmate Don Aaron recalls how painful it was to watch: "Bl Bl Bl Blessed V V V Virgin . . . The longer it went the more Wes stuttered." Dkt. 23-13 at 93. Another nun who taught Wes's class in seventh grade also singled Wes out for his stuttering. His classmate James Haggard recalls how the nun refused to believe Wes could not control his stuttering, and she called on Wes to stand at his desk and read out loud to the class more than other students. Wes, who struggled with reading to begin with, would get embarrassed and start stuttering, but his embarrassment made the stuttering worse. Wes was made to continue standing and reading even as his stuttering got worse and worse. Dkt. 23-13 at 88.

42

Wes was a different kind of target for the parish priest at St. Joe's, who sexually abused him over a three-year period after Wes became an alter server at St. Joe's Catholic Church. Dkt. 23-14 at 23. Rather than the "recovered memory" that Respondent appears to ridicule, Dkt. 49 at 69, Wes disclosed the abuse to his spiritual advisor, who took the time to talk to Wes about this sensitive topic after reading an autobiographical poem he had written in the past. Dkt. 23-14 at 23. Dr. Sautter describes this sexual molestation by a priest as one that elicited the most intense emotions from Wes. Dkt. 23-8 at 2; Dkt. 23-9 at 2.

The evidence of Mr. Purkey's experiences at St. Joe's adds much to illustrate the full scope of his childhood trauma and its effects on him. Instead of finding a welcome respite and refuge from the relentless violence and abuse he faced at home, St. Joe's only compounded his trauma, from which he had no escape, safety, or security. It was at this point that Wes began to turn to alcohol and drugs. *See* Dkt. 23 at 47.

Similarly, Respondent dismisses Mr. Purkey's ex-wife Jeanette's declaration containing vivid descriptions of his behavior that, when viewed in the context of his extreme trauma history, provide an understanding of that behavior as important symptoms indicative of his complex PTSD. *See* Dkt. 23-21 at 8 (describing "flashbacks" of trauma experiences). The new evidence from Michael Speakman also describes in graphic detail the behaviors of Wes while they shared a prison

43

cell that, seen in the context of Mr. Purkey's full trauma history, also provides visible, concrete evidence symptomatic of his complex PTSD. Mr. Speakman not only observed Mr. Purkey's stuttering, but he observed Mr. Purkey's startled reactions to noise during sleep, that Mr. Purkey "got set off" when he perceived he was being mistreated or being treated unfairly by prison administrators, and that when that happened "[i]t was like he was a different person." The behavior would stop as abruptly as it started. Other times, Mr. Purkey would hardly talk, and would stare at the ceiling all day long, which Mr. Speakman says "reminds me of my son, who is autistic." Dkt. 23-38 at 35-38. *See* Dkt. 23-9 at 3 (including, among PTSD symptoms, "flashbacks of trauma"; "high levels of emotional stress and physiological reactivity when exposed to trauma-reminders"; "avoidance of trauma reminders and emotional numbing"; "presence of insomnia, irritability, concentration problems, hyper-vigilance in addition to hyper-startle responses to trauma-related cues").

The new evidence presented by Mr. Purkey in his Petition, never heard by his jury, adds considerable weight to the totality of mitigating evidence. *See Walbey v. Quarterman*, 309 Fed.Appx. 795, 804 (5th Cir. 2009) (unpublished) (the mitigating evidence omitted by trial counsel "overwhelms the 'scant' evidence, 'bereft in scope and detail,' that was presented"). Had this previously undiscovered evidence been presented to Mr. Purkey's jury, it "might well have influenced the

44

jury's appraisal of [the defendant's] culpability." *Williams v. Taylor*, 529 U.S. at 398. *See also Porter v. McCollum*, 558 U.S. 30, 41 (2009) (when assessing reasonable probability of a different result in context of mitigation, a court should "consider 'the totality of the available mitigation evidence -- both adduced at trial, and the evidence adduced in the habeas proceeding' -- and reweigh[] it against the evidence in aggravation") (quoting *Williams*, 529 U.S. at 397-398)).

**C. Trial counsel and § 2255 counsel were ineffective in failing to investigate, discover, and present expert mental health evidence of Mr. Purkey's complex PTSD symptoms and behavior throughout his life up to and including the crime.**

At the outset, Mr. Purkey is not claiming in his Petition that he is not responsible for the murder of Jennifer Long, as Respondent repeatedly suggests. *See* Dkt. 49 at 74, 78. Respondent's argument appears to be that, because evidence of Mr. Purkey's abusive childhood came in through the testimony of experts Dr. Peterson and Dr. Cunnigham, it doesn't matter if trial counsel missed the mental health "label" because they "told the story," and whatever the mental health "label," the crime Mr. Purkey committed "do[es] not fit with claims of frontal lobe impairment or mental disease relieving him of responsibility for his crimes." Dkt. 49 at 75-76, 78.

What Mr. Purkey argues is that, because trial counsel failed to conduct a thorough investigation of Mr. Purkey's life history that would have revealed the extent of his lifelong trauma, and failed to learn about the constellation of Mr.

