No. 20A-_____

_____

_____


IN THE SUPREME COURT OF THE UNITED STATES

_____


T.J. WATSON, WARDEN, ET AL., APPLICANTS

v.

WESLEY IRA PURKEY

(CAPITAL CASE)

_____

APPLICATION TO VACATE STAY OF EXECUTION ISSUED BY
THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

_____

JEFFREY B. WALL
  Acting Solicitor General
    Counsel of Record
  Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217

_____

_____

PARTIES TO THE PROCEEDING

Applicants (respondents-appellees below) are T.J. Watson, in his official capacity as Warden of United States Penitentiary - Terre Haute, and the United States of America.

Respondent (petitioner-appellant below) is Wesley Ira Purkey.

RELATED PROCEEDINGS

United States District Court (W.D. Mo.):

United States v. Purkey, No. 01-cr-308 (Jan. 26, 2004)

Purkey v. United States, No. 06-cv-8001 (Sept. 29, 2009)

United States District Court (S.D. Ind.):

Purkey v. United States, No. 19-cv-414 (Nov. 20, 2019)

United States Court of Appeals (8th Cir.):

United States v. Purkey, No. 04-1337 (Nov. 7, 2005)

Purkey v. United States, No. 10-3462 (Sept. 6, 2013)

United States Court of Appeals (7th Cir.):

Purkey v. Hanlon, No. 19-3047 (Nov. 7, 2019)

Purkey v. United States, No. 19-3318 (July 2, 2020)

Supreme Court of the United States:

Purkey v. United States, No. 05-11528 (Oct. 16, 2006)

Purkey v. United States, No. 13-9783 (Oct. 14, 2014)

IN THE SUPREME COURT OF THE UNITED STATES

_____

No. 20A-_____

T.J. WATSON, WARDEN, ET AL., APPLICANTS

v.

WESLEY IRA PURKEY

(CAPITAL CASE)

_____

APPLICATION TO VACATE STAY OF EXECUTION ISSUED BY
THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

_____

The United States Court of Appeals for the Seventh Circuit stayed respondent's scheduled execution, which is set for July 15, 2020 at 4:00 p.m. Eastern Standard Time. Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Acting Solicitor General, on behalf of applicants T.J. Watson and the United States of America, respectfully applies for an order vacating that stay.

Respondent is a federal death-row inmate convicted in 2003 following his confession to the gruesome rape and murder of a 16-year-old girl. Respondent's direct appeal ended in 2006, and postconviction proceedings challenging his conviction and sentence under 28 U.S.C. 2255 ended in 2014. In July 2019, following the completion of a lengthy process of revising the federal execution protocol, the government set a date for respondent's execution.

The following month, respondent filed an application for a writ of habeas corpus under 28 U.S.C. 2241 challenging his conviction and sentence. As relevant here, respondent asserted three claims concerning allegedly ineffective assistance of counsel during his trial 16 years earlier. Respondent's current counsel had been aware of the factual basis for at least some of those claims since 2017 or earlier, but respondent did not seek relief on them until his execution date had been set.

The district court denied respondent's habeas application, finding it barred by 28 U.S.C. 2255(e), which generally prohibits federal prisoners from using habeas applications under Section 2241 to circumvent the strict limits on timeliness and successive claims that Congress has established for federal postconviction proceedings under 28 U.S.C. 2255. On July 2, 2020, the court of appeals affirmed that decision, rejecting respondent's claim that federal prisoners can circumvent the limits on successive and untimely motions under Section 2255, see 18 U.S.C. 2255(f), (h), merely by alleging they received ineffective assistance of counsel in earlier postconviction proceedings. Indeed, the court recognized that respondent's argument is impossible to reconcile with the text of Section 2255(e), and lacks any limiting principle.

But notwithstanding its determination that respondent cannot proceed on his habeas petition, the court of appeals granted respondent relief anyway. It ordered that his execution be stayed

pending further order of that court or issuance of the court's mandate -- which would not occur until more than a month after the scheduled execution date. In doing so, the court acknowledged that one of the "requirements for a stay" identified by this Court in Nken v. Holder, 556 U.S. 418 (2009), is that "'the stay applicant has made a strong showing that he is likely to succeed on the merits.'" App., infra, 26a (citation omitted). But the court of appeals did not find that respondent had made such a showing. To the contrary, the court had just held that respondent cannot succeed in this case because his claims are statutorily barred, with no suggestion that it thought either the en banc court of appeals or this Court might reverse that decision. Instead, the court simply distinguished this case from Nken on the ground that this one involves the death penalty.

Less than 36 hours after entry of the court of appeals' decision on July 2, 2020, the government filed a motion asking the panel or the en banc Seventh Circuit to vacate the stay or, at a minimum, to require expedition of any petition for en banc review that respondent might choose to file. The court of appeals set a July 10, 2020 deadline for respondent to oppose the government's motion. As of this filing, the court of appeals has not ruled on that motion. Accordingly, in light of the impending July 15, 2020 execution date, the government respectfully moves this Court to set aside the Seventh Circuit's stay and allow the execution to

4

proceed. This Court has in the past summarily vacated stays of execution when a lower court "enjoined [the] execution without finding that [the prisoner] has a significant possibility of success on the merits." Dunn v. McNabb, 138 S. Ct. 369, 369 (2017). Such intervention is, if anything, especially warranted here, where the court of appeals correctly recognized that respondent cannot succeed on his claims, and gave no indication that it believes either the en banc court of appeals or this Court will grant discretionary review to reverse the denial of respondent's habeas application -- and yet ordered a stay nonetheless. A last-minute stay in these circumstances is directly contrary to the strict limitations that Congress imposed on collateral review of federal criminal convictions, and this Court should not allow it to remain in place.

STATEMENT

1. On the morning of January 22, 1998, respondent, who had recently been released from prison, encountered 16-year-old high school student Jennifer Long on a sidewalk in Kansas City, Missouri. See Purkey v. United States, 729 F.3d 860, 866 (8th Cir. 2013) (Purkey V), cert. denied, 574 U.S. 933 (2014). Respondent engaged Long in conversation and invited her to "party" with him. Ibid. According to respondent, Long then voluntarily entered respondent's pickup truck. After stopping at a liquor store to buy orange juice and gin, respondent told Long that he needed to

go to his home, which was across state lines in Lansing, Kansas. Long then asked to be let out of the truck. Ibid. Respondent indicated his refusal by grabbing a boning knife from the glove box and placing it under his thigh. Ibid.

After respondent drove Long to Lansing, respondent took Long into his basement, forced her at knifepoint to strip, and raped her. Purkey V, 729 F.3d at 866-867. After the rape, Long attempted to escape the house. Id. at 867. They struggled briefly, and then respondent stabbed Long repeatedly in the chest, neck, and face, eventually breaking the knife blade inside her body. Purkey V, 729 F.3d at 867.

After the murder, respondent stored Long's body in a toolbox; stopped at a bar to drink for several hours; and then went to Sears to purchase an electric chainsaw. Purkey V, 729 F.3d at 867. He then spent several days dismembering Long's body with the chainsaw before dividing Long's body parts into bags and burning the remains. Ibid. He dumped the charred remnants into a septic pond, where they were eventually recovered by investigators. Ibid.

Authorities learned that respondent had murdered Long when respondent was arrested nine months later for the unrelated murder of 80-year-old Mary Ruth Bales. Purkey V, 729 F.3d at 867. Respondent had visited Bales's home on a service call for a plumbing company. Ibid. He told Bales that he was willing to return later to complete the job for a lower price if Bales paid

him $70 up front. Ibid. Bales agreed, and she paid him the money. Respondent used the money to hire a prostitute and purchase cocaine. Ibid. After using the cocaine, he returned to Bales's home with the prostitute. Ibid. While the prostitute waited in respondent's car, respondent entered Bales's home and bludgeoned Bales to death in her bedroom with a claw hammer. Ibid. He returned to the house the following day with cans of gasoline to burn the house down. Ibid. A neighbor saw respondent in the yard and called police, leading to respondent's arrest. Ibid.

While awaiting trial for the murder of Bales, respondent contacted federal authorities concerning the Long murder. Purkey V, 729 F.3d at 868. Respondent -- who eventually received a sentence of life imprisonment in state prison in the Bales case -- gave a full confession to the earlier murder because he hoped that his confession would enable him to serve his life sentence in what he believed would be the more comfortable conditions of a federal prison. Ibid.

2. Following a jury trial in the United States District Court for the Western District of Missouri, respondent was convicted of interstate kidnapping for the purpose of forcible rape, resulting in death, in violation of 18 U.S.C. 1201(a), 1201(g), and 3559(d) (1994 & Supp. IV 1998). See App., infra, 4a-5a. The jury recommended that respondent be sentenced to death, and the district court imposed that sentence. Id. at 5a-6a. The

Eighth Circuit affirmed respondent's conviction and sentence, United States v. Purkey, 428 F.3d 738 (8th Cir. 2005), and this Court denied a writ of certiorari, Purkey v. United States, 549 U.S. 975 (2006).

In 2007, on the final day of the applicable one-year statute of limitations, Purkey filed a motion to vacate his conviction and sentence pursuant to 28 U.S.C. 2255.  See 28 U.S.C. 2255(f).  The motion raised, inter alia, a claim that his trial counsel was ineffective in 17 different respects.  App., infra, 6a.  The district court denied the motion.  Purkey v. United States, No. 06-cv-8001, 2009 WL 3160774 (W.D. Mo. Sept. 29, 2009).  The Eighth Circuit affirmed, Purkey V, supra, and this Court again denied a writ of certiorari, Purkey v. United States, 574 U.S. 933 (2014).

3.  On July 25, 2019, the federal government announced the completion of an "extensive study" that it had undertaken to consider possible revisions to the Federal Bureau of Prisons' lethal injection protocol to account for the scarcity of drugs required by the prior three-drug procedure.  In re Fed. Bureau of Prisons' Execution Protocol Cases, 955 F.3d 106, 110 (D.C. Cir. 2020) (per curiam) (Execution Protocol Cases), cert. denied, Bourgeois v. Barr, No. 19-1348 (June 29, 2020).  Following a deliberate investigation that had commenced when the prior drug became unavailable in 2011, the government published a revised addendum to its protocol, in which it adopted a single-drug

procedure (also used by many States) that would allow the federal government to resume executions. Ibid.

Alongside its adoption of this revised lethal injection protocol, the government also set execution dates for five federal inmates who had previously received capital sentences, including respondent. Execution Protocol Cases, 955 F.3d at 111. Initially, respondent's execution was scheduled for December 13, 2019. After respondent and several of the other capital prisoners filed a challenge to the federal execution protocol, however, the United States District Court of the District of Columbia entered a preliminary injunction in November 2019 barring the government from carrying out the executions as scheduled. Ibid.

On April 7, 2020, the United States Court of Appeals for the District of Columbia Circuit vacated the preliminary injunction in that case. Execution Protocol Cases, 955 F.3d at 108. The federal government subsequently set July 15, 2020 as the new date for respondent's execution.

4. At the same time that respondent was seeking to enjoin his scheduled execution through his challenge to the federal lethal injection protocol, he also initiated several other suits seeking to preclude his execution on other grounds. This application concerns one of those suits, a challenge to respondent's conviction and sentence that respondent filed in August 2019 -- nearly 13 years after the conclusion of his direct appeal, and nearly six

years after the conclusion of his Section 2255 proceedings. See D. Ct. Doc. 1 (Aug. 27, 2019). The challenge asserts, as relevant here, three claims of allegedly ineffective assistance of counsel stemming from his 2003 trial. Respondent has not asserted that those claims could satisfy the statutory requirements for a second or successive motion for collateral relief under Section 2255, see 28 U.S.C. 2255(h), and has not disputed that they would have been untimely by nearly 12 years under the statute of limitations applicable to Section 2255 motions, see 28 U.S.C. 2255(f). Instead, respondent sought to raise them by filing an application for a writ of habeas corpus under 28 U.S.C. 2241.[1]

The district court denied respondent's application, on the ground that 28 U.S.C. 2255(e) bars respondent from challenging his conviction or sentence by filing a habeas application under Section 2241. App., infra, 28a-56a. Section 2255(e) provides as follows:

> An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief,

---

[1] In addition to this suit and his challenge to the federal lethal injection protocol (which remains pending), respondent also filed two other suits seeking to bar his execution. In one, he contends that he is presently incompetent to be executed. See Purkey v. Barr, No. 19-cv-3570 (D.D.C. filed Nov. 26, 2019). In the other, he alleges that the government selected him for execution in retaliation for his acting as a jailhouse lawyer. Purkey v. Barr, No. 19-cv-517 (S.D. Ind. filed Oct. 28, 2019). As of this filing, respondent has motions to preliminarily enjoin his execution pending in both cases.

by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

28 U.S.C. 2255(e). The district court explained that because the "court which sentenced" respondent had already denied his motion for relief under Section 2255, respondent could pursue his habeas application under Section 2241 only if he could satisfy the so-called "saving clause" by showing that Section 2255's "remedy" was "inadequate or ineffective to test the legality of his detention." Ibid.; App., infra, 35a-36a. The district court found no such "inadequa[cy] or ineffective[ness]" here, because respondent could have asserted his present claims in his original Section 2255 proceedings -- he just failed to do so. App., infra, 51a.

5. On July 2, 2020, the court of appeals affirmed the district court's decision, agreeing with the district court that Section 2255(e) barred respondent's application for a writ of habeas corpus. App., infra, 1a-27a. But the court of appeals nevertheless entered a stay of execution pending further order of the court of appeals or issuance of the court of appeals' mandate. Id. at 26a-27a.

On the merits, the court of appeals explained that under its precedents, in order to show that a Section 2255 motion is "'inadequate or ineffective'" to present a federal prisoner's claim, the prisoner must make "a compelling showing that, as a practical matter, it would be impossible to use section 2255 to

cure a fundamental problem." Id. at 19a-20a (citation omitted). It found that respondent could not make that showing, because "[a]t the time [respondent] filed his motion under section 2255, nothing formally prevented him from raising each of the three errors he now seeks to raise in his petition under 2241." Id. at 20a.