Purkey's behavioral and psychological symptoms that are the long-term consequences of those experiences, trial counsel also failed to identify and engage appropriate mental health experts to reliably evaluate his trauma symptomology and explain its impact on Mr. Purkey's development, personality and behavior throughout his life and leading up to and including the crime. *See Pruitt v. Neal*, 788 F.3d 248, 275 (7th Cir. 2015) ("[T]rial counsel did not conduct a thorough investigation into Pruitt's mental health and therefore did not make 'an informed choice' about what mental health evidence to present at sentencing"). Trial counsel thus missed both the label and the story.

Mr. Purkey's trial counsel *did* focus their expert mental health testimony on the question of whether a mental disease or defect negated the intent to commit the crime. As Mr. Purkey has previously pointed out, that question is not directed at mitigation, but rather to the preliminary findings the jury was required to make about whether Mr. Purkey had the requisite mental state for the crime before even considering aggravating and mitigating circumstances in order to decide between life and death. Dkt. 23-37 at 90. The question of whether Mr. Purkey had a mental disease or defect that negated intent is a very different question than the moral choice between life or death that the jury is required to make based on an individualized consideration of mitigating circumstances. *See Penry v. Lynaugh*,

46

492 U.S. 302, 319, 321 (1989) (the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's mitigating evidence).

As a consequence of their uninformed decisions, trial counsel's mental health experts failed to accurately assess Mr. Purkey's underlying symptoms of PTSD, and thus could not adequately explain his traumatic exposure and describe his ongoing symptoms and behavior that could strengthen the complete mitigation story, had it been presented by counsel. *See Stephens v. McBride*, 489 F.3d 883 (7th Cir. 2007) ("Competent evidence of Stephens' mental illness would have strengthened the general mitigation evidence presented by defense counsel concerning Stevens' difficult background by focusing the jury on the concrete results of years of abuse on Stevens' psyche").

None of the mental health experts presented by trial counsel had expertise in PTSD. While Dr. Leeson testified at one point that his testing showed that Mr. Purkey's results correlated with several groups, including the "post traumatic stress disorder group," Dkt. 40-1 at 43, Dr. Leeson did not test Mr. Purkey for PTSD, and there was no follow up by trial counsel. Dr. Leeson also testified that Mr. Purkey scored high in the antisocial personality group. Dkt. 40-1 at 37.

Dr. Peterson's expert opinion, which was weakly premised on his primary diagnosis of a personality disorder not otherwise specified, came unraveled during cross-examination when he agreed with the government's characterization of Mr.

47

Purkey as having antisocial personality disorder, which is not a mental disease or defect, and moreover, is an aggravating, not mitigating, diagnosis. *See Walbey v. Quarterman*, 309 Fed.Appx. at 804. *See also* Dr. Kathleen Wayland and Sean D. O'Brien, *Deconstructing Antisocial Personality Disorder and Psychopathy: A Guideline Approach to Prejudicial Psychiatric Labels*, 42 HOFSTRA L. REV. 519, 565 (2013) ("Evidence that the defendant had ASPD or psychopathy . . . fails the most basic tests of scientific knowledge. The myriad scientific, reliability, and ethical concerns about labeling a person antisocial, psychopathic, and evil cloaked as psychiatric findings should result in this evidence being excluded from the highly-charged adversarial atmosphere of capital trials"); John F. Edens, Donna M. DesForges, Crissie Fernandez and Caroline A. Palac, *Effects of Psychopathy and Violence Risk Testimony on Mock Juror Perceptions of Dangerousness in a Capital Murder Trial*, Psychology, Crime & Law 10(4) 393-412 (2004) (research indicates jurors cannot set aside terms such as "psychopathy" or "antisocial personality disorder" and fairly evaluate the evidence).

In addition, to the extent Dr. Peterson's testimony contained relevant mitigating evidence, the focus of his expert testimony on Mr. Purkey's capacity to form the requisite intent for the murder of Jennifer Long suggested that the evidence had to have a "nexus" to the crime in order for the jury to consider it. Dkt. 41-1 at 49-50, 58-59. Respondent suggests the same when it argues that "any abuse

48

[Mr. Purkey] suffered as a child does not excuse or mitigate the murders he committed[.]" Dkt. 49 at 78. Such a limitation on mitigation is unconstitutional. *Tennard v. Dretke*, 542 U.S. 274 (2004) (evidence of mental impairment is inherently mitigating, regardless of whether defendant has established a nexus between his mental capacity and the crime).

Under these circumstances, whatever "glimmers" of mitigation were contained in Dr. Peterson's testimony, there remained no reliable vehicle for the jury to give meaningful consideration and effect to the testimony *as mitigation* once the jury rejected the mental disease or defect defense and answered "yes" to the preliminary question of whether Mr. Purkey had the requisite intent. *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 260 (2007) ("a 'constitutional defect' has occurred not only when a jury is precluded from even considering certain types of mitigating evidence,' but also when 'the defendant's evidence [i]s placed before the sentencer but the sentencer has no reliable mean[s] of giving mitigating effect to that evidence'") (quoting *Graham v. Collins*, 506 U.S. 461, 475 (1993)). Respondent's argument that Mr. Purkey can suffer no prejudice from the omission of the new mitigation evidence from his trial because it does not relieve him from responsibility for his crimes is without simply without merit, and unconstitutional.