The court of appeals rejected respondent's contention that alleged deficiencies by his postconviction counsel in his proceedings under Section 2255 rendered that Section's "remedy by motion ineffective or inadequate to test the legality of his detention." App., infra, 18a. The court observed that under Coleman v. Thompson, 501 U.S. 722 (1991), "there is no right to counsel in collateral proceedings, and thus no right to effective assistance of counsel" in such proceedings. App., infra, 18a (emphasis added). The court further observed that to allow federal prisoners to circumvent Section 2255's second-or-successive and timeliness limits whenever they alleged they received ineffective assistance of counsel during their earlier Section 2255 proceedings would give rise to "a never-ending series of reviews and re-reviews," with each denial of relief followed by a new suit alleging that the last set of lawyers had neglected to identify additional meritorious claims. Id. at 21a.

The court of appeals acknowledged that the ineffectiveness of post-conviction counsel can sometimes serve as a basis for "overcom[ing] a procedural bar" established as a "matter of federal

12

common law" for state prisoners who seek federal habeas relief. App., infra, 25a (discussing Trevino v. Thaler, 569 U.S. 413 (2013); and Martinez v. Ryan, 566 U.S. 1 (2012)). But the court found no basis for extending that approach to the circumstances here, because "the availability of further relief for someone in [respondent's] position is not a simple matter of federal common law. It is governed by statutes" -- and, specifically, the limitations in Section 2255(e). Ibid. While "nothing prevents Congress from changing the rules," id. at 22a, a court lacks the power to do so. The court therefore "conclude[d] that [respondent] is not entitled to raise his new arguments in a petition for a writ of habeas corpus." Id. at 25a.

Notwithstanding that conclusion, however, the court of appeals granted respondent's application for a stay of execution. App., infra, 26a-27a. In doing so, it acknowledged that this Court's decision in Nken v. Holder, 556 U.S. 418 (2009), held that one of the "requirements for a stay" is that "'the stay applicant has made a strong showing that he is likely to succeed on the merits.'" App., infra, 26a (quoting Nken, 556 U.S. at 434). But the court of appeals -- having just determined that respondent "is not entitled to raise his new arguments in a petition for a writ of habeas corpus," id. at 25a -- made no finding that respondent has any substantial likelihood of persuading the en banc court of appeals or this Court to reverse the panel's decision. See id. at

26a-27a. Instead, the court of appeals viewed Nken as distinguishable from this case on the theory that "although the Nken Court held that something more than a 'better than negligible' chance of success is necessary, it also stressed that the injury the applicant faced [there] was not 'categorically irreparable,'" while here respondent "faces categorically irreparable injury -- death." Id. at 26a (quoting Nken, 556 U.S. at 434-435).

The court of appeals stated that although it had affirmed the dismissal of respondent's claims "because of our understanding of the safety valve language" in Section 2255(e), "[i]f our reading of the safety valve is too restrictive, there would be significant issues to litigate" with respect to two of the ineffectiveness claims. App., infra, 27a. Deeming those underlying claims potentially "worthy of further exploration," the court ordered "[a] brief stay to permit the orderly conclusion of the proceedings in this court." Ibid. It concluded that such a stay "will not substantially harm the government, which has waited at least seven years to move forward on [respondent's] case," and that "the public interest" would not be served by proceeding more expeditiously in respondent's case than it would in "any [other] case." Id. at 26a-27a.

6. At approximately 2 a.m. Central Standard Time on the morning of Saturday, July 4, 2020 -- less than 36 hours after the court of appeals entered its decision -- the government filed a

14

motion asking the panel or en banc Seventh Circuit to vacate the stay of execution or, alternatively, enter an expedited schedule for any petition for rehearing respondent might choose to file that would allow the court to rule on that petition by 1 p.m. Central Standard Time on Friday, July 10, 2020. Gov't C.A. Pet. 1-3. The government explained that a decision within that time was necessary to ensure that this Court had sufficient time to consider any further motion for emergency relief in advance of the scheduled July 15, 2020 execution date. Id. at 16. The court of appeals instead gave respondent until 12 p.m. Central Standard Time on July 10, 2020 to respond to the government's July 4 motion. C.A. Doc. 40, at 2 (July 6, 2020). As of this filing, the court of appeals has not yet ruled on the government's motion.

ARGUMENT

This Court regularly exercises its authority under the All Writs Act, 28 U.S.C. 1651, to vacate stays of execution improperly entered by the lower courts. See, e.g., Dunn v. Price, 139 S. Ct. 1312 (2019); Dunn v. Ray, 139 S. Ct. 661 (2019); Mays v. Zagorski, 139 S. Ct. 360 (2018); Dunn v. McNabb, 138 S. Ct. 369 (2017); Dunn v. Melson, 137 S. Ct. 2237 (2017); Lombardi v. Smulls, 571 U.S. 1187 (2014); Roper v. Nicklasson, 571 U.S. 1107 (2013). And the Court has recognized that summary vacatur is especially appropriate where a lower court enters a last-minute stay of

execution "without finding that [the prisoner] has a significant possibility of success on the merits." McNabb, 138 S. Ct. at 369.

The court of appeals abused its authority in precisely that fashion here. Over the first 25 pages of its opinion, it correctly determined that respondent is barred from obtaining habeas corpus relief on his claims. But in the final page-and-a-half, it ordered that his execution nevertheless be stayed, on the remote chance that the en banc court of appeals or this Court might decide that the panel's "reading of the safety valve is too restrictive." App., infra, 26a. The panel gave no indication that it thought such a result was at all likely -- and, indeed, yesterday another Seventh Circuit panel applying the decision below to a separate but "indistinguishable" Section 2241 case found the prisoner's efforts to bypass Section 2255's limitations "frivolous" and denied his motion for a stay. Lee v. Watson, No. 19-3318, 2020 WL 3888196, at *2-*3 (7th Cir. July 10, 2020). Yet despite respondent's failure to establish that he has a significant possibility of success, the court of appeals entered a stay in this case anyway based on its erroneous view that a stay would not substantially harm the government and that the public interest would not be served by expediting resolution of this case.

In these extraordinary circumstances, this Court's intervention is warranted. The court of appeals' order conflicts with this Court's precedents requiring that a stay be supported by

a strong showing of a substantial likelihood of success, and it represents the very sort of last-minute delay that the limitations in Section 2255 were adopted to prevent. "Both the [government] and the victims of crime have an important interest in the timely enforcement of a sentence." Bucklew v. Precythe, 139 S. Ct. 1112, 1133 (2019) (quoting Hill v. McDonough, 547 U.S. 573, 584 (2006)). The Court should not allow that interest to be frustrated here on the basis of an application that the court of appeals itself correctly recognized cannot ultimately succeed.

I.   THE COURT OF APPEALS FAILED TO ADHERE TO THE REQUIREMENTS THIS COURT HAS SET OUT FOR STAYS AND OTHER SUCH INTERIM RELIEF

This Court has held that one of the "critical" considerations a lower court must consider when ordering a stay or granting preliminary injunctive relief is "'whether the stay applicant has made a strong showing that he is likely to succeed on the merits.'" Nken v. Holder, 556 U.S. 418, 434 (2009) (citation omitted); see Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (holding that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits"). "It is not enough that the chance of success on the merits be 'better than negligible.'" Nken, 556 U.S. at 434 (citation omitted).

Because the court of appeals itself had already held that respondent cannot succeed in this case, applying the stay factors set forth in Nken would have required it to find a substantial likelihood that either the en banc court of appeals or this Court

would grant respondent extraordinary discretionary review and reverse the panel decision. The court of appeals made no such finding. See App., _infra_, 26a-27a. Instead, it appears to have taken the view that the "requirements" described in _Nken_ are inapplicable to capital cases, distinguishing _Nken_ on the ground that the harm at issue there was "not 'categorically irreparable'" in the same sense that an execution would be. App., _infra_, 26a (quoting _Nken_, 556 U.S. at 435).

That view is plainly incorrect. _Nken_ contains no such carve-out, and this Court has held, squarely and repeatedly, that "like other stay applicants, inmates seeking [a stay of execution] must satisfy _all_ of the requirements for a stay, including a showing of a significant possibility of success on the merits." _Hill_, 547 U.S. at 584 (emphasis added); see, _e.g._, _Barefoot_ v. _Estelle_, 463 U.S. 880, 895 (1983) (finding it "well established" that in order to grant a "[s]tay[] of execution * * * pending the filing and consideration of a petition for a writ of certiorari * * * 'there must be a significant possibility of reversal'") (citation omitted).

Accordingly, when this Court has previously considered stays of "execution [entered] without finding that [the prisoner] has a significant possibility of success on the merits," it has summarily vacated them. _McNabb_, 138 S. Ct. at 369. That course is appropriate here as well. Given the "important interest in the

timely enforcement of a sentence," no justification exists for further delaying respondent's scheduled execution based on claims that the court of appeals itself recognized to be unavailing. Hill, 547 U.S. at 584.

## II. RESPONDENT COULD NOT ESTABLISH ENTITLEMENT TO A STAY UNDER A PROPER APPLICATION OF THE STAY FACTORS

Although the court of appeals' own failure to make the required finding of a substantial likelihood of success is sufficient grounds to vacate the stay, see McNabb, 138 S. Ct. at 369, vacatur is particularly appropriate because respondent is not entitled to a stay under any proper application of the stay factors. As the court of appeals correctly recognized in affirming the district court's decision, respondent cannot establish a likelihood of success on the merits. Equitable considerations likewise weigh against entry of a stay in this case, because the facts that form the basis for his current claims have been available since respondent's trial in 2003 and have been known in significant part to respondent's current counsel since at least May 2017, and yet respondent waited to assert those claims until more than a month after his execution date was set in July 2019. Finally, as noted above, the public interest in the enforcement of criminal judgments weighs against entry of a stay as well.

19

A.  Respondent Cannot Establish A Likelihood Of Success On The Merits

As the court of appeals recognized in affirming the district court's decision here, Section 2255(e) bars respondent's attempt to use an application for a writ of habeas corpus to assert claims of ineffective assistance of counsel during his trial more than 16 years ago.  See App., _infra_, 13a-25a.  Respondent has not identified, and counsel for the government is not aware of, any decision of any court allowing a federal prisoner to pursue habeas relief under comparable circumstances.  And no substantial likelihood exists that the en banc Seventh Circuit or this Court will do so in this case.

Congress enacted Section 2255 in 1948 in order to make federal postconviction challenges more efficient by requiring federal prisoners to bring such challenges in the district of their conviction rather than the district in which they happened to be confined.  See _United States_ v. _Hayman_, 342 U.S. 205, 210-219 (1952) (discussing the legislative impetus for enactment of Section 2255).  A half-century later, in the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 105, 110 Stat. 1220, Congress sought to further streamline such federal postconviction challenges by imposing a one-year statute of limitations (generally running from the date that a prisoner's conviction becomes final) and barring second or successive challenges outside of certain narrowly drawn scenarios

inapplicable here. See 28 U.S.C. 2255 (Supp. II 1996). In order to ensure that federal prisoners do not circumvent the Section 2255 framework specifically enacted for federal postconviction challenges by instead seeking relief under the general federal habeas statute, 28 U.S.C. 2241, Congress has also provided since 1948 that a federal prisoner who could seek -- or has sought -- relief by motion under Section 2255 may not instead pursue an application for a writ of habeas corpus under Section 2241. See 28 U.S.C. 2255(e).

Section 2255(e) allows a federal prisoner to pursue relief under Section 2241 only in a circumstance where he can show "the remedy by motion [under Section 2255] is inadequate or ineffective to test the legality" of his conviction or sentence. 28 U.S.C. 2255(e). As the court of appeals recognized, however, the saving clause of Section 2255(e) is "narrow," and respondent's claims do not come within it. App., infra, 13a.[2] "It is not enough that proper use of [a Section 2255 motion] results in denial of relief," id. at 20a, for then a prisoner could always resort to Section 2241 whenever the deliberate limitations in Section 2255 block the

---

[2] The government has argued that the court of appeals' prior decisions take an overly expansive view of Section 2255(e)'s saving clause, in at least certain respects. See Pet. at 14-25, United States v. Wheeler, 139 S. Ct. 1318 (2019) (No. 18-420). And in this case, even the court of appeals' view does not allow for resort to Section 2241 -- as the court itself recognized. Nor has respondent identified any other circuit whose precedent would.

prisoner's claim. Instead, at the very least, a prisoner must make "a compelling showing that, as a practical matter, it would be impossible to use section 2255 to cure a fundamental problem." Ibid. No such showing can be made with respect to the ineffective assistance claims that respondent seeks to assert here, because respondent would have been free to bring those claims in his motion under Section 2255 -- he just failed to do so (asserting instead 17 other ineffective assistance claims). See id. at 20a-21a.

Respondent nevertheless contends that Section 2255 was "inadequate or ineffective" for him because his counsel in the Section 2255 proceedings initiated in 2007 (who was different from his trial and direct appeal counsel) failed to identify and assert his present claims. See App., infra, 20a-21a. But as the court of appeals put it, "how far are we supposed to take that?" Id. at 21a. Allowing federal prisoners to escape Section 2255(e)'s limitations on second or successive claims merely by alleging that their earlier postconviction counsel had been ineffective for failing to raise the claims they now wished to bring would generate "a never-ending series of reviews and re-reviews" -- exactly what the limits in Section 2255 are intended to prevent. Ibid.

In the courts below, respondent sought to overcome this difficulty by observing that in Martinez v. Ryan, 566 U.S. 1 (2012) and Trevino v. Thaler, 569 U.S. 413 (2013), this Court held that otherwise-applicable procedural default rules can sometimes be

overcome where state prisoners did not receive the effective assistance of counsel in their state post-conviction proceedings, even though prisoners have no constitutional right to counsel in such proceedings, see, e.g., Coleman v. Thompson, 501 U.S. 722, 752 (1991).  As the court of appeals recognized, however, Martinez and Trevino are fundamentally different from this case because they established exceptions to judicially created rules of "federal common law," whereas the bar applicable here "is governed by statutes" -- namely, Section 2255(e)'s general preclusion of challenges to federal convictions and sentences through a Section 2241 habeas application.  App., infra, 25a.  While "judge-made * * * doctrines, even if flatly stated at first, remain amenable to judge-made exceptions," "a statutory * * * provision stands on a different footing."  Ross v. Blake, 136 S. Ct. 1850, 1857 (2016) (refusing to create judicial exceptions to the mandatory exhaustion requirement of the Prison Litigation Reform Act of 1995).  "There, Congress sets the rules -- and courts have a role in creating exceptions only if Congress wants them to."  Ibid.