As Dr. Sautter explains, the kind of high levels of traumatic stress Mr. Purkey experienced growing up actually damages the developing brain, and "the

49

impact of these potential abnormalities would be expected to interact with any possible traumatic brain injuries suffered by Mr. Purkey to decrease his ability to control his emotional behaviors and posttraumatic stress." App. 82 at 705. Had evidence of Mr. Purkey's frontal lobe damage been presented to the jury in this light and had counsel explained to the jury in a meaningful way that his brain damage from prior head injuries interacted with the damage resulting from his trauma history and complex PTSD to affect Mr. Purkey's behaviors over time, general mitigating evidence of Mr. Purkey's extraordinary trauma history would have been strengthened. *Stephens v. McBride*, 489 F.3d 883 (7th Cir. 2007). Because of trial counsel's failure to conduct a constitutionally adequate mitigation investigation, Dr. Leeson's conclusions about Mr. Purkey's frontal lobe damage from his prior head injuries, and the brain imaging presented by Dr. Preston, were without context. They merely showed that Mr. Purkey had brain damage, and thus likely carried little to no weight with the jury as mitigation. Without the full story of Mr. Purkey's family and social history, and the extraordinary trauma Mr. Purkey suffered growing up, trial counsel did not, and could not, make "an informed choice" about what mental health evidence to present at sentencing. *Pruitt v. Neal*, 788 F.3d at 275.

Prejudice is shown from counsel's failure to investigate and present mitigating evidence where the undiscovered mitigating evidence "might well have

50

influenced the jury's appraisal of [the defendant's] moral culpability." *Wiggins*, 539

U.S. at 538 (quoting *Williams v. Taylor*, 529 U.S. at 398). This inquiry is not

foreclosed even if trial counsel presented *some* mitigating evidence to the jury.

*Sears v. Upton*, 130 S.Ct. at 3266; *Porter v. McCollum*, 558 U.S. at 40-44. *See also*

*Walbey v. Quarterman*, 309 Fed.Appx at 802 ("*Williams* stands for the proposition

that counsel can be prejudicially ineffective even if some of the available

mitigation evidence is presented and even is there is psychiatric testimony").

Taking into consideration, as this Court must, the totality of the available

mitigation evidence both old and new, and reweighing it against the evidence in

aggravation, *Porter v. McCollum*, 558 U.S. at 41 (2009) (citing *Williams*, 529 U.S.

at 397-398), "there is a reasonable probability that at least one juror would have

struck a different balance of aggravating and mitigating circumstances." *Wiggins*,

539 U.S. at 537.

**IV.**   **Fred Duchardt perpetrated a fraud on the court requiring relief setting aside the judgment on his 28 U.S.C § 2255 petition by making false and misleading statements to the court in the § 2255 proceeding intended to secure denial of Mr. Purkey's claims of ineffective assistance of counsel alleged against Mr. Duchardt, and which the habeas court subsequently relied upon in denying Mr. Purkey relief (CLAIM 3)**

Instead of addressing the claim presented, Respondent argues that the issue

is moot because the Eighth Circuit did not rely on Mr. Duchardt's affidavit in

finding no prejudice on the ineffective assistance of counsel claims that Mr.

51

Purkey's § 2255 counsel raised. Dkt. 49 at 79. The problem with Respondent's argument is two-fold. First, the Eighth Circuit's finding of no prejudice with respect to § 2255 counsel's claims was a consequence of § 2255 counsel's own failure to investigate and present the wealth of mitigating evidence that Mr. Purkey presents in this Petition. *See* Claim 2. Section 2255 counsel did not raise, and the Eighth Circuit did not consider, the claim presented here. Second, the district court substantially relied on Mr. Duchardt's affidavit in denying Mr. Purkey's § 2255 motion without an evidentiary hearing. Dkt. 23-39 at 2. The deliberate falsehoods made in the affidavit were clearly intended to deceive the district court and obtain a judgment against his former client on the ineffective assistance of counsel claims that were raised by Mr. Purkey's § 2255 counsel, which is the essence of fraud on the court. *In re Bressman*, 874 F.3d 142, 152 (3rd Cir. 2017). That claim is not moot.

Federal courts have inherent equitable power to remedy a fraud on the court. *In re Bressman*, 874 F.3d at 149 (citing *Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 248-249 (1944)). Respondent, citing *Taft v. Donellan Jerome, Inc.*, 407 F.2d 807, 809 (7th Cir. 1969), argues that a fraud on the court claim "must be raised in the court that rendered the judgment in the first place -- in this case, the Western District of Missouri." Dkt. 49 at 83. However, *Taft* only held that a motion under Rule 60(b) to set aside a judgment for fraud on the court had to be

52

brought in the court that rendered the original judgment. However, in *Hadden v. Rumsey Products*, 196 F.2d 92 (2nd Cir. 1952), it was held that a New York court had jurisdiction over an independent action to obtain equitable relief from an Ohio judgment that plaintiff was attempting to register and enforce against defendants in New York where they resided. Here, given the fact that Mr. Purkey is incarcerated in the Southern District of Indiana, and defendants, also residents of the Southern District of Indiana, are seeking to enforce a judgment against Mr. Purkey from the Western District of Missouri by executing him, this Court has jurisdiction over Mr. Purkey's equitable action to obtain relief from the judgment for Mr. Duchardt's fraud on the court.