Nothing suggests Congress wanted courts to allow extra-textual exceptions to Section 2255(e) for defendants who claim not to have received the effective assistance of counsel in earlier postconviction proceedings.  And respondent has not identified any court that has ever held otherwise.  It is thus exceedingly unlikely that either the en banc Seventh Circuit or this Court

would hold that respondent's application for habeas relief should proceed. See Lee, 2020 WL 3888196, at *2 (describing such a position as "frivolous"). Accordingly, respondent cannot establish the substantial likelihood of success necessary to support issuance of a stay. See Hill, 547 U.S. at 584.

B.    Equitable Considerations Weigh Against Entry Of A Last-Minute Stay

Equitable considerations also weigh strongly against entry of a stay in this case. This Court has held that "[a] court considering a stay must  * * *  apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" Hill, 547 U.S. at 584 (quoting Nelson v. Campbell, 541 U.S. 637, 650 (2004)). That equitable presumption should be particularly strong in a case, like this one, where the prisoner is seeking to circumvent statutory limitations enacted to streamline postconviction challenges and thereby prevent delays in the execution of capital judgments occasioned by last-minute litigation. See pp. 19-23, supra.

The court of appeals addressed this factor only indirectly, observing that after the government issued a notice on July 25, 2019 setting respondent's execution date, respondent "los[t] no time  * * *  fil[ing] a detailed petition under" Section 2241. App., infra, 9a. But if the court meant to suggest that this fact

should weigh in respondent's favor, it was mistaken. All of the ineffective-assistance claims at issue here stem from respondent's original 2003 trial. Indeed, the factual basis underlying one of the alleged errors was, as the court of appeals itself put it, "apparent to everyone from the minute the jury returned its verdict." App., infra, 23a. The factual basis for another one of the claims -- concerning trial counsel's failure to object to the seating of one of the jurors -- is set out in a sworn affidavit signed in May 2017, more than two years before respondent filed his habeas application. D. Ct. Doc. 23-36, at 1170-1172 (Sept. 12, 2019).

Even where a federal prisoner identifies new evidence that persuasively establishes his factual innocence of the charged offense -- one of the narrow circumstances in which Section 2255 would indeed permit a successive collateral attack, see 28 U.S.C. 2255(h)(1) -- Congress has required that he assert any "claim or claims" based on that evidence within 1 year of "the date on which the facts * * * could have been discovered through the exercise of due diligence," 28 U.S.C. 2255(f)(4). Here, however, respondent did not act with any such expedition or diligence. Instead he filed his more-than-200-page habeas application and nearly 3000-page appendix -- asserting claims based on information his counsel had obtained years earlier -- only after an execution date had been set. See D. Ct. Docs. 1, 23.

Had respondent filed his application when he first had notice of the factual basis for those claims, the application would have run its course by now. Having instead filed only after the scheduling of his execution, respondent has no equitable right to demand that his execution be further delayed. See Hill, 547 U.S. at 584.

C. The Public Interest Weighs Against A Stay

Finally, in considering the public interest, see Nken, 556 U.S. at 434, this Court has repeatedly emphasized in the context of state executions that "'[b]oth the [government] and the victims of crime have an important interest in the timely enforcement of a sentence.'" Bucklew, 139 S. Ct. at 1133 (quoting Hill, 547 U.S. at 584); see, e.g., Nelson, 541 U.S. at 650 (describing "the State's significant interest in enforcing its criminal judgments"); Gomez v. District Court, 503 U.S. 653, 654 (1992) (per curiam) (noting that "[e]quity must take into consideration the State's strong interest in proceeding with its judgment").

The court of appeals' entry of a stay frustrates that interest. In doing so, it contravenes not only general equitable principles, but also the policies Congress has embedded in the very statutes at issue here. As discussed above, see pp. 19-24, supra, Congress refined Section 2255 specifically to prevent untimely, successive claims that collaterally attack final federal

sentences. That interest is just as strong in this case as in others. Although the government did not schedule respondent's execution until last year due to the careful but time-consuming process that the government undertook in revising the federal lethal injection protocol, see pp. 7-8, supra, treating that process as though it somehow undercut the public interest in carrying out respondent's sentence would improperly penalize the government -- and the public itself -- for acting conscientiously.

And insofar as the court of appeals placed a thumb on the scales in favor of delaying the implementation of capital sentences, see App., infra, 26a, that approach is incompatible with the importance this Court has placed on "the timely enforcement of a sentence." Bucklew, 139 S. Ct. at 1133 (citation omitted); see Barr v. Roane, 140 S. Ct. 353, 353 (2019) (expecting court of appeals to act with "appropriate dispatch" in resolving capital case). If a court is unwilling to allow an execution to go forward even after it has determined that a prisoner's claim cannot succeed, the public will never obtain the "assurance of real finality" that this Court's cases -- and Section 2255 itself -- promote. Calderon v. Thompson, 523 U.S. 538, 556 (1998).

### CONCLUSION

This Court should vacate the court of appeals' stay of execution in order to allow respondent's execution to proceed as scheduled on July 15, 2020.

Respectfully submitted.

JEFFREY B. WALL
  Acting Solicitor General

JULY 2020

In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 19-3318

WESLEY IRA PURKEY,

*Petitioner-Appellant*,

*v.*

UNITED STATES OF AMERICA, *et al.*,

*Respondents-Appellees*.

_____

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:19-cv-00414-JPH-DLP — **James P. Hanlon**, *Judge*.

_____

ARGUED JUNE 16, 2020 — DECIDED JULY 2, 2020

_____

Before WOOD, *Chief Judge*, and BRENNAN and ST. EVE,
*Circuit Judges*.

WOOD, *Chief Judge*. Accuracy and finality are both central
goals of the judicial system, but there is an inherent conflict
between them. Suppose later information comes to light in a
criminal case, and that information reveals potential factual
or constitutional errors in the original proceeding. Do we
privilege accuracy and re-open the case, or do we privilege
finality and leave the errors unexamined? And if we do

(1a)

permit a second look, is a third or fourth also proper? The case before us presents just such a question, and the stakes could not be higher. We must decide whether Wesley Purkey, who sits on federal death row at the U.S. Penitentiary in Terre Haute, Indiana, has run out of opportunities to challenge his conviction and death sentence for kidnapping and murder. Purkey urges that his proceedings up to now have been undermined by ineffective assistance of counsel, first at the trial level, and then on collateral review. The United States argues that Purkey already has had an opportunity to challenge the effectiveness of trial counsel and, under the governing statutes, he has come to the end of the line. The district court ruled for the government. We conclude that this is not one of those rare cases in which the defendant is entitled to another day in court, and so we affirm the district court's judgment.

## I

We can be brief about the underlying facts, since we are concerned almost exclusively about procedure in this appeal. On January 22, 1998, Purkey (then 46 years old) saw Jennifer Long at a grocery store in Kansas City, Missouri. He asked her if she wanted to party with him. She accepted the invitation and got into Purkey's pickup truck. At the time, Long was 16 years old; she commented to Purkey that she had been at her high school but had left after an argument with some friends.

Matters almost immediately took a bad turn: Purkey told Long that he needed to stop off briefly at his house in nearby Lansing, Kansas, but Long objected. Purkey then threatened her by removing a boning knife from the glove box and placing it under his thigh, while telling her that he would not let her out of the truck. He drove her across the state line to his

home, where he raped her, stabbed her repeatedly with the boning knife, and ultimately killed her.

In order to conceal the murder, Purkey stored Long's body in a toolbox for a few days; he later dismembered it and burned the pieces in his fireplace. What he could not destroy, he dumped into a septic lagoon.

That was not Purkey's only murder during 1998. In October, he killed 80-year-old Mary Ruth Bales using only the claw end of a hammer. This took place in Kansas, where he was quickly caught and placed in custody. In December 1998, while awaiting trial in the Bales case, Purkey sent a letter to Detective Bill Howard of the Kansas City, Kansas, police department, stating that he wanted to talk about a kidnapping and homicide that had occurred earlier that year. Purkey also insisted that an FBI agent come along. His reason was this: he realized that he faced a life sentence in Kansas for the Bales murder, but he thought that if he were convicted on federal charges, he would also receive a life sentence, but he could serve it in a federal facility. It apparently did not occur to him that the death penalty is possible for certain federal crimes.

Purkey had several conversations with Detective Howard and FBI Special Agent Dick Tarpley. In each of them, he said that he planned to plead guilty in the Bales case. He also expressed a willingness to confess to another murder in exchange for a life sentence in federal prison. Howard and Tarpley promised to inform the U.S. Attorney in Kansas of Purkey's offer, but they made no other commitment. Purkey then confessed that nine months earlier, he had kidnapped a young woman named Jennifer in Kansas City, Missouri, transported her to his home, and had raped, killed, dismembered, and disposed of her. Howard and Tarpley passed this

4                                                      No. 19-3318

information along to the U.S. Attorney, who indicated that if Purkey cooperated further, he might be willing to prosecute the case.

Purkey did cooperate, by taking Howard and Tarpley to the crime scene, showing them the septic pond where he had deposited the remains, giving handwritten and oral confessions, and identifying Long's photograph from a lineup. Purkey was under the impression that he was negotiating for a life sentence, but Howard and Tarpley denied that any such deal was on the table. And indeed, on October 10, 2001, after Purkey pleaded guilty in Kansas court to the Bales murder, a grand jury in the Western District of Missouri indicted him for the kidnapping, rape, and murder of Long, in violation of 18 U.S.C. §§ 1201(a), 1201(g), and 3559(d). The U.S. Attorney filed a notice that the government planned to seek the death penalty. See 18 U.S.C. § 3593(a).

## II

### A

At the trial, Purkey was represented by Attorneys Frederick Duchardt, Jr. (principal counsel) and Laura O'Sullivan. Because Purkey had repeatedly confessed that he kidnapped Long (four times, by the government's count), his defense depended on the jury's accepting his contention that he had lied when he said that he took her by force, and that the truth was instead that he thought she was a prostitute who willingly accompanied him from Missouri to Kansas. He testified that he had fabricated the claim of force because he wanted to be prosecuted in federal court. The government responded with certain statements from Purkey's suppression hearing, at which he admitted that he took Long across state lines against

her will, to impeach his trial testimony. Purkey's lawyers made no effort to exclude this evidence, which he now says was ultimately used not just for impeachment, but (impermissibly) to prove the truth about coercion. The jury was not persuaded by Purkey's account; on November 5, 2003, it returned a verdict of guilty.

The penalty phase of the trial began shortly thereafter, on November 10, 2003. Purkey's lawyers submitted evidence on 27 mitigating factors, though as we will see, current counsel believe that their work fell short of the constitutional minimum. Experts testified that Purkey both had organic brain damage, principally stemming from severe injuries suffered in car accidents, and that his mental capacity was diminished. The government offered evidence in opposition to the alleged mitigating factors, and it also introduced evidence of six statutory and four non-statutory aggravating factors. See 18 U.S.C. § 3592(c) (listing 16 statutory aggravating factors and permitting consideration of any other aggravating factor for which the defendant received notice). The jury found that the government had proven the existence of all six statutory factors. See 18 U.S.C. §§ 3592(c)(1), (2), (3), (4), (6), and (11). It also found three of the four non-statutory factors: loss because of personal characteristics and impact on the family; previous vicious killing of Bales; and substantial criminal history.

The penalty question was submitted to the jury on November 19, 2003; it returned a death sentence on the same day. Although the verdict form included space for findings on mitigating factors, the jury left that section blank. When the jury announced its verdict, defense counsel initially objected to this omission and the court offered to send the jury back for further deliberations. But the government objected, and

defense counsel dropped the point without further comment. The court thus never resolved the question whether the blank form meant that the jury neglected to address the question of mitigation, or if it meant that it thought about the subject and concluded that there was nothing to report. The court formally imposed a sentence of death and entered its judgment on January 23, 2004.

Purkey appealed to the Eighth Circuit, which affirmed the conviction and sentence. *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005) (*Purkey I*). The Supreme Court denied Purkey's petition for a writ of certiorari. *Purkey v. United States*, 549 U.S. 975 (2006). Purkey then filed a motion for postconviction relief under 28 U.S.C. § 2255.

B

Purkey raised two primary claims in his section 2255 proceedings: (1) ineffective assistance of trial counsel in 17 different particulars, in violation of his Sixth Amendment rights; and (2) several alleged violations of his due process rights during the trial (namely, government misconduct during the trial, insufficient evidence to find kidnapping beyond a reasonable doubt, and error in the jury's failure to address the question of mitigating evidence). He urged the district court to give him an evidentiary hearing on the ineffectiveness-of-counsel claim. In order to respond to that charge, the government submitted a 117-page affidavit from attorney Duchardt, in which Duchardt defended his work.[1] Purkey asserted that

---

[1] The district court ordered the preparation of that affidavit in response to a motion from the government. See *Purkey v. United States,* No. 06-8001-CV-W-FJG, 2008 WL 11429383 at *2 (W.D. Mo. Feb. 1, 2008). In the same order, the court denied Purkey's counsel's motion to compel the Federal Bureau of Prisons (BOP) to provide Purkey with necessary psychiatric

No. 19-3318                                                    7

the court could not take Duchardt's word on these points, and worse, that Duchardt had misrepresented certain things and had violated his duty of confidentiality to Purkey. The district court decided, however, that Purkey had failed to overcome the presumption that Duchardt's actions reflected trial strategy. It therefore denied relief under section 2255. *Purkey v. United States*, No. 06-8001-CV-W-FJG, 2009 WL 3160774 (W.D. Mo. Sept. 29, 2009) (*Purkey II*).