Moreover, to the extent that Mr. Purkey's claim can be deemed defaulted because it was not raised in his § 2255 proceedings, the default is due to the ineffective assistance of his § 2255 counsel. Under the *Martinez/Trevino* doctrine, itself an equitable remedy, and applicable here for the reasons set forth in Section I, § 2255 counsel's ineffective assistance establishes cause for the default. Fraud on the court by Mr. Purkey's own trial counsel, intended to interfere with the administration of justice in his § 2255 proceedings, is an egregious breach of duty to his former client and should be construed as equivalent to *per se* ineffective assistance of counsel, especially when Mr. Duchardt's fraud extended back to his budget requests to the trial court. *See* Dkt. 23 at 153-154. Duchardt's fraud on the

53

court thus undermines the fairness and reliability of the proceedings both at Mr. Purkey's trial and on his § 2255 motion. *See Strickland*, 466 U.S. at 687. There can be no question that this claim is a substantial one that deserves encouragement to proceed further. *Martinez*, 132 S.Ct. at 1318-1319 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).

Respondent fares no better on the merits. For instance, Respondent argues that Mr. Duchardt's statement in his affidavit that § 2255 counsel had interposed no objection was not a lie because "at the time the statement was written, counsel had apparently not objected." Dkt. 49 at 83. This is an absurd argument in light of the fact that Mr. Duchardt sent a draft of his statement to § 2255 counsel before sending it to government counsel *asking if they had any objection*. Counsel *did* object, and communicated that objection by email to Mr. Duchardt. Dkt. 23-39 at 7. There is no evidence whatever, and Mr. Duchardt never claimed, that he did not receive counsel's email, and Duchardt had plenty of opportunity to correct his affidavit before it was submitted the district court in the § 2255 proceedings.

Respondent further argues "nothing shows that [Mr. Duchardt] received or read the email before he sent the affidavit to government counsel." Dkt. 49 at 83. Even if that was true, it does not help Respondent because it only shows that Mr. Duchardt did not bother to wait for a response from § 2255 counsel before sending his affidavit to government counsel, and that his giving § 2255 counsel an

54

opportunity to object was thus nothing more than a sham. Indeed, § 2255 counsel

Teresa Norris interpreted Mr. Duchardt's manner of giving "notice" of his affidavit

to her "as a way for him to be able to say that notice was given, without giving me

any actual opportunity to lodge the objections he surely should have expected to

come." Dkt. 23-37 at 341. It was only fortuitous that Ms. Norris happened to be

sitting in front of her computer and email when Duchardt sent the affidavit to her,

and "[s]hortly after I first saw the affidavit -- I mean within brief minutes of just a

first skim -- I conveyed to Mr. Duchardt that I vehemently objected to him

providing the affidavit to the Government, only to then learn that my objection was

too late because Mr. Duchardt had already sent the affidavit to the Government."

Dkt. 23-37 at 341.

Regarding Mr. Duchardt's statement in his affidavit that Laura O'Sullivan

"had never before tried a case involving the death penalty *or* a mental defense,"

Dkt. 23-37 at 170 (emphasis added), Respondent argues that "if Duchardt was

wrong, he was not far off the mark." Dkt. 49 at 84. Respondent's argument

provides no defense to a statement that emphatically asserted Ms. O'Sullivan "had

never tried a case involving . . . a mental defense." *Id*. That statement was plainly

false. Respondent then argues that, "for this statement to be a lie rather than a

mistake, Purkey must show that Duchardt knew about O'Sullivan's experience in

her trials with frontal lobe damage and battered women's syndrome." Dkt. 49 at 84.

55

But Respondent's argument only confirms Mr. Duchardt's fraud on the court. Mr. Duchardt swore to the truth of the statement, and thus it matters not whether he was lying or mistaken when he made the statement because, as Mr. Purkey argues in his Petition, Mr. Duchardt was either acting in willful ignorance of the truth or in willful disregard of the truth. Dkt. 23 at 152. In either case, the clear intent of the false statement was the same: to deceive the district court into discrediting Ms. O'Sullivan's declaration submitted as evidence in support of the § 2255 petition and crediting his own statements.

Respondent's answer to Mr. Duchardt's false and misleading statements about Mic Armstrong's qualifications as a mitigation investigator is to misconstrue those statements to support its argument. For example, Respondent suggests that "when Duchardt recounted in his affidavit that he asked Armstrong to serve as both fact and mitigation investigator, he did not state when that conversation occurred" and "[i]t could have been early in the case, or it could have been later as the case progressed and Duchardt determined to dispense with a traditional 'mitigation specialist.'" Dkt. 49. at 86-87. But Mr. Duchardt's affidavit does not suggest that he at some unspecified point asked Armstrong to serve the dual role of both fact and mitigation investigator; on the contrary, his affidavit states that he chose Armstrong to serve in the dual role from the beginning of the case "because of his experience and training." Dkt. 23-37 at 170.