Through counsel, Purkey moved to alter or amend the court's rejection of his section 2255 motion; at the same time, he filed a pro se motion "to Withdraw Habeas Proceedings and Set an Expeditious Execution Date." *Purkey v. United States*, No. 06-8001-CV-W-FJG, 2009 WL 5176598 (W.D. Mo. Dec. 22, 2009) (*Purkey III*). The district court denied the motion insofar as it sought reconsideration of the denial of relief under section 2255, and it permitted Purkey to withdraw the pro se motion seeking the abandonment of his section 2255 request and an early execution date. Nearly a year later, the court issued a lengthy opinion in which it denied Purkey's request for a certificate of appealability. *Purkey v. United States*, No. 06-8001-CV-W-FJG, 2010 WL 4386532 (W.D. Mo. Oct. 28, 2010) (*Purkey IV*).

Turning to the Eighth Circuit, Purkey was successful in obtaining a certificate of appealability "to review whether Purkey received effective assistance of counsel during the penalty phase of the trial and whether the district court abused its discretion by denying relief without conducting an

treatment, it denied Purkey's pro se motion seeking leave to dismiss counsel and proceed pro se, and it gave the government an extension of time in which to respond to the motion under section 2255.

evidentiary hearing." *Purkey v. United States*, 729 F.3d 860, 861 (8th Cir. 2013) (*Purkey V*). The certificate permitted "Purkey to challenge three aspects of Duchardt's performance in this proceeding: (1) his alleged failure to adequately prepare and present the testimony of three expert witnesses, (2) his alleged failure to adequately investigate and prepare two mitigating witnesses, which resulted in their testimony being more prejudicial than beneficial, and (3) his alleged failure to adequately investigate and present other mitigating evidence." *Id.* at 862.

The Eighth Circuit found that Duchardt had presented "a lengthy and detailed mitigation case" during the penalty phase. *Id.* at 863. Over two days, he offered testimony from 18 witnesses—family members, inmates, and religious counselors—all of whom stated that Purkey's parents had inflicted significant physical and emotional abuse on him. Both were alcoholics, his mother (and many others) humiliated him because he was a stutterer, and his mother sexually abused both him and his brother in the most graphic ways imaginable. Purkey's medical and mental health records were introduced; they showed that Purkey had a serious personality disorder and a below-average IQ. Although section 2255 counsel had more to offer, the Eighth Circuit found that the new material was "entirely cumulative." *Id.* at 865. Moreover, the court added, to the extent the proffered information did not cover the same ground as the penalty-phase evidence, it could not conclude that there was a reasonable probability that the new evidence would have changed the result, given the particularly gruesome nature of the crime. *Id.* at 866. Finally, it saw no abuse of discretion in the district court's decision not to hold an evidentiary

hearing. Purkey sought certiorari from this decision, but the Supreme Court denied review. 574 U.S. 933 (2014).

## C

That set the stage for the current proceedings—and we mean to use the plural, because there are three moving pieces, although we are involved in only one of them. As are all federal prisoners under a sentence of death, Purkey is housed in the U.S. Penitentiary in Terre Haute, Indiana. For many years—to be exact, since March 18, 2003, when Louis Jones, Jr. was executed—the federal government has not carried out any executions. But policy changed in the current Administration, which is moving quickly to resume executions. On July 25, 2019, the government issued a notice scheduling Purkey's execution for December 13, 2019. Losing no time, on August 27, 2019, Purkey filed a detailed petition under 28 U.S.C. § 2241 in the Southern District of Indiana challenging the constitutionality of his conviction and death sentence. We refer to this as the "Habeas Corpus" case; it is the one presently before us. Second, on October 21, 2019, Purkey filed a complaint in the District of Columbia challenging the execution protocol that the Bureau of Prisons (BOP) proposes to use. We refer to this as the "Execution Protocol" case. Finally, on November 11, 2019, Purkey filed another complaint in the District of Columbia, asserting that he was entitled to relief from the death penalty under the Supreme Court's ruling in *Ford v. Wainwright*, 477 U.S. 399 (1985). We refer to this as the *Ford* claim.

## 1

Before turning to the Habeas Corpus case, we say a word about the Execution Protocol litigation and the *Ford* claim. The impetus for the Execution Protocol litigation came from

the fact that the Federal Death Penalty Act of 1994 (FDPA) calls for federal executions to be done "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). At the time the Department of Justice announced that it had scheduled Purkey's execution for December 13, 2019, there was a consolidated action pending in the district court for the District of Columbia. In that case numerous death-row inmates (some of whom also had fixed execution dates) challenged the execution protocol that BOP planned to use for them. The Protocol, adopted in 2019, calls for BOP to use a single drug, pentobarbital, to carry out executions. See *Matter of Federal Bureau of Prisons' Execution Protocol Cases*, Nos. 19-mc-145 (TSC) *et al.*, 2019 WL 6691814 (D.D.C. Nov. 20, 2019).

The details of this litigation need not detain us. What is important is that the D.C. district court preliminarily enjoined the Department of Justice from moving ahead under the 2019 Protocol, noting among other things that it had taken DOJ eight years to come up with the Protocol, that the defendants had a strong interest in litigating the legality of their executions, and that a minor additional delay would not irreparably injure the government. The initial dates thus came and went with no executions. The government promptly appealed, however, and a divided panel of the Court of Appeals for the District of Columbia Circuit vacated the injunction and remanded the case to the district court. See *In re Federal Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020). The majority held that the FDPA does not compel the DOJ to follow every last detail of the relevant state's execution procedures, and that the Department did not violate the Administrative Procedure Act, because this matter is exempt from notice-and-comment rulemaking. The inmates

Case: 19-3318    Document: 36    11a    Filed: 07/02/2020    Pages: 27

immediately filed a petition for a writ of certiorari, which was docketed as No. 19-1348 under the name *Bourgeois v. Barr*. On June 29, the Supreme Court denied the petition along with an application for a stay. We have no role in the Execution Protocol litigation.

2

Purkey's *Ford* claim is, by definition, an individual one. In it, he asserts that he is now afflicted with dementia (Alzheimer's type) and schizophrenia, and that these conditions have worsened over the time he has been in prison, to the point that he no longer appreciates why he faces execution. The government contests these assertions. *Ford* holds that the Eighth Amendment bars the execution of a person who, as of the planned time for death, is "insane." See 477 U.S. at 410 (plurality opinion of Marshall, J.), 421–22 (Powell, J., concurring in the judgment). See also *Panetti v. Quarterman*, 551 U.S. 930 (2007) (confirming *Ford* holding and holding that a *Ford* claim is not ripe until execution is imminent). On February 24, 2020, the government filed a motion to dismiss the *Ford* claim, or in the alternative to transfer it from the District of Columbia (where Purkey filed it) to the Southern District of Indiana. Purkey filed his motion in opposition on March 16, and the government responded on March 20. To date, the district court has not yet ruled on the motion.

In the midst of all this, the Department of Justice issued a statement on June 15 resetting Purkey's execution date for July 15, 2020. Purkey responded with a motion filed on June 22 for a preliminary injunction barring the execution. The government's response to that motion was due on June 29, and Purkey's reply is due on July 2. We have no current role in the *Ford* litigation.

3

That brings us to the case before us, which Purkey brought under the basic habeas corpus statute, 28 U.S.C. § 2241. We held oral argument in this case on June 16, a date that had long been scheduled as of the time the government issued the new execution schedule on June 15. The most important question we must answer is whether Purkey is entitled to use section 2241. Only if the answer is yes may we reach the merits of the claims he wishes to bring.

In the great majority of cases, the exclusive post-conviction remedy for a federal prisoner is the one Purkey already has invoked: a motion under 28 U.S.C. § 2255. Strict procedures govern the way such a motion must be presented. First, there is a one-year statute of limitations, which runs from one of four dates specified in the statute. See 28 U.S.C. § 2255(f). The only relevant date in Purkey's case is the first: "the date on which the judgment of conviction becomes final." Purkey met that deadline; his section 2255 motion was the subject of the district court's decisions in *Purkey II* through *IV* and the Eighth Circuit's ruling in *Purkey V*. Second, a federal prisoner is limited to one motion under section 2255 unless he receives permission to file a second or successive motion from the appropriate court of appeals. See 28 U.S.C. § 2255(h). The criteria for authorization are draconian: they are met only if there is compelling newly discovered evidence of innocence or "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court." *Id.* Purkey concedes that he cannot satisfy either of these criteria.

Finally, the statute recognizes a narrow pathway to the general habeas corpus statute, section 2241, in the provision

that has come to be called the "safety valve." Here is what it says:

> *An application for a writ of habeas corpus* in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, *shall not be entertained* if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, *unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention*.

28 U.S.C. § 2255(e) (emphasis added). We thus turn to the question whether Purkey's case fits within the narrow confines of the safety valve.

## III

This court has had a number of opportunities to consider the safety valve, but three cases are central: *In re Davenport*, 147 F.3d 605 (7th Cir. 1998); *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001); and *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (*en banc*). The district court, regarding these three as defining the limits of the safety valve, examined each of them and concluded that Purkey's situation was distinguishable. We do not agree with the idea that those cases rigidly describe the outer limits of what might prove that section 2255 is "inadequate or ineffective to test the legality" of a person's detention, but as we will see, Purkey's case does not require us to move beyond what we already have done.

Our first occasion to find the safety valve applicable occurred in *Davenport*, a case that actually involved two defendants, Davenport and Nichols. The part of the opinion pertinent here involved Nichols. He had been convicted of using a

firearm in the commission of a drug offense, in violation of the version of 18 U.S.C. § 924(c) that existed in 1990. After his conviction and a failed motion under section 2255, the Supreme Court decided *Bailey v. United States*, 516 U.S. 137 (1995), which held that "use" for purposes of section 924(c) did not include mere possession. Because Nichols's case had involved only possession, Nichols sought relief under the All Writs Act, 28 U.S.C. § 1651. The district court rejected that motion as an attempt to evade the need to obtain permission from the court of appeals to file a successive section 2255 motion. 147 F.3d at 607.

We noted that Nichols's situation fell outside the narrow rules under which a second or successive motion may be authorized: he did not claim to have any new evidence, nor was there a new rule of *constitutional* law that applied to his case. Instead, the Supreme Court had cut the legs out from under the interpretation of his statute of conviction, leaving him in prison for actions that (as clarified by the Court) did not constitute a crime. Under those circumstances, we held that

> A procedure for postconviction relief can fairly be termed inadequate when it is so configured as to deny a convicted defendant *any* opportunity for judicial rectification of so fundamental a defect in his conviction as having been imprisoned for a nonexistent offense.

*Id.* at 611. We went on to add three qualifications to that holding. First, "the change of law has to have been made retroactive by the Supreme Court." *Id.* Second, "it must be a change that eludes the permission in section 2255 for successive motions." *Id.* And third, "'change in law' is not to be equated to a difference between the law in the circuit in which the prisoner was sentenced and the law in the circuit in which he is

incarcerated." *Id.* at 612. None of these qualifications applied to Nichols's case, and so we held that he was entitled to proceed under section 2241.

The circumstances in *Garza* were even more unusual than those in *Davenport*. Like Purkey, petitioner Garza was on federal death row awaiting execution. He had been convicted on a number of charges, including three counts of killing in furtherance of a continuing criminal enterprise, in violation of 18 U.S.C. § 848(e). The wrinkle was this: the murders in question had occurred in Mexico, and he had never been charged or convicted there for them. Instead, the jury in his U.S. prosecution had found beyond a reasonable doubt at the capital sentencing phase of his trial that he had committed the murders. See 18 U.S.C. § 3593(c) (requiring the government to prove aggravating factors beyond a reasonable doubt). After Garza exhausted his direct appeals and his motion under section 2255, he turned to the Inter-American Commission on Human Rights for relief. This Commission, established pursuant to the Organization of American States (to which the United States is a party), exists to hear this type of claim. This was the earliest point at which Garza could seek relief, because the Commission requires applicants to exhaust national remedies. The Commission concluded that "Garza's death sentence was a violation of international human rights norms to which the United States had committed itself." 253 F.3d at 920.

Garza followed up in the district court with a petition under section 2241; he conceded that he did not satisfy the criteria for a successive motion under section 2255. We concluded that he was entitled to use section 2241, because it would have been impossible under the Inter-American Commission's exhaustion rule to have sought relief there in time to include its

findings in either his direct appeal or his original section 2255 motion. The treaty on which he relied does not give rise to private rights of action, and so he could not invoke it in his original case. But, he contended, the Commission's process did create private rights. We found that this was not such an outlandish claim that our jurisdiction was defeated, although when we reached the merits in his case, we concluded that the Commission had only the power to make recommendations to the U.S. government, which remained free to take them or leave them. That was not enough to justify a stay of his execution, and so we denied his petition.

The last case in this line is *Webster*, which was decided by the *en banc* court. Once again, the result hinged on the availability of section 2241 (via the safety valve) for a federal prisoner who had completed his direct appeals and had unsuccessfully pursued a motion under section 2255. Webster found himself on death row after being convicted of the federal crime of kidnapping resulting in death and related offenses. 784 F.3d at 1124. Turning to section 2241, he sought to present "newly discovered evidence that would demonstrate that he is categorically and constitutionally ineligible for the death penalty under the Supreme Court's decisions in *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Hall* [*v. Florida*, 572 U.S. 701 (2014)]." *Id.* at 1125. At the trial, a central question was whether Webster was so intellectually impaired that he should not be subject to the death penalty. The defense introduced evidence of Webster's school records, intelligence testing, and inability to fake test results. The government responded with lay witnesses who all said that Webster "did not seem mentally retarded to them," *id.* at 1130, and experts who said that Webster was able to perform adequately in school and beyond. Throughout, the government urged that

No. 19-3318                                                        17

Webster was faking his mental limitations in an effort to avoid the death penalty.

Years after his conviction and the denial of his section 2255 motion, new counsel discovered evidence that gravely undermined the government's theory. It turned out that Webster's trial counsel had asked the Social Security Administration for records on Webster and had been told that there were none. That was wrong. In fact, the Administration had records dating from a year *before* his crime in which Webster had been described as someone whose "[i]deation was sparse and this appeared to be more of a function of his lower cognitive ability than of any mental illness." *Id.* at 1133. The same doctor concluded that Webster was both "mentally retarded and antisocial," and that there was no evidence of malingering. *Id*. There were other records to the same effect.