56

Moreover, there is no evidence whatever to support Respondent's further suggestion that, at the time Duchardt made the statement, he "still intended to hire a mitigation specialist and have Armstrong work with and for the mitigation specialist." Dkt. 49. at 87. Indeed, it is clear from the evidence that Mr. Duchardt had *no* intention of hiring a mitigation specialist, because he wanted Mic to serve in a dual role from the beginning of the case. The budget requests do not "mirror" Mr. Duchardt's affidavit as Respondent insists. Indeed, they squarely contradict each other: Mr. Duchardt swore in his affidavit that he intended from the beginning of the case for Armstrong to serve in the dual role of both fact and mitigation investigator, but his budget requests to the trial court portrayed the opposite. Mr. Duchardt submitted separate budget requests for Mr. Armstrong, who had already been brought on to Mr. Purkey's case as an investigator, and a mitigation specialist, who had yet to be hired. Dt. 23-39 at 32. It was only four months after his initial budget request that Mr. Duchardt represented to the court that he had "learned" that the cost of a mitigation specialist had doubled, and he requested additional funding for Armstrong to serve in the dual role of investigator and mitigation specialist under the guise of "budgetary savings." Dkt. 23-36 at 13-14. In that request, Mr. Duchardt asserted that his original request for funding for Mr. Armstrong as an investigator was "based on the assumption that a mitigation specialist would be hired." Dkt. 23-36 at 13. Under these facts, either Mr. Duchardt's affidavit stating

57

that he intended from the beginning of the case for Mr. Armstrong to serve in that

dual role was *true* -- in which case the budget requests were intended to manipulate

the trial court to secure additional funds for Armstrong to serve in that dual role;

or, his affidavit stating that he intended from the beginning of the case for Mr.

Armstrong to serve in that dual role was *false* -- in which case the statement was

made to deceive the § 2255 court into accepting as fact that Mr. Armstrong was

qualified as a mitigation specialist when he was not.

Respondent then argues that there is no evidence to show that Mr. Duchardt

knew Armstrong to be unqualified, and "the fact that Armstrong left a prior job

under bad circumstances doesn't prove that Duchardt knew or believed him to be

unqualified." Dkt. 49 at 86. Yet it was Mr. Duchardt who originally hired and

supervised Armstrong at the MSPD. The "bad circumstances" under which

Armstrong was ultimately fired from MSPD were because Mr. Armstrong was

incompetent as an investigator. Those circumstances are not at all "contested." *See*

Dkt. 49 at 86. Mr. Armstrong even claimed in his lawsuit against MSPD for

wrongful termination, later dismissed in January 2001 for lack of prosecution, that

he had "an express contract" with Mr. Duchardt for essentially lifetime

employment at MSPD. Dkt. 23-36 at 205, 208, 273-274. Contrary to Mr.

Duchardt's assertions in his affidavit that Armstrong had "performed very

successfully" in the dual role of both fact investigator and mitigation specialist at

58

MSPD, Mr. Armstrong was never trained as a mitigation specialist at MSPD, nor did he ever serve in that capacity when he was employed there. Dkt. 23-36 at 25-26. The evidence further belies Mr. Duchardt's claim in his affidavit that Mr. Armstrong had served in that dual role "successfully" in the state cases he took in his private practice. Those state cases were contracted through MSPD, and Mr. Duchardt was expressly told by MSPD to stop using Mr. Armstrong as an investigator because of his termination, and Mr. Duchardt did so. Dkt. 23-36 at 205, 208, 273-274.

Respondent relies on Mr. Purkey's ex-wife Jeanette's admission of poisoning Mr. Purkey as evidence that Mr. Armstrong "performed well" in Mr. Purkey's case, and that "Mr. Purkey's current counsel uses the poisoning information as mitigation in their § 2241 motion." Dkt. 49 at 86. The fact that Mr. Purkey's wife was poisoning Mr. Purkey is no doubt an important one in the totality of Mr. Purkey's bio-psycho-social history. But the poisoning was never presented by trial counsel as mitigating evidence. Instead, Mr. Duchardt sought admission of the poisoning evidence at the guilt phase of Mr. Purkey's trial, which was denied by the trial court as irrelevant to the homicide of Jennifer Long. (Trial Tr. Vol. V at 657; Vol. IX at 1176). Prior to the penalty phase, Mr. Duchardt argued the evidence was relevant to the Bales homicide, ostensibly to rebut the government's reliance on the

59

homicide as an aggravating circumstance. The trial court again ruled the evidence inadmissible. (Trial Tr. Vol. IX at 1176).

Moreover, when § 2255 counsel interviewed Mr. Armstrong, "he provided no helpful substantive information related to his investigation in Mr. Purkey's case." Dkt. 23-37 at 342. Instead, it was apparent that Mr. Armstrong was obsessed with the poisoning issue, and Teresa Norris recalls that Armstrong said something about "digging up a dead dog to try to prove that Mr. Purkey's ex-wife was poisoning him." Dkt. 23-37 at 342. This is hardly illustrative of Mr. Armstrong having "performed well" in Mr. Purkey's case, especially when the evidence was deemed inadmissible for the purposes sought by trial counsel, and trial counsel then wholly ignored its value as mitigating evidence.

Mr. Duchardt submitted his affidavit as an officer of the court and as Mr. Purkey's former trial lawyer. The materially false and misleading statements contained in his affidavit could have had no other purpose than to deceive the court and thereby interfere with the court's impartial adjudication of Mr. Purkey's claims of ineffective assistance of counsel raised in his § 2255 motion. *See Bressman*, 874 F.3d at 152. As an attorney and officer of the court, Mr. Duchardt's fraudulent conduct had "a much greater likelihood of undermining the working of the normal process of adjudication because courts rely on the integrity of their officers." *Id*. *See also Hazel-Atlas*, 322 U.S. at 246.