This was a game-changer for Webster. As we pointed out in the opinion, there was no question of late fabrication of the new evidence, and (taking the facts favorably to Webster), his lawyer had diligently sought evidence from that very source—the Social Security Administration. Counsel had no duty to continue pestering the Administration after he had been informed that it had nothing; he was entitled to take the government at its word. Moreover, these records were far from cumulative. They directly contradicted the government's assertion at trial that Webster had concocted a story of mental disability solely to avoid the death penalty. A jury aware of those records could conclude that Webster is categorically ineligible for capital punishment under the Supreme Court's decision in *Atkins*. Much more, therefore, than garden-variety newly discovered evidence was at play.

See 784 F.3d at 1140. Only by using the safety valve could Webster test the constitutionality of his capital sentence.

Purkey recognizes that his case does not fit the profile of any of the three we have just discussed, but he argues that at a broader level, he has presented the same type of problem and we should thus extend our earlier cases to his situation. In essence, he argues that section 2255 is structurally inadequate to test the legality of a conviction and sentence any time a defendant receives ineffective assistance of counsel in his one permitted motion. He recognizes that he faces a problem in the line of Supreme Court decisions holding that there is no right to counsel in collateral proceedings, and thus no right to effective assistance of counsel. See *Coleman v. Thompson*, 501 U.S. 722 (1991). But, he points out, *Coleman* is not the last word on this subject. In *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), the Supreme Court recognized that a state prisoner whose first opportunity (either *de jure* or *de facto*) to raise an ineffectiveness-of-counsel argument is in state post-conviction proceedings can avoid procedural default in a later action under 28 U.S.C. § 2254 if he can show ineffectiveness of post-conviction counsel. And, he adds, this court held in *Ramirez v. United States*, 799 F.3d 845 (7th Cir. 2015), that a federal prisoner could seek to reopen an action under section 2255 using Federal Rule of Civil Procedure 60(b) on reasoning that is analogous to *Martinez* and *Trevino*.

With that much established, Purkey jumps from the ability to use Rule 60(b) to reopen a section 2255 case to the assumption that *any* federal prisoner whose counsel is ineffective during his initial section 2255 proceeding can show that a motion under section 2255 is inadequate or ineffective and thus that he is entitled to avail himself of section 2241. At oral

argument, Purkey also offered a narrower version of this theory, applicable only to capital cases. Because defendants facing the federal death penalty have a statutory right to counsel in a section 2255 proceeding, see 18 U.S.C. § 3599(a)(2), Purkey reasons that ineffectiveness of that counsel deprives a defendant of effective collateral review and thus permits the defendant to resort to section 2241.

The government strenuously opposes this line of reasoning, which it sees as unraveling all of the restrictions Congress has imposed on collateral relief for federal prisoners. It also points out that there is a difference between lacking an opportunity to raise a claim, and having that opportunity but not using it effectively. At best, it concludes, Purkey is in the latter situation. He had and used the opportunity to raise his complaints about ineffective assistance of trial counsel during his section 2255 proceeding. The fact that new counsel have now uncovered even more instances of ineffective assistance is not surprising, but, it says, the same will be true in countless other cases. Vincit omnia finis.

## IV

Although we do not believe that *Davenport*, *Garza*, and *Webster* create rigid categories delineating when the safety valve is available—and such a finding would be inconsistent with the standard-based language of section 2255(e)—we do think that the words "inadequate or ineffective," taken in context, must mean something more than unsuccessful. We said as much in *Webster*. 784 F.3d at 1136. In *Davenport*, that something more came from the structure of the statute. Statutory problems are simply not covered in section 2255, whether through oversight or through confidence that the safety valve would solve the rare problem that arises when, because of an

intervening Supreme Court decision, a person discovers that he is in prison for something that the law does not criminalize. In *Garza*, that something more arose because of an international treaty whose machinery could not be invoked until after the person had exhausted national remedies. And in *Webster*, the combined facts of the Social Security Administration's alleged mis-information to counsel, counsel's diligence, the timing of the discovery of the critical evidence, and the constitutional ban on executing the mentally disabled had the effect of making section 2255 structurally unavailable and opening the door to the section 2241 proceeding. We need not speculate on what other scenarios might satisfy the safety valve, other than to say that there must be a compelling showing that, as a practical matter, it would be impossible to use section 2255 to cure a fundamental problem. It is not enough that proper use of the statute results in denial of relief.

At the time Purkey filed his motion under section 2255, nothing formally prevented him from raising each of the three errors he now seeks to raise in his petition under 2241. The first of those relates to the failure of trial counsel not to spot the fact that Juror 13 (whose first name was also Jennifer) had disclosed on her jury questionnaire that she too had been the victim of an attempted rape when she was 16 years old. Because trial counsel never noticed that glaring fact, he did not object to Juror 13's being seated, and she in fact served on the jury that convicted Purkey and voted for the death penalty.

We can accept as true the fact that Purkey's trial counsel missed this disturbing coincidence, and it may be likely that if counsel had noticed it and moved to strike Juror 13 for cause, such a motion would have been granted. But that is not the proper question before us now. It is instead whether,

having raised in his section 2255 motion 17 specific ways in which his trial counsel were ineffective, Purkey is now entitled to add additional allegations not by obtaining permission to file a successive section 2255 motion, but through section 2241. Purkey says yes and points to the fact that section 2255 counsel also missed the problem with Juror 13. But how far are we supposed to take that? What if we were now to permit a section 2241 proceeding, Purkey were to lose, and new counsel were to come in and discover that trial counsel also failed to make a meritorious *Batson* objection? Would the ineffectiveness of the first lawyers who litigated the section 2241 proceeding entitle him to a new section 2241 proceeding? If not, why not? And if so, what would stop a never-ending series of reviews and re-reviews (particularly since there is no numerical limit for section 2241)? Purkey has offered no satisfactory answers to these questions, and we can think of none.

Instead, as the law now stands, once a Sixth Amendment claim of ineffective assistance of counsel has been raised, as happened in Purkey's case, that is the end of the line. In evaluating applications for permission to file a second or successive petition under 28 U.S.C. § 2254 (the habeas corpus statute for state prisoners), we are required to dismiss a claim "that was presented in a prior application." 28 U.S.C. § 2244(b)(1). We apply the same rule to second or successive motions under section 2255. Pertinent here, if an applicant has already raised a Sixth Amendment ineffectiveness claim in an earlier application—even if the specific details of the ineffective performance are different—we must dismiss a new claim of ineffective assistance of the same lawyer. This rule flows from the Supreme Court's instruction to "consider the totality of the evidence before the judge or jury" in evaluating a claim of ineffectiveness, not each particular instance of ineffective

performance in isolation. *Strickland v. Washington*, 466 U.S. 668, 695 (1984).

No system is perfect, and we find it troubling that these rules will leave some people under even a sentence of death (the ultimate irrevocable action) in the position of never having received effective assistance of counsel in the critical respect. It is thus worth nothing that nothing prevents Congress from changing the rules, especially for capital cases, to ensure that the ultimate penalty is not carried out on someone who fell through the cracks and did not get the quality of legal assistance to which the Constitution entitles him. But, as we noted at the outset, in a human institution there is always some risk of error. All we can do is to strive to minimize it and to follow the law to the best of our ability.

Our analysis of Purkey's second proposed argument for his section 2241 petition is similar. Current counsel have undertaken a much more comprehensive search for, and analysis of, the extensive mitigating evidence than trial counsel or section 2255 counsel had performed. The section 2241 petition sets out this evidence over nearly 100 pages. Most of this evidence goes well beyond the evidence that post-conviction counsel presented in *Purkey II* and that the Eighth Circuit discussed in *Purkey V*. We agree with Purkey that the efforts of trial counsel to build a case for mitigation fell short of what current counsel have now found. But the critical question, as the Eighth Circuit noted in *Purkey V*, is whether there is a reasonable probability that this evidence would have changed the jury's sentencing recommendation, or if, on the other hand, it was essentially cumulative.

At this point, we must comment that we are disturbed that the jury left blank the spaces on the verdict form for its

No. 19-3318                                                        23

consideration of Purkey's many trial arguments in mitigation, and that trial counsel did not insist that the case be returned to the jury for completion of those blanks when he had the chance. If the jury really meant that it thought that Purkey had failed to carry his burden on each and every point, it should have been required to say so. Once it was focusing on mitigation, however, it may have found some points in Purkey's favor. There is no doubt, even based on only the trial evidence, that Purkey has had a hideous life. It was for the jury to balance aggravating and mitigating factors, but it is hard to know whether it did that.

Once again, however, this fault was apparent to everyone from the minute the jury returned its verdict. Trial counsel commented on it; original appellate counsel knew about it; and section 2255 counsel knew about it. We have no idea at this remove why counsel did not preserve this point throughout these proceedings. What we do know is that lawyers must pick and choose among issues, and it is not out of the question that Purkey's lawyers thought it better to focus on more promising arguments. Even if they did not analyze this point, we are left with the fundamental problem for Purkey: the mechanisms of section 2255 gave him an opportunity to complain about ineffective assistance of trial counsel, and he took advantage of that opportunity. There was nothing structurally inadequate or ineffective about section 2255 as a vehicle to make those arguments.

Finally, Purkey would like to argue that section 2255 counsel fell below the standards established by the Sixth Amendment (and perhaps section 3599(a)(2)) when counsel omitted any challenge to the use of Purkey's testimony at his suppression hearing. Recall that Purkey had confessed several times

to both local police and the FBI that he had "kidnapped" Long, meaning that he had taken her across state lines without her consent. At the suppression hearing (according to Purkey), trial counsel advised him to stick with that story, even though trial counsel knew that it was untrue and that Purkey believed that Long had gone with him willingly. This is somewhat convoluted, in our view, but as best we understand it, Purkey complied with counsel's advice at the suppression hearing and continued to maintain that he had coerced Long into driving to Kansas with him. At the suppression hearing, Purkey also wanted to show that this confession was involuntary, because he gave it only in the erroneous belief that the government was prepared to seek a lighter sentence in federal court if he confessed.

At the trial Purkey gave the jury a new version of events: he thought Long was a prostitute, she went willingly with him not only into the truck but from Missouri to Kansas, and only then did the murder occur. Obviously that would have invited prosecution from Kansas, but the link necessary for federal jurisdiction would have disappeared (or so Purkey thought). When Purkey presented his account, however, the government impeached his testimony with his statements at the suppression hearing. Trial counsel did not object, nor did he object when the government used the same statements to prove the truth of the matter in its closing argument.

These too are arguments about effectiveness of counsel that were apparent from the start. The question of Long's willingness to travel with Purkey was relevant, but it was up to the jury to decide whether to believe his confessions or his recantation. The record shows that both stories were on the record, and so the government was entitled to use his earlier

No. 19-3318                                                    25

version as impeachment. If it strayed over the line, that is a problem, but it is too late to correct it (and it is not clear to us that this would have been prejudicial, in light of all the evidence against Purkey at the trial).

V

Purkey has raised serious arguments in this appeal—particularly his points about Juror 13 and the failure to conduct an adequate mitigation investigation—and we do not mean to minimize them even though we have ruled against him. He is correct that the Supreme Court's decisions in *Martinez* and *Trevino* can be read to say that a person can overcome a procedural bar to bringing a claim of ineffective assistance of trial counsel in a federal court, if counsel in post-conviction proceedings was him- or herself ineffective. The idea of an entitlement to *one* untainted opportunity to make one's case is deeply embedded in our law. Purkey argues that he has yet to have that one opportunity. He also asks why it should matter if, in *Martinez* and *Trevino*, the ineffective lawyer was engaged in a state-court proceeding, whereas here, the ineffective lawyer was engaged in a federal-court proceeding, particularly after our ruling in *Ramirez*.

But the problem is that the availability of further relief for someone in Purkey's position is not a simple matter of federal common law. It is governed by statutes. In this case, the pertinent statute is 28 U.S.C. § 2255(e), a statute that played no part in *Ramirez*. For the reasons we have discussed, we conclude that Purkey is not entitled to raise his new arguments in a petition for a writ of habeas corpus under 28 U.S.C. § 2241. We thus AFFIRM the judgment of the district court.

Before concluding this opinion, however, we have one more piece of unfinished business to be resolved. As we noted earlier, 24 hours before the oral argument in this appeal, the government set Purkey's execution date for July 15, 2020. Purkey promptly moved for a stay of execution during the pendency of these proceedings. The government has opposed his motion.

The Supreme Court set forth the requirements for a stay in *Nken v. Holder*, 556 U.S. 418 (2009):

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* at 434. Importantly, although the *Nken* Court held that something more than a "better than negligible" chance of success is necessary, it also stressed that the injury the applicant faced in its own case was not "categorically irreparable." *Id.* at 434–35. Although we have ruled against Purkey on the merits, we have emphasized that at least two of the points he has raised are worthy of further exploration—the seating of Juror 13, and the failure of trial counsel to conduct a proper mitigation analysis. We have rejected those points not on the merits, but because of our understanding of the safety valve language, 28 U.S.C. § 2255(e). If our reading of the safety valve is too restrictive, there would be significant issues to litigate. And, unlike the alien in *Nken*, Purkey faces categorically irreparable injury—death. A brief stay to permit the orderly conclusion of the proceedings in this court will not substantially harm the government, which has waited at least seven

No. 19-3318                                                    27

years to move forward on Purkey's case. Finally, the public interest is surely served by treating this case with the same time for consideration and deliberation that we would give any case. Just because the death penalty is involved is no reason to take short-cuts—indeed, it is a reason not to do so.

For these reasons, we grant Purkey's motion on the following terms. His July 15, 2020, date of execution is temporarily stayed pending the completion of proceedings in the Seventh Circuit. This stay will expire upon the issuance of this court's mandate or as specified in any subsequent order that is issued.

28a

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 2:19-cv-00414-JPH-DLP |
| | ) | |
| UNITED STATES OF AMERICA, et al. | ) | |
| | ) | |
| Respondents. | ) | |

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

Wesley Purkey is a federal prisoner on death row at the United States Penitentiary in Terre Haute, Indiana.  He was sentenced to death 16 years ago in the United States District Court for the Western District of Missouri after a jury found him guilty of kidnapping and murdering Jennifer Long.  The conviction and sentence were affirmed on direct appeal.  Mr. Purkey sought postconviction relief under 28 U.S.C. § 2255 in the district court where he was convicted and sentenced.  That request was denied by the district court and affirmed on appeal.