60

V.  **Because there is a substantial possibility that the jury at Mr. Purkey's penalty trial understood the instructions in a way that rendered jurors unable to consider and give effect to mitigating evidence in determining whether to sentence Mr. Purkey to death, Mr. Purkey's death sentence is unconstitutional under the Eighth Amendment (CLAIM 4)**

Contrary to Respondent's argument, Mr. Purkey's claim is not the same as that raised either in his direct appeal or by § 2255 counsel. Mr. Purkey is not arguing here is not about the trial court "not requir[ing] Purkey's jury to return findings regarding pled and proven mitigating factors" as was argued on direct appeal, Dkt. 49 at 88,     nor is he arguing that his jury "did not vote on obvious mitigating evidence" as was argued in the § 2255 motion. Dkt. 49 at 89. What Mr. Purkey is arguing that there is an unconstitutional *risk* that the jurors understood their instructions in a way that rendered them unable to consider and give effect to mitigating evidence in determining whether to sentence Mr. Purkey to death. *See* Dkt. 23 at 161-167. That a strong possibility this unconstitutional risk was realized is borne out by the new evidence from the jurors themselves.

The jurors were instructed in the Special Verdict Form to record their findings as to each of the mitigating circumstances, and they failed to follow those instructions. Dkt. 23-37 at 94; Dkt. 23-40 at 87. Respondent argues that there is "no chance that the jury mistakenly believed that it was required to reach unanimous agreement before it could consider mitigating factors." Dkt. 49 at 91. But the juror declarations show that there was every chance the jurors were under

61

the mistaken belief that they had to reach unanimous agreement on mitigating factors. One juror said they "talked about" the mitigating factors section, but he did not know why the section was not filled out, and did not recall whether they took a vote on each mitigating factor. Dkt. 23-40 at 93-94. Similarly, another juror stated that "[t]he judge instructed us to complete the form, but I do not remember us voting on each factor one-by-one" and "[t]he foreman kept the verdict form." Dkt. 23-40 at 97. Another juror stated she "understood the judge's instructions to be that the jury's decision *had to be unanimous, either for life or for death*" and did not recall if votes were taken for each of the mitigating factors. Dkt. 23-40 at 101 (emphasis added). Yet another juror stated that, "[w]hile we discussed the mitigating factors, *if everyone agreed* that something was or was not mitigating then we moved on[. . .] *[i]f we did not agree unanimously, then we discussed it until it was unanimous*." Dkt. 23-40 at 103 (emphasis added).

Based on this new evidence, there is not just a possibility, but a substantial *probability* that jurors understood from the instructions that they had to unanimously agree as to the existence of a particular mitigating factor in order to consider it, and that the blank spaces on the special verdict form represented a failure to reach unanimous agreement on the existence of the mitigating factors. The genuine risk of such a result is unacceptable under the Eighth Amendment.

*Mills v. Maryland*, 486 U.S. 367, 375 (1988) (citing *Lockett v. Ohio*, 438 U.S. 586, 605 (1978); *Andres v. United States*, 333 U.S. 740, 752 (1948)).

Respondent contends that the juror declarations instead "demonstrate that although the jury considered and discussed the proposed mitigating factors, it was not persuaded by them and concluded that the death penalty was appropriate in light of the severity of Purkey's crimes." Dkt. 49 at 95. However, the quotations from the juror declarations that Respondent relies on to support their proposition only show that several jurors made up their minds to impose the death penalty at the guilt phase, in the case of one juror (*see* Dkt. 23-40 at 92), or before deliberations even began at the penalty phase (*see* Dkt. 23-40 at 96, 101), and thus failed to follow their instructions.

In the absence of this new evidence that was pre-existing but discovered only after the denial of his § 2255 motion, and which shows that Mr. Purkey's death sentence was obtained in violation of his constitutional rights, Mr. Purkey has never been allowed a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his sentence. Therefore, § 2241 is an available remedy to raise this challenge. *See Webster v. Daniels*, 784 F.3d 1123, 1136 (7th Cir. 2015) (*en banc*); *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001); *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998). *See also Webster*, 784 F.3d at 1137 ((Court must "take into account that a core purpose of habeas corpus is to

63

prevent a custodian from inflicting an unconstitutional sentence . . . there is no reason to assume that our procedural system is powerless to act in such a case . . . [t]o hold otherwise would lead in some cases . . . to the intolerable result of condoning an execution that violates the Eighth Amendment").

For these reasons, and for the reasons set forth in his Petition, *see* Am.Pet. at 155-161, Mr. Purkey is entitled to habeas relief.