Mr. Purkey cannot bring a successive § 2255 motion in the court of conviction, so he seeks relief from this Court in the form of a 28 U.S.C. § 2241 petition that raises eight claims.  These claims, however, cannot be raised and adjudicated under § 2241 because they do not fall within any of the limited circumstances the Seventh Circuit has recognized when a federal prisoner may challenge a conviction and sentence by way of § 2241.  Moreover, there is not a structural problem with § 2255 when applied to Mr. Purkey's case.  For these

1

reasons, Mr. Purkey's § 2241 action must be dismissed and his petition for a writ of habeas corpus denied.

## I.

A full recitation of the facts and procedural background is set forth in the two opinions issued by the United States Court of Appeals for the Eighth Circuit following Mr. Purkey's appeals. *See United States v. Purkey*, 428 F.3d 738, 744-46 (8th Cir. 2005) ("*Purkey I*"); *United States v. Purkey*, 729 F.3d 860, 866-68 (8th Cir. 2013) ("*Purkey II*").

### A.      Factual Background

While the details of Mr. Purkey's crimes are not relevant to the ultimate resolution of his legal claims, a brief summary is appropriate for context.

Jennifer Long, a sixteen-year-old high school sophomore, disappeared in January 1998. *Purkey I*, 428 F.3d at 745. She was walking on a sidewalk in Missouri when Mr. Purkey picked her up in his truck and drove her to his house in Kansas. *Purkey II*, 729 F.3d at 866-67. Mr. Purkey raped her and, after she attempted to escape, "became enraged and repeatedly stabbed [her] in the chest, neck, and face with [a] boning knife, eventually breaking its blade inside her body." *Id.* Mr. Purkey dismembered her body with a chainsaw, burned her remains in his fireplace, and dumped them into a septic pond. *Id.*

No one knew what happened to Jennifer Long until December 1998. *Purkey I*, 428 F.3d at 745. At that time, Mr. Purkey faced a life sentence for murdering eighty-year-old Mary Ruth Bales, whom Mr. Purkey bludgeoned to death with a hammer in her own home. *Purkey II*, 729 F.3d at 867–68. Mr.

2

30a

Purkey confessed to law enforcement that he had kidnapped, raped, and murdered Jennifer Long earlier that year. *Id.* He also admitted taking "extraordinary measures to dispose of the body, including dismembering it with a chain saw and burning the remains[.]" *Purkey I*, 428 F.3d at 745. Law enforcement recovered remnants of crushed human bones where Mr. Purkey told them he had disposed of them, and in his former house where the murder took place. Mr. Purkey led law enforcement to where he left her remains. *Id*; *Purkey II*, 729 F.3d at 867; Dkt. 33-1 at 76–78.

### B.  Procedural Background

Mr. Purkey was indicted for the kidnapping and murder of Jennifer Long on October 10, 2001, in the United States District Court for the Western District of Missouri. *See United States v. Purkey*, No. 4:01-cr-00308-FJG (W.D. Mo. Oct. 10, 2001), Dkt. 1. On November 5, 2003, a jury found Mr. Purkey guilty. *Id.*, Dkt. 461.

The separate penalty phase of the proceedings lasted seven days. Mr. Purkey's counsel presented 27 mitigating factors, including evidence of brain abnormalities and abuse as a child. Dkt. 23-37 at 94-97. The mitigation evidence included the testimony of 18 witnesses over two days. Dkt. 38-1; Dkt. 39-1; Dkt. 40-1; Dkt. 41-1; Dkt. 42-1. Finding the existence of all six statutory aggravating factors, the jury recommended a sentence of death. *Purkey*, No. 4:01-cr-00308-FJG, Dkt. 487. The District Court sentenced Mr. Purkey to death on January 23, 2004. *Id.*, Dkt. 505.

3

Mr. Purkey appealed his conviction and sentence to the United States Court of Appeals for the Eighth Circuit. He raised several challenges to the pretrial proceedings, jury selection, and the guilt and penalty phases. *Purkey I*, 428 F.3d at 746–64. One of those challenges—which is similar to claims before this Court—was that the District Court erred by accepting the mitigating factors portion of the verdict without requiring the jury to write out their specific findings. *Id.* at 763. The Eighth Circuit rejected Mr. Purkey's claims and affirmed his conviction and sentence. *Id.* at 764. Mr. Purkey's petition for writ of certiorari was denied by the United States Supreme Court on October 16, 2006. *See Purkey v. United States*, 127 S. Ct. 433 (2006).

On November 25, 2006, Mr. Purkey initiated postconviction proceedings by filing a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 in the United States District Court for the Western District of Missouri. *See Purkey v. United States*, 2009 WL 3160774 (W.D. Mo. Sept. 29, 2009). The same District Judge who presided over Mr. Purkey's trial presided over his § 2255 motion.

Mr. Purkey made 17 allegations of ineffective assistance against his trial counsel—Frederick Duchardt, Jr. and Laura O'Sullivan. *Id.* at *1-3. Mr. Duchardt submitted a 117-page affidavit to "refute" Mr. Purkey's claims. *Id.* at *2. The District Court substantially relied on Mr. Duchardt's affidavit in rejecting the ineffective assistance of counsel claims. *Id.* Mr. Purkey also alleged several due process violations. *Id.* at *3-5. The District Court rejected these claims as well and denied Mr. Purkey's § 2255 motion. *Id.* at *6. The District Court later

4

denied Mr. Purkey's Rule 59(e) motion to alter or amend the judgment, *see Purkey v. United States*, 2009 WL 5176598, *3 (W.D. Mo. Dec. 22, 2009), and his request for a certificate of appealability, *see Purkey v. United States*, 2010 WL 4386532, *10 (W.D. Mo. Oct. 28, 2010).

Mr. Purkey sought a certificate of appealability from the Eighth Circuit on several claims, *see* Dkt. 48-13, but the Eighth Circuit granted Mr. Purkey a certificate of appealability on only two of them, *see Purkey II*, 729 F.3d at 861; Dkt. 48-14. First, the Eighth Circuit permitted Mr. Purkey to raise three issues regarding the ineffectiveness of his trial counsel during the penalty phase: "(1) his alleged failure to adequately prepare and present the testimony of three expert witnesses, (2) his alleged failure to adequately investigate and prepare two mitigating witnesses, which resulted in their testimony being more prejudicial than beneficial, and (3) his alleged failure to adequately investigate and present other mitigating evidence." *Purkey II*, 729 F.3d at 862. These issues are similar to the second claim Mr. Purkey raises in this Court. Second, the Eighth Circuit permitted Mr. Purkey to challenge whether the District Court abused its discretion by denying relief without an evidentiary hearing. *Id.*

The Eighth Circuit rejected both of Mr. Purkey's claims. It reasoned that it need not decide whether Mr. Purkey could establish deficient performance—and consequently did not consider Mr. Duchardt's affidavit—because Mr. Purkey could not establish prejudice given the "particularly gruesome" nature of the crime. *Id.* at 862-68 & n.2. As to whether the District Court should have held an evidentiary hearing, the Eighth Circuit reasoned that Mr. Purkey could not

33a

establish prejudice even taking his evidence as true, so it was not an abuse of discretion to decline to hold an evidentiary hearing. *Id.* at 869.

Mr. Purkey petitioned for panel rehearing, Dkt. 48-15, which the Eighth Circuit denied on December 17, 2013, Dkt. 48-16. The Supreme Court denied Mr. Purkey's petition for writ of certiorari on October 14, 2014. *See Purkey v. United States*, 135 S. Ct. 355 (2014).

On July 25, 2019, the Department of Justice set Mr. Purkey's execution date for December 13, 2019. He filed the instant habeas petition under 28 U.S.C. § 2241 on August 27, 2019. He filed an amended petition on September 12, 2019. The petition was fully briefed on October 28, 2019.

## II.

Mr. Purkey raises eight claims in his § 2241 petition:

(1) trial counsel provided ineffective assistance by failing to challenge Juror 13;

(2) trial counsel provided ineffective assistance by failing to investigate, develop, and present compelling mitigation evidence;

(3) Mr. Duchardt perpetrated a fraud on the Court during the § 2255 proceedings by submitting an affidavit containing false and misleading statements to undermine Mr. Purkey's ineffective assistance of counsel claims;

(4) Mr. Purkey's death sentence violates the Eighth Amendment because there is a substantial possibility that the jury instructions led the jury to believe that they could not consider certain mitigating evidence;

6

(5) Mr. Purkey's death sentence violates the Sixth Amendment because the jury did not find beyond a reasonable doubt each fact necessary to impose a death sentence;

(6) imposition of the death penalty under the Federal Death Penalty Act violates the Eighth Amendment;

(7) imposition of the death penalty on individuals such as Mr. Purkey who suffer from a severe mental illness violates the Eighth Amendment; and

(8) trial counsel provided ineffective assistance by improperly advising Mr. Purkey before he testified at the pre-trial suppression hearing.  *See* Dkt. 23.

The United States takes the position that the Court cannot reach the merits of these claims because Mr. Purkey cannot raise them in a § 2241 petition.  Dkt. 49.  That's true if Mr. Purkey cannot meet the requirements of 28 U.S.C. § 2255(e)—commonly referred to as the Savings Clause.  *See Webster v. Daniels*, 784 F.3d 1123, 1135 (7th Cir. 2015) (en banc).  Mr. Purkey argues that some of his claims meet these requirements.  Dkt. 23; Dkt. 58.

## III.

The Court begins its analysis by examining the statutory framework governing federal prisoners' postconviction challenges.  The Court next assesses whether Seventh Circuit precedent requires or allows Mr. Purkey's claims to proceed under the Savings Clause.  The Court then turns to Mr. Purkey's arguments for recognizing a new category of claims that can be brought via § 2241.

35a

### A.   Statutory   Framework   for   Federal   Prisoners   Seeking Postconviction Relief

The only way a federal prisoner may pursue postconviction relief in a separate civil action is under 28 U.S.C. §§ 2255 and 2241.

#### 1.  Section 2255

"As a general rule, a federal prisoner wishing to collaterally attack his conviction or sentence must do so under § 2255." *Chazen v. Marske*, 938 F.3d 851, 856 (7th Cir. 2019).   Congress has placed limitations on a federal prisoner's ability to bring a § 2255 action.   First, such action can only be brought in the court which imposed the sentence.   28 U.S.C. § 2255(a).   Second, a federal prisoner is limited to bringing one § 2255 motion, unless the court of appeals for the district where the action is filed determines that a second or successive motion contains:

> (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or

> (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

28 U.S.C. § 2255(h).

#### 2.  The Savings Clause and Section 2241

Congress created within § 2255 a narrow exception to the "general rule" that requires a federal prisoner to bring a collateral attack under § 2255—the Savings Clause.   Under the Savings Clause, a prisoner can seek a writ of habeas corpus through an action under § 2241 if the prisoner can show "that the remedy

8

by [§ 2255] motion is inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e). Unlike a § 2255 action, which must be brought in the district where the sentence was imposed, a § 2241 action must be brought in the district where the prisoner is in custody. *Webster*, 784 F.3d at 1124.

Consistent with the "general rule," the Savings Clause "steers almost all prisoner challenges to their convictions and sentences toward § 2255" and away from § 2241. *Shepherd*, 911 F.3d 861, 862 (7th Cir. 2018). Consequently, a federal prisoner may seek relief under § 2241 "[o]nly in rare circumstances where § 2255 is inadequate or ineffective to test the legality of the prisoner's detention . . . ." *Light v. Caraway*, 761 F.3d 809, 812 (7th Cir. 2014) (citations and quotations omitted). To determine whether Mr. Purkey's petition presents such a "rare circumstance," the Court looks to Seventh Circuit precedent.

### B. Instances Where the Seventh Circuit has Found the Savings Clause to Apply

Determining whether § 2255 is inadequate or ineffective is a "very knotty procedural issue" of "staggering" complexity. *Chazen*, 938 F.3d at 855-56. While it is "hard to identify exactly what [the Savings Clause] requires," *id.* at 863 (Barrett, J., concurring), several guiding principles have emerged from the cases.

Section 2255 is inadequate or ineffective as applied to a specific case only where there is "some kind of structural problem with section 2255." *Webster*, 784 F.3d at 1136. A structural problem requires "something more than a lack of success with a section 2255 motion." *Id.* It must "foreclose[] even one round of effective collateral review, unrelated to the petitioner's own mistakes." *Poe v.*

9

*LaRiva*, 834 F.3d 770, 773 (7th Cir. 2016) (citation and quotation omitted). Section 2255 is inadequate or ineffective where the court finds that the federal prisoner did not have "a reasonable opportunity [in a prior § 2255 proceeding] to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *Chazen*, 938 F.3d at 856 (alteration in original) (quoting *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998)).

Applying these principles, the Seventh Circuit has found a structural problem with § 2255 in three instances:

1.   When a claim is based on a new rule of *statutory* law made retroactive by the Supreme Court.  *See Davenport*, 147 F.3d at 610.

2.   When a claim is based on a decision of an international tribunal that could not have been raised in an initial § 2255 motion.  *See Garza v. Lappin*, 253 F.3d 918, 920 (7th Cir. 2001).

3.   When a claim is based on limited types of new evidence that "would reveal that the Constitution categorically prohibits a certain penalty."  *Webster*, 784 F.3d at 1139.

*See id.* at 1135–36 (analyzing *Davenport*—which contains the Seventh Circuit's "most extensive treatment" of the Savings Clause—and *Garza* when setting out the Seventh Circuit's Savings Clause precedents); *see also Fulks v. Krueger*, 2019 WL 4600210, *3 (S.D. Ind. Sept. 20, 2019).  The parties appear to agree that these three cases identify the structural problems with § 2255 recognized by the Seventh Circuit.  *See* Dkt. 49 at 38–42; Dkt. 58 at 7–9.