**VI.   Mr. Purkey's death sentence is unconstitutional in light of *Hurst v. Florida* because his sentencing jury did not find, beyond a reasonable doubt, each fact necessary to impose a sentence of death (CLAIM 6)**

Respondent alleges that Mr. Purkey's claim is barred because "it is a claim that could have been, and in fact was, raised in his direct appeal and is now barred from relitigation." Dkt. 49 at 99. But *Hurst v. Florida* was not decided until 2016, long after Mr. Purkey's § 2255 proceedings were over. *Hurst*, 136 S.Ct. 616 (2016). *Hurst* constitutes new law affecting the legality of Mr. Purkey's death sentence, and the issue could not have been raised earlier at his trial, on direct appeal, or in his § 2255 motion. Because § 2255 is inadequate and ineffective to test the legality of his sentence, the savings clause under § 2255(e) permits Mr. Purkey to bring his claim in his § 2241 petition to challenge the legality of his sentence. *See Webster v. Daniels*, 784 F.3d at 1139 (Court must "take into account that a core purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence . . . there is no reason to assume that our procedural

64

system is powerless to act in such a case . . . [t]o hold otherwise would lead in some cases . . . to the intolerable result of condoning an execution that violates the Eighth Amendment"); *Garza v. Lappin*, 253 F.3d 918  (intervening decision of international tribunal after petitioner exhausted both his direct appeals and his opportunity for relief under § 2255 sufficient to invoke § 2255(e)'s savings clause and permit him to bring a petition under § 2241).

**VII.   Trial counsel was constitutionally ineffective in his advice to Mr. Purkey prior to his suppression testimony that trial counsel knew directly contradicted Mr. Purkey's reasons for confessing to a federal kidnapping in reliance on the promise of a life-sentence plea offer, and in subsequently failing to file a motion in limine to prevent the government from using Mr. Purkey's suppression testimony to impeach his trial testimony that he did not kidnap Jennifer Long, and arguing that his suppression statements were true (CLAIM 8)**

Mr. Purkey has already shown why § 2255(e) and § 2241 allow him to bring his new claims in this Petition, and those arguments are incorporated but need not be repeated here. *See* Section I. Under applicable *Martinez*/*Trevino* doctrine, a defaulted claim of ineffective assistance of trial counsel can be brought if the claim is substantial and the default was due to the ineffective assistance of initial-review postconviction counsel. A "substantial" ineffective assistance claim is one that has "some merit." *Martinez*, 132 S.Ct. at 1318-1319 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). There is more than "some merit" in Mr. Purkey's arguments in Claim Eight.  Section 2255 counsel themselves failed to raise this claim, and

therefore, "as an equitable matter," the initial-review postconviction proceeding was "not . . . sufficient to ensure that proper consideration was given to a substantial claim." *Id.* at 1318. Thus, § 2255 counsel's own ineffectiveness establishes cause for the default, allowing for full merits review of Mr. Purkey's substantial claim of ineffective assistance of trial counsel.

Respondent argues that the "record is devoid" of any evidence supporting Mr. Purkey's claim that trial counsel was constitutionally ineffective in his advice to him prior to the suppression hearing to persist in the statement originally made to law enforcement in order to preserve the chance of a life sentence plea offer from the Government. Dkt. 49, p. 117. But privileged attorney/client communications are not made part of the trial record, and it is therefore, nonsensical to argue that Mr. Purkey's argument fails because there is nothing in the record to support it. What transpired in conversations between Mr. Purkey and his trial attorneys is known only to them, and Mr. Purkey is firm in his position that trial counsel gave him this advice.

Respondent contends that Mr. Purkey's claim is implausible because a life-sentence plea offer was never contemplated by the Government. Dkt. 49, p. 118 – 119. Mr. Purkey insists, however, that his trial lawyer held out hope that the Government would extend a life-sentence plea offer. Consistent with this belief, prior to Mr. Purkey's motion to suppress testimony, trial counsel encouraged Mr.

66

Purkey to stay consistent with his earlier statements, because in doing so, he would uphold his side of a life-sentence bargain he insists was made with law enforcement, thus improving the chances for a life-sentence plea offer. Mr. Purkey would not know that a life-sentence plea offer was implausible unless the implausibility of such a plea offer was communicated to him by his trial attorneys.

Respondent further argues that the record reveals that Mr. Purkey's trial attorney was "blindsided" by Mr. Purkey's suppression testimony admission, and that he went into full "damage control" mode after the admission was made. Dkt. 49, p. 117. Contrary to Respondent's assertions, what the record reveals instead is that Mr. Duchardt failed to object to the very question that elicited the incriminating response, and failed on redirect examination to rehabilitate Mr. Purkey by giving him a chance to explain his direct examination admission even though trial counsel was well aware that Mr. Purkey had recanted the admission to kidnapping from the inception of representation. Dkt. 23, p. 212. Trial counsel compounded these errors by failing to file a motion in *limine* to prevent the use of Mr. Purkey's suppression hearing testimony at trial, and when the Government impeached Mr. Purkey's trial testimony with the suppression hearing admission, by failing to ask Mr. Purkey to explain the inconsistent statements on redirect examination. Dkt. 23, p. 213, 228.

67

Respondent argues that trial counsel was not ineffective because there was no legal basis to file a motion in *limine* to exclude the suppression hearing admission because the law in most federal circuits permitted the use of a defendant's suppression hearing statements for impeachment purposes at trial, though Respondent concedes that Seventh and Eighth Circuit law was silent regarding the issue at the time of Mr. Purkey's trial.  Dkt. 49, p. 120 – 121.  Even if this excuses trial counsel's failure to file a motion in *limine* regarding use of the statement for impeachment, which Mr. Purkey does not concede, it does not excuse trial counsel's failure to file a motion in *limine* to prevent that Government from arguing the truth of the inconsistent statement, or his failure to object when the Government went beyond impeachment, and argued the truth of the suppression hearing statement during closing arguments.  *See United States v. Simmons*, 390 U.S. 377, 394 (1968)(holding "that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial *on the issue of guilt*")(emphasis included by Repondent, Dkt. 49, p. 120).