38a

1. *Davenport*

In *Davenport*, the Seventh Circuit found a structural problem in § 2255 because § 2255(h) does not permit federal prisoners to file a second or successive § 2255 motion raising claims based on new *statutory* law. The petitioner sought the benefit of a Supreme Court decision changing the Seventh Circuit's interpretation of a statute that existed at the time of his first § 2255 motion. *Davenport*, 147 F.3d at 610. Because the Supreme Court changed the governing law after the petitioner's § 2255 proceedings had concluded, he "could not [have] use[d] a first motion under [§ 2255] to obtain relief on a basis not yet established by law." *Id.* Nor could he have received authorization to file "a second or other successive motion [under § 2255(h)] . . . because the basis on which he [sought] relief [was] neither newly discovered evidence nor a new rule of *constitutional* law." *Id.* (emphasis added); *see Poe*, 834 F.3d at 773 ("Where *Davenport* recognized a structural problem in § 2255(h) is in the fact that it did not permit a successive petition for new rules of *statutory* law made retroactive by the Supreme Court."). This structural problem was fixed in *Davenport* "by effectively giving such prisoners the relief that they would have had if § 2255(h)(2) had included them." *Chazen*, 938 F.3d at 864 (Barrett, J., concurring).

The Seventh Circuit has "developed a three-part test implementing *Davenport*'s holding." *Beason v. Marske*, 926 F.3d 932, 935 (7th Cir. 2019). The petitioner must establish that:

> (1) the claim relies on a statutory interpretation case, not a constitutional case and thus could not have been invoked by a successive § 2255 motion; (2) the petitioner could not have invoked

11

the decision in his first § 2255 motion and the decision applies retroactively; and (3) the error is grave enough to be deemed a miscarriage of justice.

*Id.*

2. *Garza*

In *Garza*, the Seventh Circuit again found a structural problem with § 2255 rooted in § 2255(h).  After the conclusion of the petitioner's first § 2255, he received a decision from the Inter-American Commission on Human Rights finding that his rights were violated during the penalty phase of his criminal trial.  *Garza*, 253 F.3d at 920.  The petitioner wished to use this decision to challenge his death sentence.  *Id.*  Notably, the petitioner could not have petitioned the Inter-American Commission on Human Rights for relief until he had exhausted his "national remedies"—that is, until after he had filed a § 2255 motion.  *Id.*  Because it was "literally impossible" for the petitioner to have raised his claim in his § 2255 motion, there was a structural problem with § 2255 in that it did not "provide[] an adequate avenue for testing Garza's present challenge to the legality of his sentence."  *Id.* at 922–23.  Simply put, the petitioner could not have raised his claim in his initial § 2255, nor, as in *Davenport*, could he have received authorization to file a second or successive § 2255 motion under § 2255(h).  *Id.* at 923.

3. *Webster*

In *Webster*, the Seventh Circuit held for the first and only time that the Savings Clause was met for a constitutional claim.  The petitioner in *Webster* sought to challenge his death sentence as barred by *Atkins v. Virginia*, 536 U.S.

12

40a

304 (2002), which held that the Eighth Amendment forbids the execution of a person with an intellectual disability.  Although the petitioner had raised an *Atkins* claim in his § 2255 proceeding, he wished to present "newly discovered evidence" to support that claim in his § 2241 petition.  *Webster*, 784 F.3d at 1125.

The Seventh Circuit found that "there is no categorical bar against resort to section 2241 in cases where new evidence would reveal that the Constitution categorically prohibits a certain penalty."  *Id.* at 1139.  The structural problem identified by the Seventh Circuit was based on at least two concerns.  First, § 2255(h)(1) only allows a second or successive § 2255 motion if newly discovered evidence meets a certain threshold to demonstrate that the petitioner is not guilty of the *offense.  Id.* at 1134–35, 1138.  It does not allow for such motions if the petitioner presents newly discovered evidence that the petitioner is ineligible to receive his *sentence.  Id.*  Second, Congress could not have contemplated whether claims of categorical ineligibility for the death penalty should be permitted in second or successive § 2255 motions because the relevant cases— *Atkins* and *Roper v. Simmons*, 543 U.S. 551 (2005)[1]—had not been decided when § 2255 was enacted.  *Webster*, 784 F.3d at 1138 ("[T]he fact that the Supreme Court had not yet decided *Atkins* and *Roper* at the time AEDPA was passed supports the conclusion that the narrow set of cases presenting issues of constitutional ineligibility for execution is another lacuna in the statute."); *id.* at

---

[1] In *Roper*, the Supreme Court held it violates the Eighth and Fourteenth Amendments to impose "the death penalty on offenders who were under the age of 18 when their crimes were committed."  543 U.S. at 578.

1139 ("In Webster's case, the problem is that the Supreme Court has now established that the Constitution itself forbids the execution of certain people: those who satisfy the criteria for intellectual disability that the Court has established, and those who were below the age of 18 when they committed the crime.").

*Webster* is the first and only time the Seventh Circuit permitted a constitutional claim to proceed through the Savings Clause. Indeed, the court "took great care to assure that its holding was narrow in scope." *Poe*, 834 F.3d at 774. It limited its holding to the narrow legal and factual circumstances presented in the case, stating explicitly that the case "will have a limited effect on future habeas corpus proceedings." *Webster*, 784 F.3d at 1140 n.9; *see Poe*, 834 F.3d at 774 ("[T]here is nothing in *Webster* to suggest that its holding applies outside the context of new evidence.").

To fall within *Webster*'s holding, the new evidence must meet three conditions:

> First, the evidence sought to be presented must have existed at the time of the original proceedings. . . . Second, the evidence must have been unavailable at the time of trial despite diligent efforts to obtain it. Third, and most importantly, the evidence must show that the petitioner is constitutionally ineligible for the penalty he received. Because the Supreme Court has declared only two types of persons (minors and the intellectually disabled) categorically ineligible for a particular type of punishment, our ruling is as a matter of law limited to that set of people—those who assert that they fell into one of these categories at the time of the offense. These three limitations are more than adequate to prevent the dissent's feared flood of section 2241 petitions[.]

*Webster*, 784 F.3d at 1140 n.9. It's thus "a rare case" that qualifies. *Id.* at 1140.

14

In sum, the Seventh Circuit has found a structural defect in § 2255 in three instances, each limited to a narrowly identified specific type of claim.

### C.   Mr. Purkey's Claims Do Not Fit within Any of the Instances Where the Seventh Circuit Has Found the Savings Clause to Apply

Mr. Purkey's claims do not fall within the holdings of *Davenport*, *Garza*, or *Webster*.   Mr. Purkey's claims are all constitutional rather than statutory, so none of them meet *Davenport*'s first requirement. *See Poe*, 834 F.3d at 773 (explaining that *Davenport* "preclude[s] use of § 2241 for a constitutional case"). The structural defect in § 2255 identified in *Davenport*—that § 2255(h) does not permit successive § 2255 motions "for new rules of *statutory* law made retroactive by the Supreme Court," *id.*—therefore does not apply to any of his claims.

Mr. Purkey's claims do not fit within *Garza*'s narrow holding.   Unlike the petitioner's claims in *Garza*—which were based on the decision of an international tribunal and could not possibly have been raised in his initial § 2255 motion—Mr. Purkey's claims are common constitutional claims that can be raised in a § 2255 motion and thus do not implicate the structural concern identified in *Garza*.   Notably, the Seventh Circuit has recognized that *Garza* involved "'very unusual facts' . . . [and thus] its applicability beyond those facts is limited."   *Kramer v. Olson*, 347 F.3d 214, 218 n.1 (7th Cir. 2003) (quoting *Garza*, 253 F.3d at 921).

Last, Mr. Purkey's claims do not fall within *Webster*'s narrow holding. Among other limitations, *Webster* only applies to claims that an individual is

15

43a

"categorically ineligible for the death penalty," such as claims under *Atkins* and *Roper*. *Webster*, 784 F.3d at 1138-40; *see id.* at 1140 n.9 ("Because the Supreme Court has declared only two types of persons (minors and the intellectually disabled) categorically ineligible for a particular type of punishment, our ruling is as a matter of law limited to that set of people—those who assert that they fell into one of these categories at the time of the offense.").[2]  Only one of Mr. Purkey's claims meets this requirement—his claim that *Atkins* should be extended to preclude execution of those who are mentally ill.  Dkt. 23 at 199.  But Mr. Purkey does not present any argument that this claim meets the Savings Clause, let alone a specific argument that it meets the requirements of *Webster* by, for example, showing that the claim relies on newly discovered evidence that existed at the time of the original proceeding.  *See* Dkt. 23; Dkt. 58.  Accordingly, Mr.

---

[2] For the first time in his reply, Mr. Purkey presents a cursory argument for why the Savings Clause is met for Claim 4 (that the jury instructions led the jury to believe that they could not consider certain mitigating evidence) and Claim 6 (the death penalty violates the Eighth Amendment).  *See* Dkt. 58 at 67-69.  He argues that Claim 4 falls within *Webster* because he relies on new evidence—namely, juror affidavits that purportedly show that jurors misunderstood the jury instructions.  *Id.* at 66-67.  But, as explained, this claim does not meet *Webster*'s third limitation.

As to Claim 6, he argues that this claim relies on new law—the Supreme Court's decision in *Hurst v. Florida*, 136 S. Ct. 616 (2016)—and thus his claim falls within *Garza* and *Webster*.  Dkt. 58 at 68-69.  *Webster* is of no assistance for this claim, as it does not rely on new evidence.  *Poe*, 834 F.3d at 774 ("[T]here is nothing in *Webster* to suggest that its holding applies outside the context of new evidence.").  *Garza* is also of no assistance, as nothing in it suggests that simply relying on a new legal precedent can meet the Savings Clause.  If it did, *Garza* would not be described by the Seventh Circuit as having only "limited" applicability beyond its "very unusual facts.'"  *Kramer*, 347 F.3d at 218 (quoting *Garza*, 253 F.3d at 921).

16

44a

Purkey's claims cannot proceed through the Savings Clause via the structural defect in § 2255 identified in *Webster*.

Recognizing that his claims do not fall within the specific holdings of *Davenport, Garza,* or *Webster,* dkt. 58 at 7-8, Mr. Purkey argues that he can nonetheless meet the general Savings Clause test set forth in these cases. *Id.* at 7-9. In other words, Mr. Purkey asks this Court to extend the Seventh Circuit's Savings Clause precedents to new types of claims. The Court now turns to these arguments.

### D.   The *Martinez–Trevino* Doctrine Does Not Apply to Mr. Purkey's Case

Mr. Purkey's only fully developed Savings Clause argument is for his ineffective assistance of trial counsel claims (Claims 1, 2, and 8).[3] *See* Dkt. 23 at 11-19; Dkt. 58 at 6-19. Mr. Purkey argues that his ineffective assistance claims meet the Savings Clause because he "has not had a meaningful opportunity to present" them to any Court. Dkt. 23 at 15.

There is no dispute that Mr. Purkey could not have raised these ineffective assistance claims on direct appeal and that he cannot raise them now in a second or successive § 2255 motion. Dkt. 23 at 12, 15; Dkt. 49 at 36. Mr. Purkey could not have raised his ineffective assistance claims on direct appeal because, except in rare circumstances, such claims "should be pursued in a collateral proceeding under 28 U.S.C. § 2255." *United States v. Moody,* 770 F.3d

---

[3] Mr. Purkey does not advance any argument for why the Savings Clause is met for Claims 5 and 7, and the cursory arguments for why his other claims meet the Savings Clause are addressed in Section III.C above.

17

577, 582 (7th Cir. 2014); *see United States v. Bryant*, 754 F.3d 443, 444 (7th Cir. 2014) ("A claim of ineffective assistance need not, and usually as a matter of prudence should not, be raised in a direct appeal, where evidence bearing on the claim cannot be presented and the claim is therefore likely to fail even if meritorious."). He cannot raise them now in a second or successive § 2255 motion because his claims do not meet the criteria in § 2255(h).

That leaves the failure to raise the claims in his initial § 2255 proceeding. Mr. Purkey maintains that he did not raise them because § 2255 counsel was ineffective.[4] Dkt. 23 at 13-18. Mr. Purkey argues that he may raise these claims now in this § 2241 action based on *Martinez v. Ryan*, 566 U.S. 1 (2012), *Trevino v. Thaler*, 569 U.S. 413 (2013), and *Ramirez v. United States*, 799 F.3d 845, 853 (7th Cir. 2015). Dkt. 23 at 16-17. The United States argues that neither the *Martinez–Trevino* doctrine nor *Ramirez* relate to the Savings Clause analysis, and that this Court should not extend the holdings of those cases to the entirely different legal question presented here. Dkt. 49 at 42-47.

1. The *Martinez–Trevino* Doctrine

The Court begins with the *Martinez–Trevino* doctrine. Both *Martinez* and *Trevino* involved state prisoners whose ineffective assistance of trial counsel claims were deemed procedurally defaulted by a federal court because the claims were not properly raised in state court.

---

[4] Because Mr. Purkey's claims must be rejected for other reasons, the Court does not address whether § 2255 counsel provided ineffective assistance by not adequately investigating and presenting Mr. Purkey's ineffective assistance of trial counsel claims.

18

In *Martinez*, appointed postconviction counsel failed to raise an ineffective assistance claim in an Arizona collateral proceeding. Martinez's postconviction relief case was dismissed. About a year and half later, Martinez obtained new counsel and filed new ineffective assistance of counsel claims in a second Arizona collateral proceeding. The petition was dismissed because Martinez had not raised these claims in his first collateral proceeding. After exhausting all postconviction procedures available under Arizona law, Martinez sought habeas relief in federal court.

The District Court denied relief on the basis that Martinez had procedurally defaulted his ineffective assistance claims by not properly raising them in state court. After the Ninth Circuit affirmed, the Supreme Court granted certiorari to answer the "precise question" of "whether ineffective assistance in an initial-review collateral proceeding on a claim of ineffective assistance at trial may provide cause for a procedural default in a federal habeas proceeding." *Martinez*, 566 U.S. at 9. The Supreme Court held that if state law requires state prisoners to raise ineffective assistance of trial counsel claims "in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel *or counsel in that proceeding was ineffective*." 566 U.S. at 17 (emphasis added).