Respondent argues that trial counsel was completely taken by surprise by Mr. Purkey's suppression hearing admission, but this is pure speculation as trial counsel made no statement on the record about being surprised by Mr. Purkey's admission.  The more important question, however, is not whether trial counsel

68

was surprised by the admission, but why Mr. Purkey would make such an admission in light of his firmly established recantation. Trial counsel never gave Mr. Purkey the chance to answer this question, because they did not ask him to explain the inconsistency. If Mr. Purkey had been asked, the record would be clear about the true reason for his suppression hearing admission: that the suppression hearing admission was a direct result of the advice given to him by trial counsel in the context of creating the best possible case posture for a life-sentence plea offer. Mr. Purkey therefore persists in his claim that trial counsel was constitutionally ineffective for the reasons given in Claim 8 of the Petition.

## VIII.  Mr. Purkey is entitled to a stay

Contrary to Respondent's contention, Mr. Purkey is entitled to a stay of execution pursuant to *Hill v. McDonough*, 547 U.S. 573, 584 (2006).

As to *Hill's* first factor, as detailed in his § 2241 Petition and Reply, this Court has jurisdiction, pursuant to *Martinez/Trevino*. Critically, Respondent concedes that his claims are procedurally defaulted. Mr. Purkey's claims raise substantial claims of ineffective assistance of law affecting his fundamental rights, which have never been reviewed by any court. *See* Motion for Stay of Execution, Dkt. 4, at 5-8.

With regard to *Hill's* second factor, balancing of harms, Respondent's argument is flawed. While Respondent is correct that the victims have an

"important interest in the timely enforcement of the defendant's sentence," (Dkt. 49 at 125), that does not outweigh the harm suffered by Mr. Purkey, who would be put to death before his substantial claims are adjudicated.

Third, contrary to Respondent's argument, counsel for Mr. Purkey have been diligent. As Respondent acknowledges, counsel have been reinvestigating this case since 2016. *See* Dkt. 49 at 125 -126. This fact supports, not refutes, counsel's diligence. Respondent's claim of "strategy" inexplicably assumes that counsel was waiting for an execution date before filing the § 2241 Petition. There is no basis in fact for this presumption. Counsel had no indication that Respondent would begin setting execution dates, let alone one for Mr. Purkey. Neither the length of time Mr. Purkey has been on federal death row, nor the span since the denial of certiorari from his federal habeas would have indicated to his counsel that he would be first in line for execution. Respondent should not doubly benefit from its own arbitrary selection of prisoners for execution.

Respondent's accusation of strategic delay ignores the reality of this case. There are many factors that resulted in a lengthier investigation: Mr. Purkey's mental impairments, historical limitations in funding and resources, counsel's access to their client, and caseload of counsel. Despite these factors, counsel diligently investigated Mr. Purkey's case, developed critical evidentiary support, identified appropriate mental health experts and worked to bring them up to speed

70

in the case, and, finally, drafted and filed a Petition dense with compelling factual and legal support.

Finally, Respondent's arguments about public interest are without merit. As an initial matter, the public's interest should be viewed through the lens of Respondent's arbitrary setting of execution dates. The public does not benefit because justice is short circuited to make way for governmental arbitrariness. Nor does the public benefit from the execution of an unconstitutional death sentence. Here, where the majority of the delay has been caused by the government, they should not now be permitted to argue about the harm of delay. It is disingenuous for Respondent to argue that a factor it long ignored should now support denying a stay to enable counsel to litigate substantial constitutional issues on behalf of their client.  The most compelling public interest is ensuring the constitutional rights of its citizens, which includes the rights of the accused. *See* Dkt. 4 at 11-12.

## REQUEST FOR RELIEF

For all of the foregoing reasons set forth herein, and in the Petition, Dkt. 23, and based upon the full record of this matter, Petitioner reiterates his requests that the Court provide the following relief:

1.     That Petitioner be granted a stay of execution pending a final resolution of the claim raised in this Petition;

2.      That leave to amend this Petition, if necessary, be granted;

71

3.      That Respondents be Ordered to respond to this Petition;

4.      That Petitioner be permitted to file a Reply and/or a Traverse addressing Respondents' affirmative defenses and arguments;

5.      That an evidentiary hearing be conducted on the merits of Petitioner's claims, any procedural issues, and all disputed issues of fact;

6.      That habeas relief from Petitioner's convictions and sentences, including his sentence of death, be granted.

Respectfully submitted,

/s/Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

/s/Michelle M. Law
Assistant Federal Public Defender
Western District of Missouri
901 Saint Louis Street, Suite 801
Springfield, Missouri 65806
(417) 873-9022
michelle_law@fd.org

Counsel for Petitioner

72

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2019, the foregoing Reply to the Government's Response to Petition for Writ of Habeas Corpus and Motion for Stay Petition for Writ of Habeas Corpus was filed electronically with the Clerk of the Court via CM/ECF to be served on the parties authorized to be noticed.

/s/Rebecca E. Woodman
Counsel for Petitioner

73