In *Trevino*, the Court considered "whether, as a systematic matter, Texas affords meaningful review of a claim of ineffective assistance of trial counsel." *Trevino*, at 425. Concluding it did not, the Court extended the holding of

19

*Martinez* to jurisdictions like Texas where, although one can technically raise ineffective assistance of trial counsel claims on direct review, the "structure and design" of the system make that "virtually impossible."  569 U.S. at 416.

2.  The Extension of the *Martinez–Trevino* Doctrine in the Seventh Circuit

In *Ramirez*, the Seventh Circuit addressed, to a limited extent, whether the *Martinez–Trevino* doctrine applies in the context of a federal § 2255 proceeding. The petitioner was a federal prisoner who failed to timely appeal the denial of his § 2255 motion because § 2255 counsel abandoned him.  799 F.3d at 847. Consequently, he was not able to obtain appellate review of his § 2255 proceeding.  *Id.* at 849.  The petitioner then "moved under Federal Rule of Civil Procedure 60(b)(6) for relief from the judgment," arguing "that postconviction counsel was ineffective for causing him to miss the appeal deadline."  *Id.* at 848. The District Court denied the motion, believing that "there is no right to counsel on collateral review."  *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722 (1991)).

The Seventh Circuit resolved two issues.  It first found that the petitioner was not "trying to present a new reason why he should be relieved of either his conviction or sentence" but instead was "trying to reopen his existing section 2255 proceeding and overcome a procedural barrier to its adjudication."  *Id.* at 850.   Under these circumstances, the Seventh Circuit concluded that the petitioner's Rule 60(b)(6) motion was permitted and was "not a disguised second or successive motion under section 2255."  *Id.*

The Seventh Circuit next concluded that the *Martinez–Trevino* doctrine applies to federal prisoners "who bring motions for postconviction relief under

20

48a

section 2255." *Ramirez*, 799 F.3d at 852. Therefore, under Rule 60(b)(6), the petitioner could argue that § 2255 counsel's abandonment allowed him to file an otherwise untimely appeal. *Id.* at 854 ("We see no reason to distinguish between actions at the state level that result in procedural default and the consequent loss of a chance for federal review [as happened in *Martinez* and *Trevino*], and actions at the federal level that similarly lead to a procedural default that forfeits appellate review.").

3. Mr. Purkey's Claims Cannot Proceed Under *Martinez, Trevino*, or *Ramirez*

Mr. Purkey argues that under *Ramirez*, he may now raise claims of ineffective assistance of trial counsel that were not raised in his § 2255 action due to ineffective assistance of § 2255 counsel. Acknowledging that he cannot bring a second or successive § 2255 action, Mr. Purkey argues that he nonetheless has the right to judicial review of his § 2255 proceeding. Dkt. 23 at 15-18. More specifically, he argues that he must be able to present his claims in a § 2241 action and that *Ramirez* supports opening this avenue of review.

The Court disagrees. *Martinez, Trevino,* and *Ramirez* do not involve the Savings Clause and thus are not controlling. Moreover, nothing in *Ramirez* suggests that its holding regarding *Martinez–Trevino* applies outside of the § 2255 context. The Seventh Circuit framed the second legal question in *Ramirez* as whether *Martinez* and *Trevino* "apply to some or all federal prisoners who bring motions for postconviction relief *under section 2255.*" 799 F.3d at 852 (emphasis added). But this says nothing about whether *Martinez–Trevino* has any role in demonstrating whether the Savings Clause is met and thus whether § 2241 is

21

49a

available.  Further, applying *Martinez–Trevino* to the narrow circumstances of a Rule 60(b) motion in a § 2255 proceeding does not create a rule that federal prisoners must have an alternative way to raise ineffective assistance of postconviction counsel when § 2255 is closed.  *Ramirez* does not address these questions at all.  And unlike the petitioner in *Ramirez,* Mr. Purkey had appellate review of his § 2255 case.  Applying it here would therefore require a substantial extension of *Ramirez,* and the Seventh Circuit has rejected other opportunities to do so.  *Cf. Lombardo,* 860 F.3d at 559 (holding that *Ramirez* should not be extended to the equitable tolling context).

Moreover, *Ramirez* has been construed narrowly by the Seventh Circuit to the facts involving abandonment of counsel.  *See Lombardo v. United States*, 860 F.3d 547, 559 (7th Cir. 2017) ("[N]otwithstanding its discussion of *Martinez* and *Trevino* and its embracing of the principles underlying those cases, *Ramirez*'s holding is best construed as resting on [counsel] abandonment."); *see also Adams v. United States*, 911 F.3d 397, 404 n.2 (7th Cir. 2018) (citing *Ramirez* for the proposition that "[a]bandonment by counsel" can qualify as a procedural defect that can be raised in a Rule 60(b) motion following the denial of § 2255 relief).

For these reasons, the Court rejects Mr. Purkey's argument that ineffective assistance of trial counsel claims that rely on *Martinez–Trevino* meet the Savings Clause.[5]  Mr. Purkey does not cite any federal court that has accepted this

---

[5] Mr. Purkey argues, in reply, that the *Martinez–Trevino* doctrine permits his fraud-on-the-Court claim (Claim 3) to proceed in this action.  Dkt. 58 at 57-58.

22

argument, and the federal courts that have considered this argument have rejected it. *See, e.g.*, *United States v. Sheppard*, 742 F. App'x 599 (3d Cir. 2018) (rejecting the petitioner's argument that *Ramirez* shows he meets the Savings Clause because he can raise the *Martinez–Trevino* issue in a Rule 60(b) motion in the underlying § 2255; "Section 2255 together with Rule 60(b) thus plainly is not inadequate or ineffective to test the legality of [the petitioner's] conviction and sentence such that he may resort to a § 2241 habeas corpus petition."); *Rojas v. Unknown Party*, 2017 WL 4286186, *6 (D. Ariz. May 16, 2017) ("*Martinez* and *Trevino* do not impact the [Savings Clause] analysis or otherwise apply to § 2241 petitions. Simply stated, *Martinez* and *Trevino* were based on the narrow ground of procedural default in the context of a § 2254 petition. The reasoning of these cases has never been extended or applied by any court to a § 2241 petition."); *see also Dinwiddie v. United States*, No. 2:18-cv-00149-JPH-MJD, Dkt. 25 (S.D. Ind. July 25, 2019); *Jackman v. Shartle*, 535 F. App'x 87, 89 n.5 (3d Cir. 2013).

The Court concludes that neither *Ramirez* nor any other precedent requires it to grant Mr. Purkey the relief he seeks.

### E. There is No Structural Problem with § 2255 When Applied to Mr. Purkey's Case

To the extent that *Ramirez* may authorize, without requiring, the Court to extend *Ramirez*'s holding to the Savings Clause context, the Court declines to do so. There is no structural problem with § 2255 when applied to the facts of Mr.

---

For the same reasons it does not permit his ineffective assistance claims to proceed, the Court rejects this contention.

Purkey's case.  While Mr. Purkey did not succeed with his § 2255 motion, a structural problem requires "something more than a lack of success with a section 2255 motion."  *Webster*, 784 F.3d at 1136.  It must "foreclose[] even one round of effective collateral review, unrelated to the petitioner's own mistakes." *Poe v. LaRiva*, 834 F.3d 770, 773 (7th Cir. 2016) (citation and quotation omitted). That's not the case here.

In his § 2255 action, Mr. Purkey made 17 allegations of ineffective assistance against his trial counsel.  Those claims were heard and adjudicated by the District Court, and the denial of them was affirmed by the Eighth Circuit. The record demonstrates that Mr. Purkey had "'a *reasonable* opportunity [in a prior § 2255 proceeding] to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence.'"  *Chazen*, 938 F.3d at 856 (quoting *Davenport*, 147 F.3d at 609) (emphasis added); *see Davenport*, 147 F.3d at 609 ("Nothing in 2255 made the remedy provided by that section inadequate to enable Davenport to test the legality of his imprisonment. He had an unobstructed procedural shot at getting his sentence vacated.").  A reasonable opportunity does not include the opportunity to years later second-guess the selection of the claims that were asserted in the § 2255 action, pick new or "better" claims, and have those claims subject to judicial review in another judicial district.  Applied to the facts of Mr. Purkey's case, § 2255 is not inadequate or ineffective.

Moreover, allowing Mr. Purkey's ineffective assistance claims to be brought in a § 2241 proceeding would be contrary to the statutory framework Congress

24

52a

created for federal prisoners seeking postconviction relief.  Congress amended § 2255 in 1996 as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA").  Most relevant here, AEDPA limits federal prisoners to one § 2255 motion unless they receive authorization from the Court of Appeals to file a second or successive § 2255 motion.  28 U.S.C. § 2255(h).  This limitation was designed to curtail the problem of "repetitive filings" from federal prisoners challenging their convictions.  *Garza*, 253 F.3d at 922.

Congress chose to "steer[] almost all [federal] prisoner challenges to their convictions and sentences toward § 2255."  *Shepherd*, 911 F.3d at 862.  It did so by requiring § 2255 motions be filed in the district of conviction, *Light*, 761 F.3d at 812, and limiting federal prisoners' access to § 2241 by way of the Savings Clause.  *See Davenport*, 147 F.3d at 609 ("The purpose behind the enactment of section 2255 was to change the venue of postconviction proceedings brought by federal prisoners from the district of incarceration to the district in which the prisoner had been sentenced."  (citing *United States v. Hayman*, 342 U.S. 205, 212-19 (1952)).

Section 2255 "not only relieved the district courts where the major federal prisons were located from a heavy load of petitions for collateral relief; it also enhanced the efficiency of the system by assigning these cases to the judges who were familiar with the records."  *Webster*, 784 F.3d at 1145.

The Savings Clause "must be applied in light of [§ 2255's] history."  *Taylor v. Gilkey*, 314 F.3d 832 (7th Cir. 2002); *see Unthank v. Jett*, 549 F.3d 534, 535 (7th Cir. 2008) (same).  It cannot be interpreted so expansively that it

25

undermines "the careful structure Congress has created." *Garza*, 253 F.3d at 921; *see Chazen*, 938 F.3d at 865 (Barrett, J., concurring) (expressing "skeptic[ism]" of an argument that, if accepted, "risks recreating some of the problems that § 2255 was designed to fix").

In the limited instances where the Seventh Circuit has found the Savings Clause met, the Court crafted narrow holdings so as to not "creat[e] too large an exception to the exclusivity of section 2255." *Webster*, 784 F.3d at 1140; *see id.* at 1140 n.9. Here, that's not possible. The petitioners in *Davenport*, *Garza*, and *Webster* each presented a very specific "problem" based on a unique set of facts presented. In each case the relief granted was symmetrical, and thus inherently limited to a very small category of cases involving scenarios that could not or were not foreseen by Congress. In *Davenport*, for example, the petitioner's "problem" was that § 2255(h) did not permit a successive petition for new rules of statutory law. To fix this problem, the Seventh Circuit crafted a narrow exception with three specific requirements limiting when and how a petitioner could pass through this exception. *See Beason*, 926 F.3d at 935; *Davenport*, 147 F.3d at 610-12.

Here, there is no very specific "problem" based on a unique set of facts that could be remedied through a narrowly drawn rule that would apply to a very small category of cases. Mr. Purkey's "problem" is that after availing himself of the postconviction relief process created by Congress, including appellate review, he did not get the outcome that he wanted on his claims of ineffective assistance

of counsel.   But there is no "something more," *Webster*, 784 F.3d at 1136, so there is no structural problem with § 2255.

Unlike the limited types of claims that the Seventh Circuit has held to meet the Savings Clause in *Davenport* (statutory claims based on a retroactive change in the law), *Garza* (claims based on new decisions from international tribunals), and *Webster* (*Atkins* or *Roper* claims based on newly discovered evidence that existed at the time of the original proceedings and could not be discovered through reasonable diligence), Mr. Purkey asks the Court to allow ineffective assistance of trial counsel claims to proceed through the Savings Clause on the basis that § 2255 counsel was ineffective.   But unlike the relatively narrow categories of claims allowed to proceed in *Davenport*, *Garza*, and *Webster*, ineffective assistance of trial claims are ubiquitous.   *See Burt v. Titlow*, 571 U.S. 12, 19 (2013) (emphasizing that ineffective assistance of counsel claims are "common" and have been "adjudicated in countless criminal cases for nearly 30 years").   To allow such a frequently litigated claim to be raised in a § 2241 petition would dismantle the very structure of § 2255.   "If error in the resolution of a collateral attack were enough to show that § 2255 is inadequate or ineffective, many of the amendments made in 1996 would be set at naught." *Taylor*, 314 F.3d at 836.

**IV.**

For the foregoing reasons, the claims Mr. Purkey presents in his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 are barred by the Savings Clause, 28 U.S.C. § 2255(e).   His ineffective assistance of trial counsel

55a

claims (Claims 1, 2, and 8) are rejected for the reasons set forth in Sections III.D and III.E. His remaining five claims fail to fall within any of the Seventh Circuit's Savings Clause precedents, and Mr. Purkey does not advance any basis for extending those precedents to these claims. Accordingly, his petition is denied with prejudice. *See Prevatte v. Merlak*, 865 F.3d 894, 901 (7th Cir. 2017) (explaining that dismissals pursuant to § 2255(e) are with prejudice).

Because the Court has resolved Mr. Purkey's claims, his motion to stay his execution pending resolution of his claims, dkt. [4], is **denied** as moot. Final Judgment consistent with this Order shall issue.

**SO ORDERED.**

Date: 11/20/2019

*James Patrick Hanlon*
_____
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Brian Patrick Casey
U.S. ATTORNEY'S OFFICE
brian.casey@usdoj.gov

Michelle M. Law
FEDERAL DEFENDER -- WESTERN DISTRICT OF MISSOURI
michelle_law@fd.org

Kathleen D. Mahoney
UNITED STATES ATTORNEY'S OFFICE
kate.mahoney@usdoj.gov

Brian L. Reitz
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
brian.reitz@usdoj.gov

56a

Jeffrey E. Valenti
UNITED STATES ATTORNEY'S OFFICE
jeff.valenti@usdoj.gov

Rebecca Ellen Woodman
REBECCA E. WOODMAN, ATTORNEY AT LAW, L.C.
rewlaw@outlook.com

29